**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION**

MUNICIPAL EMPLOYEES' RETIREMENT
SYSTEM OF MICHIGAN,

      Plaintiff,

vs.

Case No.

Hon.

VERDANTF AG, BERRY POLMANN, and
GAIA ARNABOLDI,

      Defendants.

_____

Miller, Canfield, Paddock and Stone, P.L.C.
Scott R. Eldridge (P66452)
Matthew P. Allen (P57914)
Erika L. Giroux (P81998)
123 West Allegan St., Suite 200
Lansing, Michigan 48933
(517) 487-2070
eldridge@millercanfield.com
allen@millercanfield.com
giroux@millercanfield.com
*Attorneys for Plaintiff*

_____

## **COMPLAINT**

1.      The Municipal Employees' Retirement System of Michigan ("MERS") is a statutorily-created public corporation charged with administering retirement plans for employees of Michigan's local units of government, including the police officers, firefighters, waste collectors, and state-court judges who keep Michigan's communities safe, clean, and orderly.

2.      Verdant*f* AG ("Verdantf"), run by its two principals, Berry Polmann and Gaia Arnaboldi, is an offshore investment outfit that represented to MERS that it was a qualified investment adviser that would provide expert fiduciary investment management services on behalf

of Michigan's hardworking public employees. MERS originally engaged Verdantf in 2015 to provide investment advice to MERS and negotiate and manage various investments on behalf of MERS, including executing investment-related documents on behalf of MERS under a power of attorney.

3.     This put MERS in a vulnerable position with Verdantf. MERS was reliant on Verdantf's, Polmann's, and Arnaboldi's fiduciary duties to MERS under the securities laws, common law, and their Investment Management Agreement to act in MERS' best interests when exercising Verdantf's discretion on how best to invest MERS' assets. These legal and fiduciary duties exist because of the potent opportunity such discretion provides to advisers like Defendants to act unlawfully, or even fraudulently, for example: by using MERS' funds to purchase highly conflicted, personal interests in the same investments they bought for MERS; continuing to invest MERS' funds into these conflicted, poorly performing investments to try and salvage their personal, conflicting interests; and failing to inform MERS of material information to prevent MERS from learning the details of Defendants' mismanagement and rampant conflicts of interest in these investments.

4.     Only when MERS fired Verdantf and hired another investment adviser did MERS discover that Defendants did all of this and more. Defendants' failures to fulfill their legal and fiduciary obligations to act solely in MERS' best interest with the degree of care, skill, prudence, and diligence required of advisers in their position were egregious, and their efforts to conceal these failures and hide their conflicting interests constitute clear fraud.

5.     In particular, Defendants decided to invest MERS' assets in a series of alternative energy companies collectively known as Concord Blue. Unbeknownst to MERS, Polmann and Arnaboldi each purchased personal stakes in the same Concord Blue investments. While this

investment at first had the potential for a high upside, as time went on, it should have become apparent to Verdantf that the investment was failing.

6.      However, rather than divesting MERS from the Concord Blue investment, Defendants instead doubled down, pouring more of MERS' funds into Concord Blue because they were attempting to salvage their undisclosed, conflicted personal interests in these investments.

7.      Defendants' breaches of fiduciary duty, fraud, and clear conflicts of interest kept MERS in the Concord Blue investment that failed to provide MERS with any real return—MERS has yet to recover tens of millions of dollars that Verdantf invested on MERS' behalf in Concord Blue. This is all because Defendants wantonly misused the retirement funds of thousands of Michiganders and put their own interests ahead of the Michigan retirees whose interests Defendants had a duty to protect.

8.      Defendants' fraud, negligence, and other flagrant misconduct in managing MERS' assets and the mismanagement of the Concord Blue investment, among other misconduct, constitute breaches of fiduciary duty, breaches of Verdantf's contractual obligations to MERS, securities fraud, common law fraud and misrepresentation, negligent misrepresentation, and silent fraud.

## Parties, Jurisdiction, and Venue

9.      MERS was first created by the Michigan Legislature in 1945 to manage and administer retirement and other post-employment benefits for employees of municipalities and judicial courts. *See* 1945 PA 135 and 1984 PA 427 (known as the "Municipal Employees Retirement Act"), codified at Mich. Comp. Laws §§ 38.1501, *et seq.*

10.     In 1996, MERS' status changed from that of a State agency to become a "public corporation" that is "an instrumentality of [its] participating municipalities and participating

courts," *see* Mich. Comp. Laws § 38.1502c(3), but it continued to perform the same functions, *see* 1996 PA 220.

11.     MERS serves the post-employment benefits needs of more than 1,000 Michigan municipalities and judicial courts. As part of its mission, MERS contracts with investment managers like Verdantf to manage and invest the plan contributions received from MERS' participating municipalities and courts and their employees.

12.     MERS' principal offices are located at 1134 Municipal Way, Lansing, Michigan 48917.

13.     Verdantf is a private investment asset management company focused on investments in renewable energy, waste conversion, and agriculture.

14.     Verdantf is a Swiss regulated public limited company. Verdantf's principal offices were located at Gladbachstrasse 105, CH-8044, Zurich, Zurich, Switzerland, and later Dreikönigstrasse 33, CH-8002, Zurich, Zurich, Switzerland, and its principal place of business is in Switzerland.

15.     Verdantf was founded in 2015 by Polmann and Arnaboldi, who remained its two principals during the term of Verdantf's relationship with MERS.

16.     Polmann and Arnaboldi reviewed and/or approved all of the investment decisions and strategies pursued by Verdantf during the term of its relationship with MERS.

17.     Like Verdantf, Polmann and Arnaboldi acted as MERS' investment advisers and managers during the term of the relationship between Verdantf and MERS.

18.     Upon information and belief, Polmann is a citizen of and resides in Switzerland. Polmann does not reside in and is not domiciled in the State of Michigan.

19.    Upon information and belief, Arnaboldi is a citizen of and resides in Switzerland. Arnaboldi does not reside in and is not domiciled in the State of Michigan.

20.    Jurisdiction is proper in this Court under 28 U.S.C. § 1332 because there is complete diversity of citizenship between Plaintiff and Defendants and the amount in controversy exceeds $75,000.

21.    This Court also has jurisdiction over MERS' claims under the Securities Exchange Act of 1934 pursuant to 28 U.S.C. § 1331 and supplemental jurisdiction over MERS' state law claims pursuant to 28 U.S.C. § 1367.

22.    This Court has personal jurisdiction over Defendants because Defendants knowingly and voluntarily agreed to perform investment management and advisory services for and assumed fiduciary duties to a Michigan public corporation that operates solely within the State of Michigan and provides services to Michigan municipal employees.

23.    Verdantf also expressly "submit[ted] to the jurisdiction of the court of the State of Michigan, or of the United States Federal District Court sitting in the Western District of the State of Michigan, over any action, suit, or proceeding arising out of or relating to" the Investment Management Agreement between MERS and Verdantf dated March 7, 2016 ("IMA"). (Ex. 1, IMA § 8.9). This action arises out of and relates to the IMA.

24.    Venue is proper in this District because a substantial part of the events giving rise to the claims occurred in this judicial District and because Defendants are subject to personal jurisdiction in this District. *See* 28 U.S.C. § 1391(b)(2), (3).

25.    Verdantf also expressly consented to suit in this Court in the IMA between MERS and Verdantf. (Ex. 1, IMA § 8.9).

**MERS and Verdantf Enter into an Investment Management and Advisory Relationship**

26.     MERS engaged Verdantf beginning in 2015 as part of a strategy designed to identify emerging real asset managers.

27.     Prior to 2015, Polmann and Arnaboldi had provided investment advisory and management services to MERS while they were employed with their previous investment advisory firm, Adveq. MERS relied on Adveq to ensure that it was appropriately registered and in compliance with all applicable securities laws, which, based on MERS' information and belief, it was.

28.     While investing almost always involves some degree of mixed results, MERS was generally satisfied with the performance of its investment portfolio under Polmann and Arnaboldi's management at Adveq. During that time, Polmann and Arnaboldi had generally pursued sound investment strategies and provided sound investment advice to MERS.

29.     Polmann and Arnaboldi left Adveq in or around 2015 and founded Verdantf.

30.     Because of the established relationship with Polmann and Arnaboldi and their track record at Adveq, MERS had a sound reason for believing and trusting that Polmann and Arnaboldi understood MERS' investment goals and objectives and that Polmann and Arnaboldi would be able to pursue sound investment strategies and provide sound investment advice to MERS at Verdantf. Relatedly, this provided MERS a sound reason to trust Defendants with discretion to act in MERS' best interests.

31.     Initially, in June 2015, MERS engaged Verdantf to manage MERS' investment in ROMO Wind Holding AG, a Danish wind energy technology company, and then, in December 2015, to manage MERS' investment in Agricola Cerro Prieto ("ACP"), a corporate farm in Peru that produces avocados, blueberries, and asparagus.

32.    Effective March 7, 2016, MERS and Verdantf entered into the IMA, pursuant to which Verdantf agreed to oversee a pool of $150 million in assets referred to as the "MERS Real Assets Account" or "MERS Account." (Ex. 1, IMA §§ 1.1, 1.2).

33.    The IMA provided Verdantf with "full fiduciary responsibility for the management and investment of the funds in the MERS Account," subject to certain specific limitations in the IMA. (Ex. 1, IMA §§ 1.1, 3.13)

34.    Specifically, Verdantf agreed that it was "a fiduciary to MERS and shall comply with those applicable fiduciary duties of an Investment Fiduciary set forth in the Investment Act," *i.e.*, the Michigan Public Employee Retirement System Investment Act ("<u>PERSIA</u>"). (Ex. 1, IMA § 3.13; *see also id.* § 2.1).

35.    As such, Verdantf agreed that it would "be responsible for **all** due diligence regarding potential and consummated investments made under the MERS Account . . ." (Ex. 1, IMA § 1.8) (emphasis added).

36.    To effectuate the investment management arrangement, MERS granted power of attorney to Verdantf's managing partners, Polmann and Arnaboldi. (Ex. 1, IMA § 7.1).

37.    Verdantf warranted that it had the qualifications and requisite legal and regulatory approvals to advise on and manage MERS' investments. (Ex. 1, IMA §§ 3.1, 3.5–3.6, 3.11).

38.    Verdantf further agreed that it would not engage in "transactions in which it has a conflicting material interest (direct or indirect) without prior written consent from MERS" and that it would "immediately notify MERS if this section is breached and all material details regarding the conflicts of interest." (Ex. 1, IMA § 3.14).

39.    And Verdantf agreed to "keep accurate and detailed accounts and records of its services" consistent with applicable laws and regulations and "provide MERS . . . with such

documents, reports, data, and other information at such times as MERS may reasonably require," including, specifically, quarterly and annual financial statements. (Ex. 1, IMA §§ 1.4–1.6).

40.    For a time, Defendants appeared to be successfully managing MERS' assets in a manner that was consistent with MERS' risk profile and investment goals and objectives, including the ACP investment.

41.    However, while Verdantf initially presented promising opportunities for investment, as time went on, Defendants proved to be both poor managers and poor allocators of capital, failing to adequately perform diligence on potential investments to the degree required of an institutional-quality private equity real asset manager, failing to divest MERS from investments that proved to be underperforming (likely in part because of undisclosed conflicts of interest), and failing to adequately plan for the allocation of existing capital based on the amounts available, MERS' needs, and the underlying investments.

## Defendants Fail to Build the Structural Capabilities at Verdantf to Effectively Manage the MERS Relationship

42.    When Polmann and Arnaboldi founded Verdantf in 2015, MERS sought to position itself as an early strategic partner of Verdantf to capitalize on its deal flow and potentially supplement returns through an alliance, expecting that Defendants would be successful in building out Verdantf's business into a larger institutional investment management firm.

