# EXHIBIT 1

# INVESTMENT MANAGEMENT AGREEMENT

## BETWEEN

## MUNICIPAL EMPLOYEES' RETIREMENT SYSTEM OF MICHIGAN

## AND

## verdant*f* AG

March 7, 2016

# INVESTMENT MANAGEMENT AGREEMENT

This Investment Management Agreement (Agreement) is executed and entered into as of the 7th day of March, 2016 (Effective Date) by and between verdant*f* AG, a Swiss regulated public limited company, (verdant*f*), and the Municipal Employees' Retirement System of Michigan (MERS), a public corporation established and maintained under the laws of the State of Michigan, and tax qualified under the United States Internal Revenue Code section 401(a) and tax exempt under Internal Revenue Code section 501(a).

In consideration of the mutual agreements contained in this Agreement, verdant*f* and MERS agree as follows:

## ARTICLE I.
## APPOINTMENT, AUTHORITIES, RECORDS, REPORTING AND MEETINGS

1.1     <u>Appointment</u>.  MERS appoints verdant*f* to provide investment management services regarding the MERS Real Assets Account (MERS Account), and verdant*f* accepts the appointment, on the terms and conditions set forth in this Agreement.  verdant*f* shall be responsible for managing and investing the funds in the MERS Account in all respects and shall have full fiduciary responsibility for the management and investment of the funds in the MERS Account, subject to the limitations contained in this Agreement including Section 1.8.

1.2     <u>Commitment size and Investment Period</u>.  The MERS Account will initially be limited to $150 million USD, which may be extended at the same conditions by mutual written agreement between the parties.

1.3     <u>Authorized MERS Personnel</u>.  Upon execution of this Agreement, MERS shall provide verdant*f* with a list of authorized MERS personnel (Authorized Persons) who will be permitted to advise, inform and direct verdant*f* on MERS' behalf, together with signature specimens of certain Authorized Persons who may execute specific tasks under this Agreement. The list of Authorized Persons and any changes to such list shall be made in writing (including email) to verdant*f*.  Until notified of any such change, verdant*f* may rely and act upon instructions and notices received from any Authorized Person identified on the then current list furnished by MERS in accordance with such list's terms and conditions.

1.4     <u>Administration and Records</u>.

    (a)     verdant*f* shall keep accurate and detailed accounts and records of its services under this Agreement, including such records as are required under the Investment Advisers Act of 1940, as amended, and any other applicable law, regulation or requirement.  verdant*f* agrees that all accounts and records relating to said services shall be open to inspection, copying, and audit at all reasonable times by any Person designated by MERS.  Upon termination, MERS may require that all books and records be transferred to it, except for those books and records that are required by law to be retained by verdant*f*.

(b)    verdantf agrees to maintain adequate books, records, and supporting documents to verify the services provided under this Agreement. Failure to maintain the books, records, and supporting documents required by this section shall establish a presumption in favor of MERS for the recovery of any funds authorized to be paid by MERS under this Agreement for which adequate books, records, and supporting documentation are not available to support such funds' purported disbursement. verdantf agrees that, except for accounts and records routinely or customarily destroyed in the ordinary course of business in compliance with applicable laws governing the retention of such documents, no accounts and records may be destroyed by verdantf unless otherwise agreed in writing by verdantf and MERS.

1.5    Reporting. verdantf shall provide MERS and its staff, auditors, accountants, and other professional advisers, with such documents, reports, data, and other information at such times as MERS may reasonably require. Such information shall be in a form satisfactory to, and approved by, MERS and agreed to by verdantf, which agreement shall not be unreasonably withheld. Specifically, verdantf shall provide detailed information regarding the use of capital called for the MERS Account, including but not limited to the salient facts of prospective investments, including estimated returns, MERS' ownership percentage, use of leverage and terms of said leverage, and any other information deemed pertinent to the particular capital call.

1.6    Quarterly and Annual Financial Statements.

(a)    Not later than 60 days following the end of each calendar quarter, verdantf shall forward to MERS the latest unaudited financial statement of the MERS Account, which shall include estimated share value and net asset value relative to each MERS Account investment, and itemization of investment and/or management fees and costs. Not later than 120 days following the end of each calendar year, verdantf shall provide MERS with the audited financial statement of the MERS Account.

(b)    Not later than 30 days following the receipt of unaudited quarterly financial statements from each investment made under the MERS Account, verdantf shall forward to MERS a written statement of MERS' estimated share value and net asset value relative to such investment. Not later than 30 days following the receipt of the audited annual financial statements for the previous calendar year corresponding to each investment made under the MERS Account, verdantf shall provide MERS with a copy of said statements or grant access to them through electronic means.

1.7    Meetings and Consultation. verdantf shall meet with MERS at such times and places as MERS and verdantf mutually agree. verdantf shall regularly consult with MERS and its staff on MERS' investments made under the MERS Account in order to assist MERS' development of a diversified, skilled, and balanced team. verdantf shall consult with and inform MERS' staff as requested in the development of investment ideas, strategy, and execution, as well as providing ongoing evaluation of strategy and performance. This interface shall include

regular telephone communication, exchange of written data and analysis, e-mail, and other interaction as agreed by MERS and verdant*f*.  Notwithstanding any other provisions in this section, verdant*f* agrees to meet in person with MERS at least twice every 18 months, one meeting to take place at MERS' office and one meeting to take place at verdant*f*'s office.  MERS shall provide notice to verdant*f* ten business days, as defined under Michigan law (Business Days), before any in-person meeting.  verdant*f* further agrees to participate in at least one telephone call per fiscal quarter with MERS to provide a status update.

     1.8    <u>Investment Due Diligence and Approval</u>.  As the investment manager of the MERS Account and MERS' fiduciary, verdant*f* shall be responsible for all due diligence regarding potential and consummated investments made under the MERS Account.  verdant*f* shall bring to MERS for its consideration verdant*f*'s recommendation regarding any potential investment before it has expended $25,000 USD in due diligence expenses.  MERS may, in its sole discretion, veto any potential investment or require additional due diligence by verdant*f* and resubmission for approval by MERS, under conditions determined in MERS' sole discretion.  MERS will not unreasonably delay its approval or veto of a potential investment and verdant*f* shall use all commercially reasonable efforts to bring potential investments to MERS for consideration as early as possible before a final approval is required by the individual investment in order to execute the investment.

     1.9    <u>Governmental, Regulatory, and Tax Filings</u>.  verdant*f* shall identify and notify MERS of required governmental, regulatory, tax or other filings required to be made in any jurisdiction relative to MERS' investments under the MERS Account.  verdant*f* shall execute and file any such required filings on behalf of MERS.

## ARTICLE II.
## COMPENSATION

     2.1    <u>Fees and Expenses</u>.  MERS shall pay verdant*f* as set forth in Schedule 1 of this Agreement.  verdant*f* agrees to furnish to MERS within ten Business Days of MERS' delivery of a written request (including email) by MERS, all fees and expenses information required by section 13(7) of the Michigan Public Employee Retirement System Investment Act, MCL 38.1132 *et seq.* (the Investment Act).

     2.2    <u>Invoices</u>.  verdant*f* shall submit to MERS a quarterly invoice within ten Business Days preceding each calendar quarter for which services are to be provided.  Invoices shall be emailed to mersreporting@mersofmich.com.

     2.3    <u>Most Favored Nation</u>.  For so long as this Agreement remains effective, if verdant*f* provides a lower fee agreement, exclusive of the revenue share referred to in Section 7.2 below, unless otherwise agreed with MERS in writing, to any new client for Comparable Services (as defined below), verdant*f* shall promptly advise MERS of such lower fee agreement, and reduce MERS' fees to the level specified in the agreement with such other client, to be effective as of the first day of the calendar quarter following the effective date of the new client's lower fee.  "Comparable Services" means similar management services provided to a client of a comparable asset size with a comparable direct investment allocation.  Nothing in this section shall require either party to violate any confidentiality obligations to which it is bound.

