# EXHIBIT 2

**Execution Version**

**CONCORD BLUE DEVELOPMENT, LLC**

**MEMBERSHIP INTEREST SUBSCRIPTION AGREEMENT**

**DATED AS OF March 8, 2016**

THE MEMBERSHIP INTERESTS THAT ARE THE SUBJECT OF THIS AGREEMENT HAVE NOT BEEN REGISTERED OR QUALIFIED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR ANY RULES OR REGULATIONS PROMULGATED THEREUNDER, OR UNDER ANY APPLICABLE STATE SECURITIES LAWS, INCLUDING THE SECURITIES LAWS OF THE STATE OF DELAWARE OR THE STATE OF CALIFORNIA, OR ANY RULES OR REGULATIONS PROMULGATED THEREUNDER, WHICH WILL BE ISSUED TO INVESTOR PURSUANT TO AN EXEMPTION FROM SUCH REGISTRATION OR QUALIFICATION IN RELIANCE ON THE REPRESENTATIONS AND WARRANTIES OF INVESTOR HEREUNDER, AND MAY NOT BE OFFERED FOR SALE, SOLD, PLEDGED, HYPOTHECATED, TRANSFERRED OR OTHERWISE DISPOSED OF BY INVESTOR UNLESS REGISTERED OR QUALIFIED UNDER THE SECURITIES ACT AND ALL APPLICABLE STATE SECURITIES LAWS OR AN EXEMPTION FROM SUCH REGISTRATION OR QUALIFICATION IS ESTABLISHED TO THE SATISFACTION OF THE ISSUER.

# TABLE OF CONTENTS

**Page**

**ARTICLE 1 DEFINITIONS**..................................................................................................1

    Section 1.01   Definitions.........................................................................................1

**ARTICLE 2 SUBSCRIPTION AND CLOSING** .................................................................2

    Section 2.01   Subscription and Issuance..................................................................2
    Section 2.02   Closing ..............................................................................................2
    Section 2.03   Conditions Precedent ........................................................................3
    Section 2.04   Amendments to Licenses ...................................................................3
    Section 2.05   Transfer Restrictions .........................................................................4
    Section 2.06   Costs of Transactions ........................................................................4
    Section 2.07   Use of Funds .....................................................................................4

**ARTICLE 3 REPRESENTATIONS AND WARRANTIES** ................................................5

    Section 3.01   Representations and Warranties of the Company ..............................5
    Section 3.02   Representations and Warranties of Investor ...................................14

**ARTICLE 4 INDEMNIFICATION** ....................................................................................15

    Section 4.01   Indemnification by the Company and CBE .....................................15
    Section 4.02   Remedy of Investor .........................................................................16
    Section 4.03   Company's Right to Cure .................................................................16
    Section 4.04   Time Limitations on and Forfeiture of Claims ...............................17
    Section 4.05   Limitations on Liability ..................................................................17
    Section 4.06   Exclusion or Reduction of Liability.................................................18
    Section 4.07   Indemnification by the Investor ......................................................18
    Section 4.08   Procedures for Indemnification Claims ...........................................19

**ARTICLE 5 ADDITIONAL COVENANTS** ......................................................................19

    Section 5.01   EPC Wrap ........................................................................................19
    Section 5.02   Interest in Certain Projects..............................................................19

**ARTICLE 6 GOVERNING LAW AND DISPUTE RESOLUTION** .................................21

    Section 6.01   Governing Law ................................................................................21
    Section 6.02   Arbitration.......................................................................................21
    Section 6.03   Equitable Remedies .........................................................................22
    Section 6.04   Consent to Jurisdiction and Venue ..................................................22
    Section 6.05   Recovery of Costs ...........................................................................22

**ARTICLE 7 MISCELLANEOUS PROVISIONS** .............................................................23

    Section 7.01   Survival...........................................................................................23
    Section 7.02   Parties in Interest.............................................................................23
    Section 7.03   Assignment .....................................................................................23
    Section 7.04   Notices ............................................................................................23
    Section 7.05   Entire Agreement ............................................................................24

2

Section 7.06    Binding Effect ....................................................................................24
Section 7.07    Amendment ........................................................................................24
Section 7.08    Waiver or Consent ..............................................................................24
Section 7.09    Severability ........................................................................................24
Section 7.10    Drafting Presumption ........................................................................24
Section 7.11    Headings ............................................................................................25
Section 7.12    Gender ...............................................................................................25
Section 7.13    Counterparts ......................................................................................25
Section 7.14    Further Assurances .............................................................................25
Section 7.15    Confidentiality and Press Release .......................................................25
Section 7.16    Sovereignty ........................................................................................26

DWT 29020018v7 0106299-000001

## MEMBERSHIP INTEREST
## SUBSCRIPTION AGREEMENT

**THIS MEMBERSHIP INTEREST SUBSCRIPTION AGREEMENT** is made as of March 8, 2016, by and between Concord Blue Development, LLC, a Delaware limited liability company (the "**Company**"), and Municipal Employees' Retirement System of Michigan, a public nonprofit corporation established and maintained under the laws of the State of Michigan ("**Investor**"). Capitalized terms not defined herein shall have the meanings set forth in the Amended and Restated Limited Liability Company Agreement of the Company in the form attached hereto as <u>Exhibit A</u> (as amended, amended and restated, supplemented or otherwise modified from time to time, the "**LLC Agreement**"). CBE shall be a party to this Agreement for the limited purposes specified herein. The Company, the Investor and CBE are each a "**Party**" and are collectively the "**Parties**".

## RECITALS

**WHEREAS**, the Company was formed pursuant to a Limited Liability Company Certificate of Formation filed with the Secretary of State of the State of Delaware on July 24, 2014 (as amended from time to time, the "**Certificate of Formation**");

**WHEREAS**, as of the date hereof, all issued and outstanding membership interests in the Company are owned and held of record and beneficially by the sole member of the Company, Concord Blue Energy, Inc., a Delaware corporation ("**CBE**"), pursuant to that certain Operating Agreement of the Company dated as of July 24, 2014 (the "**Original LLC Agreement**"); and

**WHEREAS**, Investor desires to subscribe for and purchase, and the Company desires to issue and sell to Investor, Class A Units in the Company, upon the terms and subject to the conditions hereinafter set forth;

**NOW, THEREFORE**, in consideration of the mutual promises, agreements, covenants, representations and warranties hereinafter set forth, the Parties, intending to be bound legally, hereby agree as follows:

## ARTICLE 1
## DEFINITIONS

Section 1.01    <u>Definitions</u>. In addition to the terms defined elsewhere in this Agreement, the following terms used herein shall be construed to have the meanings set forth or referenced below.

(a)    "**Affiliate**" means, with respect to any specified Person, any other Person who, directly or indirectly, controls, is controlled by or is under common control with such specified Person.

(b)    "**Business Day**" means any day, other than a Saturday or a Sunday, that is neither a legal holiday nor a day on which banking institutions are generally authorized or required by Law to close in Lansing, Michigan or Los Angeles, California.

(c)    "**Founder**" means Christopher Thannhaeuser.

(d)    "**Knowledge**" shall be determined as follows: (i) an individual will be deemed to have Knowledge of a particular fact or other matter if such individual is actually aware of such fact or other matter or such individual would, in light of his or her particular function within the Company or the Subsidiary, reasonably be expected to discover or otherwise become aware of such fact or other matter in performing his or her particular duties, and (ii) the Company will be deemed to have Knowledge of a particular fact or other matter if any member of the Company's board of managers has Knowledge of such fact or matter.

(e)    "**Lien**" shall mean any lien, charge, encumbrance, security  interest including but not limited to interests arising from options, pledges, mortgages, indentures, security agreements, rights of first refusal or rights of preemption, irrespective of whether such lien arises under any agreement, covenant, other instrument, the mere operation of statutory or other laws or by means of a judgment, order or decree of any court, judicial or administrative authority, and shall also mean any approval or consent required from a third party to the exercise or transfer of a right or title.

(f)    "**Person**" means an individual, a partnership, a corporation (including a business trust), a joint stock company, a limited liability company, an unincorporated association, a joint venture or other entity or a governmental authority.

## ARTICLE 2
## SUBSCRIPTION AND CLOSING

Section 2.01    Subscription and Issuance.

(a)    Upon the terms and subject to the conditions herein set forth and subject to deposit of the Escrow Amount as specified in Section 2.07 below, Investor shall subscribe for and purchase from the Company for a subscription price and capital contribution to the Company of $25,000,000 (the "**Subscription Price**") payable in full in lawful currency of the United States of America in a single installment at the Closing (as hereinafter defined) which shall be deposited in the Escrow Account, and the Company shall issue and sell to Investor, (a) at the Closing, one (1) Class A Unit of the Company, and (b) additional Class A Units as the Escrow Amount is released from the Escrow Account (each as defined in Section 2.07 below) in accordance with Section 3.04(b) of the LLC Agreement.  In the event amounts remaining in the Escrow Account are returned to Investor pursuant to Section 3.04(b) of the LLC Agreement or Section 2.07 of this Agreement, Investor shall have no further right to acquire Class A Units under this Agreement.

(b)    If, on the fifth anniversary of the Closing Date, the Investor has not released all of the funds in the Escrow Account, the Company may exercise its option to release the remaining funds to the Investor, as set forth in Section 3.04(b)(ii) of the LLC Agreement.

Section 2.02    Closing. Subject to satisfaction or waiver of the conditions precedent set forth in Section 2.03 hereof, the closing for the subscription, purchase, issuance and sale the Class A Units hereunder and the payment of the Subscription Price ("**Closing**") shall occur at the offices of the Company located at 12424 Wilshire Boulevard, Suite 660, Los Angeles, California

2

90025, United States of America ("**Company Offices**"), as of the date hereof or at such other place, date or time as the Company and Investor may agree upon in writing or upon which such Closing actually occurs ("**Closing Date**"). At the Closing,

(a)     The Company and CBE shall execute and deliver, and Investor shall execute and deliver, the LLC Agreement;

(b)     Investor shall deposit the Subscription Price into the Escrow Account for the Class A Units by wire transfer of immediately available funds from an account located in the United States of America to the Escrow Account in accordance with the Escrow Agreement; and

(c)     The Company shall deliver to Investor evidence of the issuance, to the name of Investor, of one (1) Class A Unit.

Section 2.03   Conditions Precedent. The obligations of each Party to complete the transactions contemplated at Closing are subject to the fulfillment (or written waiver) of the following conditions as of the Closing Date:

(a)     The obligations of the Company to complete the transactions contemplated at the Closing are subject to the fulfillment of the following conditions as of the Closing Date, or written waiver of any or all such conditions by the Company and CBE, (i) the representations and warranties of Investor contained in Section 3.02 hereof shall be true and correct in all materials respects as of the respective dates therein set forth occurring on or before the Closing Date, and (ii) Investor shall have fully performed and observed all of the terms, covenants and conditions on Investor's part to be performed and observed under this Agreement on and as of the Closing Date, including, without limitation, delivery of the Subscription Price and execution and delivery of all agreements, documents and instruments required to be executed and/or delivered by Investor at the Closing, including, without limitation, the LLC Agreement and the Escrow Agreement to be entered into on the Closing Date among MERS, CBE and the Company to regulate the disbursement of the amount included in the corresponding escrow account (the "**Escrow Agreement**"); and

(b)     The obligations of Investor to complete the transactions contemplated at the Closing are subject to the fulfillment of the following conditions as of the Closing Date, or written waiver of any or all such conditions by Investor, (i) the representations and warranties of the Company contained in Section 3.01 hereof shall be true and correct in all respects as of the respective dates therein set forth occurring on or before the Closing Date,  (ii) the Company shall have fully performed and observed all of the terms, covenants and conditions on its part to be performed and observed under this Agreement on and as of the Closing Date, including, without limitation, execution and delivery of all other agreements, documents and instruments required to be executed and/or delivered by the Company and/or CBE at the Closing, including, without limitation, the LLC Agreement and the Escrow Agreement.

Section 2.04   Amendments to Licenses.  Prior to the Closing Date, the Agreement and Omnibus Amendment (the "**Amendment Agreement**"), as attached hereto as Exhibit B, and such other agreements deemed by Investor necessary to secure the rights to use the Intellectual

Property Rights shall have been executed, including but not limited to, the Indemnification Agreement, dated March 8, 2016.

Section 2.05   Transfer Restrictions. Investor agrees that the transfer of the Class A Units is restricted under the LLC Agreement and further that the Class A Units may not be offered for sale, sold, pledged, hypothecated, transferred or otherwise disposed of unless registered or qualified under the Securities Act of 1933, as amended, and all rules and regulations promulgated thereunder (collectively, "**Federal Securities Act**"), or the laws of any state, including the laws of the State of Delaware and the State of California, and all rules and regulations promulgated thereunder (collectively, "**State Securities Acts**"), or an exemption from such registration or qualification is established to the satisfaction of the Company, and the LLC Agreement and any certificate or certificates evidencing the Class A Units shall contain a legend to such effect as follows:

> THE UNITS REPRESENTED BY THIS DOCUMENT HAVE NOT BEEN REGISTERED UNDER ANY SECURITIES LAWS AND THE TRANSFERABILITY OF SUCH UNITS IS RESTRICTED.  SUCH UNITS MAY NOT BE SOLD, ASSIGNED OR TRANSFERRED, NOR WILL ANY ASSIGNEE, VENDEE, TRANSFEREE OR ENDORSEE THEREOF BE RECOGNIZED AS HAVING ACQUIRED ANY SUCH UNITS BY THE ISSUER FOR ANY PURPOSES, UNLESS (a) A REGISTRATION STATEMENT UNDER THE SECURITIES ACT OF 1933, AS AMENDED, WITH RESPECT TO SUCH UNITS WILL THEN BE IN EFFECT AND SUCH TRANSFER HAS BEEN QUALIFIED UNDER ALL APPLICABLE STATE SECURITIES LAWS, OR (b) THE AVAILABILITY OF AN EXEMPTION FROM SUCH REGISTRATION AND QUALIFICATION WILL BE ESTABLISHED TO THE SATISFACTION OF COUNSEL TO THE ISSUER.

> THE UNITS REPRESENTED BY THIS DOCUMENT ARE SUBJECT TO FURTHER RESTRICTIONS AS TO THEIR SALE, TRANSFER, HYPOTHECATION OR ASSIGNMENT AS SET FORTH IN THE AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT OF THE COMPANY, WHICH IS AVAILABLE AT THE PRINCIPAL OFFICE OF THE COMPANY.

Section 2.06   Costs of Transactions. Except as otherwise expressly provided in Article 4 and Section 6.05 of this Agreement, each Party shall bear the costs and expenses, including, without limitation, attorneys' fees and costs, incurred by such Party in connection with the preparation and negotiation of this Agreement, the performance and observance of all of the terms, covenants and conditions on part of such Party to be performed and observed under this Agreement, and the consummation of the transactions on part of such Party to be consummated under this Agreement.

Section 2.07   Use of Funds.  Investor shall deposit $25,000,000 of the Subscription Price (the "**Escrow Amount**"), in the form of either cash or United States Treasury Bonds, in an escrow account to be opened in the name of the Company and the Investor with a bank agreed upon by the Parties (the "**Escrow Account**"), such funds or bonds to be released only, partially or totally, by written instructions received from the Company and the Investor and approved by a Supermajority Board  Vote (including the MERS Managers) of the Company, and used thereafter

4

exclusively for the purposes set forth on <u>Exhibit C</u> hereto, as provided for in the LLC Agreement.  For the avoidance of doubt, such written instructions by the Investor shall be subject to the Investor's concurrent receipt of equity interests in the Core Project(s) as set forth in <u>Section 5.02</u> below.  In the event of a material breach of any covenant or any of the representations and warranties contained in this Agreement or in the Stock Purchase Agreement dated March 8, 2016 between Investor and Concord Blue Engineering, GmbH (the "**SPA**"), which breach remains uncured for a period of forty (40) Business Days, Investor shall have the right by written notice to the escrow holder to immediately terminate the Escrow Account and withdraw the remaining funds contained therein.  This provision shall be included in substantively the same form in the Escrow Agreement and agreed to by the escrow holder.

## ARTICLE 3
## REPRESENTATIONS AND WARRANTIES

Section 3.01    <u>Representations and Warranties of the Company</u>. The Company and CBE hereby jointly and severally represent and warrant to Investor as follows, as of the Closing Date:

(a)    <u>Formation, Existence and Standing</u>. The Company is a limited liability company duly formed, validly existing and in good standing under the laws of the State of Delaware, and has all requisite limited liability company power and authority to own, operate and license its properties and assets, and to carry on its business as presently being conducted. The Company is duly qualified to do business as a foreign limited liability company in each jurisdiction in which the business of the Company is presently being conducted, where the failure to be so qualified would have an adverse effect on the business of the Company as presently being conducted (taken as a whole).

(b)    <u>Certificate of Formation and Operating Agreement</u>. Attached hereto (i) as <u>Schedule 3.01(b)(1)</u> is a true, correct and complete copy of the Certificate of Formation of the Company, as amended and in force on the Closing Date, (ii) the total capital of the Company is US$2,750,100 and (iii) as <u>Schedule 3.01(b)(2)</u> is a true, correct and complete copy of the Original LLC Agreement of the Company, as amended and in force on the Closing Date immediately prior to the execution and delivery of the LLC Agreement, after the execution of which the Original LLC Agreement shall cease to have effect.

(c)    <u>Capitalization</u>. As of the Closing Date immediately prior to the execution and delivery of the LLC Agreement, (i) the authorized membership interests in the Company will consist of a single class of membership interests, all of which will have been duly authorized, validly issued fully paid and non-assessable, and (ii) there is a convertible promissory note held by Berger Group Holdings that will convert into Class A Units at the Closing, and there are no other options, warrants or other rights to purchase or otherwise acquire any of membership interest in the Company.

(d)    <u>Issuance of Class A Units</u>. The Class A Units, when issued at Closing, will be duly authorized, validly issued, will have the rights, preferences and privileges of Class A Units in the Company described in the LLC Agreement and applicable laws of the State of Delaware, and the Class A Units, when so issued at Closing will be free of any Liens, claims, encumbrances or adverse interests, other than any Liens or encumbrances created by or imposed

5

upon the holders thereof through no action of the Company or CBE; provided, however, that the Class A Units shall be subject to restrictions on transfer under the Federal Securities Act and/or applicable States Securities Acts and under the LLC Agreement.

(e)     Power and Authority of the Company. The Company has all requisite limited liability power and authority, and has been duly authorized by all requisite action and approvals of the managers and, if and to the extent necessary, the members of the Company, to execute and deliver this Agreement and all other agreements, instruments and documents to which the Company is a party be executed and delivered pursuant hereto, to perform and observe all of the terms, covenants and conditions in the part of the Company to be performed or observed hereunder and thereunder, and to consummate all of the transactions on the part of the Company to be consummated hereunder and thereunder, including, without limitation, issuance of the Class A Units to Investor pursuant to the terms and conditions of this Agreement.

(f)     Absence of Conflict. The execution and delivery of this Agreement and all other agreements, instruments and documents to which the Company is a party to be executed and delivered pursuant hereto, the performance and observance of all of the terms, covenants and conditions in the part of the Company to be performed or observed hereunder and thereunder, and the consummation all of the transactions on the part of the Company to be consummated hereunder and thereunder, including, without limitation, issuance of the Class A Units to Investor pursuant to the terms and conditions of this Agreement, will not violate or conflict with, or result in a material breach by the Company, or constitute a material default or a material event of default under, (i) the Certificate of Formation or Original LLC Agreement, (ii) any contract, agreement, note, indenture, deed of trust, mortgage or instrument to which the Company is a party, or by which the Company or its assets is otherwise bound or subject, that would, either individually or in the aggregate, adversely impair the condition (financial or otherwise), business, operations, assets or liabilities of the Company (taken as a whole), or (iii) to the best knowledge of the Company, any order, judgment, law, rule or regulation of any court or other governmental authority of competent jurisdiction to which the Company is a party, or by which the Company or its assets is otherwise bound or subject, that would, either individually or in the aggregate, adversely impair the condition (financial or otherwise), business, operations, assets or liabilities of the Company (taken as a whole).

(g)     Consents and Authorizations. Except for the consent of CBE for the issuance of the Class A Units to Investor and the execution and delivery of the LLC Agreement, which has been obtained by the Company, no consent, approval or authorization of, or declaration or filing with, any third party or governmental authority on the part of the Company is required in connection with the execution and delivery of this Agreement and all other agreements, instruments and documents to which the Company is a party to be executed and delivered pursuant hereto, including the LLC Agreement, the performance and observance of all of the terms, covenants and conditions in the part of the Company to be performed or observed hereunder and thereunder, and the consummation all of the transactions on the part of the Company to be consummated hereunder and thereunder, including, without limitation, issuance of the Class A Units to Investor pursuant to the terms and conditions of this Agreement, which if not obtained, made or filed, (i) would adversely impair the validity or enforceability of this Agreement and all other agreements, instruments and documents to which the Company is a party to be executed and delivered pursuant hereto, including the LLC Agreement, or any of the

transactions contemplated hereunder and thereunder, including, without limitation, issuance of the Class A Units to Investor pursuant to the terms and conditions of this Agreement, or (ii) which would adversely impair the condition (financial or otherwise), business, operations, assets or liabilities of the Company (taken as a whole).

(h)    Legal Effect. This Agreement and all other agreements, instruments and documents to which the Company is a party to be executed and delivered pursuant hereto to which the Company is a party, constitute a valid and binding obligation of the Company, enforceable against it in accordance with their respective terms except as such enforcement may be limited by laws affecting the rights of creditors generally and principles of equity.

(i)    Brokers or Finders. Neither the Company nor CBE has entered into any contract or taken any other action by which Investor has incurred, or will incur, directly or indirectly, any liability for brokerage or finders' fees or any similar charges in connection with this Agreement or the transactions contemplated thereby as a result of any such agreement or other action by the Company.

(j)    Key Agreements.   Schedule 3.01(j) sets forth, as of the date hereof, (i) each agreement between the Company, on the one hand, and (A) any investor in the Company or (B) Lockheed Martin Corporation or any affiliate thereof (collectively, "**LMC**"), or (C) verdant*f* AG, a limited liability company organized and existing under the laws of Switzerland ("**verdant*f* AG**"); and (ii) each other agreement to which the Company is a party that is deemed to be a strategic agreement for the Company to advance its initial business plan.

(k)    Data Room.   Each of the investors in the Company and LMC has had access to the same due diligence materials within the virtual data room maintained by the Company for the purposes of due diligence of investors in the Company and LMC relating to the transactions to be consummated on the Closing Date.

(l)    Bankruptcy, Etc.   No measures have been taken for the dissolution and liquidation or declaration of bankruptcy of the Company. In particular, no order has been made, resolution passed or meeting convened for the winding up (or other process whereby the business is terminated and the assets of the Company are distributed amongst the creditors and/or members) of the Company and the Company is neither over-indebted, insolvent, in liquidation or in composition proceedings or in any other similar proceedings.

(m)    Books and Records. The corporate books and records of the Company are up to date in all material respects and contain records which are complete and accurate in all material respects.

(n)    Subsidiaries.

(i)    The Company is the legal and beneficial owner of 70% of the issued and outstanding equity interests of Concord Blue Virgin Islands LLC, a United States Virgin Islands limited liability company (the "**Subsidiary**").   The Company has no other subsidiaries.

(ii)    Except for any encumbrances contained in the organizational documents of the Subsidiary, all equity interests held by the Company in the Subsidiary are free and clear of any Liens, restrictions, rights of first refusal and rights of others of any nature.

(iii)    The Subsidiary is validly formed, duly organized and lawfully existing in the United States Virgin Islands, with corporate power to carry on its business as presently conducted, and all membership interests held by the Company in the Subsidiary are duly authorized, validly issued and fully paid in.

(iv)    No measures have been taken for the dissolution and liquidation or declaration of bankruptcy of the Subsidiary. In particular, no order has been made, resolution passed or meeting convened for the winding up (or other process whereby the business is terminated and the assets of the Subsidiary are distributed amongst its creditors and/or equity holders) of the Subsidiary and the Subsidiary is neither over-indebted, insolvent, in liquidation or in composition proceedings or in any other similar proceedings.

(v)    The corporate books and records of the Subsidiary are up to date in all material respects and contain records which are complete and accurate in all material respects.

(o)    <u>Business Permits and Licenses</u>.

(i)    The Company and the Subsidiary (A) have all governmental approvals, licenses and permits required for the continued conduct of their respective businesses as currently conducted, and (B) are in compliance with the terms and conditions of all such governmental approvals, licenses and permits.

(ii)    All such governmental approvals, licenses and permits are in full force and effect and, to the best of the Company's Knowledge, no circumstances exist which will result in a modification, revocation or non-renewal of any such approvals, licenses or permit.

(iii)    The fact that this Agreement is executed and the transactions contemplated by this Agreement are consummated will not lead to the termination of any such governmental approval, license or permit and will not give rise to any right of the competent authorities or other third parties to terminate such governmental approval, license or permit or to take any other adverse action thereunder.

(p)    <u>Ordinary Course of Business</u>.

(i)    Except for the transactions contemplated by, or any facts or events disclosed in, this Agreement, the Company and the Subsidiary have, through the Closing Date, conducted their respective businesses in the ordinary course of business and consistent with past practice.

(ii)    In particular, neither the Company nor the Subsidiary has, except as set forth on <u>Schedule 3.01(p)</u>:

(A)    taken or failed to take any action which could interfere with the consummation of the transactions contemplated under this Agreement;

8

(B)     formed, entered into, varied, terminated or withdrawn from any partnership, consortium, joint venture or similar business organization or cooperation agreement with third parties, other than (1) that certain Teaming Agreement with Lockheed Martin Corporation or its Affiliates and (2) that certain Partnering Agreement, dated as of March 8, 2016, by and among the Company, CBE and verdant *f* AG;

(C)     made amendments to its existing certificate of formation or corresponding corporate document, other than amendments to the operating agreement being negotiated with the Investor and/or its representatives as of the date hereof;

(D)     entered into, increased or extended any liability under any guarantee, security or indemnity in favor of any third party or borrowed any money or incur any indebtedness or other liability to a third party (except for prepayments in the ordinary course of business) in excess of $50,000 in aggregate;

(E)     made, increased or extended any loan or advance or grant any credit to any third party (it being understood, for the avoidance of doubt, that accounts receivables in the ordinary course of business are not being deemed a credit);

(F)     granted, created or allowed the creation of any Lien over any of its or their assets other than charges arising by operation of law;

(G)     entered into any agreement with the Company or the Company's Affiliates at terms which are not at arms' length, other than intellectual property licenses for Intellectual Property Rights (as defined in Section 3.01(v)) used by the Company and the Subsidiary as set forth on Schedule 3.01(p);

(H)     made any change in any method of accounting or keeping of books of account or accounting or cash management methods, principles or practices, including timing of payments of accounts payable and collections of accounts receivable, or any revaluation of assets;

(I)     agreed or committed to do any of the foregoing; or

(J)     taken any action outside the ordinary course of the Company's or the Subsidiary's business, inconsistent with past practice or not in compliance with applicable laws or causing a breach of the Company's representations and warranties contained herein.

(q)     Financial Statements.

(i)     Schedule 3.01(q) contains a copy of the consolidated unaudited financial statements of CBE as of December 31, 2014, consolidated unaudited financial statements of CBE for the fiscal year ended December 31, 2015 (together the "**Financial Statements**").  As a wholly-owned Subsidiary of CBE, CBD has no separate financial statements.

9

(ii)    The Financial Statements have been prepared in accordance with generally accepted accounting principles of the United States ("**US GAAP**") applied on a consistent basis throughout the periods indicated, except, as to any unaudited Financial Statements, for the omission of notes thereto and normal year-end audit adjustments.  The Financial Statements fairly present, in all respects, the financial condition and operating results of the Company as of the dates, and for the periods, indicated therein, subject to normal year-end adjustments.  Except as set forth in the Financial Statements, the Company has no material liabilities or material obligations, contingent or otherwise, other than liabilities and obligations (i) incurred in the ordinary course of business after January 1, 2016, (ii) under contracts made in the ordinary course of business, (iii) incurred in connection with the transactions contemplated hereby, and (iv) of a type or nature not required under US GAAP to be reflected in the Financial Statements which, in all such cases, individually and in the aggregate, would not have an adverse effect.  Except as disclosed in the Financial Statements, the Company is not a guarantor or indemnitor of any indebtedness of any other Person.  The Company maintains a standard system of accounting established and administered in accordance with US GAAP.

(r)    <u>Litigation</u>.  There is no claim, action, lawsuit, litigation, arbitration or administrative proceeding pending or threatened (in writing or, to the Knowledge of the Company, otherwise) by or against the Company or the Subsidiary.

(s)    <u>Environment</u>.

(i)    The Company and the Subsidiary are in compliance with all applicable environmental laws and with the conditions imposed by such environmental laws and have all environmental permits required for the conduct of their respective businesses.

(ii)    No action, suit or proceedings by any governmental or administrative authority is pending or threatened in writing against the Company or the Subsidiary alleging any violation of any such environmental laws and, to the best of the Company's Knowledge, there are no circumstances that can reasonably be expected to form the basis of any such action, suit or proceeding.

(iii)    Except for hazardous materials which are stored, shipped or otherwise handled by the Company or the Subsidiary in the ordinary course of business and in compliance with applicable environmental laws, there are, to the best of Company's Knowledge, no hazardous materials used or handled by the company or the Subsidiary or that are, to the best of the Company's Knowledge, present on, under or within any premises of the Company or the Subsidiary.

(t)    <u>Taxes</u>.

(i)    The Company and the Subsidiary have timely and duly filed all tax returns required to be filed with a governmental tax authority. All such tax returns have been prepared in the manner required by applicable law and are true and correct in all respects.

(ii)    All taxes relating to a tax period ending prior to December 31, 2014, caused by or arising from acts or omissions prior to December 31, 2014, have been paid or fully provisioned for in the Financial Statements.

(u)    <u>Assets (Other Than Intellectual Property)</u>

(i)    The Company and the Subsidiary own, or have sufficient rights to use, all the material assets (other than Intellectual Property Rights, which are addressed in <u>Section 3.01(v)</u>) necessary for the carrying on of their respective businesses as currently conducted.

(ii)    The assets owned by the Company and the Subsidiary are free and clear of any Liens (except for such Liens with which the assets have been encumbered by virtue of law or in the course of its ordinary business or that are reflected in the Financial Statements).

(iii)    All assets owned, rented or leased by the Company and the Subsidiary (other than Intellectual Property Rights, which are addressed in <u>Section 3.01(v)</u>) are in good and operative condition subject to ordinary wear and tear.

(v)    <u>Intellectual Property Rights.</u>

(i)    The Company or the Subsidiary are the legal and beneficial owner of, or have adequate license to use, all the know-how and all patents, trade names, trademarks, domain names, copyrights and other intellectual property rights (including all applications for protection thereof) necessary for the continued conduct of their respective businesses as currently conducted or that the Companies currently use (the "**Intellectual Property Rights**"), and <u>Schedule 3.01(v)</u> contains a complete and correct list of all such patents, registered trademarks and domain names.

(ii)    The Intellectual Property Rights owned by the Company and the Subsidiary are validly registered in the name of the Company or the Subsidiary to the extent set forth on <u>Schedule 3.01(v)</u> and the Founder has no interest in or right to use any of the Intellectual Property Rights. All registration fees for the Intellectual Property Rights have are fully paid and none of the Intellectual Property Rights is subject to any Lien or encumbrance.

(iii)    The Intellectual Property Rights used by the Company and the Subsidiary in the ordinary course of their respective businesses as presently conducted are subsisting, to best of the Company's Knowledge valid and enforceable, and have not been adjudged invalid or unenforceable in whole or part. No claims have been made or threatened (in writing or, to the Company's Knowledge, otherwise) challenging the use, validity, subsistence or enforceability of the Intellectual Property Rights. To the best of Company's Knowledge, the use of the Intellectual Property Rights does not infringe any third party rights.

(iv)    To the best of the Company's Knowledge, the operation of the Company's and the Subsidiary's respective businesses as presently conducted does not conflict with, infringe, misappropriate or otherwise violate the intellectual property rights or other proprietary rights of any third party. No claims of third parties are pending or threatened (in writing or, to the Company's Knowledge, otherwise) against the Company or the Subsidiary alleging any of the foregoing.

(v)    Except as disclosed in <u>Schedule 3.01(v)</u>, there are no assignments, licenses, sublicenses, agreements or commitments outstanding or effective granting any other

11

Person any right to use, operate under, license, sublicense or otherwise exploit any of the Intellectual Property Rights.

(vi)    The Company has taken reasonable precautions to protect, document and safeguard all trade secrets, know-how, confidential information, customer lists, software, technical information, data, process technology, plans, drawings, and blue prints which relate to the business of the Company and the Subsidiary.

(vii)    The Company and the Subsidiary own, or have sufficient rights to use, all computer and telecommunication facilities and other information equipment and resources necessary for the continued conduct of their respective businesses as currently conducted.

(viii)    The Company and the Subsidiary have no employees.

(w)    Real Property.

(i)    The Company and the Subsidiary do not own any real property.

(ii)    The Company and the Subsidiary have good and valid title as lessees to the real property set forth on Schedule 3.01(w) (the "**Leased Real Property**").

(iii)    There are no liabilities outstanding due to any reconstruction of the any Leased Real Property and all payment obligations related thereto have been discharged.

(x)    Compliance.

(i)    Research, development, manufacturing and other activities conducted by the Company and the Subsidiary or otherwise relevant for the Company's and the Subsidiary's products and services have been conducted in compliance with applicable laws, regulations, standards, and accepted applicable industry codes of practice in all respects.

(ii)    Products and services manufactured or provided by the Company and the Subsidiary, in each case in all jurisdictions in which such products are distributed and in all respects, (A) meet the safety and compliance requirements under applicable laws and regulations, (B) have been licensed for distribution to the extent such license is required for the distribution under applicable laws and regulation, and (C) are duly registered in all relevant registers in accordance with applicable laws and regulations.

(iii)    The Company and the Subsidiary have complied with all health and safety, labor and employment and other laws applicable to it, and no action, suit or proceeding by an third party or any governmental or administrative authority is pending or threatened in writing against the Company or the Subsidiary alleging failure to comply with such laws in effect at the date of this Agreement.

(iv)    The Company and the Subsidiary have in all respects complied with all corporate and commercial as well as all U.S. import and export laws and other trade regulations applicable to it, and no action, suit or proceeding by an third party or any

12

governmental or administrative authority is pending or threatened in writing against the Company or the Subsidiary alleging failure to comply with such laws or regulation in effect at the date of this Agreement.

      (y)    <u>No Leakage</u>.

      (i)    No leakage has occurred through the Closing Date. For the purpose of this <u>Section 3.01(y)</u>, the term "leakage" shall mean:

      (ii)    any dividend or distribution of profits or assets declared, or any payments in lieu of any dividend or distribution, paid or made or any repurchase, redemption or return of share capital paid or agreed to be paid, in each case by the Company or the Subsidiary to, for the benefit of, or at the direction of, any of the Company or any existing member of the Company;

      (iii)    bonuses, payments or accruals of interest on management, consultancy, monitoring, service or directors' fees, charges or other compensation made by the Company or the Subsidiary to or for the benefit of the Founder or any of the existing equity holders or employees of the Company or the Subsidiary (A) in connection with the transactions contemplated by this Agreement (such as a transaction bonus or change of control payments) and (B) outside of the performance of his employment or consultancy contract or of his mandate as board member of the Company or the Subsidiary;

      (iv)    any Founder transaction costs incurred in connection with the transactions contemplated by this Agreement paid by the Company or the Subsidiary and not reimbursed by or on behalf of the Founder to them on or before the date of this Agreement; or

      (v)    the waiver by the Company or the Subsidiary of any amount, right, value or benefit owed to the Company or the Subsidiary by the Founder or any of the existing equity holders or employees of the Company or the Subsidiary.

      (z)    <u>No Contributions to Government Officials</u>. The Company, the Subsidiary, the Founder, and their respective Affiliates have not made any contributions to an official of a Michigan state or local governmental entity under section 13(e) of Michigan Public Act 314 of 1965, as amended, at any time.

      (aa)    <u>Affiliate Transactions</u>.  Except as set forth on <u>Schedule 3.01(aa)</u>, there are no contracts, claims, indebtedness, liabilities or obligations between the Company or the Subsidiary, on the one hand, and the Founder or any existing equity holder or any of their respective Affiliates, on the other hand.

