# EXHIBIT 3

**Execution Version**

**AMENDED AND RESTATED
LIMITED LIABILITY COMPANY AGREEMENT**

**OF**

**CONCORD BLUE DEVELOPMENT, LLC**

**DATED AS OF**

**March 21, 2016**

# TABLE OF CONTENTS

**Page**

**ARTICLE 1 DEFINITIONS** ...................................................................................**2**

Section 1.01    Defined Terms .................................................................... 2
Section 1.02    Construction .....................................................................16

**ARTICLE 2 ORGANIZATION** ............................................................................**16**

Section 2.01    Formation .........................................................................16
Section 2.02    Name ................................................................................16
Section 2.03    Purpose; Powers ..............................................................16
Section 2.04    Principal Office ................................................................17
Section 2.05    Registered Office; Registered Agent ...............................17
Section 2.06    Term .................................................................................17
Section 2.07    Title to Property ...............................................................17
Section 2.08    No State Law Partnership .................................................17

**ARTICLE 3 MEMBER CAPITAL** .......................................................................**17**

Section 3.01    Members ...........................................................................17
Section 3.02    Units .................................................................................17
Section 3.03    Reclassifications of Interests ............................................18
Section 3.04    Initial Capital Contributions ............................................18
Section 3.05    LMC Discretionary Payments ..........................................19
Section 3.06    Additional Investments ....................................................19
Section 3.07    Preemptive Rights ............................................................19
Section 3.08    Regulatory Approval ........................................................20
Section 3.09    Return of Contributions ...................................................20
Section 3.10    Advances by Members ......................................................21
Section 3.11    Company-Held Units ........................................................21
Section 3.12    Representations and Warranties of Members ...................21

**ARTICLE 4 ALLOCATIONS** .............................................................................**23**

Section 4.01    Allocation of Net Profits and Net Losses .........................23
Section 4.02    Regulatory Allocations ....................................................23
Section 4.03    Tax Allocations ................................................................25
Section 4.04    Other Tax Provisions .......................................................25

**ARTICLE 5 DISTRIBUTIONS** ..........................................................................**26**

Section 5.01    Distributions.....................................................................26
Section 5.02    Tax Withholding ..............................................................27

**ARTICLE 6 MANAGEMENT** ............................................................................**28**

Section 6.01    Exclusive Management of the Company by the Board ......28
Section 6.02    Election of Managers .......................................................28
Section 6.03    Board Procedures .............................................................30

Section 6.04    Board Supermajority Decisions ..................................................31
Section 6.05    Member Supermajority Decisions ..............................................33
Section 6.06    Fiduciary Duties of Managers ...................................................35
Section 6.07    Payments to Managers ...............................................................35
Section 6.08    Officers .......................................................................................35
Section 6.09    Strategic Plan; Annual Budget ..................................................36
Section 6.10    Key Man Provision .....................................................................36
Section 6.11    Deadlock; Dispute Resolution ...................................................37
Section 6.12    Insurance .....................................................................................38
Section 6.13    Change of Control .......................................................................38

**ARTICLE 7 RIGHTS AND RESTRICTIONS ON MEMBERS ............................40**

Section 7.01    General .........................................................................................40
Section 7.02    Meetings of the Members ............................................................41
Section 7.03    Information; Confidentiality .......................................................42
Section 7.04    Transactions Between the Company and the Members ................43

**ARTICLE 8 INFORMATION RIGHTS AND TAX MATTERS ...........................44**

Section 8.01    Reports; Access...........................................................................44
Section 8.02    Tax Matters Member....................................................................44
Section 8.03    Tax Classification .......................................................................45
Section 8.04    Tax Returns and Elections ..........................................................45
Section 8.05    Waiver of Participation in Tax Proceedings ...............................45

**ARTICLE 9 TRANSFERS...................................................................................46**

Section 9.01    General Transfer Provisions .......................................................46
Section 9.02    Transfers in Violation of Agreement ..........................................47
Section 9.03    Admission of Additional Members..............................................47
Section 9.04    Withdrawing Member ..................................................................48
Section 9.05    Right of First Offer; Right of Last Refusal ................................48
Section 9.06    Legend...........................................................................................49
Section 9.07    Distributions and Allocations in Respect of Transferred Units .......50

**ARTICLE 10 DISSOLUTION AND WINDING UP.........................................50**

Section 10.01   Dissolution Events .....................................................................50
Section 10.02   Winding Up...................................................................................51
Section 10.03   Notice of Dissolution/Termination .............................................51
Section 10.04   Allocations During Period of Liquidation ..................................52
Section 10.05   The Liquidator .............................................................................52
Section 10.06   Form of Liquidating Distributions ..............................................52

**ARTICLE 11 INDEMNIFICATION ...............................................................52**

Section 11.01   Indemnification of Covered Persons...........................................52
Section 11.02   Advancement of Expenses ...........................................................53
Section 11.03   Directors' and Officers' Insurance...............................................53
Section 11.04   Survival of Indemnification and Advancement of Expenses..........53
Section 11.05   Limitation on Indemnification ....................................................53

Section 11.06  Indemnification of Employees and Agents .......................................................54
Section 11.07  Severability of Indemnification ....................................................................54
Section 11.08  Company as Indemnitor of First Resort ........................................................54

**ARTICLE 12 MISCELLANEOUS** .................................................................................**55**

Section 12.01  Notices ..........................................................................................................55
Section 12.02  Binding Effect; Third Party Beneficiaries ....................................................55
Section 12.03  Survival of Terms ..........................................................................................55
Section 12.04  Construction ..................................................................................................55
Section 12.05  Severability ...................................................................................................55
Section 12.06  Governing Law ..............................................................................................56
Section 12.07  Dispute Resolution; Consent to Jurisdiction; Waiver of Jury Trial ................56
Section 12.08  Specific Performance .....................................................................................57
Section 12.09  No Recourse ...................................................................................................57
Section 12.10  Further Assurances.........................................................................................57
Section 12.11  Entire Agreement; Supersedure .....................................................................57
Section 12.12  Effect of Waiver or Consent ..........................................................................57
Section 12.13  Amendment ....................................................................................................58
Section 12.14  Counterparts...................................................................................................58

**<u>EXHIBITS</u>**

Exhibit A     -     Members
Exhibit B     -     Board of Managers
Exhibit C     -     Addendum Agreement
Exhibit D     -     Contributed Projects
Exhibit E     -     Escrow Agreement
Exhibit F     -     Officers

**AMENDED AND RESTATED**
**LIMITED LIABILITY COMPANY AGREEMENT**

THIS AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT (this "**Agreement**"), dated as of March 21, 2016 (the "**Effective Date**"), is entered into by and among Concord Blue Development, LLC, a Delaware limited liability company (the "**Company**"), Concord Blue Energy, Inc., a Delaware corporation ("**CBE**"), Municipal Employees' Retirement System of Michigan, a public nonprofit corporation established and maintained under the laws of the State of Michigan ("**MERS**"), and each other Person who after the Effective Date becomes a Member of the Company and becomes a party to this Agreement.

**RECITALS**

WHEREAS, the Company was organized and formed by filing a Certificate of Formation with the Secretary of State of the State of Delaware on July 24, 2014 (the "**Certificate of Formation**");

WHEREAS, CBE entered into that certain Operating Agreement of Concord Blue Development, LLC, dated as of July 24, 2014 (the "**Original LLC Agreement**");

WHEREAS, on or prior to the Effective Date, CBE has contributed to the Company (i) an amount of cash equal to $2,750,100 and (ii) all of its right, title and interest in and to the equity interests in the Projects set forth in Exhibit D in exchange for the Interest in the Company held by CBE prior to the Effective Date and reclassified as of the Effective Date pursuant to Section 3.03 into 72,459,458 Class B Units;

WHEREAS, substantially concurrently herewith, MERS is executing a Membership Interest Subscription Agreement with the Company (each a "**Subscription Agreement**", and collectively, the "**Subscription Agreements**"), pursuant to which MERS is acquiring Class A Units of the Company;

WHEREAS, the Company has executed that certain Convertible Promissory Note, dated as of July 1, 2015 (the "**LBG Note**"), in the principal amount of $475,000 in favor of Berger Group Holdings, Inc. ("**LBG**"), which LBG Note including accrued and unpaid interest thereon, following the execution hereof will be converted into Class A Units of the Company in accordance with the terms thereof; and

WHEREAS, the parties hereto now desire to amend and restate the Original LLC Agreement in its entirety by adopting and executing this Agreement in order to set forth the Members' rights and obligations and to provide for the management of the Company and its affairs and the conduct of its business.

NOW, THEREFORE, in consideration of the foregoing and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Company and the Members hereby adopt the following as the "limited liability company agreement" (as defined in the Act) of the Company:

## ARTICLE 1
## DEFINITIONS

Section 1.01    Defined Terms.  Capitalized terms used in this Agreement are defined as follows:

"**Accredited Investor**" has the meaning ascribed to such term in Rule 501(a) of Regulation D promulgated under the Securities Act (but excluding for such purpose Rule 501(a)(4)).

"**Act**" means the Delaware Limited Liability Company Act.

"**Additional Contributions**" has the meaning set forth in Section 3.07(a).

"**Additional Investment Units**" has the meaning set forth in Section 3.06.

"**Additional Units**" has the meaning set forth in Section 3.07(a).

"**Adjusted Capital Account Deficit**" means, with respect to any Member for any Taxable Period, the deficit balance, if any, in such Member's Capital Account as of the end of such Taxable Period, after increasing such Capital Account by any amounts that such Member is actually obligated to restore or is deemed obligated to restore as described in Treasury Regulation Section 1.704-1(b)(2)(ii)(c) or the penultimate sentence of either Treasury Regulation Section 1.704-2(g)(1) or Treasury Regulation Section 1.704-2(i)(5), and reducing such Capital Account by any amounts described in Treasury Regulation Section 1.704-1(b)(2)(ii)(d)(4), (5) and (6).

"**Affiliate**" means, with respect to any Person (a) any Person directly or indirectly controlling, controlled by or under common control with such Person (each, to the extent not an individual, an "**Affiliated Entity**"), (b) any officer, director, general partner, manager or trustee of such Person or (c) any Person who is an officer, director, general partner, manager or trustee of any Person described in clauses (a) or (b) of this sentence.  For purposes of this definition, the terms "controlling," "controlled," "controlled by" or "under common control with" will mean the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract or otherwise, or the power to elect at least 50% of the directors, managers, general partners or Persons exercising similar authority with respect to such Person.  Notwithstanding the foregoing, neither the Company nor its Subsidiaries will be deemed to be an Affiliate of any Member.

"**Affiliated Entity**" has the meaning set forth in clause (a) of the definition of Affiliate.

"**Agreement**" has the meaning set forth in the preamble to this Agreement.

"**Annual Budget**" has the meaning set forth in Section 6.09.

"**Anti-Dilution Net Cash Percentage**" means, with respect to any Member as of any date of determination, the percentage of Net Cash that would be distributable to such Member

2

pursuant to Section 5.01(a)(i)(D), assuming for these purposes that the amounts required to be distributed pursuant to Section 5.01(a)(i)(A) through Section 5.01(a)(i)(C) had already been distributed.

"**Assumed Tax Rate**" shall mean the highest marginal combined U.S. federal, state and local income Tax rate (including the tax rate applicable pursuant to Section 1411 of the Code) applicable to an individual residing in Los Angeles, California, taking into account the character (e.g., long-term or short-term capital gain or ordinary or tax-exempt) of the applicable income and the deductibility of state and local income taxes for U.S. federal income Tax purposes.

"**Board**" has the meaning set forth in Section 6.01(a).

"**Business**" means the business of the Company as described in Section 2.03.

"**Business Day**" means any day other than a Saturday, Sunday, any federal holiday or day on which banking institutions in the States of New York or California are authorized or required by Law or other governmental action to close.

"**Capital Account**" means the Capital Account maintained for each Member on the Company's books and records in accordance with the following provisions:

(a)    To each Member's Capital Account there shall be added (i) such Member's Capital Contributions, (ii) such Member's allocable share of Net Profits and any items in the nature of income or gain that are specially allocated to such Member pursuant to Article 4 hereof or other provisions of this Agreement, and (iii) the amount of any Company liabilities assumed by such Member or which are secured by any property distributed to such Member.

(b)    From each Member's Capital Account there shall be subtracted (i) the amount of (A) cash and (B) the Gross Asset Value(s) of any Company asset(s) (other than cash) distributed to such Member pursuant to any provision of this Agreement, (ii) such Member's allocable share of Net Losses and any other items in the nature of expenses or losses that are specially allocated to such Member pursuant to Article 4 or other provisions of this Agreement, and (iii) liabilities of such Member assumed by the Company or which are secured by any property contributed by such Member to the Company.

(c)    In the event any Unit is transferred in accordance with the terms of this Agreement, the transferee shall succeed to the Capital Account of the transferor to the extent it relates to the transferred Unit.

(d)    In determining the amount of any liability for purposes of subparagraphs (a) and (b) above, there shall be taken into account Section 752(c) of the Code and any other applicable provisions of the Code and Treasury Regulations.

(e)    The foregoing provisions and the other provisions of this Agreement relating to the maintenance of Capital Accounts are intended to comply with Treasury Regulation Sections 1.704-1(b) and 1.704-2 and shall be interpreted and applied in a manner consistent with such Treasury Regulations.  In the event that the Board shall determine that it is prudent to modify the

DWT 29010545v3 0106299-000001
ACTIVE 209496623v.20

manner in which the Capital Accounts, or any additions or subtractions thereto, are computed in order to comply with such Treasury Regulations, the Board may make such modification, provided that it is not likely to have a material effect on the amounts distributable to any Member pursuant to <u>Section 10.02</u> hereof upon the dissolution of the Company.

"**Capital Contributions**" means, with respect to any Member, the total amount of cash and the initial Gross Asset Value of property other than cash (as reasonably determined by the Board in good faith) contributed to the capital of the Company by such Member, whether as an Initial Capital Contribution, as an Additional Contribution or as an additional Capital Contribution.

"**Cause**" shall mean, with respect to any Manager, that such Manager (a) has engaged in dishonesty related to the Company's or a Company Affiliate's business, or has committed any fraud or felony or other crime (whether or not related to the Company's business); or (b) the Member has engaged in willful misconduct in connection with his, her or its duties and obligations as a Manager.

"**CB Germany**" means Concord Blue Engineering GmbH, a German company.

"**CBE**" has the meaning set forth in the preamble to this Agreement.

"**CBE Managers**" has the meaning set forth in <u>Section 6.02(a)(i)</u>.

"**CBR**" means the Concord Blue Reformer technology developed by CBE and its Affiliates.

"**Certificate of Formation**" has the meaning set forth in the recitals to this Agreement.

"**Chairman**" has the meaning set forth in <u>Section 6.03(a)(i)</u>.

"**Change of Control Event**" has the meaning set forth in <u>Section 6.13</u>.

"**Change of Control Notice**" has the meaning set forth in <u>Section 6.13</u>.

"**Class A Member**" means to the extent that a Member holds Class A Units, such Member is a Class A Member. Initially, on the Effective Date, MERS shall be the only Class A Member. A Class A Member may also hold Class B Units, and to such extent, is also a Class B Member.

"**Class A Percentage Interest**" means, with respect to any Class A Member and any Class A Units, a percentage equal to the number of Class A Units held by such Class A Member divided by the aggregate number of Class A Units outstanding at the time of determination.

"**Class A Units**" has the meaning set forth in <u>Section 3.02(a)(i)</u>.

"**Class B Member**" means to the extent that a Member holds Class B Units, such Member is a Class B Member. Initially, on the Effective Date, CBE shall be the only Class B

DWT 29010545v3 0106299-000001
ACTIVE 209496623v.20

Member.  A Class B Member may also hold Class A Units, and to such extent, is also a Class A Member.

"**Class B Percentage Interest**" means, with respect to any Class B Member and any Class B Units, a percentage equal to the number of Class B Units held by such Class B Member divided by the aggregate number of Class B Units outstanding at the time of determination.

"**Class B Units**" has the meaning set forth in Section 3.02(a)(ii).

"**Code**" means the United States Internal Revenue Code of 1986, as amended.

"**Company**" has the meaning set forth in the preamble to this Agreement.

"**Company Minimum Gain**" has the meaning set forth in Treasury Regulation Sections 1.704-2(b)(2) and 1.704-2(d)(1) for the phrase "partnership minimum gain."

"**Company Notice Date**" has the meaning set forth in Section 9.05(b)(i).

"**Company ROFR**" means the right, but not an obligation, of the Company to purchase, pursuant to Section 9.05(b), all or any portion of ROFR Units with respect to a proposed Transfer, on the terms and conditions specified in the ROFR Notice.

"**Confidential Information**" has the meaning set forth in Section 7.03(e).

"**Core Projects**" has the meaning set forth in Section 5.02 of the Subscription Agreement.

"**Core Project Proceeds**" means all distributions, dividends, interest and payments of cash, Interests or other property paid to a Class A Member with respect to or in connection with a Core Project; provided, that Core Project Proceeds shall not include (a) any distributions, dividends, interest and payments of cash, Interests or other property paid or made to a Class A Member by the Company in respect of such Class A Member's Units, or (b) payments made to a Class A Member in exchange for goods or services provided by such Class A Member or its Affiliate with respect to such Core Project or (c) any distributions, dividends, interest and payments of cash, interests or other property paid to a Class A Member in respect of shares or participations or units not granted pursuant to Section 5.02 of the Subscription Agreement.

"**Covered Person**" has the meaning set forth in Section 11.01.

"**Deadlock**" has the meaning set forth in Section 6.11(a).

"**Depreciation**" means, for each Taxable Period, an amount equal to the depreciation, amortization or other cost recovery deduction allowable for U.S. federal income Tax purposes with respect to an asset for such Taxable Period, except that with respect to any such asset the Gross Asset Value of which differs from its adjusted Tax basis at the beginning of such Taxable Period, Depreciation shall be an amount that bears the same ratio to such beginning Gross Asset Value as the U.S. federal income Tax depreciation, amortization or other cost recovery deduction

DWT 29010545v3 0106299-000001
ACTIVE 209496623v.20

for such year or other period bears to such beginning adjusted Tax basis; <u>provided</u>, <u>however</u>, that if the U.S. federal income Tax depreciation, amortization or other cost recovery deduction for such year or other period is zero, Depreciation shall be determined with reference to such beginning Gross Asset Value using any reasonable method selected by the Board.

"**Derived Units**" means, with reference to a Member at any time, the Units owned by such Member as of the Effective Date and any Units derived therefrom (whether as a result of the exercise of preemptive rights associated with such Units, the split, combination or other change to such Units or otherwise), whether owned by such Member or another Member at such time.

"**Discretionary Payments**" has the meaning set forth in the Teaming Agreement Amendment.

"**Dispute**" has the meaning set forth in <u>Section 12.06</u>.

"**Disputing Members**" has the meaning set forth in <u>Section 6.11</u>.

"**Dissolution Event**" has the meaning set forth in <u>Section 10.01(a)</u>.

"**Effective Date**" has the meaning set forth in the preamble to this Agreement.

"**Effective Date Unit Price**" has the meaning set forth in <u>Section 3.04(a)</u>.

"**Escrow Account**" shall mean the account established pursuant to the Escrow Agreement in which the Escrow Amount shall be deposited.

"**Escrow Agent**" shall mean Wells Fargo Bank, National Association.

"**Escrow Agreement**" shall mean the Escrow Agreement to be entered into on the Effective Date among MERS, CBE, the Company and the Escrow Agent in substantially the form attached hereto as <u>Exhibit E</u>, that shall regulate the disbursement of the Escrow Amount from the Escrow Account.

"**Escrow Amount**" shall mean $25,000,000.

"**Excluded Issuance**" means the issuance of (a) Class A Units to MERS or LBG pursuant to <u>Section 3.05</u>, (b) Class B Units pursuant to <u>Section 3.06</u> (other than Additional Investment Units) (c) Interests in the Company or any Subsidiary issued to any Person that is not a Member or an Affiliate thereof as consideration in any acquisition or other strategic transaction (such as a joint venture, marketing or distribution arrangement or technology transfer or development arrangement) approved as an Excluded Issuance in accordance with this Agreement, (d) Interests in the Company or any Subsidiary issued to the Company or any wholly owned Subsidiary, (e) Interests in the Company or any Subsidiary issued in connection with any share split, stock dividend, distribution, reclassification or recapitalization of the Company approved as an Excluded Issuance in accordance with this Agreement, (f) any Interests or options to purchase Interests in the Company or any Subsidiary, restricted awards, performance awards, phantom

6

interests or any other Interest-based awards (including Profits Units) issued to an employee or other service provider of the Company or any Subsidiary under a management incentive plan implemented and approved as an Excluded Issuance in accordance with this Agreement, (g) any Interests in the Company or any Subsidiary issued to any Person that is not a Member or an Affiliate thereof for nominal or no consideration as an incentive to a creditor of the Company or any Subsidiary in connection with the incurrence of indebtedness and that do not represent a significant portion of the value of the associated transaction, but excluding Interests issued as in-kind interest paid by the Company on indebtedness of the Company approved as an Excluded Issuance in accordance with this Agreement, (h) Class A Units to MERS pursuant to Section 3.04(b), (i) Units issued to finance the redemption of MERS Units by the Company pursuant to Section 3.09(c), or (j) the issuance of Class A Units to LBG upon conversion of the LBG Note.

"**Fair Market Value**" means, as of any time with respect to any asset, the fair market value of such asset, at such time, as determined reasonably and in good faith by the Board (subject to Section 6.04(j)).

"**Fiscal Year**" means any twelve month period commencing on January 1 and ending on either (a) December 31 or (b) the date on which all Property is distributed to the Members pursuant to Article 10.

"**Financial Closing**" has the meaning set forth in Section 3.09(b).

"**Founder**" means Christopher Thannhaeuser.

"**GAAP**" means United States generally accepted accounting principles consistently applied.

"**Governmental Entity**" means any court or tribunal in any jurisdiction (domestic or foreign) or any governmental or regulatory body, agency, department, commission, board, bureau or other authority or instrumentality (domestic or foreign).

"**Gross Asset Value**" means, with respect to any asset of the Company, the asset's adjusted basis for U.S. federal income Tax purposes, except as follows:

(a)    The initial Gross Asset Value of any asset contributed by a Member to the Company shall be the gross Fair Market Value of such asset.

(b)    The Gross Asset Values of all Company assets will be adjusted to equal their respective gross Fair Market Value as of the following times:

(i)    the acquisition of additional Units by a new or existing Member in exchange for more than a de minimis Capital Contribution to the Company;

(ii)    the distribution by the Company to a Member of more than a de minimis amount of Company assets as consideration for Units;

7

(iii)    the liquidation or dissolution of the Company within the meaning of Treasury Regulation Section 1.704-1(b)(2)(ii)(g); and

(iv)    the grant of any Units (other than a de minimis number of Units) as consideration for the provision of services to or for the benefit of the Company, provided that an adjustment described in clause (i), (ii) or (iv) of this paragraph (b) will be made only if the Board reasonably determines that such adjustment is necessary or appropriate to reflect the relative interests of the Members of the Company.

(c)    The Gross Asset Value of any Company asset distributed to a Member shall be adjusted to equal the Fair Market Value of such asset on the date of distribution.

(d)    The Gross Asset Values of Company assets shall be increased (or decreased) to reflect any adjustments to the adjusted basis of such assets pursuant to Code Section 734(b) or Section 743(b) of the Code, but only to the extent that such adjustments are taken into account in determining Capital Accounts pursuant to Treasury Regulation Section 1.704-1(b)(2)(iv)(m) and paragraph (e) of the definition of "Net Profits" or "Net Losses" or Section 4.02(d); provided, however, that Gross Asset Values shall not be adjusted pursuant to this subparagraph (d) to the extent that an adjustment pursuant to subparagraph (b) above is made in connection with a transaction that would otherwise result in an adjustment pursuant to this subparagraph (d).

If the Gross Asset Value of an asset has been determined or adjusted pursuant to paragraph (a), (b) or (d) above, such Gross Asset Value will thereafter be adjusted by the Depreciation taken into account with respect to such asset.

"**HSR Act**" has the meaning set forth in Section 3.08.

"**Initial Capital Contribution**" means the Capital Contributions described in Section 3.04.

"**Interest**" means, with respect to any Person: (a) capital stock, membership interests (including Units), partnership interests, other equity interests, rights to profits or revenue and any other similar interest of such Person; (b) any security or other interest convertible into or exchangeable or exercisable for any of the foregoing, and any and all warrants, rights or options to purchase, or obligations of a Person to sell, any of the foregoing, whether voting or nonvoting, and whether or not such shares, warrants, options, rights or other interests are authorized or otherwise existing on any date of determination; and (c) any right (contingent or otherwise) to acquire any of the foregoing.

"**IPO**" means any underwritten initial public offering by the IPO Issuer of equity securities pursuant to an effective registration statement under the Securities Act or the consummation of a similar initial public offering by the IPO Issuer pursuant to a comparable process under applicable foreign securities Laws, provided that an IPO will not include an offering made in connection with a business acquisition or combination pursuant to a registration statement on Form S-4 or any similar form, or an employee benefit plan pursuant to a registration statement on Form S-8 or any similar form.

"**IPO Issuer**" means (a) the Company or (b) an Affiliated Entity of the Company or a Subsidiary of the Company that will be the issuer in an IPO.