43.    However, while Verdantf seemed to have an eye for identifying unique real asset investment opportunities, as time went on, it became apparent that Verdantf was not as capable as Defendants had represented it to be with respect to the management side.

44.    For example, Verdantf never scaled up an in-house team capable of managing MERS' extensive assets. Rather, over the course of its relationship with MERS, Verdantf lost one of its three partners and one of its two senior strategic advisers, and Defendants failed to replace

either with adequate substitutes. Instead, Verdantf relied on contract employees for modeling and some operations work. And Verdantf never hired an administrator to establish a back-office functionality suitable for institutional investors.

45.     More substantively, Defendants never developed appropriate policies at Verdantf for investment valuation, which led to inconsistencies, and never created a culture of compliance.

46.     Verdantf further proved to be poor at allocating capital, as Defendants failed to adequately conduct due diligence on new investments to the degree required of an institutional-quality private equity real asset manager, and further failed to plan for the allocation of existing capital based on amounts available, MERS' needs, and the underlying investments.

**Defendants Fail to Register as Investment Advisers Under State or Federal Law, Which Helps Them Avoid Registration and Disclosure Obligations and Facilitate Their Misconduct and Breaches of Duty**

47.     Defendants also had affirmative duties to act in the best interests of MERS and the hardworking Michiganders whose retirement funds it manages, and to avoid all conflicts of interests with MERS unless they were clearly disclosed and approved in writing.

48.     Defendants were investment fiduciaries to MERS under PERSIA, which requires investment fiduciaries like Defendants to "discharge his or her duties solely in the interest of the participants and the beneficiaries." Mich. Comp. Laws § 38.1133(2).

49.     Defendants were investment advisers to MERS under PERSIA and the Investment Advisers Act of 1940 ("IAA") because there were paid to advise MERS as to the value of securities investments and the advisability of investing in or buying securities and provided MERS with analysis concerning securities. 15 U.S.C. § 80b-2(11).

50.     As such, Defendants had a legal obligation to register as investment advisers under the IAA. 15 U.S.C. § 80b-3(a). Further, under PERSIA, Defendants were required to be either

federally registered advisers under the IAA or registered under the Michigan Uniform Securities Act ("<u>MUSA</u>"). Mich. Comp. Laws § 38.1133(11)(a).

51.    "Michigan's Legislature enacted [MUSA] to protect the public from fraud and deception . . . by regulating the persons who are involved in the offer and sale of securities." *Pransky v. Falcon Group, Inc.*, 874 N.W.2d 367, 373 (Mich. Ct. App. 2015).

52.    Like the IAA, MUSA affirmatively prohibits a person from transacting business in Michigan as an investment adviser or investment adviser representative unless they are so registered. Mich. Comp. Laws §§ 451.2403(1), 451.2404(1), 451.2506, 451.2509(5). Violators are liable to their client for all the investment management fees they paid, 6% interest, and attorney fees. Mich. Comp. Laws § 451.2509(5).

53.    The U.S. Supreme Court has also defined Defendants' duties as investment advisers under the securities laws as follows:

> The Investment Advisers Act of 1940 thus reflects a congressional recognition 'of the delicate fiduciary nature of an investment advisory relationship, as well as a congressional intent to eliminate, or at least to expose, all conflicts of interest which might incline as investment adviser—consciously or unconsciously—to render advice which was not disinterested.

*SEC v. Capital Gains Res. Bureau, Inc.*, 375 U.S. 180, 191–92 (1963).

54.    The legal and fiduciary duties on Defendants to appropriately register triggers a host of required filings, disclosures, and compliance promises that will better protect investors like the beneficiaries of MERS.

55.    Here, MERS was especially vulnerable to and reliant on Defendants because Defendants accepted powers of attorney that allowed Defendants unfettered discretion to purchase or sell interests in various investments, thus heightening Defendants' fiduciary duties.

56.    MERS reasonably relied on Defendants to ensure they were appropriately registered.

57.    Verdantf warranted and represented to MERS in the IMA that Defendants would be appropriately registered. (Ex. 1, IMA §§ 3.1, 3.5–3.6, 3.11).

58.    MERS discovered later that neither Verdantf, Polmann, nor Arnaboldi had properly registered as investment advisers or investment adviser representatives under Michigan or federal law.

**Verdantf Invests Millions of Dollars of MERS' Assets in Concord Blue, and Defendants Engage in a Financially Conflicted Deal**

59.    Shortly after finalizing the IMA, Verdantf invested $25 million of the MERS Real Asset Account in Concord Blue Development, LLC ("CB Development") in exchange for a 0.000001% ownership interest and 27.167% voting interest. (Ex. 2, CB Dev. Membership Interest Subscription Agmt. § 2.01(a); Ex. 3, Am. & Restated CB Dev. LLC Agmt. § 3.04(a), Ex. A).

60.    MERS agreed with investing in Concord Blue because its ultimate goal was to obtain interests in the projects (*i.e.*, the equity and real assets) that would be developed with the technology that Concord Blue was developing. Defendants were all aware that was MERS' investment strategy and a key reason for approving the Concord Blue investment.

61.    MERS' $25 million was deposited into an escrow account and was to be "used . . . exclusively" to "develop, finance, construct, equip, test, operate, maintain and repair the Core Projects"—two alternative energy projects in Herten, Germany, and Eagar, Arizona—unless otherwise approved by CB Development's management Board. (Ex. 2, CB Dev. Membership Interest Subscription Agmt. §§ 2.07, 5.02(a), Ex. C).

62.    Under the Membership Interest Subscription Agreement, MERS was to receive an equity interest in the Core Projects "valued at US$15,000,000" upon the release of $5,000,000 from the escrow account. (Ex. 2, CB Dev. Membership Interest Subscription Agmt. § 5.02(a)).

63. Under the Amended and Restated Limited Liability Company Agreement, if the Core Projects did not receive critical amounts of external funding within two years, then MERS had the right to redeem its membership shares in exchange for a corresponding portion of the original $25,000,000 paid by MERS. (Ex. 3, Am. & Restated CB Dev. LLC Agmt. § 3.09(b)).

64. The Amended and Restated Limited Liability Company Agreement further provided that MERS was allotted one seat on CB Development's Board so long as it maintained at least a 7.5% voting interest and two seats on the Board if it maintained a 25% voting interest. (Ex. 3, Am. & Restated CB Dev. LLC Agmt. § 6.02(a)(i)(B)).

65. As part of the CB Development transaction, both Polmann and Arnaboldi were appointed to CB Development's management Board. (Ex. 3, Am. & Restated CB Dev. LLC Agmt. § 6.02(a)(iii), Ex. B).

66. Polmann and Arnaboldi signed the *Membership Interest Subscription Agreement* (Ex. 2) and *Amended and Restated Limited Liability Company Agreement* (Ex. 3) effectuating the CB Development investment on behalf of MERS.

67. Around the same time, Verdantf also used $10,500,000 of the MERS Real Asset Account to acquire 30,534 common stock shares (a 15% equity interest) in Concord Blue Energy, Inc. ("CB Energy"). (Ex. 4, CB Energy Stock Purchase Agmt., Recitals, Sched. 3.01(*l*)).

68. As part of that transaction, Polmann was appointed to CB Energy's Board of Directors on behalf of MERS. (Ex. 5, 2d Am. & Restated S'holders Agmt. § 2.1(B)). MERS was entitled to retain a seat on CB Energy's Board of Directors so long as it owned at least 2.5% of CB Energy's stock. (*See id.*).

69. CB Energy and its other shareholders also agreed that, as long as MERS retained at least 2.5% ownership of CB Energy, they would not, without MERS' or its Board representative's

approval, "amend or repeal the Company's [CB Energy's] Charter or bylaws or the charter or bylaws (or equivalent organizational documents) of any subsidiary of the Company: (i) in any manner that affects the Shares owned by the Investor [MERS] or the rights of the Investor . . ." (Ex. 5, 2d Am. & Restated S'holders Agmt. § 3.3(A)).

70.    Polmann and Arnaboldi signed the *Stock Purchase Agreement* (Ex. 4) and *Second Amended and Restated Shareholders' Agreement* (Ex. 5) effectuating the CB Energy investment on behalf of MERS.

71.    CB Energy and CB Development were both part of a network of private companies based in Germany seeking to develop hydrogen energy technology.

72.    Although they were based in Germany, both CB Energy and CB Development were organized under the laws of the State of Delaware.

73.    CB Energy owned the remaining 72.833% voting interest in CB Development that was not owned by MERS following the March 2016 transactions. (Ex. 3, Am. & Restated CB Dev. LLC Agmt., Ex. A).

74.    Other companies in the Concord Blue family included Concord Blue Patent GmbH ("CB Patent"), a private German patent holding entity, as well as Concord Blue Engineering GmbH ("CB Engineering"), a private German entity that employed engineers to execute on the company's vision.

75.    CB Engineering was also a shareholder of CB Energy and sold MERS a portion of its shares to facilitate MERS' ownership interest. (*See* Ex. 4, CB Energy Stock Purchase Agmt. Sched. 3.01(*l*)).

76.    At the same time, Verdantf, CB Development, and CB Energy entered into a *Partnering Agreement*, pursuant to which CB Development agreed to "establish an investment

13

subsidiary CB CAPITAL [] for raising and managing External Capital" for waste conversion projects, which would be wholly owned by CB Development. (Ex. 6, Partner. Agmt. § 5).

77.    Under the Partnering Agreement, Verdantf agreed to "manage CB CAPITAL" and to "share revenues derived from the management of CB CAPITAL[] with MERS." (Ex. 6, Partner. Agmt. § 5).

78.    In other words, through the Partnering Agreement, Defendants set it up so that they, too, stood to profit from the Concord Blue deal. This created a financial conflict of interest by incentivizing Defendants to maintain MERS' position in the Concord Blue investment past the point when it was apparent that doing so was not in MERS' best interests so that Defendants could financially benefit.

79.    Polmann and Arnaboldi signed the *Partnering Agreement* (Ex. 6) on behalf of Verdantf.

80.    To date, it remains unclear to MERS what action, if any, Verdantf ever took to facilitate the goals of the Partnering Agreement. Rather than seeking external project funding, it appears that Verdantf simply continued funding the projects with MERS' money.

## Verdantf Continues Committing Millions of Dollars of MERS' Assets to Concord Blue Despite a Lack of Returns, and Polmann and Arnaboldi Acquire Additional Conflicted Personal Investments

81.    Between May 2016 and November 2017, Polmann and Arnaboldi, as members of the CB Development Board, consented to the release of $16,175,581 from the MERS escrow account to CB Development.

82.    Even though MERS had released more than $5,000,000 from the escrow account to CB Development, MERS was not issued an equity interest in the Core Projects. (*See* Ex. 7, CB Dev. 2016 Fin. Stmt., Note 6).

83.     Instead, despite no clear signs of positive performance by Concord Blue, Polmann and Arnaboldi chose to continue funneling MERS' assets into the Concord Blue venture, this time directly cutting themselves in on the deal.

84.     On December 21, 2017, Verdantf purchased a 25% interest for MERS in CB Patent for $12,699,497.80, while Polmann and Arnaboldi *each* purchased a 2.5% interest in CB Patent for just $1 each. (Ex. 8, Unit Purchase Agmt.; Ex. 9, 1st Amend. to Unit Purchase Agmt.).

85.     In other words, in a "heads, I win; tails, you lose" move, Polmann and Arnaboldi put all of the financial risk of this investment on MERS while taking an interest for themselves for essentially no money and no risk—if the investment succeeded, it would be to Polmann and Arnaboldi's benefit, but if not, it would come at no financial loss to either Polmann or Arnaboldi (only to MERS).

86.     Polmann and Arnaboldi signed the *Unit Purchase Agreement* (Ex. 8) and *First Amendment to Unit Purchase Agreement* (Ex. 9) effectuating the CB Patent investment on behalf of MERS.