## ARTICLE III.
## REPRESENTATIONS, WARRANTIES AND COVENANTS OF VERDANT*f*

verdant*f* hereby represents and warrants, or covenants, as applicable, to MERS as follows:

3.1     <u>Qualifications of verdant*f*</u>.  verdant*f* is duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization and has full company power and authority to carry on its business as it has been and is conducted.

3.2     <u>Authority to Enter Into Agreement</u>.  The execution and delivery of this Agreement and the consummation of the transactions contemplated by this Agreement are within the power of verdant*f* and have been duly authorized by all necessary company and other action.  verdant*f* has duly executed and delivered this Agreement, and this Agreement constitutes a legal, valid, and binding agreement and obligation of verdant*f*, enforceable against verdant*f* in accordance with its terms, except insofar as such enforceability may be limited by bankruptcy or insolvency.

3.3     <u>Compliance with the Agreement</u>.  verdant*f* covenants that all services that verdant*f* shall provide under this Agreement shall meet the requirements and standards set forth in the body of this Agreement and any attached schedules.

3.4     <u>Conflict of Previous Agreements</u>.  Neither the execution nor delivery of this Agreement nor the consummation of the transactions contemplated by this Agreement will violate any agreement to which verdant*f* is a party or by which it is bound, any law, regulation, order, or any provision of the charter documents of verdant*f*.

3.5     <u>Legal and Regulatory Approvals</u>.  verdant*f* will timely complete all registrations, filings, approvals, licenses, authorizations, consents, or examinations (Authorizations) required by the Securities Act of 1933 and any rules and regulations issued under said Act, as well as by the laws of any state, which may require verdant*f* to obtain such Authorizations in connection with this Agreement and performance of the services contemplated by this Agreement.  verdant*f* shall maintain such proper Authorizations during the term of this Agreement.

3.6     <u>Qualifications of verdant*f*'s Agents</u>.  The Agents of verdant*f* responsible for discharging verdant*f*'s duties and obligations under this Agreement are and will be individuals experienced in the performance of the various functions contemplated by this Agreement.  None of verdant*f*'s Agents has been convicted of any felony, found liable in a civil or administrative proceeding, pleaded no contest, or agreed to any consent decree with respect to any matter involving breach of trust, breach of fiduciary duty, fraud, violations of any securities law or the United States Financial Industry Regulatory Authority (FINRA) Code of Conduct, or bankruptcy law violations.  verdant*f* shall notify MERS in writing (including email) if this representation and warranty is no longer accurate within five Business Days of the date of the conviction, liability, plea, or consent agreement.

3.7     <u>verdant*f*'s Independence in Contracting with MERS</u>.  verdant*f* has not agreed with, employed or retained any Person or selling agency to solicit or secure this Agreement under any contract, arrangement or understanding for a commission, percentage, brokerage,

5

contingent fee, or other consideration, whether provided directly or indirectly, except for Agents of verdant*f*. All such arrangements shall be fully disclosed to MERS in writing (including email) prior to execution of this Agreement. If verdant*f* in any way breaches or violates this warranty, MERS shall have the right to immediately terminate this Agreement and, in MERS sole discretion, to deduct from verdant*f*'s compensation under this Agreement, or otherwise recover, the full amount of such commission, percentage, brokerage, or contingent fee.

3.8    Employment of MERS' Agents. verdant*f* does not and shall not knowingly employ in any capacity: (a) any MERS Agent who either could influence the award of this Agreement or any competing agreement, or who does or will have any direct or indirect financial interest in this Agreement (Interested Person) and (b) any spouse or economic dependent of any Interested Person. To the best of verdant*f*'s knowledge, no Interested Person or any spouse or economic dependent of any Interested Person has an interest in the Agreement.

For purposes of this Agreement, "Agent" means any Person appointed, engaged or employed by MERS or verdant*f* or under the direct or indirect control of MERS or verdant*f*, respectively. For purposes of this Agreement, "Person" means an individual, a corporation, an association, a partnership, an organization, a limited liability company or partnership, a business, a trust, an estate, or any other legal entity.

3.9    Completeness of Material Facts Represented. verdant*f* represents and warrants that no representation or warranty contained in this Agreement nor any written statement, certificate, or document furnished or to be furnished to MERS by or on behalf of verdant*f* pursuant to this Agreement contains or will contain any misstatement of a material fact or omits or will omit to state a material fact necessary to make the statements contained in this Agreement or any written statement, certificate, or document referenced in this section not misleading.

3.10    Litigation, Legal Proceedings, and Regulatory Inquiries. verdant*f* represents, warrants, and covenants that neither it nor any Agent of it is or has been involved in any civil or criminal litigation, arbitration, mediation, or other legal proceeding related to its investment activities, including any non-routine review by a regulatory agency for any findings, deficiencies, or corrective actions related to investment activities. If verdant*f* becomes subject to any of these proceedings, reporting or findings, then, unless verdant*f* is prohibited from making such disclosure by law, verdant*f* will provide MERS with notice of same, all records related to same, as reasonably requested by MERS, a brief explanation of same, and indicate the current status of same. Such information and records shall be promptly emailed (or otherwise delivered) to Patricia J. Tarini, MERS' General Counsel, at ptarini@mersofmich.com.

3.11    Legal Compliance. verdant*f* represents, warrants, and covenants that it will comply and use commercially reasonable efforts to cause each investment made under the MERS Account to comply with all applicable requirements that any federal or state (or foreign, if applicable) securities law or regulation may impose with respect to the subject matter of or transactions contemplated by this Agreement and, upon MERS' reasonable request, verdant*f* will promptly cooperate with, and furnish information to MERS regarding, such legal requirements. Specifically, verdant*f* shall not knowingly act on the basis of any information obtained or utilized by verdant*f* in violation of the securities laws of the United States or any

6

foreign country. Furthermore, verdant*f* covenants that it shall abide by and assist U.S. anti-terrorism laws and promptly communicate any related actions to MERS.

3.12  <u>Insurance</u>. verdant*f* represents and warrants that for the investments currently forming part of the MERS Account, the individuals acting for MERS as directors and/or officers in each investment of the MERS Account are or will be covered by directors and officers liability insurance obtained by such investments for their respective directors and officers and agrees to use commercially reasonable efforts to cause such coverage to be maintained at all times during the term of this Agreement in the current investments as well as in future investments. Such insurance policies shall provide sufficient coverage limits so as to adequately protect such individuals from any losses that may be sustained by them while acting in representation of or as designees or appointees of the MERS Account. verdant*f* will provide MERS a copy of said insurance policies at MERS' request. verdant*f* will also immediately notify MERS if and when it learns that said insurance policy has lapsed or been canceled.

verdant*f* further represents and warrants that it shall obtain full Insurance Solution for Asset Managers (ISAM) coverage for purposes of providing coverage for its services under this Agreement, and agrees to use commercially reasonable efforts to cause such coverage to be maintained at all times during the term of this Agreement. Such insurance policy shall provide sufficient coverage limits, as mutually agreed to between the parties, so as to adequately protect any losses that may be sustained by the MERS Account resulting from breaches of fiduciary duty by verdant*f* as finally determined by a court of competent jurisdiction, if and when other insurance coverage is unavailable. verdant*f* will provide MERS a copy of said insurance policy at MERS' request. verdant*f* will also immediately notify MERS if and when it learns that said insurance policy has lapsed or been canceled. verdant*f* shall obtain said insurance as soon as possible and no fees under this Agreement shall be paid to verdant*f* until it provides proof of said insurance to MERS.