      (bb)    <u>Disclosure</u>.  All information disclosed by the Company to the Investor is, to the best of CBE's and the Company's Knowledge, true, complete and not misleading in any material respect, and neither the Company nor CBE has Knowledge of any facts pertaining to the Company or the Subsidiary or their respective businesses that affect adversely the Company and the Subsidiary and their respective businesses as a whole, except such adverse effects specifically disclosed in writing in this Agreement, including the Exhibits and Schedules attached hereto.  The content of the data room contains specific time-stamps to denote the date

13

and time a document was added, removed, or modified.  Except as explicitly noted by a time-stamp, the content of the data room has not changed in any respect since February 29, 2016, and the content as of such date is contained in a CD-ROM provided to Purchaser on the Closing Date.

Section 3.02    <u>Representations and Warranties of Investor</u>. Investor hereby represents and warrants to the Company and CBE as follows, as of the date hereof and as of the Closing Date:

(a)    <u>Financial Qualification</u>.  Investor is a public nonprofit corporation established and maintained under the laws of the State of Michigan not formed for the specific purpose of acquiring the securities offered, with total assets in excess of $5,000,000. Investor has the financial resources to bear the economic risk of illiquidity of the investment in the Class A Units for an indefinite period of time and the economic risk of a complete loss of the investment in the Class A Units.

(b)    <u>Investment Experience</u>. Investor acknowledges (i) that Investor has experience as an investor in securities of companies in the development stage and is able to fend for itself, can bear the economic risk of its investment and has such knowledge and experience in financial or business matters that it is capable of evaluating the merits and risks of its investment in the Class A Units and protecting its own interests in connection with such investment, and (ii) that Investor has obtained legal, tax and accounting advice from its qualified professional advisors regarding all aspects of the proposed investment in the Class A Units that Investor has deemed necessary in order to make its decision to invest in the Class A Units.

(c)    <u>Investment Intent</u>. Investor is acquiring the Class A Units for investment for Investor's own account, not as a nominee or agent, and not with the view to, or for resale in connection with, any distribution, and has no present intention of selling, transferring, disposing of or otherwise distributing the Class A Units or any portion thereof or interest therein. Investor acknowledges and understands that the Class A Units have not been registered or qualified under the Federal Securities Act or any applicable States Securities Acts by reason of a specific exemption from the registration and qualification provisions thereunder, the availability of which depends upon, among other things, the bona fide nature of the investment intent of the Investor and the accuracy of the representations of Investor as herein expressed.

(d)    <u>Investment Risk</u>. Investor acknowledges (i) that the purchase of the Class A Units is a speculative investment involving a high degree of risk which may result in the complete loss of the investment, and understands and has taken full cognizance of such risks in Investor's decision to invest in the Class A Units, (ii) that Investor must bear the economic risk of the purchase of the Class A Units for an indefinite period of time because, among other reasons, the Class A Units have not been registered or qualified under Federal Securities Act or the State Securities Acts, and, therefore, cannot be sold, pledged, assigned or otherwise disposed of unless the Class A Units are subsequently registered or qualified under the Federal Securities Act or under any applicable State Securities Acts or an exemption from such registration or qualification is available to the satisfaction of the Company, and (iii) that the Company has no obligation to register or qualify the Class A Units under the Federal Securities Act or under any applicable State Securities Acts.

14

(e)    <u>Access to Information</u>. Based on its actual knowledge of the Company, Investor has received, or has had access to, the information Investor considers appropriate to make an informed investment decision with respect to the Units.  Investor has had an opportunity to ask questions and receive answers from the Company regarding the terms and conditions of the transactions contemplated hereby (including the purchase and sale of the Units) and the business, management, properties and financial condition of the Company.

(f)    <u>Power and Authority of Investor</u>. Investor has all requisite power and authority, and has been duly authorized by all requisite action and approvals of the managers, directors or general partners and, if and to the extent necessary, the members, shareholders, limited partners or other owners of Investor, to enter into this Agreement and all other agreements, instruments and documents to which Investor is a party to be executed and delivered pursuant hereto, including the LLC Agreement, to perform and observe all of the terms, covenants and conditions in the part of Investor to be performed or observed hereunder and thereunder, including without limitation, to purchase the Class A Units and pay the Subscription Price therefor, and to consummate all of the transactions on the part of Investor to be consummated hereunder and thereunder.

(g)    <u>Legal Effect</u>. This Agreement and all other agreements, instruments and documents to which Investor is a party to be executed and delivered pursuant hereto, including the LLC Agreement, constitute a valid and binding obligation of Investor enforceable against Investor in accordance with its terms except as such enforcement may be limited by laws affecting the rights of creditors generally and principles of equity.

(h)    <u>Brokers or Finders</u>. Investor has not entered into any contract or taken any other action by which the Company and the members of the Company, or any of them, has incurred, or will incur, directly or indirectly, any liability for brokerage or finders' fees or any similar charges in connection with this Agreement or the transactions contemplated thereby as a result of any such agreement or other action by Investor.

## ARTICLE 4
## INDEMNIFICATION

Section 4.01    <u>Indemnification by the Company and CBE</u>. Provided that the Investor delivered to the Company a Notice of Breach in accordance with <u>Section 4.02(a)</u> and if and to the extent the cure as per <u>Section 4.03</u> cannot be effected, or is not effected within the time period set forth in <u>Section 4.04</u>, the Company and CBE shall indemnify, defend and hold harmless the Investor and its managers, directors, officers, employees, members, shareholders, partners or other owners,  agents, attorneys, representatives, successors and permitted assigns (collectively, "**Investor Indemnitees**"), and each of them, from and against any and all claims, demands, actions, suits, proceedings, liabilities, losses, damages, costs and expenses (including, without limitation, all settlement payments and reasonable attorneys' fees and costs) (collectively, "**Losses**"), asserted against, imposed upon or incurred by the Investor Indemnitees, or any of them, under, arising from or related to (i) any breach of any representation or warranty of the Company contained in this Agreement, and/or (ii) any breach, default or failure to perform any covenant or obligation of the Company or CBE contained in this Agreement. Any breach of this Agreement shall be deemed to be a breach of any other agreements related hereto, including

15

but not limited to, the SPA, Shareholders Agreement, and LLC Agreement executed in connection herewith.

Section 4.02    Remedy of Investor.

(a)    Notice of Breach.

(i)    The Investor shall deliver a written notice to the Company which shall include a description in reasonable detail of the facts then known about any claim for misrepresentation or breach of warranty and which shall specify the representation or warranty allegedly breached and shall state the amount of reasonably anticipated Losses relating to such claim, as well as disclosing to the Company all documents and information supporting such claim (the "**Notice of Breach**") on the earlier of:

(A)    the date not later than thirty (30) Business Days after (i) the Investor becoming aware of a misrepresentation or breach of warranty or (ii) receipt by the Investor of notice of any claim made or threatened in writing to be made by any third party which the Investor believes is reasonably likely to give rise to a claim for misrepresentation or breach of a warranty; or

(B)    promptly upon the Investor receiving any submission to, or a decision or order rendered by any court, arbitral tribunal or governmental or administrative body (including without limitation any taxation authority) which is reasonably likely to result in a claim based upon misrepresentation or the breach of a warranty, but in any event such notice shall, to the extent practicable, be delivered to the Company early enough so that the Company has a reasonable opportunity to respond to such submission or to submit a timely appeal or other challenge against such decision or order.

(b)    Failure to give Notice of Breach within the time periods set forth in Section 4.02(a) shall, if the notice has been given within the time limitation set out in Section 4.04, not exclude the Company's liability under this Agreement in connection with the relevant matter. The Company's liability shall, however, be reduced or, as the case may be, excluded altogether vis-à-vis the Investor, if and to the extent a Loss has been caused or aggravated by virtue of the Investor's failure to give timely notice in accordance with Section 4.02(a). If, however, the Notice of Breach has not been given within the time limitation set out in Section 4.04, the Company's liability shall be excluded.

Section 4.03    Company's Right to Cure.    With respect to any misrepresentation or breach of warranty notified by the Investor to the Company pursuant to Section 4.02(a), the Company shall have the right, within a reasonable period of time not exceeding forty (40) Business Days after the receipt of the Notice of Breach, to put the Investor in the same position, as reasonably determined by the Investor, in which it would have been if the representation or warranty had been complied with. Company's failure to cure shall give Investor the right to exercise its remedies under this Agreement, including Section 2.07 and Section 4.05 hereof.

16

Section 4.04    <u>Time Limitations on and Forfeiture of Claims</u>.

(a)    A claim by the Investor against the Company for misrepresentation or breach of a warranty shall in any case be time-barred and forfeited unless the Investor shall have delivered a Notice of Breach to the Company in accordance with <u>Section 4.02(a)</u>:

(i)    unless otherwise set forth in this <u>Section 4.04</u>, on or before the lapse of a period of 18 months from the Closing Date;

(ii)    with regard to the representations and warranties in <u>Section 3.01(s)</u> (Environment), on or before the later of (i) the lapse of a period of 10 years from the Closing Date, or (ii) 6 (six) months after the relevant statute of limitations has expired (except in circumstances in which there is no statute of limitations, in which circumstances, a claim may be brought at any time);

(iii)    with regard to the representations and warranties in <u>Section 3.01(t)</u> (Taxes), on or before the later of (i) the lapse of a period of 5 years from the Closing Date, or (ii) 6 (six) months after the relevant statute of limitations has expired;

(iv)    with regard to the representations and warranties in Section 3.01(x) (Compliance), on or before the later of (i) the lapse of a period of 3 years from the Closing Date, or (ii) 6 (six) months after the relevant statute of limitations has expired; and

(v)    with regard to the representations and warranties in <u>Section 3.01(a)</u> (Formation, Existence and Standing), <u>Section 3.01(n)</u> (Subsidiaries), <u>Section 3.01(e)</u> (Power and Authority of the Company), and with respect to any claims based on willful misconduct, fraud, or gross negligence, such claims may be brought at any time.

Section 4.05    <u>Limitations on Liability</u>.

(a)    <u>Qualifying Claim and Threshold</u>.  Investor shall not be entitled to be paid any sum in respect of a claim for Losses for misrepresentation or breach of a warranty unless (i) the amount of such claim on a stand-alone basis exceeds 0.5% of the Subscription Price (a "**Qualifying Claim**") and (ii) the liability of the Company to the Investor in respect of such Qualifying Claim when combined with the liability of the Company hereunder for all other Qualifying Claims exceeds 1% of the Subscription Price (the "**Threshold**"). If the Threshold is met, the Investor shall be entitled to recover from the first dollar and not only the amount exceeding the Threshold.

(b)    <u>Cap</u>.  The Company's cumulative and aggregated liability for Losses for breaches of any representations and warranties shall be limited to the Subscription Price (excluding any portion of the Subscription Price held in the Escrow Account). Notwithstanding the foregoing, the limitations set forth in this <u>Section 4.05(b)</u> shall not apply in the case of the Company or CBE's willful misconduct, fraud or gross negligence.

(c)    <u>Collateral</u>.  In the event the Company and CBE, or CB Patents Germany (if applicable), have insufficient funds to pay for Losses at the time a claim is made against the Company or CBE, such Losses may be paid at the discretion of Investor in additional Units

17

issued by the Company and/or transferred by CBE at the fair market value of such Units as determined by an independent appraiser, reasonably acceptable to Investor and Company; provided that in no event will Investor receive pursuant to this <u>Section 4.05(c)</u> voting Units of the Company in excess of 49% of the aggregate voting Units of CBD.  In addition to and notwithstanding the foregoing remedies, Investor in its sole discretion may terminate the Escrow Account in accordance with Section 2.07 and withdraw the funds contained therein.

Section 4.06   <u>Exclusion or Reduction of Liability</u>.

(a)   The Company's liability for misrepresentation or breach of a warranty shall be reduced or excluded vis-à-vis the Investor if and to the extent:

(i)   The Investor, following Closing, shall have failed to use commercially reasonable best efforts to mitigate the Losses sustained by it in an amount equal to the amount of Losses that could have been avoided through such mitigation;

(ii)   The Investor shall have recovered or, through commercially reasonable best efforts, could recover or could have reasonably recovered any amount in respect of such Losses from any third person, including but not limited to an insurer, in an amount equal to the amount of such actual or potential recovery, after deduction of reasonably documented costs and expenses incurred in making such recovery (including reasonable attorney's fees);

(iii)   a specific provision, reserve or valuation allowance has been made or included in the Financial Statements, in an amount equal to the amount of such provision, reserve or valuation allowance;

(iv)   any tax payable by the Investor is reduced as a result of a matter giving rise to a claim, in an amount equal to the amount of such reduction; and

(v)   such claim arises or is increased as a result of any legislation, regulation or rule of law or practice of any relevant and competent authority not in force at the date hereof or the withdrawal after Closing of any concession previously made by any relevant authority or as a result of any change made or introduced on or after the date hereof in any legislation, regulation or  rule of law or practice of any relevant and competent authority, whether or not such change or withdrawal purports to be effective retrospectively in whole or part.

(b)   The Company shall have no liability for Losses if and to the extent such liability is attributable to any act, omission, transaction or arrangement of the Investor constituting a breach of this Agreement.

Section 4.07   <u>Indemnification by the Investor</u>.  The Investor shall indemnify, defend and hold harmless the Company, the equity holders of the Company and their respective managers, directors, officers, employees, shareholders, agents, attorneys, heirs, representatives, successors and permitted assigns (collectively, "**Company Indemnitees**"), and each of them, from and against any and all Losses arising out of, in connection with or related to (i) any breach of any representation or  warranty of Investor contained in this Agreement and/or (ii) any material

18

breach, default or failure to perform any covenant or obligation of Investor contained in this Agreement.

Section 4.08     Procedures for Indemnification Claims.

(a)     In the event of any Losses related to any claim, assertion, proceeding or other occurrence by or in respect of a third party for which any party entitled to indemnification pursuant to Section 4.01 or Section 4.07 hereof (the "**Indemnitee**") may request indemnification hereunder (collectively, "**Third-Party Claim**"), the indemnifying party (the "**Indemnitor**") shall have the right to direct, through counsel of its own choosing, the defense or settlement of any such Third-Party Claim at its own expense. Indemnitee may participate in (but not control) such defense, but in such case the expenses of Indemnitee shall be borne by Indemnitee unless Indemnitee is entitled to assert defenses to any such Third-Party Claim which are materially different from, or in addition to, those available to Indemnitor, in which case Indemnitee may retain its own counsel in order to assert any such defenses, at Indemnitor's expense.

(b)     In the event of any Third-Party Claim, Indemnitee shall provide Indemnitor with access to Indemnitee's records relating to such Third-Party Claim during normal business hours and shall otherwise cooperate with Indemnitor in the defense or settlement thereof, and the Indemnitor shall reimburse the Indemnitee for all its reasonable out-of-pocket expenses in connection therewith. If Indemnitor commences or undertakes the defense of any Third-Party Claim, Indemnitee shall not pay, or permit to be paid, any part of the Third-Party Claim unless Indemnitor consents in writing to such payment, or unless Indemnitor fails to defend or withdraws from the defense of such Third-Party Claim or unless a final judgment from which no appeal may be taken by or on behalf of Indemnitor is entered against Indemnitee for the Third-Party Claim. If Indemnitor fails to defend or, if after commencing or undertaking any such defense, fails to diligently prosecute or withdraws from such defense, Indemnitee shall have the right to undertake the defense and settlement thereof, at Indemnitor's expense. Upon the full payment of any claim for indemnification pursuant to Section 4.01 or Section 4.07 hereof, Indemnitor shall be subrogated to all rights and remedies of Indemnitee against any third party.

# ARTICLE 5
# ADDITIONAL COVENANTS

Section 5.01     EPC Wrap.     The Parties acknowledge that LMC will be the EPC contractor for the Herten, Germany project currently under development by the Company and its affiliates and that LMC will provide an "EPC wrap" for such project, as described further in Exhibit D.  In addition, it is anticipated that LMC will be the EPC contractor for the projects described on Exhibit E.  In the event that LMC or a suitable replacement reasonably acceptable to Investor (such consent not to be unreasonably withheld, delayed or conditioned), is not the EPC contractor on any of such projects, Investor shall have the right and, upon the written request of Investor to the Company, the Company shall return to Investor, to the extent then unused, the portion of the Subscription Price corresponding to the Investor's pro rata portion of the Company's investment in such project.

Section 5.02     Interest in Certain Projects.

19

(a)        Subject to Investor's deposit in full of the Subscription Price to the Escrow Account and the release of not less than $5,000,000 from the Escrow Account (the date all such conditions are satisfied, the "*Release Date*"), the Company and Investor agree that on the Release Date the Investor will receive equity interests valued at US$15,000,000 in the aggregate in either or both of the following projects, as determined by the Investor in its sole discretion: (i) that certain project to be developed and located in Herten, Germany by the Company and/or its affiliates, and (ii) that certain project under development in Eagar, Arizona by the Company and/or its affiliates (the projects described in clauses (i) and (ii) being referred to as the "*Core Projects*").   The Parties shall determine the date (the "*Value Date*") on which both Core Projects (x) shall be valued by mutual agreement of the Parties, (y) the portion of equity interests to be received by Investor in each Core Project (provided that the aggregate value of such interests shall not exceed US$15,000,000) and (z) shall determine each Core Project's projected cash flow.  The value of each Core Project for purposes of this Section 5.02(a) shall be based on the net present value of the projected cash flows from the applicable Core Project over the applicable Core Project's useful life.  In addition, at the time of issuance of such equity interests, Investor will receive a warrant that is exercisable for nominal consideration for an additional interest in the applicable Core Project in the event that in the second year of such Core Project's operation, cash flow to Investor from such Core Project is more than 12% below the projected amount for such Core Project, the percentage amount of such additional interest to be determined by reference to the percentage of the shortfall in the cash flows to Investor from such Core Project. As an illustrative example, if the shortfall in cash flows to Investor from such Core Project is 20% below the projected amount for such Core Project, the percentage amount of such additional interest shall provide Investor with an additional 8% of cash flows from such Core Project, based on the actual cash flow of such Core Project measured as of the end of such second year. In addition, Investor will receive a put right such that in the event the applicable Core Project is not developed, Investor will have the option to put its equity interest (including the additional interest) in such Core Project to the Company in exchange for a comparably valued interest and warrant in a different project then under development by the Company (an "*Other Project*"). The Company will create a new special purpose vehicle for each Core Project.  The foregoing will be subject to documentation reasonably agreeable to the Company and Investor.  Company and CBE shall use their good faith best efforts to obtain financing necessary for the Core Projects and develop the Core Projects in a timely fashion in accordance with applicable laws.

(b)        Within thirty (30) days following the date the entire amount of the Subscription Price has been released to the Company from the Escrow Account, the Parties will engage an independent appraiser to perform an independent valuation of each of the Core Projects in which the Investor has received equity interests pursuant to Section 5.02(a) and any Other Projects.  Such appraiser shall perform a valuation, as of the Value Date, based on the net present value of the projected cash flows from the applicable Core Project calculated at the time of such appraisal over the applicable Core Project's useful life. In the event the values of the Core Projects as determined by such independent appraiser are different from the values of the Core Projects calculated as of the Value Date, the percentage equity interest pursuant to Section 5.02(a) shall be adjusted such that it is based on the value of the applicable Core Project as determined by the independent appraiser.   In addition, the Investor shall have the right, exercisable for a period of thirty (30) days following the Investor's receipt of the valuation report from the independent appraiser, to put its equity interest (including the additional interest) in

20

such Core Project to the Company in exchange for a comparably valued interest in an Other Project.

(c)       In the event that (i) the entire amount of the Subscription Price has not been released to the Company from the Escrow Account on or prior to the second anniversary of the Closing Date or (ii) the Investor has exercised its right to have its Units redeemed by the Company pursuant to Section 3.09(b) of the LLC Agreement, the Investor will transfer to the Company for no consideration a pro rata portion of the Investor's equity interests received pursuant to Section 5.02(a) and Section 5.02(b) in each Core Project or Other Project, as applicable.  The pro rata portion of equity interests in each Core Project or Other Project, as applicable, to be transferred to the Company pursuant to this Section 5.02(c) shall be determined by multiplying the equity interest received by the Investor pursuant to Section 5.02(a) and Section 5.02(b) and then held by the Investor by a fraction, the numerator of which is the amount of the Subscription Price that has not been released to the Company from the Escrow Account on or prior to the second anniversary of the Closing Date and the denominator of which is the Subscription Price.

## ARTICLE 6
## GOVERNING LAW AND DISPUTE RESOLUTION

Section 6.01   Governing Law. Subject to Section 7.16 below, this Agreement, the respective rights, obligations and remedies of the Parties hereunder and all controversies, disputes and claims under, arising from or related to this Agreement, the interpretation, breach, termination or validity hereof, or the transactions contemplated hereunder, shall be governed by and construed in accordance with the internal laws of the State of California, without reference to its principles of conflict of laws.

Section 6.02   Arbitration. Subject to the provisions of Section 6.03 hereof, in the event of any controversy, dispute or claim under, arising from or related to this Agreement, the interpretation, breach, termination or validity hereof, or any of the transactions contemplated hereunder, the sole and exclusive remedy of the Parties shall be to submit such controversy, dispute or claim to mediation and binding arbitration as provided herein.   In the event that such dispute cannot be resolved within thirty (30) days after the date when both Parties are aware of the dispute, it shall be referred to mediation before a single, mutually agreeable mediator with the Judicial Arbitration and Mediation Services ("JAMS") located in Los Angeles, California. In the event that a controversy, dispute or claim cannot be resolved within thirty (30) days after the appointment of a mediator, the Parties agree to submit the dispute to binding arbitration before one mutually agreeable arbitrator with JAMS who shall be a retired judge located in Los Angeles, California.   In the event that the Parties are unable to agree upon the selection of an arbitrator within thirty (30) days after Notice requesting arbitration shall have been given by either Party to the other Party, the Parties shall request the presiding judge of the Superior Court for Los Angeles County, California, to appoint such arbitrator.  Arbitration of the dispute shall commence no later than thirty (30) days after the selection or appointment of such arbitrator, and shall be conducted before such arbitrator at a hearing of no more than three (3) days commenced no later than ninety (90) days after the selection or appointment of such arbitrator. The arbitrator shall be bound by the express terms of this Agreement and shall endeavor to reach his or her decision as quickly as possible, which decision shall be final and binding on the Parties absent

the grounds for vacating or correcting the award pursuant to Sections 1286.2 or 1286.6 of the California Code of Civil Procedure. The arbitrator shall also have the power to award costs and expenses of the arbitration (including attorneys' fees and costs pursuant to Section 6.05 hereof) to the prevailing Party. Application to enforce the arbitrator's decision may be made in any court of competent jurisdiction; any other application or dispute shall be submitted to the Superior Court for Los Angeles County, California, for determination. The rules of discovery pertaining to a California Court of Law shall apply to any such arbitration, including, without limitation, Sections 1283.01 and 1283.05 of the California Code of Civil Procedure, the provisions of which are hereby incorporated herein and made a part hereof by reference; provided, however, (i) that each Party shall have the right to not more than two (2) oral or written depositions as provided in Section 94 of the California Code of Civil Procedure without leave of the arbitrator notwithstanding anything contained in Section 1283.05(e) of the California Code of Civil Procedure to the contrary, and (ii) that the total time for oral depositions shall not exceed twenty-five (25) hours in the aggregate per Party.

Section 6.03    Equitable Remedies. Nothing contained in this Article shall be deemed or construed to limit or preclude the right of any Party to seek and obtain in any court of competent jurisdiction any injunctive relief, specific performance or other equitable remedies to enforce and protect its rights under this Agreement and to prevent or curtail any breach or threatened breach of this Agreement by the other Party. In connection therewith, each Party acknowledges and agrees (i) that issuance of Class A Units to Investor hereunder is of a special, unique and irreplaceable character, (ii) that monetary damages would not provide an adequate remedy in the event of the breach or threatened breach of any of terms, covenants and conditions on the part of such Party to be performed or observed under this Agreement, and (iii) in the event of any breach or threatened breach of such terms, covenants and conditions by such Party, that the other Party shall be entitled to injunctive relief, specific performance and other equitable remedies in any court of competent jurisdiction to enforce and protect its rights under this Agreement and to prevent or curtail any breach or threatened breach of this Agreement by the defaulting Party without the necessity of proving actual damages and without the necessity of posting any bond or other security in connection therewith to the maximum extent permitted under applicable law, in addition to any other remedies to which it may be entitled. Seeking or obtaining any such injunctive relief, specific performance or other equitable remedies shall not be deemed a waiver of the right of arbitration hereunder by any Party.

Section 6.04    Consent to Jurisdiction and Venue. Subject to Section 6.02, each Party hereby irrevocably consents and submits to the personal jurisdiction of, and venue in, the Superior Court for Los Angeles County, California, in any legal action, equitable suit, arbitration or other proceeding under, arising from or related to this Agreement, the interpretation, breach, termination or validity hereof, or any of the transactions contemplated hereunder.

Section 6.05    Recovery of Costs. In any legal action, equitable suit, arbitration or other proceeding under, arising from or related to this Agreement, the interpretation, breach, termination or validity hereof, or any of the transactions contemplated hereunder, the prevailing Party shall be entitled to recover reasonable attorneys' fees and costs incurred by such Party in connection therewith, in addition to any other relief to which such Party may be entitled.

## ARTICLE 7
## MISCELLANEOUS PROVISIONS

Section 7.01    Survival. The provisions of Section 2.05, Section 2.06, Section 2.07, Article 4, Article 6 and Article 7 hereof shall survive Closing and shall expire on the date upon which the respective terms, covenants and conditions on the part of each Party to be performed or observed thereunder shall have been fully satisfied, discharged or observed by such Party in accordance with the terms thereof, or until expiration of all statutes of limitation applicable thereto. The representations, warranties and indemnities of the parties hereunder shall survive Closing, and shall expire as provided in Section 4.04, except as to any matter as to which a claim has been submitted to the indemnifying Party prior thereto, in which case, such claim so timely submitted shall survive the expiration of such periods until expiration of all statutes of limitation applicable thereto. None of the terms, covenants, conditions, representations, warranties or indemnities of the parties hereunder shall be deemed to have merged into any instrument of conveyance or transfer or other agreement, document or instrument delivered by any Party at each respective Closing.

Section 7.02    Parties in Interest. Nothing in this Agreement, whether express or implied, is intended to confer any rights or remedies under or by reason of this Agreement on any persons or entities other than the parties to it and their respective successors and permitted assigns, nor is anything in this Agreement intended to relieve or discharge the obligation or liability of any third persons to any Party to this Agreement, nor shall any provision give any third persons any right of subrogation or action over against any Party to this Agreement.

Section 7.03    Assignment. Each Party acknowledges and agrees that the identity and investor qualifications of Investor as a party subscribing for and purchasing the Class A Units, and character of the Class A Units to be issued to Investor, are of a special, unique and irreplaceable nature, and that neither Party may assign any of the rights or delegate any of the obligations of such Party under this Agreement, either in whole or in part, at any time prior to the consummation of the Closing and thereafter only with respect to the Class A Units actually subscribed for and purchased by, and issued to, Investor at the Closing and subject to the terms of the LLC Agreement, without the prior written consent of the other Party in each instance, which consent may be withheld for any or no reason or conditioned upon such additional terms and conditions as the non-assigning Party shall determine in the sole and absolute discretion of such non-assigning Party. Any assignment of this Agreement, or any assignment of any of the rights or any delegation of any of the obligations of a Party under this Agreement, either in whole or in part, in violation of this Section shall be null and void.

Section 7.04    Notices. All notices, directions and other communications required or permitted to be given hereunder ("**Notice**") shall be in writing and sent by certified or registered mail, return receipt requested, postage prepaid, or transmitted by facsimile, electronic mail or other form of electronic written communication that the recipient has the facilities to receive, promptly confirmed by a manually signed original thereof sent by certified or registered mail, return receipt requested, postage prepaid, or delivered personally against a signed receipt therefor, in each case to the intended recipient as follows: (i) if to the Company, to Concord Blue Development, LLC, c/o Concord Blue Energy, Inc., 12424 Wilshire Boulevard, Suite 660, Los Angeles, California 90025, United States of America, Attention: President (E-Mail:

23

cb@concordblueenergy.com), with a copy contemporaneously sent to Concord Blue Engineering GmbH, Konigsallee 6, 40212 Duesseldorf, Germany, Attention Christopher Thannhaeuser, Chairman (Facsimile Number: 492113230505; E-Mail: ct@concordblue.de), and (ii) if to Investor, to Verdant*f* AG (on behalf of the Municipal Employees' Retirement System of Michigan), Attention: Ms. Gaia Arnaboldi / Mr. Berry Polmann, Gladbachstrasse 105, 8044 Zurich, Switzerland (Facsimile Number: 795553375 / 795555373; E-Mail: gaia@verdantf.com / berry@verdantf.com), or at such other address as either Party may designate from time to time by Notice given to the other Party in accordance with the provisions of this Agreement.  Each Notice sent by certified or registered mail shall be deemed given on the date shown on the return receipt as the date of delivery or the date upon which the appropriate postal authority certifies that it was unable to effectuate delivery, whichever is applicable. Each Notice transmitted by facsimile, electronic mail or other form of electronic written communication or delivered personally shall be deemed given on the date of transmission or delivery, as the case may be.

Section 7.05    Entire Agreement. This Agreement and the LLC Agreement contains the complete and entire understanding of the parties and shall supersede and replace any and all other arrangements, communications, representations or agreements, whether oral or written, with respect to the subject matter hereof.

Section 7.06    Binding Effect. This Agreement and the respective rights and obligations of the parties hereunder shall be binding upon and inure to the benefit of the parties hereto and their respective heirs, devisees, representatives, successors and permitted assigns.

Section 7.07    Amendment. This Agreement may be amended only in writing signed by the Manager of the Company and by Investor.

Section 7.08    Waiver or Consent. No waiver of any rights or obligations under this Agreement or of any objection to any act or omission connected therewith shall be claimed or implied by any Party, or be deemed or construed to constitute a consent to the continuation of any such act or omission or a consent to any other or future act or omission, unless in writing signed by the Party against whom enforcement of such waiver or consent is sought.

Section 7.09    Severability. In the event any provision, clause or application of this Agreement is invalidated or unenforceable for any reason whatsoever, this Agreement shall remain binding and in full force and effect to the maximum extent permitted under applicable law, except for such invalidated or unenforceable provision, clause or application. If any injustice or frustration of purpose shall result therefrom, however, the parties shall negotiate in good faith to provide adjustments to ameliorate the effects of such injustice or frustration of purpose.

Section 7.10    Drafting Presumption. It is acknowledged that the parties and their respective agents have participated in an arms'-length negotiation in the preparation of this Agreement. As a consequence, the parties agree that no presumption shall be applied in any interpretation of this Agreement that the terms hereof shall be construed more strictly against the Party who prepared the same, whether through such Party's agents or otherwise.

Section 7.11    Headings. The article and section headings contained in this Agreement are solely for the purpose of convenience and shall neither be deemed a part of this Agreement nor be used in any interpretation hereof.

Section 7.12    Gender. Each term stated in the singular shall include the plural, and pronouns stated in the masculine gender shall include the feminine and neuter genders, and *vice versa*, wherever appropriate by the context.

Section 7.13    Counterparts. This Agreement may be executed in one or more counterparts, each of which shall be deemed an original and all of which shall constitute one and the same instrument.

Section 7.14    Further Assurances. Each Party shall execute and/or deliver any and all other agreements, instruments and documents, and shall take any and all other actions, as reasonably requested by the other Party to effectuate fully the transactions contemplated the Closing or otherwise to effectuate fully the transactions contemplated by this Agreement. All agreements, instruments and documents not attached as Exhibits to this Agreement required to be delivered hereunder at or prior to the Closing shall be in form and substance reasonably satisfactory to the parties and their respective legal counsel.

Section 7.15    Confidentiality and Press Release.

(a)    The terms and conditions of this Agreement, and any information received by the parties under or in connection with this Agreement as well as the identity of the Investor (the "**Confidential Information**") shall be kept strictly confidential by each Party hereto and shall not be disclosed to any third party. The term Confidential Information shall not include any information

(i)    which as of the time of its disclosure by a Party was already lawfully in the possession of the receiving Party, evidence of which can be provided;

(ii)    which at the time of disclosure was in the public domain; or

(iii)    the disclosure of which was previously explicitly authorized by the disclosing Party or the Company.

(b)    Nothing herein shall restrict from

(i)    disclosing Confidential Information required by law, legal process or regulations;

(ii)    disclosing this Agreement to a third party being interested in good faith in an acquisition of or subscription for shares or a financing of the Company or the Subsidiary, all based on appropriate non-disclosure agreements;

(iii)    disclosing the identity of the Investor to legal counsel and independent accountants of the Company and, on a need to know basis as reasonably determined

DWT 29020018v7 0106299-000001

by the board of directors of the Company to other participants in transactions or potential transactions with the Company; as well as

(iv)    disclosing Confidential Information in order to make use of the rights and to comply with the obligations under this Agreement.

(c)    Notwithstanding anything herein to the contrary, the parties acknowledge that the Investor intends to disclose in reports maintained or issued by the Investor or to the Investor's board: (i) the name of the Company; (ii) the date that the investment was made by the Investor in the Company; (iii) the Subscription Price; (iv) the amount of cash distributed to the Investor by the Company; (v) the value of the Investor's investment in the Company based on the financial statements delivered to the Investor and (vi) the internal rate of return of the Investor's investment in the Company; provided that such disclosure is made only in connection with similar disclosure of information with respect to other investments made by the Investor. The parties consent in advance to such disclosures in the manner described above and any such disclosure shall not constitute a breach of this Agreement, the LLC Agreement, or any documents contemplated hereby or thereby. The parties acknowledge that the Investor is subject to the Michigan Freedom of Information Act ("**MFOIA**") and that, pursuant to its policies in connection therewith, its employees are not subject to confidentiality agreements with the Company that would encompass confidential information. The parties consent to the disclosure of confidential information to employees of the Investor who are made aware of the confidential nature of such information and their obligations with respect thereto. The parties agree that in the event the Investor receives a request under the MFOIA to disclose such confidential information it shall not be obligated to provide notice to or cooperate with the efforts of any other party in connection with any challenge to its standing to obtain a protective order or other remedy to protect such confidential information from being disclosed pursuant to such MFOIA request.

Section 7.16    <u>Sovereignty</u>.  The Investor reserves all immunities, defenses, rights or actions arising out the Investor's sovereign status or under the Eleventh Amendment to the United States Constitution, except to the extent waived by statute. No waiver of such reserved immunities, defenses, rights or actions shall be implied or otherwise deemed to exist by reason of its entry into this Agreement, by any express or implied provision thereof or by any actions or omissions to act by the Investor or any of its representatives or agents, whether taken pursuant to this Agreement or prior to the Investor's execution thereof. This provision shall be governed by, and construed in accordance with, the laws of the State of Michigan, United States of America.

[Signature Pages Follow]

IN WITNESS WHEREOF, each Party has duly executed and delivered this Membership Interest Subscription Agreement as of the date first above written.