"**IRR**" means the pre-tax, compounded annual internal rate of return, calculated using the "XIRR" worksheet function as currently embedded in Microsoft Excel or any successor software and/or function thereto.

"**Law**" means any applicable federal, state or local order, writ, injunction, judgment, settlement, award, decree, statute, law (including common law), rule or regulation.

"**LBG**" has the meaning set forth in the recitals to this Agreement.

"**LBG Note**" has the meaning set forth in the recitals to this Agreement.

"**Lien**" means any lien, pledge, condemnation award, claim, restriction, easement, covenant, exception to  title, charge, preferential purchase right, equity, security interest, exclusive license, mortgage, deed of trust, hypothecation or encumbrance of any nature whatsoever including a statutory landlord lien.

"**Liquidator**" has the meaning set forth in Section 10.05(a).

"**LMC**" means Lockheed Martin Corporation, a Maryland corporation, acting through its Missile and Fire Control business unit, and its successors and permitted assigns under the Teaming Agreement (including any wholly-owned affiliate of Lockheed Martin Corporation elected pursuant to the terms of Teaming Agreement Amendment).

"**LMC Performance Bonus Payments**" means, as of any date of determination, the cash payments required to be paid to LMC pursuant to Section 3 of the Teaming Agreement Amendment.

"**LMC Performance Bonus Percentage**" means, as of any date of determination, the designated percentage required to be paid to LMC with respect to the LMC Performance Bonus Payments pursuant to Section 3 of the Teaming Agreement Amendment.

"**Major Holder Approval**" means the approval (whether by affirmative vote or written consent) of (i) MERS (so long as MERS has not transferred any of the Class A Units held by MERS on the Effective Date) and CBE (so long as CBE continues to hold at least an aggregate 15% Percentage Interest) and (ii) a majority of the Managers then serving on the Board.

"**Majority-in-Interest**" means the Members who have aggregate Voting Percentage Interests that are greater than 50% of all Voting Percentage Interests or, if used in relationship to a specified group of Units, the Members who have aggregate Voting Percentage Interests in such specified group that are greater than 50% of the aggregate Voting Percentage Interests of all Units in such group.

"**Manager**" has the meaning set forth in Section 6.02(a).

9

"**Material Adverse Effect**" means a material adverse effect on the business, assets, financial condition or results of operations of the Company excluding any effect resulting from (i) any change in political, social, economic, industry, market or financial conditions (including changes in the electric generating, transmission or distribution industry, the wholesale or retail markets for electrical power, the general state of the energy industry, the transmission system, interest rates, consumer confidence, outbreak of hostilities, terrorist activities or war), of general applicability in the regions in which any Project developed by the Company is located, (ii) any change in applicable Law or regulatory policy, (iii) effects of weather or meteorological events, (iv) strikes, work stoppages or other labor disturbances or (v) the execution or delivery of this Agreement, the Subscription Agreements or the transactions contemplated hereby or thereby or the announcement thereof.

"**Member**" means any Person (a) who is referred to as a Member on <u>Exhibit A</u> to this Agreement or who has become a new Member pursuant to the terms of this Agreement and (b) who has not ceased to be a Member, including Class A Members and Class B Members.

"**Member Indemnitors**" has the meaning set forth in <u>Section 11.08</u>.

"**Member Minimum Gain**" means an amount determined in accordance with Treasury Regulation Section 1.704-2(i) with respect to "partner minimum gain."

"**Member Nonrecourse Debt**" has the meaning set forth in Treasury Regulation Section 1.704-2(b)(4) for the phrase "partner nonrecourse debt."

"**Member Nonrecourse Deductions**" has the meaning set forth in Treasury Regulation Section 1.704-2(i) for the phrase "partner nonrecourse deductions."

"**MERS**" has the meaning set forth in the preamble to this Agreement.

"**MERS Managers**" has the meaning set forth in <u>Section 6.02(a)(i)</u>.

"**Net Cash**" means the gross cash proceeds from Company operations and the sale of its assets after the payment of all expenses and other charges (including any LMC Performance Bonus Payments), less the portion thereof used to pay or establish reserves, all as determined by the Board.

"**Net Profits**" or "**Net Losses**" means, for each Taxable Period, an amount equal to the Company's taxable income or loss for such Taxable Period determined in accordance with Section 703(a) of the Code (for this purpose, all items of income, gain, loss, deduction or credit required to be stated separately pursuant to Section 703(a)(1) of the Code shall be included in taxable income or loss), with the following adjustments:

(a)      any income of the Company that is exempt from U.S. federal income Tax and not otherwise taken into account in computing Net Profits or Net Losses pursuant to this definition of Net Profits and Net Losses shall increase the amount of such income and/or decrease the amount of such loss;

DWT 29010545v3 0106299-000001
ACTIVE 209496623v.20

(b)      any expenditure of the Company described in Section 705(a)(2)(B) of the Code or treated as Code Section 705(a)(2)(B) expenditures pursuant to Treasury Regulation Section 1.704-1(b)(2)(iv)(i), and not otherwise taken into account in computing Net Profits or Net Losses pursuant to this definition of Net Profits and Net Losses, shall decrease the amount of such income and/or increase the amount of such loss;

(c)      gain or loss resulting from any taxable disposition of Company assets shall be computed by reference to the Gross Asset Value of the Company assets disposed of, notwithstanding that the adjusted Tax basis of such Company assets differs from its Gross Asset Value;

(d)      in lieu of the depreciation, amortization and other cost recovery deductions taken into account in computing such income or loss, there shall be taken into account Depreciation for such Taxable Period;

(e)      to the extent an adjustment to the adjusted Tax basis of any asset included in Company assets pursuant to Section 734(b) or Section 743(b) of the Code is required pursuant to Treasury Regulation Section 1.704-1(b)(2)(iv)(m) to be taken into account in determining Capital Accounts as a result of a distribution other than in liquidation of a Member's interest in the Company, the amount of such adjustment shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases the basis of the asset) from the disposition of the asset and shall be taken into account for the purposes of computing Net Profits and Net Losses;

(f)      if the Gross Asset Value of any Company asset is adjusted in accordance with subparagraph (b) or subparagraph (c) of the definition of "Gross Asset Value" above, the amount of such adjustment shall be taken into account in the taxable year of such adjustment as gain or loss from the disposition of such asset for purposes of computing Net Profits or Net Losses;  and

(g)      notwithstanding any other provision of this definition of Net Profits and Net Losses, any items that are specially allocated pursuant to Section 4.02 hereof shall not be taken into account in computing Net Profits or Net Losses.  The amounts of the items of Company income, gain, loss or deduction available to be specially allocated pursuant to Section 4.02 hereof shall be determined by applying rules analogous to those set forth in this definition of Net Profits and Net Losses.

"**New Majority Shareholder**" has the meaning set forth in Section 6.13.

"**Nonrecourse Deductions**" has the meaning set forth in Treasury Regulation Sections 1.704-2(b)(1) and 1.704-2(c).

"**Nonrecourse Liability**" has the meaning set forth in Treasury Regulation Sections 1.704-2(b)(3) and 1.752-1(a)(2).

"**Non-Sanctioned Transferee**" means any Person other than: (a) any Person subject to any sanctions administered by the U.S. Office of Foreign Assets Control, including any "Specially Designated National and Blocked Person" or similar sanctions, (b) any Person

DWT 29010545v3 0106299-000001
ACTIVE 209496623v.20

domiciled or organized in a jurisdiction subject to any sanctions administered by the U.S. Office of Foreign Assets Control or made subject to special measures by the Financial Crimes Enforcement Network of the U.S. Department of Treasury or (c) any Person that is owned or controlled, directly or indirectly, by any Person described in any of clauses (a) and (b) above.

"**Non-Voting Participant**" has the meaning set forth in <u>Section 6.02(b)</u>.

"**Officer**" has the meaning set forth in <u>Section 6.08</u>.

"**Organizational Documents**" means: (a) the articles or certificate of incorporation and the bylaws of a corporation; (b) the articles or certificate of formation and regulations and company agreement of a limited liability company; (c) the partnership agreement and any statement of partnership of a general or limited liability partnership; (d) the limited partnership agreement and the certificate of limited partnership of a limited partnership; (e) any charter or similar document adopted or filed in connection with the creation, formation or organization of a Person; and (f) any amendment to any of the foregoing.

"**Original LLC Agreement**" has the meaning set forth in the recitals to this Agreement.

"**Percentage Interest**" means, with respect to any Member and any Units, a percentage equal to the number of Units held by such Member divided by the aggregate number of Units outstanding at the time of determination.  The Members' respective Percentage Interests as of the Effective Date are specified opposite each Member's name on <u>Exhibit A</u>.  <u>Exhibit A</u> may be amended by the Board to reflect any increases and decreases in the Members' Percentage Interests arising from the direct Transfer, issuance or forfeiture of Units from time to time after the Effective Date in accordance with this Agreement.

"**Percentage Interest Share**" means, with respect to any Member and any offering of Units, such number of Units as is equal to the product of such Member's Percentage Interest (including in the calculation of such Member's Percentage Interest any Additional Investment Units issued to such Member) and the number of such Units.

"**Permitted Encumbrances**" means (a) liens, deposits or pledges created pursuant to this Agreement or the Subscription Agreement, (b) liens, deposits or pledges to secure statutory obligations relating to worker's compensation and/or unemployment insurance or other social security legislation, (c) liens, deposits or pledges arising out of judgments or awards so long as enforcement of any such lien has been stayed and an appeal or Proceeding for review is being prosecuted in good faith and in connection with which security has been provided or are fully covered by insurance, (d) liens, deposits or pledges for Taxes not yet due or that are being contested in good faith by appropriate Proceedings and are bonded or for which adequate reserves have been established in accordance with GAAP, (e) carriers', warehousemen's, mechanics', materialmen's, repairmen's, supplier's, construction, employees', contractors', operators' or other similar liens or charges securing the payment of expenses not yet due and payable that were incurred in the ordinary course of business or which are the subject of a good faith contest and for which security for such lien has otherwise been provided in accordance with GAAP, (f) trade contracts or other obligations of a like nature incurred in the ordinary course of business, (g) obligations or duties to any Governmental Entity arising in the ordinary course of

12

business (including under licenses and permits held and under all applicable laws, rules, regulations and orders of any Governmental Entity), (h) liens, deposits or pledges to secure statutory obligations in the ordinary course of business (other than for the repayment of borrowed money), and (i) all other encumbrances and exceptions that are incurred in the ordinary course of business that, in the case of this clause (i), are not incurred for borrowed money, do not exceed $25,000 in the aggregate and do not have a Material Adverse Effect on either the use of any material assets of the Company as currently used or the value of any such assets.

"**Person**" means any individual, company, partnership (whether general or limited), limited liability company, corporation, trust, estate, association, nominee, Governmental Entity or other entity.

"**Preemptive Notice**" has the meaning set forth in Section 3.07(b).

"**Preemptive Period**" has the meaning set forth in Section 3.07(b).

"**Preemptive Purchaser**" has the meaning set forth in Section 3.07(b).

"**Preemptive Rights Holder**" means any Member that certifies to the Company's reasonable satisfaction that such Member is an Accredited Investor.

"**Proceedings**" means all proceedings, actions, claims, suits, investigations and inquiries by or before any arbitrator or Governmental Entity.

"**Project**" means a facility incorporating the CBR and related CBR equipment used to convert biomass and various forms of waste materials into energy and other products.

"**Property**" means all real and personal property owned or acquired by the Company or its Subsidiaries, including cash, and any improvements thereto, and will include both tangible and intangible property.

"**Proposed Purchaser**" has the meaning set forth in Section 3.07(a).

"**Put Option**" has the meaning set forth in Section 6.13.

"**Put Period**" has the meaning set forth in Section 6.13.

"**Put Price**" has the meaning set forth in Section 6.13.

"**Put Units**" has the meaning set forth in Section 6.13.

"**Responding Members**" has the meaning set forth in Section 6.11.

"**ROFR Notice**" has the meaning set forth in Section 9.05(b)(i).

"**ROFR Notice Period**" has the meaning set forth in Section 9.05(b)(i).

"**ROFR Offer**" has the meaning set forth in Section 9.05(b)(ii).

DWT 29010545v3 0106299-000001
ACTIVE 209496623v.20

"**ROFR Offeror**" has the meaning set forth in Section 9.05(a).

"**ROFR Price**" has the meaning set forth in Section 9.05(b)(i).

"**ROFR Purchaser**" has the meaning set forth in Section 9.05(b)(ii).

"**ROFR Units**" has the meaning set forth in Section 9.05(a).

"**Secondary Notice**" has the meaning set forth in Section 9.05(b)(i).

"**Secondary Notice Date**" has the meaning set forth in Section 9.05(b)(ii).

"**Securities Act**" means the Securities Act of 1933.

"**Strategic Plan**" has the meaning set forth in Section 6.09.

"**Subscription Agreement**" has the meaning set forth in the recitals to this Agreement.

"**Subscription Price**" has the meaning set forth in the Subscription Agreement.

"**Subsidiary**" means (a) any corporation, partnership, limited liability company or other entity in which the Company or any direct or indirect Subsidiary of the Company owns directly or indirectly, with power to vote a majority of the Interests having ordinary voting power to elect a majority of the board of directors or other Persons performing similar functions, (b) a partnership in which the Company or any direct or indirect Subsidiary of the Company is a general partner or (c) a limited liability company in which the Company or any direct or indirect Subsidiary of the Company is a managing member or manager.

"**Supermajority Board Vote**" has the meaning specified in Section 6.04.

"**Supermajority Member Vote**" has the meaning specified in Section 6.05.

"**Tax**" means any U.S. federal, state or local or foreign net income, alternative or add-on minimum, gross income, gross receipts, commercial activity, property, sales, use, transfer, gains, license, excise, employment, payroll, withholding or minimum Tax, or any Tax custom, duty, governmental fee or other like assessment or charge of any kind whatsoever, together with any interest or any penalty, addition to Tax or additional amount imposed by any Governmental Entity.

"**Tax Advances**" has the meaning set forth in Section 5.01(b).

"**Tax Distributions**" has the meaning specified in Section 5.01(b).

"**Tax Information**" has the meaning specified in Section 8.01(c).

"**Tax Matters Member**" has the meaning set forth in Section 8.02.

14

"**Taxable Period**" means (a) the period commencing on the date hereof and ending on December 31, 2015, (b) any subsequent period commencing on January 1 and ending on the following December 31, or (c) any portion of the period described in clause (b) for which the Company is required to allocate Net Profit, Net Loss or items of Company income, gain, loss or deduction pursuant to Article 4.

"**Teaming Agreement**" means that certain Teaming Agreement, dated as of July 25, 2013, by and between LMC and CBE, as amended by the Teaming Agreement Amendment and as further amended, amended and restated, supplemented or otherwise modified from time to time.

"**Teaming Agreement Amendment**" means that certain First Amendment to Teaming Agreement, dated as of December 18, 2015, by and among LMC, CBE and the Company.

"**Third Party**" means (a) with respect to any Person, any other Person (whether or not another Member) that is not an Affiliate of such Person and (b) with respect to the Company, any other Person that is not an Affiliate of the Company or of any Member or Manager.

"**Transfer**" as a noun, means any voluntary or involuntary direct or indirect transfer, sale, pledge or hypothecation or other disposition and, as a verb, means voluntarily or involuntarily to directly or indirectly transfer, sell, pledge or hypothecate or otherwise dispose of, including any disposition of the economic value or other risk of ownership through hedging transactions or derivatives involving any Interests.

"**Treasury Regulations**" means the income tax regulations, including temporary regulations, promulgated under the Code.

"**Unit**" means a unit representing a fractional part of the Interests of the Members and shall include all types and classes of Units, including the Class A Units and the Class B Units; provided, that any type or class of Unit shall have the privileges, preference, duties, liabilities, obligations and rights set forth in this Agreement and the Interests represented by such type or class or series of Unit shall be determined in accordance with such privileges, preference, duties, liabilities, obligations and rights.

"**Voting Percentage Interest**" means, with respect to any Member as of any date of determination, the Percentage Interest such Member would hold if on such date all amounts in the Escrow Account were released and contributed to the Company as a Capital Contribution by MERS and MERS were issued Class A Units, in each case, in accordance with Section 3.04(b). The Members' respective Voting Percentage Interests as of the Effective Date are specified opposite each Member's name on Exhibit A.  Exhibit A may be amended by the Board to reflect any increases and decreases in the Members' Voting Percentage Interests arising from the Transfer, issuance or forfeiture of Units, or release of amounts in the Escrow Account to MERS, from time to time after the Effective Date in accordance with this Agreement.  For the avoidance of doubt, the Voting Percentage Interest shall not be based on the Units or portions thereof held by a Member or its Affiliates.

DWT 29010545v3 0106299-000001
ACTIVE 209496623v.20

Section 1.02   Construction.  Unless the context requires otherwise:  (a) words in the singular form will be construed to include the plural and vice versa; (b) the term "including" will be construed to be expansive rather than limiting in nature and to mean "including, without limitation"; (c) references to Articles and Sections refer to Articles and Sections of this Agreement; (d) the words "this Agreement," "herein," "hereof," "hereby," "hereunder" and words of similar import refer to this Agreement as a whole and not to any particular subdivision unless expressly so limited; (e) references to Exhibits are to the Exhibits attached to this Agreement, each of which is hereby incorporated herein and made a part hereof for all purposes as if set forth in full herein; (f) the term "or" is not exclusive and will have the inclusive meaning of "and/or"; (g) derivative forms of defined terms will have correlative meanings; (h) references to any Law or statute will include all rules and regulations promulgated thereunder, and references to any Law or statute will be construed as including any legal and statutory provisions consolidating, amending, succeeding or replacing the applicable Law or statute; (i) references to any document will include any amendment, restatement or supplement to, or replacement or novation of, such document but disregarding any amendment, restatement, supplement, replacement or novation made in breach of this Agreement; (j) references to a Person include such Person's successors and permitted assigns; (k) references to "days" are to calendar days unless otherwise indicated; and (l) the Article, Section and other headings contained in this Agreement are for reference purposes only and are not intended to describe, interpret, define, or limit the scope, extent, or intent of this Agreement or any provision hereof.

## ARTICLE 2
## ORGANIZATION

Section 2.01   Formation.  The Company was formed as a Delaware limited liability company by the filing of the Certificate of Formation under and pursuant to the Act and upon the terms and conditions set forth in this Agreement.  The fact that the Certificate of Formation is on file in the office of the Secretary of State of Delaware will constitute notice that the Company is a limited liability company.  The rights and liabilities of the Members will be as provided under the Act, the Certificate of Formation and this Agreement.

Section 2.02   Name. The name of the Company is "Concord Blue Development, LLC". All Company business will be conducted in the name of "Concord Blue Development, LLC" or such other name that complies with the Act, as the Board may select from time to time.

Section 2.03   Purpose; Powers. The purposes of the Company are limited to, directly or through one or more special purpose vehicles or holding companies, (i) engaging in the construction, lease and ownership, and the operation, management, maintenance, financing and refinancing of Projects; (ii) to acquire, own, hold or dispose of equity interests in entities directly or indirectly holding assets of Projects; (iii) entering into, complying with and performing the various agreements evidencing, necessitated by or arising in connection with Projects, and all incidental, ancillary, necessary or appropriate documents related thereto; (iv) engaging in the purchase, ownership, use, transmission, marketing and sale of any input, output, right, credit, attribute or allowance associated therewith; (v) exercising any power and taking any action as are considered necessary or desirable in connection with the administration of the Company's affairs and the administration of Projects, including the maintaining of records, the engagement of

16

professional advisors and consultants, the establishment of bank accounts, and prosecution or defense of legal actions; and (vi) taking all actions incidental, ancillary, necessary or appropriate to the foregoing that may be engaged in by a limited liability company formed under the Act.

Section 2.04    Principal Office.  The principal office of the Company is located at 12424 Wilshire Blvd., Suite 660, Los Angeles, CA 90025, or such other place as may from time to time be determined by the Board.  The Board will give prompt notice of any such change to each of the Members.

Section 2.05    Registered Office; Registered Agent.  The registered office and the name of the registered agent of the Company will be the office of the initial registered agent named in the Certificate of Formation or such other office (which need not be a place of business of the Company) as the Board may designate from time to time in the manner provided by the Act.

Section 2.06    Term.  The Company will continue in existence perpetually until the Company is dissolved in accordance with the provisions of this Agreement.

Section 2.07    Title to Property.  All Property owned by the Company will be owned by the Company as an entity and no Member will have any ownership interest in such Property in its individual capacity, and each Member's interest in the Company will be personal property for all purposes.  The Company will hold title to all of its Property in the name of the Company and not in the name of any Member.

Section 2.08    No State Law Partnership.  Except as set forth in Section 8.03, the Members intend that the Company will not be a partnership (including a limited partnership) or joint venture for any purpose, and that no Member or any Manager will, by virtue of this Agreement, be a partner of, or in a joint venture with, any other Member or Manager.

## ARTICLE 3
## MEMBER CAPITAL

Section 3.01    Members.  The Persons listed on Exhibit A as Members are the sole Members of the Company as of the Effective Date.

Section 3.02    Units.

(a)    Unit Designations.  The Interests in the Company shall consist solely of Units issued by the Company to the Members, which Units shall be uncertificated. The Units shall initially consist of two classes:

(i)    a class of Units designated as "**Class A Units**" that will have the rights and interests set forth in this Agreement for such Class A Units; and

(ii)    a class of Units designated as "**Class B Units**" that will have the rights and interests set forth in this Agreement for such Class B Units.

17

(b)     Number of Units.  On the Effective Date, each Member holds the number and class of Units set forth opposite such Member's name on Exhibit A.

Section 3.03    Reclassifications of Interests.  All Interests in the Company held by CBE as of the Effective Date are hereby reclassified as 72,459,458 Class B Units.

Section 3.04    Initial Capital Contributions.

(a)     Simultaneous with the execution of this Agreement and pursuant to the Subscription Agreement, MERS has made a cash deposit in the amount of US$ 25,000,000 (Twenty-Five Million US Dollars) in the Escrow Account and in partial consideration therefore has been issued one (1) Class A Unit representing a Percentage Interest of 0.000001% in the Company.  The total Capital Contributions and Class A Units and Class B Units of each member is set forth opposite such Member's name on Exhibit A.

(b)     MERS Escrow Amount.

(i)     Simultaneous with the execution of this Agreement and pursuant to the Subscription Agreement, MERS wired the Escrow Amount to the Escrow Account.  Subject to the definition of Voting Percentage Interest as set forth herein, the Escrow Amount shall be held in the Escrow Account and shall not be deemed to be Capital Contributions by MERS until such time as such amounts are released from the Escrow Account.  Upon any release from the Escrow Account, the released amount shall be contributed to the Company as a Capital Contribution by MERS, and MERS shall be issued in respect thereof Class A Units at a price per Unit equal to $0.925 (the "**Effective Date Unit Price**").

(ii)     The Company, at its option (as determined by a majority of the CBE Managers without any vote or approval of the MERS Managers), may require that any amounts remaining in the Escrow Account on the fifth anniversary of the Effective Date be released to MERS and, for the avoidance of doubt, such amounts shall not be deemed to be Capital Contributions by MERS to the Company and shall not be counted in determining the Voting Percentage Interest of MERS.  In the event such released amounts are returned to MERS, MERS shall have no further right to acquire Class A Units under this Agreement or the Subscription Agreement.

(c)     Following the Effective Date, pursuant to the terms of the LBG Note, the LBG Note, together with all accrued and unpaid interest thereon, will be converted into Class A Units at a price per Unit equal to the Effective Date Unit Price, and the principal amount of the LBG Note, together with all accrued and unpaid interest thereon, shall be deemed to be a Capital Contribution of LBG in respect of such Class A Units.

(d)     On or prior to the Effective Date, CBE has contributed to the  Company (i) an amount of cash equal to $2,750,100 and (ii) all of its right, title and interest in and to the equity interests in the Projects set forth in Exhibit D in exchange for the Interest in the Company held by CBE prior to the Effective Date and reclassified pursuant to Section 3.03 into 72,459,458 Class B Units.  The parties hereto agree that the Fair Market Value of equity interests in the Projects set forth in Exhibit D and contributed to the Company equals $64,274,898.65.

18

(e)    Except as otherwise provided in <u>Section 3.04(c)</u> or <u>Section 3.05</u>, the Company shall issue solely Class B Units in respect of any Capital Contribution received by the Company following the Effective Date.

Section 3.05    <u>LMC Discretionary Payments</u>.  In the event LMC makes Discretionary Payments pursuant to the Teaming Agreement, each of MERS, LBG (to the extent then a Class A Member) and any Third Party who becomes a Member in respect to Capital Contributions made pursuant to <u>Section 3.06</u>, simultaneously with the payment by LMC of such Discretionary Payments, shall be issued, for no additional consideration and on a pro rata basis in accordance with their respective Class A Percentage Interests, Class A Units until CBE's Percentage Interest has been diluted such that the Anti-Dilution Net Cash Percentage of MERS, LBG (to the extent then a Class A Member) and any such Third Party, as applicable, as of immediately prior to payment by LMC of such Discretionary Payments is equal to such Member's Anti-Dilution Net Cash Percentage immediately following the payment by LMC of such Discretionary Payments.