87.     Despite the funds in the CB Development escrow being bookmarked for CB Development and the Core Projects, Polmann and Arnaboldi authorized the release of *all* remaining funds in that escrow account ($8,861,990) to fund a portion of the CB Patent purchase.

88.     On January 17, 2018, Verdantf sent MERS a draw down notice directing payment of $3,831,572 for the purpose of "reballancing [sic] MERS' Exposure to CBD [CB Development], acquiring an [sic] 25% initial share in Concord Blue Patent GmbH, CB's global patent portfolio and a 25% of all future cash flow derived from this portfolio." (Ex. 10, Drawdown Notice 005).

89.     Verdantf then directed the payment of these funds ($3,837,508 in total) to CB Patent for the remaining purchase price.

90.     Defendants took these actions and continued to invest MERS' funds in Concord Blue despite the fact that Defendants had apparently caused CB Development to "cease all CB Eagar activities as Verdantf/MERS have not been supporting since end of 2016 and CBE [CB Energy] is no longer in a position to continue supporting." (Ex. 11, CB Dev. Q4 2017 Fin. Report, p.15).

91.     While a lack of returns is not atypical in the early years when investing in a startup venture, Defendants, given their unique level of involvement with Concord Blue, were or should have been aware of red flags and other key indicators that the projects were not progressing in the manner originally contemplated or likely to lead to sustained success.

92.     A reasonable and prudent investment adviser or manager in Defendants' position would certainly have recognized the potential problems with the Concord Blue investment at this point and would either have diversified MERS' investment portfolio, divested the Concord Blue investment in whole or in part, or become more actively engaged in exercising oversight and management rights in the venture, or at least would not have engaged in these transactions without building in additional protections for MERS. Defendants failed to take any of those actions.

93.     Not only were Defendants not carrying out their fiduciary and legal duties to act in MERS' best interests in prudently investing and managing this investment, but Defendants were also engaged in clear and obvious conflicted self-dealing and fraud.

94.     Throughout this time, Verdantf, Polmann, and Arnaboldi continually misrepresented to MERS the health of the Concord Blue entities and investments and failed to disclose material information regarding the performance of these investments. These misrepresentations and omissions including concealing the financial health of Concord Blue, greatly exaggerating Concord Blue's prospects for signing a commercial deal for its technology,

16

and misleadingly claiming that Concord Blue had a pipeline of projects, purportedly worth billions of dollars, and was ready to close deals imminently.

**Verdantf Pours More of MERS' Assets into Concord Blue to Prop Up the Venture While Concealing that a Key Strategic Partner Had Pulled Out**

95.     On November 24, 2020, Polmann and Arnaboldi, on behalf of MERS, signed a *Second Amendment to Amended and Restated Limited Liability Company Agreement* (Ex. 12) regarding CB Development that substantially altered MERS' ownership and voting rights.

96.     Specifically, that Agreement acknowledged that CB Development lacked the funds to redeem MERS' membership shares. (Ex. 12, 2d Amend. to Am. & Restated LLC Agmt. § 1.01(b)).

97.     On behalf of MERS, Polmann and Arnaboldi agreed to allow CB Development to substitute equity interests in CB Energy for redemption of its CB Development shares. (Ex. 12, 2d Amend. to Am. & Restated LLC Agmt. § 1.01(b)).

98.     To MERS, Polmann and Arnaboldi portrayed their negotiation of this conversion right as a prudent investment decision.

99.     On behalf of MERS, Polmann and Arnaboldi further agreed to allow CB Development to substitute equity interests in CB Energy for the $15,000,000 equity interest that MERS was supposed to have received in the Core Projects. (Ex. 12, 2d Amend. to Am. & Restated LLC Agmt. § 4.01).

100.    Cumulatively, the stock substitutions and transactions in this Agreement wiped out MERS' interest in CB Development and converted that entire interest to a 38.5% minority share in CB Energy. (*See* Ex. 12, 2d Amend. to Am. & Restated LLC Agmt. fig. 4.2, 5.1; Ex. 13, CB Energy 2021 Fin. Stmt. Note 6, p.13).

101.    Defendants knew that MERS had agreed to the Concord Blue investment because of the potential for returns from the alternative energy projects that Concord Blue was supposed to develop.

102.    Yet Defendants engaged in transactions on MERS' behalf that gave away MERS' redemption rights, which were supposed to be a safeguard for MERS if the investment did not pan out, and resulted in MERS' capital being deployed in a technology company with no projects.

103.    Shortly thereafter, in November 2020, Verdantf committed MERS to a €2,375,000 "bridge loan" (equal to $2,862,071 USD at the time) to Infinite Fuels, a German company developing a waste-to-hydrogen project using CB Energy's technology, to be made in three installments. (Ex. 14, IF Bridge Loan Facility Agmt.).

104.    Polmann signed the *Bridge Loan Facility Agreement* (Ex. 14) on behalf of MERS.

105.    The procceds of the loan were supposed to be paid by Infinite Fuels to CB Engineering to start work on the project CB Energy was contracted to oversee. (Ex. 14, IF Bridge Loan Facility Agmt. § 2.2).

106.    Verdantf represented to MERS that the Infinite Fuels bridge loan was "pretty much no risk 12% aanual [sic] coupon for MERS" because it claimed the loan was guaranteed through the "EU Life Program." (Ex. 15, 11/6/2020 WhatsApp Message Excerpt; Ex. 16, Draw Down Notice 033).

107.    This was a lie. In reality, the Infinite Fuels bridge loan was not guaranteed and was high-risk because Infinite Fuels was insolvent. Despite knowing about Infinite Fuels' insolvency proceeding while it was pending, Verdantf elected to take no action to mitigate the loss of $2,862,071, or to try to recoup any of MERS' assets through the insolvency process.

108.    In addition, despite knowing that the driving force behind MERS' approval of the Concord Blue investment was the involvement of Lockheed Martin and the Exclusive Teaming Agreement that Lockheed Martin had signed with Concord Blue regarding waste-to-energy facility projects, Verdantf failed to effectively manage that relationship or to disclose material information about the Concord Blue/Lockheed Martin relationship.

109.    Rather, from 2016 until June of 2021, Verdantf represented to MERS that the relationship with Lockheed Martin was continuing as anticipated, with Lockheed Martin tweaking the technology design and changing components where necessary, which resulted in some delays to the project.

110.    Yet, in June of 2021, Verdantf suddenly told MERS that CB Energy terminated the collaboration because Lockheed Martin failed to diligently pursue the partnership due to other business pursuits.

111.    In reality, and contrary to Defendants' misrepresentations, Lockheed Martin terminated the Teaming Agreement due to CB Energy and CB Development failing to pay Lockheed Martin $2 million when due on October 18, 2019, and failing to cure the nonpayment for more than a year and a half thereafter. (Ex. 17, LM Termination Ltr.).

112.    It also turned out that Defendants had misrepresented to MERS that the project delays were the results of Lockheed Martin's strategic decisions, rather than Concord Blue's failure to develop the technology.

113.    Defendants knew or should have known about the nonpayment and the reasons for Lockheed Martin's termination of the Teaming Agreement because Polmann and/or Arnaboldi were on the Boards of CB Development and CB Energy.

114.    The loss of this key strategic partner—apparently due to financial mismanagement by CB Energy and CB Development—should have prompted Verdantf to, at the very least, reevaluate the Concord Blue investment.

115.    But despite knowing that Lockheed Martin's involvement with Concord Blue was the driving reason behind MERS' approval of the investment, Verdantf completely failed to de-risk the investment when the relationship with Lockheed Martin terminated.

116.    Instead, Defendants continued pouring MERS' money into Concord Blue. Defendants apparently made these decisions because of their own lack of competence as investment advisers and because Defendants were worried about salvaging their own interests in these projects.

117.    On June 7, 2021, almost contemporaneously with the Lockheed Martin termination, Polmann and Arnaboldi, on behalf of MERS, signed a *Bridge Loan to Land Sale Loan Agreement* (Ex. 18), pursuant to which MERS agreed to pay CB Energy $1,830,000 for the land on which the facility for one of the Core Projects, in Herten, Germany, was located.

118.    However, even though this $1,830,000 payment was made to CB Energy, MERS never received any land transfer.

119.    On August 13, 2021, Verdantf sent MERS a draw down notice directing payment of $3,550,000, that would "provide MERS a controlling interest in Concord Blue while providing working capital until the financial close of the German projects." (Ex. 19, Draw Down Notice 043).

120.    On December 2, 2021, Polmann and Arnaboldi, on behalf of MERS, signed a *New Equity Purchase Agreement* (Ex. 20), pursuant to which MERS agreed to pay CB Energy $11,380,000, "to fund Concord Blue operations to the end of the year . . . and into 2022" (§ 2).

121.    This New Equity Purchase Agreement converted MERS' $1,830,000 "loan" from June 2021 into an equity investment in CB Energy and required MERS to pay an additional $6,000,000, on top of the $3,550,000, it had recently paid to "fund Concord Blue operations."

122.    MERS made that $6,000,000 payment to CB Energy on December 10, 2021.

123.    This new equity investment in CB Energy was a further departure from what Defendants knew was MERS' rationale for investing in Concord Blue in the first place—to own interests in projects (*i.e.*, real assets)—and into higher-risk territory of investing in a pre-revenue company.

124.    Shortly thereafter, on December 28, 2021, Polmann and Arnaboldi, acting through CB Patent Investments LLC, acquired a 2.5% interest in CB Energy. (Ex. 21, Stock Purchase Agmt.). CB Patent Investments LLC also already owned a 2.5% interest in CB Patent. (Ex. 22, List of CB Patent Shareholders).

125.    On the same date, Verdantf entered into a *Membership Interest Purchase Agreement* (Ex. 23), pursuant to which it agreed to buy out the other owners of CB Patent Investments LLC. That transaction meant that Polmann and Arnaboldi beneficially owned the entirety of CB Patent Investments LLC, as well as CB Patent Investments LLC's ownership interests in CB Patent and CB Energy.

126.    Defendants failed to disclose that transaction to MERS at the time it occurred.

127.    Defendants also failed to disclose to MERS that this acquisition was done following a lawsuit brought by CB Patent Investment LLC's former owner against Christopher "Charlie" Thannhäuser, who wholly owned CB Patent's controlling shareholder, CT Power GmbH ("CT Power"). Upon information and belief, that lawsuit involved breaches of fiduciary duty,

mismanagement, and disputes over control and information rights. Defendants did not disclose the existence of that lawsuit to MERS.

128.    Thannhäuser, through CT Power, owns a majority of CB Patent and a significant minority in CB Energy. He is a primary developer and control person of the entire Concord Blue project.

129.    In other words, Polmann and Arnaboldi, directly and through Verdantf, bought out the interests in Concord Blue of an investor who believed that Concord Blue's key control person and executive (Thannhäuser) had engaged in mismanagement and breaches of fiduciary duty.

130.    A reasonably prudent investment adviser and manager in that situation would have at least seriously evaluated the Concord Blue investment at that point given the allegations against Thannhäuser and almost certainly would have adopted risk mitigation strategies to protect MERS' position.

131.    Unsurprisingly, given their own conflicted investment in Concord Blue, Polmann and Arnaboldi did not, and instead continued trying to salvage the investment rather than de-risking MERS' position.

132.    On October 24, 2022, MERS paid another $1,000,000 to CB Energy "for working capital." (Ex. 24, Draw Down Notice 057).

133.    On February 23, 2023, Polmann and Arnaboldi, on behalf of MERS, signed a *Convertible Loan Agreement* (Ex. 25), pursuant to which MERS agreed to pay CB Energy another $4,800,000, "for . . . helping [CB Energy] during its fundraising process." That $4,800,000 was paid to CB Energy on February 27, 2023.