3.13  <u>Investment Fiduciary Status</u>. verdant*f* and MERS agree that based on verdant*f*'s duties, obligations and responsibilities under this Agreement, verdant*f* is a fiduciary to MERS and shall comply with those applicable fiduciary duties of an Investment Fiduciary set forth in the Investment Act. Notwithstanding the forgoing, MERS acknowledges that nothing in this Agreement precludes verdant*f* from having other clients and providing services to those clients that are the same or similar to those verdant*f* is agreeing to provide to MERS pursuant to this Agreement.

3.14  <u>Conflicts of Interest</u>. verdant*f* shall refrain from transactions in which it has a conflicting material interest (direct or indirect) without prior written consent from MERS. verdant*f* shall immediately notify MERS if this section is breached and all material details regarding the conflict of interest.

3.15  <u>Gifts</u>. verdant*f* covenants that no gratuities in the form of gifts, entertainment, or otherwise have been given nor will be given to any Agent of MERS or any member of MERS' Retirement Board concerning the entry into and/or continuation of this Agreement.

3.16  <u>Contributions to Michigan Government Officials</u>. verdant*f* represents and warrants to MERS that, as of the effective date of this Agreement, neither it nor any of its Agents

has made a contribution to an official of a Michigan state or local governmental entity as prohibited by fiduciaries under section 13(e) of the Investment Act, as amended, during the immediately preceding 24 calendar month period. verdant*f* agrees to provide prompt written notice to MERS of any such contribution described in the preceding sentence that is made by verdant*f* or its Agents at any time during the 24 calendar month period commencing on the effective date of this Agreement.

      3.17    <u>Change in Warranties or Organization, Key Person Departure</u>.

      (a)    verdant*f* shall notify MERS in writing within five Business Days if verdant*f* becomes aware that any of the representations and warranties of verdant*f* set forth in this Agreement cease to be true at any time during the term of this Agreement; or if there is any material change in the management personnel of verdant*f* or the professional personnel actively involved in rendering services under this Agreement, any material change in ownership or control of verdant*f*, or any other material change in the business organization of verdant*f*, including without limitation the filing for bankruptcy relief.

      (b)    Notwithstanding the provisions of Section 6.2 (Termination) and Section 6.3 (Rights, Remedies, and Responsibilities upon Termination), MERS shall have the right, upon written notice to verdant*f*, to terminate this Agreement in the event (a) that Gaia Arnaboldi (GA) and Berry Polmann (BP) cease to maintain at least a combined 50% ownership interest in verdant*f*, (an "Ownership Reduction") or (b) of any material change, to which MERS has not consented, in the combined responsibilities of GA and BP for the business of verdant*f* whereby GA and BP (collectively) cease to maintain at least 50% of the ultimate business responsibility for verdant*f* (a "Responsibility Reduction"); *provided, however*, that in the event of either an Ownership Reduction or a Responsibility Reduction, verdant*f* shall have not less than 60 days to propose a substitute verdant*f* principal to act on MERS' behalf in lieu of termination, which proposal MERS may either accept or reject at MERS' sole and exclusive discretion. MERS may terminate this Agreement effective immediately upon any such rejection.

    3.18    <u>Outside Fees Generated by the MERS Real Assets Account</u>. BP, GA or any other partner or employee of verdant*f* shall not accept compensation from any investment of the MERS Account, either as employees or as board members representing MERS or MERS' interests. Additionally, 100% of any fees paid to BP, GA, verdant*f*, or any of its employees related to advisory work done on behalf of portfolio companies of the MERS Account, including but not limited to financing fees, restructuring fees, consulting fees and brokerage fees, shall be reimbursed to MERS or used to offset management fees owed by MERS to verdant*f* under this Agreement. For the avoidance of doubt, revenues generated by joint ventures or partnerships with portfolio companies of the MERS Account are explicitly excluded from the above provision.

3.19    Reliance on verdant*f*'s Representations.  verdant*f* understands that MERS has relied upon the foregoing acknowledgments, representations, warranties, covenants, and agreements and that the same constitute a material inducement to MERS' decision to enter into this Agreement.

3.20    Contents of Underlying Investments.  Regarding all investments made under the MERS Account by verdant*f*, verdant*f* shall use commercially reasonable efforts to ensure, through each investment's legal documents or otherwise, that MERS' tax exposure is eliminated or reduced to the greatest extent permitted by law.  Further, verdant*f* shall ensure, through each investment's legal documents or otherwise, that MERS' potential liability regarding any investment made under the MERS Account is limited to only MERS' capital investment for that particular investment, and that no pass-through liability directly to MERS is possible.  verdant*f* shall also ensure that MERS' specific interests, as identified in MERS' general side letter attached as Schedule III, are represented in each investment made under the MERS Account, to the fullest extent practicable.  Breach of this clause shall subject verdant*f* to a for-cause termination of the Agreement at MERS' discretion, unless verdant*f* cures the breach within 30 days of the discovery of the breach.

## ARTICLE IV.
## REPRESENTATIONS, WARRANTIES AND COVENANTS OF MERS

MERS hereby represents and warrants, or covenants, to verdant*f* as follows:

4.1    Qualifications of MERS.  MERS is duly organized, validly existing, and in good standing under the laws of the jurisdiction of its organization and has full power and authority to carry on its business as it has been and is conducted.

4.2    Authority to Enter Into Agreement.    The execution and delivery of this Agreement and the consummation of the transactions contemplated in it are within the power of MERS and have been duly authorized by all necessary corporate and other action.  MERS has duly executed and delivered this Agreement, and this Agreement constitutes a legal, valid, and binding agreement and obligation of MERS, enforceable against MERS in accordance with its terms, except insofar as such enforceability may be limited by bankruptcy or insolvency.  MERS is duly authorized and has full legal power and authority to engage and pay verdant*f* for the services contemplated by this Agreement.

4.3    Conflict of Previous Agreements.  Neither the execution nor delivery of this Agreement nor the consummation of the transactions provided in it will violate any agreement to which MERS is a party or by which it is bound; any law; regulation; order; decree; or any provision of the charter documents of MERS.

4.4    Legal and Regulatory Approvals.    MERS has completed, obtained, and performed all registrations, filings, approvals, licenses, authorizations, consents, or examinations required by any government or governmental authority for entry into this Agreement and performance of its acts contemplated by this Agreement, and MERS shall maintain such proper authorizations during the term of this Agreement.

4.5     Compliance with Investment Act.  MERS, to the best of its knowledge, is in compliance with all provisions of the Investment Act with which it is obligated to comply.

4.6     Provision of Information.  MERS agrees to promptly provide any information requested by verdant*f*, which MERS may legally provide, and which verdant*f* reasonably believes will enable it to comply with any applicable law, rule, or regulation, including, without limitation, anti-money laundering laws.

4.7     Tax Qualification and Exemption.  MERS is and shall at all times remain tax qualified under the United States Internal Revenue Code section 401(a) and tax exempt under Internal Revenue Code section 501(a).

4.8     No Conflict of Interest.  MERS acknowledges and agrees that nothing in this Agreement constitutes a conflict of interest with respect to verdant*f*'s relationship with MERS.

## ARTICLE V.
## INDEMNIFICATION

5.1     Indemnity.  verdant*f* agrees to indemnify and hold harmless MERS, MERS' Retirement Board, and MERS' Agents (any and all of whom is/are referred to as a "MERS Indemnified Party"), from and against any and all losses, claims, damages, judgments, liabilities, fines, costs, charges, expenses (including but not limited to reasonable attorneys' fees and actual out-of-pocket costs), or penalties (any and all of which is/are referred to collectively as "Damages"), of every kind and description to which the MERS Indemnified Party may become subject, insofar as such Damages are caused by or arise directly out of a Cause event as outlined in Section 6.3(e) (Cause) occurring on or after the Effective Date and prior to the termination of this Agreement; *provided*, that verdant*f* shall not be obligated to reimburse a MERS Indemnified Party to the extent that a court of competent jurisdiction in a finding not subject to appeal has determined that such MERS Indemnified Party is not entitled to indemnity under this Agreement.