**CONCORD BLUE DEVELOPMENT, LLC**

By: _____

Name: Gregory Bilson

Title:  Manager

**CONCORD BLUE ENERGY, INC.**

By: _____

Name: Christopher Thannhaeuser

Title: CEO

[Signature Page to Membership Interest Subscription Agreement]

**MUNICIPAL EMPLOYEES'
RETIREMENT SYSTEM OF MICHIGAN**

By verdant∫ AG pursuant to power of attorney
dated March __8__, 2016

By: _____

Name: _ Gaia Arnaboldi, Berry Polmann _____

Title: _ Managing Partner, Managing Partner

[Signature Page to Membership Interest Subscription Agreement]

**EXHIBIT A**

**FORM OF LLC AGREEMENT**

[Attached]

**AMENDED AND RESTATED
LIMITED LIABILITY COMPANY AGREEMENT**

**OF**

**CONCORD BLUE DEVELOPMENT, LLC**

**DATED AS OF**

**March [__], 2016**

# TABLE OF CONTENTS

**Page**

**ARTICLE 1 DEFINITIONS** ................................................................................**2**

    Section 1.01   Defined Terms ......................................................................2
    Section 1.02   Construction ........................................................................16

**ARTICLE 2 ORGANIZATION** .........................................................................**16**

    Section 2.01   Formation ...........................................................................16
    Section 2.02   Name ..................................................................................16
    Section 2.03   Purpose; Powers................................................................16
    Section 2.04   Principal Office ..................................................................17
    Section 2.05   Registered Office; Registered Agent .................................17
    Section 2.06   Term ...................................................................................17
    Section 2.07   Title to Property .................................................................17
    Section 2.08   No State Law Partnership ...................................................17

**ARTICLE 3 MEMBER CAPITAL** ....................................................................**17**

    Section 3.01   Members ............................................................................17
    Section 3.02   Units ..................................................................................17
    Section 3.03   Reclassifications of Interests.............................................18
    Section 3.04   Initial Capital Contributions .............................................18
    Section 3.05   LMC Discretionary Payments ...........................................19
    Section 3.06   Additional Investments .....................................................19
    Section 3.07   Preemptive Rights .............................................................19
    Section 3.08   Regulatory Approval..........................................................20
    Section 3.09   Return of Contributions ....................................................20
    Section 3.10   Advances by Members .......................................................21
    Section 3.11   Company-Held Units ..........................................................21
    Section 3.12   Representations and Warranties of Members .................21

**ARTICLE 4 ALLOCATIONS** .............................................................................**23**

    Section 4.01   Allocation of Net Profits and Net Losses .........................23
    Section 4.02   Regulatory Allocations ......................................................23
    Section 4.03   Tax Allocations..................................................................25
    Section 4.04   Other Tax Provisions .........................................................25

**ARTICLE 5 DISTRIBUTIONS** .........................................................................**26**

    Section 5.01   Distributions.......................................................................26
    Section 5.02   Tax Withholding ................................................................27

**ARTICLE 6 MANAGEMENT** ...........................................................................**28**

    Section 6.01   Exclusive Management of the Company by the Board ....28
    Section 6.02   Election of Managers .........................................................28
    Section 6.03   Board Procedures ...............................................................30

Section 6.04    Board Supermajority Decisions ..................................................................31
Section 6.05    Member Supermajority Decisions ..............................................................33
Section 6.06    Fiduciary Duties of Managers ....................................................................35
Section 6.07    Payments to Managers ...............................................................................35
Section 6.08    Officers .......................................................................................................35
Section 6.09    Strategic Plan; Annual Budget ...................................................................36
Section 6.10    Key Man Provision .....................................................................................36
Section 6.11    Deadlock; Dispute Resolution ....................................................................37
Section 6.12    Insurance .....................................................................................................38
Section 6.13    Change of Control .......................................................................................38

**ARTICLE 7 RIGHTS AND RESTRICTIONS ON MEMBERS ...............................................40**

Section 7.01    General ........................................................................................................40
Section 7.02    Meetings of the Members ...........................................................................41
Section 7.03    Information; Confidentiality ........................................................................42
Section 7.04    Transactions Between the Company and the Members ...............................43

**ARTICLE 8 INFORMATION RIGHTS AND TAX MATTERS ...............................................44**

Section 8.01    Reports; Access...........................................................................................44
Section 8.02    Tax Matters Member....................................................................................44
Section 8.03    Tax Classification ........................................................................................45
Section 8.04    Tax Returns and Elections ..........................................................................45
Section 8.05    Waiver of Participation in Tax Proceedings ...............................................45

**ARTICLE 9 TRANSFERS..........................................................................................................46**

Section 9.01    General Transfer Provisions ........................................................................46
Section 9.02    Transfers in Violation of Agreement ..........................................................47
Section 9.03    Admission of Additional Members..............................................................47
Section 9.04    Withdrawing Member ..................................................................................48
Section 9.05    Right of First Offer; Right of Last Refusal .................................................48
Section 9.06    Legend..........................................................................................................49
Section 9.07    Distributions and Allocations in Respect of Transferred Units ....................50

**ARTICLE 10 DISSOLUTION AND WINDING UP....................................................................50**

Section 10.01   Dissolution Events ......................................................................................50
Section 10.02   Winding Up...................................................................................................51
Section 10.03   Notice of Dissolution/Termination ..............................................................51
Section 10.04   Allocations During Period of Liquidation ....................................................52
Section 10.05   The Liquidator .............................................................................................52
Section 10.06   Form of Liquidating Distributions ...............................................................52

**ARTICLE 11 INDEMNIFICATION ...........................................................................................52**

Section 11.01   Indemnification of Covered Persons ............................................................52
Section 11.02   Advancement of Expenses ...........................................................................53
Section 11.03   Directors' and Officers' Insurance...............................................................53
Section 11.04   Survival of Indemnification and Advancement of Expenses.........................53
Section 11.05   Limitation on Indemnification .....................................................................53

Section 11.06  Indemnification of Employees and Agents........................................54
Section 11.07  Severability of Indemnification ....................................................54
Section 11.08  Company as Indemnitor of First Resort .........................................54

**ARTICLE 12 MISCELLANEOUS** ....................................................................**55**

Section 12.01  Notices ......................................................................................55
Section 12.02  Binding Effect; Third Party Beneficiaries ......................................55
Section 12.03  Survival of Terms ........................................................................55
Section 12.04  Construction ...............................................................................55
Section 12.05  Severability .................................................................................55
Section 12.06  Governing Law ...........................................................................56
Section 12.07  Dispute Resolution; Consent to Jurisdiction; Waiver of Jury Trial................56
Section 12.08  Specific Performance ...................................................................57
Section 12.09  No Recourse................................................................................57
Section 12.10  Further Assurances.......................................................................57
Section 12.11  Entire Agreement; Supersedure ....................................................57
Section 12.12  Effect of Waiver or Consent .........................................................57
Section 12.13  Amendment.................................................................................58
Section 12.14  Counterparts................................................................................58

## **EXHIBITS**

Exhibit A    -    Members
Exhibit B    -    Board of Managers
Exhibit C    -    Addendum Agreement
Exhibit D    -    Contributed Projects
Exhibit E    -    Escrow Agreement
Exhibit F    -    Officers

## AMENDED AND RESTATED
## LIMITED LIABILITY COMPANY AGREEMENT

**THIS AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT** (this "**Agreement**"), dated as of March [__], 2016 (the "**Effective Date**"), is entered into by and among Concord Blue Development, LLC, a Delaware limited liability company (the "**Company**"), Concord Blue Energy, Inc., a Delaware corporation ("**CBE**"), Municipal Employees' Retirement System of Michigan, a public nonprofit corporation established and maintained under the laws of the State of Michigan ("**MERS**"), and each other Person who after the Effective Date becomes a Member of the Company and becomes a party to this Agreement.

### RECITALS

**WHEREAS**, the Company was organized and formed by filing a Certificate of Formation with the Secretary of State of the State of Delaware on July 24, 2014 (the "**Certificate of Formation**");

**WHEREAS**, CBE entered into that certain Operating Agreement of Concord Blue Development, LLC, dated as of July 24, 2014 (the "**Original LLC Agreement**");

**WHEREAS**, on or prior to the Effective Date, CBE has contributed to the Company (i) an amount of cash equal to $2,750,100 and (ii) all of its right, title and interest in and to the equity interests in the Projects set forth in Exhibit D in exchange for the Interest in the Company held by CBE prior to the Effective Date and reclassified as of the Effective Date pursuant to Section 3.03 into 72,459,458 Class B Units;

**WHEREAS**, substantially concurrently herewith, MERS is executing a Membership Interest Subscription Agreement with the Company (each a "**Subscription Agreement**", and collectively, the "**Subscription Agreements**"), pursuant to which MERS is acquiring Class A Units of the Company;

**WHEREAS**, the Company has executed that certain Convertible Promissory Note, dated as of July 1, 2015 (the "**LBG Note**"), in the principal amount of $475,000 in favor of Berger Group Holdings, Inc. ("**LBG**"), which LBG Note including accrued and unpaid interest thereon, following the execution hereof will be converted into Class A Units of the Company in accordance with the terms thereof; and

**WHEREAS**, the parties hereto now desire to amend and restate the Original LLC Agreement in its entirety by adopting and executing this Agreement in order to set forth the Members' rights and obligations and to provide for the management of the Company and its affairs and the conduct of its business.

**NOW, THEREFORE**, in consideration of the foregoing and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Company and the Members hereby adopt the following as the "limited liability company agreement" (as defined in the Act) of the Company:

# ARTICLE 1
# DEFINITIONS

Section 1.01    <u>Defined Terms</u>.  Capitalized terms used in this Agreement are defined as follows:

"**Accredited Investor**" has the meaning ascribed to such term in Rule 501(a) of Regulation D promulgated under the Securities Act (but excluding for such purpose Rule 501(a)(4)).

"**Act**" means the Delaware Limited Liability Company Act.

"**Additional Contributions**" has the meaning set forth in <u>Section 3.07(a)</u>.

"**Additional Investment Units**" has the meaning set forth in <u>Section 3.06</u>.

"**Additional Units**" has the meaning set forth in <u>Section 3.07(a)</u>.

"**Adjusted Capital Account Deficit**" means, with respect to any Member for any Taxable Period, the deficit balance, if any, in such Member's Capital Account as of the end of such Taxable Period, after increasing such Capital Account by any amounts that such Member is actually obligated to restore or is deemed obligated to restore as described in Treasury Regulation Section 1.704-1(b)(2)(ii)(c) or the penultimate sentence of either Treasury Regulation Section 1.704-2(g)(1) or Treasury Regulation Section 1.704-2(i)(5), and reducing such Capital Account by any amounts described in Treasury Regulation Section 1.704-1(b)(2)(ii)(d)(4), (5) and (6).

"**Affiliate**" means, with respect to any Person (a) any Person directly or indirectly controlling, controlled by or under common control with such Person (each, to the extent not an individual, an "**Affiliated Entity**"), (b) any officer, director, general partner, manager or trustee of such Person or (c) any Person who is an officer, director, general partner, manager or trustee of any Person described in clauses (a) or (b) of this sentence.  For purposes of this definition, the terms "controlling," "controlled," "controlled by" or "under common control with" will mean the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract or otherwise, or the power to elect at least 50% of the directors, managers, general partners or Persons exercising similar authority with respect to such Person.  Notwithstanding the foregoing, neither the Company nor its Subsidiaries will be deemed to be an Affiliate of any Member.

"**Affiliated Entity**" has the meaning set forth in clause (a) of the definition of Affiliate.

"**Agreement**" has the meaning set forth in the preamble to this Agreement.

"**Annual Budget**" has the meaning set forth in <u>Section 6.09</u>.

"**Anti-Dilution Net Cash Percentage**" means, with respect to any Member as of any date of determination, the percentage of Net Cash that would be distributable to such Member

pursuant to Section 5.01(a)(i)(D), assuming for these purposes that the amounts required to be distributed pursuant to Section 5.01(a)(i)(A) through Section 5.01(a)(i)(C) had already been distributed.

"**Assumed Tax Rate**" shall mean the highest marginal combined U.S. federal, state and local income Tax rate (including the tax rate applicable pursuant to Section 1411 of the Code) applicable to an individual residing in Los Angeles, California, taking into account the character (e.g., long-term or short-term capital gain or ordinary or tax-exempt) of the applicable income and the deductibility of state and local income taxes for U.S. federal income Tax purposes.

"**Board**" has the meaning set forth in Section 6.01(a).

"**Business**" means the business of the Company as described in Section 2.03.

"**Business Day**" means any day other than a Saturday, Sunday, any federal holiday or day on which banking institutions in the States of New York or California are authorized or required by Law or other governmental action to close.

"**Capital Account**" means the Capital Account maintained for each Member on the Company's books and records in accordance with the following provisions:

(a) To each Member's Capital Account there shall be added (i) such Member's Capital Contributions, (ii) such Member's allocable share of Net Profits and any items in the nature of income or gain that are specially allocated to such Member pursuant to Article 4 hereof or other provisions of this Agreement, and (iii) the amount of any Company liabilities assumed by such Member or which are secured by any property distributed to such Member.

(b) From each Member's Capital Account there shall be subtracted (i) the amount of (A) cash and (B) the Gross Asset Value(s) of any Company asset(s) (other than cash) distributed to such Member pursuant to any provision of this Agreement, (ii) such Member's allocable share of Net Losses and any other items in the nature of expenses or losses that are specially allocated to such Member pursuant to Article 4 or other provisions of this Agreement, and (iii) liabilities of such Member assumed by the Company or which are secured by any property contributed by such Member to the Company.

(c) In the event any Unit is transferred in accordance with the terms of this Agreement, the transferee shall succeed to the Capital Account of the transferor to the extent it relates to the transferred Unit.

(d) In determining the amount of any liability for purposes of subparagraphs (a) and (b) above, there shall be taken into account Section 752(c) of the Code and any other applicable provisions of the Code and Treasury Regulations.

(e) The foregoing provisions and the other provisions of this Agreement relating to the maintenance of Capital Accounts are intended to comply with Treasury Regulation Sections 1.704-1(b) and 1.704-2 and shall be interpreted and applied in a manner consistent with such Treasury Regulations. In the event that the Board shall determine that it is prudent to modify the

manner in which the Capital Accounts, or any additions or subtractions thereto, are computed in order to comply with such Treasury Regulations, the Board may make such modification, provided that it is not likely to have a material effect on the amounts distributable to any Member pursuant to Section 10.02 hereof upon the dissolution of the Company.

"**Capital Contributions**" means, with respect to any Member, the total amount of cash and the initial Gross Asset Value of property other than cash (as reasonably determined by the Board in good faith) contributed to the capital of the Company by such Member, whether as an Initial Capital Contribution, as an Additional Contribution or as an additional Capital Contribution.

"**Cause**" shall mean, with respect to any Manager, that such Manager (a) has engaged in dishonesty related to the Company's or a Company Affiliate's business, or has committed any fraud or felony or other crime (whether or not related to the Company's business); or (b) the Member has engaged in willful misconduct in connection with his, her or its duties and obligations as a Manager.

"**CB Germany**" means Concord Blue Engineering GmbH, a German company.

"**CBE**" has the meaning set forth in the preamble to this Agreement.

"**CBE Managers**" has the meaning set forth in Section 6.02(a)(i).

"**CBR**" means the Concord Blue Reformer technology developed by CBE and its Affiliates.

"**Certificate of Formation**" has the meaning set forth in the recitals to this Agreement.

"**Chairman**" has the meaning set forth in Section 6.03(a)(i).

"**Change of Control Event**" has the meaning set forth in Section 6.13.

"**Change of Control Notice**" has the meaning set forth in Section 6.13.

"**Class A Member**" means to the extent that a Member holds Class A Units, such Member is a Class A Member.  Initially, on the Effective Date, MERS shall be the only Class A Member.  A Class A Member may also hold Class B Units, and to such extent, is also a Class B Member.

"**Class A Percentage Interest**" means, with respect to any Class A Member and any Class A Units, a percentage equal to the number of Class A Units held by such Class A Member divided by the aggregate number of Class A Units outstanding at the time of determination.

"**Class A Units**" has the meaning set forth in Section 3.02(a)(i).

"**Class B Member**" means to the extent that a Member holds Class B Units, such Member is a Class B Member.  Initially, on the Effective Date, CBE shall be the only Class B

Member.  A Class B Member may also hold Class A Units, and to such extent, is also a Class A Member.

"**Class B Percentage Interest**" means, with respect to any Class B Member and any Class B Units, a percentage equal to the number of Class B Units held by such Class B Member divided by the aggregate number of Class B Units outstanding at the time of determination.

"**Class B Units**" has the meaning set forth in Section 3.02(a)(ii).

"**Code**" means the United States Internal Revenue Code of 1986, as amended.

"**Company**" has the meaning set forth in the preamble to this Agreement.

"**Company Minimum Gain**" has the meaning set forth in Treasury Regulation Sections 1.704-2(b)(2) and 1.704-2(d)(1) for the phrase "partnership minimum gain."

"**Company Notice Date**" has the meaning set forth in Section 9.05(b)(i).

"**Company ROFR**" means the right, but not an obligation, of the Company to purchase, pursuant to Section 9.05(b), all or any portion of ROFR Units with respect to a proposed Transfer, on the terms and conditions specified in the ROFR Notice.

"**Confidential Information**" has the meaning set forth in Section 7.03(e).

"**Core Projects**" has the meaning set forth in Section 5.02 of the Subscription Agreement.

"**Core Project Proceeds**" means all distributions, dividends, interest and payments of cash, Interests or other property paid to a Class A Member with respect to or in connection with a Core Project; provided, that Core Project Proceeds shall not include (a) any distributions, dividends, interest and payments of cash, Interests or other property paid or made to a Class A Member by the Company in respect of such Class A Member's Units, or (b) payments made to a Class A Member in exchange for goods or services provided by such Class A Member or its Affiliate with respect to such Core Project or (c) any distributions, dividends, interest and payments of cash, interests or other property paid to a Class A Member in respect of shares or participations or units not granted pursuant to Section 5.02 of the Subscription Agreement.

"**Covered Person**" has the meaning set forth in Section 11.01.

"**Deadlock**" has the meaning set forth in Section 6.11(a).

"**Depreciation**" means, for each Taxable Period, an amount equal to the depreciation, amortization or other cost recovery deduction allowable for U.S. federal income Tax purposes with respect to an asset for such Taxable Period, except that with respect to any such asset the Gross Asset Value of which differs from its adjusted Tax basis at the beginning of such Taxable Period, Depreciation shall be an amount that bears the same ratio to such beginning Gross Asset Value as the U.S. federal income Tax depreciation, amortization or other cost recovery deduction

for such year or other period bears to such beginning adjusted Tax basis; provided, however, that if the U.S. federal income Tax depreciation, amortization or other cost recovery deduction for such year or other period is zero, Depreciation shall be determined with reference to such beginning Gross Asset Value using any reasonable method selected by the Board.

"**Derived Units**" means, with reference to a Member at any time, the Units owned by such Member as of the Effective Date and any Units derived therefrom (whether as a result of the exercise of preemptive rights associated with such Units, the split, combination or other change to such Units or otherwise), whether owned by such Member or another Member at such time.

"**Discretionary Payments**" has the meaning set forth in the Teaming Agreement Amendment.

"**Dispute**" has the meaning set forth in Section 12.06.

"**Disputing Members**" has the meaning set forth in Section 6.11.

"**Dissolution Event**" has the meaning set forth in Section 10.01(a).

"**Effective Date**" has the meaning set forth in the preamble to this Agreement.

"**Effective Date Unit Price**" has the meaning set forth in Section 3.04(a).

"**Escrow Account**" shall mean the account established pursuant to the Escrow Agreement in which the Escrow Amount shall be deposited.

"**Escrow Agent**" shall mean Wells Fargo Bank, National Association.

"**Escrow Agreement**" shall mean the Escrow Agreement to be entered into on the Effective Date among MERS, CBE, the Company and the Escrow Agent in substantially the form attached hereto as Exhibit E, that shall regulate the disbursement of the Escrow Amount from the Escrow Account.

"**Escrow Amount**" shall mean $25,000,000.

"**Excluded Issuance**" means the issuance of (a) Class A Units to MERS or LBG pursuant to Section 3.05, (b) Class B Units pursuant to Section 3.06 (other than Additional Investment Units) (c) Interests in the Company or any Subsidiary issued to any Person that is not a Member or an Affiliate thereof as consideration in any acquisition or other strategic transaction (such as a joint venture, marketing or distribution arrangement or technology transfer or development arrangement) approved as an Excluded Issuance in accordance with this Agreement, (d) Interests in the Company or any Subsidiary issued to the Company or any wholly owned Subsidiary, (e) Interests in the Company or any Subsidiary issued in connection with any share split, stock dividend, distribution, reclassification or recapitalization of the Company approved as an Excluded Issuance in accordance with this Agreement, (f) any Interests or options to purchase Interests in the Company or any Subsidiary, restricted awards, performance awards, phantom

interests or any other Interest-based awards (including Profits Units) issued to an employee or other service provider of the Company or any Subsidiary under a management incentive plan implemented and approved as an Excluded Issuance in accordance with this Agreement, (g) any Interests in the Company or any Subsidiary issued to any Person that is not a Member or an Affiliate thereof for nominal or no consideration as an incentive to a creditor of the Company or any Subsidiary in connection with the incurrence of indebtedness and that do not represent a significant portion of the value of the associated transaction, but excluding Interests issued as in-kind interest paid by the Company on indebtedness of the Company approved as an Excluded Issuance in accordance with this Agreement, (h) Class A Units to MERS pursuant to Section 3.04(b), (i) Units issued to finance the redemption of MERS Units by the Company pursuant to Section 3.09(c), or (j) the issuance of Class A Units to LBG upon conversion of the LBG Note.

"**Fair Market Value**" means, as of any time with respect to any asset, the fair market value of such asset, at such time, as determined reasonably and in good faith by the Board (subject to Section 6.04(j)).

"**Fiscal Year**" means any twelve month period commencing on January 1 and ending on either (a) December 31 or (b) the date on which all Property is distributed to the Members pursuant to Article 10.

"**Financial Closing**" has the meaning set forth in Section 3.09(b).

"**Founder**" means Christopher Thannhaeuser.

"**GAAP**" means United States generally accepted accounting principles consistently applied.

"**Governmental Entity**" means any court or tribunal in any jurisdiction (domestic or foreign) or any governmental or regulatory body, agency, department, commission, board, bureau or other authority or instrumentality (domestic or foreign).

"**Gross Asset Value**" means, with respect to any asset of the Company, the asset's adjusted basis for U.S. federal income Tax purposes, except as follows:

(a)    The initial Gross Asset Value of any asset contributed by a Member to the Company shall be the gross Fair Market Value of such asset.

(b)    The Gross Asset Values of all Company assets will be adjusted to equal their respective gross Fair Market Value as of the following times:

(i)    the acquisition of additional Units by a new or existing Member in exchange for more than a de minimis Capital Contribution to the Company;

(ii)    the distribution by the Company to a Member of more than a de minimis amount of Company assets as consideration for Units;

(iii)    the liquidation or dissolution of the Company within the meaning of Treasury Regulation Section 1.704-1(b)(2)(ii)(g); and

(iv)    the grant of any Units (other than a de minimis number of Units) as consideration for the provision of services to or for the benefit of the Company, provided that an adjustment described in clause (i), (ii) or (iv) of this paragraph (b) will be made only if the Board reasonably determines that such adjustment is necessary or appropriate to reflect the relative interests of the Members of the Company.

(c)    The Gross Asset Value of any Company asset distributed to a Member shall be adjusted to equal the Fair Market Value of such asset on the date of distribution.

(d)    The Gross Asset Values of Company assets shall be increased (or decreased) to reflect any adjustments to the adjusted basis of such assets pursuant to Code Section 734(b) or Section 743(b) of the Code, but only to the extent that such adjustments are taken into account in determining Capital Accounts pursuant to Treasury Regulation Section 1.704-1(b)(2)(iv)(m) and paragraph (e) of the definition of "Net Profits" or "Net Losses" or Section 4.02(d); provided, however, that Gross Asset Values shall not be adjusted pursuant to this subparagraph (d) to the extent that an adjustment pursuant to subparagraph (b) above is made in connection with a transaction that would otherwise result in an adjustment pursuant to this subparagraph (d).

If the Gross Asset Value of an asset has been determined or adjusted pursuant to paragraph (a), (b) or (d) above, such Gross Asset Value will thereafter be adjusted by the Depreciation taken into account with respect to such asset.

"**HSR Act**" has the meaning set forth in Section 3.08.

"**Initial Capital Contribution**" means the Capital Contributions described in Section 3.04.

"**Interest**" means, with respect to any Person: (a) capital stock, membership interests (including Units), partnership interests, other equity interests, rights to profits or revenue and any other similar interest of such Person; (b) any security or other interest convertible into or exchangeable or exercisable for any of the foregoing, and any and all warrants, rights or options to purchase, or obligations of a Person to sell, any of the foregoing, whether voting or nonvoting, and whether or not such shares, warrants, options, rights or other interests are authorized or otherwise existing on any date of determination; and (c) any right (contingent or otherwise) to acquire any of the foregoing.

"**IPO**" means any underwritten initial public offering by the IPO Issuer of equity securities pursuant to an effective registration statement under the Securities Act or the consummation of a similar initial public offering by the IPO Issuer pursuant to a comparable process under applicable foreign securities Laws, provided that an IPO will not include an offering made in connection with a business acquisition or combination pursuant to a registration statement on Form S-4 or any similar form, or an employee benefit plan pursuant to a registration statement on Form S-8 or any similar form.

"**IPO Issuer**" means (a) the Company or (b) an Affiliated Entity of the Company or a Subsidiary of the Company that will be the issuer in an IPO.

"**IRR**" means the pre-tax, compounded annual internal rate of return, calculated using the "XIRR" worksheet function as currently embedded in Microsoft Excel or any successor software and/or function thereto.

"**Law**" means any applicable federal, state or local order, writ, injunction, judgment, settlement, award, decree, statute, law (including common law), rule or regulation.

"**LBG**" has the meaning set forth in the recitals to this Agreement.

"**LBG Note**" has the meaning set forth in the recitals to this Agreement.

"**Lien**" means any lien, pledge, condemnation award, claim, restriction, easement, covenant, exception to  title, charge, preferential purchase right, equity, security interest, exclusive license, mortgage, deed of trust, hypothecation or encumbrance of any nature whatsoever including a statutory landlord lien.

"**Liquidator**" has the meaning set forth in Section 10.05(a).

"**LMC**" means Lockheed Martin Corporation, a Maryland corporation, acting through its Missile and Fire Control business unit, and its successors and permitted assigns under the Teaming Agreement (including any wholly-owned affiliate of Lockheed Martin Corporation elected pursuant to the terms of Teaming Agreement Amendment).

"**LMC Performance Bonus Payments**" means, as of any date of determination, the cash payments required to be paid to LMC pursuant to Section 3 of the Teaming Agreement Amendment.

"**LMC Performance Bonus Percentage**" means, as of any date of determination, the designated percentage required to be paid to LMC with respect to the LMC Performance Bonus Payments pursuant to Section 3 of the Teaming Agreement Amendment.

"**Major Holder Approval**" means the approval (whether by affirmative vote or written consent) of (i) MERS (so long as MERS has not transferred any of the Class A Units held by MERS on the Effective Date) and CBE (so long as CBE continues to hold at least an aggregate 15% Percentage Interest) and (ii) a majority of the Managers then serving on the Board.

"**Majority-in-Interest**" means the Members who have aggregate Voting Percentage Interests that are greater than 50% of all Voting Percentage Interests or, if used in relationship to a specified group of Units, the Members who have aggregate Voting Percentage Interests in such specified group that are greater than 50% of the aggregate Voting Percentage Interests of all Units in such group.

"**Manager**" has the meaning set forth in Section 6.02(a).

"**Material Adverse Effect**" means a material adverse effect on the business, assets, financial condition or results of operations of the Company excluding any effect resulting from (i) any change in political, social, economic, industry, market or financial conditions (including changes in the electric generating, transmission or distribution industry, the wholesale or retail markets for electrical power, the general state of the energy industry, the transmission system, interest rates, consumer confidence, outbreak of hostilities, terrorist activities or war), of general applicability in the regions in which any Project developed by the Company is located, (ii) any change in applicable Law or regulatory policy, (iii) effects of weather or meteorological events, (iv) strikes, work stoppages or other labor disturbances or (v) the execution or delivery of this Agreement, the Subscription Agreements or the transactions contemplated hereby or thereby or the announcement thereof.

"**Member**" means any Person (a) who is referred to as a Member on Exhibit A to this Agreement or who has become a new Member pursuant to the terms of this Agreement and (b) who has not ceased to be a Member, including Class A Members and Class B Members.

"**Member Indemnitors**" has the meaning set forth in Section 11.08.

"**Member Minimum Gain**" means an amount determined in accordance with Treasury Regulation Section 1.704-2(i) with respect to "partner minimum gain."

"**Member Nonrecourse Debt**" has the meaning set forth in Treasury Regulation Section 1.704-2(b)(4) for the phrase "partner nonrecourse debt."

"**Member Nonrecourse Deductions**" has the meaning set forth in Treasury Regulation Section 1.704-2(i) for the phrase "partner nonrecourse deductions."

"**MERS**" has the meaning set forth in the preamble to this Agreement.

"**MERS Managers**" has the meaning set forth in Section 6.02(a)(i).

"**Net Cash**" means the gross cash proceeds from Company operations and the sale of its assets after the payment of all expenses and other charges (including any LMC Performance Bonus Payments), less the portion thereof used to pay or establish reserves, all as determined by the Board.

"**Net Profits**" or "**Net Losses**" means, for each Taxable Period, an amount equal to the Company's taxable income or loss for such Taxable Period determined in accordance with Section 703(a) of the Code (for this purpose, all items of income, gain, loss, deduction or credit required to be stated separately pursuant to Section 703(a)(1) of the Code shall be included in taxable income or loss), with the following adjustments:

(a)      any income of the Company that is exempt from U.S. federal income Tax and not otherwise taken into account in computing Net Profits or Net Losses pursuant to this definition of Net Profits and Net Losses shall increase the amount of such income and/or decrease the amount of such loss;

(b)    any expenditure of the Company described in Section 705(a)(2)(B) of the Code or treated as Code Section 705(a)(2)(B) expenditures pursuant to Treasury Regulation Section 1.704-1(b)(2)(iv)(i), and not otherwise taken into account in computing Net Profits or Net Losses pursuant to this definition of Net Profits and Net Losses, shall decrease the amount of such income and/or increase the amount of such loss;

(c)    gain or loss resulting from any taxable disposition of Company assets shall be computed by reference to the Gross Asset Value of the Company assets disposed of, notwithstanding that the adjusted Tax basis of such Company assets differs from its Gross Asset Value;

(d)    in lieu of the depreciation, amortization and other cost recovery deductions taken into account in computing such income or loss, there shall be taken into account Depreciation for such Taxable Period;

(e)    to the extent an adjustment to the adjusted Tax basis of any asset included in Company assets pursuant to Section 734(b) or Section 743(b) of the Code is required pursuant to Treasury Regulation Section 1.704-1(b)(2)(iv)(m) to be taken into account in determining Capital Accounts as a result of a distribution other than in liquidation of a Member's interest in the Company, the amount of such adjustment shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases the basis of the asset) from the disposition of the asset and shall be taken into account for the purposes of computing Net Profits and Net Losses;

(f)    if the Gross Asset Value of any Company asset is adjusted in accordance with subparagraph (b) or subparagraph (c) of the definition of "Gross Asset Value" above, the amount of such adjustment shall be taken into account in the taxable year of such adjustment as gain or loss from the disposition of such asset for purposes of computing Net Profits or Net Losses;  and

(g)    notwithstanding any other provision of this definition of Net Profits and Net Losses, any items that are specially allocated pursuant to Section 4.02 hereof shall not be taken into account in computing Net Profits or Net Losses.  The amounts of the items of Company income, gain, loss or deduction available to be specially allocated pursuant to Section 4.02 hereof shall be determined by applying rules analogous to those set forth in this definition of Net Profits and Net Losses.

"**New Majority Shareholder**" has the meaning set forth in Section 6.13.

"**Nonrecourse Deductions**" has the meaning set forth in Treasury Regulation Sections 1.704-2(b)(1) and 1.704-2(c).

"**Nonrecourse Liability**" has the meaning set forth in Treasury Regulation Sections 1.704-2(b)(3) and 1.752-1(a)(2).

"**Non-Sanctioned Transferee**" means any Person other than: (a) any Person subject to any sanctions administered by the U.S. Office of Foreign Assets Control, including any "Specially Designated National and Blocked Person" or similar sanctions, (b) any Person

domiciled or organized in a jurisdiction subject to any sanctions administered by the U.S. Office of Foreign Assets Control or made subject to special measures by the Financial Crimes Enforcement Network of the U.S. Department of Treasury or (c) any Person that is owned or controlled, directly or indirectly, by any Person described in any of clauses (a) and (b) above.

"**Non-Voting Participant**" has the meaning set forth in Section 6.02(b).

"**Officer**" has the meaning set forth in Section 6.08.

"**Organizational Documents**" means: (a) the articles or certificate of incorporation and the bylaws of a corporation; (b) the articles or certificate of formation and regulations and company agreement of a limited liability company; (c) the partnership agreement and any statement of partnership of a general or limited liability partnership; (d) the limited partnership agreement and the certificate of limited partnership of a limited partnership; (e) any charter or similar document adopted or filed in connection with the creation, formation or organization of a Person; and (f) any amendment to any of the foregoing.

"**Original LLC Agreement**" has the meaning set forth in the recitals to this Agreement.

"**Percentage Interest**" means, with respect to any Member and any Units, a percentage equal to the number of Units held by such Member divided by the aggregate number of Units outstanding at the time of determination.  The Members' respective Percentage Interests as of the Effective Date are specified opposite each Member's name on Exhibit A.  Exhibit A may be amended by the Board to reflect any increases and decreases in the Members' Percentage Interests arising from the direct Transfer, issuance or forfeiture of Units from time to time after the Effective Date in accordance with this Agreement.

"**Percentage Interest Share**" means, with respect to any Member and any offering of Units, such number of Units as is equal to the product of such Member's Percentage Interest (including in the calculation of such Member's Percentage Interest any Additional Investment Units issued to such Member) and the number of such Units.

"**Permitted Encumbrances**" means (a) liens, deposits or pledges created pursuant to this Agreement or the Subscription Agreement, (b) liens, deposits or pledges to secure statutory obligations relating to worker's compensation and/or unemployment insurance or other social security legislation, (c) liens, deposits or pledges arising out of judgments or awards so long as enforcement of any such lien has been stayed and an appeal or Proceeding for review is being prosecuted in good faith and in connection with which security has been provided or are fully covered by insurance, (d) liens, deposits or pledges for Taxes not yet due or that are being contested in good faith by appropriate Proceedings and are bonded or for which adequate reserves have been established in accordance with GAAP, (e) carriers', warehousemen's, mechanics', materialmen's, repairmen's, supplier's, construction, employees', contractors', operators' or other similar liens or charges securing the payment of expenses not yet due and payable that were incurred in the ordinary course of business or which are the subject of a good faith contest and for which security for such lien has otherwise been provided in accordance with GAAP, (f) trade contracts or other obligations of a like nature incurred in the ordinary course of business, (g) obligations or duties to any Governmental Entity arising in the ordinary course of

business (including under licenses and permits held and under all applicable laws, rules, regulations and orders of any Governmental Entity), (h) liens, deposits or pledges to secure statutory obligations in the ordinary course of business (other than for the repayment of borrowed money), and (i) all other encumbrances and exceptions that are incurred in the ordinary course of business that, in the case of this clause (i), are not incurred for borrowed money, do not exceed $25,000 in the aggregate and do not have a Material Adverse Effect on either the use of any material assets of the Company as currently used or the value of any such assets.

"**Person**" means any individual, company, partnership (whether general or limited), limited liability company, corporation, trust, estate, association, nominee, Governmental Entity or other entity.

"**Preemptive Notice**" has the meaning set forth in Section 3.07(b).

"**Preemptive Period**" has the meaning set forth in Section 3.07(b).

"**Preemptive Purchaser**" has the meaning set forth in Section 3.07(b).

"**Preemptive Rights Holder**" means any Member that certifies to the Company's reasonable satisfaction that such Member is an Accredited Investor.

"**Proceedings**" means all proceedings, actions, claims, suits, investigations and inquiries by or before any arbitrator or Governmental Entity.

"**Project**" means a facility incorporating the CBR and related CBR equipment used to convert biomass and various forms of waste materials into energy and other products.

"**Property**" means all real and personal property owned or acquired by the Company or its Subsidiaries, including cash, and any improvements thereto, and will include both tangible and intangible property.

"**Proposed Purchaser**" has the meaning set forth in Section 3.07(a).

"**Put Option**" has the meaning set forth in Section 6.13.

"**Put Period**" has the meaning set forth in Section 6.13.

"**Put Price**" has the meaning set forth in Section 6.13.

"**Put Units**" has the meaning set forth in Section 6.13.

"**Responding Members**" has the meaning set forth in Section 6.11.

"**ROFR Notice**" has the meaning set forth in Section 9.05(b)(i).

"**ROFR Notice Period**" has the meaning set forth in Section 9.05(b)(i).

"**ROFR Offer**" has the meaning set forth in Section 9.05(b)(ii).

"**ROFR Offeror**" has the meaning set forth in Section 9.05(a).

"**ROFR Price**" has the meaning set forth in Section 9.05(b)(i).

"**ROFR Purchaser**" has the meaning set forth in Section 9.05(b)(ii).

"**ROFR Units**" has the meaning set forth in Section 9.05(a).

"**Secondary Notice**" has the meaning set forth in Section 9.05(b)(i).

"**Secondary Notice Date**" has the meaning set forth in Section 9.05(b)(ii).

"**Securities Act**" means the Securities Act of 1933.

"**Strategic Plan**" has the meaning set forth in Section 6.09.

"**Subscription Agreement**" has the meaning set forth in the recitals to this Agreement.

"**Subscription Price**" has the meaning set forth in the Subscription Agreement.

"**Subsidiary**" means (a) any corporation, partnership, limited liability company or other entity in which the Company or any direct or indirect Subsidiary of the Company owns directly or indirectly, with power to vote a majority of the Interests having ordinary voting power to elect a majority of the board of directors or other Persons performing similar functions, (b) a partnership in which the Company or any direct or indirect Subsidiary of the Company is a general partner or (c) a limited liability company in which the Company or any direct or indirect Subsidiary of the Company is a managing member or manager.

"**Supermajority Board Vote**" has the meaning specified in Section 6.04.

"**Supermajority Member Vote**" has the meaning specified in Section 6.05.