Section 3.06    <u>Additional Investments</u>.  If at any time during the period beginning on the Effective Date and ending on the date that is five (5) years following the Effective Date, the Company, subject to the other terms and provisions of this Agreement (including <u>Section 3.07</u>, <u>Section 6.04</u> and <u>Section 6.05</u>) issues any Units in respect of Capital Contributions used by the Company to fund or invest, directly or indirectly, in any Core Project, solely to the extent that the Company as of the date of such determination has received and expended with respect to the construction and development of such Core Projects an aggregate amount in excess of $25,000,000 from (A) Members other than CBE or (B) one or more Third Parties who become Members (such Units being referred to as "**Additional Investment Units**"), each of the Members other than CBE (determined as of immediately prior to such issuance) shall be issued, for no additional consideration, a number of (i) if such Member is a Class A Member, Class A Units, and (ii) if such Member is not a Class A Member, Class B Units, in each case, sufficient to maintain, after giving effect to the issuance of the Additional Investment Units, the Percentage Interest of such Member immediately prior to the issuance of such Additional Investment Units.

Section 3.07    <u>Preemptive Rights</u>.

(a)    Prior to the Company or any of its Subsidiaries issuing (other than in an Excluded Issuance) any Units, whether through sale, exchange, conversion or otherwise (collectively, the "**Additional Units**") to any Person (each, a "**Proposed Purchaser**"), the Board and the Members must approve such issuance in accordance with <u>Section 6.04(a)</u> and <u>Section 6.05(c)</u>, and each Preemptive Rights Holder will have the right to purchase the number of Additional Units as provided in this <u>Section 3.07</u> in exchange for Capital Contributions (such Capital Contributions, "**Additional Contributions**").

(b)    The Company will give each Preemptive Rights Holder at least 30 days' prior notice (the "**Preemptive Notice**") of any proposed issuance of Additional Units, which notice will set forth in reasonable detail the proposed terms and conditions of such issuance and will offer to each Preemptive Rights Holder the opportunity to purchase a percentage of such Additional Units equal to its Percentage Interest Share (which Percentage Interest Share will be calculated as of the date of such notice) of the Additional Units at the same price, on the same

19

terms and conditions and at the same time as the Additional Units are proposed to be issued by the Company; provided that if all Persons entitled to purchase or receive Additional Units are required to also purchase other securities of the Company (including debt and/or equity securities), Preemptive Rights Holders exercising their rights pursuant to this Section 3.07(b) shall also be required to purchase the same type of securities (on the same terms and conditions) that such Persons are required to purchase.  If any Preemptive Rights Holder wishes to exercise its preemptive rights, it must do so by delivering an irrevocable written notice to the Company within 20 days after delivery by the Company of the Preemptive Notice (the "**Preemptive Period**"), which notice will state the dollar amount of Additional Units such Preemptive Rights Holder (each a "**Preemptive Purchaser**") elects to purchase up to a maximum amount equal to such Preemptive Rights Holder's Percentage Interest Share in respect of the total offering amount plus the additional dollar amount of Additional Units such Preemptive Purchaser elects to purchase in excess of its Percentage Interest Share, if any, if other Preemptive Rights Holders do not elect to purchase their full Percentage Interest Share of the Additional Units.  The rights of each Preemptive Purchaser to purchase a dollar amount of Additional Units in excess of each such Preemptive Purchaser's Percentage Interest Share of the Additional Units will be based on the relative Percentage Interests of those Preemptive Purchasers desiring to purchase excess Additional Units.

(c)    If not all of the Additional Units are subscribed for by the Preemptive Rights Holders, the Company will have the right, but will not be required, to issue and sell the unsubscribed portion of the Additional Units to the Proposed Purchaser at any time during the 90 days following the termination of the Preemptive Period pursuant to the terms and conditions set forth in the Preemptive Notice.  The Board may, in its discretion, impose such other reasonable terms and procedures such as setting a closing date, rounding the number of Units covered by this Section 3.07 to the nearest whole Unit and requiring customary closing deliverables in connection with any issuance of Interests described in this Section 3.07.

Section 3.08    Regulatory Approval.  If any regulatory approval, including the filing and the expiration of any waiting period under the Hart Scott-Rodino Antitrust Improvements Act of 1976 (the "**HSR Act**"), is required prior to the issuance of any Units, the Company will not issue such Units, and the Members will not be required or permitted to make any Additional Contribution with respect thereto, until such approval has been obtained (or in the case of the HSR Act, such filing has been completed and such waiting period has expired).  The Company and the Members will use their respective commercially reasonable efforts to comply promptly with all applicable regulatory requirements.  The Company will bear all documented and reasonable third party fees and expenses, including all filing fees, incurred by it or the Members in connection with such compliance.

Section 3.09    Return of Contributions.

(a)    A Member is not entitled to the return of any part of its Capital Contributions or to be paid interest in respect of either its Capital Account or its Capital Contributions.  An unpaid Capital Contribution is not a liability of the Company or of any Member.  A Member is not required to contribute or to lend any cash or property to the Company to enable the Company to return any Member's Capital Contributions.

20

(b)    Notwithstanding the above, if on the second anniversary of the Effective Date that certain Core Project located in Herten, Germany and that certain Core Project located in Eagar, Arizona, have not both reached "**Financial Closing**" (meaning an agreement has been reached and funding has been received from one or more lenders and/or one or more equity providers providing in the aggregate for financing sufficient for the construction of such Core Projects), then MERS may elect by prior written notice to the Company to have all or part of the Units acquired hereunder by MERS (other than any Units issued pursuant to Section 3.07) redeemed and cancelled by the Company in exchange for all or part of the Subscription Price, excluding the portion of the Subscription Price that has not been released from the Escrow Account in accordance with Section 3.04(b). The redemption price per Unit shall be the same price per Unit as paid by MERS in its initial Capital Contribution; provided that any Units issued pursuant to Section 3.05 or Section 3.06 to MERS shall be redeemed for no additional consideration.

(c)    In the event MERS exercises its right to have all or part of its Units redeemed and cancelled by the Company in accordance with Section 3.09(b), the Company shall have the right, exercisable by written notice to MERS delivered within 30 days following the notice delivered by MERS pursuant to Section 3.09(b):

(i)    to redeem, at the applicable per Unit prices provided in Section 3.09(b), all of the Units acquired by MERS hereunder, including any Units issued pursuant to Section 3.07, which Units issued pursuant to Section 3.07 shall be redeemed at the same price per Unit as paid by MERS in purchasing such Units pursuant to Section 3.07. Such redemption shall take place within 120 days following the Company's delivery of notice under this Section 3.09(c); and

(ii)    to require that all amounts then remaining in the Escrow Account be released to MERS, which released amounts, for the avoidance of doubt, shall not be deemed to be Capital Contributions by MERS and shall not be counted in determining the Voting Percentage Interest of MERS.

Section 3.10    Advances by Members. Subject to the other terms and conditions herein (including Section 6.05(b)), if the Company does not have sufficient cash to pay its obligations, then with the approval of the Board, any or all of the Members may (but will have no obligation to) advance all or part of the needed funds to or on behalf of the Company, which advances will constitute a loan from such Member or Members to the Company, will bear interest and be subject to such other terms and conditions as agreed between such Member or Members and the Company and will not be deemed to be a Capital Contribution.

Section 3.11    Company-Held Units. Any Units held by the Company will not entitle or bind any Person to any voting or other rights or obligations under this Agreement with respect to such Units.

Section 3.12    Representations and Warranties of Members. Each Member represents and warrants as of the Effective Date (or, in the case of a new Member, on the date it is admitted to the Company pursuant to Section 9.03) to the Company that:

21

(a)    <u>Authority</u>.  Such Member has full power and authority to execute and deliver this Agreement and to perform its obligations hereunder and thereunder, and the execution, delivery and performance by such Member of this Agreement has been duly authorized by all necessary action.

(b)    <u>Binding Obligations</u>.  This Agreement has been duly and validly executed and delivered by such Member and constitutes, or will constitute, the binding obligation of such Member enforceable against such Member in accordance with its terms, subject to applicable bankruptcy, insolvency, fraudulent transfer, moratorium and similar Laws relating to or affecting the enforcement of creditors' rights generally and to legal principles of general applicability governing the availability of equitable remedies.

(c)    <u>No Conflict</u>.  The execution, delivery and performance by such Member of this Agreement will not, with or without the giving of notice or the passage of time, or both, (i) violate any provision of Law to which such Member is subject, (ii) violate any order, judgment or decree applicable to such Member or (iii) conflict with, or result in a breach or default under: (A) any term or condition of such Member's Organizational Documents or (B) any other instrument to which such Member is a party or by which any property of such Member is otherwise bound or subject, except, in the case of this clause (B), where such conflict, breach or default would not reasonably be expected to, individually or in the aggregate, materially impair such Member's ability to perform its obligations under such instrument.

(d)    <u>Investment Entirely For Own Account</u>.  The Units acquired or to be acquired by such Member will be acquired for investment for such Member's own account, not as a nominee or agent, and not with a view to the resale or distribution of any part thereof; such Member has no present intention of selling, granting any participation in, or otherwise distributing the same; and such Member does not have any contract, undertaking, agreement or arrangement with any Person to sell, transfer or grant participations to such Person or to any third Person, with respect to any of the Units.

(e)    <u>Unregistered Securities</u>.  Such Member understands that the Units, at the time of issuance, will not be registered under the Securities Act or other applicable federal or state securities Laws and the rules and regulations promulgated thereunder.  Such Member also understands that such Units are being offered and sold pursuant to an exemption from registration contained in the Securities Act based in part upon such Member's representations contained in this Agreement.

(f)    <u>Accredited Investor</u>.  Such Member is an Accredited Investor.

(g)    <u>Restricted Securities</u>.  Such Member understands that the Units to be acquired by such Member may not be Transferred without registration under the Securities Act or an exemption therefrom, and that in the absence of either an effective registration statement covering such Units or an available exemption from registration under the Securities Act, the Units must be held indefinitely.  Such Member understands that the Company has no present intention of registering the Units to be acquired by such Member.  Such Member also understands that there is no assurance that any exemption from registration under the Securities Act will be available and that, even if available, such exemption may not allow such Member to

22

Transfer all or any portion of the Units to be acquired by it under the circumstances, in the amounts or at the times such Member might propose.  In particular, such Member is aware that the Units may not be sold pursuant to Rule 144 promulgated under the Securities Act unless all of the conditions of Rule 144 are met.  Among the conditions for use of Rule 144 may be availability of current information to the public about the Company.  Such information is not now available and the Company has no plans to make such information available.

(h)    Taxes.  Such Member has reviewed with its own Tax advisors the federal, state and local and the other Tax consequences of an investment in Interests in the Company.  Such Member acknowledges and agrees that the Company is making no representation or warranty as to the federal, state, local or foreign Tax consequences to such Member as a result of such Member's acquisition of Units.  Such Member understands that it will be responsible for its own Tax liability that may arise as result of such Member's acquisition of Units.

# ARTICLE 4
# ALLOCATIONS

Section 4.01    Allocation of Net Profits and Net Losses.  Except as otherwise provided in this Agreement, items of income, gain, loss or deduction taken into account in determining Net Profit or Net Loss for any Taxable Period shall be allocated among the Members for purposes of determining Capital Accounts in a manner such that the Capital Account of each Member as of the end of such Taxable Period and immediately after making such allocations, is, as nearly as possible, equal (proportionately) to the difference (which may be negative) between (a) the distributions which such Member would be entitled to receive if each of the Company's assets were sold for cash equal to its respective Gross Asset Value, all Company liabilities were satisfied (limited with respect to each nonrecourse liability to the Gross Asset Value of the assets securing such liability), and the net assets of the Company were distributed to the Members in accordance with Section 5.01(a) immediately after making such allocation, less (b) such Member's share of Company Minimum Gain and Member Minimum Gain, computed immediately prior to the hypothetical sale of assets, and the amount, if any, such Member is obligated or treated as obligated to contribute to the Company.

Section 4.02    Regulatory Allocations.  Notwithstanding the foregoing provision of this Article 4, the following special allocations shall be made in the following order of priority:

(a)    Minimum Gain Chargeback.  If there is a net decrease in Company Minimum Gain or in any Member Minimum Gain during any Taxable Period, each Member shall be specially allocated items of Company income and gain for such period (and, if necessary, for subsequent periods) in an amount and manner required by Treasury Regulation Section 1.704-2(f) or 1.704-2(i)(4).  The items to be so allocated will be determined in accordance with Treasury Regulation Section 1.704-2, and the allocation provided in this Section 4.02(a) shall be subject to any exceptions provided therein.

(b)    Qualified Income Offset.  If any Member unexpectedly receives an adjustment, allocation, or distribution of the type contemplated by Treasury Regulation Section 1.704-1(b)(2)(ii)(d)(4), (5) or (6), items of Company income and gain shall be allocated to such Member in an amount and manner sufficient to eliminate any resulting Adjusted Capital Account

23

Deficit of such Member, as quickly as possible, to the extent required by such Treasury Regulation; <u>provided</u> that an allocation pursuant to this <u>Section 4.02(b)</u> shall be made only if and to the extent that such Member would have an Adjusted Capital Account Deficit after all other allocations provided for in this <u>Article 4</u> have been tentatively made as if this <u>Section 4.02(b)</u> were not in this Agreement.

(c)      <u>Gross Income Allocation</u>.  In the event any Member has an Adjusted Capital Account Deficit at the end of any Taxable Period, each such Member shall be specially allocated items of Company income and gain in the amount of such excess as quickly as possible; <u>provided</u> that an allocation pursuant to this <u>Section 4.02(c)</u> shall be made only if and to the extent that such Member would have a deficit Capital Account in excess of such sum after all other allocations provided for in this <u>Article 4</u> have been made as if <u>Section 4.02(b)</u> and this <u>Section 4.02(c)</u> were not in this Agreement.

(d)      <u>Certain Additional Adjustments</u>.  To the extent that an adjustment to the adjusted Tax basis of any Company asset pursuant to Section 734(b) or Section 743(b) of the Code is required, pursuant to Treasury Regulation Section 1.704-1(b)(2)(iv)(m)(2) or Treasury Regulation Section 1.704-1(b)(2)(iv)(m)(4), to be taken into account in determining Capital Accounts as the result of a distribution to a Member in complete liquidation of its interest in the Company, the amount of such adjustment to the Capital Accounts shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases such basis), and such gain or loss shall be specially allocated to the Members in accordance with their interests in the Company in the event that Treasury Regulation Section 1.704-1(b)(2)(iv)(m)(2) applies, or to the Members to whom such distribution was made in the event that Treasury Regulation Section 1.704-1(b)(2)(iv)(m)(4) applies.

(e)      <u>Limitation on Loss Allocations</u>.  No Member shall be allocated items of deduction or loss to the extent such allocation would cause such Member to have (or increase the amount of) an Adjusted Capital Account Deficit.  To the extent items of deduction or loss are not allocated to a Member as a result of this limitation, such items of deduction or loss shall instead be allocated to the other Members in proportion to the amounts that may be so allocated to them without causing (or increasing) an Adjusted Capital Account Deficit for such Members.

(f)      <u>Nonrecourse Deductions</u>.  The Nonrecourse Deductions for each taxable year of the Company shall be allocated pro rata among the Members in accordance with their Units.

(g)      <u>Member Nonrecourse Deductions</u>.  The Member Nonrecourse Deductions shall be allocated for each Taxable Period to the Member that bears the economic risk of loss (within the meaning of Treasury Regulation Section 1.752-2) for the Member Nonrecourse Debt to which such Member Nonrecourse Deductions are attributable.

(h)      <u>Curative Allocations</u>.  To the extent an amount of income, gain, loss or deduction has been allocated pursuant to this <u>Section 4.02</u>, the Company shall make offsetting allocations in an amount and manner determined appropriate by the Board, so as to cause the net amount of all such allocations to be the same (to the   maximum extent possible) as the allocations that would have occurred in the event that no allocations had been made pursuant to

24

the foregoing provisions of this <u>Section 4.02</u>.  In determining the curative allocations to be made pursuant to this <u>Section 4.02(h)</u>, the Board may take into account future allocations expected to be made pursuant to the foregoing provisions of this <u>Section 4.02</u>.

(i)    <u>Amendment of Allocations</u>.  The Tax Matters Member will be entitled to make reasonable interpretations of the Treasury Regulations promulgated under Section 704(b) of the Code as necessary to effectuate the intent of this <u>Section 4.02</u>.

Section 4.03    <u>Tax Allocations</u>.

(a)    Except as provided in <u>Section 4.03(b)</u>, each item of income, gain, loss, deduction and credit of the Company as determined for U.S. federal income Tax purposes shall be allocated between the Members as nearly possible in the same manner as the corresponding allocation (if any) of each such item for the Capital Accounts of the Members.

(b)    In accordance with Section 704(c) of the Code and the applicable Treasury Regulations thereunder, income, gain, loss, deduction and Tax depreciation with respect to any property contributed to the capital of the Company, or with respect to any property that has a Gross Asset Value different than its adjusted Tax basis, will, solely for U.S. federal income Tax purposes, be allocated among the Members so as to take into account any variation between the adjusted Tax basis of such property to the Company and the Gross Asset Value of such property. The Company shall use the "traditional method" under Treasury Regulation Section 1.704-3(b) or such other permissible method as the Tax Matters Member may determine for making any such allocations allowable under Section 704(c) and the Treasury Regulations thereunder.

Section 4.04    <u>Other Tax Provisions</u>.

(a)    For any Taxable Period during which any Units are transferred between the Members or to another Person, the portion of the Net Profits, Net Losses and other items of income, gain, loss, deduction and credit that are allocable with respect to such transferred Units shall be apportioned between the transferor and the transferee under any method allowed pursuant to Section 706 of the Code and the applicable Treasury Regulations as determined by the Tax Matters Member.

(b)    For purposes of determining a Member's proportional share of the Company's "excess nonrecourse liabilities" within the meaning of Treasury Regulation Section 1.752-3(a)(3), a Member's interest in Net Profits shall be equal to the number of Units owned by such Member divided by the total number of Units outstanding.

(c)    The Tax Matters Member shall make all other decisions concerning the allocation of items of income, gain, loss, deduction, and credit among the Member pursuant to the terms of this Agreement that are not specifically and expressly provided for by the terms of this Agreement.

DWT 29010545v3 0106299-000001
ACTIVE 209496623v.20

**ARTICLE 5**
**DISTRIBUTIONS**

Section 5.01    Distributions.

(a)    Distributions.

(i)    Priority.  Subject to Section 6.05(v) and applicable Law, the Board shall be permitted to cause the Company to make distributions at any time and from time to time. Notwithstanding anything herein to the contrary, beginning on the fourth anniversary of the Effective Date, the Company shall make distributions to the Members (to the extent of Net Cash available for distribution) in accordance with the order of priority set forth in this Section 5.01(a).  Subject to Section 5.01(b), all distributions will be made to the Members as follows and in the following order of priority:

(A)    *First*: to the Class A Members, pro rata in accordance with their Class A Percentage Interests, until the Class A Members have received a return of 100% of all Capital Contributions made by the Class A Members in respect of their respective Class A Units;

(B)    *Second*: to the Class A Members, pro rata in accordance with their Class A Percentage Interests, until the excess of (1) the cumulative distributions to the Class A Members pursuant to Section 5.01(a)(i)(A) and this Section 5.01(a)(i)(B) over (2) the Class A Members' aggregate Capital Contributions, equals an 8% IRR on the aggregate Capital Contributions made by the Class A Members in respect of their respective Class A Units (taking into account the date on which each Capital Contribution and each such prior distribution was made);

(C)    *Third*:  to the Class B Members, pro rata in accordance with their Class B Percentage Interests, until the Class B Members have received in the aggregate an amount equal to the aggregate amounts distributed to the Class A Members in accordance with Section 5.01(a)(i)(A) and Section 5.01(a)(i)(B) above; and

(D)    *Fourth*:  to all the Members, pro rata in accordance with their Percentage Interests.

(ii)    Core Project Proceeds.  For purposes of Section 5.01(a)(i)(A) and Section 5.01(a)(i)(B), all distributions of Core Project Proceeds paid to any Member, to the extent such distributions are the related to equity interests received by such Member pursuant to Section 5.02 of the Subscription Agreement shall be deemed to have been distributed by the Company to such Class A Member.

(b)    Tax Distributions.  Prior to any distribution pursuant to Section 5.01(a), to the extent permitted by applicable Law and the requirements of any applicable  agreements, the Company shall make distributions ("**Tax Distributions**") to the Members intended to be sufficient to enable them to pay, on a quarterly basis, any U.S. federal, state and local income Taxes arising from the taxable income and gain allocated to such Members from the Company;

26

<u>provided</u> that such payments shall be made within 15 days after the close of each applicable quarter.  Subject to the following sentence, the amount of any such Tax Distribution shall equal the product of the (x) Assumed Tax Rate and (y) aggregate amounts of  taxable income or gain of the Company that were actually allocated or are estimated to be allocated to such Member for U.S. federal income Tax purposes for such period and all prior periods (to the extent no Tax Distribution has previously been made with respect to such taxable income or gain) reduced, but not below zero, by any Tax deduction, loss or credit previously or currently allocated to such Member and not previously taken into account for purposes of the calculation of the amount of any Tax Distribution.  The amount of any Tax Distribution for a particular quarter shall take into account prior Tax Distributions as follows: (x) if Net Cash is not sufficient to satisfy the required Tax Distribution for a particular quarter, the Company shall make up such deficit out of Net Cash in future periods, and (y) if it is determined that the aggregate amounts of Tax Distributions paid to any Member exceeded the product of (i) the Assumed Tax Rate and (ii) the aggregate amounts of taxable income or gain that were actually allocated to such Member for U.S. federal income Tax purposes in the Company income Tax returns filed with respect to such Taxable Period and all prior Taxable Periods, reduced, but not below zero, by any Tax deduction, loss or credit previously or currently allocated to such Member, then the Tax Distribution to such Member for subsequent periods shall be reduced by the amount of overpayment.  Any Tax Distributions shall be treated as an advance against, and shall reduce the amount of, the next distribution(s) that the Member would otherwise receive pursuant to <u>Section 5.01(a)</u>, <u>Section 10.02</u> or any other provision of this Agreement.

Section 5.02    <u>Tax Withholding</u>.

(a)    To the extent the Company is required by Law to withhold or to make Tax payments on behalf of or relating to any Member ("**Tax Advances**"), the Board may cause the Company to withhold those amounts and make those Tax payments as so required.  The Company may take whatever steps the Board considers appropriate to cause the Member in respect of which a Tax Advance is made (including in respect of Members that have previously withdrawn from the Company) to be responsible for the Tax Advance.  Among other things, the Company may treat the Tax Advance as a distribution in respect of the relevant Member as of the last day of the Period in which the Company paid the Tax Advance to the taxing authorities. To the extent the Company is not able to recover a Tax Advance otherwise, a Member on whose behalf or as to whom a Tax Advance has been made shall, upon the Board's request, promptly repay the Company for the amount of the Tax Advance.  Any amount not so repaid by the end of the 10th day after the date the Member received the Board's request will bear interest starting on the 11th day after that receipt at the highest rate permitted by Law.  Each Member shall indemnify and hold harmless the Company and the Board from and against any liability relating to Tax Advances required on behalf of or relating to that Member.

(b)    Each Member hereby agrees to furnish the Company with any representations, certifications and forms as shall reasonably be requested by the Company to assist it in determining the extent of, and in fulfilling, its obligations in respect of Tax Advances. The Company shall, at the reasonable request and at the expense of a Member, use reasonable efforts to assist the Member in applying for any reduction of or exemption from withholding Tax, or securing any Tax refunds or credits available to such Member.

27

## ARTICLE 6
## MANAGEMENT

Section 6.01    Exclusive Management of the Company by the Board.

(a)    Subject to Section 6.05, any other voting rights expressly provided to the Members herein (including but not limited to the definition of Voting Percentage Interest) and any non-waivable provisions of applicable Law, (i) all powers of the Company will be exercised by or under the authority of, and the Business, Property and affairs of the Company will be managed under the direction of, a board of managers (the "**Board**"), and (ii) the Board will have, and is hereby granted, the full and complete power, authority and discretion for, on behalf of and in the name of the Company, to take such actions as it may in its sole discretion deem necessary or advisable to carry out any and all of the objectives and purposes of the Company.

Section 6.02    Election of Managers.

(a)    Number, Term and Qualifications.

(i)    The Board will initially consist of up to five members (each, a "**Manager**") of which:

(A)    (1) so long as CBE-Derived Units represent at least 37.5% of the aggregate Voting Percentage Interests, three Managers,  (2) so long as CBE-Derived Units represent at least 25% of the aggregate Voting Percentage Interests, but less than 37.5% of the aggregate Voting Percentage Interests, two Managers, and (3) so long as CBE-Derived Units represent at least 7.5% of the aggregate Voting Percentage Interests, but less than 25% of the aggregate Voting Percentage Interests, one Manager, will be designated from time to time by a Majority-in-Interest of the CBE-Derived Units (the "**CBE Managers**"); and

(B)    (1) so long as MERS-Voting Percentage Interests represent at least 25% of the aggregate Voting Percentage Interests, two Managers, and (2) so long as MERS-Voting Percentage Interests represent at least 7.5% of the aggregate Voting Percentage Interests, but less than 25% of the aggregate Voting Percentage Interests, one Manager (the "**MERS Managers**").  For the avoidance of doubt on the Effective Date the Board will include two (2) MERS Managers upon funding of amounts set forth in Section 3.04(a).

The Members shall ensure that all designees are promptly appointed as Managers.