134.    A reasonable investment adviser or manager in Defendants' position would certainly have recognized the potential problems with the Concord Blue investment at this point

and would either have diversified MERS' investment portfolio, divested the Concord Blue investment in whole or in part, or become more actively engaged in exercising oversight and management rights in the venture, or at least would not have engaged in these transactions without building in additional protections for MERS. At a bare minimum, at this point, Defendants should have had a meaningful discussion with MERS regarding the direction of the Concord Blue projects, potential exposure risks, and options for de-risking and divesting. Defendants failed to take any of those actions.

135.    Throughout this time, Verdantf, Polmann, and Arnaboldi continually misrepresented to MERS the health of the Concord Blue entities and investments and failed to disclose material information regarding the performance of these investments. These misrepresentations and omissions including concealing the financial health of Concord Blue, greatly exaggerating Concord Blue's prospects for signing a commercial deal for its technology, and misleadingly claiming that Concord Blue had a pipeline of projects, purportedly worth billions of dollars, and was ready to close deals imminently.

## MERS Terminates the Verdantf IMA and Learns of Additional Mismanagement by Verdantf

136.    Although MERS did not yet know the full extent of Defendants' mismanagement of its investments, by the summer of 2023, based on the Concord Blue investment's (at best) stagnant lack of return, Verdantf's persistent failure to scale up its operations to meet the needs of an institutional investor like MERS, and other concerns about Verdantf's ability to effectively

manage MERS' assets, MERS terminated the IMA by letter dated June 28, 2023, which termination became effective July 28, 2023.  (Ex. 26, Termination Ltr.).[1]

137.    Only after Verdantf's termination did MERS begin learning the true extent of Defendants' mismanagement, misrepresentations and omissions, and breaches of fiduciary duty with respect to Concord Blue.

138.    For one, MERS learned that Defendants had withheld from MERS significant documentation relating to the Concord Blue transactions. Had these documents been timely shared with MERS, MERS would have been able to effectively monitor its investment in Concord Blue, to request additional information regarding the investment, to understand the structure of and risks associated with that investment, and to take (or direct Defendants to take) corrective action when it became apparent that the investment was at risk of failure.

139.    MERS also learned that Defendants had consistently and repeatedly, over a course of years, misrepresented and/or failed to disclose to MERS numerous facets of the Concord Blue transactions, including material information about the Concord Blue entities and investments and the performance of these investments. Significantly, this included information regarding Concord Blue's failure to develop any alternative energy projects and its capabilities to do so, despite the fact that Defendants knew the investment in real asset projects was a key factor in MERS' investment decision.

140.    In addition, MERS learned that, from December 28, 2022 through February 5, 2023, unbeknownst to MERS, Verdantf—in its own capacity—issued a series of bridge loans to CB Energy totaling €730,303.39, which were convertible into CB Energy equity at a valuation of

---

[1] The same day MERS issued its termination notice, Polmann and Arnaboldi, purportedly acting on behalf of MERS, signed <u>another</u> *Convertible Loan Agreement* (Ex. 27) that rolled the $1,000,000 "working capital" payment from October 2022 into a convertible loan.

$18 million. These bridge loans underscore that Defendants' primary motivation was to prop up the Concord Blue project rather than to effectively represent MERS' interests.

141.    More recently, MERS received a CB Patent Shareholder Resolution dated January 25, 2025, which purports to amend CB Patent's Articles of Association to provide that assignment of CB Patent shares requires no shareholder consent, and that a vote of 75% of CB Patent shareholders (*i.e.*, the shareholders other than MERS, *including* Polmann and Arnaboldi) can transfer all of the assets owned by CB Patent. (Ex. 28, CB Patent Resolution).

142.    This Resolution effectively kills MERS' ability to stop the other shareholders from looting CB Patent of all of its assets—namely, the intellectual property it owns, which is its primary asset.

143.    In particular, CB Patent has indirectly licensed its intellectual property to CB Energy, a company in which MERS has a controlling interest. The effect of the Resolution is that Polmann, Arnaboldi, and Thannhäuser can divest CB Energy of the CB Patent intellectual property licenses and transfer those licenses to a new entity in which MERS has no financial or ownership interest, thus rendering CB Energy a shell.

144.    In total, Defendants invested $56,555,079 of MERS' assets in the Concord Blue ventures.

145.    In return, MERS received only $3,845,064 in dividends from CB Development, nearly a decade ago in 2016, which was subsequently recalled.

146.    MERS' net investment in Concord Blue is $52,710,015.

147.    To date, MERS has not received any portion of that net $52,710,015, back from Concord Blue or Defendants.

148.    Nor has MERS received back any portion of the €2,375,000 "bridge loan" from Infinite Fuels or Defendants.

149.    Because of Defendants' actions, including the actions Polmann and Arnaboldi took or failed to take while on the Board of CB Energy and CB Development, it is unlikely that MERS will receive any material recovery on its investment.

150.    Given the interconnected nature of the Concord Blue companies and the nascent stage of the technology Concord Blue is developing, MERS' options for divesting from the Concord Blue investment are now limited. The investments are difficult to value (if they have any value at all) and have no ready market for sale, and there are a very limited number of potentially interested buyers.

### COUNT I: BREACH OF FIDUCIARY DUTY (Against All Defendants)

151.    MERS incorporates the preceding allegations as though fully re-alleged and set forth herein.

152.    Verdantf owed a fiduciary duty to MERS under the IMA, common law, and Michigan statute.

153.    Polmann and Arnaboldi similarly owed fiduciary duties to MERS under common law and Michigan statute.

154.    Through the IMA, Verdantf assumed a fiduciary role in managing MERS' investments. (Ex. 1, IMA §§ 1.1, 3.13).

155.    MERS reasonably put its faith, confidence, and trust in Verdantf, Polmann, and Arnaboldi, with respect to the management of MERS' investment assets, and relied on Verdantf's, Polmann's, and Arnaboldi's judgment and advice in investing MERS' assets and managing those investments.

156.    Defendants each owed MERS a duty to act with due care, with loyalty, and in good faith; to act for the benefit of MERS regarding matters within the scope of the investment advisory and management relationship; and to subordinate their personal interests to those of MERS with respect to matters within the scope of the investment advisory and management relationship.

157.    Additionally, Defendants owed MERS a fiduciary duty pursuant to PERSIA.

158.    PERSIA sets forth the specific powers and duties of an "investment fiduciary."

159.    An "investment fiduciary" includes an individual who "exercises discretionary authority or control in the investment of a [retirement] system's assets" or who "renders investment advice for a [retirement] system for a fee or other direct or indirect compensation." Mich. Comp. Laws § 38.1132c.

160.    Defendants each qualified as investment fiduciaries with respect to MERS.

161.    PERSIA requires that an investment fiduciary "discharge his or her duties solely in the interest of the participants and the beneficiaries." Mich. Comp. Laws § 38.1133.

162.    As relevant here, PERSIA imposes the following fiduciary duties:

a.    To act with the same "care, skill, prudence, and diligence" as a prudent person faced with similar circumstances and with similar aims, Mich. Comp. Laws § 38.1133(3)(a);

b.    To "[a]ct with due regard for the management, reputation, and stability of the issuer and the character of the particular investments being considered," Mich. Comp. Laws § 38.1133(3)(b);

c.    To "[m]ake investments for the exclusive purposes of providing benefits to participants and participants' beneficiaries, and of defraying reasonable expenses of investing the assets of the system," Mich. Comp. Laws § 38.1133(3)(c);

27

d.   To "[g]ive appropriate consideration" to relevant and important facts relating to the investments, such as the risk of loss and opportunity for return, diversification of the investments, and liquidity of the current investment returns relative to anticipated cash flow, Mich. Comp. Laws § 38.1133(3)(d)-(e);

e.   To "[p]repare and maintain written objectives, policies, and strategies with clearly defined accountability and responsibility for implementing and executing the system's investments," Mich. Comp. Laws § 38.1133(3)(f); and

f.   To monitor investments, Mich. Comp. Laws § 38.1133(3)(g).

163.   Defendants each abused MERS' trust and betrayed MERS' confidence in managing MERS' assets in at least the myriad ways described herein.

164.   Defendants breached their duty of care by imprudently investing MERS' assets and mismanaging those investments.

165.   Defendants repeatedly failed to invest the assets in the MERS Real Assets Account in prudent ways, mismanaged MERS' assets, and engaged in inexplicable investment decisions by throwing good money after bad into the Concord Blue investment.

166.   Defendants' acts and omissions include but are not limited to:

a.   Failing to obtain and pursue adequate protections for MERS with respect to its investment in CB Development, including failure to support the Core Projects and to pursue MERS' right to an equity interest in those Projects under the relevant contracts;

b.   Converting MERS' investment in CB Development into an equity stake in CB Energy, a company with no apparent assets, despite years of low to no performance by CB Energy;

28

c.  Investing in CB Patent without a clear understanding of the role CB Patent played in the Concord Blue family of companies or its ability to contribute to developing the Core Projects;

d.  Continuing to invest MERS' money in Concord Blue despite Concord Blue's and Verdantf's failures to obtain external financing for Concord Blue's projects;

e.  Failing to de-risk MERS' investment in Concord Blue after Concord Blue lost its partnership with Lockheed Martin;

f.  Failing to recall the $25 million invested into CB Development and earmarked for funding projects when it became clear that no successful projects were being funded by Concord Blue;

g.  Continuing to invest MERS' assets in CB Development, CB Energy, and/or CB Patent after it became apparent or should have become apparent that Concord Blue was not providing any material return on investment and was not likely to do so in the near future, and was further unlikely to enter into development agreements for use of the technology on projects;

h.  Failing to take any corrective action or otherwise change course regarding MERS' investments into CB Energy, CB Development, or CB Patent, and, in fact, continuing to invest more, despite **years** of no return on investment and no progress on the Concord Blue projects;

i.  Failing to conduct adequate due diligence into Infinite Fuels, which would have revealed the significant risk of loaning money to it, before issuing the bridge loan to Infinite Fuels, and misrepresenting the loan's risk profile to MERS; and

j.    Failing to monitor Infinite Fuels' financial status or to act swiftly to recoup MERS' losses once Defendants learned of Infinite Fuels' insolvency proceeding.

167.    Defendants failed to exercise the requisite skill, care, prudence, and diligence in making, monitoring, planning for, and valuing investments that would be expected of a prudent fiduciary and reasonable investment adviser and manager faced with the same information.

168.    Defendants' failure to re-evaluate, protect, or otherwise course-correct MERS' investment in Concord Blue after eight years without any returns or successful development projects fell well below the expected standard of care.

169.    The same is true of Defendants either failing to perform due diligence on Infinite Fuels before issuing the bridge loan, or issuing the bridge loan despite the glaring risks and then failing to monitor or protect that investment.

170.    These failures are tied to Verdantf's institutional failure to prepare and maintain written objectives, policies, and strategies with clearly defined accountability and responsibility for implementing and executing the system's investments, including its apparent failure to properly register as an investment adviser with the federal or state government.

171.    Defendants also breached their common law and statutory duties of loyalty to MERS through Polmann's and Arnaboldi's ownership of undisclosed interests in CB Energy and CB Patent and Verdantf's partnering with CB Development and CB Energy on a funding venture.

172.    This created a conflict of interest because Defendants were motivated to maintain MERS' interest in Concord Blue—and to use MERS for continual cash infusions—despite the risks to MERS in order to protect Verdantf's and its managing partners' own investments and interests in Concord Blue.

173.    Verdantf not only acquired significant interests in CB Development, CB Energy, and CB Patent on behalf of MERS, but also repeatedly issued capital calls for MERS to invest *more* money long after a reasonable investor and investment adviser and manager would have taken action to protect their investment or cut their losses.