5.2     Cumulative Rights.  The rights of any MERS Indemnified Party to the indemnification provided in this Agreement shall be cumulative of, and in addition to, any and all rights to which the MERS Indemnified Party may otherwise be entitled by contract or as a matter of law or equity.

5.3     Indemnity Survival.   This indemnification provision shall survive the termination of this Agreement.

## ARTICLE VI.
## EFFECTIVE DATE AND TERMINATION

6.1     Effective Date.  This Agreement shall be effective as of the Effective Date (as defined above).

6.2     Termination.  This Agreement may be terminated by MERS with or without Cause (as defined below), upon 30 days' prior written notice (including email) given by MERS to verdant*f*.  Upon the effective date of such termination (Termination Date), verdant*f* shall

cease to perform its duties and obligations under this Agreement and shall reasonably cooperate with MERS in the wrapping up of the relationship between MERS and verdant*f*.

6.3    <u>Rights, Remedies, and Responsibilities upon Termination</u>.  In the event of any termination of this Agreement, all of the terms and conditions of this Agreement shall continue to apply through the Termination Date and through any period following such date, during which verdant*f* shall continue to perform its duties in a manner consistent with its duties to MERS, and to perform all services required under this Agreement in order to complete any transactions pending on the Termination Date and to facilitate an orderly transition to a successor (Transition Period), at the exclusive direction of MERS. The following provisions shall also apply to any termination of this Agreement:

(a)    <u>Post-Termination Responsibilities</u>. Unless otherwise directed by MERS, verdant*f* shall take all necessary steps to stop services under this Agreement on the Termination Date, except for those services required during the Transition Period.

(b)    <u>Termination Invoice</u>.  Following the Termination Date, verdant*f* shall submit to MERS, in the form and with any reasonable certifications as may be prescribed by MERS in good faith, verdant*f*'s final invoice (Termination Invoice).  The Termination Invoice shall prorate verdant*f*'s fees in accordance with Section 2.1 (Fees and Expenses).  verdant*f* shall submit such Termination Invoice no later than 60 days after the Termination Date. Upon verdant*f*'s failure to submit its Termination Invoice within the time allowed, MERS may determine, on the basis of information available to it, the amount, if any, due as refund from or remuneration to verdant*f*; such determination by MERS shall be final and not subject to challenge of any kind.  Within ten Business Days after MERS has made such determination or after verdant*f* has timely submitted its Termination Invoice, MERS shall authorize payment to verdant*f*, or verdant*f* shall issue a refund to MERS, as the case may be.

(c)    <u>Good Faith Transfer and Record Retention</u>.  Upon any termination of this Agreement, to the extent directed by MERS, verdant*f* shall continue to serve as investment administrator under this Agreement and be compensated at the then existing compensation level for the duration of the Transition Period. verdant*f* shall cooperate with MERS in good faith to effect a smooth and orderly transfer of such services and all applicable records.  Upon termination of this Agreement, verdant*f* shall return all of MERS' records in accordance with the terms and conditions of this Agreement.

(d)    <u>No Payment</u>.  If verdant*f* is removed for Cause, no Incentive Fee or Management Fee shall be due to verdant*f* in respect of any periods following the Termination Date.

(e)    <u>Cause Definition</u>.  For purposes of this Agreement, the term "Cause" shall mean one or more of the following:

(i)    verdant*f* commits, as finally determined by a court of competent jurisdiction, material:

    (A)    fraud;

    (B)    intentional/ willful misconduct;

    (C)    breach of a duty set forth in Section 3.13 (Contractual Fiduciary Duties) hereof; or

    (D)    gross negligence;

(ii)    verdant*f* materially breaches this Agreement, including, but not limited to violations of Section 3.14 (Conflicts of Interest), as reasonably determined in good faith by MERS; or

(iii)    verdant*f* files, either voluntarily or involuntarily, for bankruptcy.

(f)    <u>Payment of Incentive Fee in the Event of Termination without Cause</u>. In the event MERS' terminates verdant*f* without Cause (as defined below) and notwithstanding any Termination Invoice being issued and paid, verdant*f* shall remain entitled to an Incentive Fee as follows:

(i)    Termination without Cause in year 0 through the fourth anniversary of the effective date of Closing for each investment: 50% of the amount of the Incentive Fee that would have been payable to verdant*f* had MERS not so terminated verdant*f*, payable in connection with or promptly following realization by MERS of each and every investment that formed part of the MERS Account, and that was fully executed, at the time of termination.

(ii)    Termination without Cause on or after fourth anniversary and through the eighth anniversary of Closing for each investment: 80% of the amount of the Incentive Fee that would have been payable to verdant*f* had MERS not so terminated verdant*f*, payable in connection with or promptly following realization by MERS of each and every investment that formed part of the MERS Account, and that was fully executed, at the time of termination.

(iii)    Termination without Cause after the eighth anniversary of Closing for each investment: 100% of the amount of the Incentive Fee that would have been payable to verdant*f* had MERS not so terminated verdant*f*, payable in connection with or promptly following realization by MERS of each and every investment that formed part of the MERS Account, and that was fully executed, at the time of termination.

## ARTICLE VII.
## POWER OF ATTORNEY, REVENUE SHARE, RESERVED CAPACITY

7.1     <u>Power of Attorney</u>.  MERS grants to each of GA and BP a power of attorney to execute documents in MERS' name with respect to all matters set forth on Schedule 2.  Such power of attorney shall terminate immediately upon written notice by MERS to verdant*f*.  By their signatures below, each of GA and BP acknowledge and agree to this Section 0.

7.2     <u>Revenue Share</u>.

(a)     In exchange for MERS' commitment to the MERS Account, verdant*f* shall grant to MERS a share of its future, non-MERS affiliated revenues (Revenue Share).  The Revenue Share shall be equal to ten percent (10%) of the gross revenues earned by verdant*f* during each calendar quarter, after deducting from such amount any and all costs related to fundraising.  The Revenue Share shall be payable by verdant*f* to MERS within forty-five (45) days of the end of the calendar quarter in which the revenues were earned.  The Revenue Share shall apply to all fees earned by verdant*f* from its non-MERS customers, including, but not limited to, management fees, incentive fees, consulting fees or carried interest.  The Revenue Share shall have a term of 150 months (12.5 years) from the date of the initial investment in the MERS Account under this Agreement; provided that, if this Agreement shall terminate, then the Revenue Share shall no longer be payable by verdant*f*.

(b)     An Ownership Reduction or Responsibility Reduction as defined in Section 3.17(b) in years zero through five will require approval by MERS, which approval shall not be unreasonably withheld.  In the event of a change of control during years zero through five, MERS shall receive 20% of the gross sale proceeds and the revenue share agreement provided in Section 7.2(a) shall be terminated.  In the event of a change of control beyond year five, MERS shall receive 10% of the gross sale proceeds of such event and the revenue share agreement provided in Section 7.2(a) shall be terminated.

7.3     <u>Allocation and reserved capacity</u>.  For so long as (i) the MERS Account is not fully invested and funds are available for new investments and (ii) MERS has active investments with verdant*f*, either under this Agreement or any other investment management or investment administrative agreements, and (iii) is not in default under those agreements, verdant*f* shall give MERS priority over other clients with respect to any investment opportunity which becomes available to verdant*f* and which would match the amounts available for investment under the MERS Account and the investment criteria of MERS.

Additionally, verdant*f* shall reserve the right for MERS to participate in each of said investment opportunities up to the following limits:

(a)     For investment opportunities where the aggregate amount of capital to be invested is less than $60 million USD, 50% of the investment capacity shall be reserved for MERS; and

(b)     For investment opportunities where the aggregate amount of capital to be invested is greater than $60 million USD, 25% of the investment capacity shall be reserved for MERS.