"**Tax**" means any U.S. federal, state or local or foreign net income, alternative or add-on minimum, gross income, gross receipts, commercial activity, property, sales, use, transfer, gains, license, excise, employment, payroll, withholding or minimum Tax, or any Tax custom, duty, governmental fee or other like assessment or charge of any kind whatsoever, together with any interest or any penalty, addition to Tax or additional amount imposed by any Governmental Entity.

"**Tax Advances**" has the meaning set forth in Section 5.01(b).

"**Tax Distributions**" has the meaning specified in Section 5.01(b).

"**Tax Information**" has the meaning specified in Section 8.01(c).

"**Tax Matters Member**" has the meaning set forth in Section 8.02.

"**Taxable Period**" means (a) the period commencing on the date hereof and ending on December 31, 2015, (b) any subsequent period commencing on January 1 and ending on the following December 31, or (c) any portion of the period described in clause (b) for which the Company is required to allocate Net Profit, Net Loss or items of Company income, gain, loss or deduction pursuant to Article 4.

"**Teaming Agreement**" means that certain Teaming Agreement, dated as of July 25, 2013, by and between LMC and CBE, as amended by the Teaming Agreement Amendment and as further amended, amended and restated, supplemented or otherwise modified from time to time.

"**Teaming Agreement Amendment**" means that certain First Amendment to Teaming Agreement, dated as of December 18, 2015, by and among LMC, CBE and the Company.

"**Third Party**" means (a) with respect to any Person, any other Person (whether or not another Member) that is not an Affiliate of such Person and (b) with respect to the Company, any other Person that is not an Affiliate of the Company or of any Member or Manager.

"**Transfer**" as a noun, means any voluntary or involuntary direct or indirect transfer, sale, pledge or hypothecation or other disposition and, as a verb, means voluntarily or involuntarily to directly or indirectly transfer, sell, pledge or hypothecate or otherwise dispose of, including any disposition of the economic value or other risk of ownership through hedging transactions or derivatives involving any Interests.

"**Treasury Regulations**" means the income tax regulations, including temporary regulations, promulgated under the Code.

"**Unit**" means a unit representing a fractional part of the Interests of the Members and shall include all types and classes of Units, including the Class A Units and the Class B Units; provided, that any type or class of Unit shall have the privileges, preference, duties, liabilities, obligations and rights set forth in this Agreement and the Interests represented by such type or class or series of Unit shall be determined in accordance with such privileges, preference, duties, liabilities, obligations and rights.

"**Voting Percentage Interest**" means, with respect to any Member as of any date of determination, the Percentage Interest such Member would hold if on such date all amounts in the Escrow Account were released and contributed to the Company as a Capital Contribution by MERS and MERS were issued Class A Units, in each case, in accordance with Section 3.04(b). The Members' respective Voting Percentage Interests as of the Effective Date are specified opposite each Member's name on Exhibit A. Exhibit A may be amended by the Board to reflect any increases and decreases in the Members' Voting Percentage Interests arising from the Transfer, issuance or forfeiture of Units, or release of amounts in the Escrow Account to MERS, from time to time after the Effective Date in accordance with this Agreement. For the avoidance of doubt, the Voting Percentage Interest shall not be based on the Units or portions thereof held by a Member or its Affiliates.

Section 1.02  <u>Construction</u>.  Unless the context requires otherwise:  (a) words in the singular form will be construed to include the plural and vice versa; (b) the term "including" will be construed to be expansive rather than limiting in nature and to mean "including, without limitation"; (c) references to Articles and Sections refer to Articles and Sections of this Agreement; (d) the words "this Agreement," "herein," "hereof," "hereby," "hereunder" and words of similar import refer to this Agreement as a whole and not to any particular subdivision unless expressly so limited; (e) references to Exhibits are to the Exhibits attached to this Agreement, each of which is hereby incorporated herein and made a part hereof for all purposes as if set forth in full herein; (f) the term "or" is not exclusive and will have the inclusive meaning of "and/or"; (g) derivative forms of defined terms will have correlative meanings; (h) references to any Law or statute will include all rules and regulations promulgated thereunder, and references to any Law or statute will be construed as including any legal and statutory provisions consolidating, amending, succeeding or replacing the applicable Law or statute; (i) references to any document will include any amendment, restatement or supplement to, or replacement or novation of, such document but disregarding any amendment, restatement, supplement, replacement or novation made in breach of this Agreement; (j) references to a Person include such Person's successors and permitted assigns; (k) references to "days" are to calendar days unless otherwise indicated; and (l) the Article, Section and other headings contained in this Agreement are for reference purposes only and are not intended to describe, interpret, define, or limit the scope, extent, or intent of this Agreement or any provision hereof.

**ARTICLE 2**
**ORGANIZATION**

Section 2.01  <u>Formation</u>.  The Company was formed as a Delaware limited liability company by the filing of the Certificate of Formation under and pursuant to the Act and upon the terms and conditions set forth in this Agreement.  The fact that the Certificate of Formation is on file in the office of the Secretary of State of Delaware will constitute notice that the Company is a limited liability company.  The rights and liabilities of the Members will be as provided under the Act, the Certificate of Formation and this Agreement.

Section 2.02  <u>Name</u>. The name of the Company is "Concord Blue Development, LLC". All Company business will be conducted in the name of "Concord Blue Development, LLC" or such other name that complies with the Act, as the Board may select from time to time.

Section 2.03  <u>Purpose; Powers</u>. The purposes of the Company are limited to, directly or through one or more special purpose vehicles or holding companies, (i) engaging in the construction, lease and ownership, and the operation, management, maintenance, financing and refinancing of Projects; (ii) to acquire, own, hold or dispose of equity interests in entities directly or indirectly holding assets of Projects; (iii) entering into, complying with and performing the various agreements evidencing, necessitated by or arising in connection with Projects, and all incidental, ancillary, necessary or appropriate documents related thereto; (iv) engaging in the purchase, ownership, use, transmission, marketing and sale of any input, output, right, credit, attribute or allowance associated therewith; (v) exercising any power and taking any action as are considered necessary or desirable in connection with the administration of the Company's affairs and the administration of Projects, including the maintaining of records, the engagement of

professional advisors and consultants, the establishment of bank accounts, and prosecution or defense of legal actions; and (vi) taking all actions incidental, ancillary, necessary or appropriate to the foregoing that may be engaged in by a limited liability company formed under the Act.

Section 2.04    Principal Office.  The principal office of the Company is located at 12424 Wilshire Blvd., Suite 660, Los Angeles, CA 90025, or such other place as may from time to time be determined by the Board.  The Board will give prompt notice of any such change to each of the Members.

Section 2.05    Registered Office; Registered Agent.  The registered office and the name of the registered agent of the Company will be the office of the initial registered agent named in the Certificate of Formation or such other office (which need not be a place of business of the Company) as the Board may designate from time to time in the manner provided by the Act.

Section 2.06    Term.  The Company will continue in existence perpetually until the Company is dissolved in accordance with the provisions of this Agreement.

Section 2.07    Title to Property.  All Property owned by the Company will be owned by the Company as an entity and no Member will have any ownership interest in such Property in its individual capacity, and each Member's interest in the Company will be personal property for all purposes.  The Company will hold title to all of its Property in the name of the Company and not in the name of any Member.

Section 2.08    No State Law Partnership.  Except as set forth in Section 8.03, the Members intend that the Company will not be a partnership (including a limited partnership) or joint venture for any purpose, and that no Member or any Manager will, by virtue of this Agreement, be a partner of, or in a joint venture with, any other Member or Manager.

## ARTICLE 3
## MEMBER CAPITAL

Section 3.01    Members.  The Persons listed on Exhibit A as Members are the sole Members of the Company as of the Effective Date.

Section 3.02    Units.

(a)    Unit Designations.  The Interests in the Company shall consist solely of Units issued by the Company to the Members, which Units shall be uncertificated. The Units shall initially consist of two classes:

(i)    a class of Units designated as "**Class A Units**" that will have the rights and interests set forth in this Agreement for such Class A Units; and

(ii)    a class of Units designated as "**Class B Units**" that will have the rights and interests set forth in this Agreement for such Class B Units.

(b)    Number of Units.  On the Effective Date, each Member holds the number and class of Units set forth opposite such Member's name on Exhibit A.

Section 3.03    Reclassifications of Interests.  All Interests in the Company held by CBE as of the Effective Date are hereby reclassified as 72,459,458 Class B Units.

Section 3.04    Initial Capital Contributions.

(a)    Simultaneous with the execution of this Agreement and pursuant to the Subscription Agreement, MERS has made a cash deposit in the amount of US$ 25,000,000 (Twenty-Five Million US Dollars) in the Escrow Account and in partial consideration therefore has been issued one (1) Class A Unit representing a Percentage Interest of 0.000001% in the Company.  The total Capital Contributions and Class A Units and Class B Units of each member is set forth opposite such Member's name on Exhibit A.

(b)    MERS Escrow Amount.

(i)    Simultaneous with the execution of this Agreement and pursuant to the Subscription Agreement, MERS wired the Escrow Amount to the Escrow Account.  Subject to the definition of Voting Percentage Interest as set forth herein, the Escrow Amount shall be held in the Escrow Account and shall not be deemed to be Capital Contributions by MERS until such time as such amounts are released from the Escrow Account.  Upon any release from the Escrow Account, the released amount shall be contributed to the Company as a Capital Contribution by MERS, and MERS shall be issued in respect thereof Class A Units at a price per Unit equal to $0.925 (the "**Effective Date Unit Price**").

(ii)    The Company, at its option (as determined by a majority of the CBE Managers without any vote or approval of the MERS Managers), may require that any amounts remaining in the Escrow Account on the fifth anniversary of the Effective Date be released to MERS and, for the avoidance of doubt, such amounts shall not be deemed to be Capital Contributions by MERS to the Company and shall not be counted in determining the Voting Percentage Interest of MERS.  In the event such released amounts are returned to MERS, MERS shall have no further right to acquire Class A Units under this Agreement or the Subscription Agreement.

(c)    Following the Effective Date, pursuant to the terms of the LBG Note, the LBG Note, together with all accrued and unpaid interest thereon, will be converted into Class A Units at a price per Unit equal to the Effective Date Unit Price, and the principal amount of the LBG Note, together with all accrued and unpaid interest thereon, shall be deemed to be a Capital Contribution of LBG in respect of such Class A Units.

(d)    On or prior to the Effective Date, CBE has contributed to the  Company (i) an amount of cash equal to $2,750,100 and (ii) all of its right, title and interest in and to the equity interests in the Projects set forth in Exhibit D in exchange for the Interest in the Company held by CBE prior to the Effective Date and reclassified pursuant to Section 3.03 into 72,459,458 Class B Units.  The parties hereto agree that the Fair Market Value of equity interests in the Projects set forth in Exhibit D and contributed to the Company equals $64,274,898.65.

(e)     Except as otherwise provided in <u>Section 3.04(c)</u> or <u>Section 3.05</u>, the Company shall issue solely Class B Units in respect of any Capital Contribution received by the Company following the Effective Date.

Section 3.05   <u>LMC Discretionary Payments</u>.  In the event LMC makes Discretionary Payments pursuant to the Teaming Agreement, each of MERS, LBG (to the extent then a Class A Member) and any Third Party who becomes a Member in respect to Capital Contributions made pursuant to <u>Section 3.06</u>, simultaneously with the payment by LMC of such Discretionary Payments, shall be issued, for no additional consideration and on a pro rata basis in accordance with their respective Class A Percentage Interests, Class A Units until CBE's Percentage Interest has been diluted such that the Anti-Dilution Net Cash Percentage of MERS, LBG (to the extent then a Class A Member) and any such Third Party, as applicable, as of immediately prior to payment by LMC of such Discretionary Payments is equal to such Member's Anti-Dilution Net Cash Percentage immediately following the payment by LMC of such Discretionary Payments.

Section 3.06   <u>Additional Investments</u>.  If at any time during the period beginning on the Effective Date and ending on the date that is five (5) years following the Effective Date, the Company, subject to the other terms and provisions of this Agreement (including <u>Section 3.07</u>, <u>Section 6.04</u> and <u>Section 6.05</u>) issues any Units in respect of Capital Contributions used by the Company to fund or invest, directly or indirectly, in any Core Project, solely to the extent that the Company as of the date of such determination has received and expended with respect to the construction and development of such Core Projects an aggregate amount in excess of $25,000,000 from (A) Members other than CBE or (B) one or more Third Parties who become Members (such Units being referred to as "**Additional Investment Units**"), each of the Members other than CBE (determined as of immediately prior to such issuance) shall be issued, for no additional consideration, a number of (i) if such Member is a Class A Member, Class A Units, and (ii) if such Member is not a Class A Member, Class B Units, in each case, sufficient to maintain, after giving effect to the issuance of the Additional Investment Units, the Percentage Interest of such Member immediately prior to the issuance of such Additional Investment Units.

Section 3.07   <u>Preemptive Rights</u>.

(a)     Prior to the Company or any of its Subsidiaries issuing (other than in an Excluded Issuance) any Units, whether through sale, exchange, conversion or otherwise (collectively, the "**Additional Units**") to any Person (each, a "**Proposed Purchaser**"), the Board and the Members must approve such issuance in accordance with <u>Section 6.04(a)</u> and <u>Section 6.05(c)</u>, and each Preemptive Rights Holder will have the right to purchase the number of Additional Units as provided in this <u>Section 3.07</u> in exchange for Capital Contributions (such Capital Contributions, "**Additional Contributions**").

(b)     The Company will give each Preemptive Rights Holder at least 30 days' prior notice (the "**Preemptive Notice**") of any proposed issuance of Additional Units, which notice will set forth in reasonable detail the proposed terms and conditions of such issuance and will offer to each Preemptive Rights Holder the opportunity to purchase a percentage of such Additional Units equal to its Percentage Interest Share (which Percentage Interest Share will be calculated as of the date of such notice) of the Additional Units at the same price, on the same

terms and conditions and at the same time as the Additional Units are proposed to be issued by the Company; provided that if all Persons entitled to purchase or receive Additional Units are required to also purchase other securities of the Company (including debt and/or equity securities), Preemptive Rights Holders exercising their rights pursuant to this Section 3.07(b) shall also be required to purchase the same type of securities (on the same terms and conditions) that such Persons are required to purchase.  If any Preemptive Rights Holder wishes to exercise its preemptive rights, it must do so by delivering an irrevocable written notice to the Company within 20 days after delivery by the Company of the Preemptive Notice (the "**Preemptive Period**"), which notice will state the dollar amount of Additional Units such Preemptive Rights Holder (each a "**Preemptive Purchaser**") elects to purchase up to a maximum amount equal to such Preemptive Rights Holder's Percentage Interest Share in respect of the total offering amount plus the additional dollar amount of Additional Units such Preemptive Purchaser elects to purchase in excess of its Percentage Interest Share, if any, if other Preemptive Rights Holders do not elect to purchase their full Percentage Interest Share of the Additional Units.  The rights of each Preemptive Purchaser to purchase a dollar amount of Additional Units in excess of each such Preemptive Purchaser's Percentage Interest Share of the Additional Units will be based on the relative Percentage Interests of those Preemptive Purchasers desiring to purchase excess Additional Units.

(c)     If not all of the Additional Units are subscribed for by the Preemptive Rights Holders, the Company will have the right, but will not be required, to issue and sell the unsubscribed portion of the Additional Units to the Proposed Purchaser at any time during the 90 days following the termination of the Preemptive Period pursuant to the terms and conditions set forth in the Preemptive Notice.  The Board may, in its discretion, impose such other reasonable terms and procedures such as setting a closing date, rounding the number of Units covered by this Section 3.07 to the nearest whole Unit and requiring customary closing deliverables in connection with any issuance of Interests described in this Section 3.07.

Section 3.08    Regulatory Approval.  If any regulatory approval, including the filing and the expiration of any waiting period under the Hart Scott-Rodino Antitrust Improvements Act of 1976 (the "**HSR Act**"), is required prior to the issuance of any Units, the Company will not issue such Units, and the Members will not be required or permitted to make any Additional Contribution with respect thereto, until such approval has been obtained (or in the case of the HSR Act, such filing has been completed and such waiting period has expired).  The Company and the Members will use their respective commercially reasonable efforts to comply promptly with all applicable regulatory requirements.  The Company will bear all documented and reasonable third party fees and expenses, including all filing fees, incurred by it or the Members in connection with such compliance.

Section 3.09    Return of Contributions.

(a)     A Member is not entitled to the return of any part of its Capital Contributions or to be paid interest in respect of either its Capital Account or its Capital Contributions.  An unpaid Capital Contribution is not a liability of the Company or of any Member.  A Member is not required to contribute or to lend any cash or property to the Company to enable the Company to return any Member's Capital Contributions.

(b)     Notwithstanding the above, if on the second anniversary of the Effective Date that certain Core Project located in Herten, Germany and that certain Core Project located in Eagar, Arizona, have not both reached "**Financial Closing**" (meaning an agreement has been reached and funding has been received from one or more lenders and/or one or more equity providers providing in the aggregate for financing sufficient for the construction of such Core Projects), then MERS may elect by prior written notice to the Company to have all or part of the Units acquired hereunder by MERS (other than any Units issued pursuant to Section 3.07) redeemed and cancelled by the Company in exchange for all or part of the Subscription Price, excluding the portion of the Subscription Price that has not been released from the Escrow Account in accordance with Section 3.04(b). The redemption price per Unit shall be the same price per Unit as paid by MERS in its initial Capital Contribution; provided that any Units issued pursuant to Section 3.05 or Section 3.06 to MERS shall be redeemed for no additional consideration.

(c)     In the event MERS exercises its right to have all or part of its Units redeemed and cancelled by the Company in accordance with Section 3.09(b), the Company shall have the right, exercisable by written notice to MERS delivered within 30 days following the notice delivered by MERS pursuant to Section 3.09(b):

(i)     to redeem, at the applicable per Unit prices provided in Section 3.09(b), all of the Units acquired by MERS hereunder, including any Units issued pursuant to Section 3.07, which Units issued pursuant to Section 3.07 shall be redeemed at the same price per Unit as paid by MERS in purchasing such Units pursuant to Section 3.07. Such redemption shall take place within 120 days following the Company's delivery of notice under this Section 3.09(c); and

(ii)     to require that all amounts then remaining in the Escrow Account be released to MERS, which released amounts, for the avoidance of doubt, shall not be deemed to be Capital Contributions by MERS and shall not be counted in determining the Voting Percentage Interest of MERS.

Section 3.10   Advances by Members.  Subject to the other terms and conditions herein (including Section 6.05(b)), if the Company does not have sufficient cash to pay its obligations, then with the approval of the Board, any or all of the Members may (but will have no obligation to) advance all or part of the needed funds to or on behalf of the Company, which advances will constitute a loan from such Member or Members to the Company, will bear interest and be subject to such other terms and conditions as agreed between such Member or Members and the Company and will not be deemed to be a Capital Contribution.

Section 3.11   Company-Held Units.  Any Units held by the Company will not entitle or bind any Person to any voting or other rights or obligations under this Agreement with respect to such Units.

Section 3.12   Representations and Warranties of Members.  Each Member represents and warrants as of the Effective Date (or, in the case of a new Member, on the date it is admitted to the Company pursuant to Section 9.03) to the Company that:

(a)    <u>Authority</u>.  Such Member has full power and authority to execute and deliver this Agreement and to perform its obligations hereunder and thereunder, and the execution, delivery and performance by such Member of this Agreement has been duly authorized by all necessary action.

(b)    <u>Binding Obligations</u>.  This Agreement has been duly and validly executed and delivered by such Member and constitutes, or will constitute, the binding obligation of such Member enforceable against such Member in accordance with its terms, subject to applicable bankruptcy, insolvency, fraudulent transfer, moratorium and similar Laws relating to or affecting the enforcement of creditors' rights generally and to legal principles of general applicability governing the availability of equitable remedies.

(c)    <u>No Conflict</u>.  The execution, delivery and performance by such Member of this Agreement will not, with or without the giving of notice or the passage of time, or both, (i) violate any provision of Law to which such Member is subject, (ii) violate any order, judgment or decree applicable to such Member or (iii) conflict with, or result in a breach or default under: (A) any term or condition of such Member's Organizational Documents or (B) any other instrument to which such Member is a party or by which any property of such Member is otherwise bound or subject, except, in the case of this clause (B), where such conflict, breach or default would not reasonably be expected to, individually or in the aggregate, materially impair such Member's ability to perform its obligations under such instrument.

(d)    <u>Investment Entirely For Own Account</u>.  The Units acquired or to be acquired by such Member will be acquired for investment for such Member's own account, not as a nominee or agent, and not with a view to the resale or distribution of any part thereof; such Member has no present intention of selling, granting any participation in, or otherwise distributing the same; and such Member does not have any contract, undertaking, agreement or arrangement with any Person to sell, transfer or grant participations to such Person or to any third Person, with respect to any of the Units.

(e)    <u>Unregistered Securities</u>.  Such Member understands that the Units, at the time of issuance, will not be registered under the Securities Act or other applicable federal or state securities Laws and the rules and regulations promulgated thereunder.  Such Member also understands that such Units are being offered and sold pursuant to an exemption from registration contained in the Securities Act based in part upon such Member's representations contained in this Agreement.

(f)    <u>Accredited Investor</u>.  Such Member is an Accredited Investor.

(g)    <u>Restricted Securities</u>.  Such Member understands that the Units to be acquired by such Member may not be Transferred without registration under the Securities Act or an exemption therefrom, and that in the absence of either an effective registration statement covering such Units or an available exemption from registration under the Securities Act, the Units must be held indefinitely.  Such Member understands that the Company has no present intention of registering the Units to be acquired by such Member.  Such Member also understands that there is no assurance that any exemption from registration under the Securities Act will be available and that, even if available, such exemption may not allow such Member to

Transfer all or any portion of the Units to be acquired by it under the circumstances, in the amounts or at the times such Member might propose.  In particular, such Member is aware that the Units may not be sold pursuant to Rule 144 promulgated under the Securities Act unless all of the conditions of Rule 144 are met.  Among the conditions for use of Rule 144 may be availability of current information to the public about the Company.  Such information is not now available and the Company has no plans to make such information available.

(h)     Taxes.  Such Member has reviewed with its own Tax advisors the federal, state and local and the other Tax consequences of an investment in Interests in the Company.  Such Member acknowledges and agrees that the Company is making no representation or warranty as to the federal, state, local or foreign Tax consequences to such Member as a result of such Member's acquisition of Units.  Such Member understands that it will be responsible for its own Tax liability that may arise as result of such Member's acquisition of Units.

## ARTICLE 4
## ALLOCATIONS

Section 4.01     Allocation of Net Profits and Net Losses.  Except as otherwise provided in this Agreement, items of income, gain, loss or deduction taken into account in determining Net Profit or Net Loss for any Taxable Period shall be allocated among the Members for purposes of determining Capital Accounts in a manner such that the Capital Account of each Member as of the end of such Taxable Period and immediately after making such allocations, is, as nearly as possible, equal (proportionately) to the difference (which may be negative) between (a) the distributions which such Member would be entitled to receive if each of the Company's assets were sold for cash equal to its respective Gross Asset Value, all Company liabilities were satisfied (limited with respect to each nonrecourse liability to the Gross Asset Value of the assets securing such liability), and the net assets of the Company were distributed to the Members in accordance with Section 5.01(a) immediately after making such allocation, less (b) such Member's share of Company Minimum Gain and Member Minimum Gain, computed immediately prior to the hypothetical sale of assets, and the amount, if any, such Member is obligated or treated as obligated to contribute to the Company.

Section 4.02     Regulatory Allocations.  Notwithstanding the foregoing provision of this Article 4, the following special allocations shall be made in the following order of priority:

(a)     Minimum Gain Chargeback.  If there is a net decrease in Company Minimum Gain or in any Member Minimum Gain during any Taxable Period, each Member shall be specially allocated items of Company income and gain for such period (and, if necessary, for subsequent periods) in an amount and manner required by Treasury Regulation Section 1.704-2(f) or 1.704-2(i)(4).  The items to be so allocated will be determined in accordance with Treasury Regulation Section 1.704-2, and the allocation provided in this Section 4.02(a) shall be subject to any exceptions provided therein.

(b)     Qualified Income Offset.  If any Member unexpectedly receives an adjustment, allocation, or distribution of the type contemplated by Treasury Regulation Section 1.704-1(b)(2)(ii)(d)(4), (5) or (6), items of Company income and gain shall be allocated to such Member in an amount and manner sufficient to eliminate any resulting Adjusted Capital Account

Deficit of such Member, as quickly as possible, to the extent required by such Treasury Regulation; provided that an allocation pursuant to this Section 4.02(b) shall be made only if and to the extent that such Member would have an Adjusted Capital Account Deficit after all other allocations provided for in this Article 4 have been tentatively made as if this Section 4.02(b) were not in this Agreement.

(c)    Gross Income Allocation.    In the event any Member has an Adjusted Capital Account Deficit at the end of any Taxable Period, each such Member shall be specially allocated items of Company income and gain in the amount of such excess as quickly as possible; provided that an allocation pursuant to this Section 4.02(c) shall be made only if and to the extent that such Member would have a deficit Capital Account in excess of such sum after all other allocations provided for in this Article 4 have been made as if Section 4.02(b) and this Section 4.02(c) were not in this Agreement.

(d)    Certain Additional Adjustments.    To the extent that an adjustment to the adjusted Tax basis of any Company asset pursuant to Section 734(b) or Section 743(b) of the Code is required, pursuant to Treasury Regulation Section 1.704-1(b)(2)(iv)(m)(2) or Treasury Regulation Section 1.704-1(b)(2)(iv)(m)(4), to be taken into account in determining Capital Accounts as the result of a distribution to a Member in complete liquidation of its interest in the Company, the amount of such adjustment to the Capital Accounts shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases such basis), and such gain or loss shall be specially allocated to the Members in accordance with their interests in the Company in the event that Treasury Regulation Section 1.704-1(b)(2)(iv)(m)(2) applies, or to the Members to whom such distribution was made in the event that Treasury Regulation Section 1.704-1(b)(2)(iv)(m)(4) applies.

(e)    Limitation on Loss Allocations.    No Member shall be allocated items of deduction or loss to the extent such allocation would cause such Member to have (or increase the amount of) an Adjusted Capital Account Deficit.  To the extent items of deduction or loss are not allocated to a Member as a result of this limitation, such items of deduction or loss shall instead be allocated to the other Members in proportion to the amounts that may be so allocated to them without causing (or increasing) an Adjusted Capital Account Deficit for such Members.

(f)    Nonrecourse Deductions.    The Nonrecourse Deductions for each taxable year of the Company shall be allocated pro rata among the Members in accordance with their Units.

(g)    Member Nonrecourse Deductions.    The Member Nonrecourse Deductions shall be allocated for each Taxable Period to the Member that bears the economic risk of loss (within the meaning of Treasury Regulation Section 1.752-2) for the Member Nonrecourse Debt to which such Member Nonrecourse Deductions are attributable.

(h)    Curative Allocations.    To the extent an amount of income, gain, loss or deduction has been allocated pursuant to this Section 4.02, the Company shall make offsetting allocations in an amount and manner determined appropriate by the Board, so as to cause the net amount of all such allocations to be the same (to the   maximum extent possible) as the allocations that would have occurred in the event that no allocations had been made pursuant to

the foregoing provisions of this <u>Section 4.02</u>.  In determining the curative allocations to be made pursuant to this <u>Section 4.02(h)</u>, the Board may take into account future allocations expected to be made pursuant to the foregoing provisions of this <u>Section 4.02</u>.

(i)    <u>Amendment of Allocations</u>.  The Tax Matters Member will be entitled to make reasonable interpretations of the Treasury Regulations promulgated under Section 704(b) of the Code as necessary to effectuate the intent of this <u>Section 4.02</u>.

Section 4.03    <u>Tax Allocations</u>.

(a)    Except as provided in <u>Section 4.03(b)</u>, each item of income, gain, loss, deduction and credit of the Company as determined for U.S. federal income Tax purposes shall be allocated between the Members as nearly possible in the same manner as the corresponding allocation (if any) of each such item for the Capital Accounts of the Members.

(b)    In accordance with Section 704(c) of the Code and the applicable Treasury Regulations thereunder, income, gain, loss, deduction and Tax depreciation with respect to any property contributed to the capital of the Company, or with respect to any property that has a Gross Asset Value different than its adjusted Tax basis, will, solely for U.S. federal income Tax purposes, be allocated among the Members so as to take into account any variation between the adjusted Tax basis of such property to the Company and the Gross Asset Value of such property. The Company shall use the "traditional method" under Treasury Regulation Section 1.704-3(b) or such other permissible method as the Tax Matters Member may determine for making any such allocations allowable under Section 704(c) and the Treasury Regulations thereunder.

Section 4.04    <u>Other Tax Provisions</u>.

(a)    For any Taxable Period during which any Units are transferred between the Members or to another Person, the portion of the Net Profits, Net Losses and other items of income, gain, loss, deduction and credit that are allocable with respect to such transferred Units shall be apportioned between the transferor and the transferee under any method allowed pursuant to Section 706 of the Code and the applicable Treasury Regulations as determined by the Tax Matters Member.

(b)    For purposes of determining a Member's proportional share of the Company's "excess nonrecourse liabilities" within the meaning of Treasury Regulation Section 1.752-3(a)(3), a Member's interest in Net Profits shall be equal to the number of Units owned by such Member divided by the total number of Units outstanding.

(c)    The Tax Matters Member shall make all other decisions concerning the allocation of items of income, gain, loss, deduction, and credit among the Member pursuant to the terms of this Agreement that are not specifically and expressly provided for by the terms of this Agreement.

**ARTICLE 5**
**DISTRIBUTIONS**

Section 5.01    Distributions.

(a)    Distributions.

(i)    Priority.  Subject to Section 6.05(v) and applicable Law, the Board shall be permitted to cause the Company to make distributions at any time and from time to time. Notwithstanding anything herein to the contrary, beginning on the fourth anniversary of the Effective Date, the Company shall make distributions to the Members (to the extent of Net Cash available for distribution) in accordance with the order of priority set forth in this Section 5.01(a).  Subject to Section 5.01(b), all distributions will be made to the Members as follows and in the following order of priority:

(A)    *First*: to the Class A Members, pro rata in accordance with their Class A Percentage Interests, until the Class A Members have received a return of 100% of all Capital Contributions made by the Class A Members in respect of their respective Class A Units;

(B)    *Second*: to the Class A Members, pro rata in accordance with their Class A Percentage Interests, until the excess of (1) the cumulative distributions to the Class A Members pursuant to Section 5.01(a)(i)(A) and this Section 5.01(a)(i)(B) over (2) the Class A Members' aggregate Capital Contributions, equals an 8% IRR on the aggregate Capital Contributions made by the Class A Members in respect of their respective Class A Units (taking into account the date on which each Capital Contribution and each such prior distribution was made);

(C)    *Third*: to the Class B Members, pro rata in accordance with their Class B Percentage Interests, until the Class B Members have received in the aggregate an amount equal to the aggregate amounts distributed to the Class A Members in accordance with Section 5.01(a)(i)(A) and Section 5.01(a)(i)(B) above; and

(D)    *Fourth*:  to all the Members, pro rata in accordance with their Percentage Interests.

(ii)    Core Project Proceeds.  For purposes of Section 5.01(a)(i)(A) and Section 5.01(a)(i)(B), all distributions of Core Project Proceeds paid to any Member, to the extent such distributions are the related to equity interests received by such Member pursuant to Section 5.02 of the Subscription Agreement shall be deemed to have been distributed by the Company to such Class A Member.

(b)    Tax Distributions.  Prior to any distribution pursuant to Section 5.01(a), to the extent permitted by applicable Law and the requirements of any applicable  agreements, the Company shall make distributions ("**Tax Distributions**") to the Members intended to be sufficient to enable them to pay, on a quarterly basis, any U.S. federal, state and local income Taxes arising from the taxable income and gain allocated to such Members from the Company;

provided that such payments shall be made within 15 days after the close of each applicable quarter.  Subject to the following sentence, the amount of any such Tax Distribution shall equal the product of the (x) Assumed Tax Rate and (y) aggregate amounts of  taxable income or gain of the Company that were actually allocated or are estimated to be allocated to such Member for U.S. federal income Tax purposes for such period and all prior periods (to the extent no Tax Distribution has previously been made with respect to such taxable income or gain) reduced, but not below zero, by any Tax deduction, loss or credit previously or currently allocated to such Member and not previously taken into account for purposes of the calculation of the amount of any Tax Distribution.  The amount of any Tax Distribution for a particular quarter shall take into account prior Tax Distributions as follows: (x) if Net Cash is not sufficient to satisfy the required Tax Distribution for a particular quarter, the Company shall make up such deficit out of Net Cash in future periods, and (y) if it is determined that the aggregate amounts of Tax Distributions paid to any Member exceeded the product of (i) the Assumed Tax Rate and (ii) the aggregate amounts of taxable income or gain that were actually allocated to such Member for U.S. federal income Tax purposes in the Company income Tax returns filed with respect to such Taxable Period and all prior Taxable Periods, reduced, but not below zero, by any Tax deduction, loss or credit previously or currently allocated to such Member, then the Tax Distribution to such Member for subsequent periods shall be reduced by the amount of overpayment.  Any Tax Distributions shall be treated as an advance against, and shall reduce the amount of, the next distribution(s) that the Member would otherwise receive pursuant to Section 5.01(a), Section 10.02 or any other provision of this Agreement.

Section 5.02    Tax Withholding.

(a)    To the extent the Company is required by Law to withhold or to make Tax payments on behalf of or relating to any Member ("**Tax Advances**"), the Board may cause the Company to withhold those amounts and make those Tax payments as so required.  The Company may take whatever steps the Board considers appropriate to cause the Member in respect of which a Tax Advance is made (including in respect of Members that have previously withdrawn from the Company) to be responsible for the Tax Advance.  Among other things, the Company may treat the Tax Advance as a distribution in respect of the relevant Member as of the last day of the Period in which the Company paid the Tax Advance to the taxing authorities. To the extent the Company is not able to recover a Tax Advance otherwise, a Member on whose behalf or as to whom a Tax Advance has been made shall, upon the Board's request, promptly repay the Company for the amount of the Tax Advance.  Any amount not so repaid by the end of the 10th day after the date the Member received the Board's request will bear interest starting on the 11th day after that receipt at the highest rate permitted by Law.  Each Member shall indemnify and hold harmless the Company and the Board from and against any liability relating to Tax Advances required on behalf of or relating to that Member.

(b)    Each Member hereby agrees to furnish the Company with any representations, certifications and forms as shall reasonably be requested by the Company to assist it in determining the extent of, and in fulfilling, its obligations in respect of Tax Advances. The Company shall, at the reasonable request and at the expense of a Member, use reasonable efforts to assist the Member in applying for any reduction of or exemption from withholding Tax, or securing any Tax refunds or credits available to such Member.

**ARTICLE 6**
**MANAGEMENT**

Section 6.01    Exclusive Management of the Company by the Board.

(a)    Subject to Section 6.05, any other voting rights expressly provided to the Members herein (including but not limited to the definition of Voting Percentage Interest) and any non-waivable provisions of applicable Law, (i) all powers of the Company will be exercised by or under the authority of, and the Business, Property and affairs of the Company will be managed under the direction of, a board of managers (the "**Board**"), and (ii) the Board will have, and is hereby granted, the full and complete power, authority and discretion for, on behalf of and in the name of the Company, to take such actions as it may in its sole discretion deem necessary or advisable to carry out any and all of the objectives and purposes of the Company.

Section 6.02    Election of Managers.

(a)    Number, Term and Qualifications.

(i)    The Board will initially consist of up to five members (each, a "**Manager**") of which:

(A)    (1) so long as CBE-Derived Units represent at least 37.5% of the aggregate Voting Percentage Interests, three Managers,  (2) so long as CBE-Derived Units represent at least 25% of the aggregate Voting Percentage Interests, but less than 37.5% of the aggregate Voting Percentage Interests, two Managers, and (3) so long as CBE-Derived Units represent at least 7.5% of the aggregate Voting Percentage Interests, but less than 25% of the aggregate Voting Percentage Interests, one Manager, will be designated from time to time by a Majority-in-Interest of the CBE-Derived Units (the "**CBE Managers**"); and

(B)    (1) so long as MERS-Voting Percentage Interests represent at least 25% of the aggregate Voting Percentage Interests, two Managers, and (2) so long as MERS-Voting Percentage Interests represent at least 7.5% of the aggregate Voting Percentage Interests, but less than 25% of the aggregate Voting Percentage Interests, one Manager (the "**MERS Managers**").  For the avoidance of doubt on the Effective Date the Board will include two (2) MERS Managers upon funding of amounts set forth in Section 3.04(a).

The Members shall ensure that all designees are promptly appointed as Managers.