(ii)    For the avoidance of doubt, if the applicable Derived Units do not represent the minimum Voting Percentage Interests specified above, the number of members of the Board will be reduced by the number of Managers that would otherwise have been appointed by the Majority-in-Interest of such Derived Units and such Managers' presence, vote and consent shall not be needed for any purpose under this Agreement. If both CBE and MERS are unable to designate at least one Manager, then a Board of three and up to five Managers shall be elected by a Supermajority Member Vote.

28

(iii)    The initial Managers as of the date hereof will be those Persons set forth on Exhibit B hereto.  Each Manager will hold office until such Manager's successor is designated as provided in this Section 6.02 or until such Manager's earlier resignation, removal, death or disability.

(b)    Non-Voting Participant.  The Board may provide (with the approval of at least one MERS Manager for so long as MERS has the right to designate a MERS Manager) for the participation in meetings of the Board of non-voting participants (each a "**Non-Voting Participant**"); provided, however, that any such Non-Voting Participant shall agree to hold in confidence and trust, in accordance with the terms of Section 7.03, as Confidential Information all information provided to such Non-Voting Participant in connection with such meetings; provided, further, that the Company has the right to withhold any information, and to exclude any such Non-Voting Participant from any meeting or portion thereof, if (A) the Board has reasonably determined that such Non-Voting Participant is a competitor of the Company or a holder of an Interest of more than 10% of a competitor of the Company or (B) access to such information or attendance at such meeting or portion thereof could adversely affect the attorney-client privilege between the Company and its legal counsel.  So long as LBG is a Class A Member, a Person designated from time to time by a Majority-in-Interest of the LBG-Derived Units will be entitled to participate in meetings of the Board as a Non-Voting Participant. A Person designated by LMC will be entitled to participate in meetings of the Board as a Non-Voting Participant in accordance with Section 4 of the Teaming Agreement Amendment.  For the avoidance of doubt, the Persons designated from time to time by a Majority-in-Interest of the LBG-Derived Units and by LMC as provided in this Section 6.02(b) shall be deemed to be approved by the MERS Managers.

(c)    Removal.

(i)    Without Cause.  Any Manager may be removed or replaced from the Board (and thereupon from all committees thereof) at any time, without Cause, only by (A) delivery to the Company of a notice, signed by the Members that are then entitled to designate such Manager in accordance with Section 6.02(a), stating that such Manager is removed or replaced (as the case may be) effective as of a date specified therein, (B) resignation of such Manager pursuant to Section 6.02(d), (C) death of such Manager, or (D) incapacity of such Manager.

(ii)    With Cause.  Any Manager may be removed if (A) Cause exists, and (B) a Supermajority Board Vote (including the vote of the Member with the right to designate such Manager) approves such removal in writing.

(d)    Resignation.  Any Manager may resign at any time by giving written notice to the Company.  The resignation of any Manager will take effect upon receipt of that notice or at such later time as specified in the notice.  Unless otherwise specified in the notice, the acceptance of the resignation will not be necessary to make it effective.

(e)    Vacancies.  Any Manager vacancy occurring for any reason (including a removal for Cause) will be filled by the Members entitled to designate such Manager in

29

accordance with Section 6.02(a) and the Members will ensure that such designee is promptly appointed as a Manager.

Section 6.03    Board Procedures.

(a)    Meetings of the Board.

(i)    Meetings of the Board shall be presided over by a Chairman of the Board (the "**Chairman**").  So long as CBE-Derived Units represent at least 37.5% of the aggregate Voting Percentage Interests, CBE shall have the right to appoint the Chairman of the Board with the advice of MERS.  In the event CBE-Derived Units cease to represent at least 37.5% of the aggregate Voting Percentage Interests, MERS shall appoint the Chairman for a period of one (1) year, following which CBE shall appoint the Chairman for a period of one (1) year, and thereafter the Chairman shall be appointed by the MERS and CBE in rotation on an annual basis.  In the event the Board or any committee thereof consists of an even number of Managers, the vote of the Chairman shall be the deciding vote on any matter that is subject to a majority vote on which an even number of votes is cast in favor of and against such matter. Notwithstanding the foregoing, no Member will have the right to appoint the Chairman unless such Member holds an aggregate 7.50% Voting Percentage Interest.

(ii)    The Board will hold regular meetings at such times and places (provided that the Board will meet at least once in each calendar quarter) as will be designated from time to time by resolution of the Board.  Notice of such regular meetings will not be required if held at the times and places set forth in the relevant resolution and such resolution has been provided to each Manager.

(iii)    Special meetings of the Board may be called by the Chairman of the Board or any Manager.

(iv)    All meetings will be held upon 10 days' notice by mail or delivered personally or by telephone or email to the Managers and the Non-Voting Participant setting forth the time and location of such meeting.  Notice of a special meeting will also state the purpose or purposes for which such meeting is called.  Notice of a meeting need not be given to any Manager or Non-Voting Participant who signs a waiver of notice or a consent to holding the meeting (which waiver or consent need not specify the purpose of the meeting) or an approval of the minutes thereof, whether before or after the meeting, or who attends the meeting without protesting, prior to its commencement, the lack of notice to such Manager or Non-Voting Participant.  All such waivers, consents and approvals will be filed with the Company records or made a part of the minutes of the meeting.

(v)    A majority of the Managers present, whether or not a quorum is present, may adjourn any meeting to another time.  If the meeting is adjourned for more than 24 hours, notice of any adjournment will be given prior to the time of the adjourned meeting to the Managers who are not present at the time of the adjournment.

(vi)    Meetings of the Board may be held at the Company's principal office or such other place as may be approved by the Board.  Managers and Non-Voting

30

Participants may participate in a meeting through use of conference telephone or similar communications equipment, so long as all Managers and Non-Voting Participants participating in such meeting can hear one another, subject to the provisions of <u>Section 6.02(b)</u>. Participation in a meeting in such manner constitutes a presence in person at such meeting.

(b)    <u>Quorum</u>.  A quorum for the transaction of business at any meeting of the Board requires the presence at such meeting of 80% of the Managers then in office; <u>provided</u>, <u>however</u>, that in the event a quorum is not present at the appointed time for a meeting, such meeting will be automatically adjourned to such time as the Chairman of the Board (or, if applicable, the Manager who called the meeting) will so determine at which a quorum can be reached.  A meeting of the Board at which a quorum is initially present may continue to transact business, notwithstanding the withdrawal of Managers, but any action taken must be approved by the requisite number of Managers as provided in this Agreement.

(c)    <u>Voting</u>.  Subject to <u>Section 6.04</u> and <u>Section 6.05</u>, any decision or approval of the Board under this Agreement requires the vote or approval of a majority of Managers present at a meeting at which a quorum is present.  Each Manager will be entitled to exercise one vote; <u>provided</u>, <u>however</u>, that in respect of a meeting of the Board, each Manager may exercise the vote of any other Manager appointed by the same Member as appoints it who is not present at such meeting.

(d)    <u>Action by Written Consent</u>.  Notwithstanding anything herein to the contrary, any action required or permitted to be taken by the Board (or any committee of the Board) may be taken by the Board without a meeting if all the Managers of the Board (or Board committee) execute a unanimous written consent.  Such action by written consent will have the same force and effect as a vote at a duly constituted meeting of the Board.

(e)    <u>Subsidiaries</u>.   The Company will cause the board of directors (or equivalent) of each Subsidiary of the Company to submit to the Board for approval by the Board or Members, as applicable, any action that would require Board or Member approval if the action were taken by the Company rather than the Subsidiary. The Company shall be responsible for ensuring that all Subsidiaries and shareholder (or similar agreements) of the Subsidiaries provide for this provision to be enforceable.

Section 6.04    <u>Board Supermajority Decisions</u>.  Notwithstanding <u>Section 6.01</u> and except as otherwise provided in the Strategic Plan or Annual Budget, each approved in accordance with <u>Section 6.09</u>, the Company will not, and the Board will not cause the Company to, without the affirmative vote or written consent of 80% of the Managers serving on the Board at such time (a "**Supermajority Board Vote**"):

(a)    take any action requiring a Supermajority Member Vote pursuant to <u>Section 6.05</u>;

(b)    adopt, approve, amend, modify or supplement any Strategic Plan;

DWT 29010545v3 0106299-000001
ACTIVE 209496623v.20

(c)    enter into, amend or terminate any material teaming agreement, alliance, memorandum of agreement, memorandum of understanding, intellectual property agreement or similar agreement with a strategic partner;

(d)    enter into any lease for real property that requires payment of rent by the Company in excess of rental amounts approved in the then-current Annual Budget;

(e)    hire any officer or other employee of the Company, or enter into any employee leasing or similar arrangement, in each case, prior to the date when Financial Closing has occurred;

(f)    make capital expenditures or capital contributions to the Core Projects, or Subsidiaries of the Company, other than or in excess of those approved in the then-current Annual Budget;

(g)    make a decision to alter or discontinue the Core Projects or replace the Core Projects, in whole or in part.

(h)    determine appropriate types and amounts of insurance for the Company, obtain insurance policies on behalf of the Company or make any amendments, renewals, supplements or other amendments to insurance coverage of the Company;

(i)    open any banking or other types of deposit or investment account of the Company;

(j)    establish the value of any non-cash Company assets, including in connection with a Capital Contribution of assets to the Company by a Member or a distribution of assets to a Member by the Company;

(k)    adopt, amend or terminate any employee benefit plan;

(l)    enter into, amend or terminate any collective bargaining agreement;

(m)    enter into, amend or terminate any proprietary information agreement, nondisclosure agreement or similar agreement between the Company and any other Person that (A) is outside the Company's ordinary course of business or (B) contains any exclusivity or similar restriction or limitation (whether with respect to time, geography or otherwise);

(n)    institute, join as a party, otherwise participate in or settle any claim, litigation, arbitration, dispute or other judicial or administrative proceeding;

(o)    engage the services of any law firm, accounting firm or similar professional organization other than for the amounts as approved in the then-current Annual Budget;

(p)    exercise the Company ROFR in accordance with Section 9.05(b);

32

(q)    release funds from the Escrow Account (other than pursuant to <u>Section 3.04(b)(ii)</u> hereof or Section 2.07 of the Subscription Agreement); or

(r)    agree to do any of the foregoing.

Section 6.05    <u>Member Supermajority Decisions</u>.    Notwithstanding <u>Section 6.01</u> and except as otherwise provided in the Strategic Plan or Annual Budget, each approved in accordance with <u>Section 6.09</u>, the Company will not, and the Board will not cause the Company to, without the affirmative vote or written consent of Members holding 80% of the aggregate Voting Percentage Interests outstanding (a "**Supermajority Member Vote**"):

(a)    make any loan or advance payment of funds of the Company to or for the benefit of any Person;

(b)    borrow any money from any source or otherwise incur or guarantee any indebtedness in excess of $100,000, other than pursuant to credit arrangements existing on the Effective Date;

(c)    issue any Interests (other than Units issued pursuant hereto and the issuance of interests as Excluded Issuance under (c), (e), (f), (g), (h), (i) and (j) of the definition of Excluded Issuance);

(d)    pledge the credit of any Member to the Company or bind or commit any Member to any Person, including any officer or agent of the Company;

(e)    make or grant any pledge, mortgage, encumbrance or security interest in any Company asset, except Permitted Encumbrances;

(f)    make any material amendments or modifications to the Certificate of Formation or this Agreement;

(g)    make any material change to the scope or purpose of the Company or the nature of the Company's Business;

(h)    make calls for or require additional Capital Contributions by the existing Members other than as required pursuant to the Annual Budget or in connection with approval by the Board of a Subsidiary;

(i)    purchase or acquire a fee interest in real property other than approved in the then-current Annual Budget;

(j)    institute, join as a party, otherwise participate in or settle any claim, litigation, arbitration, dispute or other judicial or administrative proceeding (A) on a basis that admits criminal liability by the Company or (B) for an amount in excess of $100,000;

DWT 29010545v3 0106299-000001
ACTIVE 209496623v.20

(k)    liquidate or dissolve the Company, or cause the Company to make any filing or take any action with respect to the commencement of proceedings regarding the voluntary reorganization, liquidation, dissolution, winding up or bankruptcy;

(l)    cause the Company to merge or consolidate with or into another Person, to sell any material portion of the Company's assets or to purchase any material portion of the assets or rights of any Person, in each case whether in a single transaction or a series of transactions;

(m)    enter into any transaction between the Company and any Member or Affiliate thereof (except for license agreements with CBE or its Affiliates in effect on the Effective Date, and related license agreements with CBE or its Affiliates entered into in the ordinary course of business);

(n)    make any payment or offer of any payment to any official of any foreign government, other than ordinary fees paid in accordance with published fee schedules;

(o)    give or make, by endorsement, countersignature or otherwise, any guaranty by the Company, or by any Member for the benefit of the Company, of any debt, obligation or undertaking of any Person;

(p)    enter into any rate swap, currency swap, commodity hedge, or similar transaction other than approved in the then-current Annual Budget;

(q)    cause the Company to form or acquire any Subsidiaries (other than special purpose vehicles for Project development) or to enter into or form any partnerships, joint ventures, limited liability companies or other business combinations with any other Person;

(r)    expose the Company to any unfunded potential termination liability in respect of contractual or pre-contractual activity of the Company in an amount in excess of $100,000;

(s)    hire any officer or other employee of the Company with total annual base compensation in an amount in excess of $100,000;

(t)    make or change any Tax elections or changes in accounting practices (other than as required by Law) that reasonably would be expected to disproportionately and adversely affect any particular Member;

(u)    make any type of political contribution or any donation to a charity or other non-profit organization or any payments to any Governmental Entity or supra-national authority other than established fees required for obtaining permits and licenses in the ordinary course of business;

(v)    make distributions of Net Cash other than amounts approved in the then-current Annual Budget;

DWT 29010545v3 0106299-000001
ACTIVE 209496623v.20

(w)    pay any type of bonus, commission, finder's fee or contingency fee otherwise than in accordance with the then-current Annual Budget;

(x)    hire or change external auditors or making any significant change in accounting principles and practices used by the Company;

(y)    enter into any single transaction or series of related transactions for the sale, transfer, assignment, conveyance or other disposition of assets or rights of the Company, or purchase of assets or rights of any Person by the Company, involving total consideration in an amount that is not approved in the then-current Annual Budget;

(z)    make or authorize any repayment of any funds borrowed by the Company, except according to the terms of a loan instrument that was previously approved or included in the Annual Budget;

(aa)    pay any type of broker's or finder's fee otherwise than in accordance with the then-current Annual Budget;

(bb)    hold assets of a Project in the name of the Company (it being understood that the Company's investments in Projects shall be made through special purpose vehicles or holding companies); or

(cc)    agree to do any of the foregoing.

Section 6.06    Fiduciary Duties of Managers.  Each Manager (including any Manager serving on any committee of the Board) will have the same fiduciary duties that such individual would have if the Company were a corporation organized under the Laws of the State of Delaware and such individual were a director of such corporation, and the Company and its Members will have the same rights and remedies in respect of such duties as if the Company were a corporation organized under the Laws of the State of Delaware and the Members were its stockholders. The Company shall obtain appropriate directors and officers insurance covering all Managers and key officers in an amount not less than $2 million in coverage.

Section 6.07    Payments to Managers.  No Manager will be entitled to any fee or other payment from the Company for such Manager's services to the Company in his capacity as a Manager; provided, however, that all of the Managers will be entitled to reimbursement for reasonable out-of-pocket expenses incurred while providing services to the Company.

Section 6.08    Officers.

(a)    Officers.  The Board may, from time to time, delegate to one or more individuals (the "**Officers**") such authority and duties (subject to any matters that are specified as requiring the vote or approval of the Board or the Members, and subject to the remainder of this Section 6.08) as the Board deems advisable.

(b)    Appointment of Officers.  The Officers will serve at the pleasure of the Board, subject to all rights, if any, of an Officer under any contract of employment.  Any

35

individual may hold any number of Officer titles.  The salaries and/or other compensation, if any, of the Officers will be fixed from time to time by the Board.  The initial Officers of the Company are set forth on <u>Exhibit F</u>.

(c)    <u>Removal, Resignation and Filling of Vacancy of Officers</u>.  Subject to the rights, if any, of an Officer under a contract of employment approved by the Board, any Officer may be removed, either with or without cause, by the Board at any time.  Any Officer may resign at any time by giving notice to the Board.  Any resignation will take effect upon receipt of that notice or at any later time specified in that notice; and, unless otherwise specified in that notice, the acceptance of the resignation will not be necessary to make it effective.  Any resignation is without prejudice to the rights, if any, of the Company including any rights under any contract to which such Officer is a party.  A vacancy in any office because of death, resignation, removal, disqualification or any other cause will be filled in the manner prescribed by the Board.

(d)    <u>General Authority and Duties of Officers</u>.  Each Officer (in such Person's capacity as an Officer) will have the same fiduciary duties that an officer of the Company would have if the Company were a corporation organized under the Laws of the State of Delaware, and the Company and its Members will have the same rights and remedies in respect of such duties as if the Company were a corporation organized under the Laws of the State of Delaware and the Members were its stockholders.  Except as expressly provided otherwise in this Agreement and subject to any matters that are specified as requiring the vote or approval of the Board or the Members, the Officers will have delegated authority from the Board for conducting the day-to-day business of the Company in accordance with a delegation of authority approved by Major Holder Approval.  The Board may adopt resolutions from time to time further limiting and clarifying the duties and powers of the Officers.

Section 6.09    <u>Strategic Plan; Annual Budget</u>.  The Company will develop prior to the commencement of each Fiscal Year beginning with Fiscal Year 2017 a three-year strategic business plan (the "**Strategic Plan**"), which Strategic Plan shall (a) include a detailed annual business plan and budget for the Company and its Subsidiaries (the "**Annual Budget**"), and (b) prior to its adoption, be submitted for Major Holder Approval.  The Annual Budget will detail the financial needs of the Company and include pro-forma financial statements.  If a Strategic Plan or an Annual Budget is not adopted in accordance with this <u>Section 6.09</u> prior to the start of the applicable Fiscal Year (including as a result of a Deadlock subject to <u>Section 6.11</u>), then, until so adopted, the Strategic Plan and Annual Budget for such Fiscal Year will be the same as the prior Fiscal Year's Strategic Plan and Annual Budget; <u>provided</u>, that in the case of the Annual Budget, non-recurring or extraordinary items shall be excluded, and the budget for each line item shall be increased by 5.0%.  The first such Strategic Plan and Annual Budget (for the remainder of Fiscal Year 2016) shall be developed within 180 days following the Effective Date.

Section 6.10    <u>Key Man Provision</u>.  Except in the event of death, disability or force majeure, in the event that Founder ceases to devote a majority of his business time and his efforts, skill, business judgment to the advancement of the business and interest of the Company (either directly or through CBE) without a Supermajority Board Vote,  Founder will resign from the Board and CBE will vote its Units (i) to remove Founder as a Manager and (ii) as directed by MERS until the hiring of a replacement which is (a) reasonably acceptable to the MERS

36

Managers for so long as MERS has the right to designate a MERS Manager or (b) approved by the affirmative vote or written consent of 75% of the Managers, including at least one MERS Manager for so long as MERS has the right to designate a MERS Manager.

Section 6.11    Deadlock; Dispute Resolution.

(a)    In the event that (i) a matter set forth in under Section 6.04, Section 6.05 or Section 6.09 is considered by the Board at a meeting of the Board or by the Members at a meeting of the Members, as applicable, (ii) the Managers or Members, as applicable, vote in contrary manners such that the applicable Supermajority Board Vote or Supermajority Member Vote cannot be obtained, and (iii) such Managers or Members, as applicable, refuse to defer such matter for further consideration at a future meeting of the Board or Members, as applicable (a "**Deadlock**"), any Member or Members that has the right to appoint a Manager (each a "**Disputing Member**") may submit its basis for such Deadlock or disagreement by written notice to each other Member that has the right to appoint a Manager (each a "**Responding Member**"). If any such Deadlock proves incapable of being settled between the representatives of the Disputing Members and Responding Members normally responsible for compliance with this Agreement, such dispute will then be sought to be resolved by negotiations between designated senior executives of the Disputing Members and Responding Members who have authority to settle the controversy.  The executives will meet at a mutually acceptable time and place within 30 days of the date of the date of delivery of a notice by the Disputing Members to attempt to resolve the dispute.

(b)    If the dispute has not been resolved through good faith negotiation pursuant to Section 6.11(a) within 45 days of the Disputing Members' notice, the Disputing Members or the Responding Members may refer the matter to non-binding mediation before a single, mutually agreeable mediator with the Judicial Arbitration and Mediation Services ("**JAMS**") located in Los Angeles, California.  If the Disputing Members and Responding Members reach agreement pertaining to any dispute pursuant to the procedures set forth in this Section 6.11(b), such agreement shall be reduced to writing, signed by the Disputing Members and Responding Members and shall be final and binding upon the Disputing Members and Responding Members.

(c)    If the dispute has not been resolved within 90 days of the Disputing Members' notice, the dispute may be submitted to arbitration by either the Disputing Members or the Responding Members.  Any arbitration proceeding will be conducted before one mutually agreeable arbitrator with JAMS who shall be a retired judge located in Los Angeles, California. Notwithstanding anything to the contrary in this Agreement, any party may pursue any remedy that may be otherwise available to it under this Agreement at any time in the event of a claim for breach of this Agreement caused by gross negligence, willful misconduct or fraud.

(d)    Any arbitral award issued will be conclusive and binding on the Disputing Members and Responding Members, and the Disputing Members and Responding Members shall take such further action as shall be reasonably necessary to implement the terms of such arbitral award.  The arbitrator will have no authority to award any damages inconsistent with the

DWT 29010545v3 0106299-000001
ACTIVE 209496623v.20

terms of this Agreement.  The arbitrator will render its decision in writing, explaining the reasons supporting such decision.

(e)    The fees and expenses of the arbitrator will be shared equally by the Disputing Members and Responding Members.  All other expenses and costs of the arbitration proceeding will be the responsibility of the party incurring such expenses and costs.

Section 6.12    Insurance.

(a)    The Company shall maintain the following insurance at its own expense, with insurance companies with an AM Best rating of A-, VII or better and customary coverage levels for comparable companies in the Company's industry: workers compensation, automobile, commercial general liability, umbrella/excess liability, and all risks property insurance.

(b)    The Company shall maintain a Manager and officer liability insurance policy in an appropriate amount as agreed by the Members.

Section 6.13    Change of Control.

(a)    The occurrence of one or both of the following scenarios will be deemed as a change of control event ("**Change of Control Event**"):

(i)    Change of Control at the Company. If CBE sells all or part of its Units in the Company such that its Percentage Interest in the Company would fall below fifty point one percent (50.1%); provided that, reductions of CBE´s Percentage Interest below 50.1% which are due to Capital Contributions to the Company by (and new issuances of Units by the Company to) (i) a Member other than CBE or (ii) a third party who becomes a Member shall not be considered as a Change of Control Event; or,

(ii)    Change of Control at CBE. If a Person other than Founder (a "**New Majority Shareholder**") obtains "control" (used in this Section 6.13 as defined in the definition of "Affiliate" hereunder) of CB Germany or CBE; provided that, reductions of Founder's interest in CB Germany or CB Germany's interest in CBE due to capital contributions by and share issuances to third parties shall not be considered as a Change of Control Event.

(b)    If at any time: (i) Founder, CB Germany or CBE wishes or intends to enter into one or more transactions, the effect of which would be to cause a Change of Control Event; or, (ii) CB Germany's shareholding structure has been altered in such way that a New Majority Shareholder obtains control of CB Germany or CBE; then CBE will give written notice to MERS, of such transfer or situation, as it may correspond (a "**Change of Control Notice**"). In case of any attempt of Change of Control of CB Germany or CBE referred to above, CB Germany or CBE, as the case may be, shall give notice to the New Majority Shareholder that under such event the New Majority Shareholder will be obligated to purchase all or part of MERS' Units in the Company as specified in the Put Option mentioned in Section 6.13(d) below. In case MERS exercises the Put Option one or more times and the New Majority Shareholder fails to comply to purchase the MERS' Units in the Company by the end of the last date for closing as established in paragraph Section 6.13(d) below, then on the day following

38

such date, MERS shall give notice of the New Majority Shareholder´s default and CBE will become obligated to comply with the Put Option on the same terms and conditions provided in paragraph Section 6.13(d) herein and purchase the Put Units within the following 30 days.

(c)    In the case of the Change of Control Event mentioned in Section 6.13(a)(i) above, MERS shall have the right to exercise its rights under Section 9.05. If MERS decides not to exercise these rights, from that moment on for a period of one hundred twenty (120) days MERS shall be free to sell and transfer (in one or more transactions) all or a portion of its Units to any third parties, without being subject to any of the limitations contained in this Agreement other than Section 9.01, Section 9.03 and Section 9.04; provided that the proposed transferee of such Units is not deemed by the Board, in its reasonable judgment, to be a direct competitor of the Company or a director, officer, employee or holder of more than 10% of a direct competitor of the Company.

(d)    In the case of a Change of Control Event described in Section 6.13(a)(ii), MERS shall have the right to sell and transfer (in one or more transactions) all or a portion of its Units to the New Majority Shareholder, without being subject to any of the limitations contained in this Agreement other than Section 9.01, and within one hundred twenty (120) days from the receipt by MERS of the Change of Control Notice, MERS may (but is not obligated to):

(i)    Sell to the New Majority Shareholder, on one or more occasions during such 120-day period (the "**Put Period**"), and the New Majority Shareholder shall be obligated to purchase from MERS upon exercise of such option, all or a part of MERS's Units in the Company as specified in the notice given by MERS to Controlling Shareholder and to the New Majority Shareholder (the "**Put Option**").