174.    In addition, Defendants failed to fulfill their duties of prudence and care when they misrepresented the status of MERS' investments through either material omissions or false statements.

175.    Specifically, Defendants repeatedly misrepresented the nature of the risks they were taking in investing MERS' funds, and/or omitted material information that would have changed MERS' instructions regarding those investments.

176.    Defendants' acts and omissions include but are not limited to:

   a.   Misrepresenting that Verdantf was qualified under federal laws and regulations to serve as an investment adviser, when it had not properly registered as an investment adviser as required by state and federal law;

   b.   Misrepresenting that Lockheed Martin was terminated because it was not diligently pursuing the partnership with CB Energy and CB Development for other business reasons, when really Lockheed Martin terminated the relationship based on CB Energy and CB Development's breach of the parties' Teaming Agreement;

   c.   Issuing the May 2021 capital call and either (1) falsely suggesting that the call would be securitized by transferred ownership to MERS of land and buildings in Germany or (2) failing to inform MERS when the transfer did not occur;

   d.   Failing to timely disclose that Verdantf was issuing bridge loans to CB Energy;

e.  Falsely representing that the Infinite Fuels bridge loan was guaranteed by the European Union and that it was "pretty much no risk"; and

f.  Failing to timely inform MERS about Infinite Fuels' insolvency proceedings and the unlikelihood that it would repay the loan.

177.    Defendants' misrepresentations and material omissions about the serious issues with the Concord Blue investment—including, for example, regarding Lockheed Martin's termination of the business relationship and the nature of various capital calls made during the end of the parties' relationship—were material.

178.    Had Defendants been forthright about the status and health of the Concord Blue investments and companies and provided MERS with the relevant information on these investments and entities, MERS could have and would have requested additional information and/or performed additional due diligence on these investments at a point where MERS would have had an opportunity to mitigate risks and/or direct Defendants to take action to protect MERS' investments.

179.    Further, as MERS' investment advisers and managers who had direct contact with the Concord Blue companies and were directly involved in managing these assets, Defendants were uniquely positioned to obtain and provide information on Concord Blue—and uniquely well positioned to conceal, misrepresent, or fail to disclose highly relevant information regarding the status of these investments, such that, despite MERS' best efforts and diligence in monitoring the Concord Blue investment, because of this information disparity, Defendants effectively prevented MERS from uncovering the full scope of Defendants' misconduct and the relevant facts regarding Concord Blue.

180.    Defendants' breaches of their fiduciary duties to MERS resulted in and proximately caused financial losses and damages to MERS.

181.    Specifically, to date, MERS has yet to recover $52,710,015, that it invested in Concord Blue, in addition to the €2,375,000 "bridge loan" it made to Infinite Fuels.

### COUNT II: BREACH OF CONTRACT (Against Verdantf)

182.    MERS incorporates the preceding allegations as though fully re-alleged and set forth herein.

183.    MERS and Verdantf are and were at all relevant times each parties competent to contract.

184.    MERS and Verdantf reached a valid and binding agreement in the IMA.

185.    The IMA was supported by the exchange of good, sufficient, and lawful consideration between MERS and Verdantf.

186.    The subject matter of the IMA is lawful.

187.    Through the IMA, MERS entrusted Verdantf with broad discretion to manage MERS' investments. (*See, e.g.*, Ex. 1, IMA § 1.1).

188.    When a party to a contract exercises discretion over its performance, that party undertakes an enforceable implied covenant of good faith and fair dealing. Thus, an investment manager assumes a duty of good faith and fair dealing when it assumes discretionary authority and control with respect to the management and investment of another's assets. The investment manager breaches this duty by engaging in imprudent or disloyal investment activities.

189.    Verdantf breached the IMA by (1) being imprudent in making and managing investments of MERS' funds, (2) engaging in conflicts of interest, and (3) failing to keep MERS appraised of the status of its investments.

190.    As described in detail in paragraph 166, *supra*, Verdantf repeatedly breached Sections 1.1, 3.13, and 1.8 of the IMA, which required Verdantf to conduct due diligence and prudently and loyally manage investments as a fiduciary. By lulling MERS into a false sense of security that its investments would result in returns, Verdantf caused MERS not to exercise its rights to veto potential investments, request additional due diligence, request a change of course with its investment management, or terminate the IMA altogether. (*See* Ex. 1, IMA §§ 1.8, 6.2–6.3).

191.    Had Verdantf been forthright with MERS, many of the losses connected to Concord Blue or Infinite Fuels would have been avoided or mitigated.

192.    In addition, as described in paragraph 171, *supra*, Verdantf breached the IMA's prohibition on and disclosure requirements related to conflicts of interest. (*See* Ex. 1, IMA § 3.15).

193.    Finally, as described in detail in paragraph 176, *supra*, Verdantf failed to carry out its reporting and consultation obligations in good faith and with fair dealing.  (*See* Ex. 1, IMA §§ 1.5, 1.7).

194.    Verdantf's breaches of its contractual obligations to MERS resulted in and proximately caused financial losses and damages to MERS.

195.    Specifically, to date, MERS has yet to recover $52,710,015, that it invested in Concord Blue, in addition to the €2,375,000 "bridge loan" it made to Infinite Fuels.

## COUNT III: VIOLATION OF SECTION 10(b) OF THE SECURITIES EXCHANGE ACT OF 1934 AND RULE 10b-5 (Against All Defendants)

196.    MERS incorporates the preceding allegations as though fully re-alleged and set forth herein.

197.    Under the Securities Exchange Act, it is unlawful for anyone "[t]o use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device

or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors." 15 U.S.C. § 78j(b).

198.    The implementing regulation for Section 10(b) provides that "[i]t shall be unlawful for any person, directly or indirectly, . . . (a) To employ any device, scheme, or artifice to defraud, (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security." 17 C.F.R. § 240.10b-5.

199.    Defendants here engaged in a scheme to defraud MERS in connection with the Concord Blue investment and collectively made several false representations of material fact and numerous material omissions throughout the course of their investment advisory relationship with MERS that have proximately caused MERS' financial losses.

200.    As part of this scheme, Defendants repeatedly failed to disclose or misrepresented to MERS critical information about the health of the Concord Blue companies and MERS' investment in those companies, in service of continuing to invest significant sums of MERS' assets in a venture in which Polmann and Arnaboldi held a financial interest and that Defendants hoped or believed would financially benefit them.

201.    The materially false representations and material omissions made by Defendants as part of this scheme, and in connection with the purchase and sale of securities, include the following:

35

a. Despite knowing that the key reason for MERS' approval of the Concord Blue investment was the involvement of Lockheed Martin and the Exclusive Teaming Agreement that Lockheed Martin had signed with Concord Blue regarding waste-to-energy facility projects, Defendants failed to disclose to MERS for more than a year that CB Energy and CB Development failed to pay Lockheed Martin $2 million when due in October 2019, even though Polmann and/or Arnaboldi were on the Boards of the Concord Blue entities and were aware of this nonpayment. Again, despite knowing that Concord Blue's partnership with Lockheed Martin was critical to MERS' investment decision, Defendants, through their agent Polmann, falsely told MERS that CB Energy terminated the collaboration because Lockheed Martin failed to diligently pursue the partnership. This information was material, and Defendants had a duty to disclose it. A reasonable investor would have wanted to know that the key factual basis for their investment was no longer true and that a company in which they had invested was apparently unable to pay its obligations when due. Defendants knew or should have known that withholding the true information about Lockheed Martin's termination presented a danger of misleading and would mislead MERS, but intentionally withheld it anyway to deceive or manipulate MERS into maintaining its investment in Concord Blue due, at least in part, to Defendants' conflicting financial interests in Concord Blue. Defendants instead intentionally deceived and misled MERS about the reasons for the termination. MERS relied on these representations and omissions by not de-risking its investment in Concord Blue, as a result of which MERS has suffered financial

losses, in the form of not recovering the tens of millions of dollars it invested in Concord Blue.

b.  During the time Defendants served as MERS' investment advisers, Defendants each repeatedly failed to inform, advise, or share with MERS that the Concord Blue companies were struggling to obtain capital from external sources, to successfully develop alternative energy projects, and to enter into partnership agreements with key strategic development partners, which information Defendants knew and knew was material, and which Defendants had a duty to disclose. Defendants also knew that Concord Blue's potential to develop projects with real assets was a key motivating factor for MERS' investment in Concord Blue. A reasonable investor would have wanted to know accurate information regarding the financial performance of its investment and financial indicators that the investment might not produce any returns. Defendants knew or should have known that withholding this information presented a danger of misleading and would mislead MERS, but intentionally withheld it anyway to deceive or manipulate MERS into maintaining its investment in Concord Blue due, at least in part, to Defendants' conflicting financial interests in Concord Blue. MERS relied on Defendants to monitor the Concord Blue investment and on Defendants' failure to disclose this key financial information by not de-risking its investment in Concord Blue, as a result of which MERS has suffered financial losses, in the form of not recovering the tens of millions of dollars it invested in Concord Blue.

c.  Defendants failed to disclose to MERS the existence of a lawsuit brought by CB Patent Investment LLC's minority owner against Thannhäuser, who was

beneficially its controlling shareholder and manager and overall Concord Blue's key control person, alleging breaches of fiduciary duty and mismanagement, and further failed to disclose that this lawsuit resulted in Defendants buying out the interest of that owner, giving them additional conflicting interests in Concord Blue. This information was material, and Defendants had a duty to disclose it. A reasonable investor would have wanted to know of mismanagement and breach of fiduciary duty claims against the key manager and control person of the venture in which it was invested, and would also have wanted to know that its investment adviser had acquired additional financial interests in that venture. Defendants knew or should have known that withholding this information presented a danger of misleading and would mislead MERS, but intentionally withheld it anyway to deceive or manipulate MERS into maintaining its investment in Concord Blue due, at least in part, to Defendants' conflicting financial interests in Concord Blue. MERS relied on these representations and omissions by not de-risking its investment in Concord Blue or exerting greater shareholder rights in the venture, as a result of which MERS has suffered financial losses, in the form of not recovering the tens of millions of dollars it invested in Concord Blue.

d. Through Polmann, Verdantf falsely represented to MERS that the Infinite Fuels bridge loan was "pretty much no risk 12% aanual [sic] coupon for MERS." (Ex. 15, 11/6/2020 WhatsApp Message Excerpt). Verdantf further falsely claimed to MERS that the Infinite Fuels loan was guaranteed through the "EU Life Program." (Ex. 16, Draw Down Notice 033). These misrepresentations were false, and Verdantf and Polmann either knew they were false or acted with an extreme departure from the

standard of care required of investment advisers by failing to investigate the truth or falsity of these representations. A reasonable investor would have wanted to know accurate information about the risk level of the loan they were making and whether there was any security or guaranty for that loan. Defendants intentionally deceived and misled MERS about the risk level of the Infinite Fuels loan to deceive or manipulate MERS into continuing to prop up the Concord Blue venture due, at least in part, to Defendants' conflicting financial interests in Concord Blue. MERS relied on Verdantf's and Polmann's misrepresentations in greenlighting the loan, as a result of which MERS has suffered financial losses, in the form of not recovering any portion of the Infinite Fuels loan.

202.    At the time that Defendants made these misrepresentations and omissions to MERS, Defendants, through their agents Polmann and Arnaboldi, had direct access to information from the Concord Blue entities regarding the performance, capabilities, ownership, financial performance, and strategic outlook of those companies and information regarding the Infinite Fuels investment. Thus, when Defendants made these affirmative misrepresentations or omissions to MERS, Defendants had actual or constructive knowledge that the representations were false or that they were withholding information as a result of which the information they did provide to MERS was misleading.

203.    Defendants each participated in this scheme of fraud and deceit for the purpose of investing MERS' assets in the Concord Blue venture in which Defendants held a financial interest and which Defendants believed would financially benefit them.