Any changes to the above reserved capacity limits for specific investment opportunities must be agreed to in writing by verdant*f* and MERS. Upon mutual agreement, for investment opportunities where the aggregate amount of capital is less than $30 million USD, 100% of the investment capacity might be allocated to MERS.

## ARTICLE VIII.
## MISCELLANEOUS

8.1     <u>Confidentiality</u>. verdant*f* shall retain as strictly confidential all information about MERS, except as to any information required to be disclosed by law or regulation or in furtherance of a representative of verdant*f* carrying out his or her duties under this Agreement. Nothing in this Agreement shall require either party to violate the terms of any confidentiality obligation applicable to such party. This section shall survive the termination of this Agreement.

8.2     <u>Publicity</u>. No press release or other announcement concerning this Agreement shall be issued without prior written approval by both parties. Neither party shall at any time disclose any financial amounts, including the amount of money allocated under this Agreement, management fees, or other monetary specifics of any agreement with respect to the subject matter of this Agreement without the written consent of the other party.

8.3     <u>Headings: Interpretation</u>. The headings in the Agreement have been inserted for convenience of reference only and shall in no way restrict or otherwise modify any of the terms or provisions of this Agreement. Each party has participated fully and equally in the review and negotiation of this Agreement. The language in all parts of this Agreement shall in all cases be construed according to its fair meaning, and not strictly for or against either party.

8.4     <u>Counterparts</u>. This Agreement may be executed in any number of counterparts, each of which shall be an original, but all such counterparts shall together constitute one and the same instrument.

8.5     <u>Assignment</u>. verdant*f* may not assign this Agreement or any rights and responsibilities created by the Agreement without the prior written consent of MERS, which consent may be granted or withheld in MERS' sole discretion. Despite MERS' consent, no assignment shall release verdant*f* of any of its obligations or alter any of its primary obligations to be performed under the Agreement, unless such consent expressly provides for such release of verdant*f*. Any attempted assignment or delegation of this Agreement in violation of this provision shall be void and shall entitle MERS to immediately terminate this Agreement for cause.

8.6     Severability.  Should one or more provisions of this Agreement be held by any court to be invalid, void, or unenforceable, the remaining provisions shall continue in full force and effect.  The parties shall negotiate mutually acceptable alternate terms to effectuate the parties' intent with respect to any provision held by any court to be invalid, void, or unenforceable.

8.7     Amendments; Modifications; Waiver.  This Agreement contains the entire agreement, and supersedes any previous agreement, whether oral or written, between MERS and verdantƒ with respect to the subject matter of this Agreement.  This Agreement may not be amended or modified in any respect unless in a written document signed by both MERS and verdantƒ.  Except as provided in this Agreement, no waiver of any breach, failure of condition, right or remedy provided in this Agreement, shall be effective for any purpose unless specifically set forth in writing and signed by the parties.  The waiver of any breach, failure of condition, right or remedy in respect to any occurrence or event on one occasion shall not be deemed a waiver of such breach, failure of condition, right, or remedy in respect to such occurrence or event on any other occasion.  Notwithstanding the foregoing, pursuant to Section 2.3 (Most Favored Nation) of this Agreement, upon the effective date of verdantƒ's agreement to lower fees with a comparable client, this Agreement shall be amended to provide MERS with such lower fees.

8.8     Force Majeure.  Neither party shall be liable to the other for any default or delay in the performance of its obligations under this Agreement if and to the extent such default or delay is caused, directly or indirectly, by: flood, earthquake, elements of nature; riots, civil disorders, terrorism, rebellions or revolutions in any country; or any other cause beyond the reasonable control of the applicable party; but in every case the default or delay in performance must be beyond the reasonable control and without the fault or negligence of the applicable party.

8.9     Governing Law and Jurisdiction.  This Agreement shall be construed and enforced according to the laws of the State of Michigan, without regard to choice of law rules.  MERS and verdantƒ hereby submit to the jurisdiction of the courts of the State of Michigan, or of the United States Federal District Court sitting in the Western District of the State of Michigan, over any action, suit, or proceeding arising out of or relating to this Agreement.  Nothing in this Agreement shall affect the right of either party to serve process in any manner permitted by law or limit the right of either party to bring proceedings against the other party in the competent courts of any other jurisdiction or jurisdictions.

8.10    Notices.  All notices, reports, demands and other communications required under this Agreement and under any law shall be in writing and shall be deemed properly delivered if delivered by registered mail, an internationally recognized courier service, or by email if addressed as set forth below or to such other address or marked for such other attention as the addressed party shall have designated in writing to the other party:

If to MERS:

Edward Mikolay
Senior Investment Officer and Director of Private Markets

Municipal Employees' Retirement System of Michigan
1134 Municipal Way
Lansing, MI 48917, USA
Email:    mersreporting@mersofmich.com

See also Sections 2.2 (Invoices) and 3.10 (Litigation, Legal Proceedings, and Regulatory Inquiries)

If to verdant*f*:

> Gaia Arnaboldi
> verdant*f* AG
> Gladbachstrasse 105
> CH-8044
> Zurich, Zurich, Switzerland
> Email: gaia@verdantf.com

With copy to:

> Berry Polmann
> verdant*f* AG
> Gladbachstrasse 105
> CH-8044
> Zurich, Zurich, Switzerland
> Email: berry@verdantf.com

Notice shall be deemed given upon receipt.

8.11    Integration.  This Agreement, and any and all schedules attached to it and documents referenced in it, supersedes all previous oral and written agreements or understandings, and all contemporaneous oral and written negotiations, commitments, understandings and communications between the parties relating to the subject matter of this Agreement.

8.12    Schedules.  The schedules attached to this Agreement are incorporated in and made a part of this Agreement by reference.

8.13    No Agency.  verdant*f* shall at all times be acting in the capacity of an independent contractor.  Nothing in this Agreement or in any other document referred to in this Agreement and no action taken pursuant to this Agreement shall cause verdant*f* to be treated as an agent of MERS except as expressly provided in and limited by the terms and conditions of this Agreement.  This Agreement does not create a partnership, association, joint venture, or other entity between MERS and verdant*f*.  Nothing in this Agreement shall otherwise cause MERS to be responsible for any action or inaction of verdant*f* or any of its Agents.  verdant*f* understands and agrees that all persons furnishing services pursuant to this Agreement are deemed Agents solely of verdant*f* and not of MERS.

8.14    <u>Survival</u>.  The provisions of Section 2.1 (Fees and Expenses), ARTICLE V (Indemnification), ARTICLE VI (Effective Date and Termination), Sections 7.2 and 7.3 (Revenue Share and Reserved Capacity) and **Error! Reference source not found.** (Miscellaneous) and Schedule 1 attached to this Agreement shall survive the termination of the Agreement.

8.15    <u>Asset Ownership</u>.  For the avoidance of doubt, MERS is and shall at all times remain the sole owner of the assets in the MERS Account.

*[Signature Page Follows]*

IN WITNESS WHEREOF, the parties have hereunto executed this Agreement as of the day and year first above written:

For verdantf AG, verdantf

By: _____

    Gaia Arnaboldi
    Managing Partner

By: _____

    Berry Polmann
    Managing Partner

For the Municipal Employees' Retirement System of Michigan (MERS)

By: _____

    Jeb Burns
    Chief Investment Officer

## SCHEDULE 1

## FEES AND EXPENSES

### A.  MANAGEMENT FEES

Subject to Section 2.3 (Most Favored Nation) of the Agreement, MERS shall pay verdant*f* an annual "Management Fee" in an amount equal to one percent (1.00%) of MERS' aggregate invested capital in the investments made under the MERS Account.  MERS shall pay to verdant*f* the Management Fee in advance during the month preceding each calendar quarter.

### B.  INCENTIVE FEE

1. An "Incentive Fee" shall be calculated and paid on a "per investment" basis according to each individual investment made under the MERS Account.