(ii)    For the avoidance of doubt, if the applicable Derived Units do not represent the minimum Voting Percentage Interests specified above, the number of members of the Board will be reduced by the number of Managers that would otherwise have been appointed by the Majority-in-Interest of such Derived Units and such Managers' presence, vote and consent shall not be needed for any purpose under this Agreement. If both CBE and MERS are unable to designate at least one Manager, then a Board of three and up to five Managers shall be elected by a Supermajority Member Vote.

(iii)    The initial Managers as of the date hereof will be those Persons set forth on Exhibit B hereto.  Each Manager will hold office until such Manager's successor is designated as provided in this Section 6.02 or until such Manager's earlier resignation, removal, death or disability.

(b)    Non-Voting Participant.  The Board may provide (with the approval of at least one MERS Manager for so long as MERS has the right to designate a MERS Manager) for the participation in meetings of the Board of non-voting participants (each a "**Non-Voting Participant**"); provided, however, that any such Non-Voting Participant shall agree to hold in confidence and trust, in accordance with the terms of Section 7.03, as Confidential Information all information provided to such Non-Voting Participant in connection with such meetings; provided, further, that the Company has the right to withhold any information, and to exclude any such Non-Voting Participant from any meeting or portion thereof, if (A) the Board has reasonably determined that such Non-Voting Participant is a competitor of the Company or a holder of an Interest of more than 10% of a competitor of the Company or (B) access to such information or attendance at such meeting or portion thereof could adversely affect the attorney-client privilege between the Company and its legal counsel.  So long as LBG is a Class A Member, a Person designated from time to time by a Majority-in-Interest of the LBG-Derived Units will be entitled to participate in meetings of the Board as a Non-Voting Participant. A Person designated by LMC will be entitled to participate in meetings of the Board as a Non-Voting Participant in accordance with Section 4 of the Teaming Agreement Amendment.  For the avoidance of doubt, the Persons designated from time to time by a Majority-in-Interest of the LBG-Derived Units and by LMC as provided in this Section 6.02(b) shall be deemed to be approved by the MERS Managers.

(c)    Removal.

(i)    Without Cause.  Any Manager may be removed or replaced from the Board (and thereupon from all committees thereof) at any time, without Cause, only by (A) delivery to the Company of a notice, signed by the Members that are then entitled to designate such Manager in accordance with Section 6.02(a), stating that such Manager is removed or replaced (as the case may be) effective as of a date specified therein, (B) resignation of such Manager pursuant to Section 6.02(d), (C) death of such Manager, or (D) incapacity of such Manager.

(ii)    With Cause.  Any Manager may be removed if (A) Cause exists, and (B) a Supermajority Board Vote (including the vote of the Member with the right to designate such Manager) approves such removal in writing.

(d)    Resignation.  Any Manager may resign at any time by giving written notice to the Company.  The resignation of any Manager will take effect upon receipt of that notice or at such later time as specified in the notice.  Unless otherwise specified in the notice, the acceptance of the resignation will not be necessary to make it effective.

(e)    Vacancies.  Any Manager vacancy occurring for any reason (including a removal for Cause) will be filled by the Members entitled to designate such Manager in

accordance with Section 6.02(a) and the Members will ensure that such designee is promptly appointed as a Manager.

Section 6.03    Board Procedures.

(a)    Meetings of the Board.

(i)    Meetings of the Board shall be presided over by a Chairman of the Board (the "**Chairman**").  So long as CBE-Derived Units represent at least 37.5% of the aggregate Voting Percentage Interests, CBE shall have the right to appoint the Chairman of the Board with the advice of MERS.  In the event CBE-Derived Units cease to represent at least 37.5% of the aggregate Voting Percentage Interests, MERS shall appoint the Chairman for a period of one (1) year, following which CBE shall appoint the Chairman for a period of one (1) year, and thereafter the Chairman shall be appointed by the MERS and CBE in rotation on an annual basis.  In the event the Board or any committee thereof consists of an even number of Managers, the vote of the Chairman shall be the deciding vote on any matter that is subject to a majority vote on which an even number of votes is cast in favor of and against such matter.  Notwithstanding the foregoing, no Member shall have the right to appoint the Chairman unless such Member holds an aggregate 7.50% Voting Percentage Interest.

(ii)    The Board will hold regular meetings at such times and places (provided that the Board will meet at least once in each calendar quarter) as will be designated from time to time by resolution of the Board.  Notice of such regular meetings will not be required if held at the times and places set forth in the relevant resolution and such resolution has been provided to each Manager.

(iii)    Special meetings of the Board may be called by the Chairman of the Board or any Manager.

(iv)    All meetings will be held upon 10 days' notice by mail or delivered personally or by telephone or email to the Managers and the Non-Voting Participant setting forth the time and location of such meeting.  Notice of a special meeting will also state the purpose or purposes for which such meeting is called.  Notice of a meeting need not be given to any Manager or Non-Voting Participant who signs a waiver of notice or a consent to holding the meeting (which waiver or consent need not specify the purpose of the meeting) or an approval of the minutes thereof, whether before or after the meeting, or who attends the meeting without protesting, prior to its commencement, the lack of notice to such Manager or Non-Voting Participant.  All such waivers, consents and approvals will be filed with the Company records or made a part of the minutes of the meeting.

(v)    A majority of the Managers present, whether or not a quorum is present, may adjourn any meeting to another time.  If the meeting is adjourned for more than 24 hours, notice of any adjournment will be given prior to the time of the adjourned meeting to the Managers who are not present at the time of the adjournment.

(vi)    Meetings of the Board may be held at the Company's principal office or such other place as may be approved by the Board.  Managers and Non-Voting

Participants may participate in a meeting through use of conference telephone or similar communications equipment, so long as all Managers and Non-Voting Participants participating in such meeting can hear one another, subject to the provisions of Section 6.02(b). Participation in a meeting in such manner constitutes a presence in person at such meeting.

(b)     Quorum. A quorum for the transaction of business at any meeting of the Board requires the presence at such meeting of 80% of the Managers then in office; provided, however, that in the event a quorum is not present at the appointed time for a meeting, such meeting will be automatically adjourned to such time as the Chairman of the Board (or, if applicable, the Manager who called the meeting) will so determine at which a quorum can be reached. A meeting of the Board at which a quorum is initially present may continue to transact business, notwithstanding the withdrawal of Managers, but any action taken must be approved by the requisite number of Managers as provided in this Agreement.

(c)     Voting. Subject to Section 6.04 and Section 6.05, any decision or approval of the Board under this Agreement requires the vote or approval of a majority of Managers present at a meeting at which a quorum is present. Each Manager will be entitled to exercise one vote; provided, however, that in respect of a meeting of the Board, each Manager may exercise the vote of any other Manager appointed by the same Member as appoints it who is not present at such meeting.

(d)     Action by Written Consent. Notwithstanding anything herein to the contrary, any action required or permitted to be taken by the Board (or any committee of the Board) may be taken by the Board without a meeting if all the Managers of the Board (or Board committee) execute a unanimous written consent. Such action by written consent will have the same force and effect as a vote at a duly constituted meeting of the Board.

(e)     Subsidiaries. The Company will cause the board of directors (or equivalent) of each Subsidiary of the Company to submit to the Board for approval by the Board or Members, as applicable, any action that would require Board or Member approval if the action were taken by the Company rather than the Subsidiary. The Company shall be responsible for ensuring that all Subsidiaries and shareholder (or similar agreements) of the Subsidiaries provide for this provision to be enforceable.

Section 6.04     Board Supermajority Decisions. Notwithstanding Section 6.01 and except as otherwise provided in the Strategic Plan or Annual Budget, each approved in accordance with Section 6.09, the Company will not, and the Board will not cause the Company to, without the affirmative vote or written consent of 80% of the Managers serving on the Board at such time (a "**Supermajority Board Vote**"):

(a)     take any action requiring a Supermajority Member Vote pursuant to Section 6.05;

(b)     adopt, approve, amend, modify or supplement any Strategic Plan;

(c)    enter into, amend or terminate any material teaming agreement, alliance, memorandum of agreement, memorandum of understanding, intellectual property agreement or similar agreement with a strategic partner;

(d)    enter into any lease for real property that requires payment of rent by the Company in excess of rental amounts approved in the then-current Annual Budget;

(e)    hire any officer or other employee of the Company, or enter into any employee leasing or similar arrangement, in each case, prior to the date when Financial Closing has occurred;

(f)    make capital expenditures or capital contributions to the Core Projects, or Subsidiaries of the Company, other than or in excess of those approved in the then-current Annual Budget;

(g)    make a decision to alter or discontinue the Core Projects or replace the Core Projects, in whole or in part.

(h)    determine appropriate types and amounts of insurance for the Company, obtain insurance policies on behalf of the Company or make any amendments, renewals, supplements or other amendments to insurance coverage of the Company;

(i)    open any banking or other types of deposit or investment account of the Company;

(j)    establish the value of any non-cash Company assets, including in connection with a Capital Contribution of assets to the Company by a Member or a distribution of assets to a Member by the Company;

(k)    adopt, amend or terminate any employee benefit plan;

(l)    enter into, amend or terminate any collective bargaining agreement;

(m)    enter into, amend or terminate any proprietary information agreement, nondisclosure agreement or similar agreement between the Company and any other Person that (A) is outside the Company's ordinary course of business or (B) contains any exclusivity or similar restriction or limitation (whether with respect to time, geography or otherwise);

(n)    institute, join as a party, otherwise participate in or settle any claim, litigation, arbitration, dispute or other judicial or administrative proceeding;

(o)    engage the services of any law firm, accounting firm or similar professional organization other than for the amounts as approved in the then-current Annual Budget;

(p)    exercise the Company ROFR in accordance with Section 9.05(b);

(q)    release funds from the Escrow Account (other than pursuant to <u>Section 3.04(b)(ii)</u> hereof or Section 2.07 of the Subscription Agreement); or

(r)    agree to do any of the foregoing.

Section 6.05    <u>Member Supermajority Decisions</u>.    Notwithstanding <u>Section 6.01</u> and except as otherwise provided in the Strategic Plan or Annual Budget, each approved in accordance with <u>Section 6.09</u>, the Company will not, and the Board will not cause the Company to, without the affirmative vote or written consent of Members holding 80% of the aggregate Voting Percentage Interests outstanding (a "**Supermajority Member Vote**"):

(a)    make any loan or advance payment of funds of the Company to or for the benefit of any Person;

(b)    borrow any money from any source or otherwise incur or guarantee any indebtedness in excess of $100,000, other than pursuant to credit arrangements existing on the Effective Date;

(c)    issue any Interests (other than Units issued pursuant hereto and the issuance of interests as Excluded Issuance under (c), (e), (f), (g), (h), (i) and (j) of the definition of Excluded Issuance);

(d)    pledge the credit of any Member to the Company or bind or commit any Member to any Person, including any officer or agent of the Company;

(e)    make or grant any pledge, mortgage, encumbrance or security interest in any Company asset, except Permitted Encumbrances;

(f)    make any material amendments or modifications to the Certificate of Formation or this Agreement;

(g)    make any material change to the scope or purpose of the Company or the nature of the Company's Business;

(h)    make calls for or require additional Capital Contributions by the existing Members other than as required pursuant to the Annual Budget or in connection with approval by the Board of a Subsidiary;

(i)    purchase or acquire a fee interest in real property other than approved in the then-current Annual Budget;

(j)    institute, join as a party, otherwise participate in or settle any claim, litigation, arbitration, dispute or other judicial or administrative proceeding (A) on a basis that admits criminal liability by the Company or (B) for an amount in excess of $100,000;

(k)    liquidate or dissolve the Company, or cause the Company to make any filing or take any action with respect to the commencement of proceedings regarding the voluntary reorganization, liquidation, dissolution, winding up or bankruptcy;

(l)    cause the Company to merge or consolidate with or into another Person, to sell any material portion of the Company's assets or to purchase any material portion of the assets or rights of any Person, in each case whether in a single transaction or a series of transactions;

(m)    enter into any transaction between the Company and any Member or Affiliate thereof (except for license agreements with CBE or its Affiliates in effect on the Effective Date, and related license agreements with CBE or its Affiliates entered into in the ordinary course of business);

(n)    make any payment or offer of any payment to any official of any foreign government, other than ordinary fees paid in accordance with published fee schedules;

(o)    give or make, by endorsement, countersignature or otherwise, any guaranty by the Company, or by any Member for the benefit of the Company, of any debt, obligation or undertaking of any Person;

(p)    enter into any rate swap, currency swap, commodity hedge, or similar transaction other than approved in the then-current Annual Budget;

(q)    cause the Company to form or acquire any Subsidiaries (other than special purpose vehicles for Project development) or to enter into or form any partnerships, joint ventures, limited liability companies or other business combinations with any other Person;

(r)    expose the Company to any unfunded potential termination liability in respect of contractual or pre-contractual activity of the Company in an amount in excess of $100,000;

(s)    hire any officer or other employee of the Company with total annual base compensation in an amount in excess of $100,000;

(t)    make or change any Tax elections or changes in accounting practices (other than as required by Law) that reasonably would be expected to disproportionately and adversely affect any particular Member;

(u)    make any type of political contribution or any donation to a charity or other non-profit organization or any payments to any Governmental Entity or supra-national authority other than established fees required for obtaining permits and licenses in the ordinary course of business;

(v)    make distributions of Net Cash other than amounts approved in the then-current Annual Budget;

(w)    pay any type of bonus, commission, finder's fee or contingency fee otherwise than in accordance with the then-current Annual Budget;

(x)    hire or change external auditors or making any significant change in accounting principles and practices used by the Company;

(y)    enter into any single transaction or series of related transactions for the sale, transfer, assignment, conveyance or other disposition of assets or rights of the Company, or purchase of assets or rights of any Person by the Company, involving total consideration in an amount that is not approved in the then-current Annual Budget;

(z)    make or authorize any repayment of any funds borrowed by the Company, except according to the terms of a loan instrument that was previously approved or included in the Annual Budget;

(aa)    pay any type of broker's or finder's fee otherwise than in accordance with the then-current Annual Budget;

(bb)    hold assets of a Project in the name of the Company (it being understood that the Company's investments in Projects shall be made through special purpose vehicles or holding companies); or

(cc)    agree to do any of the foregoing.

Section 6.06    <u>Fiduciary Duties of Managers</u>.  Each Manager (including any Manager serving on any committee of the Board) will have the same fiduciary duties that such individual would have if the Company were a corporation organized under the Laws of the State of Delaware and such individual were a director of such corporation, and the Company and its Members will have the same rights and remedies in respect of such duties as if the Company were a corporation organized under the Laws of the State of Delaware and the Members were its stockholders. The Company shall obtain appropriate directors and officers insurance covering all Managers and key officers in an amount not less than $2 million in coverage.

Section 6.07    <u>Payments to Managers</u>.  No Manager will be entitled to any fee or other payment from the Company for such Manager's services to the Company in his capacity as a Manager; <u>provided</u>, <u>however</u>, that all of the Managers will be entitled to reimbursement for reasonable out-of-pocket expenses incurred while providing services to the Company.

Section 6.08    <u>Officers</u>.

(a)    <u>Officers</u>.  The Board may, from time to time, delegate to one or more individuals (the "**Officers**") such authority and duties (subject to any matters that are specified as requiring the vote or approval of the Board or the Members, and subject to the remainder of this <u>Section 6.08</u>) as the Board deems advisable.

(b)    <u>Appointment of Officers</u>.  The Officers will serve at the pleasure of the Board, subject to all rights, if any, of an Officer under any contract of employment.  Any

individual may hold any number of Officer titles.  The salaries and/or other compensation, if any, of the Officers will be fixed from time to time by the Board.  The initial Officers of the Company are set forth on <u>Exhibit F</u>.

(c)    <u>Removal, Resignation and Filling of Vacancy of Officers</u>.  Subject to the rights, if any, of an Officer under a contract of employment approved by the Board, any Officer may be removed, either with or without cause, by the Board at any time.  Any Officer may resign at any time by giving notice to the Board.  Any resignation will take effect upon receipt of that notice or at any later time specified in that notice; and, unless otherwise specified in that notice, the acceptance of the resignation will not be necessary to make it effective.  Any resignation is without prejudice to the rights, if any, of the Company including any rights under any contract to which such Officer is a party.  A vacancy in any office because of death, resignation, removal, disqualification or any other cause will be filled in the manner prescribed by the Board.

(d)    <u>General Authority and Duties of Officers</u>.  Each Officer (in such Person's capacity as an Officer) will have the same fiduciary duties that an officer of the Company would have if the Company were a corporation organized under the Laws of the State of Delaware, and the Company and its Members will have the same rights and remedies in respect of such duties as if the Company were a corporation organized under the Laws of the State of Delaware and the Members were its stockholders.  Except as expressly provided otherwise in this Agreement and subject to any matters that are specified as requiring the vote or approval of the Board or the Members, the Officers will have delegated authority from the Board for conducting the day-to-day business of the Company in accordance with a delegation of authority approved by Major Holder Approval.  The Board may adopt resolutions from time to time further limiting and clarifying the duties and powers of the Officers.

Section 6.09    <u>Strategic Plan; Annual Budget</u>.  The Company will develop prior to the commencement of each Fiscal Year beginning with Fiscal Year 2017 a three-year strategic business plan (the "**Strategic Plan**"), which Strategic Plan shall (a) include a detailed annual business plan and budget for the Company and its Subsidiaries (the "**Annual Budget**"), and (b) prior to its adoption, be submitted for Major Holder Approval.  The Annual Budget will detail the financial needs of the Company and include pro-forma financial statements.  If a Strategic Plan or an Annual Budget is not adopted in accordance with this <u>Section 6.09</u> prior to the start of the applicable Fiscal Year (including as a result of a Deadlock subject to <u>Section 6.11</u>), then, until so adopted, the Strategic Plan and Annual Budget for such Fiscal Year will be the same as the prior Fiscal Year's Strategic Plan and Annual Budget; <u>provided</u>, that in the case of the Annual Budget, non-recurring or extraordinary items shall be excluded, and the budget for each line item shall be increased by 5.0%.  The first such Strategic Plan and Annual Budget (for the remainder of Fiscal Year 2016) shall be developed within 180 days following the Effective Date.

Section 6.10    <u>Key Man Provision</u>.  Except in the event of death, disability or force majeure, in the event that Founder ceases to devote a majority of his business time and his efforts, skill, business judgment to the advancement of the business and interest of the Company (either directly or through CBE) without a Supermajority Board Vote,  Founder will resign from the Board and CBE will vote its Units (i) to remove Founder as a Manager and (ii) as directed by MERS until the hiring of a replacement which is (a) reasonably acceptable to the MERS

Managers for so long as MERS has the right to designate a MERS Manager or (b) approved by the affirmative vote or written consent of 75% of the Managers, including at least one MERS Manager for so long as MERS has the right to designate a MERS Manager.

Section 6.11    Deadlock; Dispute Resolution.

(a)    In the event that (i) a matter set forth in under Section 6.04, Section 6.05 or Section 6.09 is considered by the Board at a meeting of the Board or by the Members at a meeting of the Members, as applicable, (ii) the Managers or Members, as applicable, vote in contrary manners such that the applicable Supermajority Board Vote or Supermajority Member Vote cannot be obtained, and (iii) such Managers or Members, as applicable, refuse to defer such matter for further consideration at a future meeting of the Board or Members, as applicable (a "**Deadlock**"), any Member or Members that has the right to appoint a Manager (each a "**Disputing Member**") may submit its basis for such Deadlock or disagreement by written notice to each other Member that has the right to appoint a Manager (each a "**Responding Member**"). If any such Deadlock proves incapable of being settled between the representatives of the Disputing Members and Responding Members normally responsible for compliance with this Agreement, such dispute will then be sought to be resolved by negotiations between designated senior executives of the Disputing Members and Responding Members who have authority to settle the controversy.  The executives will meet at a mutually acceptable time and place within 30 days of the date of the date of delivery of a notice by the Disputing Members to attempt to resolve the dispute.

(b)    If the dispute has not been resolved through good faith negotiation pursuant to Section 6.11(a) within 45 days of the Disputing Members' notice, the Disputing Members or the Responding Members may refer the matter to non-binding mediation before a single, mutually agreeable mediator with the Judicial Arbitration and Mediation Services ("**JAMS**") located in Los Angeles, California.  If the Disputing Members and Responding Members reach agreement pertaining to any dispute pursuant to the procedures set forth in this Section 6.11(b), such agreement shall be reduced to writing, signed by the Disputing Members and Responding Members and shall be final and binding upon the Disputing Members and Responding Members.

(c)    If the dispute has not been resolved within 90 days of the Disputing Members' notice, the dispute may be submitted to arbitration by either the Disputing Members or the Responding Members.  Any arbitration proceeding will be conducted before one mutually agreeable arbitrator with JAMS who shall be a retired judge located in Los Angeles, California. Notwithstanding anything to the contrary in this Agreement, any party may pursue any remedy that may be otherwise available to it under this Agreement at any time in the event of a claim for breach of this Agreement caused by gross negligence, willful misconduct or fraud.

(d)    Any arbitral award issued will be conclusive and binding on the Disputing Members and Responding Members, and the Disputing Members and Responding Members shall take such further action as shall be reasonably necessary to implement the terms of such arbitral award.  The arbitrator will have no authority to award any damages inconsistent with the

terms of this Agreement.  The arbitrator will render its decision in writing, explaining the reasons supporting such decision.

(e)    The fees and expenses of the arbitrator will be shared equally by the Disputing Members and Responding Members.  All other expenses and costs of the arbitration proceeding will be the responsibility of the party incurring such expenses and costs.

Section 6.12    Insurance.

(a)    The Company shall maintain the following insurance at its own expense, with insurance companies with an AM Best rating of A-, VII or better and customary coverage levels for comparable companies in the Company's industry: workers compensation, automobile, commercial general liability, umbrella/excess liability, and all risks property insurance.

(b)    The Company shall maintain a Manager and officer liability insurance policy in an appropriate amount as agreed by the Members.

Section 6.13    Change of Control.

(a)    The occurrence of one or both of the following scenarios will be deemed as a change of control event ("**Change of Control Event**"):

(i)    Change of Control at the Company. If CBE sells all or part of its Units in the Company such that its Percentage Interest in the Company would fall below fifty point one percent (50.1%); provided that, reductions of CBE´s Percentage Interest below 50.1% which are due to Capital Contributions to the Company by (and new issuances of Units by the Company to) (i) a Member other than CBE or (ii) a third party who becomes a Member shall not be considered as a Change of Control Event; or,

(ii)    Change of Control at CBE. If a Person other than Founder (a "**New Majority Shareholder**") obtains "control" (used in this Section 6.13 as defined in the definition of "Affiliate" hereunder) of CB Germany or CBE; provided that, reductions of Founder's interest in CB Germany or CB Germany's interest in CBE due to capital contributions by and share issuances to third parties shall not be considered as a Change of Control Event.

(b)    If at any time: (i) Founder, CB Germany or CBE wishes or intends to enter into one or more transactions, the effect of which would be to cause a Change of Control Event; or, (ii) CB Germany's shareholding structure has been altered in such way that a New Majority Shareholder obtains control of CB Germany or CBE; then CBE will give written notice to MERS, of such transfer or situation, as it may correspond (a "**Change of Control Notice**"). In case of any attempt of Change of Control of CB Germany or CBE referred to above, CB Germany or CBE, as the case may be, shall give notice to the New Majority Shareholder that under such event the New Majority Shareholder will be obligated to purchase all or part of MERS' Units in the Company as specified in the Put Option mentioned in Section 6.13(d) below. In case MERS exercises the Put Option one or more times and the New Majority Shareholder fails to comply to purchase the MERS' Units in the Company by the end of the last date for closing as established in paragraph Section 6.13(d) below, then on the day following

such date, MERS shall give notice of the New Majority Shareholder's default and CBE will become obligated to comply with the Put Option on the same terms and conditions provided in paragraph Section 6.13(d) herein and purchase the Put Units within the following 30 days.

(c)      In the case of the Change of Control Event mentioned in Section 6.13(a)(i) above, MERS shall have the right to exercise its rights under Section 9.05. If MERS decides not to exercise these rights, from that moment on for a period of one hundred twenty (120) days MERS shall be free to sell and transfer (in one or more transactions) all or a portion of its Units to any third parties, without being subject to any of the limitations contained in this Agreement other than Section 9.01, Section 9.03 and Section 9.04; provided that the proposed transferee of such Units is not deemed by the Board, in its reasonable judgment, to be a direct competitor of the Company or a director, officer, employee or holder of more than 10% of a direct competitor of the Company.

(d)      In the case of a Change of Control Event described in Section 6.13(a)(ii), MERS shall have the right to sell and transfer (in one or more transactions) all or a portion of its Units to the New Majority Shareholder, without being subject to any of the limitations contained in this Agreement other than Section 9.01, and within one hundred twenty (120) days from the receipt by MERS of the Change of Control Notice, MERS may (but is not obligated to):

(i)      Sell to the New Majority Shareholder, on one or more occasions during such 120-day period (the "**Put Period**"), and the New Majority Shareholder shall be obligated to purchase from MERS upon exercise of such option, all or a part of MERS's Units in the Company as specified in the notice given by MERS to Controlling Shareholder and to the New Majority Shareholder (the "**Put Option**").

(ii)      The Put Option may be exercised by MERS as many times as it may correspond during the Put Period, by giving written notice to the New Majority Shareholder and CBE (the "**Put Notice**") at any time (and, for the avoidance of doubt, on one or more occasions) during the Put Period.

(iii)      In each case, the Put Notice shall specify: (A) the number and class of Units which MERS is willing to sell to the New Majority Shareholder (the "**Put Units**"); (B) the price per Unit for those Put Units (the "**Put Price**"), which shall be a sum in USD equal to the highest of: (1) two times (2x) the aggregate amounts contributed by MERS as Capital Contributions to the Company or (2) a value of an applicable annual internal rate of return for MERS of twenty percent (20%) over the aggregate amounts contributed by MERS as Capital Contributions to the Company, since the date such amounts were disbursed by MERS (such calculation shall include all distributions or any cash out payments to the MERS), divided between all MERS' Units, and multiplied by the number of Put Units; and (C) the bank account into which the Put Price shall be paid.

(iv)      Closing of the purchase of the Put Units will take place at the Company's headquarters office thirty (30) days following the date the Put Notice is given to the CBE and the New Majority Shareholder, unless the New Majority Shareholder and MERS agree in writing to a different date, time or place. After such 30-day period, and only if the purchase of the Put Units has not been executed due to causes not attributable to MERS, the New Majority

Shareholder shall pay MERS daily liquidated damages calculated in accordance with the following formula, which shall be paid together with the Put Price:

$$\frac{\text{Net Profit of Company for the prior Fiscal Year}}{360} \times \text{Percentage Interest of MERS as of such date} = \text{daily liquidated damages}$$

(v)    At the closing of such purchase, MERS will deliver to the New Majority Shareholder any documentation necessary to transfer the Put Units to the New Majority Shareholder, free and clear of any lien or rights of others of any nature created by MERS, other than liens or rights created pursuant to this Agreement.

(vi)    For the avoidance of doubt, MERS shall be entitled to any distributions or return of capital relating to the Put Units which are the subject of the relevant Put Notice which were declared or otherwise had a record date on or before the date on which the Put Units have been duly transferred to the New Majority Shareholder (and New Majority Shareholder has fully paid up the Put Price and any interest accrued in MERS' favor thereon). To the extent that any such  distributions or return of capital are paid to the New Majority Shareholder, whether before or after the date where the Put Shares have been duly transferred to the New Majority Shareholder, the New Majority Shareholder shall be deemed to hold such amounts in trust and for the benefit of MERS and shall promptly pay to MERS an amount equal to the amount of such distributions or return of capital so received by it.

## ARTICLE 7
## RIGHTS AND RESTRICTIONS ON MEMBERS

Section 7.01    <u>General</u>.

(a)    Members will not have any right to act on behalf of or with respect to the Company except to the extent expressly authorized to do so by the provisions of this Agreement or by written action of the Board.  Any Person admitted to the Company as a Member following the direct Transfer of Interests from a Member will succeed to all of the rights, duties and obligations of its transferor with respect to such Interests under this Agreement.  No Member, in his, her or its capacity as a Member, may be held liable for the debts, obligations or liabilities of the Company, and no Member will be obligated, in his, her or its capacity as a Member, to provide financial, operational or performance guarantees of Company obligations.

(b)     No Member has any voting right except as expressly set forth in this Agreement and as required by non-waiveable provisions of the Act.

Section 7.02     Meetings of the Members.

(a)     Meetings of the Members may be called for any purpose or purposes and, unless otherwise prescribed by statute, may be called by the Board. The Members may designate any place, either within or outside the State of Delaware, as the place of meeting for any meeting of the Members. If no designation is made, or if a special meeting is otherwise called, the place of meeting shall be the principal executive office of the Company.

(b)     An ordinary general meeting of Members will be held within three (3) months after the end of each Fiscal Year at a time and place determined by the Board. An extraordinary meeting of Members may be held at any time in compliance with resolutions of the Board and applicable requirements under applicable Law.

(c)     Except as provided in Section 7.02(d), written notice stating the place, day and hour of the meeting and the purpose or purposes for which the meeting is called shall be delivered not less than five (5) nor more than fifty (50) days before the date of the meeting, and in accordance with the provisions of Section 12.01.

(d)     If Members representing all of the Voting Percentage Interests shall meet at any time and place, either within or outside of the State of Delaware, and consent to the holding of a meeting at such time and place, such meeting shall be valid without call or notice, and at such meeting lawful action may be taken.

(e)     For the purpose of determining Members entitled to notice of, or to vote at, any meeting of Members, the date on which notice of the meeting is mailed shall be the record date for such determination of Members. When a determination of Members entitled to vote at any meeting of Members has been made as provided in this Section 7.02, such determination shall apply to any adjournment thereof.

(f)     Members holding at least an aggregate 80% Voting Percentage Interest, represented in person or by proxy, shall constitute a quorum at any meeting of Members. In the absence of a quorum at any such meeting, 80% of the Voting Percentage Interests so represented may adjourn the meeting from time to time for a period not to exceed sixty (60) days without further notice. However, if the adjournment is for more than sixty (60) days, or if after the adjournment a new record date is fixed for the adjourned meeting, a notice of the adjourned meeting shall be given to each Member of record entitled to vote at the meeting. At such adjourned meeting at which a quorum shall be present or represented, any business may be transacted which might have been transacted at the meeting as originally noticed. The Members present at a duly organized meeting may continue to transact business until adjournment, notwithstanding the withdrawal during such meeting of that number of Voting Percentage Interests whose absence would cause less than a quorum.

(g)     If a quorum is present, the affirmative vote of Members holding not less than 80% of the aggregate Voting Percentage Interests present at a meeting at which a quorum is present shall be the act of the Members, unless the vote of a greater proportion or number is otherwise required by the Act or this Agreement. Such action shall be evidenced by a written resolution for inclusion in the minutes of the Company records.

(h)    At all meetings of Members, a Member may vote in person or by proxy executed in writing by the Member or by a duly authorized attorney-in-fact.  Such proxy shall be filed with the Board before or at the time of the meeting.  No proxy shall be valid after eleven (11) months from the date of its execution, unless otherwise provided in the proxy.

(i)    Notwithstanding anything herein to the contrary, any action required or permitted to be taken by the Members may be taken by the Members without a meeting if the Members necessary to approve such action (if such action were taken at a meeting of the Members) execute a written consent.  Such action by written consent will have the same force and effect as a vote at a duly constituted meeting of the Members.

(j)    When any notice is required to be given to any Member, a waiver thereof in writing signed by the Member entitled to such notice, whether before, at, or after the time stated therein, shall be equivalent to the giving of such notice.

(k)    A meeting among Members may be held by any means of communication through which the participants may simultaneously hear each other during the meeting.  If all the other requirements for a meeting are met, a Member participating in a meeting by this means shall be deemed to be present at the meeting in person or by proxy, as the case may be, and the minutes may reflect such.

Section 7.03    Information; Confidentiality.

(a)    No Member will be entitled to obtain any Confidential Information relating to the Company or the Business except as expressly provided in this Agreement or to the extent required by non-waiveable provisions of the Act; and to the extent a Member obtains such Confidential Information, such Member will be subject to the provisions of this Section 7.03.

(b)    Except as contemplated hereby or required by applicable Law, each Member and Manager will keep confidential and will not disclose to others, and will use his, her or its commercially reasonable efforts to prevent such Person's Affiliates and any of such Person's or such Person's Affiliates' present or former employees, agents and representatives from disclosing to others without a Supermajority Member Vote any Confidential Information that (i) pertains to this Agreement, including any negotiations pertaining hereto, the structure of the Company, the allocation of Units hereunder, any of the transactions contemplated hereby, or the Business; or (ii) pertains to Confidential Information or proprietary information of any Member or the Company or which any Member has labeled in writing as confidential or proprietary.

(c)    Notwithstanding the confidentiality obligations of Section 7.03(b), any Member (i) may disclose to its Affiliates and such Affiliates' employees, agents, representatives, partners and investors any Confidential Information made available to such Person (provided that such recipients are subject to similar confidentiality obligations and that such disclosing Person will be responsible and liable to the Company and the other Members for any breach of such confidentiality obligations by any such recipient), (ii) may disclose such Confidential Information to bona fide prospective purchasers of such Member's direct or indirect Interests in the Company, such prospective purchasers' actual and potential sources of funding and such

prospective purchasers' and such actual and potential funding sources' employees, agents, representatives and investors for purposes of evaluating a potential acquisition (provided that (A) such recipients are subject to similar confidentiality obligations and that such disclosing Person will be responsible and liable to the Company and the other Members for any breach of such confidentiality obligations by any such recipient and (B) in case such Confidential Information is shared in connection with a proposed Transfer of Interests to any competitor, customer or supplier of the Company, such Member will notify the Board and the other Members in writing at least 15 days in advance of disclosing Confidential Information to such Persons, and will use commercially reasonable efforts and take additional precautions to manage the disclosure of such information in light of competitive concerns, including those efforts and precautions reasonably requested by the Board or other Members) and (iii) may disclose such Confidential Information as may be reasonably necessary to enforce such Person's rights hereunder or as may be required to comply with any applicable orders or regulations of a Governmental Entity or court of competent jurisdiction, in which case such Person will provide the Company with written notice of such requirement as soon as practicable, so that the Company may seek an appropriate protective order and, in the absence of a protective order or the receipt of a written waiver by the Company, such Person may disclose such Confidential Information only to the extent required by the applicable orders or regulatory authority and will use commercially reasonable efforts to obtain assurances that the information will be treated confidentially.

(d)    The obligations of each Member under this <u>Section 7.03</u> shall terminate with respect to such Member on the fifth anniversary of the date on which such Member ceased to be Member (including by reason of a termination of the Company pursuant to <u>Section 10.03</u>).

(e)    The term "**Confidential Information**" means information which is confidential or proprietary in nature, was provided to such Member or Manager, in his, her or its capacity as such, and relates to the Company and the Business; <u>provided</u> that "Confidential Information" will not include information (i) that is available, or becomes available, to the public through no fault or action in violation of this Agreement by such Member, Manager, Affiliate or their respective agents, representatives or employees, or (ii) that becomes available on a non-confidential basis from any source other than the Company, the Board, any other Member or Manager, or any such Person's agents, representatives, employees or Affiliates and such source is not prohibited from disclosing such information.

Section 7.04    <u>Transactions Between the Company and the Members</u>.  Subject to <u>Section 6.05</u> and except as otherwise provided by applicable Law or by this Agreement, any Member may, but will not be obligated to, lend money to the Company or any Subsidiary, act as surety for the Company or any Subsidiary and transact other business with the Company or any Subsidiary and have the same rights and obligations when transacting business with the Company or any Subsidiary as a Person who is not a Member subject to this <u>Section 7.04</u>, including CBE pursuant to that certain Project Development Agreement, dated as of June 26, 2015, by and between CBE and the Company.  The existence of these relationships and acting in such capacities will not result in the Member being deemed to be participating in the control of the business of the Company or any Subsidiary or otherwise affect the limited liability of the Member.  The provisions of this <u>Section 7.04</u> will not impair, affect or diminish the restrictions or obligations of any Person under any other agreement or instrument.

## ARTICLE 8
## INFORMATION RIGHTS AND TAX MATTERS

Section 8.01    Reports; Access.

(a)    Member Information Rights.  The Company will furnish to each Class A Member and any Member holding (together with any Affiliates) at least an aggregate 5% Voting Percentage Interest the following:

(i)    within 15 days after Major Holder Approval, the Strategic Plan, including the Annual Budget; and

(ii)    within 90 days after the end of each Fiscal Year: (A) an audited consolidated balance sheet as of the end of such Fiscal Year and the related consolidated income statement, statement of Members' equity and statement of cash flows for such Fiscal Year prepared in accordance with GAAP and (B) a signed audit letter from the Company's independent, external auditors related to such audited financial statements.