(ii)    The Put Option may be exercised by MERS as many times as it may correspond during the Put Period, by giving written notice to the New Majority Shareholder and CBE (the "**Put Notice**") at any time (and, for the avoidance of doubt, on one or more occasions) during the Put Period.

(iii)    In each case, the Put Notice shall specify: (A) the number and class of Units which MERS is willing to sell to the New Majority Shareholder (the "**Put Units**"); (B) the price per Unit for those Put Units (the "**Put Price**"), which shall be a sum in USD equal to the highest of: (1) two times (2x) the aggregate amounts contributed by MERS as Capital Contributions to the Company or (2) a value of an applicable annual internal rate of return for MERS of twenty percent (20%) over the aggregate amounts contributed by MERS as Capital Contributions to the Company, since the date such amounts were disbursed by MERS (such calculation shall include all distributions or any cash out payments to the MERS), divided between all MERS' Units, and multiplied by the number of Put Units; and (C) the bank account into which the Put Price shall be paid.

(iv)    Closing of the purchase of the Put Units will take place at the Company's headquarters office thirty (30) days following the date the Put Notice is given to the CBE and the New Majority Shareholder, unless the New Majority Shareholder and MERS agree in writing to a different date, time or place. After such 30-day period, and only if the purchase of the Put Units has not been executed due to causes not attributable to MERS, the New Majority

DWT 29010545v3 0106299-000001
ACTIVE 209496623v.20

Shareholder shall pay MERS daily liquidated damages calculated in accordance with the following formula, which shall be paid together with the Put Price:

$$\frac{\text{Net Profit of Company for the prior Fiscal Year} \times \text{Percentage Interest of MERS as of such date}}{360} = \text{daily liquidated damages}$$

(v)    At the closing of such purchase, MERS will deliver to the New Majority Shareholder any documentation necessary to transfer the Put Units to the New Majority Shareholder, free and clear of any lien or rights of others of any nature created by MERS, other than liens or rights created pursuant to this Agreement.

(vi)    For the avoidance of doubt, MERS shall be entitled to any distributions or return of capital relating to the Put Units which are the subject of the relevant Put Notice which were declared or otherwise had a record date on or before the date on which the Put Units have been duly transferred to the New Majority Shareholder (and New Majority Shareholder has fully paid up the Put Price and any interest accrued in MERS' favor thereon). To the extent that any such  distributions or return of capital are paid to the New Majority Shareholder, whether before or after the date where the Put Shares have been duly transferred to the New Majority Shareholder, the New Majority Shareholder shall be deemed to hold such amounts in trust and for the benefit of MERS and shall promptly pay to MERS an amount equal to the amount of such distributions or return of capital so received by it.

**ARTICLE 7**
**RIGHTS AND RESTRICTIONS ON MEMBERS**

Section 7.01    General.

(a)    Members will not have any right to act on behalf of or with respect to the Company except to the extent expressly authorized to do so by the provisions of this Agreement or by written action of the Board.  Any Person admitted to the Company as a Member following the direct Transfer of Interests from a Member will succeed to all of the rights, duties and obligations of its transferor with respect to such Interests under this Agreement.  No Member, in his, her or its capacity as a Member, may be held liable for the debts, obligations or liabilities of the Company, and no Member will be obligated, in his, her or its capacity as a Member, to provide financial, operational or performance guarantees of Company obligations.

(b)     No Member has any voting right except as expressly set forth in this Agreement and as required by non-waiveable provisions of the Act.

40

Section 7.02    Meetings of the Members.

(a)    Meetings of the Members may be called for any purpose or purposes and, unless otherwise prescribed by statute, may be called by the Board.  The Members may designate any place, either within or outside the State of Delaware, as the place of meeting for any meeting of the Members.  If no designation is made, or if a special meeting is otherwise called, the place of meeting shall be the principal executive office of the Company.

(b)    An ordinary general meeting of Members will be held within three (3) months after the end of each Fiscal Year at a time and place determined by the Board.  An extraordinary meeting of Members may be held at any time in compliance with resolutions of the Board and applicable requirements under applicable Law.

(c)    Except as provided in Section 7.02(d), written notice stating the place, day and hour of the meeting and the purpose or purposes for which the meeting is called shall be delivered not less than five (5) nor more than fifty (50) days before the date of the meeting, and in accordance with the provisions of Section 12.01.

(d)    If Members representing all of the Voting Percentage Interests shall meet at any time and place, either within or outside of the State of Delaware, and consent to the holding of a meeting at such time and place, such meeting shall be valid without call or notice, and at such meeting lawful action may be taken.

(e)    For the purpose of determining Members entitled to notice of, or to vote at, any meeting of Members, the date on which notice of the meeting is mailed shall be the record date for such determination of Members.  When a determination of Members entitled to vote at any meeting of Members has been made as provided in this Section 7.02, such determination shall apply to any adjournment thereof.

(f)    Members holding at least an aggregate 80% Voting Percentage Interest, represented in person or by proxy, shall constitute a quorum at any meeting of Members.  In the absence of a quorum at any such meeting, 80% of the Voting Percentage Interests so represented may adjourn the meeting from time to time for a period not to exceed sixty (60) days without further notice.  However, if the adjournment is for more than sixty (60) days, or if after the adjournment a new record date is fixed for the adjourned meeting, a notice of the adjourned meeting shall be given to each Member of record entitled to vote at the meeting.  At such adjourned meeting at which a quorum shall be present or represented, any business may be transacted which might have been transacted at the meeting as originally noticed.  The Members present at a duly organized meeting may continue to transact business until adjournment, notwithstanding the withdrawal during such meeting of that number of Voting Percentage Interests whose absence would cause less than a quorum.

(g)    If a quorum is present, the affirmative vote of Members holding not less than 80% of the aggregate Voting Percentage Interests present at a meeting at which a quorum is present shall be the act of the Members, unless the vote of a greater proportion or number is otherwise required by the Act or this Agreement.  Such action shall be evidenced by a written resolution for inclusion in the minutes of the Company records.

41

(h)      At all meetings of Members, a Member may vote in person or by proxy executed in writing by the Member or by a duly authorized attorney-in-fact.  Such proxy shall be filed with the Board before or at the time of the meeting.  No proxy shall be valid after eleven (11) months from the date of its execution, unless otherwise provided in the proxy.

(i)      Notwithstanding anything herein to the contrary, any action required or permitted to be taken by the Members may be taken by the Members without a meeting if the Members necessary to approve such action (if such action were taken at a meeting of the Members) execute a written consent.  Such action by written consent will have the same force and effect as a vote at a duly constituted meeting of the Members.

(j)      When any notice is required to be given to any Member, a waiver thereof in writing signed by the Member entitled to such notice, whether before, at, or after the time stated therein, shall be equivalent to the giving of such notice.

(k)      A meeting among Members may be held by any means of communication through which the participants may simultaneously hear each other during the meeting.  If all the other requirements for a meeting are met, a Member participating in a meeting by this means shall be deemed to be present at the meeting in person or by proxy, as the case may be, and the minutes may reflect such.

Section 7.03    Information; Confidentiality.

(a)      No Member will be entitled to obtain any Confidential Information relating to the Company or the Business except as expressly provided in this Agreement or to the extent required by non-waiveable provisions of the Act; and to the extent a Member obtains such Confidential Information, such Member will be subject to the provisions of this Section 7.03.

(b)      Except as contemplated hereby or required by applicable Law, each Member and Manager will keep confidential and will not disclose to others, and will use his, her or its commercially reasonable efforts to prevent such Person's Affiliates and any of such Person's or such Person's Affiliates' present or former employees, agents and representatives from disclosing to others without a Supermajority Member Vote any Confidential Information that (i) pertains to this Agreement, including any negotiations pertaining hereto, the structure of the Company, the allocation of Units hereunder, any of the transactions contemplated hereby, or the Business; or (ii) pertains to Confidential Information or proprietary information of any Member or the Company or which any Member has labeled in writing as confidential or proprietary.

(c)      Notwithstanding the confidentiality obligations of Section 7.03(b), any Member (i) may disclose to its Affiliates and such Affiliates' employees, agents, representatives, partners and investors any Confidential Information made available to such Person (provided that such recipients are subject to similar confidentiality obligations and that such disclosing Person will be responsible and liable to the Company and the other Members for any breach of such confidentiality obligations by any such recipient), (ii) may disclose such Confidential Information to bona fide prospective purchasers of such Member's direct or indirect Interests in the Company, such prospective purchasers' actual and potential sources of funding and such

42

prospective purchasers' and such actual and potential funding sources' employees, agents, representatives and investors for purposes of evaluating a potential acquisition (provided that (A) such recipients are subject to similar confidentiality obligations and that such disclosing Person will be responsible and liable to the Company and the other Members for any breach of such confidentiality obligations by any such recipient and (B) in case such Confidential Information is shared in connection with a proposed Transfer of Interests to any competitor, customer or supplier of the Company, such Member will notify the Board and the other Members in writing at least 15 days in advance of disclosing Confidential Information to such Persons, and will use commercially reasonable efforts and take additional precautions to manage the disclosure of such information in light of competitive concerns, including those efforts and precautions reasonably requested by the Board or other Members) and (iii) may disclose such Confidential Information as may be reasonably necessary to enforce such Person's rights hereunder or as may be required to comply with any applicable orders or regulations of a Governmental Entity or court of competent jurisdiction, in which case such Person will provide the Company with written notice of such requirement as soon as practicable, so that the Company may seek an appropriate protective order and, in the absence of a protective order or the receipt of a written waiver by the Company, such Person may disclose such Confidential Information only to the extent required by the applicable orders or regulatory authority and will use commercially reasonable efforts to obtain assurances that the information will be treated confidentially.

(d)    The obligations of each Member under this <u>Section 7.03</u> shall terminate with respect to such Member on the fifth anniversary of the date on which such Member ceased to be Member (including by reason of a termination of the Company pursuant to <u>Section 10.03</u>).

(e)    The term "**Confidential Information**" means information which is confidential or proprietary in nature, was provided to such Member or Manager, in his, her or its capacity as such, and relates to the Company and the Business; <u>provided</u> that "Confidential Information" will not include information (i) that is available, or becomes available, to the public through no fault or action in violation of this Agreement by such Member, Manager, Affiliate or their respective agents, representatives or employees, or (ii) that becomes available on a non-confidential basis from any source other than the Company, the Board, any other Member or Manager, or any such Person's agents, representatives, employees or Affiliates and such source is not prohibited from disclosing such information.

Section 7.04    <u>Transactions Between the Company and the Members</u>.  Subject to <u>Section 6.05</u> and except as otherwise provided by applicable Law or by this Agreement, any Member may, but will not be obligated to, lend money to the Company or any Subsidiary, act as surety for the Company or any Subsidiary and transact other business with the Company or any Subsidiary and have the same rights and obligations when transacting business with the Company or any Subsidiary as a Person who is not a Member subject to this <u>Section 7.04</u>, including CBE pursuant to that certain Project Development Agreement, dated as of June 26, 2015, by and between CBE and the Company.  The existence of these relationships and acting in such capacities will not result in the Member being deemed to be participating in the control of the business of the Company or any Subsidiary or otherwise affect the limited liability of the Member.  The provisions of this <u>Section 7.04</u> will not impair, affect or diminish the restrictions or obligations of any Person under any other agreement or instrument.

43

# ARTICLE 8
# INFORMATION RIGHTS AND TAX MATTERS

Section 8.01    Reports; Access.

(a)    Member Information Rights.  The Company will furnish to each Class A Member and any Member holding (together with any Affiliates) at least an aggregate 5% Voting Percentage Interest the following:

(i)    within 15 days after Major Holder Approval, the Strategic Plan, including the Annual Budget; and

(ii)    within 90 days after the end of each Fiscal Year: (A) an audited consolidated balance sheet as of the end of such Fiscal Year and the related consolidated income statement, statement of Members' equity and statement of cash flows for such Fiscal Year prepared in accordance with GAAP and (B) a signed audit letter from the Company's independent, external auditors related to such audited financial statements.

To the extent that a Manager designated by a particular Member receives in a timely fashion the reports and financial statements referenced above, the Company need not also provide them to the designating Member, unless requested.

(b)    Member Access Rights.  Upon request, and with reasonable prior notice to the Company, the Company will permit representatives of each Class A Member and any Member holding (together with any Affiliates) at least an aggregate 5% Voting Percentage Interest, during normal office hours, to:

(i)    visit any of the sites and premises where the Business is conducted and meet with management at reasonable times and places;

(ii)    inspect any of the offices, branches, sites, facilities, plants and equipment of the Company or its Subsidiaries; and

(iii)    have access to and make copies of the books of account and all records of the Company and its Subsidiaries.

(c)    Tax Returns. The Company will send to each Member as soon as reasonably practicable following the end of each calendar year the information necessary for the Member to complete that Member's U.S. federal and state income Tax or information returns ("**Tax Information**").  The Tax Matters Member may obtain extensions of the date on which the Company's income Tax returns are due and will notify Members of any such extension as soon as reasonably practicable after determining that it is appropriate for the Company to obtain the extension.  In that event, the Company will provide Tax Information within a reasonable period before the expiration of the term of the extension.

Section 8.02    Tax Matters Member.  CBE will be designated the tax matters partner under Section 6231 of the Code (in such capacity, the "**Tax Matters Member**") and will serve

44

as the Tax Matters Member as long as it qualifies as a tax matters partner under the Code.  The Tax Matters Member is authorized to take such actions and to execute and file all statements and forms on behalf of the Company which may be permitted or required by the applicable provisions of the Code or Treasury Regulations.  The Tax Matters Member will have full and exclusive power and authority on behalf of the Company to represent the Company (at the Company's expense) in connection with all examinations of the Company's affairs by tax authorities, including resulting administrative and judicial Proceedings, and to expend Company funds for professional services and costs associated therewith.  The Tax Matters Member will keep the Members informed as to the status of any audit of the Company's Tax affairs, and will take such action as may be permitted to cause any Member so requesting to become a "notice partner" within the meaning of Section 6223 of the Code.  If an audit of any of the Company's Tax returns occurs, the Tax Matters Member will not settle or otherwise compromise assertions of the auditing agent which may disproportionately and adversely affect any Member as compared to the position taken on the Company's Tax returns without the prior written consent of the Board.

Section 8.03   <u>Tax Classification</u>.   The Members intend that the Company shall be treated at all times as a partnership for income Tax purposes, and no Member shall take any action to the contrary, unless the Board determines that doing so would increase the net-after-Tax return of the Company's activities to the Members.

Section 8.04   <u>Tax Returns and Elections</u>. The Company's Tax year will be the calendar year.  The Board will instruct the Company's accountants to prepare and file all required income Tax returns for the Company.  The Tax Matters Member will make any Tax election for the Company necessary for completion of the Company's income Tax returns and may make any other Tax election for the Company or any Subsidiary that the Tax Matters Member considers appropriate, including any election under Section 754 of the Code to cause the basis of Property to be adjusted as provided in Sections 734 and 743 of the Code.  Each Member agrees in respect of any year in which that Member had a Capital Account in the Company that, except to the extent the Board expressly agrees otherwise in writing with him or her or it, he or she or it shall not: (i) treat, on his or her or its individual income Tax returns, any item of income, gain, loss, deduction or credit of the Company in a manner inconsistent with the treatment of that item by the Company, as reflected on the Schedule K-1 or other information statement the Company provides him or her or it, or (ii) file any claim for refund relating to any such item based on, or that would result in, any such inconsistent treatment.

Section 8.05   <u>Waiver of Participation in Tax Proceedings</u>.  Pursuant to Section 6224(b) of the Code, each Member waives any right granted by the Code to participate in any administrative proceeding of the Company for any taxable year in which the Member is a partner in the Company for U.S. federal income Tax purposes.  Each Member further waives any right granted in connection with the Tax laws of any state or local jurisdiction to participate in any administrative proceeding of the Company for any taxable year in which the Member is a partner in the Company for purposes of the Tax laws of such state or local jurisdiction.  Each Member shall, upon request by the Board, provide all additional information or documentation, execute all forms or other documents and take all other action required by law to effect such a waiver. Each Member's obligations under <u>Section 8.04</u> and this <u>Section 8.05</u> will survive such Member's

45

withdrawal from the Company.  This agreement may be filed with the Internal Revenue Service or any state or local taxing authority upon the commencement of any administrative proceeding of the Company.

# ARTICLE 9
# TRANSFERS

Section 9.01    General Transfer Provisions.  Each Member is permitted to Transfer its Units, subject to compliance with the other provisions of this Article 9 and the following:

(a)    such Member must provide the Company with five days' advance written notice of any such Transfer;

(b)    such Transfer may only be made to a Non-Sanctioned Transferee; and

(c)    no such Transfer will be permitted without a Supermajority Board Vote; provided, however, that this Section 9.01(c) will not apply to any of the following Transfers:

(i)    any Transfer following the consummation of an IPO;

(ii)    any Transfer pursuant to a merger in which the Company is a constituent entity;

(iii)    any Transfer to a wholly-owned Subsidiary or other Affiliate of the applicable Member which is not a competitor of the Company as reasonably determined by the Board;

(iv)    any Transfer occurring after the fifth anniversary of the Effective Date to a Person which is not a competitor of the Company as reasonably determined by the Board; or

(v)    any Transfer by MERS in accordance with Section 6.13.

(d)    Any such Transfer must be permitted under the Securities Act and other applicable federal or state securities Laws; provided, however, that if such Transfer occurs prior to the consummation of an IPO, the Board can condition such Transfer on the delivery of an opinion of outside counsel in form and substance satisfactory to the Company to the effect that such Transfer may be effected without registration under the Securities Act and other applicable federal or state securities;

(e)    Except following the consummation of an IPO, no such Transfer will be permitted if it would:

(i)    cause the Company to be considered a "publicly traded partnership" under Section 7704(b) of the Code within the meaning of Treasury Regulation Section 1.7704-1(h)(1)(ii), including the look-through rule in Treasury Regulation Section 1.7704-1(h)(3);

46

(ii)    affect the Company's existence or qualification as a limited liability company under the Act;

(iii)    cause material adverse Tax consequences to the Company or the Members;

(iv)    cause the Company to lose its status as a partnership for federal income Tax purposes;

(v)    cause the Company or any of the Company's Subsidiaries to be required to register as an investment company under the Investment Company Act of 1940, as amended; or

(vi)    cause the Properties of the Company or any of the Company's Subsidiaries to be deemed "plan assets" as defined under the Employee Retirement Income Security Act of 1974 or its accompanying regulations or result in any "prohibited transaction" thereunder involving the Company or any Subsidiary of the Company.

Section 9.02    Transfers in Violation of Agreement.

(a)    Transfers of Units may only be made in strict compliance with all applicable terms of this Agreement.  The Members agree that the restrictions contained in this Article 9 are fair and reasonable and in the best interests of the Company and the Members. Each Member will notify the Company in the event of any Transfer or attempted Transfer of Units in violation of Article 9 and will provide the Company with any documentation reasonably requested thereof.  In the case of a Transfer or attempted Transfer of Units that is not permitted or required by this Agreement, the Members engaging or attempting to engage in such Transfer will be liable to indemnify and hold harmless the Company and the other Members from all cost, liability and damages that any of such indemnified Persons may incur (including incremental tax liabilities, lawyers' fees and expenses) as a result of such Transfer or attempted Transfer and efforts to enforce the indemnity granted hereby.

(b)    Any purported Transfer of Units that does not so comply with all applicable provisions of this Agreement will be null and void and of no force or effect, and the Company will not recognize or be bound by any such purported Transfer and will not effect any such purported Transfer on the books of the Company or Capital Accounts of the Members.

Section 9.03    Admission of Additional Members.  The recipient of a Unit (whether such Unit is Transferred from another Member or issued by the Company) must satisfy the following conditions to be admitted as a Member:

(a)    the recipient executes and delivers an Addendum Agreement in the form attached as Exhibit C hereto to the Company;

(b)    the recipient pays or reimburses the Company for all reasonable legal costs that the Company incurs in connection with the admission of the recipient as a Member with respect to the Units received by such recipient; and

(c)    the Board must approve the admission of such Member (other than LBG in respect of conversion of the LBG Note).

Section 9.04    <u>Withdrawing Member</u>.  Upon the direct Transfer of all of the Units held by a Member, the transferor Member will cease to be a Member and to have the rights and powers afforded to a Member under this Agreement, and the transferor Member will be released from all obligations under this Agreement arising from such Person's status as a Member except (a) those obligations that by their express terms survive the termination of a Person's status as a Member as set forth in <u>Section 12.03</u>, (b) those obligations or liabilities of the transferor Member arising out of a breach of this Agreement and (c) those obligations or liabilities of the transferor Member based on events occurring, arising or maturing prior to the date of Transfer.

Section 9.05    <u>Right of First Offer; Right of Last Refusal</u>.

(a)    <u>Generally</u>.  Subject to the terms and conditions specified in this <u>Section 9.05</u>, if any Member seeks to sell or Transfer any Units (other than a Transfer pursuant to <u>Section 9.01(c)(i)</u> through <u>Section 9.01(c)(iii)</u>) (the "**ROFR Units**"), then such Member (the "**ROFR Offeror**") must first make an offering of the ROFR Units first, to the Company and second, to the other Members in accordance with the following provisions of this <u>Section 9.05</u>.

(b)    <u>ROFR</u>.

(i)    The ROFR Offeror will give written notice (the "**ROFR Notice**") to the Company and each other Member stating its bona fide intention to Transfer the ROFR Units and specifying (i) the number of ROFR Units, (ii) the proposed price per ROFR Unit (the "**ROFR Price**"), which shall be entirely in U.S. dollars (whether in the form of cash or a promissory note and whether payable immediately or deferred over time), (iii) the proposed transferee and (iv) the other material terms and conditions pursuant to which the ROFR Offeror proposes to Transfer the ROFR Units.  The ROFR Notice will constitute the ROFR Offeror's offer to Transfer the ROFR Units to the Company, which offer will be irrevocable for a period of 30 days (the "**ROFR Notice Period**").  To exercise the Company ROFR, the Company must deliver to the ROFR Offeror, by no later than the 30th day after delivery of the ROFR Notice (the "**Company Notice Date**"), a written notice notifying the ROFR Offeror that the Company intends to exercise the Company ROFR as to all or any portion of the ROFR Units (and specifying the number of Units thereof) with respect to the proposed Transfer.  If the Company does not intend to exercise the Company ROFR with respect to all ROFR Units subject to the proposed Transfer, the Company must deliver to the ROFR Offeror and each Member, by no later than the Company Notice Date, a written notice to that effect specifying the number of ROFR Units as to which the Company ROFR is not being exercised or that the Company ROFR is not being exercised as to any ROFR Units, as applicable (the "**Secondary Notice**").

(ii)    Upon receipt of the Secondary Notice, if any Member wishes to purchase any of the ROFR Units as to which the Company ROFR is not being exercised, it must do so by delivering an irrevocable written notice (the "**ROFR Offer**") to the ROFR Offeror by no later than the 30th day after delivery of the Secondary Notice (the "**Secondary Notice Date**"), which notice will state the number of ROFR Units such Member (each, a "**ROFR Purchaser**") would like to purchase up to a maximum amount equal to such ROFR Purchaser's Percentage

48

Interest Share of the ROFR Units plus the number of ROFR Units such ROFR Purchaser would like to purchase in excess of its Percentage Interest Share, if any, if other Members do not elect to purchase their full Percentage Interest Share of the ROFR Units.  The rights of each ROFR Purchaser to purchase ROFR Units in excess of its Percentage Interest Share of the ROFR Units will be based on the relative Percentage Interests of the ROFR Purchasers that desire to purchase excess ROFR Units.

(iii)    Any ROFR Offer so delivered will be binding upon delivery, irrevocable by such ROFR Purchasers and will obligate such ROFR Purchasers to purchase (and the Offering Holder to sell) the ROFR Units as to which such ROFR Offer was made in accordance with the terms and conditions set forth in the ROFR Notice within 30 days after the end of the ROFR Notice Period.

(iv)    If the ROFR Offeror does not receive offers from the ROFR Purchasers and the Company in respect of all of the ROFR Units, the ROFR Offeror will, during the 180-day period following the end of the ROFR Notice Period, have the right, but will not be required, to sell the ROFR Units to the transferee named in the ROFR Notice or an Affiliate of such transferee, in each case, at a price and on material terms no more favorable to the ROFR Offeror than those set forth in the ROFR Notice.

(v)    The closing of any sale to the Company pursuant to the Company ROFR shall occur within 60 days following the Company Notice Date, and the closing of any sale to the ROFR Purchasers in accordance with this Section 9.05 shall occur within 60 days following the Secondary Notice Date.

(c)    Cooperation.  The Company (to the extent the Company ROFR is exercised), the ROFR Offeror and the ROFR Purchasers will take all actions as may be reasonably necessary to consummate the transactions contemplated by this Section 9.05, including entering into agreements and delivering certificates and instruments and consents as may be deemed necessary or appropriate.