204.    Defendants' fraudulent conduct, misrepresentations, and omissions resulted in and proximately caused financial losses and damages to MERS in the form of the amounts that MERS invested in Concord Blue and the Infinite Fuels loan.

205.    Specifically, to date, MERS has yet to recover $52,710,015, that it invested in Concord Blue, in addition to the €2,375,000 "bridge loan" it made to Infinite Fuels.

## COUNT IV: VIOLATION OF MICHIGAN UNIFORM SECURITIES ACT – SECURITIES FRAUD (Against All Defendants)

206.    MERS incorporates the preceding allegations as though fully re-alleged and set forth herein.

207.    Under MUSA, "[i]t is unlawful for a person, in connection with the offer, sale, or purchase of a security . . . , to directly or indirectly do any of the following: (a) Employ a device, scheme, or artifice to defraud. (b) Make an untrue statement of a material fact or omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading. (c) Engage in an act, practice, or course of business that operates or would operate as a fraud or deceit on another person." Mich. Comp. Laws § 451.2501.

208.    Defendants here engaged in a scheme to defraud MERS in connection with the Concord Blue investment and collectively made several false representations of material fact and numerous material omissions throughout the course of their investment advisory relationship with MERS that have proximately caused MERS' financial losses.

209.    As part of this scheme, Defendants repeatedly failed to disclose or misrepresented to MERS critical information about the health of the Concord Blue companies and MERS' investment in those companies, in service of continuing to invest significant sums of MERS' assets

in a venture in which Polmann and Arnaboldi held a financial interest and that Defendants hoped or believed would financially benefit them.

210.    The materially false representations and material omissions made by Defendants as part of this scheme, and in connection with the purchase and sale of securities, include the following:

a. Despite knowing that the key reason for MERS' approval of the Concord Blue investment was the involvement of Lockheed Martin and the Exclusive Teaming Agreement that Lockheed Martin had signed with Concord Blue regarding waste-to-energy facility projects, Defendants failed to disclose to MERS for more than a year that CB Energy and CB Development failed to pay Lockheed Martin $2 million when due in October 2019, even though Polmann and/or Arnaboldi were on the Boards of the Concord Blue entities and were aware of this nonpayment. Again, despite knowing that Concord Blue's partnership with Lockheed Martin was critical to MERS' investment decision, Defendants, through their agent Polmann, falsely told MERS that CB Energy terminated the collaboration because Lockheed Martin failed to diligently pursue the partnership. This information was material, and Defendants had a duty to disclose it. A reasonable investor would have wanted to know that the key factual basis for their investment was no longer true and that a company in which they had invested was apparently unable to pay its obligations when due. Defendants knew or should have known that withholding the true information about Lockheed Martin's termination presented a danger of misleading and would mislead MERS, but intentionally withheld it anyway to deceive or manipulate MERS into maintaining its investment in Concord Blue due, at least in

part, to Defendants' conflicting financial interests in Concord Blue. Defendants instead intentionally deceived and misled MERS about the reasons for the termination. MERS relied on these representations and omissions by not de-risking its investment in Concord Blue, as a result of which MERS has suffered financial losses, in the form of not recovering the tens of millions of dollars it invested in Concord Blue.

b.  During the time Defendants served as MERS' investment advisers, Defendants each repeatedly failed to inform, advise, or share with MERS that the Concord Blue companies were struggling to obtain capital from external sources, to successfully develop alternative energy projects, and to enter into partnership agreements with key strategic development partners, which information Defendants knew and knew was material, and which Defendants had a duty to disclose. Defendants also knew that Concord Blue's potential to develop projects with real assets was a key motivating factor for MERS' investment in Concord Blue. A reasonable investor would have wanted to know accurate information regarding the financial performance of its investment and financial indicators that the investment might not produce any returns. Defendants knew or should have known that withholding this information presented a danger of misleading and would mislead MERS, but intentionally withheld it anyway to deceive or manipulate MERS into maintaining its investment in Concord Blue due, at least in part, to Defendants' conflicting financial interests in Concord Blue. MERS relied on Defendants to monitor the Concord Blue investment and on Defendants' failure to disclose this key financial information by not de-risking its investment in Concord Blue, as a result of which

MERS has suffered financial losses, in the form of not recovering the tens of millions of dollars it invested in Concord Blue.

c.  Defendants failed to disclose to MERS the existence of a lawsuit brought by CB Patent Investment LLC's minority owner against Thannhäuser, who was beneficially its controlling shareholder and manager and overall Concord Blue's key control person, alleging breaches of fiduciary duty and mismanagement, and further failed to disclose that this lawsuit resulted in Defendants buying out the interest of that owner, giving them additional conflicting interests in Concord Blue. This information was material, and Defendants had a duty to disclose it. A reasonable investor would have wanted to know of mismanagement and breach of fiduciary duty claims against the key manager and control person of the venture in which it was invested, and would also have wanted to know that its investment adviser had acquired additional financial interests in that venture. Defendants knew or should have known that withholding this information presented a danger of misleading and would mislead MERS, but intentionally withheld it anyway to deceive or manipulate MERS into maintaining its investment in Concord Blue due, at least in part, to Defendants' conflicting financial interests in Concord Blue. MERS relied on these representations and omissions by not de-risking its investment in Concord Blue or exerting greater shareholder rights in the venture, as a result of which MERS has suffered financial losses, in the form of not recovering the tens of millions of dollars it invested in Concord Blue.

d.  Through Polmann, Verdantf falsely represented to MERS that the Infinite Fuels bridge loan was "pretty much no risk 12% aanual [sic] coupon for MERS." (Ex. 15,

11/6/2020 WhatsApp Message Excerpt). Verdantf further falsely claimed to MERS that the Infinite Fuels loan was guaranteed through the "EU Life Program." (Ex. 16, Draw Down Notice 033). These misrepresentations were false, and Verdantf and Polmann either knew they were false or acted with an extreme departure from the standard of care required of investment advisers by failing to investigate the truth or falsity of these representations. A reasonable investor would have wanted to know accurate information about the risk level of the loan they were making and whether there was any security or guaranty for that loan. Defendants intentionally deceived and misled MERS about the risk level of the Infinite Fuels loan to deceive or manipulate MERS into continuing to prop up the Concord Blue venture due, at least in part, to Defendants' conflicting financial interests in Concord Blue. MERS relied on Verdantf's and Polmann's misrepresentations in greenlighting the loan, as a result of which MERS has suffered financial losses, in the form of not recovering any portion of the Infinite Fuels loan.

211.    At the time that Defendants made these misrepresentations and omissions to MERS, Defendants, through their agents Polmann and Arnaboldi, had direct access to information from the Concord Blue entities regarding the performance, capabilities, ownership, financial performance, and strategic outlook of those companies and information regarding the Infinite Fuels investment. Thus, when Defendants made these affirmative misrepresentations or omissions to MERS, Defendants had actual or constructive knowledge that the representations were false or that they were withholding information as a result of which the information they did provide to MERS was misleading.

212.    Defendants each participated in this scheme of fraud and deceit for the purpose of investing MERS' assets in the Concord Blue venture in which Defendants held a financial interest and which Defendants believed would financially benefit them.

213.    Defendants' fraudulent conduct, misrepresentations, and omissions resulted in and proximately caused financial losses and damages to MERS in the form of the amounts that MERS invested in Concord Blue and the Infinite Fuels loan.

214.    Specifically, to date, MERS has yet to recover $52,710,015, that it invested in Concord Blue, in addition to the €2,375,000 "bridge loan" it made to Infinite Fuels.

## COUNT V: VIOLATION OF SECTION 20(a) OF THE SECURITIES EXCHANGE ACT OF 1934 (Against Polmann and Arnaboldi)

215.    MERS incorporates the preceding allegations as though fully re-alleged and set forth herein.

216.    Under the Securities Exchange Act, "[e]very person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable . . . , unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action." 15 U.S.C. § 78t(a).

217.    Polmann and Arnaboldi directly controlled Verdantf and directly or indirectly exercised control over each other in the course of Defendants' investment advisory and management relationship with MERS.

218.    Specifically, Polmann and Arnaboldi were both Verdantf's founders and managing partners and were integrally involved in reviewing, greenlighting, or approving all of Verdantf's investment decisions on behalf of MERS.

219.    In addition, Polmann and Arnaboldi worked closely with one another during the time Defendants served as MERS' investment advisers and managers, collaborated on investment advisory and management decisions on behalf of MERS, were aware of one another's actions in their capacity as MERS' investment advisers and managers, and expressly or tacitly approved each decision taken by the other in the course of the investment advisory and management relationship with MERS.

220.    Polmann and Arnaboldi are jointly and severally liable with each other and with Verdantf for MERS' financial losses resulting from Defendants' fraudulent conduct, misrepresentations, and omissions, which resulted in and proximately caused financial losses and damages to MERS.

221.    Specifically, to date, MERS has yet to recover $52,710,015, that it invested in Concord Blue, in addition to the €2,375,000 "bridge loan" it made to Infinite Fuels.

### COUNT VI: VIOLATION OF MICHIGAN UNIFORM SECURITIES ACT – MISREPRESENTATION OF REGISTRATION (Against All Defendants)

222.    MERS incorporates the preceding allegations as though fully re-alleged and set forth herein.

223.    MUSA prohibits a person from transacting business in Michigan as an investment adviser or investment adviser representative unless they are so registered. Mich. Comp. Laws §§ 451.2403(1), 451.2404(1), 451.2506, 451.2509(5).

224.    "Investment adviser" means "a person that, for compensation, engages in the business of advising others, either directly or through publications or writings, as to the value of securities or the advisability of investing in, purchasing, or selling securities or that, for compensation and as a part of a regular business, issues or promulgates analyses or reports concerning securities." Mich. Comp. Laws § 451.2102a(e).

225. "Investment adviser representative" means "an individual employed by or associated with an investment adviser . . . and who makes any recommendations or otherwise gives investment advice regarding securities, manages accounts or portfolios of clients, determines which recommendation or advice regarding securities should be given, provides investment advice or holds himself or herself out as providing investment advice, receives compensation to solicit, offer, or negotiate for the sale of or for selling investment advice, or supervises employees who perform any of the foregoing." Mich. Comp. Laws § 451.2102a(f).

226. If an investment adviser or investment adviser representative fails to properly register, their client may "recover the consideration paid for the advice, interest at 6% from the date of payment, costs, and reasonable attorney fees." Mich. Comp. Laws § 451.2509(5).

227. Verdantf was engaged in the business of advising others, including MERS, of the value or advisability of investing in various securities and, as part of that business, provided analyses of securities. Verdantf thus qualified as an investment adviser under MUSA.

228. Verdantf failed to register with the State of Michigan as an investment adviser. Verdantf failed to register despite agreeing in the IMA that it would obtain the necessary regulatory approvals. (Ex. 1, IMA §§ 3.1, 3.5–3.6, 3.11).

229. Polmann and Arnaboldi each were employed by or associated with Verdantf. Polmann and Arnaboldi each made recommendations and gave advice, including to MERS, regarding securities, managed MERS' investment account and portfolio, and provided investment advice regarding securities. Polmann and Arnaboldi each qualified as an investment adviser representative under MUSA.

230. Polmann and Arnaboldi each failed to register with the State of Michigan as an investment adviser representative.

231.    Because of Defendants' failures to register with the State of Michigan as required by MUSA, MERS is entitled to recover all fees it paid to Defendants under the IMA, interest at 6% from the date of payment, costs, and reasonable attorney fees.

## COUNT VII: RESCISSION OF INVESTMENT MANAGEMENT AGREEMENT (Against Verdantf)

232.    MERS incorporates the preceding allegations as though fully re-alleged and set forth herein.

233.    Verdantf entered into the IMA despite not being properly registered as an investment adviser with the federal government or the State of Michigan.