2. Subject to Section 2.3 of the Agreement, should an investment under the MERS Account generate a realized IRR (as defined below) in excess of 8%, an Incentive Fee shall be paid by MERS to verdant*f* equal to 12.5% of returns in excess of 8% with 60% catch up.  For the purposes of the calculation of an Incentive Fee, set up costs, legal documentation, due diligence costs, direct investment costs, and annual Management Fees will be added to MERS' cost basis, such that the distribution waterfall shall read in the following order:

   i.  first, 100% to MERS until MERS' invested capital (including set up costs, legal and due diligence costs, direct and indirect investment costs and the total amount of annual Management Fees) is returned, then

   ii.  second, 100% to MERS until MERS receives an amount equal to an 8% compounded annual return on its invested capital, then

   iii.  third, allocated 60% to verdant*f* and 40% to MERS until verdant*f* has received aggregate distributions in an amount equal to 12.5% of the sum of (B.2.ii) above and MERS' portion of this clause (B.2.iii), then

   iv.  fourth, split, 87.5% to MERS and 12.5% to verdant*f*.

For the avoidance of doubt, IRR is defined as: the interest rate at which the net present value (NPV) of all the cash flows (both positive and negative) from the investments under the MERS Account equals zero.  The following is the formula for calculating NPV:

$$NPV = \sum_{t-1}^{T} \frac{C_t}{(1+r)^t} - C_0$$

where:

$C_t$ = net cashflow (inflows and outflows) during the period $t$

$C_o$ = total initial investment costs

$r$ = discount rate, and

$t$ = number of time periods

To calculate IRR using the formula, one would set NPV equal to zero and solve for the discount rate $r$, which is here the IRR. Because of the nature of the formula, IRR cannot be calculated analytically, and must instead be calculated using software programmed to calculate IRR. For the purpose of this Agreement, the XIRR function of Microsoft Excel will be used to calculate IRR.

3. <u>Sale Event</u> – A "Sale Event" will occur upon sale of any investment under the MERS Account. Upon a Sale Event, MERS shall pay to verdant*f* the Incentive Fee due to verdant*f* pursuant to Section B.2 above.

4. High Watermark Incentive Fee

   i. In the event that MERS has not sold all of its investments under the MERS Account on or before a High Watermark Date (as defined below) and any of the investments made under the MERS Account generate an IRR in excess of 8% (a "High Watermark Realization Event" and, together with a Sale Event, each a "Realization Event"), MERS shall pay to verdant*f* an amount equal to the Incentive Fee that would be due to verdant*f* pursuant to Section B.2 above upon realization of any investments under the MERS Account (a "High Watermark Incentive Fee"), according to the process described in Sections B.4.ii and B.4.iii below. "High Watermark Date" shall mean the anniversary that is eight (8) years following the Effective Date and, thereafter, every two (2) years following such initial High Watermark Date (i.e., on the tenth (10th), twelfth (12th), fourteenth (14th) and so forth, anniversaries of the Effective Date) until the earlier of the date verdant*f* is terminated for Cause or all investments under the MERS Account are sold in their entirety.

   ii. Upon the triggering of a High Watermark Realization Event, each party shall promptly engage an independent auditor (the "Initial Auditors") to determine the value of the High Watermark Incentive Fee, less any amount paid to verdant*f* as an Incentive Fee in connection with a prior Realization Event (the "Unrealized High Watermark Incentive Fee"). Following evaluation by the Initial Auditors, the parties will negotiate the value of the Unrealized High Watermark Incentive Fee. If the parties have not agreed upon the value of the Unrealized High Watermark Incentive Fee within twenty (20) Business Days of entering into such negotiations, the parties, at their mutual expense, shall engage a third independent auditor to determine the final valuation of the Unrealized High Watermark Incentive Fee (the "Final Determination"). MERS shall pay to verdant*f* the Unrealized High Watermark Incentive Fee no more than fifteen (15) Business Days

following receipt of such third independent auditor's written statement of the Final Determination. After receipt of any Incentive Fee, verdant*f* shall not be required to return such Incentive Fee, or any portion of it, not withstanding valuations determined pursuant to future Realization Events.

iii. In the event of a High Watermark Realization Event, MERS shall only be required to pay the High Watermark Incentive Fee from dividends paid by the investments under the MERS Account. In the event the amount of dividends paid in the then-current fiscal year to MERS ("Current Dividends") is less than the then due and payable High Watermark Incentive Fee, the amount of such deficiency shall be accrued and shall be payable by MERS to verdant*f* from any future dividends from the investments under the MERS Account. To the extent that Current Dividends are insufficient to pay any current payable High Watermark Incentive Fee, any future dividends or proceeds of a sale of an investment under the MERS Account shall be paid first to verdant*f* until the accrued High Watermark Incentive Fee has been paid in full. The amount paid to verdant*f* pursuant to the forgoing sentence shall not reduce the amount distributable to verdant*f* pursuant to the calculation of IRR pursuant Section **Error! Reference source not found.Error! Reference source not found.**2 of this Schedule 1 in connection with any future Realization Event that occurs while any High Watermark Incentive Fee accrued pursuant to the forgoing sentence remains outstanding.

## C. EXPENSES

1. MERS shall be responsible for paying verdant*f*'s expenses related to verdant*f*'s role as an investment fiduciary to MERS; specifically, reasonable travel costs and costs of third party legal counsel, consulting, tax, accounting services, and any costs associated with scouting and due diligence of prospective investments, to the extent such costs are not paid directly by the MERS Account portfolio. MERS' written consent is required before the payment of any expense, including aggregated due diligence expenses for each investment or potential investment, in excess of $25,000 USD.

2. Expenses related to verdant*f*'s employees, information technology hardware, software, and related services, rent, insurance, reporting obligations to MERS, and travel related to non-MERS investment opportunities shall be borne exclusively by verdant*f*.

## SCHEDULE 2

### POWER OF ATTORNEY

**The Municipal Employees' Retirement System of Michigan (MERS)** hereby grants power of attorney to Ms. Gaia Arnaboldi, identified with Italian Passport No. YA4723892, and Mr. Berry Laurens Polmann, identified with Dutch Passport No. BYCL28D45, (each of them an "Attorney" and together the "Attorneys") so that any of them may, acting individually, act on behalf of and represent MERS with the following powers of attorney:

1. To consider, settle, approve, sign, execute, deliver and/or issue all agreements, documents, certificates and instruments (all whether as a deed or not) which the Attorney in his absolute discretion considers desirable in connection with any investment pursued under the MERS Account.

2. To take any steps or do anything which the Attorney in his absolute discretion considers desirable in connection with the execution and implementation of any investment made under the MERS Account.

MUNICIPAL EMPLOYEES' RETIREMENT SYSTEM OF MICHIGAN

By: _____

Name: Deb Burns

Title: Chief Investment Officer

## SCHEDULE 3

## MERS GENERAL SIDE LETTER

Municipal Employees' Retirement System of Michigan
1134 Municipal Way
Lansing, Michigan 48917

RE:    **Sample Partners Fund I, L.P., Investment**

Ladies and Gentlemen:

This side letter (**Side Letter**) is in reference to your investment in Sample Partners Fund I, L.P., a Delaware limited partnership (the **Fund**). Capitalized terms used but not otherwise defined herein shall have the meanings set forth in the Amended and Restated Limited Partnership Agreement of Sample Partners Fund I, L.P. dated as of [DATE] (the **LPA**). GP LLC, a Delaware limited liability company, is the general partner of the Partnership (the **General Partner**). Municipal Employees' Retirement System of Michigan, a multiple employer, public employee tax qualified governmental pension plan trust, tax qualified under Section 401(a) of the Internal Revenue Code (the **Code**) and tax exempt under Code Section 501(a) (**MERS** or the **Investor**) is, contemporaneously herewith, subscribing for an interest as a limited partner in the Fund (**Limited Partner**), and assuming satisfaction of the conditions contained in the Joinder Agreement executed by Investor and acceptance thereof by the General Partner, will become a Limited Partner of the Partnership.