To the extent that a Manager designated by a particular Member receives in a timely fashion the reports and financial statements referenced above, the Company need not also provide them to the designating Member, unless requested.

(b)    Member Access Rights.  Upon request, and with reasonable prior notice to the Company, the Company will permit representatives of each Class A Member and any Member holding (together with any Affiliates) at least an aggregate 5% Voting Percentage Interest, during normal office hours, to:

(i)    visit any of the sites and premises where the Business is conducted and meet with management at reasonable times and places;

(ii)    inspect any of the offices, branches, sites, facilities, plants and equipment of the Company or its Subsidiaries; and

(iii)    have access to and make copies of the books of account and all records of the Company and its Subsidiaries.

(c)    Tax Returns. The Company will send to each Member as soon as reasonably practicable following the end of each calendar year the information necessary for the Member to complete that Member's U.S. federal and state income Tax or information returns ("**Tax Information**").  The Tax Matters Member may obtain extensions of the date on which the Company's income Tax returns are due and will notify Members of any such extension as soon as reasonably practicable after determining that it is appropriate for the Company to obtain the extension.  In that event, the Company will provide Tax Information within a reasonable period before the expiration of the term of the extension.

Section 8.02    Tax Matters Member.  CBE will be designated the tax matters partner under Section 6231 of the Code (in such capacity, the "**Tax Matters Member**") and will serve

as the Tax Matters Member as long as it qualifies as a tax matters partner under the Code.  The Tax Matters Member is authorized to take such actions and to execute and file all statements and forms on behalf of the Company which may be permitted or required by the applicable provisions of the Code or Treasury Regulations.  The Tax Matters Member will have full and exclusive power and authority on behalf of the Company to represent the Company (at the Company's expense) in connection with all examinations of the Company's affairs by tax authorities, including resulting administrative and judicial Proceedings, and to expend Company funds for professional services and costs associated therewith.  The Tax Matters Member will keep the Members informed as to the status of any audit of the Company's Tax affairs, and will take such action as may be permitted to cause any Member so requesting to become a "notice partner" within the meaning of Section 6223 of the Code.  If an audit of any of the Company's Tax returns occurs, the Tax Matters Member will not settle or otherwise compromise assertions of the auditing agent which may disproportionately and adversely affect any Member as compared to the position taken on the Company's Tax returns without the prior written consent of the Board.

Section 8.03    Tax Classification.    The Members intend that the Company shall be treated at all times as a partnership for income Tax purposes, and no Member shall take any action to the contrary, unless the Board determines that doing so would increase the net-after-Tax return of the Company's activities to the Members.

Section 8.04    Tax Returns and Elections. The Company's Tax year will be the calendar year.  The Board will instruct the Company's accountants to prepare and file all required income Tax returns for the Company.  The Tax Matters Member will make any Tax election for the Company necessary for completion of the Company's income Tax returns and may make any other Tax election for the Company or any Subsidiary that the Tax Matters Member considers appropriate, including any election under Section 754 of the Code to cause the basis of Property to be adjusted as provided in Sections 734 and 743 of the Code.  Each Member agrees in respect of any year in which that Member had a Capital Account in the Company that, except to the extent the Board expressly agrees otherwise in writing with him or her or it, he or she or it shall not: (i) treat, on his or her or its individual income Tax returns, any item of income, gain, loss, deduction or credit of the Company in a manner inconsistent with the treatment of that item by the Company, as reflected on the Schedule K-1 or other information statement the Company provides him or her or it, or (ii) file any claim for refund relating to any such item based on, or that would result in, any such inconsistent treatment.

Section 8.05    Waiver of Participation in Tax Proceedings.  Pursuant to Section 6224(b) of the Code, each Member waives any right granted by the Code to participate in any administrative proceeding of the Company for any taxable year in which the Member is a partner in the Company for U.S. federal income Tax purposes.  Each Member further waives any right granted in connection with the Tax laws of any state or local jurisdiction to participate in any administrative proceeding of the Company for any taxable year in which the Member is a partner in the Company for purposes of the Tax laws of such state or local jurisdiction.  Each Member shall, upon request by the Board, provide all additional information or documentation, execute all forms or other documents and take all other action required by law to effect such a waiver.  Each Member's obligations under Section 8.04 and this Section 8.05 will survive such Member's

withdrawal from the Company.  This agreement may be filed with the Internal Revenue Service or any state or local taxing authority upon the commencement of any administrative proceeding of the Company.

## ARTICLE 9
## TRANSFERS

Section 9.01    General Transfer Provisions.  Each Member is permitted to Transfer its Units, subject to compliance with the other provisions of this Article 9 and the following:

(a)     such Member must provide the Company with five days' advance written notice of any such Transfer;

(b)     such Transfer may only be made to a Non-Sanctioned Transferee; and

(c)     no such Transfer will be permitted without a Supermajority Board Vote; provided, however, that this Section 9.01(c) will not apply to any of the following Transfers:

(i)     any Transfer following the consummation of an IPO;

(ii)     any Transfer pursuant to a merger in which the Company is a constituent entity;

(iii)     any Transfer to a wholly-owned Subsidiary or other Affiliate of the applicable Member which is not a competitor of the Company as reasonably determined by the Board;

(iv)     any Transfer occurring after the fifth anniversary of the Effective Date to a Person which is not a competitor of the Company as reasonably determined by the Board; or

(v)     any Transfer by MERS in accordance with Section 6.13.

(d)     Any such Transfer must be permitted under the Securities Act and other applicable federal or state securities Laws; provided, however, that if such Transfer occurs prior to the consummation of an IPO, the Board can condition such Transfer on the delivery of an opinion of outside counsel in form and substance satisfactory to the Company to the effect that such Transfer may be effected without registration under the Securities Act and other applicable federal or state securities;

(e)     Except following the consummation of an IPO, no such Transfer will be permitted if it would:

(i)     cause the Company to be considered a "publicly traded partnership" under Section 7704(b) of the Code within the meaning of Treasury Regulation Section 1.7704-1(h)(1)(ii), including the look-through rule in Treasury Regulation Section 1.7704-1(h)(3);

(ii)    affect the Company's existence or qualification as a limited liability company under the Act;

(iii)    cause material adverse Tax consequences to the Company or the Members;

(iv)    cause the Company to lose its status as a partnership for federal income Tax purposes;

(v)    cause the Company or any of the Company's Subsidiaries to be required to register as an investment company under the Investment Company Act of 1940, as amended; or

(vi)    cause the Properties of the Company or any of the Company's Subsidiaries to be deemed "plan assets" as defined under the Employee Retirement Income Security Act of 1974 or its accompanying regulations or result in any "prohibited transaction" thereunder involving the Company or any Subsidiary of the Company.

Section 9.02    Transfers in Violation of Agreement.

(a)    Transfers of Units may only be made in strict compliance with all applicable terms of this Agreement.  The Members agree that the restrictions contained in this Article 9 are fair and reasonable and in the best interests of the Company and the Members. Each Member will notify the Company in the event of any Transfer or attempted Transfer of Units in violation of Article 9 and will provide the Company with any documentation reasonably requested thereof.  In the case of a Transfer or attempted Transfer of Units that is not permitted or required by this Agreement, the Members engaging or attempting to engage in such Transfer will be liable to indemnify and hold harmless the Company and the other Members from all cost, liability and damages that any of such indemnified Persons may incur (including incremental tax liabilities, lawyers' fees and expenses) as a result of such Transfer or attempted Transfer and efforts to enforce the indemnity granted hereby.

(b)    Any purported Transfer of Units that does not so comply with all applicable provisions of this Agreement will be null and void and of no force or effect, and the Company will not recognize or be bound by any such purported Transfer and will not effect any such purported Transfer on the books of the Company or Capital Accounts of the Members.

Section 9.03    Admission of Additional Members.  The recipient of a Unit (whether such Unit is Transferred from another Member or issued by the Company) must satisfy the following conditions to be admitted as a Member:

(a)    the recipient executes and delivers an Addendum Agreement in the form attached as Exhibit C hereto to the Company;

(b)    the recipient pays or reimburses the Company for all reasonable legal costs that the Company incurs in connection with the admission of the recipient as a Member with respect to the Units received by such recipient; and

        (c)     the Board must approve the admission of such Member (other than LBG in respect of conversion of the LBG Note).

        Section 9.04   <u>Withdrawing Member</u>.  Upon the direct Transfer of all of the Units held by a Member, the transferor Member will cease to be a Member and to have the rights and powers afforded to a Member under this Agreement, and the transferor Member will be released from all obligations under this Agreement arising from such Person's status as a Member except (a) those obligations that by their express terms survive the termination of a Person's status as a Member as set forth in <u>Section 12.03</u>, (b) those obligations or liabilities of the transferor Member arising out of a breach of this Agreement and (c) those obligations or liabilities of the transferor Member based on events occurring, arising or maturing prior to the date of Transfer.

        Section 9.05   <u>Right of First Offer; Right of Last Refusal</u>.

        (a)     <u>Generally</u>.  Subject to the terms and conditions specified in this <u>Section 9.05</u>, if any Member seeks to sell or Transfer any Units (other than a Transfer pursuant to <u>Section 9.01(c)(i)</u> through <u>Section 9.01(c)(iii)</u>) (the "**ROFR Units**"), then such Member (the "**ROFR Offeror**") must first make an offering of the ROFR Units first, to the Company and second, to the other Members in accordance with the following provisions of this <u>Section 9.05</u>.

        (b)     <u>ROFR</u>.

        (i)     The ROFR Offeror will give written notice (the "**ROFR Notice**") to the Company and each other Member stating its bona fide intention to Transfer the ROFR Units and specifying (i) the number of ROFR Units, (ii) the proposed price per ROFR Unit (the "**ROFR Price**"), which shall be entirely in U.S. dollars (whether in the form of cash or a promissory note and whether payable immediately or deferred over time), (iii) the proposed transferee and (iv) the other material terms and conditions pursuant to which the ROFR Offeror proposes to Transfer the ROFR Units.  The ROFR Notice will constitute the ROFR Offeror's offer to Transfer the ROFR Units to the Company, which offer will be irrevocable for a period of 30 days (the "**ROFR Notice Period**").  To exercise the Company ROFR, the Company must deliver to the ROFR Offeror, by no later than the 30th day after delivery of the ROFR Notice (the "**Company Notice Date**"), a written notice notifying the ROFR Offeror that the Company intends to exercise the Company ROFR as to all or any portion of the ROFR Units (and specifying the number of Units thereof) with respect to the proposed Transfer.  If the Company does not intend to exercise the Company ROFR with respect to all ROFR Units subject to the proposed Transfer, the Company must deliver to the ROFR Offeror and each Member, by no later than the Company Notice Date, a written notice to that effect specifying the number of ROFR Units as to which the Company ROFR is not being exercised or that the Company ROFR is not being exercised as to any ROFR Units, as applicable (the "**Secondary Notice**").

        (ii)     Upon receipt of the Secondary Notice, if any Member wishes to purchase any of the ROFR Units as to which the Company ROFR is not being exercised, it must do so by delivering an irrevocable written notice (the "**ROFR Offer**") to the ROFR Offeror by no later than the 30th day after delivery of the Secondary Notice (the "**Secondary Notice Date**"), which notice will state the number of ROFR Units such Member (each, a "**ROFR Purchaser**") would like to purchase up to a maximum amount equal to such ROFR Purchaser's Percentage

Interest Share of the ROFR Units plus the number of ROFR Units such ROFR Purchaser would like to purchase in excess of its Percentage Interest Share, if any, if other Members do not elect to purchase their full Percentage Interest Share of the ROFR Units.  The rights of each ROFR Purchaser to purchase ROFR Units in excess of its Percentage Interest Share of the ROFR Units will be based on the relative Percentage Interests of the ROFR Purchasers that desire to purchase excess ROFR Units.

(iii)    Any ROFR Offer so delivered will be binding upon delivery, irrevocable by such ROFR Purchasers and will obligate such ROFR Purchasers to purchase (and the Offering Holder to sell) the ROFR Units as to which such ROFR Offer was made in accordance with the terms and conditions set forth in the ROFR Notice within 30 days after the end of the ROFR Notice Period.

(iv)    If the ROFR Offeror does not receive offers from the ROFR Purchasers and the Company in respect of all of the ROFR Units, the ROFR Offeror will, during the 180-day period following the end of the ROFR Notice Period, have the right, but will not be required, to sell the ROFR Units to the transferee named in the ROFR Notice or an Affiliate of such transferee, in each case, at a price and on material terms no more favorable to the ROFR Offeror than those set forth in the ROFR Notice.

(v)    The closing of any sale to the Company pursuant to the Company ROFR shall occur within 60 days following the Company Notice Date, and the closing of any sale to the ROFR Purchasers in accordance with this Section 9.05 shall occur within 60 days following the Secondary Notice Date.

(c)    Cooperation.  The Company (to the extent the Company ROFR is exercised), the ROFR Offeror and the ROFR Purchasers will take all actions as may be reasonably necessary to consummate the transactions contemplated by this Section 9.05, including entering into agreements and delivering certificates and instruments and consents as may be deemed necessary or appropriate.

Section 9.06  Legend.  Each Member hereby agrees that the following legend may be placed upon any counterpart of this Agreement, the Certificate of Formation or any other document or instrument evidencing ownership of Units:

THE UNITS REPRESENTED BY THIS DOCUMENT HAVE NOT BEEN REGISTERED UNDER ANY SECURITIES LAWS AND THE TRANSFERABILITY OF SUCH UNITS IS RESTRICTED.  SUCH UNITS MAY NOT BE SOLD, ASSIGNED OR TRANSFERRED, NOR WILL ANY ASSIGNEE, VENDEE, TRANSFEREE OR ENDORSEE THEREOF BE RECOGNIZED AS HAVING ACQUIRED ANY SUCH UNITS BY THE ISSUER FOR ANY PURPOSES, UNLESS (a) A REGISTRATION STATEMENT UNDER THE SECURITIES ACT OF 1933, AS AMENDED, WITH RESPECT TO SUCH UNITS WILL THEN BE IN EFFECT AND SUCH TRANSFER HAS BEEN QUALIFIED UNDER ALL APPLICABLE STATE SECURITIES LAWS, OR (b) THE AVAILABILITY OF AN EXEMPTION FROM SUCH REGISTRATION AND QUALIFICATION WILL BE ESTABLISHED TO THE SATISFACTION OF COUNSEL TO THE ISSUER.

THE UNITS REPRESENTED BY THIS DOCUMENT ARE SUBJECT TO FURTHER RESTRICTIONS AS TO THEIR SALE, TRANSFER, HYPOTHECATION OR ASSIGNMENT AS SET FORTH IN THE AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT OF THE COMPANY, WHICH IS AVAILABLE AT THE PRINCIPAL OFFICE OF THE COMPANY.

Section 9.07   Distributions and Allocations in Respect of Transferred Units.  If a Unit is Transferred in whole or in part during any Fiscal Year in compliance with the provisions of this Article 9, Net Profits, Net Losses, each item thereof and all other items attributable to the Transferred Unit for such Fiscal Year will be divided and allocated between the transferor and the transferee by taking into account their varying interests during the Fiscal Year or other relevant period in accordance with Code Section 706(d), based upon an interim closing of the books or any other convention permitted by Law and approved by the Company and the transferor Member.  All distributions on or before the date of such Transfer will be made to the transferor, and all distributions thereafter will be made to the transferee, provided that any distributions to be made to the transferee under Section 5.01 will be determined by taking into account the Tax consequences and distributions previously made to the transferor (and any predecessors in interest) in the manner determined appropriate by the Board.  Solely for purposes of making such allocations and distributions, the Company will recognize such Transfer not later than the end of the calendar month during which it is given notice of such Transfer; provided, however, that if the Company is given notice of a Transfer at least 10 Business Days prior to the Transfer, the Company will recognize such Transfer as of the date of such Transfer and; provided, further, that if the Company does not receive a notice stating the date such Unit was transferred and such other information as the Company may reasonably require within 30 days after the end of the Fiscal Year during which the Transfer occurs, then all such items will be allocated, and all distributions will be made, to the Person who, according to the books and records of the Company, was the owner of the Unit on the last day of such Fiscal Year.  Neither the Company nor any Member will incur any liability for making allocations and distributions in accordance with the provisions of this Section 9.07, whether or not any Member or the Company has knowledge of any Transfer of ownership of any Units.

## ARTICLE 10
## DISSOLUTION AND WINDING UP

Section 10.01  Dissolution Events.

(a)    Dissolution.  The Company will dissolve and will commence winding up and liquidating upon the first to occur of any of the following (each a "**Dissolution Event**"):

(i)    a Supermajority Board Vote and Supermajority Member Vote to dissolve, wind up and liquidate the Company in accordance with Article 6;

(ii)    at any time when there are no Members; and

(iii)    a judicial determination that an event has occurred that makes it unlawful, impossible or impractical to carry on the Business.

The Members hereby agree that, notwithstanding any provision of the Act, the Company will not dissolve prior to the occurrence of a Dissolution Event.

Section 10.02  Winding Up.  Upon the occurrence of (i) a Dissolution Event or (ii) the determination by a court of competent jurisdiction that the Company has dissolved prior to the occurrence of a Dissolution Event, the Liquidator will attempt to sell the Company as a going concern for the period of 180 days and if the Liquidator determines that it is unable to sell the Company as a going concern within such 180-day period, the Company will continue solely for the purposes of winding up its affairs in an orderly manner, liquidating its assets and satisfying the claims of its creditors and Members, and no Member will take any action that is inconsistent with, or not necessary to or appropriate for, the winding up of the Company's business and affairs; provided, however, that all covenants contained in this Agreement and obligations provided for in this Agreement will continue to be fully binding upon the Members until such time as the Property has been distributed pursuant to this Section 10.02 and the Certificate of Formation has been canceled pursuant to the Act.  The Liquidator will be responsible for overseeing the winding up and dissolution of the Company, which winding up and dissolution will be completed within 90 days of the occurrence of the Dissolution Event.  The Liquidator will take full account of the Company's liabilities and Property and will cause the Property or the proceeds from the sale thereof (as determined pursuant to Section 10.06), to the extent sufficient therefor, to be applied and distributed, to the maximum extent permitted by Law, in the following order:

(a)    first, to creditors (including Members who are creditors, to the extent otherwise permitted by Law) in satisfaction of all of the Company's debts and other liabilities (whether by payment or the making of reasonable provision for payment thereof; e.g., setting up an escrow fund for contingent liabilities in such amounts and for such term as the Liquidator may reasonably determine), other than liabilities for which reasonable provision for payment has been made and liabilities for distribution to partners under the Act; and

(b)    the balance, if any, to the Members in accordance with Section 5.01(a).

Except with respect to services performed by a Member as the Liquidator, if any, no Member will receive additional compensation for any services performed pursuant to this Article 10.

Section 10.03  Notice of Dissolution/Termination.

(a)    In the event a Dissolution Event occurs or an event occurs that would, but for provisions of Section 10.01, result in a dissolution of the Company, the Company will, within 30 days thereafter, provide written notice thereof to each of the Members.

(b)    Upon completion of the distribution of the Property as provided in this Article 10, the Company will be terminated, and the Liquidator will cause the filing of a certificate of cancellation pursuant to the Act and will take all such other actions as may be necessary to terminate the Company.

Section 10.04  Allocations During Period of Liquidation.  During the period commencing on the first day of the Fiscal Year during which a Dissolution Event occurs and ending on the date on which all of the assets of the Company have been distributed to the Members pursuant to Section 10.02, Net Profits and Net Losses and items of income, gain, loss and deduction will continue to be allocated among the Members pursuant to Article 4.

Section 10.05  The Liquidator.

(a)    Definition.  The term "**Liquidator**" will mean a Third Party liquidator appointed by the Board.

(b)    Fees.  The Company is authorized to pay a reasonable fee to the Liquidator for its services performed pursuant to this Article 10 and to reimburse the Liquidator for its reasonable costs and expenses incurred in performing those services.

(c)    Indemnification.  The Company will indemnify, save harmless and pay all judgments and claims against such Liquidator or any officers, directors, agents or employees of the Liquidator relating to any liability or damage incurred by reason of any act performed or omitted to be performed by the Liquidator, or any officers, directors, agents or employees of the Liquidator in connection with the liquidation of the Company, including reasonable attorneys' fees incurred by the Liquidator, officer, director, agent or employee in connection with the defense of any action based on any such act or omission, which attorneys' fees may be paid as incurred, except to the extent such liability or damage is caused by the fraud, intentional misconduct of, or a knowing violation of the Laws by the Liquidator which was material to the cause of action.

Section 10.06  Form of Liquidating Distributions.  For purposes of making distributions required by Section 10.02 hereof, the Liquidator may determine whether to distribute all or any portion of the Property in kind or to sell all or any portion of the Property and distribute the proceeds therefrom.  To the extent any Property is distributed in kind, the Liquidator (instead of the Board) will determine its Fair Market Value and will give notice of the determination to the Members at least 30 days prior to distribution.

## ARTICLE 11
## INDEMNIFICATION

Section 11.01  Indemnification of Covered Persons.  The Company will, to the fullest extent permitted by the Act, indemnify any Person who was or is a party or is threatened to be made a party to any threatened, pending or completed action, suit or Proceeding, whether civil, criminal, administrative or investigative by reason of the fact that such Person is or was a Member, Manager or Officer of the Company, or is or was serving at the request of the Company as a member, officer or director of another limited liability company, corporation, partnership, joint venture, trust or other enterprise (each, a "**Covered Person**"), against expenses (including reasonable attorneys' fees), liabilities, judgments, penalties, fines and amounts paid in settlement (including all interest, assessments and other charges paid or payable in connection with or in respect of such liabilities, judgments, penalties, fines and amounts paid in settlement) actually

and reasonably incurred by such Covered Person in connection with such action, suit or Proceeding, provided that:

(a)    such Covered Person acted in good faith and in a manner such Covered Person reasonably believed to be in or not opposed to the best interests of the Company, consistent with the terms of this Agreement; and

(b)    with respect to any criminal action or Proceeding, such Covered Person had no reasonable cause to believe his conduct was unlawful.

(i)    The termination of any action, suit or Proceeding by judgment, order, settlement, conviction, or upon a plea of *nolo contendere* or its equivalent, will not, of itself, create a presumption that a Covered Person did not act in good faith and in a manner which such Covered Person reasonably believed to be in or not opposed to the best interests of the Company, and, with respect to any criminal action or Proceeding, had reasonable cause to believe that his conduct was unlawful.

Section 11.02  <u>Advancement of Expenses</u>.  The Company will, to the fullest extent permitted by the Act, advance expenses incurred by a Covered Person in defending or investigating a threatened or pending action, suit or Proceeding in advance of the final disposition of such action, suit or Proceeding promptly upon (but in any event within five days of) receipt of an unsecured undertaking by or on behalf of such Covered Person to repay such amount if it will ultimately be determined that such Covered Person is not entitled to be indemnified by the Company as authorized by this <u>Article 11</u>.

Section 11.03  <u>Directors' and Officers' Insurance</u>.  On such terms as the Board approves, the Company will secure insurance coverage on behalf of any Person who is or was a Covered Person, providing adequate coverage with a financially sound and reputable insurer or insurers, against any liability asserted against such Covered Person and incurred by such Covered Person in any such capacity, or arising out of such Covered Person's status as such, whether or not the Company would have the power or the obligation to indemnify the Covered Person against such liability under the provisions of this <u>Article 11</u>.

Section 11.04  <u>Survival of Indemnification and Advancement of Expenses</u>.  The indemnification and advancement of expenses provided by, or granted pursuant to, this <u>Article 11</u> will, unless otherwise provided when authorized or ratified, continue as to a Person who has ceased to be a Member, Manager or Officer and will inure to the benefit of the heirs, executors and administrators of such Person and will survive the liquidation of the Company. No amendment or repeal of the provisions of this <u>Article 11</u> that adversely affects the rights of any Covered Person under this <u>Article 11</u> with respect to the acts or omissions of such Covered Person at any time prior to such amendment or repeal will apply to such Covered Person without the written consent of the Covered Person.

Section 11.05  <u>Limitation on Indemnification</u>.  Notwithstanding anything else in this Agreement to the contrary, the Company will not be obligated to indemnify any Covered Person or advance expenses to any Covered Person for (a) any Proceeding initiated by such Covered Person against the Company unless that Proceeding was brought to enforce such Covered

Person's right to indemnification under this <u>Article 11</u> and, in such Proceeding, it is determined that such Covered Person is entitled to indemnification, or (b) any Proceeding brought by the Company against such Covered Person unless such Covered Person is found not to be liable to the Company.

Section 11.06  <u>Indemnification of Employees and Agents</u>.  The Company may, to the extent authorized from time to time by the Board, provide rights to indemnification and the advancement of expenses to employees and agents of the Company similar to those conferred in this <u>Article 11</u> to Members, Managers or Officers of the Company.

Section 11.07  <u>Severability of Indemnification</u>.  The provisions of this <u>Article 11</u> are intended to comply with the Act.  To the extent that any provision of this <u>Article 11</u> authorizes or requires indemnification or the advancement of expenses contrary to the Act, the Company's power to indemnify or advance expenses under such provision will be limited to that permitted by the Act and any limitation required by the Act will not affect the validity of any other provision of this <u>Article 11</u>.

Section 11.08  <u>Company as Indemnitor of First Resort</u>.   The rights of indemnification provided in this <u>Article 11</u> are in addition to any rights to which a Covered Person may otherwise be entitled by contract (including advancement of expenses) or as a matter of Law.   The Company hereby acknowledges that the Covered Persons may have certain rights to indemnification, advancement of expenses and/or insurance provided by the Members and certain of their Affiliates (collectively, the "**Member Indemnitors**").   The Company hereby agrees that (a) the Company is the indemnitor of first resort for matters covered by this <u>Article 11</u> (i.e., its obligations to the Covered Persons under this <u>Article 11</u> are primary and any obligation of the Member Indemnitors to advance expenses or to provide indemnification for the same expenses or liabilities incurred by the Covered Persons are secondary), and (b) the Company will be required to advance the full amount of expenses incurred by the Covered Persons and will be liable for all expenses, liabilities, judgments, penalties, fines and amounts paid in settlement to the extent legally permitted and as required by the terms of this <u>Article 11</u> (or any other agreement between the Company and the Covered Persons), without regard to any rights the Covered Persons may have against the Member Indemnitors, and (c) the Company irrevocably waives, relinquishes and releases the Member Indemnitors from any and all claims against the Member Indemnitors for contribution or any other recovery of any kind (other than subrogation) in respect thereof.  The Company further agrees that no advancement or payment by the Member Indemnitors on behalf of a Covered Person with respect to any claim for which the Covered Person has sought indemnification from the Company pursuant to this <u>Article 11</u> will affect the foregoing, and the Member Indemnitors will have a right of contribution and/or be subrogated to the extent of such advancement or payment to all of the rights of recovery of the Covered Persons against the Company.  The Company agrees that the Member Indemnitors who are not Members are express third party beneficiaries of the terms of this <u>Section 11.08</u>.

# ARTICLE 12
## MISCELLANEOUS

Section 12.01 <u>Notices</u>.  Any notice, payment, demand or communication required or permitted to be given by any provision of this Agreement will be in writing and will be deemed to have been delivered, given and received for all purposes (i) if delivered personally, to the Person or to an officer of the Person to whom the same is directed, or (ii) when the same is actually received, if sent either by registered or certified mail, postage and charges prepaid, or by email, addressed as follows, or to such other address as such Person may from time to time specify by notice to the Company and the other Members:

(a)    If to the Company, to the address set forth in or determined pursuant to <u>Section 2.04</u>, with a copy (not constituting notice) to each of the Members at the applicable address set forth on <u>Exhibit A</u>; and

(b)    If to a Member, to the applicable address set forth on <u>Exhibit A</u>, with a copy (not constituting notice) to such Member's representative (as applicable) identified on <u>Exhibit A</u>; and

Section 12.02 <u>Binding Effect; Third Party Beneficiaries</u>.  Except as otherwise provided in this Agreement, every covenant, term and provision of this Agreement will be binding upon and inure to the benefit of the Members and their respective successors, transferees and assigns, and by their signatures hereto, the Company and each Member intends to and does hereby become bound.  Nothing expressed or mentioned in this Agreement is intended or will be construed to give any Person other than the parties hereto and their respective successors and permitted assigns any legal or equitable right, remedy or claim under, in or in respect of this Agreement or any provision herein contained, except as expressly provided in this Agreement. Notwithstanding the foregoing, Covered Persons shall be express third party beneficiaries with respect to their indemnity rights under <u>Article 11</u>.  Except as set forth herein, if a Member directly Transfers Units to a transferee in accordance with this Agreement, the rights associated with such Units under this Agreement will be fully assigned to such transferee; it being understood that the assignment of any rights under this Agreement will not constitute admission to the Company as a Member unless and until such transferee is duly admitted as a Member in accordance with this Agreement.

Section 12.03 <u>Survival of Terms</u>.  The provisions of Section 10.05(c), <u>Article 11</u>, <u>Section 7.03</u>, and this <u>Article 12</u> will survive the dissolution, liquidation, winding up and termination of the Company and such provisions will continue to bind and/or benefit any current or former Members (or their respective Affiliates, representatives or agents, as applicable) following such termination or such time as such Members cease to be Members of the Company.

Section 12.04 <u>Construction</u>.  Every covenant, term and provision of this Agreement will be construed simply according to its fair meaning and not strictly for or against any Member.

Section 12.05 <u>Severability</u>.  Except as otherwise provided in the succeeding sentence, every provision of this Agreement is intended to be severable, and, if any term or provision of this Agreement is illegal or invalid for any reason whatsoever, such illegality or invalidity will

not affect the validity or legality of the remainder of this Agreement.  The preceding sentence of this <u>Section 12.05</u> will be of no force or effect if the consequence of enforcing the remainder of this Agreement without such illegal or invalid term or provision would be to cause any Member to lose the material benefit of its economic bargain.

Section 12.06  <u>Governing Law</u>.  Except as expressly provided in <u>Section 12.07(d)</u>, this Agreement, and all claims, disputes, actions or other litigation that may be based upon, arise out of or relate to this Agreement or the negotiation, execution or performance of this Agreement, whether in contract, tort, equity or otherwise (each, a "**Dispute**"), will be construed in accordance with and be governed by the Laws of the State of Delaware without regard to principles of conflicts of Laws that would permit or require the application of Laws of another jurisdiction.

Section 12.07  <u>Dispute Resolution; Consent to Jurisdiction; Waiver of Jury Trial</u>.

(a)    Any controversy, dispute or claim arising from or related to this Agreement shall be resolved as set forth in <u>Section 6.11</u> above.

(b)    Each party hereby irrevocably consents and submits to the personal jurisdiction of, and venue in, the Superior Court for Los Angeles County, California, in any legal action, equitable suit, arbitration or other proceeding under, arising from or related to this Agreement, the interpretation, breach, termination or validity hereof, or any of the transactions contemplated hereunder.

(c)    EACH PARTY VOLUNTARILY AND IRREVOCABLY WAIVES ANY RIGHT TO TRIAL BY JURY OF ANY DISPUTE.  EACH OF THE PARTIES HEREBY AGREES AND CONSENTS THAT ANY DISPUTE WILL BE DECIDED BY COURT TRIAL WITHOUT A JURY AND THAT THE PARTIES MAY FILE AN ORIGINAL COUNTERPART OF A COPY OF THIS AGREEMENT WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF THE PARTIES TO THE WAIVER OF THEIR RIGHT TO TRIAL BY JURY.

(d)    Each Member acknowledges that notwithstanding anything to the contrary in this Agreement, MERS reserves all immunities, defenses, rights or actions arising out MERS' sovereign status or under the Eleventh Amendment to the United States Constitution, except to the extent waived by statute. No waiver of such reserved immunities, defenses, rights, or actions shall be implied or otherwise deemed to exist by reason of its entry into this Agreement, by any express or implied provision thereof or by any actions or omissions to act by MERS or any of its representatives or agents, whether taken pursuant to this Agreement or prior to MERS' execution hereof.  This <u>Section 12.07(d)</u> shall be governed by, and construed in accordance with, the laws of the State of Michigan, United States of America.

(e)    Any breach of this Agreement shall be deemed to be a breach of any other agreements related hereto, including but not limited to, the Subscription Agreement, Stock Purchase Agreement, and Second Amended and Restated Shareholders Agreement executed in connection herewith.

Section 12.08  <u>Specific Performance</u>.  Each party hereto acknowledges that a breach or threatened breach by such party of any of its obligations under this Agreement would give rise to irreparable harm to the other parties, for which monetary damages would not be an adequate remedy, and hereby agrees that in the event of a breach or a threatened breach by such party of any such obligations (including, for the avoidance of doubt, the disclosure of Confidential Information in violation of <u>Section 7.03</u> and the proposed Transfer of Units in violation of <u>Article 9</u>), each of the other parties hereto will, in addition to any and all other rights and remedies that may be available to them in respect of such breach, be entitled to seek equitable relief, including the issuance of a temporary restraining order, an injunction, specific performance or the enforcement of other equitable remedies against such party at the suit of an aggrieved party without the posting of any bond or other security, to compel specific performance of all of the terms of this Agreement, and waives any defenses thereto, including the defenses of: (a) failure of consideration, (b) breach of any other provision of this Agreement and (c) availability of relief in damages.

Section 12.09  <u>No Recourse</u>.  This Agreement may only be enforced against, and any Dispute may only be brought against, the entities that are expressly named as parties hereto and then only with respect to the specific obligations set forth herein with respect to each such party. Except to the extent a named party (and then only to the extent of the specific obligations undertaken by such named party in this Agreement and not otherwise), no past, present or future director, officer, employee, incorporator, authorized person, member, partner, stockholder, Affiliate, agent, attorney or their respective Affiliates shall have any liability (whether in contract or tort) for any one or more of the representations, warranties, covenants, agreements or other obligations or liabilities of any party under this Agreement (whether for indemnification or otherwise) of or for any claim based on, in respect of, or by reason of, the transactions contemplated by this Agreement.

Section 12.10  <u>Further Assurances</u>.  In connection with this Agreement and the transactions contemplated hereby, the Company and each Member will execute and deliver all such future instruments and take such other and further action as may be reasonably necessary or appropriate to carry out the provisions of this Agreement and the intention of the parties as expressed herein.

Section 12.11  <u>Entire Agreement; Supersedure</u>.  This Agreement constitutes the entire agreement of the Members and the Company relating to the subject matter hereof and supersedes all prior contracts or agreements with respect thereto, whether oral or written.

Section 12.12  <u>Effect of Waiver or Consent</u>.  A waiver or consent, express or implied, to or of any breach or default by any Person in the performance by that Person of its obligations with respect to the Company is not a consent or waiver to or of any other breach or default in the performance by that Person of the same or any other obligations of that Person with respect to the Company.  Failure on the part of a Person to complain of any act of any Person or to declare any Person in default with respect to the Company, irrespective of how long that failure continues, does not constitute a waiver by that Person of its rights with respect to that default until the applicable statute-of-limitations period has run.

Section 12.13 <u>Amendment</u>.   No provision of this Agreement may be amended or modified except by an instrument in writing executed by the Company and approved by a Supermajority Member Vote.   Any such written amendment or modification will be binding upon the Company and each Member; <u>provided</u>, <u>however</u>, that an amendment or modification modifying the rights or obligations of any Member in a manner that is disproportionately adverse to such Member relative to the rights of the other Members will be effective only with such Member's consent; <u>provided</u>, <u>further</u>, that any amendment or restatement to provide for the creation and/or issuance of Units (including the creation and issuance of a new class of Units) approved in accordance with <u>Article 6</u> shall not be deemed to affect any Member or class of Members more adversely than any other Member or class of Members.   Notwithstanding the foregoing, <u>Exhibit A</u> may be amended and updated by the Board from time to time following any new issuance, redemption, repurchase or direct Transfer of Units in accordance with this Agreement without the consent of or execution by the Members.

Section 12.14 <u>Counterparts</u>.   This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement.   The exchange of copies hereof, including signature pages hereto, by facsimile, e-mail or other means of electronic transmission shall constitute effective execution and delivery hereof as to the parties and may be used in lieu of the original Agreement for all purposes.   Signatures transmitted by facsimile, e-mail or other means of electronic transmission shall be deemed to be original signatures for all purposes.

[***Signature Pages Follow***]

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed and delivered as of the Effective Date.

**COMPANY:**

**CONCORD BLUE DEVELOPMENT, LLC**

By: _____
      Name:
      Title:

**MEMBERS:**

**CONCORD BLUE ENERGY, INC.**


By: _____
        Name:
        Title:

**MUNICIPAL   EMPLOYEES'   RETIREMENT SYSTEM OF MICHIGAN**

By verdant*f* AG pursuant to power of attorney dated March ___, 2016

By: _____
      Name:
      Title:

## EXHIBIT A

## MEMBERS

As of the Effective Date.