Section 9.06    Legend.  Each Member hereby agrees that the following legend may be placed upon any counterpart of this Agreement, the Certificate of Formation or any other document or instrument evidencing ownership of Units:

THE UNITS REPRESENTED BY THIS DOCUMENT HAVE NOT BEEN REGISTERED UNDER ANY SECURITIES LAWS AND THE TRANSFERABILITY OF SUCH UNITS IS RESTRICTED.  SUCH UNITS MAY NOT BE SOLD, ASSIGNED OR TRANSFERRED, NOR WILL ANY ASSIGNEE, VENDEE, TRANSFEREE OR ENDORSEE THEREOF BE RECOGNIZED AS HAVING ACQUIRED ANY SUCH UNITS BY THE ISSUER FOR ANY PURPOSES, UNLESS (a) A REGISTRATION STATEMENT UNDER THE SECURITIES ACT OF 1933, AS AMENDED, WITH RESPECT TO SUCH UNITS WILL THEN BE IN EFFECT AND SUCH TRANSFER HAS BEEN QUALIFIED UNDER ALL APPLICABLE STATE SECURITIES LAWS, OR (b) THE AVAILABILITY OF AN EXEMPTION FROM SUCH REGISTRATION AND QUALIFICATION WILL BE ESTABLISHED TO THE SATISFACTION OF COUNSEL TO THE ISSUER.

THE UNITS REPRESENTED BY THIS DOCUMENT ARE SUBJECT TO FURTHER RESTRICTIONS AS TO THEIR SALE, TRANSFER, HYPOTHECATION OR ASSIGNMENT AS SET FORTH IN THE AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT OF THE COMPANY, WHICH IS AVAILABLE AT THE PRINCIPAL OFFICE OF THE COMPANY.

Section 9.07   Distributions and Allocations in Respect of Transferred Units.  If a Unit is Transferred in whole or in part during any Fiscal Year in compliance with the provisions of this Article 9, Net Profits, Net Losses, each item thereof and all other items attributable to the Transferred Unit for such Fiscal Year will be divided and allocated between the transferor and the transferee by taking into account their varying interests during the Fiscal Year or other relevant period in accordance with Code Section 706(d), based upon an interim closing of the books or any other convention permitted by Law and approved by the Company and the transferor Member.  All distributions on or before the date of such Transfer will be made to the transferor, and all distributions thereafter will be made to the transferee, provided that any distributions to be made to the transferee under Section 5.01 will be determined by taking into account the Tax consequences and distributions previously made to the transferor (and any predecessors in interest) in the manner determined appropriate by the Board.  Solely for purposes of making such allocations and distributions, the Company will recognize such Transfer not later than the end of the calendar month during which it is given notice of such Transfer; provided, however, that if the Company is given notice of a Transfer at least 10 Business Days prior to the Transfer, the Company will recognize such Transfer as of the date of such Transfer and; provided, further, that if the Company does not receive a notice stating the date such Unit was transferred and such other information as the Company may reasonably require within 30 days after the end of the Fiscal Year during which the Transfer occurs, then all such items will be allocated, and all distributions will be made, to the Person who, according to the books and records of the Company, was the owner of the Unit on the last day of such Fiscal Year.  Neither the Company nor any Member will incur any liability for making allocations and distributions in accordance with the provisions of this Section 9.07, whether or not any Member or the Company has knowledge of any Transfer of ownership of any Units.

## ARTICLE 10
## DISSOLUTION AND WINDING UP

Section 10.01  Dissolution Events.

(a)    Dissolution.  The Company will dissolve and will commence winding up and liquidating upon the first to occur of any of the following (each a "**Dissolution Event**"):

(i)    a Supermajority Board Vote and Supermajority Member Vote to dissolve, wind up and liquidate the Company in accordance with Article 6;

(ii)    at any time when there are no Members; and

(iii)    a judicial determination that an event has occurred that makes it unlawful, impossible or impractical to carry on the Business.

50

The Members hereby agree that, notwithstanding any provision of the Act, the Company will not dissolve prior to the occurrence of a Dissolution Event.

Section 10.02  Winding Up.  Upon the occurrence of (i) a Dissolution Event or (ii) the determination by a court of competent jurisdiction that the Company has dissolved prior to the occurrence of a Dissolution Event, the Liquidator will attempt to sell the Company as a going concern for the period of 180 days and if the Liquidator determines that it is unable to sell the Company as a going concern within such 180-day period, the Company will continue solely for the purposes of winding up its affairs in an orderly manner, liquidating its assets and satisfying the claims of its creditors and Members, and no Member will take any action that is inconsistent with, or not necessary to or appropriate for, the winding up of the Company's business and affairs; provided, however, that all covenants contained in this Agreement and obligations provided for in this Agreement will continue to be fully binding upon the Members until such time as the Property has been distributed pursuant to this Section 10.02 and the Certificate of Formation has been canceled pursuant to the Act.  The Liquidator will be responsible for overseeing the winding up and dissolution of the Company, which winding up and dissolution will be completed within 90 days of the occurrence of the Dissolution Event.  The Liquidator will take full account of the Company's liabilities and Property and will cause the Property or the proceeds from the sale thereof (as determined pursuant to Section 10.06), to the extent sufficient therefor, to be applied and distributed, to the maximum extent permitted by Law, in the following order:

(a)    first, to creditors (including Members who are creditors, to the extent otherwise permitted by Law) in satisfaction of all of the Company's debts and other liabilities (whether by payment or the making of reasonable provision for payment thereof; e.g., setting up an escrow fund for contingent liabilities in such amounts and for such term as the Liquidator may reasonably determine), other than liabilities for which reasonable provision for payment has been made and liabilities for distribution to partners under the Act; and

(b)    the balance, if any, to the Members in accordance with Section 5.01(a).

Except with respect to services performed by a Member as the Liquidator, if any, no Member will receive additional compensation for any services performed pursuant to this Article 10.

Section 10.03  Notice of Dissolution/Termination.

(a)    In the event a Dissolution Event occurs or an event occurs that would, but for provisions of Section 10.01, result in a dissolution of the Company, the Company will, within 30 days thereafter, provide written notice thereof to each of the Members.

(b)    Upon completion of the distribution of the Property as provided in this Article 10, the Company will be terminated, and the Liquidator will cause the filing of a certificate of cancellation pursuant to the Act and will take all such other actions as may be necessary to terminate the Company.

51

Section 10.04  <u>Allocations During Period of Liquidation</u>.  During the period commencing on the first day of the Fiscal Year during which a Dissolution Event occurs and ending on the date on which all of the assets of the Company have been distributed to the Members pursuant to <u>Section 10.02</u>, Net Profits and Net Losses and items of income, gain, loss and deduction will continue to be allocated among the Members pursuant to <u>Article 4</u>.

Section 10.05  <u>The Liquidator</u>.

(a)      <u>Definition</u>.  The term "**Liquidator**" will mean a Third Party liquidator appointed by the Board.

(b)      <u>Fees</u>.  The Company is authorized to pay a reasonable fee to the Liquidator for its services performed pursuant to this <u>Article 10</u> and to reimburse the Liquidator for its reasonable costs and expenses incurred in performing those services.

(c)      <u>Indemnification</u>.  The Company will indemnify, save harmless and pay all judgments and claims against such Liquidator or any officers, directors, agents or employees of the Liquidator relating to any liability or damage incurred by reason of any act performed or omitted to be performed by the Liquidator, or any officers, directors, agents or employees of the Liquidator in connection with the liquidation of the Company, including reasonable attorneys' fees incurred by the Liquidator, officer, director, agent or employee in connection with the defense of any action based on any such act or omission, which attorneys' fees may be paid as incurred, except to the extent such liability or damage is caused by the fraud, intentional misconduct of, or a knowing violation of the Laws by the Liquidator which was material to the cause of action.

Section 10.06  <u>Form of Liquidating Distributions</u>.  For purposes of making distributions required by <u>Section 10.02</u> hereof, the Liquidator may determine whether to distribute all or any portion of the Property in kind or to sell all or any portion of the Property and distribute the proceeds therefrom.  To the extent any Property is distributed in kind, the Liquidator (instead of the Board) will determine its Fair Market Value and will give notice of the determination to the Members at least 30 days prior to distribution.

**ARTICLE 11**
**INDEMNIFICATION**

Section 11.01  <u>Indemnification of Covered Persons</u>.  The Company will, to the fullest extent permitted by the Act, indemnify any Person who was or is a party or is threatened to be made a party to any threatened, pending or completed action, suit or Proceeding, whether civil, criminal, administrative or investigative by reason of the fact that such Person is or was a Member, Manager or Officer of the Company, or is or was serving at the request of the Company as a member, officer or director of another limited liability company, corporation, partnership, joint venture, trust or other enterprise (each, a "**Covered Person**"), against expenses (including reasonable attorneys' fees), liabilities, judgments, penalties, fines and amounts paid in settlement (including all interest, assessments and other charges paid or payable in connection with or in respect of such liabilities, judgments, penalties, fines and amounts paid in settlement) actually

DWT 29010545v3 0106299-000001
ACTIVE 209496623v.20

and reasonably incurred by such Covered Person in connection with such action, suit or Proceeding, provided that:

(a)    such Covered Person acted in good faith and in a manner such Covered Person reasonably believed to be in or not opposed to the best interests of the Company, consistent with the terms of this Agreement; and

(b)    with respect to any criminal action or Proceeding, such Covered Person had no reasonable cause to believe his conduct was unlawful.

(i)    The termination of any action, suit or Proceeding by judgment, order, settlement, conviction, or upon a plea of *nolo contendere* or its equivalent, will not, of itself, create a presumption that a Covered Person did not act in good faith and in a manner which such Covered Person reasonably believed to be in or not opposed to the best interests of the Company, and, with respect to any criminal action or Proceeding, had reasonable cause to believe that his conduct was unlawful.

Section 11.02  Advancement of Expenses.  The Company will, to the fullest extent permitted by the Act, advance expenses incurred by a Covered Person in defending or investigating a threatened or pending action, suit or Proceeding in advance of the final disposition of such action, suit or Proceeding promptly upon (but in any event within five days of) receipt of an unsecured undertaking by or on behalf of such Covered Person to repay such amount if it will ultimately be determined that such Covered Person is not entitled to be indemnified by the Company as authorized by this Article 11.

Section 11.03  Directors' and Officers' Insurance.  On such terms as the Board approves, the Company will secure insurance coverage on behalf of any Person who is or was a Covered Person, providing adequate coverage with a financially sound and reputable insurer or insurers, against any liability asserted against such Covered Person and incurred by such Covered Person in any such capacity, or arising out of such Covered Person's status as such, whether or not the Company would have the power or the obligation to indemnify the Covered Person against such liability under the provisions of this Article 11.

Section 11.04  Survival of Indemnification and Advancement of Expenses.  The indemnification and advancement of expenses provided by, or granted pursuant to, this Article 11 will, unless otherwise provided when authorized or ratified, continue as to a Person who has ceased to be a Member, Manager or Officer and will inure to the benefit of the heirs, executors and administrators of such Person and will survive the liquidation of the Company.  No amendment or repeal of the provisions of this Article 11 that adversely affects the rights of any Covered Person under this Article 11 with respect to the acts or omissions of such Covered Person at any time prior to such amendment or repeal will apply to such Covered Person without the written consent of the Covered Person.

Section 11.05  Limitation on Indemnification.  Notwithstanding anything else in this Agreement to the contrary, the Company will not be obligated to indemnify any Covered Person or advance expenses to any Covered Person for (a) any Proceeding initiated by such Covered Person against the Company unless that Proceeding was brought to enforce such Covered

Person's right to indemnification under this <u>Article 11</u> and, in such Proceeding, it is determined that such Covered Person is entitled to indemnification, or (b) any Proceeding brought by the Company against such Covered Person unless such Covered Person is found not to be liable to the Company.

Section 11.06  <u>Indemnification of Employees and Agents</u>.  The Company may, to the extent authorized from time to time by the Board, provide rights to indemnification and the advancement of expenses to employees and agents of the Company similar to those conferred in this <u>Article 11</u> to Members, Managers or Officers of the Company.

Section 11.07  <u>Severability of Indemnification</u>.  The provisions of this <u>Article 11</u> are intended to comply with the Act.  To the extent that any provision of this <u>Article 11</u> authorizes or requires indemnification or the advancement of expenses contrary to the Act, the Company's power to indemnify or advance expenses under such provision will be limited to that permitted by the Act and any limitation required by the Act will not affect the validity of any other provision of this <u>Article 11</u>.

Section 11.08  <u>Company as Indemnitor of First Resort</u>.   The rights of indemnification provided in this <u>Article 11</u> are in addition to any rights to which a Covered Person may otherwise be entitled by contract (including advancement of expenses) or as a matter of Law.   The Company hereby acknowledges that the Covered Persons may have certain rights to indemnification, advancement of expenses and/or insurance provided by the Members and certain of their Affiliates (collectively, the "**Member Indemnitors**").  The Company hereby agrees that (a) the Company is the indemnitor of first resort for matters covered by this <u>Article 11</u> (i.e., its obligations to the Covered Persons under this <u>Article 11</u> are primary and any obligation of the Member Indemnitors to advance expenses or to provide indemnification for the same expenses or liabilities incurred by the Covered Persons are secondary), and (b) the Company will be required to advance the full amount of expenses incurred by the Covered Persons and will be liable for all expenses, liabilities, judgments, penalties, fines and amounts paid in settlement to the extent legally permitted and as required by the terms of this <u>Article 11</u> (or any other agreement between the Company and the Covered Persons), without regard to any rights the Covered Persons may have against the Member Indemnitors, and (c) the Company irrevocably waives, relinquishes and releases the Member Indemnitors from any and all claims against the Member Indemnitors for contribution or any other recovery of any kind (other than subrogation) in respect thereof.  The Company further agrees that no advancement or payment by the Member Indemnitors on behalf of a Covered Person with respect to any claim for which the Covered Person has sought indemnification from the Company pursuant to this <u>Article 11</u> will affect the foregoing, and the Member Indemnitors will have a right of contribution and/or be subrogated to the extent of such advancement or payment to all of the rights of recovery of the Covered Persons against the Company.  The Company agrees that the Member Indemnitors who are not Members are express third party beneficiaries of the terms of this <u>Section 11.08</u>.

# ARTICLE 12
## MISCELLANEOUS

Section 12.01  <u>Notices</u>.   Any notice, payment, demand or communication required or permitted to be given by any provision of this Agreement will be in writing and will be deemed to have been delivered, given and received for all purposes (i) if delivered personally, to the Person or to an officer of the Person to whom the same is directed, or (ii) when the same is actually received, if sent either by registered or certified mail, postage and charges prepaid, or by email, addressed as follows, or to such other address as such Person may from time to time specify by notice to the Company and the other Members:

(a)     If to the Company, to the address set forth in or determined pursuant to <u>Section 2.04</u>, with a copy (not constituting notice) to each of the Members at the applicable address set forth on <u>Exhibit A</u>; and

(b)     If to a Member, to the applicable address set forth on <u>Exhibit A</u>, with a copy (not constituting notice) to such Member's representative (as applicable) identified on <u>Exhibit A</u>; and

Section 12.02  <u>Binding Effect; Third Party Beneficiaries</u>.   Except as otherwise provided in this Agreement, every covenant, term and provision of this Agreement will be binding upon and inure to the benefit of the Members and their respective successors, transferees and assigns, and by their signatures hereto, the Company and each Member intends to and does hereby become bound.   Nothing expressed or mentioned in this Agreement is intended or will be construed to give any Person other than the parties hereto and their respective successors and permitted assigns any legal or equitable right, remedy or claim under, in or in respect of this Agreement or any provision herein contained, except as expressly provided in this Agreement. Notwithstanding the foregoing, Covered Persons shall be express third party beneficiaries with respect to their indemnity rights under <u>Article 11</u>.   Except as set forth herein, if a Member directly Transfers Units to a transferee in accordance with this Agreement, the rights associated with such Units under this Agreement will be fully assigned to such transferee; it being understood that the assignment of any rights under this Agreement will not constitute admission to the Company as a Member unless and until such transferee is duly admitted as a Member in accordance with this Agreement.

Section 12.03  <u>Survival of Terms</u>.   The provisions of Section 10.05(c), <u>Article 11</u>, <u>Section 7.03</u>, and this <u>Article 12</u> will survive the dissolution, liquidation, winding up and termination of the Company and such provisions will continue to bind and/or benefit any current or former Members (or their respective Affiliates, representatives or agents, as applicable) following such termination or such time as such Members cease to be Members of the Company.

Section 12.04  <u>Construction</u>.   Every covenant, term and provision of this Agreement will be construed simply according to its fair meaning and not strictly for or against any Member.

Section 12.05  <u>Severability</u>.   Except as otherwise provided in the succeeding sentence, every provision of this Agreement is intended to be severable, and, if any term or provision of this Agreement is illegal or invalid for any reason whatsoever, such illegality or invalidity will

not affect the validity or legality of the remainder of this Agreement.  The preceding sentence of this <u>Section 12.05</u> will be of no force or effect if the consequence of enforcing the remainder of this Agreement without such illegal or invalid term or provision would be to cause any Member to lose the material benefit of its economic bargain.

Section 12.06  <u>Governing Law</u>.  Except as expressly provided in <u>Section 12.07(d)</u>, this Agreement, and all claims, disputes, actions or other litigation that may be based upon, arise out of or relate to this Agreement or the negotiation, execution or performance of this Agreement, whether in contract, tort, equity or otherwise (each, a "**Dispute**"), will be construed in accordance with and be governed by the Laws of the State of Delaware without regard to principles of conflicts of Laws that would permit or require the application of Laws of another jurisdiction.

Section 12.07  <u>Dispute Resolution; Consent to Jurisdiction; Waiver of Jury Trial</u>.

(a)     Any controversy, dispute or claim arising from or related to this Agreement shall be resolved as set forth in <u>Section 6.11</u> above.

(b)     Each party hereby irrevocably consents and submits to the personal jurisdiction of, and venue in, the Superior Court for Los Angeles County, California, in any legal action, equitable suit, arbitration or other proceeding under, arising from or related to this Agreement, the interpretation, breach, termination or validity hereof, or any of the transactions contemplated hereunder.

(c)     EACH PARTY VOLUNTARILY AND IRREVOCABLY WAIVES ANY RIGHT TO TRIAL BY JURY OF ANY DISPUTE.  EACH OF THE PARTIES HEREBY AGREES AND CONSENTS THAT ANY DISPUTE WILL BE DECIDED BY COURT TRIAL WITHOUT A JURY AND THAT THE PARTIES MAY FILE AN ORIGINAL COUNTERPART OF A COPY OF THIS AGREEMENT WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF THE PARTIES TO THE WAIVER OF THEIR RIGHT TO TRIAL BY JURY.

(d)     Each Member acknowledges that notwithstanding anything to the contrary in this Agreement, MERS reserves all immunities, defenses, rights or actions arising out MERS' sovereign status or under the Eleventh Amendment to the United States Constitution, except to the extent waived by statute. No waiver of such reserved immunities, defenses, rights, or actions shall be implied or otherwise deemed to exist by reason of its entry into this Agreement, by any express or implied provision thereof or by any actions or omissions to act by MERS or any of its representatives or agents, whether taken pursuant to this Agreement or prior to MERS' execution hereof.  This <u>Section 12.07(d)</u> shall be governed by, and construed in accordance with, the laws of the State of Michigan, United States of America.

(e)     Any breach of this Agreement shall be deemed to be a breach of any other agreements related hereto, including but not limited to, the Subscription Agreement, Stock Purchase Agreement, and Second Amended and Restated Shareholders Agreement executed in connection herewith.

56

Section 12.08  <u>Specific Performance</u>.  Each party hereto acknowledges that a breach or threatened breach by such party of any of its obligations under this Agreement would give rise to irreparable harm to the other parties, for which monetary damages would not be an adequate remedy, and hereby agrees that in the event of a breach or a threatened breach by such party of any such obligations (including, for the avoidance of doubt, the disclosure of Confidential Information in violation of <u>Section 7.03</u> and the proposed Transfer of Units in violation of <u>Article 9</u>), each of the other parties hereto will, in addition to any and all other rights and remedies that may be available to them in respect of such breach, be entitled to seek equitable relief, including the issuance of a temporary restraining order, an injunction, specific performance or the enforcement of other equitable remedies against such party at the suit of an aggrieved party without the posting of any bond or other security, to compel specific performance of all of the terms of this Agreement, and waives any defenses thereto, including the defenses of: (a) failure of consideration, (b) breach of any other provision of this Agreement and (c) availability of relief in damages.

Section 12.09  <u>No Recourse</u>.  This Agreement may only be enforced against, and any Dispute may only be brought against, the entities that are expressly named as parties hereto and then only with respect to the specific obligations set forth herein with respect to each such party. Except to the extent a named party (and then only to the extent of the specific obligations undertaken by such named party in this Agreement and not otherwise), no past, present or future director, officer, employee, incorporator, authorized person, member, partner, stockholder, Affiliate, agent, attorney or their respective Affiliates shall have any liability (whether in contract or tort) for any one or more of the representations, warranties, covenants, agreements or other obligations or liabilities of any party under this Agreement (whether for indemnification or otherwise) of or for any claim based on, in respect of, or by reason of, the transactions contemplated by this Agreement.

Section 12.10  <u>Further Assurances</u>.  In connection with this Agreement and the transactions contemplated hereby, the Company and each Member will execute and deliver all such future instruments and take such other and further action as may be reasonably necessary or appropriate to carry out the provisions of this Agreement and the intention of the parties as expressed herein.

Section 12.11  <u>Entire Agreement; Supersedure</u>.  This Agreement constitutes the entire agreement of the Members and the Company relating to the subject matter hereof and supersedes all prior contracts or agreements with respect thereto, whether oral or written.

Section 12.12  <u>Effect of Waiver or Consent</u>.  A waiver or consent, express or implied, to or of any breach or default by any Person in the performance by that Person of its obligations with respect to the Company is not a consent or waiver to or of any other breach or default in the performance by that Person of the same or any other obligations of that Person with respect to the Company.  Failure on the part of a Person to complain of any act of any Person or to declare any Person in default with respect to the Company, irrespective of how long that failure continues, does not constitute a waiver by that Person of its rights with respect to that default until the applicable statute-of-limitations period has run.

57

Section 12.13 <u>Amendment</u>.   No provision of this Agreement may be amended or modified except by an instrument in writing executed by the Company and approved by a Supermajority Member Vote.  Any such written amendment or modification will be binding upon the Company and each Member; <u>provided</u>, <u>however</u>, that an amendment or modification modifying the rights or obligations of any Member in a manner that is disproportionately adverse to such Member relative to the rights of the other Members will be effective only with such Member's consent; <u>provided</u>, <u>further</u>, that any amendment or restatement to provide for the creation and/or issuance of Units (including the creation and issuance of a new class of Units) approved in accordance with <u>Article 6</u> shall not be deemed to affect any Member or class of Members more adversely than any other Member or class of Members.  Notwithstanding the foregoing, <u>Exhibit A</u> may be amended and updated by the Board from time to time following any new issuance, redemption, repurchase or direct Transfer of Units in accordance with this Agreement without the consent of or execution by the Members.

Section 12.14 <u>Counterparts</u>.  This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement.  The exchange of copies hereof, including signature pages hereto, by facsimile, e-mail or other means of electronic transmission shall constitute effective execution and delivery hereof as to the parties and may be used in lieu of the original Agreement for all purposes. Signatures transmitted by facsimile, e-mail or other means of electronic transmission shall be deemed to be original signatures for all purposes.

**[*Signature Pages Follow*]**

DWT 29010545v3 0106299-000001
ACTIVE 209496623v.20

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed and delivered as of the Effective Date.

**COMPANY:**

**CONCORD BLUE DEVELOPMENT, LLC**

By: _____

Name: Christopher Thannhaeuser
Title:  CEO

[Signature Page to Amended and Restated Limited Liability Company Agreement]

**MEMBERS:**

**CONCORD BLUE ENERGY, INC.**

By: _____
       Name: Christopher Thannhaeuser
       Title:  CEO

[Signature Page to Amended and Restated Limited Liability Company Agreement]

**MUNICIPAL EMPLOYEES' RETIREMENT SYSTEM OF MICHIGAN**

By verdant*f* AG pursuant to power of attorney dated March 8, 2016

By: _____

    Name: Gaia Arnaboldi

    Title: Managing Partner

By: _____

    Name:  Berry Polmann

    Title:  Managing Partner

[Signature Page to Amended and Restated Limited Liability Company Agreement]

**<u>EXHIBIT A</u>**

**MEMBERS**

As of the Effective Date.

**Common Units**

| Member | Address | Initial Capital Contributions | Additional Contributions | Class A Units | Class B Units | Percentage Interest | Voting Percentage Interest |
|---|---|---|---|---|---|---|---|
| Concord Blue Energy, Inc. | 12424 Wilshire Blvd. Suite 660 Los Angeles, CA 90025 Phone: +1 310 979 2900 | $67,024,998.65 | $0 | 0 | 72,459,458 | 99.999999% | 72.833% |
| Municipal Employees' Retirement System of Michigan | Verdantƒ AG (on behalf of the Municipal Employees' Retirement System of Michigan) Attention: Ms. Gaia Arnaboldi / Mr. Berry Polmann, Gladbachstrasse 105, 8044 Zurich, Switzerland (Phone: +41795553375 / +41795555373; E-Mail: gaia@verdantf.com / berry@verdantf.com | $0.00[1] | $0 | 1 | 0 | 0.000001% | 27.167% |
| | **TOTAL** | $67,024,998.65 | $0 | 1 | 72,459,458 | 100.00% | 100.00% |

---

[1] $25,000,000 in Escrow Account to be treated as set forth in Section 3.04(b).