234.    Under Michigan and federal law, investment advisory contracts entered into by an entity that is not properly registered as an investment adviser are subject to rescission. *Pransky*, 874 N.W.2d at 380–83; *Michelson v. Voison*, 658 N.W.2d 188, 191 (Mich. Ct. App. 2003); 15 U.S.C. § 80b-15(b).

235.    Because Verdantf failed to register as an investment adviser with the appropriate state or federal authorities, the IMA should be deemed and declared rescinded, voided, and of no further legal effect.

## COUNT VIII: FRAUD AND MISREPRESENTATION (Against All Defendants)

236.    MERS incorporates the preceding allegations as though fully re-alleged and set forth herein.

237.    Defendants here engaged in a scheme to defraud MERS in connection with the Concord Blue investment and collectively made several false representations of material fact and numerous material omissions throughout the course of their investment advisory relationship with MERS that have proximately caused MERS' financial losses.

238.     As part of this scheme, Defendants repeatedly failed to disclose or misrepresented to MERS critical information about the health of the Concord Blue companies and MERS' investment in those companies, in service of continuing to invest significant sums of MERS' assets in a venture in which Polmann and Arnaboldi held a financial interest and that Defendants hoped or believed would financially benefit them.

239.     Because of their role as MERS' investment advisers and managers, Defendants had a duty to MERS to disclose material information about the Concord Blue investment that Defendants knew or should have known would affect MERS' willingness to invest or maintain its investment in Concord Blue.

240.     The materially false representations and material omissions made by Defendants include the following:

     a.  Despite knowing that the key reason for MERS' approval of the Concord Blue investment was the involvement of Lockheed Martin and the Exclusive Teaming Agreement that Lockheed Martin had signed with Concord Blue regarding waste-to-energy facility projects, Defendants failed to disclose to MERS for more than a year that CB Energy and CB Development failed to pay Lockheed Martin $2 million when due in October 2019, even though Polmann and/or Arnaboldi were on the Boards of the Concord Blue entities and were aware of this nonpayment. Again, despite knowing that Concord Blue's partnership with Lockheed Martin was critical to MERS' investment decision, Defendants, through their agent Polmann, falsely told MERS that CB Energy terminated the collaboration because Lockheed Martin failed to diligently pursue the partnership. This information was material, and Defendants had a duty to disclose it. A reasonable investor would have wanted

to know that the key factual basis for their investment was no longer true and that a company in which they had invested was apparently unable to pay its obligations when due. Defendants knew or should have known that withholding the true information about Lockheed Martin's termination presented a danger of misleading and would mislead MERS, but intentionally withheld it anyway to deceive or manipulate MERS into maintaining its investment in Concord Blue due, at least in part, to Defendants' conflicting financial interests in Concord Blue. Defendants instead intentionally deceived and misled MERS about the reasons for the termination. MERS relied on these representations and omissions by not de-risking its investment in Concord Blue, as a result of which MERS has suffered financial losses, in the form of not recovering the tens of millions of dollars it invested in Concord Blue.

b. During the time Defendants served as MERS' investment advisers, Defendants each repeatedly failed to inform, advise, or share with MERS that the Concord Blue companies were struggling to obtain capital from external sources, to successfully develop alternative energy projects, and to enter into partnership agreements with key strategic development partners, which information Defendants knew and knew was material, and which Defendants had a duty to disclose. Defendants also knew that Concord Blue's potential to develop projects with real assets was a key motivating factor for MERS' investment in Concord Blue. A reasonable investor would have wanted to know accurate information regarding the financial performance of its investment and financial indicators that the investment might not produce any returns. Defendants knew or should have known that withholding

this information presented a danger of misleading and would mislead MERS, but intentionally withheld it anyway to deceive or manipulate MERS into maintaining its investment in Concord Blue due, at least in part, to Defendants' conflicting financial interests in Concord Blue. MERS relied on Defendants to monitor the Concord Blue investment and on Defendants' failure to disclose this key financial information by not de-risking its investment in Concord Blue, as a result of which MERS has suffered financial losses, in the form of not recovering the tens of millions of dollars it invested in Concord Blue.

c. Defendants failed to disclose to MERS the existence of a lawsuit brought by CB Patent Investment LLC's minority owner against Thannhäuser, who was beneficially its controlling shareholder and manager and overall Concord Blue's key control person, alleging breaches of fiduciary duty and mismanagement, and further failed to disclose that this lawsuit resulted in Defendants buying out the interest of that owner, giving them additional conflicting interests in Concord Blue. This information was material, and Defendants had a duty to disclose it. A reasonable investor would have wanted to know of mismanagement and breach of fiduciary duty claims against the key manager and control person of the venture in which it was invested, and would also have wanted to know that its investment adviser had acquired additional financial interests in that venture. Defendants knew or should have known that withholding this information presented a danger of misleading and would mislead MERS, but intentionally withheld it anyway to deceive or manipulate MERS into maintaining its investment in Concord Blue due, at least in part, to Defendants' conflicting financial interests in Concord Blue.

MERS relied on these representations and omissions by not de-risking its investment in Concord Blue or exerting greater shareholder rights in the venture, as a result of which MERS has suffered financial losses, in the form of not recovering the tens of millions of dollars it invested in Concord Blue.

d.  Through Polmann, Verdantf falsely represented to MERS that the Infinite Fuels bridge loan was "pretty much no risk 12% aanual [sic] coupon for MERS." (Ex. 15, 11/6/2020 WhatsApp Message Excerpt). Verdantf further falsely claimed to MERS that the Infinite Fuels loan was guaranteed through the "EU Life Program." (Ex. 16, Draw Down Notice 033). These misrepresentations were false, and Verdantf and Polmann either knew they were false or acted with an extreme departure from the standard of care required of investment advisers by failing to investigate the truth or falsity of these representations. A reasonable investor would have wanted to know accurate information about the risk level of the loan they were making and whether there was any security or guaranty for that loan. Defendants intentionally deceived and misled MERS about the risk level of the Infinite Fuels loan to deceive or manipulate MERS into continuing to prop up the Concord Blue venture due, at least in part, to Defendants' conflicting financial interests in Concord Blue. MERS relied on Verdantf's and Polmann's misrepresentations in greenlighting the loan, as a result of which MERS has suffered financial losses, in the form of not recovering any portion of the Infinite Fuels loan.

241.  At the time that Defendants made these misrepresentations and omissions to MERS, Defendants, through their agents Polmann and Arnaboldi, had direct access to information from the Concord Blue entities regarding the performance, capabilities, ownership, financial

performance, and strategic outlook of those companies and information regarding the Infinite Fuels investment. Thus, when Defendants made these affirmative misrepresentations or omissions to MERS, Defendants had actual or constructive knowledge that the representations were false or that they were withholding information as a result of which the information they did provide to MERS was misleading.

242.    Further, Defendants had a professional duty of care and fiduciary duty to MERS in acting as MERS' investment advisers and managers to provide accurate and sufficient information regarding the Concord Blue investment for MERS to be able to effectively monitor and evaluate that investment. Defendants each breached that duty by negligently and knowingly providing false or misleading information to MERS regarding the Concord Blue and Infinite Fuels investments.

243.    Defendants intended for MERS to rely on these representations and omissions in continuing to invest in Concord Blue, not divesting from Concord Blue, and entering into the Infinite Fuels bridge loan.

244.    MERS in fact relied on Defendants' misrepresentations and omissions, and more generally on the advice provided by Defendants, in continuing to invest in Concord Blue, not divesting from Concord Blue, and entering into the Infinite Fuels bridge loan.

245.    Further, as MERS' investment advisers and managers who had direct contact with the Concord Blue companies and were directly involved in managing these assets, Defendants were uniquely positioned to obtain and provide information on Concord Blue—and uniquely well positioned to conceal, misrepresent, or fail to disclose highly relevant information regarding the status of these investments, such that, despite MERS' best efforts and diligence in monitoring the Concord Blue investment, because of this information disparity, Defendants effectively prevented

MERS from uncovering the full scope of Defendants' misconduct and the relevant facts regarding Concord Blue.

246.    Defendants each participated in this scheme of fraud and deceit for the purpose of investing MERS' assets in the Concord Blue venture in which Defendants held a financial interest and which Defendants believed would financially benefit them.

247.    Defendants' fraudulent conduct, misrepresentations, and omissions resulted in and proximately caused financial losses and damages to MERS in the form of the amounts that MERS invested in Concord Blue and the Infinite Fuels loan.

248.    Specifically, to date, MERS has yet to recover $52,710,015, that it invested in Concord Blue, in addition to the €2,375,000 "bridge loan" it made to Infinite Fuels.

### COUNT IX: SILENT FRAUD (Against All Defendants)

249.    MERS incorporates the preceding allegations as though fully re-alleged and set forth herein.

250.    Defendants here engaged in a scheme to defraud MERS in connection with the Concord Blue investment and collectively made numerous material omissions throughout the course of their investment advisory relationship with MERS that have proximately caused MERS' financial losses.

251.    As part of this scheme, Defendants repeatedly failed to disclose to MERS critical information about the health of the Concord Blue companies and MERS' investment in those companies, in service of continuing to invest significant sums of MERS' assets in a venture in which Polmann and Arnaboldi held a financial interest and that Defendants hoped or believed would financially benefit them.

252.    Because of their role as MERS' investment advisers and managers, Defendants had a duty to MERS to disclose material information about the Concord Blue investment that

Defendants knew or should have known would affect MERS' willingness to invest or maintain its investment in Concord Blue.

253.    The materially false omissions made by Defendants include the following:

a.    Despite knowing that the key reason for MERS' approval of the Concord Blue investment was the involvement of Lockheed Martin and the Exclusive Teaming Agreement that Lockheed Martin had signed with Concord Blue regarding waste-to-energy facility projects, Defendants failed to disclose to MERS for more than a year that CB Energy and CB Development failed to pay Lockheed Martin $2 million when due in October 2019, even though Polmann and/or Arnaboldi were on the Boards of the Concord Blue entities and were aware of this nonpayment. Again, despite knowing that Concord Blue's partnership with Lockheed Martin was critical to MERS' investment decision, Defendants, through their agent Polmann, falsely told MERS that CB Energy terminated the collaboration because Lockheed Martin failed to diligently pursue the partnership.  This information was material, and Defendants had a duty to disclose it. Defendants knew or should have known that withholding the true information about Lockheed Martin's termination presented a danger of misleading and would mislead MERS, but intentionally withheld it anyway to induce, deceive, or manipulate MERS into maintaining its investment in Concord Blue due, at least in part, to Defendants' conflicting financial interests in Concord Blue. Defendants instead intentionally deceived and misled MERS about the reasons for the termination. MERS relied on these representations and omissions by not de-risking its investment in Concord Blue, as a result of which

MERS has suffered financial losses, in the form of not recovering the tens of millions of dollars it invested in Concord Blue.

b. During the time Defendants served as MERS' investment advisers, Defendants each repeatedly failed to inform, advise, or share with MERS that the Concord Blue companies were struggling to obtain capital from external sources, to successfully develop alternative energy projects, and to enter into partnership agreements with key strategic development partners, which information Defendants knew and knew was material, and which Defendants had a duty to disclose. Defendants also knew that Concord Blue's potential to develop projects with real assets was a key motivating factor for MERS' investment in Concord Blue. Defendants knew or should have known that withholding this information about Concord Blue's performance presented a danger of misleading and would mislead MERS, but intentionally withheld it anyway to induce, deceive, or manipulate MERS into maintaining its investment in Concord Blue due, at least in part, to Defendants' conflicting financial interests in Concord Blue. MERS relied on Defendants to monitor the Concord Blue investment and on Defendants' failure to disclose this key financial information by not de-risking its investment in Concord Blue, as a result of which MERS has suffered financial losses, in the form of not recovering the tens of millions of dollars it invested in Concord Blue.

c. Defendants failed to disclose to MERS the existence of a lawsuit brought by CB Patent Investment LLC's minority owner against Thannhäuser, who was beneficially its controlling shareholder and manager and overall Concord Blue's key control person, alleging breaches of fiduciary duty and mismanagement, and

further failed to disclose that this lawsuit resulted in Defendants buying out the interest of that owner, giving them additional conflicting interests in Concord Blue. This information was material, and Defendants had a duty to disclose it. Defendants knew or should have known that withholding this information presented a danger of misleading and would mislead MERS, but intentionally withheld it anyway to induce, deceive, or manipulate MERS into maintaining its investment in Concord Blue due, at least in part, to Defendants' conflicting financial interests in Concord Blue. MERS relied on these representations and omissions by not de-risking its investment in Concord Blue or exerting greater shareholder rights in the venture, as a result of which MERS has suffered financial losses, in the form of not recovering the tens of millions of dollars it invested in Concord Blue.