*Permitted Disclosures.* The General Partner acknowledges that the Investor intends to disclose in reports maintained or issued by the Investor or to the Investor's Board: (i) the name of the Fund; (ii) the date that the investment was made by the Investor in the Fund; (iii) the subscription of the Investor to the Fund; (iv) the amount of the Investor's cash drawn by the Fund; (v) the amount of cash distributed to the Investor by the Fund; (vi) the value of the Investor's investment in the Fund based on the Investor's capital account balance included in the financial statements delivered to the Investor; (vii) the internal rate of return of the Investor's investment in the Fund; provided that such disclosure is made only in connection with similar disclosure of information with respect to other alternative investment funds in which Investor is invested; and the types of investments made by the Fund (without naming individual portfolios) and a progress report on the Fund (without naming individual portfolios). The General Partner consents in advance to such disclosures in the manner described above and any such disclosure shall not constitute a breach of the LPA. The General Partner hereby represents and warrants that it shall not make any claim against the Investor if the Investor makes available to the public any of the foregoing in such circumstances. The General Partner acknowledges that Investor is subject to the Michigan Freedom of Information Act (MFOIA) and that, pursuant to its policies in connection therewith, its employees are not subject to confidentiality agreements with the General Partner that would encompass confidential information. The General Partner consents to the disclosure of confidential information to employees of Investor who are made aware of the confidential nature of such information and their obligations with respect thereto, provided that they comply with the

provisions of <u>Section 7.10</u> of the LPA (other than the requirement that Investor's employees be subject to the confidentiality agreements that encompass confidential information) and that they remain subject to <u>Section 7.10</u> of the LPA. The General Partner agrees that in the event Investor receives a request under the MFOIA to disclose such confidential information it shall not be obligated to cooperate with the efforts of the General Partner in connection with any challenge to its standing to obtain a protective order or other remedy to protect such confidential information from being disclosed pursuant to such MFOIA request. Notwithstanding the foregoing, the Investor will take General Partner's reasonable concerns into consideration when determining whether and to what extent to disclose confidential information that is subject to a MFOIA request.

*Key Personnel.* The General Partner agrees to notify the Investor, in writing, if any of the entities identified under the Private Placement Memorandum or LPA are no longer providing services. Such notice shall be circulated to Investor no later than thirty (30) days following the termination or departure.

*No Litigation.* The General Partner and its affiliates:

represent and warrant, as of the date of this Side Letter, that to the best of their knowledge, there is no past or present legal action, suit, arbitration, or other legal, administrative or governmental investigation, inquiry or proceeding (whether federal, state, local or foreign including, but not limited to the U.S. Securities and Exchange Commission or any state securities regulatory authority) (each an **action**) outstanding against the Fund or the General Partner that claim or allege (A) violation of any federal or state securities law, rule, or regulation; (B) breach of its fiduciary duties; and (C) within the past five (5) years prior to the date hereof, neither the General Partner nor any of its affiliates has been found liable for, nor settled, any such violation in any such action, proceeding or investigation;

shall immediately notify the Investor of (i) any lawsuits or legal proceedings in which the Fund, the General Partner, or any of their affiliates are a named party or a witness, or (ii) any lawsuit or legal proceedings pending of which they are aware which may, in the case of clause (ii), materially adversely affect the ability of the General Partner from performing its obligations; and

shall notify the Investor immediately upon notice of any investigation (other than routine examinations) by the U.S. Securities and Exchange Commission or other state securities regulatory authority.

*Insurance.* The General Partner (a) represents and warrants that it currently maintains directors and officers liability insurance (**D&O Insurance Policies**) and (b) agrees to use commercially reasonable efforts to maintain D&O Insurance Policies at all times during the term of the Fund. The General Partner shall provide the Investor with notice of any material claims made against the D&O Insurance Policies.

*Fiduciary Duties & Compliance.* The General Partner and its affiliates hereby agree to carry out their fiduciary duties with respect to the Investor and the Fund with the care, skill, prudence and diligence that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of a like character and with like aims, and with respect to all

investment opportunities managed by the General Partner and its affiliates on a fair and equitable basis. The General Partner and its affiliates further confirm that they shall use commercially reasonable efforts to not knowingly violate applicable laws of any jurisdiction where any investment is made.

*Investor's Composite Portfolios – Total Market Fund.* The parties hereto acknowledge and agree that the assets managed by the General Partner under the LPA are indirectly part of the Investor's Total Market Fund, a diversified fund utilizing various management styles and strategies to provide reasonable growth and income while minimizing market volatility relative to the broader equity markets. The Investor offers the Total Market Fund and composite portfolios (**fund of funds**) as an investment choice in its Defined Contribution Program, Deferred Compensation Program, Investment Services Program, Health Care Savings Program, and Retiree Health Care Funding Vehicle, and Investor anticipates creating other governmental plan investment options and products, as well as fund-affiliated or endorsed programs that may be marketed to the nongovernmental sector. It is understood that this Side Letter along with the LPA and the General Partner's fees for the services performed thereunder shall remain in effect and not be affected by inclusion or exclusion of assets in any of the Investor's composite portfolio offerings, including the Total Market Fund.

*Conference Calls and Annual Meeting.* Notwithstanding anything to the contrary set forth in the LPA, the General Partner hereby agrees to participate in quarterly conference calls with Investor and two (2) annual in person meetings with the Investor at General Partner's and Investor's office. Investor shall provide five (5) day notice prior to such quarterly calls and five (5) day notice prior to the annual meeting.

*Indemnification.* The Investor has advised the General Partner that its direct and indirect indemnification obligations under the Partnership Agreement may be limited to the extent required under Michigan law. Notwithstanding anything to the contrary in the Partnership Agreement, Subscription Agreement and/or the attachments thereto, the Partnership shall at no time require the Investor to make an indemnification payment to the Partnership or any other third party to the extent the Investor is prohibited by applicable Michigan law from doing so, and notifies the General Partner of such prohibition, and any indemnification payment made by the Investor shall be limited to the Investor's unfunded capital commitment; provided, however, shall not constitute a waiver of any other rights or remedies that the Partnership and the General Partner have under the Partnership Agreement, the Subscription Agreement, this Letter Agreement and applicable law with respect to any breach by the Investor under the Subscription Agreement or the Partnership Agreement.

*Investor Reporting Requirements.* Notwithstanding anything to the contrary in the LPA, the General Partner shall furnish, to the extent reasonably available, to the Investor such additional information as the Investor may reasonably request from time to time and upon reasonable written notice as is necessary to (a) comply with the Investor's reporting requirements; (b) complete the Investor's income tax or information returns; or (c) comply with any disclosure requirements of any governmental body, regulatory agency, official or authority having jurisdiction over the Investor. In addition, General Partner agrees to report to Investor within fifteen (15) days any changes in its investment strategy, ownership structure, and management and/or senior staffing.

*U.S. Tax Withholding.*  In addition to any representations and warranties provided in the Subscription Agreement, the Investor hereby represents and warrants to the General Partner that it is a tax-exempt entity under U.S. federal, state and local laws, and has never been subject to, and is unlikely to be subject to, any tax withholding requirements of the U.S. federal, state or local laws. To the extent reasonably feasible and subject to any applicable requirements of law, including laws relating to the timing, withholding and payment of taxes, before withholding and paying over to any United States taxing authority any amount purportedly representing a tax liability of the Investor pursuant to the provisions of the LPA, the General Partner will provide the Investor with written notice of any claim of any U.S. taxing authority that such withholding and payment is required by law and will provide the Investor with the opportunity to contest (at the Investor's expense) such claim during any period; provided that such contest does not subject the Limited Partnership or the General Partner or its members to any potential liability to such taxing authority for any such claimed withholding and payment, and would not otherwise, in the reasonable judgment of the General Partner, result in adverse consequences to the LPA or any of its Partners.