**Common Units**

| Member | Address | Initial Capital Contributions | Additional Contributions | Class A Units | Class B Units | Percentage Interest | Voting Percentage Interest |
|---|---|---|---|---|---|---|---|
| Concord Blue Energy, Inc. | 12424 Wilshire Blvd. Suite 660 Los Angeles, CA 90025 Phone: +1 310 979 2900 | $67,024,998.65 | $0 | 0 | 72,459,458 | 99.999999% | 72.833% |
| Municipal Employees' Retirement System of Michigan | Verdantƒ AG (on behalf of the Municipal Employees' Retirement System of Michigan) Attention: Ms. Gaia Arnaboldi / Mr. Berry Polmann, Gladbachstrasse 105, 8044 Zurich, Switzerland (Phone: +41795553375 / +41795555373; E-Mail: gaia@verdantf.com / berry@verdantf.com | $0.00[1] | $0 | 1 | 0 | 0.000001% | 27.167% |
| | **TOTAL** | $67,024,998.65 | $0 | 1 | 72,459,458 | 100.00% | 100.00% |

[1] $25,000,000 in Escrow Account to be treated as set forth in Section 3.04(b).

## <u>EXHIBIT B</u>

### INITIAL BOARD OF MANAGERS

| <u>NAME</u> | <u>CLASS</u> | <u>ADDRESS</u> |
|---|---|---|
| Christopher Charlie Thannhaeuser | CBE Manager | c/o Concord Blue Energy, Inc. 12424 Wilshire Blvd. Suite 660 Los Angeles, CA 90025 Phone: +1 310 979 2900 Email:  ct@concordblue.de |
| Gregory Bilson | CBE Manager | c/o Concord Blue Energy, Inc. 12424 Wilshire Blvd. Suite 660 Los Angeles, CA 90025 Phone: +1 310 979 2900 Email: gb@concordblueenergy.com |
| Wesley Bilson | CBE Manager | c/o Concord Blue Energy, Inc. 12424 Wilshire Blvd. Suite 660 Los Angeles, CA 90025 Phone: +1 310 979 2900 Email: wb@concordblueenergy.com |
| Berry Polmann | MERS Manager | c/o Verdant*f* AG (on behalf of the Municipal Employees' Retirement System of Michigan) Gladbachstrasse 105, 8044 Zurich, Switzerland (Phone: +41795555373; E-Mail: berry@verdantf.com |
| Gaia Arnaboldi | MERS Manager | c/o Verdant*f* AG (on behalf of the Municipal Employees' Retirement System of Michigan) Gladbachstrasse 105, 8044 Zurich, Switzerland (Phone: +41795553375; E-Mail: gaia@verdantf.com |

## <u>EXHIBIT C</u>

### ADDENDUM AGREEMENT

This Addendum Agreement is made this ___ day of _____, 201__, by and between _____ (the "**Recipient**") and **Concord Blue Development, LLC**, a Delaware limited liability company (the "**Company**"), pursuant to the terms of the Amended and Restated Limited Liability Company Agreement of the Company dated as of March [__], 2015 (as amended, supplemented, restated or modified from time to time, the "**LLC Agreement**").  Capitalized terms used but not otherwise defined herein will have the meanings ascribed to them in the LLC Agreement.

WITNESSETH:

WHEREAS, the Company and the Members entered into the LLC Agreement to impose certain restrictions and obligations upon themselves, and to provide certain rights, with respect to the Company and its Units; and

WHEREAS, the Company and the Members have required in the LLC Agreement that all Persons to whom Units of the Company are transferred and all other Persons acquiring Units (each such Person, a "**New Member**") must enter into an Addendum Agreement binding the New Member to the LLC Agreement to the same extent as if the New Member were an original party thereto and imposing the same restrictions and obligations on the New Member and the Units to be acquired by the New Member as are imposed upon the Members under the LLC Agreement;

NOW, THEREFORE, in consideration of the mutual promises of the parties and as a condition of the purchase or receipt by the Recipient of the Units, the Recipient acknowledges and agrees as follows:

1.  The Recipient has received and read the LLC Agreement and acknowledges that the Recipient is acquiring Units subject to the terms and conditions of the LLC Agreement.

2.  The Recipient agrees that the Units acquired or to be acquired by the Recipient are bound by and subject to all of the terms and conditions of the LLC Agreement, and hereby joins in, and agrees to be bound by, and will have the benefit of, all of the terms and conditions of the LLC Agreement to the same extent as if the Recipient were an original party to the LLC Agreement; provided, however, that the Recipient's joinder in the LLC Agreement will not constitute admission of the Recipient as a Member unless and until the Recipient is duly admitted in accordance with the terms of the LLC Agreement.  This Addendum Agreement will be attached to and become a part of the LLC Agreement.

3.  The Recipient hereby represents and warrants, with respect to the Recipient, as of the date hereof to the Company the matters set forth in <u>Section 3.12</u> of the LLC Agreement and agrees to notify the Company promptly if any such representation or warranty becomes untrue at any time.

4.   Any notice required as permitted by the LLC Agreement will be given to the Recipient at the address listed beneath the Recipient's signature below.

5.   The Recipient irrevocably makes, constitutes and appoints the Company as the Recipient's true and lawful agent and attorney-in-fact.

6.   THIS ADDENDUM AGREEMENT, AND ALL CLAIMS, DISPUTES, ACTIONS OR OTHER LITIGATION THAT MAY BE BASED UPON, ARISE OUT OF OR RELATE TO THIS ADDENDUM AGREEMENT OR THE NEGOTIATION, EXECUTION OR PERFORMANCE OF THIS ADDENDUM AGREEMENT, WILL BE CONSTRUED IN ACCORDANCE WITH AND BE GOVERNED BY THE LAWS OF THE STATE OF DELAWARE WITHOUT REGARD TO PRINCIPLES OF CONFLICTS OF LAWS THAT WOULD PERMIT OR REQUIRE THE APPLICATION OF LAWS OF ANOTHER JURISDICTION.

[*Signature Page Follows*]

_____
Recipient

Address:

_____
_____

    AGREED TO on behalf of the Members of the Company pursuant to <u>Section 9.03</u> of the LLC Agreement.

                                    **Concord Blue Development, LLC**

                                    By:_____
                                    Name: _____
                                    Title: _____

## **EXHIBIT D**

### **CONTRIBUTED PROJECTS**

CBE's equity interest in the Eagar, Arizona Project
CBE's equity interest in the Herten, Germany Project

**<u>EXHIBIT E</u>**

**ESCROW AGREEMENT**

## <u>EXHIBIT F</u>

### OFFICERS

| | | |
|---|---|---|
| Chief Executive Officer | - | Christopher Charlie Thannhaeuser |
| Chief Financial Officer | - | TBD |
| Chief Operating Officer | - | TBD |

**EXHIBIT B**

**Form of Amendment Agreement**

[Attached]

**EXHIBIT C**

**USE OF FUNDS**

Funds shall be used (i) to develop, finance, construct, equip, test, operate, maintain and repair the Core Projects, in all cases as approved in advance in writing by the Board of Managers of the Company including the MERS Managers, and (ii) otherwise as approved in advance in writing by the Board of Managers of the Company including the MERS Managers.

**EXHIBIT D**

**EPC WRAP**

**Exhibit C.   Herten Project EPC Wrap Summary**

The Herten Project EPC Contract contains specific provisions that provide a "wrap", including fixed price, fixed schedule guarantees, performance guarantees and warranties. Should the project Substantial Completion be delayed for reasons other than Force Majeure or should the guaranteed performance levels not be achieved within the time allotted, then Lockheed Martin is obligated to pay penalties in accordance the provisions of the EPC contract. Should equipment fail due to manufacturer's defects or faulty installation within a certain period of time, Owner may make a warranty claim against Lockheed Martin.

The specific relevant sections from the EPC Contract are Sections 8.5, 7, 9.1, 10, 15, 19, and Schedules 11, 14, 18, and portions of 21.  These are all copied (except for Schedules 14 and 21) in sequential order below for easy reference.

| | |
|---|---|
| **Section 7.1** | **Contractor Guarantee** |
| **Section 8.5** | **Availability Reference Period** |
| **Section 9.1** | **Contractor Required Insurance** |
| **Section 10** | **Warranties** |
| **Section 15** | **Liquidated Damages and Performance Bonuses** |
| **Section 17** | **Limitation of Liability** |
| **Section 19.1** | **Contractor's Representations and Warranties** |
| **Schedule 11** | **Form of Contractor Guarantee** |
| **Schedule 14** | **Completion Test Protocols** |
| **Schedule 18** | **Contractor's Required Insurance** |
| **Schedule 21** | **Bonuses, Performance Levels and Liquidated Damages** |

**EPC Contract Sections**

7.1   Contractor Parent Guaranty

Contractor shall deliver to Owner, within five (5) days of the Stage 3 Commencement Date, a guaranty of LMC (the "**Contractor Parent Guaranty**") in the form of Schedule 11 [Form of Contractor Parent Guaranty].

No later than fifteen (15) days after the earlier to occur of Substantial Completion or termination of this Agreement for any reason other than a Contractor Default, Owner shall deliver to LMC the original Contractor Parent Guaranty and a written revocation and termination of such Contractor Parent Guaranty, in form and substance reasonably acceptable to LMC. Such documents shall be delivered to LMC at the address for Notices.

8.5   Availability Reference Period

The Availability Reference Period begins following Substantial Completion, as described in Schedule 14 [Completion Testing]. At the end of this period, it is assessed whether the Plant has met the Performance Guarantee requirements for Final Completion. In the event that there is any failure to achieve the Performance Guarantees, the Contractor shall pay Performance Liquidated Damages in accordance with Article 15.2 and Schedule 21 [Bonuses, Performance Guarantee and Liquidated Damages].

9.1   Contractor Required Insurance

Contractor shall furnish and maintain certain insurance coverage ("**Contractor Required Insurance**"), as specified in Schedule 18 [Contractor Required Insurance].

ARTICLE 10 - WARRANTIES

10.1   Contractor Warranty.

The Contractor warrants to Owner that (a) materials and equipment furnished under this Contract will be of good quality and new (unless otherwise required or permitted by the Contract Documents) and will be assembled and installed in accordance with all Subcontractors' and manufacturers' instructions and specifications, (b) the Facility will

be free from defects in materials and workmanship, and will meet the requirements of this Agreement when operated in accordance with Contractor's Operating Instructions and in the absence thereof in accordance with generally accepted practices in the electric power producing industry.

10.2   <u>Contractor's Obligations.</u>

If, during the Warranty Period only, any Works or Contractor Supplied Equipment fails to satisfy a Contractor warranty set forth in Article 10.1 [Contractor Warranty] and Owner delivers notice of such defect to Contractor, Contractor shall promptly commence and diligently continue the repair or re-performance of the defective Works and/or the replacement of the defective Contractor Supplied Equipment.

Contractor's obligation to repair or re-perform defective Works or replace defective Contractor Supplied Equipment shall be its exclusive liability, and Owner's exclusive remedy, for any breach of Contractors warranties hereunder.  In the event any breach of a Contractor warranty results in physical loss or damage to the Facility, Contractor's liability shall be limited to the repair, replacement or re-performance that Contractor would have been obligated to perform prior to the occurrence of such physical loss or damage. All liability of the Contractor in relation to defects in the Works shall terminate upon expiration of the Warranty Period.

Contractor shall perform all warranty obligations in cooperation with Owner and in a manner that reasonably minimizes the duration of any interruption in the operation of the Facility.

If, after notification of any breach of a Contractor warranty set forth in Article 10.1 [Contractor Warranty] Contractor fails to diligently repair or re-perform defective Works or replace defective Contractor Supplied Equipment, Owner may conduct, or cause one or more Replacement Contractors to, conduct, such repair, re-performance or replacement.  In such event, Contractor shall be liable, and shall promptly upon receipt of an Invoice reimburse Owner, for any direct reasonable and documented costs, charges and expenses incurred by Owner for any such repair, re-performance or replacement for which Contractor is responsible pursuant to this Article 10.2 [Contractor's Obligations]; provided, however, that Contractor shall not be liable for the quality of any Works performed by a Replacement Contractor.

If any warranty work cannot be performed effectively or expeditiously at the Site, Contractor may remove any defective work or Contractor Supplied Equipment from the Site to perform any necessary repair or re-performance.

The Owner shall issue a certificate within 28 days after the latest of the expiry dates of the Warranty Periods, or as soon thereafter as the Contractor has supplied all the Contractor's Documents and completed and tested all the Works, including remedying any Defects ("**Discharge Certificate**").

10.3  Subcontractor Warranties

Contractor shall exercise commercially reasonable efforts to include in all Subcontracts with Major Subcontractors warranties that are:

    (a)    at least equal in quality to those set forth in Article 10.1 [Contractor Warranty]; and

    (b)    capable of being assigned to Owner.  Contractor shall confer with Owner prior to executing any Subcontract with a Major Subcontractor that does not include a warranty that meets either such standard.

Upon the expiration of the Warranty Period, Contractor shall assign to Owner all assignable Subcontractor warranties pertaining to the Works (including the Contractor Supplied Equipment) that remain in effect as of such date.  The Parties acknowledge and agree that upon Contractor's assignment of any Subcontractor warranty, Contractor shall automatically be released from any and all liability under this Agreement related to such warranty, including with respect to Works (including Contractor Supplied Equipment) to which such warranty applies.

10.4  Direct Agreements

The Contractor shall use commercially reasonable efforts to obtain and deliver to the Owner with the Substantial Completion Notice direct agreements:

    (a)    in the form set out in Schedule 13 [Form of Direct Agreement] executed by any Major Subcontractor appointed to design and install any material element of the Works; or

    (b)    executed by the Contractor in such form as requested by any Financing Party acting reasonably.

10.5  Access

Owner shall provide Contractor and Subcontractors with access to the Facility and the Works as may be reasonably necessary to enable Contractor and such Subcontractors to perform any obligations arising pursuant to this Article 10 [Warranties].

10.6  Exclusions

Notwithstanding any other provision of this Agreement, Contractor's warranties do not extend or apply to any defect resulting from:

    (a)    Owner's or any of its contractor's (other than Contractor's) failure to utilize Good Industry Practice in the operation or maintenance of the Facility;

    (b)    Owner's or any of its contractor's (other than Contractor's) abuse, misuse, accidental breakage or negligent acts or omissions;

(c)    Force Majeure;

(d)    electrical surges;

(e)    normal wear and tear;

(f)    failure by Owner or any of its contractors (other than Contractor) to store, operate or maintain the Facility or any Equipment in accordance with the manufacturer's operating manuals and recommendations;

(g)    any repair or modification of the Facility or any Contractor Supplied Equipment by a Person other than Contractor or a Subcontractor acting at its direction; or

(h)    any fuel not meeting the Feedstock Specifications.

10.7   Exclusive Warranty

THE WARRANTIES SET FORTH IN ARTICLE 10.1 ARE EXCLUSIVE AND NO OTHER WARRANTIES OR CONDITIONS OF ANY KIND, WHETHER STATUTORY, WRITTEN, ORAL, EXPRESS OR IMPLIED (INCLUDING WARRANTIES OR CONDITIONS OF FITNESS FOR A PARTICULAR PURPOSE OR MERCHANTABILITY AND ANY WARRANTIES OR CONDITIONS THAT MIGHT OTHERWISE ARISE FROM A COURSE OR DEALING OR TRADE USAGE) SHALL APPLY.  Owner's remedies set forth in this ARTICLE 10 are owner's exclusive remedies with respect to the warranties set forth herein.  any oral or written representation, warranty, condition, course of dealing or trade usage not contained herein will not be binding on any party.

ARTICLE 15 - LIQUIDATED DAMAGES AND PERFORMANCE BONUSES

15.1   Completion Liquidated Damages

Subject to Article 17.1(b) [Limitations of Liability], if, for reasons other than a Justified Excuse, the Substantial Completion Date occurs after the Designated Substantial Completion Date, Contractor shall pay Owner Completion Liquidated Damages calculated in accordance with Schedule 21[Bonuses, Performance Guarantees and Liquidated Damages].

15.2   Performance Liquidated Damages

Subject to Article 17.1(c) [Limitations of Liability], if the Facility fails to achieve any of the Performance Levels during Completion Tests (Performance Guarantee Test or the Availability Reference Period) designated by the Contractor as a test to determine the extent of the Performance Levels achieved pursuant to Article 8.2 and 8.5 as described in Schedule 14 [Completion Test Protocols], Contractor shall pay Owner Performance Liquidated Damages calculated in accordance with Schedule 21 [Bonuses, Performance Levels and Liquidated Damages].

15.3  <u>Acknowledgements Regarding Liquidated Damages.</u>

The parties acknowledge and agree that:

(a)  Owner shall be damaged by failure of contractor to achieve substantial completion by the designated substantial completion date and/or failure of the facility to achieve any performance levels;

(b)  It is impracticable or extremely difficult to determine the actual damages resulting therefrom; and

(c)  The completion liquidated damages and performance liquidated damages represent reasonable estimates of the actual damages that would be incurred by owner as a result of a failure by contractor to achieve substantial completion by the designated substantial completion date and/or a failure of the facility to achieve any of the performance levels.

15.4  <u>Exclusive Remedy</u>

The Parties acknowledge and agree that recovery of Completion Liquidated Damages shall be the sole and exclusive remedy of Owner in respect of any delay in the performance of the Works and that recovery of Performance Liquidated Damages shall be the sole and exclusive remedy of Owner in respect of any failure of the Facility to achieve any of the Performance Levels save in the event of any such delay leading to the termination of the Contract.

15.5  <u>Performance Bonuses</u>

In the event that the performance of the Facility exceeds the Guaranteed Performance Level and such additional performance directly results in the generation of Distributable Profits in excess of those anticipated at the date of this Agreement then the Contractor shall be paid Performance Bonuses calculated in accordance with Schedule 21.

15.6  <u>Revenues Before Substantial Completion</u>

In the event that any Distributable Pre Completion Income is generated by the Facility prior to Substantial Completion then the same will be shared equally between the Parties.

ARTICLE 17 - LIMITATION OF LIABILITY

17.1  <u>Limitations of Liability</u>

(a)  Contractor's aggregate liability in connection with or related to this Agreement or the Works including but not limited to Liquidated Damages, whether arising in contract (including indemnification and liquidated damages), warranty, tort (including sole or concurrent negligence, gross negligence and patent infringement), strict liability or otherwise, shall not exceed one hundred percent (100%) of the Stage 2 Contract Price in respect of Stage 2 and the aggregate of the Stage 2 and the Stage 3 Contract Price in respect of Stage 3, provided that these limits of liability shall not apply in relation to death or personal injury

17.2    Exclusion of Consequential Damages

Notwithstanding any other provision of this agreement, neither party shall be liable to the other party for any special, indirect, incidental, punitive, consequential or exemplary damages of any kind or nature whatsoever, loss of profit or revenues, loss of use of facilities (including the facility), cost of capital, cost of replacement power, downtime costs or claims of a party's customers for damages, in each case arising out of, in connection with or resulting from performance or non-performance of this agreement, regardless of whether a claim is based on contract, warranty, tort (including negligence, gross negligence and/or wilful misconduct), strict liability, patent infringement or otherwise.

17.3    Disclaimer

If Contractor or any Subcontractor furnishes Owner with advice or other assistance which is not required by the terms of this Agreement, the furnishing of such advice or assistance shall not subject Contractor or any Subcontractor or any of their respective Affiliates to any liability, including any liability arising in contract, warranty, tort (including negligence, gross negligence and patent infringement), strict liability or otherwise.

19.1    Contractor's Representations and Warranties

Contractor hereby represents and warrants to Owner as of the date hereof that:

(a)    it is a corporation, duly organized, validly existing and in good standing under the laws of Delaware;

(b)    it has taken all necessary corporate action to authorize the execution, delivery and performance of this Agreement, which action has not been superseded or modified;

(c)    this Agreement constitutes its legal, valid and binding obligation, enforceable against it in accordance with its terms, except to the extent such enforceability may be affected by:

(i)    insolvency, reorganization, moratorium or similar laws affecting the enforcement of creditors' rights and remedies generally; or

(ii)    general principles of equity (regardless of whether enforceability is considered in a proceeding in equity or at law);

(d)    the execution, delivery and performance of this Agreement do not violate:

(i)    its charter, bylaws or any resolution of its board of directors or other committee charged with the governance of its affairs;

(ii)    any material contract, agreement, arrangement, understanding or commitment to which it is a party or by which it or any of its assets or properties is bound; or

(iii)    any law, rule, regulation, order, writ, judgment, injunction, decree or determination affecting it or any of its properties;

(e)  it:

    (i)  is regularly paying its debts in accordance with their terms;

    (ii)  has not filed any petition for relief under the bankruptcy laws of the United States;

**Schedules**

## SCHEDULE 11

### FORM OF CONTRACTOR PARENT GUARANTY

[Date]

Guaranty No. [ ]

Gentlemen:

This Guaranty is made by Lockheed Martin Corporation, a Maryland corporation ("**Lockheed Martin**"), for the benefit of the Concord Blue One GmbH ("**Owner**").

Lockheed Martin is the ultimate parent company of Lockheed Martin Overseas Services Corporation. ("*Subsidiary*").  Subsidiary and Owner have entered into that certain Engineering, Procurement and Construction Agreement dated as of _____ pertaining to a power generating facility near Herten, Germany that will utilize forestry residue biomass as fuel (the "*Contract*").

Lockheed Martin hereby guarantees to Owner the full performance by Subsidiary of its material obligations under the Contract.  Should Subsidiary default in the performance of any one or more of its material obligations under the Contract, then Lockheed Martin, as soon as practicably possible, shall undertake to perform, or have performed for it, such obligation(s) pursuant to the Contract, subject to all limitations, excuses and defenses available to Subsidiary, whether arising out of contract or otherwise.

Prior to proceeding against Lockheed Martin under this Guaranty (a) Owner shall first have issued to Subsidiary a written demand for performance of the specific material obligation(s) alleged by Owner to have been omitted or not performed materially in accordance with the Contract's requirements and any cure period applicable to such non-performance as set forth in the Contract shall have expired without cure by Subsidiary, and (b) Owner shall give written notice to Lockheed Martin at the address set forth below of such non-performance by Subsidiary, which notice requirement may be satisfied by transmitting to Lockheed Martin a copy of the aforementioned written notice or demand given to Subsidiary in the manner provided in the Contract.

This Guaranty shall not be construed to impose upon Lockheed Martin any obligations greater than, in addition to, or other than, obligations expressly assumed by Subsidiary under the Contract and Lockheed Martin shall not be liable for damages, including consequential, incidental, special, indirect, or punitive damages or the award of litigation expenses (including attorneys' fees and court costs) for which Subsidiary would not be liable under the Contract. In no event shall the cumulative liability of Subsidiary and Lockheed Martin exceed the total for which Subsidiary would be liable under the Contract.

This Guaranty may not be assigned, in whole or in part, by Owner without the express written consent of Lockheed Martin (which consent may be granted or withheld at the sole discretion of Lockheed Martin).

This instrument embodies the entire agreement between Lockheed Martin and Owner with respect to this Guaranty.  There are no promises, terms, conditions, or obligations other than

those contained herein, and this Guaranty agreement shall supersede all previous communications, representations, or agreements, either oral or written with respect to the subject matter hereof.  No provision of this Guaranty may be changed or amended except by an instrument in writing signed by Lockheed Martin and Owner expressly referring to the provisions of this Guaranty.

This Guaranty shall in all respects be governed by and construed in accordance with the laws of the State of New York, USA, including all matters of instruction, validity and performance, notwithstanding its choice of law provisions.

This Guaranty shall be effective as of _____ and continue through and including the issue of the Discharge Certificate in accordance with Article 10.2 [Contractor's Obligations] of the Contract.

LOCKHEED MARTIN CORPORATION          [CONCORD BLUE ONE GmbH]


By: _____          By: _____
Name:                                        Name:
Title:                                       Title:
Address for notice:                          Address for notice:
6801 Rockledge Drive                         _____
Bethesda, MD  20817                          _____
U.S.A.                                       _____
Attention: Treasurer                         Attention: _____
Facsimile: 301-897-6929                      Facsimile: _____


**SCHEDULE 14**

**COMPLETION TEST PROTOCOL**

Refer to the full EPC Contract for this Schedule.

## SCHEDULE 18

### CONTRACTOR REQUIRED INSURANCE

Contractor Required Insurance for Stage 3 shall be comprised of the following coverage:

1.  Workers' compensation insurance for all of its employees in accordance with Applicable Law and employers' liability insurance in an amount of not less than $1,000,000 per accident and per employee for disease.

2.  Commercial general liability insurance written on an occurrence basis and with a combined single limit of [$1,000,000 per occurrence and $2,000,000 annual aggregate]. Such insurance shall include coverage for products/completed operations, contractual liability for written contracts, broad form property damage and personal injury liability. Such insurance will be excess of third party liability insurance to be provided under Owner Required Insurance

3.  Automobile liability insurance (including coverage for owned, non-owned and hired automobiles) covering vehicles used by Contractor, including the loading or unloading of such vehicles, in an amount of $1,000,000 combined single limit per occurrence for bodily injury, and property damage.

4.  Umbrella/excess insurance on an occurrence basis covering claims in excess of the underlying insurance described in paragraph 2 of this Schedule 18 in an [amount not less than $20,000,000 per occurrence, and on a following-form basis]. Such insurance will be excess of third party liability insurance to be provided under Owner Required Insurance

5.  Professional indemnity insurance for a period of 1 years after the Substantial Completion Date, for an amount of not less than [$5 million per claim].

## SCHEDULE 21

### BONUSES, GUARANTEED PERFORMANCE LEVELS AND LIQUIDATED DAMAGES

Refer to the full EPC Contract for this Schedule.

**EXHIBIT E**

**LMC EPC CONTRACTOR PROJECTS**

Virgin Islands Project

**SCHEDULE 3.01(b)(1)**

**CERTIFICATE OF FORMATION**

[Attached]

# *Delaware*

PAGE  1

## *The First State*

I, JEFFREY W. BULLOCK, SECRETARY OF STATE OF THE STATE OF
DELAWARE, DO HEREBY CERTIFY THE ATTACHED IS A TRUE AND CORRECT
COPY OF THE CERTIFICATE OF FORMATION OF "CONCORD BLUE
DEVELOPMENT, LLC", FILED IN THIS OFFICE ON THE TWENTY-FOURTH DAY
OF JULY, A.D. 2014, AT 4:36 O'CLOCK P.M.

5574770   8100

140994815

You may verify this certificate online
at corp.delaware.gov/authver.shtml

Jeffrey W. Bullock, Secretary of State

AUTHENTICATION:  1566033

DATE:  07-24-14

# STATE *of* DELAWARE
## LIMITED LIABILITY COMPANY
## CERTIFICATE *of* FORMATION

**First:** The name of the limited liability company is _____
CONCORD BLUE DEVELOPMENT, LLC

**Second:** The address of its registered office in the State of Delaware is _____

2140 S. DUPONT HIGHWAY _____ in the City of CAMDEN _____ .

Zip code 19934 _____ . The name of its Registered agent at such address is

PARACORP INCORPORATED

**Third:** (Use this paragraph only if the company is to have a specific effective date of dissolution: "The latest date on which the limited liability company is to dissolve is _____ .")

**Fourth:** (Insert any other matters the members determine to include herein.)

**In Witness Whereof,** the undersigned have executed this Certificate of Formation this

24th _____ day of JULY _____ , _____ 2014 _____ .

By:_____
Authorized Person (s)

Name: SHARON R. FLAVIN _____

**SCHEDULE 3.01(b)(2)**

**OPERATING AGREEMENT**

[Attached]

**OPERATING AGREEMENT**
**OF**
**CONCORD BLUE DEVELOPMENT, LLC**
**A Delaware Limited Liability Company**

THE MEMBERSHIP INTERESTS ISSUED HEREUNDER HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR THE SECURITIES LAWS OF ANY STATE. THE MEMBERSHIP INTERESTS MAY NOT BE OFFERED FOR SALE, SOLD OR OTHERWISE TRANSFERRED EXCEPT PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER SUCH ACT AND APPLICABLE STATE SECURITIES LAWS OR PURSUANT TO AN APPLICABLE EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF SUCH ACT AND SUCH LAWS OR PURSUANT TO A WRITTEN OPINION OF COUNSEL FOR THE COMPANY THAT REGISTRATION IS NOT REQUIRED.

THE SALE, ASSIGNMENT, HYPOTHECATION, PLEDGE, ENCUMBRANCE OR OTHER DISPOSITION (EACH, A "TRANSFER") OF A MEMBERSHIP INTEREST ISSUED HEREUNDER ARE RESTRICTED BY THE DELAWARE LIMITED LIABILITY COMPANY ACT (THE "ACT") AND THE TERMS OF THIS OPERATING AGREEMENT. THE COMPANY WILL NOT REGISTER THE TRANSFER OF SUCH MEMBERSHIP INTEREST ON THE BOOKS OF THE COMPANY UNLESS AND UNTIL THE TRANSFER HAS BEEN MADE IN COMPLIANCE WITH THE ACT AND THIS OPERATING AGREEMENT, AND SUCH TRANSFER WILL NOT BE VALID UNLESS AND UNTIL SO REGISTERED.

## OPERATING AGREEMENT
## OF
## CONCORD BLUE DEVELOPMENT, LLC
### A DELAWARE LIMITED LIABILITY COMPANY

This OPERATING AGREEMENT (this **"Agreement"**) of CONCORD BLUE DEVELOPMENT, LLC, a Delaware limited liability company (the **"Company"**) is hereby adopted as of July 2⁄ ,2014, by that person executing this Agreement as the "Member" on page 13 hereof, as follows:

## 1. FORMATION AND PURPOSE; GENERAL DEFINITIONS

**1.1** **Organization; Name.** The Member has caused a Certificate of Formation (as amended and/or restated from time to time, the **"Certificate"**) for the Company to be filed with the Delaware Secretary of State on the date hereof. The business and affairs of the Company shall be governed by the Certificate and, where not inconsistent with the Certificate, this Agreement and, where not inconsistent with the Certificate or this Agreement, the Act.

**1.2** **Principal Office; Agent.** The Company shall continuously maintain a principal office and registered agent in the State of Delaware as required by the Act. The principal office of the Company shall be as set forth in the annual statement of information filed by the Company with the Delaware Secretary of State or such other address as the Member shall determine from time to time. The registered agent for service of process shall be as set forth in the Articles or as determined by the Member from time to time.

**1.3** **Purpose.** The Company is formed and shall be conducted

**1.3.1** to acquire, develop, own, operate, manage, exploit, finance, refinance, sell, lease, license, dispose of and otherwise deal with (whether as the direct owner or through one or more subsidiaries, and whether solely or jointly with others as a general or limited partner, member, stockholder or holder of equity securities of any other person) one or more biomass-to-energy projects converting feedstock to electrical energy;

**1.3.2** to acquire, develop, own, operate, manage, exploit, finance, refinance, sell, lease, license, dispose of and otherwise deal with (whether as the direct owner or through one or more subsidiaries, and whether solely or jointly with others as a general or limited partner, member, stockholder or holder of equity securities of any other person) such other businesses as the Member may determine from time to time; and

**1.3.3** to conduct such other activities related to or incidental to the acquisition, development, ownership, operation, management, financing, refinancing, sale, lease, license or disposition of all or any portion of the businesses described in Sections 1.3.1 or 1.3.2 hereof; to exercise all other power necessary to or reasonably connected with such businesses as may be legally exercised by limited liability companies in Delaware or in such other states in which the Company shall own assets or conduct business; and to engage in all activities necessary, customary, convenient, or incident to any of the foregoing.

**1.4** **Term.** The term of the Company shall commence as of the date of the filing of the Articles and shall continue in existence until the date (if any) set forth in the Articles, unless sooner dissolved pursuant to this Agreement or under the Act.

**1.5** **Definitions.** In addition to such terms as are defined elsewhere in this Agreement, the following terms shall have the following meanings:

**1.5.1** **"Affiliate"** means, with respect to any person (for purposes of this Section 1.5.1 only, the **"first person"**), **(a)** any other person directly or indirectly controlling, controlled by or under common control with the first person or owning or controlling ten percent (10%) or more of the outstanding voting securities, capital or profits interests, or beneficial interests in the first person; **(b)** any officer, director, manager, trustee, general partner, or Family member of or in the first person; or **(c)** if the first person is an officer, director, manager, trustee or general partner, any corporation, partnership, trust, or limited liability company for which such first person acts in that capacity. For purposes of this Section 1.5.1, *(I)* the term **"control"** (including the terms **"controlled by"** and **"under common control with"**) means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract or otherwise, and *(II)* a manager of a limited liability company includes a member of a limited liability company that is managed by its members rather than by managers.

**1.5.2** **"Assignee"** means any person that acquires or owns a Membership Interest after a Termination Event with respect to the applicable Member (including, without limitation and as the context may require, an executor, administrator, guardian, conservator, successor, assign, trustee or other legal representative with respect to such person, or a court with jurisdiction

over such Member's person or assets); *provided*, that in the case of the death of a Member, the Assignee shall be either **(a)** as set forth in an applicable Will or **(b)** if there is no Will, either *(I)* such person's executor as appointed by a court of competent jurisdiction or *(II)* if no executor has been appointed,   such court as has jurisdiction over the estate of such Member.

        **1.5.3** **"Available Cash"** means, with respect to any fiscal period, **(a)** total cash revenues generated by the business of the Company and from other sources (but not including proceeds from a loan or extension of credit to the Company, contributions to the capital of the Company, or the elimination or reduction of Reserves previously established, less **(b)** cash expenditures (including, but not limited to, rent, compensation or reimbursements to a Member, Manager or any Affiliate thereof under Section 3.4 hereof), current debt service (including, but not limited to, payments on debts to a Member), and operating expenses (but not including the establishment or increase of Reserves).

        **1.5.4** **"Bankruptcy"** or **"Bankrupt"** means, with respect to a person, **(a)** the making by such person of an assignment for the benefit of creditors; **(b)** the filing by such person of a voluntary petition in bankruptcy; **(c)** the adjudication of such person as being bankrupt or insolvent; **(d)** the filing by such person of a petition or answer seeking for such person any reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief under any statute, law or regulation; **(e)** the filing by such person of an answer or other pleading admitting or failing to contest the material allegations of a petition filed against such person in any proceeding of a nature described in clauses (a) through (d) hereof; **(f)** the seeking, consenting to, or acquiescing in, the appointment of a trustee, receiver or liquidator for such person or of all or any substantial part of such person's property; or **(g)** the continuation of any proceedings against such person seeking reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief under any statute, law or regulation, one hundred and twenty (120) days after the commencement thereof, or the appointment of a trustee, receiver or liquidator of such person or all or any substantial part of such person's property without such person's consent or acquiescence, which appointment is not vacated or stayed within ninety (90) days or, if the appointment is stayed, ninety (90) days after the expiration of the stay during which the appointment is not vacated.   The effective date of a Bankruptcy shall be the date of the filing or other action described in clauses (a) through (f), inclusive, of this Section 1.5.4 or the expiration of the 90- or 120-day periods (as applicable) described in clause (g) of this Section 1.5.4.

        **1.5.5** **"Code"** means the Internal Revenue Code of 1986, as amended.

        **1.5.6** The **"Family"** of an individual includes such person's spouse and lineal descendants (including those by adoption)

        **1.5.7** **"Fiscal Year"** is as defined in Section 6.3 hereof.

        **1.5.8** **"Incompetence"** or **"Incompetent"** means, with respect to an individual, the adjudication of such individual by a court of competent jurisdiction as insane or incompetent to manage such individual's person or property.    The effective date of Incompetence is the date of the applicable court order.

        **1.5.9** **"LLC"** means a limited liability company.

**1.5.10 "Manager"** means **(a)** that person executing this Agreement as the "Manager" on page 13 hereof or **(b)** any other person duly appointed as the Manager under Section 3.1 hereof.

**1.5.11 "Member"** means **(a)** the person executing this Agreement as the "Member" on page 13 hereof, **(b)** an Assignee of the person described in *clause (a)* of this Section 1.5.11, or **(c)** a transferee of the person described in *clause (a)* of this Section 1.5.11 with respect to a Transfer of a Membership Interest permitted under Section 4 hereof.

**1.5.12 "Membership Interest"** means a Member's rights in the Company, collectively, including the Member's right to share in the income, gains, losses, deductions, credit, or similar items of, and to receive distributions from, the Company; any right to vote or participate in management; and any right to information concerning the business and affairs of the Company. Notwithstanding any provision of the Act to the contrary, a Member's right to share in the income, gains, losses, deductions, credit, or similar items of, and to receive distributions from, the Company (an **"Economic Interest"**) may not be Transferred apart from the full Membership Interest except as expressly provided to the contrary in this Agreement, and references herein to a "portion" of a Membership Interest refer to an undivided portion of a Membership Interest.