A-1

## <u>EXHIBIT B</u>

### INITIAL BOARD OF MANAGERS

| <u>NAME</u> | <u>CLASS</u> | <u>ADDRESS</u> |
|---|---|---|
| Christopher Charlie Thannhaeuser | CBE Manager | c/o Concord Blue Energy, Inc. 12424 Wilshire Blvd. Suite 660 Los Angeles, CA 90025 Phone: +1 310 979 2900 Email:  ct@concordblue.de |
| Gregory Bilson | CBE Manager | c/o Concord Blue Energy, Inc. 12424 Wilshire Blvd. Suite 660 Los Angeles, CA 90025 Phone: +1 310 979 2900 Email: gb@concordblueenergy.com |
| Wesley Bilson | CBE Manager | c/o Concord Blue Energy, Inc. 12424 Wilshire Blvd. Suite 660 Los Angeles, CA 90025 Phone: +1 310 979 2900 Email: wb@concordblueenergy.com |
| Berry Polmann | MERS Manager | c/o Verdant∫ AG (on behalf of the Municipal Employees' Retirement System of Michigan) Gladbachstrasse 105, 8044 Zurich, Switzerland (Phone: +41795555373; E-Mail: berry@verdantf.com |
| Gaia Arnaboldi | MERS Manager | c/o Verdant∫ AG (on behalf of the Municipal Employees' Retirement System of Michigan) Gladbachstrasse 105, 8044 Zurich, Switzerland (Phone: +41795553375; E-Mail: gaia@verdantf.com |

B-1

<u>**EXHIBIT C**</u>

**ADDENDUM AGREEMENT**

This Addendum Agreement is made this ___ day of _____, 201__, by and between _____ (the "**Recipient**") and **Concord Blue Development, LLC**, a Delaware limited liability company (the "**Company**"), pursuant to the terms of the Amended and Restated Limited Liability Company Agreement of the Company dated as of March 21, 2015 (as amended, supplemented, restated or modified from time to time, the "**LLC Agreement**"). Capitalized terms used but not otherwise defined herein will have the meanings ascribed to them in the LLC Agreement.

WITNESSETH:

WHEREAS, the Company and the Members entered into the LLC Agreement to impose certain restrictions and obligations upon themselves, and to provide certain rights, with respect to the Company and its Units; and

WHEREAS, the Company and the Members have required in the LLC Agreement that all Persons to whom Units of the Company are transferred and all other Persons acquiring Units (each such Person, a "**New Member**") must enter into an Addendum Agreement binding the New Member to the LLC Agreement to the same extent as if the New Member were an original party thereto and imposing the same restrictions and obligations on the New Member and the Units to be acquired by the New Member as are imposed upon the Members under the LLC Agreement;

NOW, THEREFORE, in consideration of the mutual promises of the parties and as a condition of the purchase or receipt by the Recipient of the Units, the Recipient acknowledges and agrees as follows:

1. The Recipient has received and read the LLC Agreement and acknowledges that the Recipient is acquiring Units subject to the terms and conditions of the LLC Agreement.

2. The Recipient agrees that the Units acquired or to be acquired by the Recipient are bound by and subject to all of the terms and conditions of the LLC Agreement, and hereby joins in, and agrees to be bound by, and will have the benefit of, all of the terms and conditions of the LLC Agreement to the same extent as if the Recipient were an original party to the LLC Agreement; provided, however, that the Recipient's joinder in the LLC Agreement will not constitute admission of the Recipient as a Member unless and until the Recipient is duly admitted in accordance with the terms of the LLC Agreement. This Addendum Agreement will be attached to and become a part of the LLC Agreement.

3. The Recipient hereby represents and warrants, with respect to the Recipient, as of the date hereof to the Company the matters set forth in <u>Section 3.12</u> of the LLC Agreement and agrees to notify the Company promptly if any such representation or warranty becomes untrue at any time.

C-1

4.   Any notice required as permitted by the LLC Agreement will be given to the Recipient at the address listed beneath the Recipient's signature below.

5.   The Recipient irrevocably makes, constitutes and appoints the Company as the Recipient's true and lawful agent and attorney-in-fact.

6.   THIS ADDENDUM AGREEMENT, AND ALL CLAIMS, DISPUTES, ACTIONS OR OTHER LITIGATION THAT MAY BE BASED UPON, ARISE OUT OF OR RELATE TO THIS ADDENDUM AGREEMENT OR THE NEGOTIATION, EXECUTION OR PERFORMANCE OF THIS ADDENDUM AGREEMENT, WILL BE CONSTRUED IN ACCORDANCE WITH AND BE GOVERNED BY THE LAWS OF THE STATE OF DELAWARE WITHOUT REGARD TO PRINCIPLES OF CONFLICTS OF LAWS THAT WOULD PERMIT OR REQUIRE THE APPLICATION OF LAWS OF ANOTHER JURISDICTION.

*[Signature Page Follows]*

C-2

_____
Recipient

Address:

_____

_____


     AGREED TO on behalf of the Members of the Company pursuant to <u>Section 9.03</u> of the LLC Agreement.

**Concord Blue Development, LLC**


By:_____

Name: _____

Title: _____


C-1

DWT 29010545v3 0106299-000001
ACTIVE 209496623v.20

**<u>EXHIBIT D</u>**

**CONTRIBUTED PROJECTS**

CBE's equity interest in the Eagar, Arizona Project
CBE's equity interest in the Herten, Germany Project

D-1

# **EXHIBIT E**

## **ESCROW AGREEMENT**

E-1

## ESCROW AGREEMENT

This Escrow Agreement dated this 21st day of March, 2016 (this "Escrow Agreement"), is entered into by and among Concord Blue Energy, Inc., a Delaware corporation ("CBE"), Concord Blue Development, LLC, a Delaware limited liability company ("CBD"), and Municipal Employees' Retirement System of Michigan, a public nonprofit corporation established and maintained under the laws of the State of Michigan ("MERS") (CBE, CBD and MERS collectively, the "Parties," and individually, a "Party"), and Wells Fargo Bank, National Association, a national banking association organized under the laws of the United States, as escrow agent ("Escrow Agent").

### RECITALS

A. MERS and CBE and/or CBD have entered into (i) that certain Stock Purchase Agreement, dated as of March 8, 2016 (the "SPA"); (ii) that certain Subscription Agreement, dated as of March 8, 2016 (the "Subscription Agreement"); and (iii) that certain Amended and Restated Limited Liability Company Agreement, dated as of March 21, 2016 (the "LLC Agreement") (each of the SPA, the Subscription Agreement and the LLC Agreement is sometimes referred to herein individually as a "Transaction Document" and collectively as the "Transaction Documents");

B. Section 2.1 of the Subscription Agreement provides that, at Closing (as defined therein), a cash amount equal to $25,000,000 (the "Escrow Amount") shall be deposited into escrow to be held in accordance with the terms of this Escrow Agreement for the purpose of establishing a source of funds to fund Capital Contributions (as defined in the LLC Agreement) of MERS into CBD;

C. MERS agrees to place in escrow certain funds and the Escrow Agent agrees to hold and distribute such funds in accordance with the terms of this Escrow Agreement; and

D. the Parties hereto acknowledge that the Escrow Agent is not a party to, is not bound by, and has no duties or obligations under, the Transaction Documents, that all references in this Escrow Agreement to the Transaction Documents are for convenience, and that the Escrow Agent shall have no implied duties beyond the express duties set forth in this Escrow Agreement;

In consideration of the promises and agreements of the Parties and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties and the Escrow Agent agree as follows:

### ARTICLE 1
### ESCROW DEPOSIT

Section 1.1    Receipt of Escrow Property.  Following execution hereof, MERS shall deliver to the Escrow Agent the Escrow Amount in immediately available funds.

Section 1.2      Investments.

(a)      The Escrow Agent is authorized and directed to deposit, transfer, hold and invest the Escrow Property (as defined below) and any investment income thereon as set forth in Exhibit A hereto, or as set forth in any subsequent written instruction signed by MERS and CBD. Any investment earnings and income (including dividends, distributions, interest and gains earned or realized) on the Escrow Amount (all such amounts, including earnings and income on such amounts are referred to herein as the "Earnings" and, together with the Escrow Amount, are sometimes referred to as the "Escrow Property") shall be added to the account containing the Escrow Amount upon which such Earnings were earned. All such Earnings shall be disbursed with the Escrow Amount in accordance with Section 1.4, Section 1.5, Section 1.6 and Section 1.10 of this Escrow Agreement.

(b)      The Escrow Agent is hereby authorized and directed to sell or redeem any such investments as it deems necessary to make any payments or distributions required under this Escrow Agreement.  The Escrow Agent shall have no responsibility or liability for any loss which may result from any investment or sale of investment made pursuant to this Escrow Agreement.  The Escrow Agent is hereby authorized, in making or disposing of any investment permitted by this Escrow Agreement, to deal with itself (in its individual capacity) or with any one or more of its affiliates, whether it or any such affiliate is acting as agent of the Escrow Agent or for any third person or dealing as principal for its own account.  The Parties acknowledge that the Escrow Agent is not providing investment supervision, recommendations, or advice.

(c)      The Parties agree that confirmations of permitted investments are not required to be issue by the Escrow Agent for each month in which a monthly statement is rendered.  No statement need be rendered for any fund or account if no activity occurred in such fund or account during such month.

Section 1.3      Procedures with Respect to Capital Contributions.  CBD and MERS from time to time may provide jointly executed instructions to the Escrow Agent directing the Escrow Agent to pay and deliver to CBD from the Escrow Property as a Capital Contribution (as defined in the LLC Agreement) an amount equal to the amount set forth in such jointly executed instructions. Upon receipt of such jointly executed instructions, the Escrow Agent shall pay and deliver to CBD from the Escrow Property the amount set forth in such jointly executed instructions, which amount shall be treated as a Capital Contribution by MERS to CBD in accordance with Section 3.04(b) of the LLC Agreement.

Section 1.4      Release of Escrow Property to MERS.

(a)      Release for Material Breach.  For purposes of this Escrow Agreement, "Business Day" means any day, other than a Saturday or a Sunday, that is neither a legal holiday nor a day on which the Escrow Agent or banking institutions are generally authorized or required by Law to close in Lansing, Michigan or Los Angeles, California.  Pursuant to Section 2.07 of the Subscription Agreement, in the event of a material breach of any covenant or any of the representations and warranties contained in the SPA or the Subscription Agreement, MERS shall have the right by executed instructions to the Escrow Agent to immediately terminate the Escrow

Account and withdraw the remaining Escrow Property contained therein, subject to <u>Section 1.4(b)</u> below.  If, at any time MERS desires to make a claim against the Escrow Property pursuant to its rights under Section 2.07 of the Subscription Agreement (a "<u>Material Breach Claim</u>"), MERS shall deliver a written notice of the Material Breach Claim (a "<u>Material Breach Claim Notice</u>") to the Escrow Agent and CBD specifying the nature of the Material Breach Claim, and MERS' payment delivery instructions.

(b)    <u>Response by CBD</u>.  No later than 5:00 pm Pacific Time on the  fortieth (40th) Business Day following but not including the date of receipt by the Escrow Agent of any Material Breach Claim Notice ("<u>Material Breach Response Period</u>"), CBD shall, with respect to such Material Breach Claim Notice, by notice to MERS and the Escrow Agent (a "<u>Material Breach Response Notice</u>"), either (i) concede the Material Breach Claim, (ii) deny the Material Breach Claim or (iii) assert that the applicable material breach has been cured.  If CBD denies liability in whole or in part or asserts that the applicable material breach has been cured, such Material Breach Response Notice shall be accompanied by a reasonably detailed description of the basis for such denial or the circumstances of such cure, as applicable.  If CBD has conceded the Material Breach Claim, the Escrow Agent shall promptly pay to MERS the entire amount of the Escrow Property then remaining in the Escrow Account.

(c)    <u>Resolutions of Disputes</u>.

(i)    If CBD has denied the Material Breach Claim or asserts that the Material Breach Claim has been cured, CBD and MERS shall attempt to resolve such dispute as promptly as possible.  If CBD and MERS resolve such dispute, they shall deliver to the Escrow Agent jointly executed instructions to (A) maintain the Escrow Property in the Escrow Account, or (B) promptly pay to MERS the entire amount of the Escrow Property then remaining in the Escrow Account (such joint notice, the "<u>Material Breach Resolution Notice</u>").

(ii)    If CBD and MERS fail to resolve such dispute within thirty (30) calendar days following but not including the date of receipt by the Escrow Agent of the Material Breach Response Notice corresponding to such dispute, any such dispute with respect to a Material Breach Claim may be submitted by any party for resolution in accordance with the terms of the Subscription Agreement. Any final, non-appealable judicial decision or award, decree, injunction, judgment or order, or any final, non-appealable quasi-judicial or arbitration decision or award, ruling, or writ arising thereby shall serve as a final, conclusive and binding decision hereunder (the "<u>Final Decision</u>").  Such Final Decision shall direct the Escrow Agent to either (A) maintain the Escrow Property in the Escrow Account, or (B) promptly pay to MERS the entire amount of the Escrow Property then remaining in the Escrow Account (a "<u>Payment Order</u>").

(d)    <u>Payment</u>.  The Escrow Agent promptly shall pay, no later than the third (3rd) Business Day following the determination of a Payment Event (as such term is defined below), to MERS, the entire amount of the Escrow Property then remaining in the Escrow Account: (i) following any concession of a Material Breach Claim by CBD pursuant to <u>Section 1.4(b)</u> of this Escrow Agreement or in any Material Breach Resolution Notice; (ii) if the Escrow Agent did not receive a Material Breach Response Notice from CBD prior to the expiration of the Material Breach Response Period; or (iii) following receipt by the Escrow Agent of a Payment Order

pursuant to any Final Decision along with a certification from the presenting Party that such decision is final, non-appealable and from a court of competent jurisdiction or arbitrator in accordance with the terms of the Subscription Agreement, (collectively, the events described in the foregoing clauses (i), (ii) and (iii), the "Payment Events").

Section 1.5    Release After Fifth Anniversary.    For a period of ten (10) Business Days following March 21, 2021, CBD may direct the Escrow Agent to pay to MERS the entire amount of the Escrow Property then remaining in the Escrow Account pursuant to Section 3.04(b)(ii) of the LLC Agreement by delivering to the Escrow Agent written instructions executed by CBD stating that CBD is electing to direct the Escrow Agent to pay to MERS the entire amount of the Escrow Property then remaining in the Escrow Account pursuant to Section 3.04(b)(ii) of the LLC Agreement.  Upon receipt of such written instructions executed by CBD, the Escrow Agent shall promptly pay to MERS the entire amount of the Escrow Property then remaining in the Escrow Account.

Section 1.6    Release Following Notice of Unit Redemption.    If MERS exercises its right to have all or part of its Units (as defined in the LLC Agreement) redeemed by CBD in accordance with Section 3.09(b) of the LLC Agreement (a "Unit Redemption"), then for a period of thirty (30) days following CBD's receipt of notice from MERS electing such Unit Redemption, CBD may direct the Escrow Agent to pay to MERS the entire amount of the Escrow Property then remaining in the Escrow Account pursuant to Section 3.09(c) of the LLC Agreement by delivering to the Escrow Agent written instructions executed by CBD stating that a Unit Redemption has been elected and that CBD is electing to direct the Escrow Agent to pay to MERS the entire amount of the Escrow Property then remaining in the Escrow Account.  Upon receipt of such written instructions, the Escrow Agent shall promptly pay to MERS the entire amount of the Escrow Property then remaining in the Escrow Account.

Section 1.7    Joint Instructions.    In the event that the Parties jointly instruct the Escrow Agent to disburse the Escrow Property to any party, the Escrow Agent shall comply with such instructions, any provision herein to the contrary notwithstanding.

Section 1.8    Security Procedure For Funds Transfers.    The Escrow Agent shall confirm each funds transfer instruction received in the name of a Party by means of the security procedure selected by such Party and communicated to the Escrow Agent through a signed certificate in the form of Exhibit B-1 or Exhibit B-2 attached hereto, which upon receipt by the Escrow Agent shall become a part of this Escrow Agreement.  Once delivered to the Escrow Agent, Exhibit B-1 or Exhibit B-2 may be revised or rescinded only by a writing signed by an authorized representative of the Party.  Such revisions or rescissions shall be effective only after actual receipt and following such period of time as may be necessary to afford the Escrow Agent a reasonable opportunity to act on it.  If a revised Exhibit B-1 or Exhibit B-2 or a rescission of an existing Exhibit B-1 or Exhibit B-2 is delivered to the Escrow Agent by an entity that is a successor-in-interest to such Party, such document shall be accompanied by additional documentation satisfactory to the Escrow Agent showing that such entity has succeeded to the rights and responsibilities of the Party under this Escrow Agreement.

The Parties understand that the Escrow Agent's inability to receive or confirm funds transfer instructions pursuant to the security procedure selected by such Party may result in a delay in

accomplishing such funds transfer, and agree that the Escrow Agent shall not be liable for any loss caused by any such delay.

Section 1.9    Income Tax Allocation and Reporting.

(a)    The Parties agree that, for tax reporting purposes, all interest and other income from investment of the Escrow Property shall, as of the end of each calendar year and to the extent required by the Internal Revenue Service, be reported as having been earned by MERS, whether or not such income was disbursed during such calendar year.

(b)    For certain payments made pursuant to this Escrow Agreement, the Escrow Agent may be required to make a "reportable payment" or "withholdable payment" and in such cases the Escrow Agent shall have the duty to act as a payor or withholding agent, respectively, that is responsible for any tax withholding and reporting required under Chapters 3, 4, and 61 of the United States Internal Revenue Code of 1986, as amended (the "Code").  The Escrow Agent shall have the sole right to make the determination as to which payments are "reportable payments" or "withholdable payments."  All parties to this Escrow Agreement shall provide an executed IRS Form W-9 or appropriate IRS Form W-8 (or, in each case, any successor form) to the Escrow Agent prior to the date hereof, and shall promptly update any such form to the extent such form becomes obsolete or inaccurate in any respect.  The Escrow Agent shall have the right to request from any party to this Escrow Agreement, or any other person or entity entitled to payment hereunder, any additional forms, documentation or other information as may be reasonably necessary for the Escrow Agent to satisfy its reporting and withholding obligations under the Code.  To the extent any such forms to be delivered under this Section 1.9(b) are not provided prior to the date hereof or by the time the related payment is required to be made or are determined by the Escrow Agent to be incomplete and/or inaccurate in any respect, the Escrow Agent  shall be entitled to withhold (without liability) a portion of any interest or other income earned on the investment of the Escrow Property or on any such payments hereunder to the extent withholding is required under Chapters 3, 4, or 61 of the Code, and shall have no obligation to gross up any such payment.

(c)    To the extent that the Escrow Agent becomes liable for the payment of any taxes in respect of income derived from the investment of the Escrow Property, the Escrow Agent shall satisfy such liability to the extent possible from Earnings derived from the Escrow Property.  The Parties, jointly and severally, shall indemnify, defend and hold the Escrow Agent harmless from and against any tax, late payment, interest, penalty or other cost or expense that may be assessed against the Escrow Agent on or with respect to the Escrow Property and the investment thereof unless such tax, late payment, interest, penalty or other expense was directly caused by the gross negligence or willful misconduct of the Escrow Agent.  The indemnification provided by this Section 1.9(c) is in addition to the indemnification provided in Section 3.1 and shall survive the resignation or removal of the Escrow Agent and the termination of this Escrow Agreement.

(d)    The Parties hereto acknowledge that the Escrow Agent, in order to help fight the funding of terrorism and money laundering activities, Federal law requires all financial institutions to obtain, verify and record information that identifies each person or corporation who opens an account and /or enters into a business relationship. The Parties hereby agree that they shall provide the Escrow Agent with such information as the Escrow Agent may request

including, but not limited to, each Party's name, physical address, tax identification number and other information that will assist the Escrow Agent identify and verify each Party's identity such as organizational documents, certificates of good standing, license to do business, or other pertinent identifying information.

Section 1.10   Termination.  This Escrow Agreement shall terminate upon the disbursement of all of the Escrow Property, including any Earnings thereon, in accordance with the terms of this Escrow Agreement. Upon termination, this Escrow Agreement shall be of no further force and effect except that the provisions of Sections 1.9(c), 3.1 and 3.2 and Article 4 hereof shall survive termination.

ARTICLE 2
DUTIES OF THE ESCROW AGENT

Section 2.1   Scope of Responsibility.  Notwithstanding any provision to the contrary, the Escrow Agent is obligated only to perform the duties specifically set forth in this Escrow Agreement, which shall be deemed purely ministerial in nature.  Under no circumstance will the Escrow Agent be deemed to be a fiduciary to any Party or any other person under this Escrow Agreement.  The Escrow Agent will not be responsible or liable for the failure of any Party to perform in accordance with this Escrow Agreement. The Escrow Agent shall neither be responsible for, nor chargeable with, knowledge of the terms and conditions of any other agreement, instrument, or document other than this Escrow Agreement, whether or not an original or a copy of such agreement has been provided to the Escrow Agent; and the Escrow Agent shall have no duty to know or inquire as to the performance or nonperformance of any provision of any such agreement, instrument, or document.  References in this Escrow Agreement to any other agreement, instrument, or document are for the convenience of the Parties, and the Escrow Agent has no duties or obligations with respect thereto.  The Escrow Agent will not be responsible to determine or to make inquiry into any term, capitalized, or otherwise, not defined herein. This Escrow Agreement sets forth all matters pertinent to the escrow contemplated hereunder, and no additional obligations of the Escrow Agent shall be inferred or implied from the terms of this Escrow Agreement or any other agreement.

Section 2.2   Attorneys and Agents.  The Escrow Agent shall be entitled to rely on and shall not be liable for any action taken or omitted to be taken by the Escrow Agent in accordance with the written advice of counsel or other professionals retained or consulted by the Escrow Agent.  The Escrow Agent shall be reimbursed as set forth in Section 3.1 for any and all compensation (fees, expenses and other costs) paid and/or reimbursed to such counsel and/or professionals.  The Escrow Agent may perform any and all of its duties through its agents, representatives, attorneys, custodians, and/or nominees.  The Escrow Agent shall not be responsible for the negligence or misconduct of agents or attorneys appointed by it with reasonable care.

Section 2.3   Reliance.  The Escrow Agent shall not be liable for any action taken or not taken by it in accordance with the written direction or written consent of the Parties or their respective agents, representatives, successors, or assigns.  The Escrow Agent shall not be liable for acting or refraining from acting upon any written notice, request, consent, direction, requisition, certificate, order, affidavit, letter, or other paper or document reasonably believed by it to be genuine and correct and to have been signed or sent by the proper person or persons, without

Exhibit E - 6

further inquiry into the person's or persons' authority.  Concurrent with the execution of this Escrow Agreement, the Parties shall deliver to the Escrow Agent Exhibit B-1 and Exhibit B-2, which contain authorized signer designations in Part I thereof.

Section 2.4    Right Not Duty Undertaken.  The permissive rights of the Escrow Agent to do things enumerated in this Escrow Agreement shall not be construed as duties.

Section 2.5    No Financial Obligation.  No provision of this Escrow Agreement shall require the Escrow Agent to risk or advance its own funds or otherwise incur any financial liability or potential financial liability in the performance of its duties or the exercise of its rights under this Escrow Agreement.

ARTICLE 3
PROVISIONS CONCERNING THE ESCROW AGENT

Section 3.1    Indemnification.  The Parties jointly and severally, shall indemnify, defend and hold harmless the Escrow Agent from and against any and all loss, liability, cost, damage and expense, including, without limitation, attorneys' fees and expenses or other professional fees and expenses which the Escrow Agent may suffer or incur by reason of any action, claim or proceeding brought against the Escrow Agent, arising out of or relating in any way to this Escrow Agreement or any transaction to which this Escrow Agreement relates, unless such loss, liability, cost, damage or expense shall have been finally adjudicated to have been caused by the willful misconduct or gross negligence of the Escrow Agent. The provisions of this Section 3.1 shall survive the resignation or removal of the Escrow Agent and the termination of this Escrow Agreement.

Section 3.2    Limitation of Liability.  THE ESCROW AGENT SHALL NOT BE LIABLE, DIRECTLY OR INDIRECTLY, FOR ANY (I) DAMAGES, LOSSES OR EXPENSES ARISING OUT OF THE SERVICES PROVIDED HEREUNDER, OTHER THAN DAMAGES, LOSSES OR EXPENSES WHICH HAVE BEEN FINALLY ADJUDICATED TO HAVE DIRECTLY RESULTED FROM THE ESCROW AGENT'S GROSS NEGLIGENCE OR WILLFUL MISCONDUCT, OR (II) SPECIAL, INDIRECT, PUNITIVE, OR CONSEQUENTIAL DAMAGES OR LOSSES OF ANY KIND WHATSOEVER (INCLUDING WITHOUT LIMITATION LOST PROFITS), EVEN IF THE ESCROW AGENT HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH LOSSES OR DAMAGES AND REGARDLESS OF THE FORM OF ACTION.