254.    At the time that Defendants made these omissions to MERS, Defendants, through their agents Polmann and Arnaboldi, had direct access to information from the Concord Blue entities regarding the performance, capabilities, ownership, financial performance, and strategic outlook of those companies and information regarding the Infinite Fuels investment.

255.    Further, Defendants had a professional duty of care and fiduciary duty to MERS in acting as MERS' investment advisers and managers to provide accurate and sufficient information regarding the Concord Blue investment for MERS to be able to effectively monitor and evaluate that investment. Defendants each breached that duty by knowingly failing to disclose material information to MERS regarding the Concord Blue and Infinite Fuels investments.

256.    Defendants intended for MERS to rely on these omissions in continuing to invest in Concord Blue and not divesting from Concord Blue.

257.    MERS in fact relied on Defendants' omissions, and more generally on the advice provided by Defendants, in continuing to invest in Concord Blue, not divesting from Concord Blue, and entering into the Infinite Fuels bridge loan.

258.    Further, as MERS' investment advisers and managers who had direct contact with the Concord Blue companies and were directly involved in managing these assets, Defendants were uniquely positioned to obtain and provide information on Concord Blue—and uniquely well positioned to conceal, misrepresent, or fail to disclose highly relevant information regarding the status of these investments, such that, despite MERS' best efforts and diligence in monitoring the Concord Blue investment, because of this information disparity, Defendants effectively prevented MERS from uncovering the full scope of Defendants' misconduct and the relevant facts regarding Concord Blue.

259.    Defendants' fraudulent conduct and omissions resulted in and proximately caused financial losses and damages to MERS in the form of the amounts that MERS invested in Concord Blue and the Infinite Fuels loan.

260.    Specifically, to date, MERS has yet to recover $52,710,015, that it invested in Concord Blue, in addition to the €2,375,000 "bridge loan" it made to Infinite Fuels.

### COUNT X: NEGLIGENT MISREPRESENTATION (Against All Defendants)

261.    MERS incorporates the preceding allegations as though fully re-alleged and set forth herein.

262.    Defendants collectively made several false representations of material fact and numerous material omissions throughout the course of their investment advisory relationship with MERS that have proximately caused MERS' financial losses.

263.    Defendants repeatedly failed to disclose or misrepresented to MERS critical information about the health of the Concord Blue companies and MERS' investment in those

companies, in service of continuing to invest significant sums of MERS' assets in a venture in which Polmann and Arnaboldi held a financial interest and that Defendants hoped or believed would financially benefit them.

264.    Because of their role as MERS' investment advisers and managers, Defendants had a professional duty of care duty to MERS to disclose material information about the Concord Blue investment that Defendants knew or should have known would affect MERS' willingness to invest or maintain its investment in Concord Blue.

265.    The materially false representations and material omissions made by Defendants include the following:

      a.    Despite knowing that the key reason for MERS' approval of the Concord Blue investment was the involvement of Lockheed Martin and the Exclusive Teaming Agreement that Lockheed Martin had signed with Concord Blue regarding waste-to-energy facility projects, Defendants failed to disclose to MERS for more than a year that CB Energy and CB Development failed to pay Lockheed Martin $2 million when due in October 2019, even though Polmann and/or Arnaboldi were on the Boards of the Concord Blue entities and were aware of this nonpayment. Again, despite knowing that Concord Blue's partnership with Lockheed Martin was critical to MERS' investment decision, Defendants, through their agent Polmann, falsely told MERS that CB Energy terminated the collaboration because Lockheed Martin failed to diligently pursue the partnership.  This information was material, and Defendants had a duty to disclose it. Defendants breached their professional duty to care and fiduciary duties to MERS by failing to disclose it and knew or should have known that withholding this information presented a danger of

misleading and would mislead MERS. At best, Defendants negligently failed to verify the true reasons for Lockheed Martin's termination of the relationship with Concord Blue. MERS relied on these representations and omissions by not de-risking its investment in Concord Blue, as a result of which MERS has suffered financial losses, in the form of not recovering the tens of millions of dollars it invested in Concord Blue.

b.  During the time Defendants served as MERS' investment advisers, Defendants each repeatedly failed to inform, advise, or share with MERS that the Concord Blue companies were struggling to obtain capital from external sources, to successfully develop alternative energy projects, and to enter into partnership agreements with key strategic development partners, which information Defendants knew and knew was material, and which Defendants had a duty to disclose. Defendants also knew that Concord Blue's potential to develop projects with real assets was a key motivating factor for MERS' investment in Concord Blue. Defendants breached their professional duty to care and fiduciary duties to MERS by failing to disclose this information and knew or should have known that withholding this information presented a danger of misleading and would mislead MERS. At best, Defendants negligently failed to verify the financial performance and prospects of Concord Blue. MERS relied on these representations and omissions by not de-risking its investment in Concord Blue, as a result of which MERS has suffered financial losses, in the form of not recovering the tens of millions of dollars it invested in Concord Blue.

c.  Defendants failed to disclose to MERS the existence of a lawsuit brought by CB Patent Investment LLC's minority owner against Thannhäuser, who was beneficially its controlling shareholder and manager and overall Concord Blue's key control person, alleging breaches of fiduciary duty and mismanagement, and further failed to disclose that this lawsuit resulted in Defendants buying out the interest of that owner, giving them additional conflicting interests in Concord Blue. This information was material, and Defendants had a duty to disclose it. Defendants breached their professional duty to care and fiduciary duties to MERS by failing to disclose it and knew or should have known that withholding this information presented a danger of misleading and would mislead MERS. MERS relied on these representations and omissions by not de-risking its investment in Concord Blue or exerting greater shareholder rights in the venture, as a result of which MERS has suffered financial losses, in the form of not recovering the tens of millions of dollars it invested in Concord Blue.

d.  Through Polmann, Verdantf falsely represented to MERS that the Infinite Fuels bridge loan was "pretty much no risk 12% aanual [sic] coupon for MERS." (Ex. 15, 11/6/2020 WhatsApp Message Excerpt). Verdantf further falsely claimed to MERS that the Infinite Fuels loan was guaranteed through the "EU Life Program." (Ex. 16, Draw Down Notice 033). These misrepresentations were false, and Verdantf and Polmann either knew they were false or were negligent in making these representations. Defendants breached their professional duty to care and fiduciary duties to MERS by failing to disclose it and knew or should have known that withholding this information presented a danger of misleading and would mislead

MERS. MERS relied on Verdantf's and Polmann's misrepresentations in greenlighting the loan, as a result of which MERS has suffered financial losses, in the form of not recovering any portion of the Infinite Fuels loan.

266.    At the time that Defendants made these misrepresentations and omissions to MERS, Defendants, through their agents Polmann and Arnaboldi, had direct access to information from the Concord Blue entities regarding the performance, capabilities, ownership, financial performance, and strategic outlook of those companies and information regarding the Infinite Fuels investment. Thus, when Defendants made these affirmative misrepresentations or omissions to MERS, Defendants knew or should have known that their representations were false or that they were withholding information as a result of which the information they did provide to MERS was misleading.

267.    Further, Defendants had a professional duty of care and fiduciary duty to MERS in acting as MERS' investment advisers and managers to provide accurate and sufficient information regarding the Concord Blue investment for MERS to be able to effectively monitor and evaluate that investment. Defendants each breached that duty by negligently and knowingly providing false or misleading information to MERS regarding the Concord Blue and Infinite Fuels investments.

268.    MERS relied on Defendants' misrepresentations and omissions, and more generally on the advice provided by Defendants, in continuing to invest in Concord Blue, not divesting from Concord Blue, and entering into the Infinite Fuels bridge loan.

269.    Further, as MERS' investment advisers and managers who had direct contact with the Concord Blue companies and were directly involved in managing these assets, Defendants were uniquely positioned to obtain and provide information on Concord Blue—and uniquely well positioned to conceal, misrepresent, or fail to disclose highly relevant information regarding the

status of these investments, such that, despite MERS' best efforts and diligence in monitoring the Concord Blue investment, because of this information disparity, Defendants effectively prevented MERS from uncovering the full scope of Defendants' misconduct and the relevant facts regarding Concord Blue.

270.    Defendants' misrepresentations and omissions resulted in and proximately caused financial losses and damages to MERS in the form of the amounts that MERS invested in Concord Blue and the Infinite Fuels loan.

271.    Specifically, to date, MERS has yet to recover $52,710,015, that it invested in Concord Blue, in addition to the €2,375,000 "bridge loan" it made to Infinite Fuels.

WHEREFORE, Plaintiff Municipal Employees' Retirement System of Michigan respectfully requests that this Court (a) enter a monetary judgment in MERS' favor and against Defendants verdant*f* AG, Berry Polmann, and Gaia Arnaboldi in an amount to be determined at trial, plus interest, costs, and attorney fees, (b) enter a judgment rescinding the Investment Management Agreement dated March 7, 2016, and (c) award any other relief that this Court deems just and equitable.

Respectfully submitted,

Miller, Canfield, Paddock and Stone, P.L.C.

By: */s/ Matthew P. Allen*
     Scott R. Eldridge (P66452)
     Matthew P. Allen (P57914)
     Erika L. Giroux (P81998)
     123 West Allegan St., Suite 200
     Lansing, Michigan 48933
     (517) 483-4918
     eldridge@millercanfield.com
     allen@millercanfield.com
     giroux@millercanfield.com
     *Attorneys for Plaintiff*

Dated: September 30, 2025

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION**

MUNICIPAL EMPLOYEES' RETIREMENT
SYSTEM OF MICHIGAN,

     Plaintiff,

vs.

VERDANTF AG, BERRY POLMANN, and
GAIA ARNABOLDI,

     Defendants.

Case No.

Hon.

---

Miller, Canfield, Paddock and Stone, P.L.C.
Scott R. Eldridge (P66452)
Matthew P. Allen (P57914)
Erika L. Giroux (P81998)
123 West Allegan St., Suite 200
Lansing, Michigan 48933
(517) 487-2070
eldridge@millercanfield.com
allen@millercanfield.com
giroux@millercanfield.com
*Attorneys for Plaintiff*

---

## JURY DEMAND

     Plaintiff Municipal Employees' Retirement System of Michigan hereby demands a trial by

jury on all issues in this matter so triable.

Respectfully submitted,

Miller, Canfield, Paddock and Stone, P.L.C.

By: */s/ Matthew P. Allen*
     Scott R. Eldridge (P66452)
     Matthew P. Allen (P57914)
     Erika L. Giroux (P81998)
     123 West Allegan St., Suite 200
     Lansing, Michigan 48933
     (517) 483-4918
     eldridge@millercanfield.com
     allen@millercanfield.com
     giroux@millercanfield.com
     *Attorneys for Plaintiff*

Dated: September 30, 2025

44226580.11/109111.00030