*Tax Filings-Non-U.S. Filings.*  If the General Partner is or becomes aware that, as a result of an investment in [     ] made directly or indirectly by the Partnership, that the Investor will be obligated to file a tax return in a jurisdiction outside of the United States, the General Partner shall use commercially reasonable efforts to notify Investor of this obligation.  In such case, the General Partner shall use commercially reasonable efforts to provide information with respect to such non-U.S. [     ] Asset (and taxation thereon) to Investor that the General Partner has in its possession or may reasonably obtain, subject to the General Partner's reasonable discretion not to disclose information that is confidential or to the extent such disclosure would violate any law or any provision of the Partnership Agreement. In no event shall the Partnership or the General Partner be liable for Investor's tax liability or cost of filing tax returns arising under this paragraph.

*Transfer of Limited Partnership Interests.*  The General Partner represents and warrants that it will not unreasonably withhold its consent to the transfer by Investor of its limited partnership interests.

*Contributions to Government Officials.*  The General Partner represents and warrants to the Investor that, as of the date hereof, that neither it nor the Partnership has made a contribution to an official of a Michigan state or local governmental entity under section 13(e) of Michigan Public Act 314 of 1965, as amended, at any time during the period through and including March 27, 2013 to the date hereof. The General Partner agrees to provide written notice of any such contribution described in the preceding sentence that is made by the General Partner, the Partnership, or the Investment Manager at any time during the 24-calendar month period commencing on the date hereof.

*Confidentiality/Disclosure of Identity.*  The General Partner shall not disclose the identity of the Investor as a Limited Partner in any marketing materials, including news releases, without the Investor's prior written consent. Notwithstanding the previous sentence, the General Partner and the Fund shall be permitted to disclose the Investor's name and the investment in the Fund (a) as requested by a governmental or similar authority or required by law, legal process, regulation (including filings for federal and state securities and other laws in connection with the offering of interests and in and making of investments by the Fund) or the rules of any self- regulatory

organization; (b) to the legal counsel and independent accountants of the General Partner and the Fund and, on a need to know basis as reasonably determined by the General Partner to perform its duties under the LPA, to other participants in transactions or potential transactions with the Fund; and (c) to other investors in the Fund.

*Annual Reports.*  Each annual report provided by the General Partner to the Investor pursuant to the Partnership Agreement shall contain: (i) a schedule of aggregate management fees and incentive fees and (ii) a breakdown of Fund expenses. In addition, the General Partner will provide the Investor with a specific breakdown of fees in accordance with section 13(7) of Public Act 314 of 1965, as amended.

*Advisory Committee.*  For so long as the Investor is not in default under the LPA, the Investor shall be entitled to appoint one (1) representative to the Advisory Committee and such representative and Investor shall be entitled to such indemnification as provided in the LPA. The Partnership will pay for all travel costs and expenses incurred by Investor's representative to attend an Advisory Committee meeting.

*Sovereign Immunity.*  The General Partner acknowledges and agrees that the Investor reserves all immunities, defenses, rights or actions arising out of Investor's sovereign status or under the Eleventh Amendment to the United States Constitution, except to the extent waived by statute. No waiver of such reserved immunities, defenses, rights, or actions shall be implied or otherwise deemed to exist by reason of its entry into any of the Investor Agreements, by any express or implied provision thereof or by any actions or omissions to act by the Investor or any of its representatives or agents, whether taken pursuant to the Investor Agreements or prior to the Investor's execution thereof.

*Credit Facilities.*  The General Partner acknowledges that based on the Investor's interpretation of Article IX, Section 18 of the Constitution of the State of Michigan, the Investor is prohibited from agreeing with any of the Partnership's lenders that the Investor will honor any request from any of the Partnership's lenders to fund any portion of its Capital Commitment or to enter into any agreement or document with any of the Partnership's lenders. Therefore, the Investor will not be required to honor any request from any of the Partnership's lenders to fund any portion of its Capital Commitment (although, for the avoidance of doubt, the Investor shall be required to honor any capital call issued by the General Partner to make Capital Contributions into an account in the name of the Partnership that is maintained with the Partnership's lender) or to deliver any opinion or any agreement to the Partnership's lenders; provided however, that the Investor agrees to provide such information as is reasonably requested by the General Partner or the Partnership's lenders with regard to the Investor.

*Negative Consent.*  Notwithstanding any provision in the LPA, in no event shall Investor's vote, consent or approval be obtained by negative consent.

*Most Favored Nations.*  Neither the Fund nor the General Partner will enter into any side letter, subscription agreement, or similar agreement, or amendment thereto with any Investor in the Fund which grants rights or benefits that are more favorable than those granted to Investor. Within thirty (30) days of the closing date, the General Partner shall provide Investor with copies of any side letter entered into by the Fund. The General Partner hereby agrees to amend this side

letter to the extent necessary to be at least as favorable to Investor as the provisions of any side letter provided, if and to the extent Investor requests such amendment within thirty (30) days after receipt of such side letters. After the closing, the General Partner shall send all side letters, subscription agreements similar agreements, and amendments thereto within thirty (30) days of entering into such agreements, and Investor shall have sixty (60) days to elect the benefit of any such side letter or agreement.

*Jurisdiction.* The Investor hereby irrevocably and unconditionally submits to the nonexclusive jurisdiction of any Michigan State court or Michigan federal court of the United States of America, and any appellate court from any of the foregoing, in any action or proceeding arising out of or relating to the Investor's status as a Limited Partner, the Partnership Agreement or the Partnership's business or affairs or for recognition or enforcement of any judgment, and the Investor hereby irrevocably and unconditionally agrees that all claims in respect of any such action or proceeding may be heard and determined in such Michigan State or, to the extent permitted by law, in such federal court. The Investor agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law. The Investor expressly agrees that this Side Letter agreement does not preclude the Partnership or the General Partner from seeking personal jurisdiction over the Investor in any court in any legal proceeding involving any claim asserted, arising out of or related to the Partnership Agreement that is brought by the General Partner on its own behalf of the Partnership against the Investor.

This Side Letter: (i) may be amended, modified, or supplemented only by written agreement of the parties hereto; (ii) shall be governed, construed, administered and regulated in all respects by the laws of the State of Michigan; and (iii) shall be binding upon the parties hereto and their respective legal representatives, heirs, successors and assigns. In case any one or more of the provisions contained in this Side Letter or any application thereof shall be invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of the remaining provisions contained herein and other application thereof shall not in any way be affected or impaired thereof. Nothing in this Side Letter shall be deemed to create any right in any person not a party hereto (other than the permitted successors and assigns of a party hereto) and this Side Letter shall not be construed in any respect to be a contract in whole or in part for the benefit of any third party (except as aforesaid). This Side Letter may be executed in any number of counterparts, any one of which need not contain the signatures of more than one party, but all of such counterparts together shall constitute one agreement. Signatures to this Side Letter transmitted by facsimile or by e-mail in .pdf format shall be valid and effective to bind the party so signing.

If the above correctly reflects our understanding with respect to the foregoing matters, please so confirm by signing and returning the enclosed copy of this Side Letter to us.

**Sample Partners Fund I, LP**

By: Global Capital GP LLC, a Delaware limited liability company, its General Partner for itself and Sample Partners Fund I, L.P.

By:  _____

Name:  _____

Its:  _____

Acknowledged and agreed to as of the date first written above by:

**INVESTOR**:

**MUNICIPAL EMPLOYEES' RETIREMENT SYSTEM OF MICHIGAN**

By: _____

Name: Jeb Burns

Title: Chief Investment Officer