**1.5.13 A "person"** means an individual or a corporation, partnership, limited liability company, trust or other legal entity.

**1.5.14 "Regulations"** mean the Treasury regulations promulgated under the Code.

**1.5.15 "Reserve"** means any amount set forth on the books of the Company as a reserve for all Company expenses, debt payments, capital expenditures or improvements, replacements and contingencies as reasonably determined by the Manager.

**1.5.16 "Termination Event"** with respect to a Member means

**1.5.16.1** the death of an individual Member, in which case the effective date of such Termination Event is the date of death;

**1.5.16.2** the Incompetence of an individual Member, in which case the effective date of such Termination Event is the effective date of such Incompetence;

**1.5.16.3** the Bankruptcy of such Member, in which case the effective date of such Termination Event is the effective date of such Bankruptcy; or

**1.5.16.4** if such Member is a corporation, trust, partnership, or LLC, the dissolution, revocation, or termination of such Member, in which case the effective date of such Termination Event shall be the date that such dissolution, termination or revocation is effective under the laws of the state of such Member's formation.

**1.5.17    A "Transfer"** of a Membership Interest means a sale, assignment, conveyance, exchange, gift, encumbrance, pledge, hypothecation, use as collateral, or other disposition or transfer of legal or beneficial ownership of such Membership Interest (whether voluntary or involuntary) other than as a result of a Termination Event with respect to a Member.

**1.5.18    A "Will"** means any instrument (whether or not styled or titled as a will, and including without limitation any trust instrument) governing or affecting the transfer of any of the Membership Interest of a person upon or as a result of such person's death.

## 2.    CAPITALIZATION AND FINANCING; TAX MATTERS

**2.1    Capital Contribution**.   The Member has made a contribution to the capital of the Company as set forth underneath such Member's signature on page 13 hereof hereto in exchange for a Membership Interest representing a one hundred percent (100%) interest in the capital and profits of the Company.

**2.2    Advances and Loans.**   A Member (directly or through an Affiliate) may, but shall not be obligated to, advance funds to or on behalf of the Company upon such security and other terms as the Member may determine, in which case **(a)** such advance shall be a debt owed by the Company to such person in such person's capacity as a creditor and not in such person's capacity as a Member, and **(b)** such advance shall be segregated in a loan payable account.

**2.3    Distributions**.   The Company shall distribute Available Cash to the Member at such times and in such amounts as the Member may determine; *provided*, that no distribution of Available Cash may be made to the extent such distribution would violate section 18-504 of the Act.

**2.3.1    Tax Treatment**.   Unless otherwise determined by the Member, this Company shall not elect to be treated as an association taxable as a corporation under section 301.7701-3 of the Regulations.

## 3.    GOVERNANCE

**3.1    Manager.** The business and affairs of the Company shall be managed by one (1) Manager, GREGORY BILSON (the **"Manager"**) who, subject to Section 3.3 hereof, shall have full, exclusive and complete authority and discretion in the management, direction and control of the Company and its business and affairs; shall serve as the "manager"of the Company within the meaning of the Act; and shall have all such rights, powers and authority generally conferred by law or as necessary to, advisable for or consistent with accomplishing the purposes of the Company.

**3.1.1    Appointment**.   The Manager shall be designated in writing by the Member from time to time and shall serve at the pleasure of the Member.

**3.1.2    Resignation**.   The Manager may resign upon thirty (30) days written notice to the Member; *provided*, that in the case of a Transfer or Termination Event, the Manager

may resign effective as of the date specified in such notice (which date may not be earlier that the effective date of such Termination Event or the date of such Transfer).

**3.1.3 Manager Also Member.** A Manager may, but need not, be a Member. If a Manager is also a Member, such Manager shall have all the rights and obligations of a Member; the removal or resignation of such Manager shall not by itself affect such person's rights and obligations as a Member; and a Termination Event with respect to such Member or a Transfer by such Member of its Membership Interest shall not by itself constitute a resignation or removal of such person as a Manager.

**3.1.4 Duties.** A Manager shall at all times be under a duty to **(a)** discharge such Manager's duties in good faith, with the care an ordinarily prudent person in a like position would exercise under similar circumstances, and in a manner such Manager reasonably believes to be in the best interests of the Company, **(b)** take all actions that may be necessary or appropriate for the continuation of the Company as a limited liability company under Delaware law, the protection of the Member from personal liability for the debts and liabilities of the Company, and the accomplishment of the Company's purposes, and **(c)** devote such time to the Company as shall be necessary to manage the Company's business; and a Manager shall further be under a fiduciary duty to conduct the affairs of the Company in the best interests of the Company, including the safekeeping and use of all of the Company property for the exclusive benefit of the Company. In discharging the duties hereunder, a Manager may rely on information received from other persons if such reliance is consistent with such Manager's duties under this Section 3.1.4.

**3.2 Powers of Members**. No Member solely by virtue of being a Member is an agent of the Company, may take part in the management or control of the business of the Company, or has the authority to make any contracts, enter into any transactions, or make any commitments on behalf of the Company.

**3.2.1 Approval Rights**. In addition to such approval rights as are expressly set forth elsewhere in this Agreement, the Member shall have the following powers:

**3.2.1.1** to approve **(a)** the sale or other disposition of all or substantially all of the assets of the Company; **(b)** any transaction entered by the Company that would result in a lien or other encumbrance on all or substantially all of the assets of the Company; **(c)** the contribution of all or substantially all of the assets of the Company to a corporation, partnership or limited liability company; **(d)** the merger of the Company; or **(e)** the conversion of the Company to a corporation or partnership; or

**3.2.1.2** to approve any act by the Manager that would **(a)** make it impossible to carry on the ordinary business of the Company; **(b)** change the nature of the Company's business as set forth in Section 1.3 hereof; **(c)** confess a judgment against the Company; **(d)** during any Fiscal Year create a Reserve (or increase a Reserve that has already been created) in or by an amount exceeding twenty percent (20%) of what Available Cash would have otherwise been with respect to such Fiscal Year; **(e)** create a Reserve (or increase a Reserve that has already been created), or use funds set aside in a Reserve, for expenses related to or arising from the day-to-day ordinary business operations of the Company; **(f)** cause the Company to enter into a contract or other arrangement with a Manager or Affiliate thereof which contract or

arrangement is for a term of more than twelve (12) months (with renewals) and/or can reasonably be expected to cause the Company to incur aggregate expenses of one thousand dollars ($1,000) or more; **(g)** cause the Company to enter into any other contract or other arrangement with any other person which contract or arrangement can reasonably be expected to cause the Company to incur aggregate expenses of two thousand five hundred dollars ($2,500) or more; or **(h)** cause the Company to retain or change its outside accountants or legal counsel.

**3.3** **Meeting and Approval Procedures.** With respect to any matter under this Agreement that requires the approval or consent of the Member, and notwithstanding any provision of this Agreement or the Act to the contrary, no Manager shall take any action or omit to take any action on behalf of the Company (including, without limitation, the execution of any contract, agreement, promissory note or other instrument or document for or on behalf of the Company or the representation to any party that such Manager is authorized to act for or on behalf of or to bind the Company in any manner whatsoever) with respect to such matter unless such Manager has been authorized to do so by the Member in the manner described in this Section 3.3.

**3.3.1** **In General**. Subject to such meeting and approval procedures as are agreed upon by the Member and the Manager in writing (which procedures shall be made part of the Company's books and records under Section 6.1 hereof), the Member and Manager shall meet and confer according to any commercially reasonable manner as they may determine from time to time.

**3.3.2** **Written Approval**. Any action or omission of the Manager shall be deemed to have been authorized by the Member for all purposes if

**3.3.2.1** either **(a)** prior to such action or omission the Member authorized the same in writing; or **(b)** the Member authorizes the same in writing after such action or omission, the Manager acted in good faith with respect to the same, and it was impractical for the Manager under the circumstances to obtain the Member's consent or approval prior to such action or omission; and

**3.3.2.2** such writing is signed by the following persons: **(a)** the Member (if the Member is an individual); **(b)** if such Member is a trust, a trustee of such trust; **(c)** if such Member is a corporation, an officer of such corporation; **(d)** if such Member is a partnership, a general partner of such partnership; **(e)** if such Member is an LLC, a manager (if such LLC is managed by managers) or member (if such LLC is member-managed) of such LLC; or **(f)** after a Termination Event with respect to a Member, any Assignee.

**3.4** **Compensation; Reimbursement.** A Manager shall be entitled to compensation for such person's services in connection with the management of the Company only as set forth in a separate agreement signed by the Manager and the Member. A Member or Manager (or such person's Affiliates, agents, employees and consultants, and such person's counsel and accountants) shall be entitled to reimbursement for all reasonable out–of–pocket expenses incurred by them for the benefit of the Company in connection with the management of the Company as determined by the Member and upon presentation of satisfactory documentary evidence thereof (which evidence shall be part of the Company's books and records under Section 6.1 hereof). Nothing in this Section 3.4 shall entitle a person to be reimbursed for compensation to officers and directors of such person

or overhead expenses of such person (including, without limitation, rents, salaries and general office expenses).

### 3.5 Liability and Indemnity

**3.5.1 Release**. No Member or Manager shall be liable, responsible or accountable in damages or otherwise to the Company or any Member or any of their successors or assigns for any act or omission by such Member or Manager performed or omitted in good faith pursuant to the authority granted by this Agreement; *provided*, that such Member or Manager is not guilty of fraud, bad faith, or gross negligence. No amendment or repeal of this Section 3.5.1 affects any liability or alleged liability of any Member or Manager for any acts, omissions, or conduct that occurred prior to the amendment or repeal.

**3.5.2 Indemnification.** To the maximum extent permitted by the Act, the Company shall indemnify, defend, and hold harmless a Member, Manager or officer of the Company (and any officer, director, shareholder, employee, agent, attorney, subsidiary and assign thereof) (for purposes of this Section 3.5.2 only, an **"Agent"**) from any liability, loss, claim, expense or damage incurred by them by reason of any act performed or omitted to be performed by them in connection with the Company, including costs and attorney's fees and any amounts expended in the settlement of any claims of liability, loss or damage; *provided*, that nothing in this Section 3.5.2 shall entitle a person to be indemnified in the case of fraud, bad faith, or gross negligence. No amendment or repeal of this Section 3.5.2 affects the liability of any person or obligations of the Company with respect to any acts, omissions, or conduct that occurred prior to the amendment or repeal.

**3.5.3 Insurance.** The Company shall have power to purchase and maintain insurance on behalf of any Agent against any liability asserted against or incurred by such Agent in such capacity or arising out of such Agent's status as such whether or not the Company would have the power to indemnify such Agent against such liability under Section 3.5.2 hereof.

**3.5.4 Advance of Expenses.** The expenses of an Agent incurred in a defense of an action, suit or proceeding for which indemnification is available under Section 3.5.2 hereof shall be paid by the Company as they are incurred and in advance of the final disposition of such action, suit or proceeding upon receipt of an undertaking by or on behalf of such Agent to repay such amount if it is ultimately determined by a court of competent jurisdiction that such Agent is not entitled to indemnification under Section 3.5.2 hereof.

**3.5.5 Determination.** Whether fraud, bad faith, or gross negligence exists for purposes of Sections 3.5.1 or 3.5.2 hereof shall be determined by independent legal counsel to the Company in a written opinion.

### 4. TRANSFER OF INTERESTS

**4.1 In General**. Notwithstanding any provision of the Act to the contrary, a Member may Transfer all or any portion of such Member's Membership Interest to a person only upon the following conditions (*provided*, that a Manager may waive such condition in such Manager's sole and absolute discretion):

**4.1.1**    the transferor or transferee shall give written notice of such Transfer to the Manager and provide the Company with the name, address, and taxpayer identification number of the transferee and such other information as the Manager shall request to prepare tax returns and other filings reflecting such Transfer as are required by the Act or otherwise;

**4.1.2**    the transferor or transferee shall furnish the Manager with an opinion of counsel in form and substance satisfactory to the Manager to the effect that such Transfer will not cause a reassessment for property tax purposes of any real property or interest therein owned by the Company for purposes of the Delaware Revenue and Taxation Code or similar provisions of any other state where such real property is located;

**4.1.3**    the transferor or transferee shall deliver to the Company an opinion of counsel in form and substance satisfactory to the Manager to the effect that the Transfer of such Membership Interest may be made without violating federal or state securities laws;

**4.1.4**    the transferor and transferee shall agree in writing to be jointly and severally responsible for, and to reimburse the Company for, all costs and expenses related to such Transfer; and

**4.1.5**    the transferee shall execute a copy of this Agreement along with an express statement that it agrees to be bound by the terms and conditions of this Agreement.

A permitted transferee shall be admitted to the Company as a Member upon compliance with all of the foregoing conditions without further action by the Company or the Manager.

**4.2**    **Effect of Violation.** Any Transfer in violation of this Section 4 shall be null and void *ab initio* and of no effect whatsoever.

**4.2.1**    **Recognition of Non-Permitted Transfers.** If the Company is required to recognize a Transfer of a Membership Interest that is not permitted by or does not comply with this Section 4 (for purposes of this Section 4.2 only, an **"attempted Transfer"**), the Membership Interest subject to such attempted Transfer shall be strictly limited to an Economic Interest and any distributions with respect to such Economic Interest may be offset against and applied toward (without limiting any other legal or equitable rights of the Company) any debts, obligations, or liabilities for damages that the attempted transferor or transferee may have to the Company, and such attempted transferee shall have no other rights under this Agreement or the Act.

**4.2.2**    **Indemnity**. In the case of an attempted Transfer of a Membership Interest that does not comply with this Section 4, the parties engaging in such attempted Transfer shall be liable to indemnify and hold harmless the Company and their successors and assigns from all cost, liability, and damage that any of such indemnified parties may incur (including, without limitation, incremental tax liability and attorneys' fees and expenses) as a result of such attempted Transfer and efforts to enforce the indemnity in this Section 4.2.2.

**4.3**    **Applicability of Agreement.** Upon the consummation of any Transfer of a Membership Interest, the Membership Interest so Transferred shall continue to be subject to this

Agreement and any further Transfers of such Membership Interest must comply with this Agreement.

## 5.    DISSOLUTION

**5.1    Events of Dissolution.** The Company shall be dissolved upon the occurrence, and only upon the occurrence, of any of the following events:

**5.1.1**    the written resolution of the Member to dissolve the Company; or

**5.1.2**    a sale or other disposition of all or substantially all of the Company's assets, or any other event that causes the Company to be unable to continue its business as a practical matter.

**5.2    Liquidation**. Upon the occurrence of an event of dissolution as described in Section 5.1 hereof, the Manager (or, if there is no Manager, such other person as shall be designated by the Member) shall take full account of the Company's assets and liabilities, shall collect the receivables of the Company, and shall liquidate the Company's assets as promptly as is consistent with obtaining the fair market value thereof. Upon dissolution, the Company shall engage in no further business other than that necessary to collect its receivables and to liquidate its assets. The proceeds from the liquidation of Company assets and collection of Company receivables, together with assets distributed in kind, shall, to the extent sufficient therefore, be applied and distributed in the following order:

**5.2.1**    first, to the expenses of liquidation, including brokerage commissions from the sale of Company assets, escrow costs, accounting and legal fees, and other expenses;

**5.2.2**    second, to the liabilities and obligations of the Company to its creditors (including the Member if it has made a loan or advance to the Company);

**5.2.3**    third, to the creation or increase of Reserves; and

**5.2.4**    fourth, to the Member.

**5.3    Termination Upon Liquidation.** Upon completion of the dissolution, winding up, liquidation and distribution of the Company assets and liquidation proceeds, the Company shall terminate and the Manager (or, if there is no Manager, such person as is designated by the Member under Section 5.2 hereof) shall file or cause to be filed such documents as are required to confirm the dissolution, termination and/or withdrawal of the Company with the Delaware Secretary of State and appropriate government authorities of any other state where the Company has qualified to do business.

## 6.    FINANCIAL MATTERS

**6.1    Books and Records.** The books and records of, and other information pertaining to, the Company shall be available upon reasonable request for inspection, audit, and copying by the  Member, Manager, or their duly authorized representatives at the principal office of the Company set forth in Section 1.3 hereof.   The books, records and other information described in this Section 6.1 shall include at least the following: **(a)** a copy of the Articles and all amendments thereto, and executed copies of any powers of attorney pursuant to which any such instrument has been executed; **(b)** copies of this Agreement and all amendments thereto; **(c)** copies of the Company's federal, state and local income tax or information returns and reports, if any, for the six (6) most recent Fiscal Years; **(d)** financial statements of the Company for the six (6) most recent Fiscal Years; **(e)** the Company's books and records for the current and past three (3) Fiscal Years; and **(f)** any other documents specifically required by this Agreement.

**6.2    Tax Information and Elections**.   The Manager shall cause any and all tax returns to be timely filed and any and all franchise, gross receipts and other taxes to be timely paid with applicable government authorities, and may from time to time make such tax elections with respect to the Company as the Manager may deem necessary or desirable; *provided*, that the Manager may not elect to have the Company treated as an association taxable as a corporation under section 301.7701-3 of the Regulations except with the approval of the Member.

**6.3    Fiscal Year**. The fiscal year of the Company (the **"Fiscal Year"**) shall be the same as that of the Member.

## 7.    GENERAL PROVISIONS

**7.1    Complete Agreement.** This Agreement, and any schedules, exhibits or documents referred to herein or executed contemporaneously herewith, constitute the entire agreement governing the business and affairs of the Company, and supersede all prior written, and all prior and contemporaneous oral, agreements, representations, warranties, statements, promises and understandings with respect to the subject matter hereof, whether express or implied.   All schedules and exhibits attached hereto are hereby incorporated in and made a part of this Agreement as if fully set forth herein.

**7.2    Amendments.** Except as expressly provided otherwise in this Section 7.2, this Agreement may be amended only by the Member; *provided*, that a Manager's consent shall be required for any amendment that would otherwise alter, modify, or expand the obligations or liabilities of a Manager.

**7.3    Governing Law.** This Agreement shall be governed by the laws of the State of Delaware, regardless of the choice of law provisions of Delaware or any other jurisdiction and regardless of where the parties hereto may now or hereafter reside, be organized or do business.

**7.4    Power of Attorney**.   The Member irrevocably constitutes and appoints each Manager and, when a partnership or LLC is a Manager, each general partner or manager of such Manager, and when a corporation is a Manager or a partner or member in a Manager, the then-President, each Vice President, the Secretary, and each Assistant Secretary of such

corporation, in each case acting singly, with full power of substitution, as such Member's true and lawful attorney in such Member's name, place, and stead to make, execute, acknowledge, deliver, swear to, and file:

       **7.4.1**   any counterparts of this Agreement;

       **7.4.2**   any amendments to the Articles required by law or considered necessary or desirable by such Manager including, without limitation, an amendment reflecting the admission of a signatory to this Agreement or a counterpart thereof as a Member or an amendment reflecting any increase in the capital contributions of a Member;

       **7.4.3**   all certificates and other instruments necessary to qualify or continue the Company in the states where it may be doing business;

       **7.4.4**   all assignments, conveyances, or other instruments or documents necessary to effect the dissolution or termination of the Company;

       **7.4.5**   all other filings with agencies of the federal government, of any state or local government, or of any other jurisdiction that such Manager may consider necessary or desirable for Company purposes; and

       **7.4.6**   any changes in this Agreement as are required in the judgment of the Manager in order to comply with the laws of the United States, the State of Delaware and/or state in which Company property is located (including compliance with limited liability company law).

It is expressly intended by the Member that said power of attorney is coupled with an interest, that it shall be irrevocable, and that it shall survive the dissolution or other termination of the Member or the transfer by the Member of the whole or any part of its membership interest.

       **7.5**   **Notices**.  Whenever this Agreement requires that notice be given to the Company, a Member or the Manager, such notice shall be in writing and shall be given to such person at the address, facsimile number and/or electronic mail address set forth with respect to such person on page 13 hereof (or such other address and/or number as shall be communicated by one party to the other under this Section 7.5 and, in the case of the Company, c/o the Manager) as follows:  by personal delivery, in which case notice shall be deemed to have been given on the date of delivery; by certified mail, return receipt requested, in which case notice shall be deemed to have been given three (3) days after deposit of such notice in the mail; by Federal Express, United Parcel Service or other nationally-recognized "next day" delivery service, in which case notice shall be deemed to have been given the day after deposit of such notice with such service; by facsimile with a copy of such notice sent by first-class mail, in which case notice shall be deemed to have been given on the day of the facsimile transmission as set forth in a facsimile log; or by electronic mail with a copy of such notice sent by first-class mail, in which case notice shall be deemed to have been given on the day of the transmission as set forth on such copy.

       **7.6**   **Waivers.**  The failure of any party hereto at any time to require performance by another party hereto of any provision hereof shall in no way affect the full right to require such

performance at any time thereafter, nor shall the waiver by any party of a breach of any provision hereof be taken or held to be a waiver of any succeeding breach of such provision or as a waiver of the provision itself.

**7.7 Successors and Assigns.** This Agreement shall be binding upon and inure to the benefit of the parties hereto, their respective successors and permitted assigns.

**7.8 Severability**. The validity, legality or enforceability of the remainder of this Agreement shall not be affected even if one or more of the provisions of this Agreement shall be held to be invalid, illegal or unenforceable in any respect.

**7.9 Schedules and Exhibits.** All schedules and exhibits attached hereto are hereby incorporated in and made a part of this Agreement as if fully set forth herein.

**7.10 Headings; Gender; Interpretation.** The headings in this Agreement are inserted only as a matter of convenience, and in no way define, limit, or interpret the scope of this Agreement or of any particular section hereof. As used in this Agreement, the masculine, feminine or neuter gender, and the singular or plural number, shall each include the others whenever the context so indicates.

IN WITNESS WHEREOF, the undersigned have executed this Agreement as of the date first set forth above.

**"MEMBER"**                                   **"MANAGER"**

CONCORD BLUE ENERGY, INC., a
Delaware corporation

By: _____
        WESLEY BILSON                          _____
Its: President                                 GREGORY BILSON

**Capital Contribution**:
_____$/00.00_____ dollars ($ 100 )
One hundred

**SCHEDULE 3.01(j)**

**STRATEGIC AGREEMENTS**

1. Amended and Restated Project Development Agreement, dated as of Feb 19, 2016, by and between Concord Blue Energy, Inc. and Concord Blue Development, LLC.

2. Teaming Agreement, dated as of Jul 25, 2013, by and between Concord Blue USA, Inc., and Lockheed Martin Corporation.

3. 1st Amendment to Teaming Agreement, dated as of Dec 18, 2015, by and among Concord Blue Energy, Inc., Concord Blue Development, LLC, and Lockheed Martin Corporation.

4. Amended and Restated Operating Agreement of Concord Blue Eagar, LLC (f/k/a Concord Blue Development USA, LLC), dated as of May 7, 2012, by and between Concord Blue Energy, Inc. and Western Energy Solution, LLC.

5. Operating Agreement of Concord Blue Virgin Islands, LLC, dated as of March 5, 2015, by and between Concord Blue Development, LLC and Leeward Renewables, LLC.

6. Partnering Agreement, dated as of March 8, 2016, by and among the Company, CBE and verdant*f* AG.

**SCHEDULE 3.01(p)**

**ORDINARY COURSE OF BUSINESS**

1. Convertible Promissory Note, dated as of July 1, 2015, by and between the Company and Berger Group Holdings, Inc., in the principal amount of $475,000.00.

2. Amended and Restated Project Development Agreement, dated as of Feb 19, 2016, by and between Concord Blue Energy, Inc. and Concord Blue Development, LLC.

**SCHEDULE 3.01(q)**

**FINANCIAL STATEMENTS**

[Attached]

# FENTON & ROSS
## AN ACCOUNTANCY CORPORATION

**CONCORD BLUE ENERGY, INC.**

**COMPILED FINANCIAL STATEMENTS
YEAR ENDED DECEMBER 31, 2014**

10866 Wilshire Blvd., Suite 1250 • Los Angeles, CA 90024 • Tel: (310) 477-6440 • Fax: (310) 477-6474 • E-mail: dfenton@fentonross.com

Schedule 3.01(q) - 1

# CONCORD BLUE ENERGY, INC.

## YEAR ENDED DECEMBER 31, 2014

---

**CONTENTS**

| | Page |
|---|---|
| **Accountants' compilation report** | 1 |
| **Financial statements** | |
| Balance sheet | 2 |
| Statement of income | 3 |
| Statement of stockholders' equity | 4 |

# FENTON & ROSS
## AN ACCOUNTANCY CORPORATION

### ACCOUNTANTS' COMPILATION REPORT

Board of Directors
Concord Blue Energy, Inc.

We have compiled the accompanying balance sheet of Concord Blue Energy, Inc. (the "Company") for the year ended December 31, 2014, and the related statements of income and stockholders' equity for the year then ended.  We have not audited or reviewed the accompanying financial statements and, accordingly, do not express an opinion or provide any assurance about whether the financial statements are in accordance with the accounting principles generally accepted in the United States of America.

Management is responsible for the preparation and fair presentation of the financial statements in accordance with accounting principles generally accepted in the United States of America, and for designing, implementing, and maintaining internal control relevant to the preparation and fair presentation of the financial statements.

Our responsibility is to conduct the compilation in accordance with Statements on Standards for Accounting and Review Services issued by the American Institute of Certified Public Accountants.  The objective of a compilation is to assist management in presenting financial information in the form of financial statements without undertaking to obtain or provide any assurance that there are no material modifications that should be made to the financial statements.

Accounting principles generally accepted in the United States of America require that the ownership by one reporting entity, directly or indirectly, of more than 50 percent of the outstanding units of another entity to consolidate that entity in its financial statements. Management has informed us that the Company's financial statements do not include the accounts of Concord Blue Eager, LLC which the Company owns a 60 percent controlling interest. The effect of this departure on the financial statements has not been determined.

Management has elected to omit substantially all of the disclosures and the statement of cash flows required by accounting principles generally accepted in the United States of America.  If the omitted disclosures were included in the financial statements, they might influence the user's conclusions about the company's financial position, results of operations, and cash flows. Accordingly, these financial statements are not designed for those who are not informed about such matters.

*Fenton & Ross*

Los Angeles, California
February 24, 2015

1

10866 Wilshire Blvd., Suite 1250 • Los Angeles, CA 90024 • Tel: (310) 477-6440 • Fax: (310) 477-6474 • E-mail: dfenton@fentonross.com

Schedule 3.01(q) - 3

# CONCORD BLUE ENERGY, INC.

## BALANCE SHEET
## DECEMBER 31, 2014

### ASSETS

**Current assets:**

| | | |
|---|---|---:|
| Cash | $ | 1,218,695 |
| Deferred tax asset | | 82,100 |
| Due from related party | | 47,046 |
| Total current assets | | 1,347,841 |

| | | |
|---|---|---:|
| **Property, plant & equipment,** net of accumulated depreciation | | 16,434 |
| **Investments** | | 440,000 |
| **Due from related party** | | 1,750,000 |
| **Intangible asset** | | 8,360,000 |
| **Other assets** | | 18,027 |
| **Total assets** | $ | 11,932,302 |

### LIABILITIES AND STOCKHOLDER'S EQUITY

**Current liabilities:**

| | | |
|---|---|---:|
| Accounts payable and accrued expenses | $ | 400,111 |
| Income tax payable | | 188,334 |
| Notes payable shareholders | | 1,151,593 |
| Total current liabilities | | 1,740,038 |

**Stockholder's equity:**

| | | |
|---|---|---:|
| Common stock, $.01 par value:  1,000,000 shares authorized; 203,563 shares issued and outstanding | | 2,036 |
| Additional paid-in capital | | 10,213,964 |
| Retained earnings | | (23,736) |
| | | 10,192,264 |
| **Total liabilities and stockholders' equity** | $ | 11,932,302 |

See accountants' compilation report.

Schedule 3.01(q) - 4

2

## CONCORD BLUE ENERGY, INC.

**STATEMENT OF INCOME**
**YEARE ENDED DECEMBER 31, 2014**

|  | Amount |
|---|---|
| **Revenue,** net | $ 2,000,000 |
| **Operating expenses** | 1,130,979 |
| **Income from operations** | 869,021 |
| **Income tax expense** | 260,334 |
| **Net income** | $ 608,687 |

See accountants' compilation report.

# CONCORD BLUE ENERGY, INC.

## STATEMENT OF STOCKHOLDERS' EQUITY
## YEAR ENDED DECEMBER 31, 2014

| | Common stock | | Additional paid-in capital | Retained earnings | Total |
|---|---|---|---|---|---|
| | Shares issued | Amount | | | |
| Balance, December 31, 2013 | 200,000 | $ 2,000 | $ 8,998,000 | $ (632,423) | $ 8,367,577 |
| Sale of common stock | 3,563 | 36 | 1,215,964 | | 1,216,000 |
| Net income | | | - | 608,687 | 608,687 |
| Balance, December 31, 2014 | 203,563 | $ 2,036 | $ 10,213,964 | $ (23,736) | $ 10,192,264 |

See accountants' compilation report.

# FENTON & ROSS
## AN ACCOUNTANCY CORPORATION

**CONCORD BLUE ENERGY, INC.**

**COMPILED FINANCIAL STATEMENTS**
**YEAR ENDED DECEMBER 31, 2015**

10866 Wilshire Blvd., Suite 1250 • Los Angeles, CA 90024 • Tel: (310) 477-6440 • Fax: (310) 477-6474 • E-mail: dfenton@fentonross.com

Schedule 3.01(q) - 7

# CONCORD BLUE ENERGY, INC.

## YEAR ENDED DECEMBER 31, 2015

CONTENTS

| | Page |
|---|---|
| **Accountants' compilation report** | 1 |
| **Financial statements** | |
| Balance sheet | 2 |
| Statement of operations | 3 |
| Statement of stockholders' equity | 4 |

# FENTON & ROSS
## AN ACCOUNTANCY CORPORATION

### ACCOUNTANTS' COMPILATION REPORT

Board of Directors
Concord Blue Energy, Inc.

Management is responsible for the accompanying financial statements of Concord Blue Energy, Inc. (the "Company"), which comprise the balance sheet as of December 31, 2015, and the related statement of operations and retained earnings for the year then ended in accordance with accounting principles generally accepted in the United States of America. We have performed a compilation engagement in accordance with Statements on Standards for Accounting and Review Services promulgated by the Accounting and Review Services Committee of the AICPA. We did not audit or review the financial statements nor were we required to perform any procedures to verify the accuracy or completeness of the information provided by management. Accordingly, we do not express an opinion, a conclusion, nor provide any form of assurance on these financial statements.

Accounting principles generally accepted in the United States of America require that the ownership by one reporting entity, directly or indirectly, of more than 50 percent of the outstanding units of another entity to consolidate that entity in its financial statements. Management has informed us that the Company's financial statements do not include the accounts of Concord Blue Eager, LLC which the Company owns a 60 percent controlling interest. Management has not determined the effect of this departure on the financial statements.

Management has elected to omit substantially all of the disclosures and the statement of cash flows required by accounting principles generally accepted in the United States of America. If the omitted disclosures and the statement of cash flows were included in the financial statements, they might influence the user's conclusions about the Company's financial position, results of operations, and cash flows. Accordingly, the financial statements are not designed for those who are not informed about such matters.

*Fenton & Ross*

Los Angeles, California
January 28, 2016

1

# CONCORD BLUE ENERGY, INC.

**BALANCE SHEET**
**DECEMBER 31, 2015**

## ASSETS

**Current assets:**

| | | |
|---|---|---|
| Cash | $ | 8,361 |
| Deferred tax asset | | 424,700 |
| Due from related party | | 181,506 |
| Total current assets | | 614,567 |

| | | |
|---|---|---|
| **Property, plant & equipment,** net of accumulated depreciation | | 13,493 |
| **Investments** | | 1,440,000 |
| **Due from related party** | | 1,750,000 |
| **Intangible asset** | | 8,360,000 |
| **Other assets** | | 18,027 |
| **Total assets** | $ | 12,196,087 |

## LIABILITIES AND STOCKHOLDERS' EQUITY

**Current liabilities:**

| | | |
|---|---|---|
| Accounts payable and accrued expenses | $ | 958,268 |
| Income tax payable | | 152,426 |
| Convertible debt | | 475,000 |
| Notes payable shareholders | | 1,125,663 |
| Total current liabilities | | 2,711,357 |

**Stockholders' equity:**

| | |
|---|---|
| Common stock, $.01 par value:  1,000,000 shares authorized; | |
| 203,563 shares issued and outstanding | 2,036 |
| Additional paid-in capital | 10,213,964 |
| Retained earnings | (731,270) |
| | 9,484,730 |

| | | |
|---|---|---|
| **Total liabilities and stockholders' equity** | $ | 12,196,087 |

See accountants' compilation report.

Schedule 3.01(q) - 10

2

# CONCORD BLUE ENERGY, INC.

## STATEMENT OF OPERATIONS
## YEAR ENDED DECEMBER 31, 2015

| | Amount |
|---|---|
| **Revenue,** net | $      368,999 |
| **Operating expenses** | 1,399,583 |
| **Loss from operations** | (1,030,584) |
| **Other expense** | |
| Interest, net | (55,368) |
| **Loss before income tax benefit** | (1,085,952) |
| **Income tax benefit** | 378,418 |
| **Net loss** | $      (707,534) |

See accountants' compilation report.

Schedule 3.01(q) - 11

## CONCORD BLUE ENERGY, INC.

**STATEMENT OF STOCKHOLDERS' EQUITY**
**YEAR ENDED DECEMBER 31, 2015**

| | Common stock | | Additional paid-in capital | Retained earnings | Total |
|---|---|---|---|---|---|
| | Shares issued | Amount | | | |
| **Balance, December 31, 2014** | 203,563 | $ 2,036 | $ 10,213,964 | $      (23,736) | $ 10,192,264 |
| **Net loss** | | | - | (707,534) | (707,534) |
| **Balance, December 31, 2015** | 203,563 | $ 2,036 | $ 10,213,964 | $    (731,270) | $ 9,484,730 |

See accountants' compilation report.                                                                     4

## SCHEDULE 3.01(v)

## Intellectual Property Rights

1.    An invention regarding the pyrolysis and reformation of water-containing organic material components for the generation of energy on the basis of which a European patent PCT/EP 2010/007798 concerning a method regarding the pyrolysis and reformation of water-containing organic material components was filed on December 20, 2010.

2.    An invention related to a process for generating energy from organic materials and or biomass on the basis on which a Indian patent 1312/MUM/2009 filed 28th May 2009  and an international application number PCT/IN2009/000644, filed November 13, 2009.

3.    (WO2001021730) METHOD FOR GASIFYING ORGANIC MATERIALS AND MIXTURES OF MATERIALS having a United States National Stage Application filed March 25, 2002 with Application Serial Number:  10/089,012 and issued as U.S. Patent No. 7,077,878.

4.    (WO2008046578) METHOD FOR PRODUCING A PRODUCT GAS RICH IN HYDROGEN having a United States National Stage Application filed May 13, 2009 with Application Serial Number: 12/311,919.

5.    Agreement and Omnibus Amendment, dated as of March 8, 2016, by and between Concord Blue Patent GmbH, Concord Blue Engineering GmbH, Concord Blue Patents, LLC, Concord Blue Energy, Inc., and Concord Blue Development, LLC.

6.    Indemnification Agreement, dated as of March [__], 2016, by and between the Municipal Employees' Retirement System of Michigan, Concord Blue Energy, Inc., Concord Blue Development, LLC, Concord Blue Patents GmbH, and Concord Blue Engineering GmbH.

**SCHEDULE 3.01(w)**

**Leased Real Property**

None at the Closing.  Following the contribution by CBE of its interest in Concord Blue Eagar, LLC, an Arizona limited liability company ("**CB Eagar**") in accordance with the LLC Agreement, real property leased under that certain Lease Agreement, dated as of March 3, 2015, by and between the Town of Eagar and CB Eagar.

**SCHEDULE 3.01(aa)**

**AFFILIATE TRANSACTIONS**

1.  Amended and Restated Project Development Agreement, dated as of Feb 19, 2016, by and between Concord Blue Energy, Inc. and Concord Blue Development, LLC.

2.  1st Amendment to Teaming Agreement, dated as of Dec 18, 2015, by and among Concord Blue Energy, Inc., Concord Blue Development, LLC, and Lockheed Martin Corporation.

3.  Amended and Restated Operating Agreement of Concord Blue Eagar, LLC (f/k/a Concord Blue Development USA, LLC), dated as of May 7, 2012, by and between Concord Blue Energy, Inc. and Western Energy Solution, LLC.