Section 3.3    Resignation or Removal.  The Escrow Agent may resign by furnishing written notice of its resignation to the Parties, and the Parties may remove the Escrow Agent by furnishing to the Escrow Agent a joint written notice of its removal along with payment of all fees and expenses to which the Escrow Agent is entitled through the date of removal.  Such resignation shall be effective thirty (30) calendar days after the delivery of such notice or upon the earlier appointment of a successor, and such removal shall be effective upon the date specified in the joint written notice of removal, and in either case the Escrow Agent's sole responsibility thereafter shall be to safely keep the Escrow Property and to deliver the same to a successor escrow agent as shall be appointed by the Parties, as evidenced by a joint written notice filed with the Escrow Agent or in accordance with a court order.  If the Parties have failed

Exhibit E - 7

to appoint a successor escrow agent prior to the expiration of thirty (30) calendar days following the delivery of such notice of resignation or the date specified in the joint written notice of removal, the Escrow Agent may petition any court of competent jurisdiction for the appointment of a successor escrow agent or for other appropriate relief, and any such resulting appointment shall be binding upon the Parties.

Section 3.4    <u>Compensation</u>.    The Escrow Agent shall be entitled to compensation for its services as stated in the fee schedule attached hereto as <u>Exhibit C</u>, which compensation shall be paid by CBD. The fee agreed upon for the services rendered hereunder is intended as full compensation for the Escrow Agent's services as contemplated by this Escrow Agreement; provided, however, that in the event that the conditions for the disbursement of funds under this Escrow Agreement are not fulfilled, or the Escrow Agent renders any service not contemplated in this Escrow Agreement, or there is any assignment of interest in the subject matter of this Escrow Agreement, or any material modification hereof, or if any material controversy arises hereunder, or the Escrow Agent is made a party to any litigation pertaining to this Escrow Agreement or the subject matter hereof, then the Escrow Agent shall be compensated for such extraordinary services and reimbursed for all costs and expenses, including reasonable attorneys' fees and expenses, occasioned by any such delay, controversy, litigation or event.  If any amount due to the Escrow Agent hereunder is not paid within thirty (30) calendar days of the date due as indicated in a written invoice delivered to CBD and MERS, the Escrow Agent is hereby granted the right to set off and deduct any unpaid fees, non-reimbursed expenses and unsatisfied indemnification rights from the Escrow Property.   The Escrow Agent shall have, and is hereby granted, a prior lien upon the Escrow Property with respect to its unpaid fees, non-reimbursed expenses and unsatisfied indemnification rights, superior to the interests of any other persons or entities.

Section 3.5    <u>Disagreements</u>.    If any conflict, disagreement or dispute arises between, among, or involving any of the parties hereto concerning the meaning or validity of any provision hereunder or concerning any other matter relating to this Escrow Agreement, or the Escrow Agent is in doubt as to the action to be taken hereunder, the Escrow Agent may, at its option, retain the Escrow Property until the Escrow Agent (i) receives a final non-appealable order of a court of competent jurisdiction or a final non-appealable arbitration decision directing delivery of the Escrow Property, (ii) receives a written agreement executed by each of the parties involved in such disagreement or dispute directing delivery of the Escrow Property, in which event the Escrow Agent shall be authorized to disburse the Escrow Property in accordance with such final court order, arbitration decision, or agreement, or (iii) files, upon two (2) Business Days' prior notice to the Parties, an interpleader action in any court of competent jurisdiction, and upon the consent of such court, the Escrow Agent shall be relieved of all liability as to the Escrow Property and shall be entitled to recover its reasonable out of pocket attorneys' fees, expenses and other costs incurred in commencing and maintaining any such interpleader action .  Any such court order or arbitration decision shall be accompanied by a written instrument of the presenting Party certifying that such court order or arbitration decision is final, non-appealable and from a court of competent jurisdiction or from a competent arbitration panel, upon which instrument the Escrow Agent shall be entitled to conclusively rely without further investigation. The Escrow Agent shall be entitled to act on any such agreement, court order, or arbitration decision without further question, inquiry, or consent.

Section 3.6    Merger or Consolidation.  Any corporation or association into which the Escrow Agent may be converted or merged, or with which it may be consolidated, or to which it may sell or transfer all or substantially all of its corporate trust business and assets as a whole or substantially as a whole, or any corporation or association resulting from any such conversion, sale, merger, consolidation or transfer to which the Escrow Agent is a party, shall be and become the successor escrow agent under this Escrow Agreement and shall have and succeed to the rights, powers, duties, immunities and privileges as its predecessor, without the execution or filing of any instrument or paper or the performance of any further act.

Section 3.7    Attachment of Escrow Property; Compliance with Legal Orders.  In the event that any Escrow Property shall be attached, garnished or levied upon by any court order, or the delivery thereof shall be stayed or enjoined by an order of a court, or any order, judgment or decree shall be made or entered by any court order affecting the Escrow Property, the Escrow Agent is hereby expressly authorized, in its reasonable discretion, to respond as it deems appropriate or to comply with all writs, orders or decrees so entered or issued, or which it is advised in writing by legal counsel of its own choosing is binding upon it, whether with or without jurisdiction.  In the event that the Escrow Agent obeys or complies with any such writ, order or decree it shall not be liable to any of the Parties or to any other person, firm or corporation, should, by reason of such compliance notwithstanding, such writ, order or decree be subsequently reversed, modified, annulled, set aside or vacated.  The Escrow Agent shall further have no obligation to pursue any action that is not in accordance with applicable law.

Section 3.8    Force Majeure.  The Escrow Agent shall not be responsible or liable for any failure or delay in the performance of its obligation under this Escrow Agreement arising out of or caused, directly or indirectly, by circumstances beyond its reasonable control, including, without limitation, acts of God; earthquakes; fire; flood; wars; acts of terrorism; civil or military disturbances; sabotage; epidemic; riots; interruptions, loss or malfunctions of utilities, computer (hardware or software) or communications services; accidents; labor disputes; acts of civil or military authority or governmental action; it being understood that the Escrow Agent shall use commercially reasonable efforts which are consistent with accepted practices in the banking industry to resume performance as soon as reasonably practicable under the circumstances.

ARTICLE 4
MISCELLANEOUS

Section 4.1    Successors and Assigns.  This Escrow Agreement shall be binding on and inure to the benefit of the Parties and the Escrow Agent and their respective successors and permitted assigns. No other persons shall have any rights under this Escrow Agreement.  No assignment of the interest of any of the Parties in this Escrow Agreement or the Escrow Property shall be binding unless and until written notice of such assignment shall be delivered to the other Party and the Escrow Agent and shall require the prior written consent of the other Party and the Escrow Agent (such consent not to be unreasonably withheld, conditioned or delayed).

Section 4.2    Escheat.  The Parties are aware that under applicable state law, property which is presumed abandoned may under certain circumstances escheat to the applicable state.  The Escrow Agent shall have no liability to the Parties, their respective heirs, legal representatives,

successors and assigns, or any other party, should any or all of the Escrow Property escheat by operation of law.

Section 4.3    Notices.    All notices, requests, demands, and other communications required under this Escrow Agreement shall be in writing, in English, and shall be deemed to have been duly given if delivered (i) personally, (ii) by facsimile transmission with written confirmation of receipt, (iii) on the day of transmission if sent by electronic mail ("e-mail", as long as such e-mail is accompanied by a PDF signature or similar version of the relevant document bearing an authorized signature, which such signature shall, in the case of each of the parties, be a signature set forth in Exhibit B-1 or B-2, as applicable) to the e-mail address given below, and written confirmation of receipt is obtained promptly after completion of transmission, (iv) by overnight delivery with a reputable national overnight delivery service, or (v) by mail or by certified mail, return receipt requested, and postage prepaid.  If any notice is mailed, it shall be deemed given five (5) Business Days after the date such notice is deposited in the United States mail. For the purpose of this Escrow Agreement, If notice is given to a party, it shall be given at the address for such party set forth below.  It shall be the responsibility of the Parties to notify the Escrow Agent and the other Party in writing of any name or address changes.  In the case of communications delivered to the Escrow Agent, such communications shall be deemed to have been given on the date received by the Escrow Agent.

If to MERS:

Verdant*f* AG (on behalf of the Municipal Employees' Retirement System of Michigan)
Attention: Ms. Gaia Arnaboldi / Mr. Berry Polmann
Gladbachstrasse 105, 8044
Zurich, Switzerland
Facsimile Number: 795553375 / 795555373;
E-Mail: gaia@verdantf.com / berry@verdantf.com

If to CBD:
Concord Blue Development, LLC
c/o Concord Blue Energy, Inc.
12424 Wilshire Boulevard, Suite 660
Los Angeles, California 90025
Attention: President
E-Mail: cb@concordblueenergy.com

with a copy contemporaneously sent to:

Concord Blue Engineering GmbH
Konigsallee 6, 40212
Duesseldorf, Germany
Attention Christopher Thannhaeuser, Chairman
Facsimile Number: 492113230505
E-Mail: ct@concordblue.de

If to the Escrow Agent:

Wells Fargo Bank, National Association
Corporate Trust Services, MAC E2064-05A
333 S. Grand Avenue, Fifth Floor, Suite 5A
Los Angeles, CA 90071
Attn: Kheang "TK" Tan
Telephone:  (213) 253-7505
Facsimile:  (213) 253-7597
Email: kheang.b.tan@wellsfargo.com

Section 4.4      Governing Law.  This Agreement shall be governed and controlled as to validity, enforcement, interpretation, construction, effect and in all other respects by the internal laws of the State of California, without regard to any conflict of laws principles of the State of California.

Section 4.5      Consent to Jurisdiction.  Each Party hereby irrevocably consents and submits to the personal jurisdiction of, and venue in, the Superior Court for Los Angeles County, California, in any legal action, equitable suit, arbitration or other proceeding under, arising from or related to this Agreement, the interpretation, breach, termination or validity hereof, or any of the transactions contemplated hereunder.

Section 4.6      Sovereignty.  MERS reserves all immunities, defenses, rights or actions arising out the Investor's sovereign status or under the Eleventh Amendment to the United States Constitution, except to the extent waived by statute. No waiver of such reserved immunities, defenses, rights or actions shall be implied or otherwise deemed to exist by reason of its entry into this Agreement, by any express or implied provision thereof or by any actions or omissions to act by MERS or any of its representatives or agents, whether taken pursuant to this Agreement or prior to the Investor's execution thereof. This provision shall be governed by, and construed in accordance with, the laws of the State of Michigan, United States of America.

Section 4.7      Entire Agreement.  This Escrow Agreement and the exhibits hereto set forth the entire agreement and understanding of the parties related to the Escrow Property.

Section 4.8      Amendment.  This Escrow Agreement may be amended, modified, superseded, rescinded, or canceled only by a written instrument executed by the Parties and the Escrow Agent.

Section 4.9    Waivers.  The failure of any party to this Escrow Agreement at any time or times to require performance of any provision under this Escrow Agreement shall in no manner affect the right at a later time to enforce the same performance.  A waiver by any party to this Escrow Agreement of any such condition or breach of any term, covenant, representation, or warranty contained in this Escrow Agreement, in any one or more instances, shall neither be construed as a further or continuing waiver of any such condition or breach nor a waiver of any other condition or breach of any other term, covenant, representation, or warranty contained in this Escrow Agreement.

Section 4.10    Headings.  Section headings of this Escrow Agreement have been inserted for convenience of reference only and shall in no way restrict or otherwise modify any of the terms or provisions of this Escrow Agreement.

Section 4.11    Counterparts.    This Escrow Agreement may be executed in one or more counterparts, each of which when executed shall be deemed to be an original, and such counterparts shall together constitute one and the same instrument. The exchange of copies of this Escrow Agreement and of signature pages by facsimile or by electronic image scan transmission in .pdf format shall constitute effective execution and delivery of this Escrow Agreement as to the Parties and the Escrow Agent and may be used in lieu of the original Escrow Agreement for all purposes.

Section 4.12    Trial by Jury.  Each of the parties hereto hereby irrevocably waives all right to trial by jury to the extent permitted by law in any litigation, action, proceeding in any court arising out of, relating to or in connection with this Escrow Agreement.

Section 4.13    Publication; Disclosure.  By executing this Escrow Agreement, the Parties and the Escrow Agent acknowledge that this Escrow Agreement (including related attachments) contains certain information that is sensitive and confidential in nature and agree that such information needs to be protected from improper disclosure, including the publication or dissemination of this Escrow Agreement and related information to individuals or entities not a party (or who are not advisors to or representatives of a party with a contractual or professional obligation of confidentiality to such party) to this Escrow Agreement.  The Parties further agree to take reasonable measures to mitigate any risks associated with the publication or disclosure of this Escrow Agreement and information contained therein, including, without limitation, the redaction of the manual signatures of the signatories to this Escrow Agreement, or, in the alternative, publishing a conformed copy of this Escrow Agreement.  If a Party must disclose or publish this Escrow Agreement or information contained therein pursuant to any regulatory, statutory, or governmental requirement, as well as any judicial, or administrative order, subpoena or discovery request, it shall notify in writing the other Party and the Escrow Agent at the time of execution of this Escrow Agreement of the legal requirement to do so.  If any Party becomes aware of any threatened or actual unauthorized disclosure, publication or use of this Escrow Agreement, that Party shall promptly notify in writing the other Parties and the Escrow Agent and shall be liable for any unauthorized release or disclosure made by it.  The parties acknowledge that MERS is subject to the Michigan Freedom of Information Act ("MFOIA").  The parties consent to the disclosure of confidential information to employees of MERS who are made aware of the confidential nature of such information and their obligations with respect thereto. The parties agree that in the event MERS receives a request under the MFOIA to

disclose such confidential information it shall not be obligated to provide notice to or cooperate with the efforts of any other party in connection with any challenge to its standing to obtain a protective order or other remedy to protect such confidential information from being disclosed pursuant to such MFOIA request.

[The remainder of this page left intentionally blank.]

       IN WITNESS WHEREOF, this Escrow Agreement has been duly executed as of the date first written above.

CBD:

CONCORD BLUE DEVELOPMENT, LLC

By: _____
Name:  Christopher Thannhaeuser
Title:   CEO

CBE:

CONCORD BLUE ENERGY, INC.

By: _____
Name:  Christopher Thannhaeuser
Title:  CEO

MUNICIPAL EMPLOYEES'
RETIREMENT SYSTEM OF MICHIGAN

By verdant*f* AG pursuant to power of
attorney dated March 8, 2016

By:_____
Name:
Title:

By:_____
Name:
Title:

WELLS FARGO BANK, NATIONAL
ASSOCIATION, as Escrow Agent

By:     _____

Name:  _____

Title:   _____

<u>EXHIBIT A</u>

**Agency and Custody Account Direction**
**For Cash Balances**
**Wells Fargo Money Market Deposit Accounts**

Direction to use the following Wells Fargo Money Market Deposit Accounts for Cash Balances for the escrow account or accounts (the "<u>Account</u>") established under the Escrow Agreement to which this Exhibit A is attached.

You are hereby directed to deposit, as indicated below, or as MERS and CBD  shall jointly direct further in writing from time to time, all cash in the Account in the following money market deposit account of Wells Fargo Bank, National Association:

Wells Fargo Money Market Deposit Account (MMDA)

MERS and CBD understand that amounts on deposit in the MMDA are insured, subject to the applicable rules and regulations of the Federal Deposit Insurance Corporation (FDIC), in the basic FDIC insurance amount of $250,000 per depositor, per insured bank. This includes principal and accrued interest up to a total of $250,000.

MERS and CBD acknowledge that together they have full power to direct investments of the Account.

MERS and CBD understand that they may change this direction at any time and that it shall continue in effect until revoked or modified by MERS and CBD by joint written notice to you.

_____
Date

## EXHIBIT B-1

CBD and CBE certify that the names, titles, telephone numbers, e-mail addresses and specimen signatures set forth in Parts I and II of this Exhibit B-1 identify the persons authorized to provide direction and initiate or confirm transactions, including funds transfer instructions, on behalf of CBD and CBE, and that the option checked in Part III of this Exhibit B-1 is the security procedure selected by CBD and CBE for use in verifying that a funds transfer instruction received by the Escrow Agent is that of CBD and CBE.

CBD and CBE have reviewed each of the security procedures and has determined that the option checked in Part III of this Exhibit B-1 best meets its requirements; given the size, type and frequency of the instructions it will issue to the Escrow Agent.  By selecting the security procedure specified in Part III of this Exhibit B-1, CBD and CBE acknowledges that it has elected to not use the other security procedures described and agrees to be bound by any funds transfer instruction, whether or not authorized, issued in its name and accepted by the Escrow Agent in compliance with the particular security procedure chosen by CBD and CBE.

NOTICE:  The security procedure selected by CBD and CBE will not be used to detect errors in the funds transfer instructions given by CBD and CBE.  If a funds transfer instruction describes the beneficiary of the payment inconsistently by name and account number, payment may be made on the basis of the account number even if it identifies a person different from the named beneficiary.  If a funds transfer instruction describes a participating financial institution inconsistently by name and identification number, the identification number may be relied upon as the proper identification of the financial institution.  Therefore, it is important that CBD and CBE take such steps as it deems prudent to ensure that there are no such inconsistencies in the funds transfer instructions it sends to the Escrow Agent.

**Part I**

**Name, Title, Telephone Number, Electronic Mail ("e-mail") Address and Specimen Signature for person(s) designated to provide direction, including but not limited to funds transfer instructions, and to otherwise act on behalf of CBD and CBE**

| Name | Title | Telephone Number | E-mail Address | Specimen Signature |
|---|---|---|---|---|
| _____ | _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ | _____ |

**Part II**

**Name, Title, Telephone Number and E-mail Address for person(s) designated to confirm funds transfer instructions**

| Name | Title | Telephone Number | E-mail Address |
|---|---|---|---|
| _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ |

**Part III**

**Means for delivery of instructions and/or confirmations**

The security procedure to be used with respect to funds transfer instructions is checked below:

☐ _Option 1.  Confirmation by telephone call-back_.  The Escrow Agent shall confirm funds transfer instructions by telephone call-back to a person at the telephone number designated on Part II above.  The person confirming the funds transfer instruction shall be a person other than the person from whom the funds transfer instruction was received, unless only one person is designated in both Parts I and II of this Exhibit B-1.

  ☐ CHECK box, if applicable:
    If the Escrow Agent is unable to obtain confirmation by telephone call-back, the Escrow Agent may, at its discretion, confirm by e-mail, as described in Option 2.

☒ _Option 2.  Confirmation by e-mail_.  The Escrow Agent shall confirm funds transfer instructions by e-mail to a person at the e-mail address specified for such person in Part II of this Exhibit B-1. The person confirming the funds transfer instruction shall be a person other than the person from whom the funds transfer instruction was received, unless only one person is designated in both Parts I and II of this Exhibit B-1.   CBD and CBE understand the risks associated with communicating sensitive matters, including time sensitive matters, by e-mail.  CBD and CBE further acknowledges that instructions and data sent by e-mail may be less confidential or secure than instructions or data transmitted by other methods. The Escrow Agent shall not be liable for any loss of the confidentiality of instructions and data prior to receipt by the Escrow Agent.

  ☒ CHECK box, if applicable:
    If the Escrow Agent is unable to obtain confirmation by e-mail, the Escrow Agent may, at its discretion, confirm by telephone call-back, as described in Option 1.

☐ *_Option 3. Delivery of funds transfer instructions by password protected file transfer system only - no confirmation_.  The Escrow Agent offers the option to deliver funds transfer instructions through a password protected file transfer system. If CBD and CBE wishes to use the password protected file transfer system, further instructions will be provided by the Escrow Agent.  If CBD chooses this Option 3, it agrees that no further confirmation of funds transfer instructions will be performed by the Escrow Agent.

☐ *_Option 4.  Delivery of funds transfer instructions by password protected file transfer system with confirmation_.  Same as Option 3 above, but the Escrow Agent shall confirm funds transfer instructions by ☐ telephone call-back or ☐ e-mail (must check at least one, may check both) to a person at the telephone number or e-mail address designated on Part II above.  By checking a box in the prior sentence, the party shall be deemed to have agreed to the terms of such confirmation option as more fully described in Option 1 and Option 2 above.

_*The password protected file system has a password that expires every 60 days. If you anticipate having infrequent activity on this account, please consult with your Escrow Agent before selecting this option._

**Dated this _____ day of March, 2016.**

CONCORD BLUE DEVELOPMENT, LLC

**By _____**
**Name:  Christopher Thannhaeuser**
**Title: CEO**

Exhibit E - 19

CONCORD BLUE ENERGY, INC.

**By** _____
**Name:  Christopher Thannhaeuser**
**Title: CEO**

<u>EXHIBIT B-2</u>

MERS certifies that the names, titles, telephone numbers, e-mail addresses and specimen signatures set forth in Parts I and II of this Exhibit B-2 identify the persons authorized to provide direction and initiate or confirm transactions, including funds transfer instructions, on behalf of MERS, and that the option checked in Part III of this Exhibit B-2 is the security procedure selected by MERS for use in verifying that a funds transfer instruction received by the Escrow Agent is that of MERS.

MERS has reviewed each of the security procedures and has determined that the option checked in Part III of this Exhibit B-2 best meets its requirements; given the size, type and frequency of the instructions it will issue to the Escrow Agent.  By selecting the security procedure specified in Part III of this Exhibit B-2, MERS acknowledges that it has elected to not use the other security procedures described and agrees to be bound by any funds transfer instruction, whether or not authorized, issued in its name and accepted by the Escrow Agent in compliance with the particular security procedure chosen by MERS.

<u>NOTICE</u>:  The security procedure selected by MERS will not be used to detect errors in the funds transfer instructions given by MERS.  If a funds transfer instruction describes the beneficiary of the payment inconsistently by name and account number, payment may be made on the basis of the account number even if it identifies a person different from the named beneficiary.  If a funds transfer instruction describes a participating financial institution inconsistently by name and identification number, the identification number may be relied upon as the proper identification of the financial institution.  Therefore, it is important that MERS take such steps as it deems prudent to ensure that there are no such inconsistencies in the funds transfer instructions it sends to the Escrow Agent.

**Part I**
**Name, Title, Telephone Number, Electronic Mail ("e-mail") Address and Specimen Signature for person(s) designated to provide direction, including but not limited to funds transfer instructions, and to otherwise act on behalf of MERS**

| <u>Name</u> | <u>Title</u> | <u>Telephone Number</u> | <u>E-mail Address</u> | <u>Specimen Signature</u> |
|---|---|---|---|---|
| _____ | _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ | _____ |

**Part II**
**Name, Title, Telephone Number and E-mail Address for person(s) designated to confirm funds transfer instructions**

| <u>Name</u> | <u>Title</u> | <u>Telephone Number</u> | <u>E-mail Address</u> |
|---|---|---|---|
| _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ |

## Part III

### Means for delivery of instructions and/or confirmations

The security procedure to be used with respect to funds transfer instructions is checked below:

☐    *Option 1.  Confirmation by telephone call-back*.  The Escrow Agent shall confirm funds transfer instructions by telephone call-back to a person at the telephone number designated on Part II above.  The person confirming the funds transfer instruction shall be a person other than the person from whom the funds transfer instruction was received, unless only one person is designated in both Parts I and II of this Exhibit B-2.

     ☐ CHECK box, if applicable:
        If the Escrow Agent is unable to obtain confirmation by telephone call-back, the Escrow Agent may, at its discretion, confirm by e-mail, as described in Option 2.

☐    *Option 2.  Confirmation by e-mail*.  The Escrow Agent shall confirm funds transfer instructions by e-mail to a person at the e-mail address specified for such person in Part II of this Exhibit B-2. The person confirming the funds transfer instruction shall be a person other than the person from whom the funds transfer instruction was received, unless only one person is designated in both Parts I and II of this Exhibit B-2.  MERS understands the risks associated with communicating sensitive matters, including time sensitive matters, by e-mail.  MERS further acknowledges that instructions and data sent by e-mail may be less confidential or secure than instructions or data transmitted by other methods. The Escrow Agent shall not be liable for any loss of the confidentiality of instructions and data prior to receipt by the Escrow Agent.

     ☐ CHECK box, if applicable:
        If the Escrow Agent is unable to obtain confirmation by e-mail, the Escrow Agent may, at its discretion, confirm by telephone call-back, as described in Option 1.

☐    *\*Option 3. Delivery of funds transfer instructions by password protected file transfer system only - no confirmation*.  The Escrow Agent offers the option to deliver funds transfer instructions through a password protected file transfer system. If MERS wishes to use the password protected file transfer system, further instructions will be provided by the Escrow Agent.  If MERS chooses this Option 3, it agrees that no further confirmation of funds transfer instructions will be performed by the Escrow Agent.

☐    *\*Option 4.  Delivery of funds transfer instructions by password protected file transfer system with confirmation*.  Same as Option 3 above, but the Escrow Agent shall confirm funds transfer instructions by ☐ telephone call-back or ☐ e-mail (must check at least one, may check both) to a person at the telephone number or e-mail address designated on Part II above.  By checking a box in the prior sentence, the party shall be deemed to have agreed to the terms of such confirmation option as more fully described in Option 1 and Option 2 above.

*\*The password protected file system has a password that expires every 60 days. If you anticipate having infrequent activity on this account, please consult with your Escrow Agent before selecting this option.*

**Dated this _____ day of _____, 2015.**
MUNICIPAL EMPLOYEES' RETIREMENT SYSTEM OF MICHIGAN By verdant∫ AG pursuant to power of attorney dated March 8, 2016

**By:**_____    **By:**_____
Name:                                       Name:
Title:                                             Title:

EXHIBIT C

**FEES OF ESCROW AGENT**

## **EXHIBIT F**

### **OFFICERS**

Chief Executive Officer        -        Christopher Charlie Thannhaeuser

Chief Financial Officer        -        TBD

Chief Operating Officer        -        TBD

F-1