# **EXHIBIT 4**

**Execution Version**

# STOCK PURCHASE AGREEMENT

## DATED AS OF March 8, 2016

# TABLE OF CONTENTS

**Page**

**ARTICLE 1 DEFINITIONS** ..........................................................................................1

Section 1.01   Definitions....................................................................................1

**ARTICLE 2 PURCHASE AND CLOSING** .................................................................2

Section 2.01   Purchase and Sale ........................................................................2
Section 2.02   Closing .........................................................................................2
Section 2.03   Conditions Precedent ...................................................................3
Section 2.04   Amendments to Licenses .............................................................3
Section 2.05   Transfer Restrictions....................................................................3
Section 2.06   Costs of Transactions ..................................................................4

**ARTICLE 3 REPRESENTATIONS AND WARRANTIES**.........................................5

Section 3.01   Representations and Warranties with Regards to the Company, the Shares and the Subsidiaries ........................................................5
Section 3.02   Representations and Warranties of the Seller with Regards to the Seller........17
Section 3.03   Representations and Warranties of Purchaser.............................18

**ARTICLE 4 INDEMNIFICATION** ............................................................................19

Section 4.01   Indemnification by Seller ...........................................................19
Section 4.02   Remedy of Purchaser..................................................................20
Section 4.03   Seller's Right to Cure .................................................................21
Section 4.04   Time Limitations on and Forfeiture of Claims ...........................21
Section 4.05   Limitations on Liability..............................................................21
Section 4.06   Exclusion or Reduction of Liability............................................22
Section 4.07   Indemnification by Purchaser.....................................................22
Section 4.08   Defense of Third Party Claims ...................................................22

**ARTICLE 5 GOVERNING LAW AND DISPUTE RESOLUTION**............................23

Section 5.01   Governing Law ...........................................................................23
Section 5.02   Arbitration..................................................................................23
Section 5.03   Equitable Remedies....................................................................24
Section 5.04   Consent to Jurisdiction and Venue .............................................24
Section 5.05   Recovery of Costs ......................................................................24

**ARTICLE 6 MISCELLANEOUS PROVISIONS** ......................................................25

Section 6.01   Survival......................................................................................25
Section 6.02   Parties in Interest.......................................................................25
Section 6.03   Assignment.................................................................................25
Section 6.04   Notices.......................................................................................25
Section 6.05   Entire Agreement .......................................................................26
Section 6.06   Binding Effect............................................................................26
Section 6.07   Amendment................................................................................26
Section 6.08   Waiver or Consent .....................................................................26

2

Section 6.09    Severability ...................................................................................26
Section 6.10    Drafting Presumption.......................................................................26
Section 6.11    Headings ..........................................................................................27
Section 6.12    Gender ..............................................................................................27
Section 6.13    Counterparts .....................................................................................27
Section 6.14    Confidentiality and Press Release.....................................................27
Section 6.15    Sovereignty ......................................................................................28

DWT 29014772v6 0106299-000001

ACTIVE 211636693v.19

# STOCK PURCHASE AGREEMENT

**THIS STOCK PURCHASE AGREEMENT** is made as of March 8, 2016, by and among Concord Blue Engineering, GmbH, a German company ("**Seller**"), Municipal Employees' Retirement System of Michigan, a public nonprofit corporation established and maintained under the laws of the State of Michigan ("**Purchaser**") and Concord Blue Energy, Inc., a Delaware corporation (the "**Company**").

## RECITALS

**WHEREAS**, Seller owns 190,000 shares of the common stock, par value US $0.01 per share ("**Common Stock**") of the Company;

**WHEREAS**, Seller wishes to sell to Purchaser, and Purchaser wishes to purchase from Seller, 30,534 shares of Common Stock of the Company (the "**Shares**") for a purchase price of $10,500,000 (the "**Purchase Price**"), subject to the terms and conditions of this Agreement;

**NOW, THEREFORE**, in consideration of the mutual promises, agreements, covenants, representations and warranties hereinafter set forth, the parties, intending to be bound legally, hereby agree as follows:

## ARTICLE 1
## DEFINITIONS

Section 1.01    Definitions.  In addition to the terms defined elsewhere in this Agreement, the following terms used herein shall be construed to have the meanings set forth or referenced below.

(a)    "**Affiliate**" means, with respect to any specified Person, any other Person who, directly or indirectly, controls, is controlled by or is under common control with such specified Person.

(b)    "**Business Day**" means any day, other than a Saturday or a Sunday, that is neither a legal holiday nor a day on which banking institutions are generally authorized or required by Law to close in Lansing, Michigan or Los Angeles, California.

(c)    "**Founder**" means Christopher Thannhaeuser.

(d)    "**Knowledge**" shall be determined as follows: (i) an individual will be deemed to have Knowledge of a particular fact or other matter if such individual is actually aware of such fact or other matter or such individual would, in light of his or her particular function within the Company or the applicable Subsidiary, reasonably be expected to discover or otherwise become aware of such fact or other matter in performing his or her particular duties, and/or (ii) the Company will be deemed to have Knowledge of a particular fact or other matter if any member of the Company's board of directors or any person with a management position

within the Company has Knowledge of such fact or matter; and/or if any member of a Subsidiary's board of directors or any person with a management position within such Subsidiary has Knowledge of such fact or matter.

(e)  "**Lien**" shall mean any lien, charge, encumbrance, security interest including but not limited to interests arising from options, pledges, mortgages, indentures, security agreements, rights of first refusal or rights of preemption, irrespective of whether such lien arises under any agreement, covenant, other instrument, the mere operation of statutory or other laws or by means of a judgment, order or decree of any court, judicial or administrative authority, and shall also mean any approval or consent required from a third party to the exercise or transfer of a right or title.

(f)  "**Person**" means an individual, a partnership, a corporation (including a business trust), a joint stock company, a limited liability company, an unincorporated association, a joint venture or other entity or a governmental authority.

## ARTICLE 2
## PURCHASE AND CLOSING

Section 2.01   Purchase and Sale. Upon the terms and subject to the conditions herein set forth, Seller hereby agrees to sell to Purchaser, and Purchaser hereby agrees to purchase from Seller, the Shares free and clear of all Liens other than restrictions on transfer under the Federal Securities Act and/or applicable States Securities Acts (as defined in Section 2.05) and under the Shareholders Agreement, for the Purchase Price, payable in full in lawful currency of the United States of America in a single installment.

Section 2.02   Closing. Subject to satisfaction or waiver of the conditions precedent set forth in Section 2.03 hereof, the closing for purchase and sale of the Shares hereunder and the payment of the Purchase Price therefor ("**Closing**") shall occur at the offices of the Company located at 12424 Wilshire Boulevard, Suite 660, Los Angeles, California 90025, United States of America ("**Company Offices**"), on March 8, 2016 or at such other place, date or time as Seller and Purchaser may agree upon in writing or upon which such Closing actually occurs ("**Closing Date**"). At the Closing,

(a)  The Company, Seller, Purchaser and the other stockholders of the Company shall execute and deliver the Second Amended and Restated Shareholders Agreement of the Company substantially in the form attached hereto as Exhibit A (the "**Shareholders Agreement**"); and

(b)  Purchaser shall deliver the Purchase Price for the Shares by wire transfer of immediately available funds from an account located in the United States of America to an account of Seller located in the United States designated by Seller.

(c)  Further Assurances. Each party shall execute and/or deliver any and all other agreements, instruments and documents, and shall take any and all other actions, as reasonably requested by the other party to effectuate fully the transactions contemplated the

DWT 29014772v6 0106299-000001

ACTIVE 211636693v.19

Closing or otherwise to effectuate fully the transactions contemplated by this Agreement. All agreements, instruments and documents not attached as Exhibits to this Agreement required to be delivered hereunder at or prior to the Closing shall be in form and substance reasonably satisfactory to the parties and their respective legal counsel.

Section 2.03    <u>Conditions Precedent</u>. The obligations of each party to complete the transactions contemplated at Closing are subject to the fulfillment (or written waiver) of the following conditions as of the Closing Date:

(a)    The obligations of Seller to complete the transactions contemplated at the Closing are subject to the fulfillment of the following conditions as of the Closing Date, or written waiver of any or all such conditions by Seller:

(i)    the representations and warranties of Purchaser contained in <u>Section 3.03</u> hereof shall be true and correct in all material respects as of the respective dates therein set forth occurring on or before the Closing Date, and

(ii)    Purchaser shall have fully performed and observed all of the terms, covenants and conditions on Purchaser's part to be performed and observed under this Agreement on and as of the Closing Date, including, without limitation, delivery of the Purchase Price for the Shares and execution and delivery of all agreements, documents and instruments required to be executed and/or delivered by Purchaser at the Closing, including, without limitation, the Shareholders Agreement.

(b)    The obligations of Purchaser to complete the transactions contemplated at the Closing are subject to the fulfillment of the following conditions as of the Closing Date, or written waiver of any or all such conditions by Purchaser:

(i)    the representations and warranties of Company and Seller contained in <u>Section 3.01</u> and <u>3.02</u> hereof shall be true and correct in all respects as of the respective dates therein set forth occurring on or before the Closing Date, and

(ii)    Seller shall have fully performed and observed all of the terms, covenants and conditions on its part to be performed and observed under this Agreement on and as of the Closing Date, including, without limitation, execution and delivery of the share certificates and all other agreements, documents and instruments required to be executed and/or delivered by Seller at the Closing, including, without limitation, the Shareholders Agreement.

Section 2.04    <u>Amendments to Licenses</u>.  Prior to the Closing Date, the Agreement and Omnibus Amendment (the "**Amendment Agreement**"), as attached hereto as Exhibit B, and such other agreements deemed by Purchaser necessary to secure the rights to use the Intellectual Property Rights shall have been executed, including but not limited to, the Indemnification Agreement, dated March 8, 2016.

Section 2.05    <u>Transfer Restrictions</u>. Purchaser agrees that the transfer of the Shares is restricted under the Shareholders Agreement and further that the Shares may not be offered for sale, sold, pledged, hypothecated, transferred or otherwise disposed of unless registered or

DWT 29014772v6 0106299-000001

ACTIVE 211636693v.19

qualified under the Securities Act of 1933, as amended, and all rules and regulations promulgated thereunder (collectively, "**Federal Securities Act**"), or the laws of any state, including the laws of the State of Delaware, and all rules and regulations promulgated thereunder (collectively, "**State Securities Acts**"), or an exemption from such registration or qualification is established, and the Shareholders Agreement and any certificate or certificates evidencing the Shares shall contain a legend to such effect as follows:

> **THE SHARES OR OPTION, WARRANT OR OTHER RIGHTS TO ACQUIRE SHARES OF THE COMPANY REPRESENTED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED OR QUALIFIED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR ANY REGULATIONS PROMULGATED THEREUNDER, OR UNDER ANY APPLICABLE STATE SECURITIES ACTS OR ANY REGULATIONS PROMULGATED THEREUNDER, AND MAY NOT BE OFFERED FOR SALE, SOLD, PLEDGED, HYPOTHECATED, TRANSFERRED OR OTHERWISE DISPOSED OF UNLESS REGISTERED OR QUALIFIED UNDER THE SECURITIES ACT AND ALL APPLICABLE STATE SECURITIES LAWS OR AN EXEMPTION FROM SUCH REGISTRATION OR QUALIFICATION IS ESTABLISHED TO THE SATISFACTION OF THE COMPANY.**

> **THE SHARES OR OPTION, WARRANT OR OTHER RIGHTS TO ACQUIRE SHARES OF THE COMPANY REPRESENTED BY THIS CERTIFICATE ARE SUBJECT TO THE TERMS OF A SHAREHOLDERS AGREEMENT AMONG THE COMPANY AND CERTAIN SHAREHOLDERS OF THE COMPANY, INCLUDING THE HOLDER HEREOF, A COPY OF WHICH IS AVAILABLE FOR INSPECTION BY APPROPRIATE INTERESTED PARTIES AT THE PRINCIPAL OFFICE OF THE ISSUER, AND SUCH SHARES MAY NOT BE OFFERED FOR SALE, SOLD, PLEDGED, HYPOTHECATED, TRANSFERRED OR OTHERWISE DISPOSED OF EXCEPT IN COMPLIANCE WITH SAID SHAREHOLDERS AGREEMENT AND APPLICABLE LAWS.**

Section 2.06    Costs of Transactions. Except as otherwise expressly provided in Article 4 and Section 5.05 of this Agreement, each party shall bear the costs and expenses, including, without limitation, attorneys' fees and costs, incurred by such party in connection with the preparation and negotiation of this Agreement, the performance and observance of all of the terms, covenants and conditions on part of such party to be performed and observed under this Agreement, and the consummation of the transactions on part of such party to be consummated under this Agreement.

**ARTICLE 3**
**REPRESENTATIONS AND WARRANTIES**

Section 3.01    <u>Representations and Warranties with Regards to the Company, the Shares and the Subsidiaries</u>.  Seller and the Company, both hereby jointly and severally represent and warrant to Purchaser as follows, as of the Closing Date:

(a)    <u>Formation, Existence and Standing</u>. The Company is a corporation duly formed and validly existing under the laws of Delaware, and has all requisite corporate power and authority to own, operate and license its properties and assets, and to carry on its business as presently being conducted. The Company is duly qualified to do business as a foreign corporation in each jurisdiction in which the business of the Company is presently being conducted.

(b)    <u>Bylaws</u>.  The Company's Certificate of Incorporation (the "**Certificate of Incorporation**") and bylaws (the "**Bylaws**") as per <u>Schedule 3.02(b)</u> are complete and correct.

(c)    <u>Title to Shares and Ability to Sell</u>.  All of the Shares are beneficially and of record owned by Seller, free and clear of all Liens and any other limitation or restriction (including any restriction on the right to vote, sell or otherwise dispose of the Shares), except for Liens under the Federal Securities Act and/or applicable States Securities Acts and under the Shareholders Agreement.  Neither Seller nor any of its Affiliates is a party to any contract with any Person to purchase, redeem or otherwise acquire any of the Shares.  The consummation of the transactions contemplated by this Agreement will convey to Purchaser good and valid title to the Shares, free and clear of all Liens and any other limitation or restriction (including any restriction on the right to vote, sell or otherwise dispose of the Shares), except for (i) those created by Purchaser or arising out of ownership of the Shares by Purchaser and (ii) Liens under the Federal Securities Act and/or applicable States Securities Acts and under the Shareholders Agreement.

(d)    <u>Issuance of Shares</u>.  The Shares have been duly authorized and validly issued and are fully paid and nonassessable, and when delivered to Purchaser at Closing will be free of any Liens, other than the ones referred to in paragraph (c) above.

(e)    <u>Power and Authority of Company</u>.  The Company has all requisite corporate power and authority, and has been duly authorized by all requisite action and approvals, to execute and deliver this Agreement and all other agreements, instruments and documents to which the Company is a party to be executed and delivered pursuant hereto, to perform and observe all of the terms, covenants and conditions in the part of the Company to be performed or observed hereunder and thereunder, and to consummate all of the transactions on the part of the Company to be consummated hereunder and thereunder.

(f)    <u>Absence of Conflict</u>.  The execution and delivery of this Agreement and all other agreements, instruments and documents to which the Company is a party to be executed and delivered pursuant hereto, the performance and observance of all of the terms, covenants and conditions in the part of the Company to be performed or observed hereunder and thereunder,

5

and the consummation all of the transactions on the part of the Company to be consummated hereunder and thereunder, will not violate or conflict with, or result in a breach by the Company, or constitute a default or an event of default under, (i) the Shareholders Agreement, (ii) the Company's Certificate of Incorporation or Bylaws, any contract, agreement, note, indenture, deed of trust, mortgage or instrument to which the Company is a party, or by which the Company or its assets is otherwise bound or subject, that would, either individually or in the aggregate, adversely impair the condition (financial or otherwise), business, operations, assets or liabilities of the Company (taken as a whole), or (iii) to the Knowledge of the Company, any order, judgment, law, rule or regulation of any court or other governmental authority of competent jurisdiction to which the Company is a party, or by which the Company or its assets is otherwise bound or subject, that would, either individually or in the aggregate, adversely impair the condition (financial or otherwise), business, operations, assets or liabilities of the Company and the Subsidiaries (taken as a whole), as of the Closing Date.

(g)    Consents and Authorizations.  Except for waivers of rights of first refusal pursuant to the Shareholders Agreement, which will be obtained at or prior to the Closing, no consent, approval or authorization of, or declaration or filing with, any third party or governmental authority on the part of Seller or the Company is required in connection with the execution and delivery of this Agreement and all other agreements, instruments and documents to which Seller or the Company is a party to be executed and delivered pursuant hereto, including the Shareholders Agreement, the performance and observance of all of the terms, covenants and conditions in the part of Seller or the Company to be performed or observed hereunder and thereunder, and the consummation all of the transactions on the part of Seller or the Company to be consummated hereunder and thereunder, including, without limitation, the sale of the Shares to Purchaser pursuant to the terms and conditions of this Agreement, which if not obtained, made or filed, (i) would adversely impair the validity or enforceability of this Agreement and all other agreements, instruments and documents to which Seller or the Company is a party to be executed and delivered pursuant hereto, including the Shareholders Agreement, or any of the transactions contemplated hereunder and thereunder, including, without limitation, sale of the Shares to Purchaser pursuant to the terms and conditions of this Agreement, or (ii) which would adversely impair the condition (financial or otherwise), business, operations, assets or liabilities of Seller or the Company (taken as a whole).

(h)    Legal Effect.  This Agreement and all other agreements, instruments and documents to which the Company is a party to be executed and delivered pursuant hereto to which the Company is a party, constitute a valid and binding obligations of the Company, enforceable against it in accordance with their respective terms except as such enforcement may be limited by laws affecting the rights of creditors generally and principles of equity.

(i)    Fees.  Neither Seller nor the Company nor the Subsidiaries has entered into any contract or taken any other action by which Purchaser has incurred, or will incur, directly or indirectly, any liability for brokerage or finders' fees or any similar charges in connection with this Agreement or the transactions contemplated thereby as a result of any such agreement or other action by Seller.

(j)     Bankruptcy, Etc.  No measures have been taken for the dissolution and liquidation or declaration of bankruptcy of the Company. In particular, no order has been made, resolution passed or meeting convened for the winding up (or other process whereby the business is terminated and the assets of the Company are distributed amongst the creditors and/or shareholders) of the Company and the Company is neither over-indebted, insolvent, in liquidation or in composition proceedings or in any other similar proceedings.

(k)     Books and Records.  The corporate books and records of the Company are up to date in all material respects and contain records which are complete and accurate in all material respects.  All material taxes and tax liabilities of the Company that are due and payable have been paid or accrued and adequately disclosed on the books and records of the Company.

(l)     Capitalization.  As of the Closing Date immediately prior to the execution and delivery of the Shareholders Agreement, (i) the authorized capital stock of the Company will consist of 1,000,000 shares of Common Stock, 203,563 of which will continue to be outstanding, (ii) Schedule 3.01(l) contains a list of all shareholders of the Company and the number of shares each owns after giving effect to the sale of the Shares, and (iii) there is no contractual commitment of the Company to issue shares or warrants to acquire shares of Common Stock of the Company.

(m)     Subsidiaries.

(i)     Each of the Subsidiaries is an entity duly formed and validly existing under the laws of its jurisdiction of organization or formation, and has all requisite entity power and authority to own, operate and license its properties and assets, and to carry on its business as presently being conducted.  Each of the Subsidiaries is duly qualified to do business as a foreign corporation in each jurisdiction in which the business of the Subsidiary is presently being conducted.

(ii)     The Company is the legal and beneficial owner of (A) 100% of the issued and outstanding equity interests of CBD, and (B) 60% of the issued and outstanding equity interests of Concord Blue Eagar, LLC, an Arizona limited liability company ("**CB Eagar**").  CBD is the legal and beneficial owner of 70% of the issued and outstanding equity interests of Concord Blue Virgin Islands LLC, a United States Virgin Islands limited liability company ("**CBVI**", and collectively with CBD and CB Eagar, each a "**Subsidiary**", and collectively the "**Subsidiaries**").  The Company has no other subsidiaries.

(iii)     Except as set forth on Schedule 3.01(m), all shares held by the Company in any of the Subsidiaries are free and clear of any Encumbrances of any nature and have been validly issued and are fully paid up and constitute the ownership interest described in Section 3.01(m)(i).  Except as set forth in this Agreement or on Schedule 3.01(m), none of the Subsidiaries has outstanding any subscriptions, options, warrants, rights (including "phantom" stock rights), preemptive rights or other contracts, commitments, understandings or arrangements, including any right of conversion or exchange under any outstanding security, instrument or agreement obligating the Subsidiaries to issue or sell any shares of capital stock or to grant, extend or enter into any option with respect thereto. Subject to the transactions

7

contemplated by this Agreement and except as set forth on Schedule 3.01(m), no rights, contracts, commitments or derivative instruments are outstanding that could require the Subsidiaries to sell, transfer or issue any of its capital stock.

(iv)     The Subsidiaries are validly formed, duly organized and lawfully existing in each of their respective places of incorporation, with corporate power to carry on their respective businesses as presently conducted, and all membership interests held by the Company in the Subsidiaries are duly authorized, validly issued and fully paid in.

(v)     No measures have been taken for the dissolution and liquidation or declaration of bankruptcy of any of the Subsidiaries. In particular, no order has been made, resolution passed or meeting convened for the winding up (or other process whereby the business is terminated and the assets of any of the Subsidiaries are distributed amongst its creditors and/or shareholders) of any of the Subsidiary and none of the Subsidiaries is over-indebted, insolvent, in liquidation or in composition proceedings or in any other similar proceedings.

(vi)     The corporate books and records of the Subsidiaries are up to date in all material respects and contain records which are complete and accurate in all material respects.  All material taxes and tax liabilities of the Subsidiaries that are due and payable have been paid or accrued and adequately disclosed on the books and records of the Subsidiaries.

(n)     Business Permits and Licenses.

(i)     The Company and the Subsidiaries (A) have all governmental approvals, licenses and permits required for the continued conduct of their respective businesses as currently conducted, and (B) are in compliance with the terms and conditions of all such governmental approvals, licenses and permits.

(ii)     All such governmental approvals, licenses and permits are in full force and effect and, to the Seller's Knowledge, no circumstances exist which will result in a modification, revocation or non-renewal of any such approvals, licenses or permit.

(iii)     The fact that this Agreement is executed and the transactions contemplated by this Agreement are consummated will not lead to the termination of any such governmental approvals, licenses or permits and will not give rise to any right of the competent authorities or other third parties to terminate such governmental approvals, licenses or permits or to take any other adverse action thereunder.

(o)     Contracts.

(i)     Schedule 3.01(o)(i) contains an accurate and complete list of all contracts and agreements (excluding orders placed in the ordinary course of business consistent with past practice by Company or any Subsidiary with its suppliers) to which the Company or any of its Subsidiaries is a party or is subject.

(ii)     All contracts and agreements entered into by the Company or its Subsidiaries are valid, binding and enforceable by the Company or its Subsidiaries, as applicable,

8

in accordance with their respective terms, and none of the Company or its Subsidiaries is in default under any of such contracts and agreements.

(iii)    None of the contracts and agreements related to the Company's or any of its Subsidiaries' business to which the Company or any of its Subsidiaries is a party or a beneficiary violates any provision of any applicable law or permit.

(p)    <u>Ordinary Course of Business</u>.

(i)    Except for the transactions contemplated by, or any facts or events disclosed in, this Agreement, the Company and the Subsidiaries have, through the Closing Date, conducted their respective businesses in the ordinary course of business and consistent with past practice.

(ii)    In particular, neither the Company nor any Subsidiary has, through the Closing Date, except as set forth on <u>Schedule 3.01(p)</u>:

(A)    taken or failed to take any action which could interfere with the consummation of the transactions contemplated under this Agreement;

(B)    formed, entered into, varied, terminated or withdrawn from any partnership, consortium, joint venture or similar business organization or cooperation agreement with third parties, other than (1) that certain Teaming Agreement with Lockheed Martin Corporation or its Affiliates, (2) that certain Partnering Agreement, dated as of March 8, 2016, by and among the Company, CBD and verdant*f* AG, a limited liability company organized and existing under the laws of Switzerland, and (3) the transfer of an approximate 9% ownership interest in Good Earth Power AZ, LLC, an Arizona limited liability company, from CB Eagar to the Company;

(C)    made amendments to its existing certificate of formation or corresponding corporate document, other than amendments to the operating agreement of CBD being negotiated with Purchaser and/or its representatives as of the date hereof;

(D)    entered into, increased or extended any liability under any guarantee, security or indemnity in favor of any third party or borrowed any money or incurred any indebtedness or other liability to a third party (except for prepayments in the ordinary course of business) in excess of $50,000 in aggregate;

(E)    made, increased or extended any loan or advance or granted any credit to any third party (it being understood, for the avoidance of doubt, that accounts receivables in the ordinary course of business are not being deemed a credit);

(F)    granted, created or allowed the creation of any Lien over any of its or their assets other than charges arising by operation of law;

(G)    entered into any agreement with the Seller or Seller's Affiliates at terms which are not at arms' length, other than intellectual property licenses for

9

Intellectual Property Rights (as defined in <u>Section 3.01(w)</u>) used by the Company and CBD and as set forth in <u>Schedule 3.01(p)</u>;

(H)    made any change in any method of accounting or keeping of books of account or accounting or cash management methods, principles or practices, including timing of payments of accounts payable and collections of accounts receivable, or any revaluation of assets;

(I)    agreed or committed to do any of the foregoing; or

(J)    taken any action outside the ordinary course of the Company's or the applicable Subsidiary's business, inconsistent with past practice or not in compliance with applicable laws or causing a breach of the Seller's or the Company's representations and warranties contained herein.

(q)    <u>Financial Statements</u>.

(i)    <u>Schedule 3.01(q)</u> sets forth a copy of the consolidated unaudited financial statements of the Company as of December 31, 2014, and consolidated unaudited financial statements of the Company and CB Eagar for the fiscal year ended December 31, 2015 (together the "**Financial Statements**").

(ii)    The Financial Statements have been prepared in accordance with generally accepted accounting principles in the United States ("**US GAAP**") applied on a consistent basis throughout the periods indicated, except, as to any unaudited Financial Statements, for the omission of notes thereto and normal year-end audit adjustments.  The Financial Statements fairly present, in all respects, the financial condition and operating results of the Company as of the dates, and for the periods, indicated therein, subject to normal year-end adjustments; and the related statements of income, stockholders' equity and cash flows fairly present, in all respects, the income, stockholders' equity and cash flows of the Company for the periods indicated therein.  Except as set forth in the Financial Statements, the Company has no material liabilities or material obligations, contingent or otherwise, other than liabilities and obligations (i) incurred in the ordinary course of business after January 1, 2016, (ii) under contracts made in the ordinary course of business, (iii) incurred in connection with the transactions contemplated hereby, and (iv) of a type or nature not required under US GAAP to be reflected in the Financial Statements which, in all such cases, individually and in the aggregate, are not material.  Except as disclosed in the Financial Statements neither, the Company nor any subsidiary is a guarantor or indemnitor of any indebtedness of any other Person.  The Company maintains a standard system of accounting established and administered in accordance with US GAAP.

(r)    <u>Litigation</u>.  There is no claim, action, lawsuit, litigation, arbitration or administrative proceeding pending or threatened (in writing or, to the Knowledge of the Company, otherwise) by or against the Company or any of the Subsidiaries.

10

(s)    <u>Environment</u>.

(i)    The Company and the Subsidiaries are in compliance with all applicable environmental laws and with the conditions imposed by such environmental laws and have all environmental permits required for the conduct of their respective businesses.

(ii)    No action, suit or proceedings by any governmental or administrative authority is pending or threatened in writing against the Company or any of the Subsidiaries alleging any violation of any such environmental laws and, to the Company's Knowledge, there are no circumstances that can reasonably be expected to form the basis of any such action, suit or proceeding.

(iii)    Except for hazardous materials which are stored, shipped or otherwise handled by the Company or the Subsidiaries in the ordinary course of business and in compliance with applicable environmental laws, there are, to the Company's Knowledge, no hazardous materials used or handled by the company or the Subsidiaries or that are, to the Company's Knowledge, present on, under or within any premises of the Company or any of the Subsidiaries.

(t)    <u>Insurance</u>

(i)    <u>Schedule 3.01(t)</u> contains an accurate and complete list of all contracts and agreements to which the Company or any of its Subsidiaries is a party and by which any of their assets are insured, including for purposes of property, fire, liability, product liability, workmen's compensation, vehicular, crime, fiduciary, builders' risk, title and other similar risks.

(ii)    The contracts and agreements listed on <u>Schedule 3.01(t)</u> are in full force and effect in accordance with their respective terms and will remain in full force and effect after the Closing Date. None of the Company or any of its Subsidiaries has received any notice that it is in default with respect to any provision of any such contracts and agreements. None of the Company or any of its Subsidiaries has provided inaccurate, incomplete or misleading information in connection with any such contracts and agreements or failed to give any notice or present any claim thereunder in due and timely fashion or as required by any such contracts and agreements so as to jeopardize full recovery thereunder.

(iii)    Since January 1st, 2016, no insurance company has refused any application for insurance by the Company or any of its Subsidiaries with respect to any of its respective assets.

(iv)    The Company and each of its Subsidiaries has insurance policies in effect covering the risks associated with its business and properties which are of such character and in such amount as are customarily maintained by entities engaged in the same or similar business and similarly situated.

DWT 29014772v6 0106299-000001

ACTIVE 211636693v.19

(u)    <u>Taxes</u>.

(i)    The Company and the Subsidiaries have timely and duly filed all tax returns required to be filed with a governmental tax authority. All such tax returns have been prepared in the manner required by applicable law and are true and correct.

(ii)    All taxes owed by the Company relating to a tax period ending prior to December 31, 2013, caused by or arising from acts or omissions prior to December 31, 2013, have been paid or fully provisioned for in the Financial Statements. All taxes owed by the Company relating to a tax period ending prior to December 31, 2014, caused by or arising from acts or omissions prior to December 31, 2014, will be paid in full promptly following the Closing. All taxes owed by the Company relating to a tax period ending prior to December 31, 2015, caused by or arising from acts or omissions prior to December 31, 2015, will be paid in full as soon as practicable following the Closing.

(iii)    All information provided in such returns, reports, notices, accounts and information is true, complete and accurate in all respects. Except as set forth in <u>Section 3.01(u)</u>, all taxes required to be paid by the Company and/or any of its Subsidiaries that were due and payable prior to the Closing Date have been paid, without regard to whether such taxes have been assessed.

(iv)    The Financial Statements contain adequate provisions, in accordance with US GAAP, for all taxes required to have been accrued or for which the Company or any of its Subsidiaries may be liable as of the respective dates thereof. None of the Company or any of its Subsidiaries is aware of being currently under any tax examination, audit, investigation or other proceeding, nor has either received any notice (official, unofficial or otherwise) in respect thereof, for the assessment or the proposed assessment or for the collection of any taxes.

(v)    There are no agreements in effect to extend the period of limitations for the assessment or collection of any taxes for which the Company or any of its Subsidiaries is or may become liable and no requests for any such agreements are pending.

(vi)    Each of the Company and its Subsidiaries have withheld, to the extent applicable, from all employees, shareholders and creditors, and timely paid to the appropriate Governmental Authority proper and accurate amounts for all periods through the date hereof in compliance with all tax withholding provisions of all Applicable Law requirements.

(vii)    There are no agreements (including an intercompany account system) for the sharing of taxes by or between the Company, any of the Company's Subsidiaries or any of their respective Affiliates.

(viii)    There are no Encumbrances for taxes that are due and unpaid on any of the properties or assets of the Company or any of its Subsidiaries.

DWT 29014772v6 0106299-000001

ACTIVE 211636693v.19

(v)     <u>Assets (Other Than Intellectual Property)</u>

(i)     The Company and the Subsidiaries own, or have sufficient rights to use, all the material assets (other than Intellectual Property Rights, which are addressed in <u>Section 3.01(w)</u>) necessary for the carrying on of their respective businesses as currently conducted.

(ii)     The assets owned by the Company and the Subsidiaries are free and clear of any Liens (except for such Liens with which the assets have been encumbered by virtue of law or in the course of its ordinary business or that are reflected in the Financial Statements).

(iii)     All assets owned, rented or leased by the Company and the Subsidiaries (other than Intellectual Property Rights, which are addressed in <u>Section 3.01(w)</u>) are in good and operative condition subject to ordinary wear and tear.

(w)     <u>Intellectual Property Rights</u>.

(i)     The Company and the Subsidiaries are the legal and beneficial owner of, or have adequate license to use, all the know-how and all patents, trade names, trademarks, domain names, copyrights and other intellectual property rights (including all applications for protection thereof) necessary for the continued conduct of their respective businesses as currently conducted or that the Companies currently use, or that are required for the development of the business plan of the Company and its Subsidiaries (the "**Intellectual Property Rights**"), and <u>Schedule 3.01(w)</u> contains a complete and correct list of all such patents and registered trademarks.

(ii)     The Intellectual Property Rights owned by the Company and the Subsidiaries are validly registered in the name of the Company or the applicable Subsidiary to the extent set forth on <u>Schedule 3.01(w)</u> and, subject to licenses of Intellectual Property Rights granted by the Company to CBD, give the Company the exclusive rights for the use of the Concord Blue Reformer technology, and the development and construction of Concord Blue Towers, and Concord Blue Reformers, except for projects developed inside of India and Japan. Neither the Founder nor any other third party has any interest in or right to use any of the Intellectual Property Rights, except pursuant to licenses granted by the Company or its Subsidiaries in the ordinary course of business. All registration fees for the Intellectual Property Rights have are fully paid and none of the Intellectual Property Rights is subject to any Lien or encumbrance.

(iii)     The Intellectual Property Rights used by the Company and the Subsidiaries in the ordinary course of their respective businesses as presently conducted are subsisting, valid and enforceable, and have not been adjudged invalid or unenforceable in whole or part. No claims have been made or threatened in writing or otherwise challenging the use, validity, subsistence or enforceability of the Intellectual Property Rights. To the Company's Knowledge, the use of the Intellectual Property Rights does not infringe any third party rights.

DWT 29014772v6 0106299-000001

ACTIVE 211636693v.19

(iv)    To the Company's Knowledge, the operation of the Company's and the Subsidiaries' respective businesses as presently conducted does not conflict with, infringe, misappropriate or otherwise violate the intellectual property rights or other proprietary rights of any third party. No claims of third parties are pending or threatened (in writing or, to the Company's Knowledge, otherwise) against the Company or any of the Subsidiaries alleging any of the foregoing.

(v)    Schedule 3.01(w), provides a list of any and all assignments, licenses, sublicenses, agreements or commitments outstanding or effective granting any other Person any right to use, operate under, license, sublicense or otherwise exploit any of the Intellectual Property Rights.

(vi)    The Company and the Subsidiaries have taken reasonable precautions to protect, document and safeguard all trade secrets, know-how, confidential information, customer lists, software, technical information, data, process technology, plans, drawings, and blue prints which relate to the business of the Company and the Subsidiaries.

(vii)    The Company and the Subsidiaries own, or have sufficient rights to use, all computer and telecommunication facilities and other information equipment and resources necessary for the continued conduct of their respective businesses as currently conducted.

(viii)    Each current and former employee and consultant of the Company and the Subsidiaries who is, or was, engaged in product development for the Company or the Subsidiaries or in the development of Intellectual Property Rights for the Company or the Subsidiaries has executed a confidential information and invention assignment agreement restricting such person's right to disclose proprietary information of the Company or the Subsidiaries and assigning to the Company or Subsidiary, as applicable, full, effective and exclusive ownership of all Intellectual Property Rights he or she owns that are related to the Company's or the Subsidiaries' business as now conducted, or an employment, consulting or other agreement containing substantially similar terms.  The Company does not have Knowledge that any of its employees or consultants is in violation of his or her confidential information and invention assignment agreement or employment, consulting or other agreement containing substantially similar terms.

(x)    Employment Matters.    The Company and the Subsidiaries are not delinquent in payments to any of their respective employees for any wages, salaries, commissions, bonuses, or other direct compensation for any service performed for it to the date hereof or amounts required to be reimbursed to such employees.  The Company has complied in all material respects with all applicable state and federal equal employment opportunity laws and with other laws related to employment, including not limited to those related to wages, hours, worker classification and collective bargaining.  The Company has withheld and paid to the appropriate governmental entity or is holding for payment not yet due to such governmental entity all amounts required to be withheld from employees of the Company and is not liable for any arrears of wages, taxes, penalties or other sums for failure to comply with any of the foregoing.

14

(y)     <u>Real Property</u>.

(i)     The Company and the Subsidiaries do not own any real property.

(ii)     The Company and the Subsidiaries have good and valid title as lessees to the real property set forth on <u>Schedule 3.01(y)</u> which lists all real property over which Company and the Subsidiaries have any title or interest (the "**Leased Real Property**").

(iii)     There are no liabilities outstanding due to any reconstruction of the any Leased Real Property and all payment obligations related thereto have been discharged.

(iv)     All rights of the Company or the Subsidiaries to the Leased Real Property are good and valid and there are no claims by third parties which could result in the loss of any such rights.

(z)     <u>Compliance</u>.

(i)     Research, development, manufacturing and other activities conducted by the Company and the Subsidiaries or otherwise relevant for the Company's and the Subsidiaries' products and services have been conducted in compliance with applicable laws, regulations, standards, and accepted applicable industry codes of practice in all respects.

(ii)     Products and services manufactured or provided by the Company and the Subsidiaries, in each case in all jurisdictions in which such products are distributed and in all respects, (A) meet the safety and compliance requirements under applicable laws and regulations, (B) have been licensed for distribution to the extent such license is required for the distribution under applicable laws and regulation, and (C) are duly registered in all relevant registers in accordance with applicable laws and regulations.

(iii)     The Company and the Subsidiaries have in all respects complied with all health and safety, labor and employment and other laws applicable to it, and no action, suit or proceeding by an third party or any governmental or administrative authority is pending or threatened in writing against the Company or any of the Subsidiaries alleging failure to comply with such laws in effect at the date of this Agreement.

(iv)     The Company and the Subsidiaries have in all respects complied with all corporate and commercial as well as all import and export laws and other trade regulations applicable to it, and no action, suit or proceeding by an third party or any governmental or administrative authority is pending or threatened in writing against the Company or any of the Subsidiaries alleging failure to comply with such laws or regulation in effect at the date of this Agreement.

(v)     To the Knowledge of Seller, there is no existing act, matter, thing or circumstance which would reasonably be expected to have an adverse effect on the technical and commercial viability of the application of the Concord Blue Reformer Technology or of the projects utilizing Concord Blue Reformer Technology currently being developed by CBD.

15

(aa)     <u>No Leakage</u>.

(i)     No leakage has occurred through the Closing Date. For the purpose of this <u>Section 3.01(aa)</u>, the term "leakage" shall mean:

(ii)     any dividend or distribution of profits or assets declared, or any payments in lieu of any dividend or distribution, paid or made or any repurchase, redemption or return of share capital paid or agreed to be paid, in each case by the Company or any of the Subsidiaries to, for the benefit of, or at the direction of, any of the Seller or any existing stockholder of the Company or the Subsidiaries;

(iii)     bonuses, payments or accruals of interest on management, consultancy, monitoring, service or directors' fees, charges or other compensation made by the Company or the Subsidiaries to or for the benefit of the Founder or any of the existing stockholders or employees of the Company or any of the Subsidiaries (A) in connection with the transactions contemplated by this Agreement (such as a transaction bonus or change of control payments) and (B) outside of the performance of his employment or consultancy contract or of his mandate as board member of the Company or any of the Subsidiaries;

(iv)     any Founder transaction costs incurred in connection with the transactions contemplated by this Agreement paid by the Company or the Subsidiaries and not reimbursed by or on behalf of the Founder to them on or before the date of this Agreement; or

(v)     the waiver by the Company or any of the Subsidiaries of any amount, right, value or benefit owed to the Company or any of the Subsidiaries by the Founder or any of the existing stockholders or employees of the Company or any of the Subsidiaries.

(bb)     <u>No Contributions to Government Officials</u>.  The Company,  the Subsidiaries, the Founder the other stockholders of the Company and the Subsidiaries, and their respective Affiliates have not made any contributions to an official of a Michigan state or local governmental entity under section 13(e) of Michigan Public Act 314 of 1965, as amended, at any time.

(cc)     <u>Affiliate Transactions</u>.  Except as set forth on <u>Schedule 3.01(cc)</u>, there are no contracts, claims, indebtedness, liabilities or obligations between the Company or any of the Subsidiaries, on the one hand, and the Founder or any existing stockholder or any of their respective Affiliates, on the other hand.

(dd)     <u>Disclosure</u>.  All information disclosed by the Company to the Purchaser is, to the Company's and the Seller's Knowledge, true, complete and not misleading in any material respect, and neither the Company nor the Seller has Knowledge of any facts pertaining to the Company or the Subsidiaries or their respective businesses that affect adversely the Company and the Subsidiaries and their respective businesses as a whole, except such adverse effects specifically disclosed in writing in this Agreement, including the Exhibits and Schedules attached hereto.  The content of the data room contains specific time-stamps to denote the date and time a document was added, removed, or modified.  Except as explicitly noted by a time-

stamp, the content of the data room has not changed in any respect since February 29, 2016, and the content as of such date is contained in a CD-ROM provided to Purchaser on the Closing Date.

Section 3.02    <u>Representations and Warranties of the Seller with Regards to the Seller</u>. The Seller hereby represents and warrants to Purchaser as follows, as of the date hereof and as of the Closing Date:

(a)    <u>Formation, Existence and Standing</u>. Seller is a *Gesellschaft mit beschränkter Haftung* duly formed and validly existing under the laws of Germany, and has all requisite entity power and authority to own, operate and license its properties and assets, and to carry on its business as presently being conducted.

(b)    <u>Certificate of Formation and Operating Agreement</u>. Attached hereto (i) as <u>Schedule 3.02(b)(i)</u> is a true, correct and complete copy of the Certificate of Incorporation, as amended and in force on the Closing Date, and (ii) as <u>Schedule 3.02(b)(ii)</u> is a true, correct and complete copy of the Bylaws, as amended and in force on the Closing Date.

(c)    <u>Power and Authority of Seller</u>. Seller has all requisite entity power and authority, and has been duly authorized by all requisite action and approvals, to execute and deliver this Agreement and all other agreements, instruments and documents to which Seller is a party be executed and delivered pursuant hereto, to perform and observe all of the terms, covenants and conditions in the part of Seller to be performed or observed hereunder and thereunder, and to consummate all of the transactions on the part of Seller to be consummated hereunder and thereunder, including, without limitation, sale of the Shares to Purchaser pursuant to the terms and conditions of this Agreement.

(d)    <u>Ownership of the Shares</u>.  The Seller is the record and beneficial owner of the Shares and such Shares are free and clear of all encumbrances, including but not limited to, any charge, claim, pledge, condition, equitable interest, Lien, option, security interest, mortgage, right of first offer, right of first refusal, or restriction of any kind, including any restriction on use, voting, transfer, receipt of income or exercise of any other attribute of ownership except as specified in this Agreement. Except as set forth in the Shareholders Agreement, there are no voting trusts, stockholder agreements, proxies or other agreements or understandings in effect with respect to the voting or transfer of any of the Shares.

(e)    <u>Legal Effect</u>. This Agreement and all other agreements, instruments and documents to which Seller is a party to be executed and delivered pursuant hereto to which Seller is a party, constitute a valid and binding obligation of Seller, enforceable against it in accordance with their respective terms except as such enforcement may be limited by laws affecting the rights of creditors generally and principles of equity.

(f)    <u>Absence of Conflict</u>. The execution and delivery of this Agreement and all other agreements, instruments and documents to which Seller is a party to be executed and delivered pursuant hereto, the performance and observance of all of the terms, covenants and conditions in the part of Seller to be performed or observed hereunder and thereunder, and the

17

consummation all of the transactions on the part of Seller to be consummated hereunder and thereunder, including, without limitation, the sale of the Shares to Purchaser pursuant to the terms and conditions of this Agreement, will not violate or conflict with, or result in a breach by Seller, or constitute a default or a event of default under, (i) the Shareholders Agreement, (ii) the Seller's organizational documents, any contract, agreement, note, indenture, deed of trust, mortgage or instrument to which Seller is a party, or by which Seller or its assets is otherwise bound or subject, that would, either individually or in the aggregate, adversely impair the condition (financial or otherwise), business, operations, assets or liabilities of Seller (taken as a whole), or (iii) to the Knowledge of Seller, any order, judgment, law, rule or regulation of any court or other governmental authority of competent jurisdiction to which Seller is a party, or by which Seller or its assets is otherwise bound or subject, that would, either individually or in the aggregate, adversely impair the condition (financial or otherwise), business, operations, assets or liabilities of Seller (taken as a whole), as of the Closing Date.

Section 3.03    <u>Representations and Warranties of Purchaser</u>. Purchaser hereby represents and warrants to Seller and the Company as follows, as of the date hereof and as of the Closing Date:

(a)    <u>Financial Qualification</u>. Purchaser is a public nonprofit corporation established and maintained under the laws of the State of Michigan, not formed for the specific purpose of acquiring the securities offered, with total assets in excess of $5,000,000. Purchaser has the financial resources to bear the economic risk of illiquidity of the investment in the Shares for an indefinite period of time and the economic risk of a complete loss of the investment in the Shares.

(b)    <u>Investment Experience</u>. Purchaser acknowledges (i) that Purchaser has experience as an investor in securities of companies in the development stage and is able to fend for itself, can bear the economic risk of its investment and has such knowledge and experience in financial or business matters that it is capable of evaluating the merits and risks of its investment in the Shares and protecting its own interests in connection with such investment, and (ii) that Purchaser has obtained legal, tax and accounting advice from its qualified professional advisors regarding all aspects of the proposed investment in the Shares that Purchaser has deemed necessary in order to make its decision to invest in the Shares.

(c)    <u>Investment Intent</u>. Purchaser is acquiring the Shares for investment for Purchaser's own account, not as a nominee or agent, and not with the view to, or for resale in connection with, any distribution, and has no present intention of selling, transferring, disposing of or otherwise distributing the Shares or any portion thereof or interest therein. Purchaser acknowledges and understands that the Shares have not been registered or qualified under the Federal Securities Act or any applicable States Securities Acts by reason of a specific exemption from the registration and qualification provisions thereunder, the availability of which depends upon, among other things, the bona fide nature of the investment intent of the Purchaser and the accuracy of the representations of Purchaser as herein expressed.

(d)    <u>Investment Risk</u>. Purchaser acknowledges (i) that the purchase of the Shares is a speculative investment involving a high degree of risk which may result in the

18

complete loss of the investment, and understands and has taken full cognizance of such risks in Purchaser's decision to invest in the Shares, (ii) that Purchaser must bear the economic risk of the purchase of the Shares for an indefinite period of time because, among other reasons, the Shares have not been registered or qualified under Federal Securities Act or the State Securities Acts, and, therefore, cannot be sold, pledged, assigned or otherwise disposed of unless the Shares are subsequently registered or qualified under the Federal Securities Act or under any applicable State Securities Acts or an exemption from such registration or qualification is available, and (iii) that Seller has no obligation to register or qualify the Shares under the Federal Securities Act or under any applicable State Securities Acts.

(e)    <u>Access to Information</u>.  Based on its actual knowledge of the Company, Purchaser has received, or has had access to, the information Purchaser considers appropriate to make an informed investment decision with respect to the Shares. Purchaser has had an opportunity to ask questions and receive answers from the Company regarding the terms and conditions of the transactions contemplated hereby (including the purchase and sale of the Shares) and the business, management, properties and financial condition of the Company.

(f)    <u>Power and Authority of Purchaser</u>. Purchaser has all requisite power and authority, and has been duly authorized by all requisite action and approvals of the managers, directors or general partners and, if and to the extent necessary, the members, shareholders, limited partners or other owners of Purchaser, to enter into this Agreement and all other agreements, instruments and documents to which Purchaser is a party to be executed and delivered pursuant hereto, including the Shareholders Agreement, to perform and observe all of the terms, covenants and conditions in the part of Purchaser to be performed or observed hereunder and thereunder, including without limitation, to purchase the Shares and pay the Purchase Price therefor, and to consummate all of the transactions on the part of Purchaser to be consummated hereunder and thereunder.

(g)    <u>Legal Effect</u>. This Agreement and all other agreements, instruments and documents to which Purchaser is a party to be executed and delivered pursuant hereto, including the Shareholders Agreement, constitute a valid and binding obligation of Purchaser enforceable against Purchaser in accordance with its terms except as such enforcement may be limited by laws affecting the rights of creditors generally and principles of equity.

(h)    <u>Brokers or Finders</u>. Purchaser has not entered into any contract or taken any other action by which Seller and the members of Seller, or any of them, has incurred, or will incur, directly or indirectly, any liability for brokerage or finders' fees or any similar charges in connection with this Agreement or the transactions contemplated thereby as a result of any such agreement or other action by Purchaser.

**ARTICLE 4**
**INDEMNIFICATION**

Section 4.01    <u>Indemnification by Seller</u>. Provided that Purchaser delivered to the Company a Notice of Breach in accordance with <u>Section 4.02(a)</u> and if and to the extent the cure as per <u>Section 4.03</u> cannot be effected, or is not effected within the time period set forth in

19

Section 4.04, Seller shall indemnify, defend and hold harmless Purchaser and its managers, directors, officers, employees, members, shareholders, partners or other owners, agents, attorneys, representatives, successors and permitted assigns (collectively, "**Purchaser Indemnitees**"), from and against any and all claims, demands, actions, suits, proceedings, liabilities, losses, damages, costs and expenses (including, without limitation, all settlement payments and reasonable attorneys' fees and costs and including the proportionate part of any impact on the financial statements of the Company or the Subsidiaries as a result of the effects of such misrepresentation or breach of warranty or default) as well as from a lower value of the Company as a result of a misrepresentation or breach of warranty or default (collectively, "**Losses**"), asserted against, imposed upon or incurred by Purchaser Indemnitees, or any of them, under, arising from or related to (i) any breach of any representation or warranty of the Company or Seller contained in this Agreement, and/or (ii) any breach, default or failure to perform any covenant or obligation of Seller contained in this Agreement. Any breach of this Agreement shall be deemed to be a breach of any other agreements related hereto, including but not limited to, the Shareholders Agreement, Subscription Agreement, and Amended and Restated Limited Liability Agreement of CBD ("**LLC Agreement**") executed in connection herewith.

Section 4.02    Remedy of Purchaser.

(a)    Notice of Breach.

(i)    Purchaser shall deliver a written notice to Seller which shall include a description in reasonable detail of the facts then known about any claim for misrepresentation or breach of warranty or default and which shall specify the representation or warranty, covenant or obligation allegedly breached and shall state the amount of reasonably anticipated Losses relating to such claim, as well as disclosing to Seller all documents and information supporting such claim (the "**Notice of Breach**") on the earlier of:

(A)    the date not later than thirty (30) Business Days after (i) Purchaser becoming aware of a misrepresentation or breach of warranty or default or (ii) receipt by Purchaser of notice of any claim made or threatened in writing to be made by any third party which Purchaser believes is reasonably likely to give rise to a claim for misrepresentation or breach of a warranty; or

(B)    promptly upon Purchaser receiving any submission to, or a decision or order rendered by any court, arbitral tribunal or governmental or administrative body (including without limitation any taxation authority) which is reasonably likely to result in a claim based upon misrepresentation or the breach of a warranty. In any event such notice shall, to the extent practicable, be delivered to Seller early enough so that Seller has a reasonable opportunity to respond to such submission or to submit a timely appeal or other challenge against such decision or order.

(b)    Failure to give Notice of Breach within the time periods set forth in Section 4.02(a) shall, if the notice has been given within the time limitation set out in Section 4.04, not exclude Seller's liability under this Agreement in connection with the relevant matter. Seller's liability shall, however, be reduced or, as the case may be, excluded altogether vis-à-vis

20

Purchaser, if and to the extent a Loss has been caused or aggravated by virtue of Purchaser's failure to give timely notice in accordance with Section 4.02(a). If, however, the Notice of Breach has not been given within the time limitation set out in Section 4.04, Seller's liability shall be excluded.

Section 4.03     Seller's Right to Cure.  With respect to any misrepresentation or breach of warranty or default notified by Purchaser to Seller pursuant to Section 4.02(a), Seller shall have the right, within a reasonable period of time not exceeding thirty (30) days after the receipt of the Notice of Breach, to put Purchaser in the same financial position, as reasonably determined by the Purchaser, in which it would have been if the representation or warranty had been complied with or the default did not happen.

Section 4.04     Time Limitations on and Forfeiture of Claims.

(a)     A claim by Purchaser against Seller for misrepresentation or breach of a warranty shall in any case be time-barred and forfeited unless Purchaser shall have delivered a Notice of Breach to Seller in accordance with Section 4.02(a):

(i)     unless otherwise set forth in this Section 4.04, on or before the lapse of a period of 24 (twenty-four) months from the Closing Date;

(ii)     with regard to the representations and warranties in Section 3.01(s) (Environment), on or before the later of (i) the lapse of a period of 10 (ten) years from the Closing Date, or (ii) 6 (six) months after the relevant statute of limitations has expired (except in circumstances in which there is no statute of limitations, in which circumstances, a claim may be brought at any time);

(iii)     with regard to the representations and warranties in Section 3.01(u) (Taxes), on or before the later of (i) the lapse of a period of 5 (five) years from the Closing Date, or (ii) 6 (six) months after the relevant statute of limitations has expired;

(iv)     with regard to the representations and warranties in Section 3.01(z) (Compliance), on or before the later of (i) the lapse of a period of 3 (three) years from the Closing Date, or (ii) 6 (six) months after the relevant statute of limitations has expired; and

(v)     with regard to the representations and warranties in Section 3.01(a) and Section 3.02(a) (Formation, Existence and Standing), Section 3.01(m) (Subsidiaries), Section 3.01(e) (Power and Authority of Company), Section 3.02(c) (Power and Authority of Seller), Section 3.01(w) (Intellectual Property Rights), and with respect to any claims based on willful misconduct, fraud, or gross negligence, such claims may be brought at any time.

Section 4.05     Limitations on Liability.

(a)     Qualifying Claim and Threshold.  Purchaser shall not be entitled to be paid any sum in respect of a claim for Losses for misrepresentation or breach of a warranty unless (i) the amount of such claim on a stand-alone basis exceeds 0.5% of the Purchase Price (a "**Qualifying Claim**") and (ii) the liability of Seller to Purchaser in respect of such Qualifying

Claim when combined with the liability of Seller hereunder for all other Qualifying Claims exceeds 1% of the Purchase Price (the "**Threshold**"). If the Threshold is met, Purchaser shall be entitled to recover from the first dollar and not only the amount exceeding the Threshold.

(b)    Cap.  Seller's cumulative and aggregated liability for Losses for breaches of any representations and warranties shall be limited to the Purchase Price. Notwithstanding the foregoing, the limitations set forth in this Section 4.05(b) shall not apply in the case of Seller's or Company's willful misconduct, fraud or gross negligence.

(c)    Collateral.  No part of the Purchase Price shall be used to pay indemnity obligations of Seller or the Company. In the event Seller and the Company have insufficient funds to pay for Losses at the time a claim is made, such Losses may be paid at the discretion of Purchaser in additional Shares issued by the Company and/or transferred by the Seller at the fair market value of such Shares as determined by an independent appraiser, reasonably acceptable to Purchaser and Seller; provided that in no event will Purchaser receive pursuant to this Section 4.05(c) voting securities of the Company in excess of 49% of the aggregate voting securities of the Company.  In addition to and notwithstanding the foregoing remedies, Purchaser in its sole discretion may terminate the Escrow Account and withdraw the funds contained therein in accordance with Section 2.07 of the Subscription Agreement dated as of the date hereof.

Section 4.06    Exclusion or Reduction of Liability.    Seller's liability for misrepresentation or breach of a warranty shall be reduced or excluded vis-à-vis Purchaser if and to the extent Purchaser shall have recovered any amount in respect of such Losses from any third person, including but not limited to an insurer, in an amount equal to the amount of recovery, after deduction of reasonably documented costs and expenses incurred in making such recovery (including reasonable attorney's fees).

Section 4.07    Indemnification by Purchaser. Purchaser shall indemnify, defend and hold harmless Seller, and its managers, directors, officers, employees, shareholders, agents, attorneys, heirs, representatives, successors and permitted assigns, and each of them, from and against any and all Losses arising out of, in connection with or related to (i) any breach of any representation or warranty of Purchaser contained in this Agreement, and/or (ii) any material breach, default or failure to perform any covenant or obligation of Purchaser contained in this Agreement.

Section 4.08    Defense of Third Party Claims.

(a)    In the event of any Losses related to any claim, assertion, proceeding or other occurrence by or in respect of a third party for which any party entitled to indemnification pursuant to Section 4.01 or Section 4.07 hereof (the "**Indemnitee**") may request indemnification hereunder (collectively, "**Third-Party Claim**"), the indemnifying party (the "**Indemnitor**") shall have the right to direct, through counsel of its own choosing, the defense or settlement of any such Third-Party Claim at its own expense. Indemnitee may participate in (but not control) such defense, but in such case the expenses of Indemnitee shall be borne by Indemnitee unless Indemnitee is entitled to assert defenses to any such Third-Party Claim which are materially different from, or in addition to, those available to Indemnitor, in which case Indemnitee may retain its own counsel in order to assert any such defenses, at Indemnitor's expense.

22

(b)    In the event of any Third-Party Claim, Indemnitee shall provide Indemnitor with access to Indemnitee's records relating to such Third-Party Claim during normal business hours and shall otherwise cooperate with Indemnitor in the defense or settlement thereof, and the Indemnitor shall reimburse the Indemnitee for all its reasonable out-of-pocket expenses in connection therewith. If Indemnitor commences or undertakes the defense of any Third-Party Claim, Indemnitee shall not pay, or permit to be paid, any part of the Third-Party Claim unless Indemnitor consents in writing to such payment, or unless Indemnitor fails to defend or withdraws from the defense of such Third-Party Claim or unless a final judgment from which no appeal may be taken by or on behalf of Indemnitor is entered against Indemnitee for the Third-Party Claim. If Indemnitor fails to defend or, if after commencing or undertaking any such defense, fails to diligently prosecute or withdraws from such defense, Indemnitee shall have the right to undertake the defense and settlement thereof, at Indemnitor's expense. Upon the full payment of any claim for indemnification, Indemnitor shall be subrogated to all rights and remedies of Indemnitee against any third party.

## ARTICLE 5
## GOVERNING LAW AND DISPUTE RESOLUTION

Section 5.01    <u>Governing Law</u>. Subject to <u>Section 6.15</u> below, this Agreement, the respective rights, obligations and remedies of the parties hereunder and all controversies, disputes and claims under, arising from or related to this Agreement, the interpretation, breach, termination or validity hereof, or the transactions contemplated hereunder, shall be governed by and construed in accordance with the internal laws of the State of California, without reference to its principles of conflict of laws.

Section 5.02    <u>Arbitration</u>. Subject to the provisions of <u>Section 5.03</u> hereof, in the event of any controversy, dispute or claim under, arising from or related to this Agreement, the interpretation, breach, termination or validity hereof, or any of the transactions contemplated hereunder, the sole and exclusive remedy of the parties shall be to submit such controversy, dispute or claim to mediation and binding arbitration as provided herein. In the event that such dispute cannot be resolved within thirty (30) days after the date when both parties are aware of the dispute, it shall be referred to mediation before a single, mutually agreeable mediator with the Judicial Arbitration and Mediation Services ("**JAMS**") located in Los Angeles, California. In the event that a controversy, dispute or claim cannot be resolved within thirty (30) days after the appointment of a mediator, the parties agree to submit the dispute to binding arbitration before one mutually agreeable arbitrator with JAMS who shall be a retired judge located in Los Angeles, California.  In the event that the parties are unable to agree upon the selection of an arbitrator within thirty (30) days after Notice requesting arbitration shall have been given by either party to the other party, the parties shall request the presiding judge of the Superior Court for Los Angeles County, California, to appoint such arbitrator.  Arbitration of the dispute shall commence no later than thirty (30) days after the selection or appointment of such arbitrator, and shall be conducted before such arbitrator at a hearing of no more than three (3) days commenced no later than ninety (90) days after the selection or appointment of such arbitrator. The arbitrator shall be bound by the express terms of this Agreement and shall endeavor to reach his or her decision as quickly as possible, which decision shall be final and binding on the parties absent the grounds for vacating or correcting the award pursuant to Sections 1286.2 or 1286.6 of the

23

California Code of Civil Procedure. The arbitrator shall also have the power to award costs and expenses of the arbitration (including attorneys' fees and costs pursuant to Section 5.05 hereof) to the prevailing party. Application to enforce the arbitrator's decision may be made in any court of competent jurisdiction; any other application or dispute shall be submitted to the Superior Court for Los Angeles County, California, for determination. The rules of discovery then pertaining to a California Court of Law shall apply to any such arbitration, including, without limitation, Sections 1283.01 and 1283.05 of the California Code of Civil Procedure, the provisions of which are hereby incorporated herein and made a part hereof by reference; provided, however, (i) that each party shall have the right to not more than two (2) oral or written depositions as provided in Section 94 of the California Code of Civil Procedure without leave of the arbitrator notwithstanding anything contained in Section 1283.05(e) of the California Code of Civil Procedure to the contrary, and (ii) that the total time for oral depositions shall not exceed twenty-five (25) hours in the aggregate per party.

Section 5.03    Equitable Remedies. Nothing contained in this Article shall be deemed or construed to limit or preclude the right of any party to seek and obtain in any court of competent jurisdiction any injunctive relief, specific performance or other equitable remedies to enforce and protect its rights under this Agreement and to prevent or curtail any breach or threatened breach of this Agreement by the other party. In connection therewith, each party acknowledges and agrees (i) that sale of Shares to Purchaser hereunder is of a special, unique and irreplaceable character, (ii) that monetary damages would not provide an adequate remedy in the event of the breach or threatened breach of any of terms, covenants and conditions on the part of such party to be performed or observed under this Agreement, and (iii) in the event of any breach or threatened breach of such terms, covenants and conditions by such party, that the other party shall be entitled to injunctive relief, specific performance and other equitable remedies in any court of competent jurisdiction to enforce and protect its rights under this Agreement and to prevent or curtail any breach or threatened breach of this Agreement by the defaulting party without the necessity of proving actual damages and without the necessity of posting any bond or other security in connection therewith to the maximum extent permitted under applicable law, in addition to any other remedies to which it may be entitled. Seeking or obtaining any such injunctive relief, specific performance or other equitable remedies shall not be deemed a waiver of the right of arbitration hereunder by any party.

Section 5.04    Consent to Jurisdiction and Venue. Subject to Section 5.02, each party hereby irrevocably consents and submits to the personal jurisdiction of, and venue in, the Superior Court for Los Angeles County, California, in any legal action, equitable suit, arbitration or other proceeding under, arising from or related to this Agreement, the interpretation, breach, termination or validity hereof, or any of the transactions contemplated hereunder.

Section 5.05    Recovery of Costs. In any legal action, equitable suit, arbitration or other proceeding under, arising from or related to this Agreement, the interpretation, breach, termination or validity hereof, or any of the transactions contemplated hereunder, the prevailing party shall be entitled to recover reasonable attorneys' fees and costs incurred by such party in connection therewith, in addition to any other relief to which such party may be entitled.

24

# ARTICLE 6
## MISCELLANEOUS PROVISIONS

Section 6.01    Survival. The provisions of Section 2.02(c), Section 2.05, Section 2.06 and Article 4, Article 5 and Article 6 hereof shall survive Closing and shall expire on the date upon which the respective terms, covenants and conditions on the part of each party to be performed or observed thereunder shall have been fully satisfied, discharged or observed by such party in accordance with the terms thereof, or until expiration of all statutes of limitation applicable thereto. The representations, warranties and indemnities of the parties hereunder shall survive Closing, and shall expire as provided in Section 4.04, except as to any matter as to which a claim has been submitted to the indemnifying party prior thereto, in which case, such claim so timely submitted shall survive the expiration of such periods until expiration of all statutes of limitation applicable thereto. None of the terms, covenants, conditions, representations, warranties or indemnities of the parties hereunder shall be deemed to have merged into any instrument of conveyance or transfer or other agreement, document or instrument delivered by any party at each respective Closing.

Section 6.02    Parties in Interest. Nothing in this Agreement, whether express or implied, is intended to confer any rights or remedies under or by reason of this Agreement on any Persons or entities other than the parties to it and their respective successors and permitted assigns, nor is anything in this Agreement intended to relieve or discharge the obligation or liability of any third Persons to any party to this Agreement, nor shall any provision give any third Persons any right of subrogation or action over against any party to this Agreement.

Section 6.03    Assignment. Each party acknowledges and agrees that the identity and investor qualifications of Purchaser as a party purchasing the Shares, and character of the Shares to be sold to Purchaser, are of a special, unique and irreplaceable nature, and that neither party may assign any of the rights or delegate any of the obligations of such party under this Agreement, either in whole or in part, at any time prior to the consummation of the Closing and thereafter only with respect to the Shares actually purchased by, and issued to, Purchaser at the Closing and subject to the terms of the Shareholders Agreement, without the prior written consent of the other party in each instance, which consent may be withheld for any or no reason or conditioned upon such additional terms and conditions as the non-assigning party shall determine in the sole and absolute discretion of such non-assigning party. Any assignment of this Agreement, or any assignment of any of the rights or any delegation of any of the obligations of a party under this Agreement, either in whole or in part, in violation of this Section shall be null and void.

Section 6.04    Notices. All notices, directions and other communications required or permitted to be given hereunder ("**Notice**") shall be in writing and sent by certified or registered mail, return receipt requested, postage prepaid, or transmitted by facsimile, electronic mail or other form of electronic written communication that the recipient has the facilities to receive, promptly confirmed by a manually signed original thereof sent by certified or registered mail, return receipt requested, postage prepaid, or delivered personally against a signed receipt therefor, in each case to the intended recipient as follows: (i) if to the Company, to Concord Blue Development, LLC, c/o Concord Blue Energy, Inc., 12424 Wilshire Boulevard, Suite 660, Los

25

Angeles, California 90025, United States of America, Attention: President (E-Mail: cb@concordblueenergy.com), with a copy contemporaneously sent to Concord Blue Engineering GmbH, Konigsallee 6, 40212 Duesseldorf, Germany, Attention Christopher Thannhaeuser, Chairman (Facsimile Number: 492113230505; E-Mail: ct@concordblue.de), (ii) if to Seller, to Concord Blue Engineering GmbH, Konigsallee 6, 40212 Duesseldorf, Germany, Attention: Christopher Thannhaeuser, Chairman (Facsimile Number: 492113230505); E-Mail: ct@concordblue.de, and (iii) if to Purchaser, to Verdant*f* AG (on behalf of the Municipal Employees' Retirement System of Michigan), Attention: Ms. Gaia Arnaboldi / Mr. Berry Polmann, Gladbachstrasse 105, 8044 Zurich, Switzerland (Facsimile Number: 795553375 / 795555373; E-Mail: gaia@verdantf.com / berry@verdantf.com), or at such other address as either party may designate from time to time by Notice given to the other party in accordance with the provisions of this Agreement.  Each Notice sent by certified or registered mail shall be deemed given on the date shown on the return receipt as the date of delivery or the date upon which the appropriate postal authority certifies that it was unable to effectuate delivery, whichever is applicable. Each Notice transmitted by facsimile, electronic mail or other form of electronic written communication or delivered personally shall be deemed given on the date of transmission or delivery, as the case may be.

Section 6.05    Entire Agreement. This Agreement and the Shareholders Agreement contains the complete and entire understanding of the parties and shall supersede and replace any and all other arrangements, communications, representations or agreements, whether oral or written, with respect to the subject matter hereof.

Section 6.06    Binding Effect. This Agreement and the respective rights and obligations of the parties hereunder shall be binding upon and inure to the benefit of the parties hereto and their respective heirs, devisees, representatives, successors and permitted assigns.

Section 6.07    Amendment. This Agreement may be amended only in writing signed by Seller and by Purchaser.

Section 6.08    Waiver or Consent. No waiver of any rights or obligations under this Agreement or of any objection to any act or omission connected therewith shall be claimed or implied by any party, or be deemed or construed to constitute a consent to the continuation of any such act or omission or a consent to any other or future act or omission, unless in writing signed by the party against whom enforcement of such waiver or consent is sought.

Section 6.09    Severability. In the event any provision, clause or application of this Agreement is invalidated or unenforceable for any reason whatsoever, this Agreement shall remain binding and in full force and effect to the maximum extent permitted under applicable law, except for such invalidated or unenforceable provision, clause or application. If any injustice or frustration of purpose shall result therefrom, however, the parties shall negotiate in good faith to provide adjustments to ameliorate the effects of such injustice or frustration of purpose.

Section 6.10    Drafting Presumption. It is acknowledged that the parties and their respective agents have participated in an arms'-length negotiation in the preparation of this

26

Agreement. As a consequence, the parties agree that no presumption shall be applied in any interpretation of this Agreement that the terms hereof shall be construed more strictly against the party who prepared the same, whether through such party's agents or otherwise.

Section 6.11    Headings. The article and section headings contained in this Agreement are solely for the purpose of convenience and shall neither be deemed a part of this Agreement nor be used in any interpretation hereof.

Section 6.12    Gender. Each term stated in the singular shall include the plural, and pronouns stated in the masculine gender shall include the feminine and neuter genders, and *vice versa*, wherever appropriate by the context.

Section 6.13    Counterparts. This Agreement may be executed in one or more counterparts, each of which shall be deemed an original and all of which shall constitute one and the same instrument.

Section 6.14    Confidentiality and Press Release.

(a)    The terms and conditions of this Agreement, and any information received by the parties under or in connection with this Agreement as well as the identity of Purchaser (the "**Confidential Information**") shall be kept strictly confidential by each Party hereto and shall not be disclosed to any third party. The term Confidential Information shall not include any information

(i)    which as of the time of its disclosure by a party was already lawfully in the possession of the receiving party, evidence of which can be provided;

(ii)    which at the time of disclosure was in the public domain; or

(iii)    the disclosure of which was previously explicitly authorized by the disclosing party or the Company.

(b)    Nothing herein shall restrict from

(i)    disclosing Confidential Information required by law, legal process or regulations;

(ii)    disclosing this Agreement to a third party being interested in good faith in an acquisition of or subscription for shares or a financing of the Company or any of the Subsidiaries, all based on appropriate non-disclosure agreements;

(iii)    disclosing the identity of Purchaser to legal counsel and independent accountants of the Company and, on a need to know basis as reasonably determined by the board of directors of the Company to other participants in transactions or potential transactions with the Company; as well as

27

(iv)    disclosing Confidential Information in order to make use of the rights and to comply with the obligations under this Agreement.

(c)    Notwithstanding anything herein to the contrary, the parties acknowledge that the Purchaser intends to disclose in reports maintained or issued by the Purchaser or to the Purchaser's board: (i) the name of the Company; (ii) the date that the investment was made by the Purchaser in the Company; (iii) the Purchase Price; (iv) the amount of cash distributed to the Purchaser by the Company; (v) the value of the Purchaser's investment in the Company based on the financial statements delivered to the Purchaser and (vi) the internal rate of return of the Purchaser's investment in the Company; provided that such disclosure is made only in connection with similar disclosure of information with respect to other investments made by the Purchaser. The parties consent in advance to such disclosures in the manner described above and any such disclosure shall not constitute a breach of this Agreement, the Shareholders Agreement, or any documents contemplated hereby or thereby. The parties acknowledge that the Purchaser is subject to the Michigan Freedom of Information Act ("**MFOIA**") and that, pursuant to its policies in connection therewith, its employees are not subject to confidentiality agreements with the Company that would encompass confidential information. The parties consent to the disclosure of confidential information to employees of the Purchaser who are made aware of the confidential nature of such information and their obligations with respect thereto. The parties agree that in the event the Purchaser receives a request under the MFOIA to disclose such confidential information it shall not be obligated to provide notice to or cooperate with the efforts of any other party in connection with any challenge to its standing to obtain a protective order or other remedy to protect such confidential information from being disclosed pursuant to such MFOIA request.

Section 6.15    <u>Sovereignty</u>.  Purchaser reserves all immunities, defenses, rights or actions arising out of Purchaser's sovereign status or under the Eleventh Amendment to the United States Constitution, except to the extent waived by statute. No waiver of such reserved immunities, defenses, rights or actions shall be implied or otherwise deemed to exist by reason of its entry into this Agreement, by any express or implied provision thereof or by any actions or omissions to act by Purchaser or any of its representatives or agents, whether taken pursuant to this Agreement or prior to Purchaser's execution thereof. This provision shall be governed by, and construed in accordance with, the laws of the State of Michigan, United States of America.

[Signature Pages Follow]

DWT 29014772v6 0106299-000001

ACTIVE 211636693v.19

IN WITNESS WHEREOF, each party has duly executed and delivered this Stock Purchase Agreement as of the date first above written.

**CONCORD BLUE ENERGY, INC.**

By: _____

Name: Christopher Thannhaeuser _____

Title: CEO _____

[Signature Page to Stock Purchase Agreement]

**CONCORD BLUE ENGINEERING GMBH**

By: _____

Name: Christopher Thannhaeuser

Title: Director

[Signature Page to Stock Purchase Agreement]

**MUNICIPAL EMPLOYEES'**
**RETIREMENT SYSTEM OF MICHIGAN**

By verdant*f* AG pursuant to power of attorney
dated March _8_ , 2016

By:_____

Name:  Berry Polmann, Gaia Arnaboldi

Title:  Managing Partner, Managing Partner

[Signature Page to Stock Purchase Agreement]

# EXHIBIT A

# FORM OF SHAREHOLDERS AGREEMENT

[Attached]

## SECOND AMENDED AND RESTATED SHAREHOLDERS AGREEMENT

THIS SECOND AMENDED AND RESTATED SHAREHOLDERS AGREEMENT (this "**Agreement**") is made as of March 8, 2016, (the "**Effective Date**") by and among CONCORD BLUE ENERGY, INC., a Delaware corporation ("**Company**"), CONCORD BLUE ENGINEERING GMBH, a German company ("**CB Germany**"), WESTERN ENERGY SOLUTIONS, LLC, a California limited liability company ("**WES**") (CB Germany and WES being hereinafter sometimes referred to separately as an "**Original Shareholder**" and collectively as the "**Original Shareholders**"), STEFAN BURMESTER ("**Burmester**"), Municipal Employees' Retirement System of Michigan, a public nonprofit corporation established and maintained under the laws of the State of Michigan  (the "**Investor**") and such other Person or Persons as may be added as a party or parties to this Agreement pursuant to the provisions of **Section 1.3(A)** hereof.

### W I T N E S S E T H:

WHEREAS, the authorized shares of capital stock of the Company consists of 1,000,000 shares of Common Stock ("**Common Stock**"), par value US $0.01 per share, of which 200,000 shares of Common Stock are issued and outstanding as of the date of this Agreement;

WHEREAS, the Original Shareholders previously entered into that certain Shareholders Agreement dated as of April 19, 2012 (the "**Original Agreement**");

WHEREAS, the Original Shareholders amended and restated the Original Agreement on December 18, 2014 in its entirety to provide for, among other things, the manner of acquisition of Common Stock from the Company, the manner of adding one or more Persons as parties to this Agreement, including additional, supplemental and/or modified terms and conditions thereof, if any, applicable to each such Person, and for the manner of the disposition of Shares by any Shareholder subject to this Agreement (such amended and restated Original Agreement being referred to as the "**A&R Agreement**");

WHEREAS, currently CB Germany (the "**Controlling Shareholder**") is the holder of record and beneficial owner of 159,466 shares of Common Stock, WES is the holder of record and beneficial owner of 10,000 shares of Common Stock, Burmester is the holder of record and beneficial owner of 3,563 shares of Common Stock and the Investor is the holder of record and beneficial owner of 30,534 shares of Common Stock; and

WHEREAS, the parties desire to have Investor become a Party to this Agreement and amend and restate the A&R Agreement in its entirety as set forth herein;

NOW, THEREFORE, in consideration of the mutual promises, agreements, covenants, representations and warranties hereinafter set forth, the parties, intending to be bound legally, hereby agree to amend and restate the A&R Agreement in its entirety as follows:

1.    **SCOPE OF AGREEMENT**

    **1.1**    **Certain Definitions**. For purposes of this Agreement, the following terms shall have the meanings ascribed in this Section:

        **(A)**    "**Additional Shareholder**" shall mean each Person who becomes a Shareholder and party to this Agreement pursuant to the provisions of **Section 1.3(A)** hereof, for so long as such Person holds of record or owns beneficially, or both, any Shares, or any right, title or interest therein, either directly or indirectly.

        **(B)**    "**Affiliate**" shall mean, with respect to any Person (the "**first Person**"), (i) any second Person directly or indirectly controlling, controlled by or under common control with the first Person or owning or controlling ten percent (10%) or more of the outstanding voting securities, capital or profits interests, or beneficial interests in the first Person; (ii) any officer, director, manager, general partner, trustee or Family Member of the first Person; or (iii) if the first Person is an officer, director, manager, general partner or trustee, any corporation, limited liability company, partnership or trust for which such first Person acts in that capacity. For purposes of this Section, (x) the term "**control**" (including the terms "**controlled by**" and "**under common control with**") means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract or otherwise; (y) a manager of a limited liability company includes a member of a limited liability company that is managed by its members rather than by managers; and (z) a general partner includes any general partner in a limited liability partnership.

        **(C)**    "**Annual Budget**" means each of the initial budget of the Company and its subsidiaries adopted by the Board for each Financial Year, which shall be approved by the Board no later than November 30th of each previous Financial Year, each of which will cover, among other things, the following: capital expenditures, estimated revenues, operating expenses, estimated EBITDA, administrative expenses, investments, personnel/employment, marketing/advertising and financing/indebtedness.

        **(D)**    "**Annual Business Plan**" means each Financial Year's plan proposed and approved by the Board, which contains all financial, accounting, legal, and commercial operations to be developed by the Company in the following Financial Year, including a detailed annual budget for each activity/action;

        **(E)**    "**Auditors**" means the independent, external auditors of the Company which shall be a firm of the Big Five  accounting firms to be selected by the Board, currently the following: PwC, Deloitte, E&Y, KPMG, BDO;

        **(F)**    "**Beneficial Owner**" shall mean any Person who owns, either directly or indirectly, any equity interest in any Shareholder or any of its Affiliates that is an entity as of the date of this Agreement or, with respect to any Additional Shareholder or any of its Affiliates that is an entity, as of the date such Additional Shareholder became a Shareholder under this Agreement.

**(G)**    "**Board**" shall mean the board of directors of the Company.

**(H)**    "**CBD**" shall mean Concord Blue Development, LLC, a Delaware limited liability company.

**(I)**    "**CBD Operating Agreement**" shall mean that certain Amended and Restated Limited Liability Company Agreement, dated on or about the date hereof, by and among the Company, CBD and the Investor, as amended, amended and restated, supplemented or otherwise modified from time to time.

**(J)**    "**Charter**" shall mean the Company's certificate of incorporation, as amended, amended and restated, supplemented or otherwise modified from time to time.

**(K)**    "**Company Value**" shall mean, as of any given date, the gross price at which the Company's business and assets would be purchased and sold as a going concern between a willing buyer and willing seller, with both sides having knowledge of all relevant facts and neither being under any compulsion to sell or buy, as determined by an appraiser with at least five (5) years' experience in the valuation of a business similar to that conducted by the Company and associated with (a) Duff & Phelps or (b) if Duff & Phelps is unable or unwilling to so serve, a nationally-recognized valuation firm, not an Affiliate or Family Member of any Shareholder, officer or director of the Company, selected by the Board (the "**Appraiser**"). The fees of the Appraiser shall be paid by the Company.

**(L)**    "**Controlling Shareholder**" has the meaning set forth in the introductory section of this Agreement.

**(M)**    "**Drexel Engagement Letter**" shall mean that certain Engagement Letter dated July 28, 2014, by and between the Company and Drexel Hamilton LLC.

**(N)**    "**EBITDA**" means, for any period, earnings before interest and taxes of the Company and its consolidated subsidiaries for such period, plus amortization and depreciation charges, plus any other non-cash charges appearing above the operating income line in the Company's annual audited financial statements, as calculated in accordance with GAAP.

**(O)**    "**Family Member**" shall mean any spouse of any Person, any parent, sibling or lineal descendant of such Person or spouse, or any spouse of any such parent, sibling or lineal descendant, whether by blood or adoption, or any trust for the exclusive benefit of any one or more of such individuals.

**(P)**    "**Financial Year**" means the accounting year of the Company commencing each year on January 1st and ending on the following December 31st;

**(Q)**    "**Founder**" means Christopher Thannhaeuser.

**(R)**    "**GAAP**" means U.S. generally accepted accounting principles, consistently applied.

(S)     "**Initial Business Plan**" means the initial Annual Business Plan of the Company for the remainder of Financial Year 2016 approved by the Board, which shall be developed within 180 days following the Effective Date.

(T)     "**Key Personnel**" shall mean, collectively, the general manager, finance manager and operations manager of the Company.

(U)     "**Liquidation Event**" means any liquidation, winding up or bankruptcy, reorganization, composition with creditors or other analogous insolvency proceeding  (whether preventive or ordinary) of the Company or any subsidiary of the Company, whether voluntary or involuntary, or any petition presented or resolution passed for any such event or for the appointment of an insolvency practitioner.

(V)     "**Major Shareholder**" means any Shareholder that, individually or together with such Shareholder's Affiliates, holds at least 5% of the Company's Shares on a fully diluted basis.

(W)     "**Majority of Shareholders**" shall mean the Shareholder(s) holding a majority of all outstanding Shares.

(X)     "**Material Adverse Effect**" means a material adverse effect on:

(i)      the Company's or any of its subsidiaries' assets or properties;

(ii)     the Company's or any of its subsidiaries' financial condition; or

(iii)    the carrying on of the Company's or any of its subsidiaries' business or operations,

in each case, taken as a whole.

(Y)     "**New Securities**" means any new Shares or other equity securities of the Company.

(Z)     "**Permitted Transferee**" shall mean any Person to whom any Shares held by any Shareholder, or any right, title or interest therein, are Transferred, either directly or indirectly, in accordance with this Agreement, and who complies with the provisions of **Section 1.3(B)** hereof.

(AA)     "**Person**" shall mean any individual, any company, limited liability company, partnership or other business entity or enterprise or any trust, whether or not any such entity, enterprise or trust, is organized or operated for profit or nonprofit purposes.

(BB)     "**Principal**" means a Person who is an individual and the grantor of Qualified Trust which is a Shareholder or any of its Affiliate, including, without limitation, the Transferor Shareholder with respect to a Qualified Trust to which the Transferor's Shares or any portion thereof is Transferred in accordance with **Section 5.2(E)** of this Agreement.

(CC)  "**Qualified Trust**" means a trust duly created in which (a) a Principal is the grantor that is wholly revocable by such Principal, (b) such Principal, either alone or together with such Principal's spouse serve as sole trustees, and (c) the named beneficiaries include only such Principal, such Principal's spouse and/or their Family Members.

(DD)  "**Share Value**" shall mean, as of any given date, the portion of the net Company Value allocable to each share of Common Stock and all other class of equity securities of the Company convertible into Common Stock and all options, warrants and other rights to acquire any shares of Common Stock or any other class of equity securities of the Company convertible into Common Stock, outstanding on such date on a fully-diluted basis, after taking into account the portion of the Company Value allocable to any class of equity securities of the Company with preference rights and the exercise or conversion price of any options, warrants and other rights to acquire any shares of Common Stock or any other class of equity securities of the Company convertible into Common Stock, as determined by the Appraiser.

(EE)  "**Shares**" shall mean (i) all authorized and unissued shares of Common Stock or any other class of equity securities of the Company convertible into Common Stock that the Company may issue pursuant to its articles of incorporation or any amendment thereto and all treasury shares of Common Stock or any other class of equity securities of the Company convertible into Common Stock now or hereafter held by the Company, and (ii) all issued and outstanding shares of Common Stock or any other class of equity securities of the Company convertible into Common Stock, or any option, warrant or other right to acquire any shares of Common Stock or any other class of equity securities of the Company convertible into Common Stock, now or hereafter held of record or owned beneficially, or both, by any Shareholder, Shareholder, or any right, title or interest therein, either directly or indirectly, for so long as such Shareholder owns any such shares, option, warrant or other right, or any right, title or interest therein, either directly or indirectly.

(FF)  "**Shareholders**" shall mean (i) CB Germany, for so long as CB Germany holds of record or owns beneficially, or both, any Shares, or any right, title or interest therein, either directly or indirectly, and each Permitted Transferee, if any, to whom any such Shares, or any right, title or interest therein, either directly or indirectly, are Transferred who becomes a party to this Agreement pursuant to the provisions of **Section 1.3(B)** hereof in respect of any or all such Shares or right, title or interest therein, for so long as such Permitted Transferee holds any such Shares or right, title or interest therein, (ii) WES for so long as WES holds of record or owns beneficially, or both, any Shares, or any right, title or interest therein, either directly or indirectly, and each Permitted Transferee, if any, to whom any such Shares, or any right, title or interest therein, either directly or indirectly, are Transferred who becomes a party to this Agreement pursuant to the provisions of **Section 1.3(B)** hereof in respect of any or all such Shares or right, title or interest therein, for so long as such Permitted Transferee holds any such Shares or right, title or interest therein, (iii) Burmester, for so long as Burmester holds of record or owns beneficially, or both, any Shares, or any right, title or interest therein, either directly or indirectly, and each Permitted Transferee, if any, to whom any such Shares, or any right, title or interest therein, either directly or indirectly, are Transferred who becomes a party to this Agreement pursuant to the provisions of **Section 1.3(B)** hereof in respect of any or all such Shares or right, title or interest therein, for so long as such Permitted Transferee holds any such

Shares or right, title or interest therein, (iv) the Investor, for so long as the Investor holds of record or owns beneficially, or both, any Shares, or any right, title or interest therein, either directly or indirectly, and each Permitted Transferee, if any, to whom any such Shares, or any right, title or interest therein, either directly or indirectly, are Transferred who becomes a party to this Agreement pursuant to the provisions of **Section 1.3(B)** hereof in respect of any or all such Shares or right, title or interest therein, for so long as such Permitted Transferee holds any such Shares or right, title or interest therein and (v) each Person who becomes a Shareholder and party to this Agreement pursuant to the provisions of **Section 1.3(A)** hereof, for so long as such Person holds of record or owns beneficially, or both, any Shares, or any right, title or interest therein, either directly or indirectly, and each Permitted Transferee, if any, to whom any such Shares, or any right, title or interest therein, either directly or indirectly, are Transferred who becomes a party to this Agreement pursuant to the provisions of **Section 1.3(B)** hereof in respect of any or all such Shares or right, title or interest therein, for so long as such Permitted Transferee holds any such Shares or right, title or interest therein.

      **(GG)** "**Stock Purchase Agreement**" shall mean that Stock Purchase Agreement, dated as of March 8, 2016, by and among CB Germany, the Company and the Investor.

      **(HH)** "**Subscription Agreement**" shall mean that Membership Interest Subscription Agreement, dated as of March 8, 2016, by and between CBD and the Investor.

      **(II)** "**Teaming Agreement**" shall mean that certain Teaming Agreement, dated as of July 25, 2013, by and between the Company and Lockheed Martin Corporation, as amended by that certain First Amendment to Teaming Agreement, dated as of December 18, 2015, and as further amended, amended and restated, supplemented or otherwise modified from time to time.

      **(JJ)** "**Transfer**" shall mean any sale, transfer, pledge, hypothecation or other disposition of any Shares now or hereafter held of record or owned beneficially, or both, by any Shareholder, including, without limitation, the grant of any option, warrant or other rights to acquire any such Shares, or any right, title or interest therein, either directly or indirectly, whether voluntarily, involuntarily or by operation of law.

      **(KK)** "**Transferee**" shall mean any Person to whom any Shares now or hereafter held of record or owned beneficially, or both, by any Shareholder, or any right, title or interest therein, either directly or indirectly, are Transferred.

      **(LL)** "**Voting Shares**" means and includes any securities of the Company the holders of which are entitled to vote for members of the Board, including all shares of Common Stock, by whatever name called, now owned or subsequently acquired by a Shareholder, however acquired, whether through stock splits, stock dividends, reclassifications, recapitalizations, similar events or otherwise

      **1.2**    <u>**Applicability of Agreement**</u>. The provisions of this Agreement shall apply to (i) all Shares that the Company may issue pursuant to its articles of incorporation or any amendment thereto, (ii) all Shares now or hereafter held by the Company, and (iii) all Shares now or

hereafter held of record or owned beneficially, or both, by any Shareholder, and all rights, title and interests therein, either directly or indirectly.

### 1.3    Additional Parties.

(A)    **Additional Shareholders.** Subject to the provisions of **Section 3.1** hereof, (i) except as may be agreed otherwise by all Shareholders of the Company as a condition of the issuance, sale or transfer of any Shares by the Company to any Person not then a Shareholder, the Company shall necessarily require such Person to become a Shareholder and party to this Agreement upon the terms, covenants, conditions and restrictions contained in this Agreement, with such modifications, additional and/or supplemental terms and conditions applicable to such Person as the board of directors of the Company deems advisable in the best interest of the Shareholders in its sole and absolute discretion, and (ii) upon the issuance, sale or transfer of such Shares by the Company to such Person, such Person shall thereafter be deemed a "Shareholder" and party to this Agreement for so long as such Person holds any Shares, or any right, title or interest therein, either directly or indirectly, and shall be bound by and duly perform and observe each and every term, covenant, condition and restriction to be performed and observed by such Shareholder under this Agreement, with such modifications, additional and/or supplemental terms and conditions applicable to such Shareholder as the Board deems advisable in the best interest of the Shareholders in its sole and absolute discretion in connection with the issuance or transfer of Shares by the Company to such Person. Upon the request of the Company or any Shareholder, the Company and each such Person who becomes a Shareholder and party to this Agreement pursuant to the provisions of this Section shall deliver an original counterpart of an Additional Shareholder Joinder to this Agreement substantially in the form of **Exhibit** "A" attached hereto and made a part hereof, with respect to the terms, covenants, conditions and restrictions contained herein, with such modifications, additional and/or supplemental terms and conditions applicable to such Person as the Board deems advisable in the best interest of the Shareholders in its sole and absolute discretion in connection with the issuance, sale or transfer of Shares by the Company to such Person, duly executed by the Company and such Person and, if such Person is married, a consent to such terms, covenants, conditions and restrictions duly executed by the spouse of such Person in form and substance reasonably satisfactory to the Company, which original counterpart and, if applicable, consent of such spouse shall be filed with the Secretary of the Company.

(B)    **Permitted Transferees.** Subject to the provisions of **Article 5** hereof, (i) any Transferee to whom any Shares now or hereafter held of record or owned beneficially, or both, by any Shareholder, or any right, title or interest therein, either directly or indirectly, are Transferred shall be subject to all of the terms and conditions of this Agreement with respect to such Shares, or right, title, or interest therein, and (ii) any Permitted Transferee to whom any Shares now or hereafter held of record or owned beneficially, or both, held by any Shareholder, or any right, title or interest therein, either directly or indirectly, are Transferred shall thereafter be deemed a "Shareholder" and party to this Agreement, whether or not such Permitted Transferee executes a joinder to this Agreement, for so long as such Permitted Transferee holds any Shares, or any right, title or interest therein, either directly or indirectly, and shall be bound by and duly perform and observe each and every terms, covenant, condition and restriction to be performed and observed hereunder on the part of the Shareholder from whom such Shares, or

right, title or interest therein, either directly or indirectly, were acquired by such Permitted Transferee. Upon the request of the Company or any Shareholder, the Company and each Permitted Transferee shall deliver an original counterpart of a Permitted Transferee Joinder to this Agreement substantially in the form of **Exhibit "B"** attached hereto and made a part hereof with respect to the terms, covenants, conditions and restrictions contained in this Agreement applicable to the Shareholder from whom such Shares, or right, title or interest therein, either directly or indirectly, were acquired by such Permitted Transferee in accordance with the terms hereof, duly executed by such Permitted Transferee and, if such Person is married, a consent to such terms, covenants, conditions and restrictions duly executed by the spouse of such Permitted Transferee in form and substance reasonably satisfactory to the Company, which original counterpart and, if applicable, consent of such spouse shall be filed with the Secretary of the Company.

      **1.4**    <u>Inconsistencies</u>. In the event of any inconsistency between the articles of incorporation or by-laws of the Company and this Agreement, as between the Shareholders, the provisions of this Agreement shall govern and control to the maximum extent permitted under applicable law.

**2.**    **<u>BOARD COMPOSITION.</u>**

      **2.1**    <u>Board Composition</u>.  Each Shareholder agrees to vote, or cause to be voted, all Voting Shares owned by such Shareholder, or over which such Shareholder has voting control, from time to time and at all times, in whatever manner as shall be necessary to ensure that, at each annual or special meeting of the Company's stockholders at which an election of directors is held or pursuant to any written consent of the Company's stockholders, the following individuals shall be elected to the Board:

      **(A)**    three individuals jointly designated by CB Germany and WES and/or their respective Permitted Transferees, which individuals shall initially be Christopher Thannhaeuser, Wesley Bilson and Gregory Bilson; and

      **(B)**    one individual designated by the Investor (the "**Investor Director**"), which individual shall initially be Berry Polmann, for so long as the Investor and its Affiliates continue to own beneficially at least 2.5% of the Company's Shares on a fully diluted basis.

To the extent that any of clauses **(A)** and **(B)** above shall not be applicable, any member of the Board who would otherwise have been designated in accordance with the terms thereof shall instead be elected by all of the Company's stockholders entitled to vote thereon in accordance with, and pursuant to, the Charter.

      **2.2**    <u>Failure to Designate a Board Member</u>.  In the absence of any designation from the Persons or groups with the right to designate a director as specified in **Section 2.1**, the director previously designated by them and then serving shall be reelected if still eligible to serve as provided herein.

      **2.3**    <u>Removal of Board Members</u>.  Each Shareholder agrees to vote, or cause to be voted, all Voting Shares owned by such Shareholder, or over which such Shareholder has voting

control, from time to time and at all times, in whatever manner as shall be necessary to ensure that:

**(A)**    no director elected pursuant to **Section 2.1** or **Section 2.2** may be removed from office unless (i) such removal is directed or approved by the affirmative vote of the Person(s) entitled under **Section 2.1** to designate that director or (ii) the Person(s) originally entitled to designate or approve such director pursuant to **Section 2.1** is no longer so entitled to designate or approve such director;

**(B)**    any vacancies created by the resignation, removal or death of a director elected pursuant to **Section 2.1** or **Section 2.2** shall be filled pursuant to the provisions of this **Article** 2; and

**(C)**    upon the written request of any party entitled to designate a director as provided in **Section 2.1(A)** or **Section 2.1(B)** to remove such director, such director shall be removed.

All Shareholders agree to execute any written consents required to perform their obligations as set forth in this Agreement, and the Company agrees, at the written request of any party entitled to designate directors, to call a special meeting of the Company's stockholders for the purpose of electing directors.

    **2.4**    <u>**Procedures of the Board.**</u>

    **(A)**    <u>**Board Meetings**</u>.

    **(i)**    The Board will meet no less frequently than once every quarter subject to an annual schedule and confirmation of the date of the next Board meeting at the previous Board meeting.

    **(ii)**    During the fourth quarter, for each Financial Year the Board shall approve the Annual Budget and the Annual Business Plan for the succeeding Financial Year.

    **(iii)**    Notwithstanding the above, the Chairman of the Board or any director may call a meeting of the Board not contemplated in this paragraph by written notice to all other directors, which notice will set forth the date, time and place of such meeting. Board Meetings may be held telephonically and the Board may adopt resolutions by unanimous written consent.

    **(B)**    <u>**Notice of Board Meetings; Agenda**</u>.

    **(i)**    Written notice of each Board meeting shall be given by the Chairman of the Board to all directors. Written notice of a meeting under this **Section 2.4** shall be sent to the address notified from time to time by the directors, whether a physical address or via email, as may be requested by them at least fifteen (15) days in advance of such Board meeting; ***provided*** that where, exceptionally, the Board is required to make a decision in

circumstances in which the foregoing notice requirements cannot be observed, such notice requirements may be waived with the unanimous approval of all directors.

(ii)    An agenda setting out in detail the items of business proposed to be transacted at a Board meeting together with necessary information and supporting documents shall be circulated to each of the directors. The agenda, information and documents shall be circulated five (5) days prior to the date of the relevant meeting; ***provided*** that where, exceptionally, the Board is required to make a decision in circumstances in which the foregoing notice requirements cannot be observed, such requirement to circulate agenda information and documents may be waived with the unanimous approval of all Directors.

(C)    **Directors' Expenses**.  Except if a director is an officer of the Company (in which case Company policies will apply) each director shall be reimbursed for his or her reasonable expenses incurred in connection with his or her attendance to any meeting where his or her presence is required, including but not limited to in-person Shareholders' meetings and in-person Board meetings.  Such policy shall include reimbursement of the reasonable expenses incurred by such director in attending an in-person Board meeting or an in-person Shareholders' meeting or any other meeting which such director is requested to attend in his or her capacity as a director of the Company (including the reasonable costs of travel and attendance), including up to four yearly visits in conjunction with Board or Shareholder's meetings by such director to the Company's offices and operations.  Notwithstanding the foregoing, the expenses reimbursable pursuant to this **Section 2.4(C)** shall not be reimbursed to the extent they exceed the estimated amount for director expenses included in the Annual Budget approved by the Board as provided herein.

(D)    **Directors' Insurance**.  The Company shall obtain directors and officers liability insurance in an amount not less than $2 million in coverage for, at a minimum, the Investor Director, with a reputable national or international insurer.

3.    **COVENANTS WITH RESPECT TO THE COMPANY.**

3.1    **Pre-Emptive Rights**. In the event that the Board shall determine to issue, sell or transfer any Shares or any options, warrants or other rights to acquire any Shares (other than Shares and/or options, warrants or other rights to acquire Shares issuable by the Company pursuant to the Drexel Engagement Letter or any replacement thereof), at a price and upon such terms and conditions as the Board deems advisable in its sole and absolute discretion, the Company shall give notice thereof to the Shareholders, which shall state the price to be paid for such Shares or options, warrants or other rights, the terms of payment therefor and all other pertinent terms and conditions, including the equivalent fair market value of any consideration other than cash or obligations to pay cash in the future determined in good faith in the reasonable discretion of the Board ("**Company Sale Notice**"). The Company Sale Notice shall constitute an offer by the Company for the issuance, sale or transfer of those Shares or options, warrants or other rights to each Shareholder, in the same proportions as the number of Shares held by such Shareholder bears to the total number of Shares held by all Shareholders and other shareholders of the Company with pre-emptive rights in respect to such issuance or sale of such Shares or options, warrants or other rights pursuant to the articles of incorporation of the Company or any

agreement with the Company, at a price and upon terms and conditions not less favorable than the price, terms and conditions at which such Shares or options, warrants or other rights are proposed to be offered for issuance or sale by the Company; ***provided, however,*** (i) that each Shareholder shall be entitled to exercise such pre-emptive right either in whole or in part with respect to the pro rata share of such Shareholder therein, and (ii) that such pre-emptive right shall be exercisable by each Shareholder only in respect to the consideration consisting of cash or obligations to pay cash in the future and cash in an amount equal to the equivalent fair market value of any consideration other than cash or obligations to pay cash in the future determined in good faith in the reasonable discretion of the Board as specified in the Company Sale Notice, which offer may be accepted by such Shareholder either in whole or in part by written notice to such effect given to the Company at any time within thirty (30) days after the date the Company Sale Notice is given to such Shareholder by the Company.  At the end of such thirty (30) day period, the Company shall notify each Shareholder that elected to purchase or acquire all of the Shares or options, warrants or other rights available to it (each, a "**Fully Participating Shareholder**") of any other Shareholder's failure to do likewise.  During the ten (10) day period commencing after the Company has given such notice, each Fully Participating Shareholder may elect to exercise its pre-emptive right with respect to the number of remaining Shares or options, warrants or other rights equal to the proportion of Shares held by such Fully Participating Shareholder bears to the total number of Shares held by all Fully Participating Shareholders.  In the event that such Fully Participating Shareholders fail to exercise timely their pre-emptive right either in whole or in part to purchase such remaining Shares or options, warrants or other rights within such thirty-(30)-day period, the pre-emptive right of such Fully Participating Shareholders, or the unexercised portion thereof, shall terminate with respect to that particular issue or sale of such Shares or options, warrants or other rights, and the Company shall have the right thereafter to issue, sell or transfer any or all of the remaining Shares or options, warrants or other rights covered by the Company Sale Notice to any one or more Persons; ***provided, however,*** (x) that such issuance, sale or transfer shall be consummated within sixty (60) days after the date the pre-emptive rights of the Shareholders to purchase such Shares or options, warrants or other rights, or the unexercised portion thereof, has terminated pursuant to the provisions of this Section, and (y) such issuance, sale or transfer  shall not be at a lower price per Share or option, warrant or other right nor upon terms more favorable to the purchaser than that stated in the Company Sale Notice. In the event that the Company fails to consummate such issuance, sale or transfer of the remaining Shares or options, warrants or other rights covered by the Company Sale as aforesaid within such sixty-(60)-day period, the Company may not issue, sell or transfer such Shares or options, warrants or other rights without again complying with the provisions of this Section.

**3.2    Inspection Rights**. Each Shareholder shall have the right, at any time and from time to time during reasonable business hours upon reasonable prior notice given to the Company, (i) to examine and inspect the books, records and accounts of the Company, all of which shall be made available to such Shareholder and/or its authorized representatives at the principal office of the Company and (ii) to discuss the business, operations and financial situation of the Company with the main officers of the Company and its Auditors, provided that the Shareholder will notify the Company prior to contacting the Auditors and give the Company the opportunity of participating in such discussions. In the event that any Shareholder desires an extraordinary audit of the books, records and accounts of the Company, whether by the

accountants of the Company or otherwise, such Shareholder may have such audit made at its sole cost and expense.

      3.3    **Matters Requiring Investor Director Approval**.  So long as the Investor is entitled to elect the Investor Director, the Company hereby covenants and agrees with each Shareholder that it shall not, without approval of the  Shareholders (to the extent approval of the stockholders of the Company is required under Delaware law) or the Board, as the case may be, which approval must include the affirmative vote of the Investor, in case of a Shareholder resolution, or the Investor Director, in case of a Board Resolution, except to the extent included in (i) any Annual Budget or Annual Business Plan that has been approved in accordance with this **Section 3.3**, or (ii) the Initial Business Plan:

      **(A)**    amend or repeal the Company's Charter or bylaws or the charter or bylaws (or equivalent organizational documents) of any subsidiary of the Company: (i) in any manner that affects the Shares owned by the Investor or the rights of the Investor under this Agreement, except as otherwise consented by the Investor pursuant to this **Section 3.3**, or (ii) in contravention of the terms of this Agreement;

      **(B)**    except as required by the terms of the CBD Operating Agreement, the Subscription Agreement, the Teaming Agreement or the Drexel Engagement Letter, sell any shares or other equity interests or debt securities in any of the subsidiaries of the Company, or engage in any merger, consolidation, reorganization or sale of substantially all of the Company's (and/or its subsidiaries') assets, or similar transaction, in each case, other than a Conforming Sale made in accordance with **Section 4.1**;

      **(C)**    except as required by the terms of the CBD Operating Agreement, the Subscription Agreement, the Teaming Agreement or the Drexel Engagement Letter, increase or reduce the capital stock of the Company or its subsidiaries, including, without limitation, any repurchases, redemptions, conversions, issue by the Company or its subsidiaries, of debt or debt securities convertible into equity, issue by the Company or its subsidiaries, through private or public offering of New Securities (including convertible bonds);

      **(D)**    authorize or undertake any Liquidation Event;

      **(E)**    make any acquisition of any Person or all or substantially all of the assets of a Person;

      **(F)**    establish or amend a dividend policy;

      **(G)**    incur indebtedness in excess of $50,000 or grant a lien on the Company's assets for that amount; in both cases, whether in a single or several transactions;

      **(H)**    make capital expenditures which exceed those approved Annual Budget and Annual Business Plan by more than fifteen percent (15%) of the approved amount;

      **(I)**    enter into any new line of business;

**(J)**    enter into, or be a party to, any transaction with any Shareholder, an Affiliate or Family member of any Shareholder, or a director, officer or employee of the Company or any "associate" (as defined in Rule 12b-2 promulgated under the Securities Exchange Act of 1934, as amended) of any such individual (any such Person, a "**Related Party**"), except for any transactions contemplated by this Agreement;

**(K)**    appoint or remove Auditors different from the big five accounting firms.

**(L)**    approve or modify the Annual Budget and/or the Annual Business Plan;

**(M)**    grant any loan, advance or other extension of credit in excess of $25,000 to any third party (other than extensions of trade credit in the ordinary course of business and temporary advances to non-shareholder employees);

**(N)**    reduce, recapitalize, redeem or repurchase any indebtedness owing to any Shareholder or Affiliate;

**(O)**    enter into, make any material change to or terminate any partnership, strategic alliance, joint venture or other similar arrangement or relationship with any Person;

**(P)**    change the accounting policies or practices of the Company, except when required by applicable law;

**(Q)**    modify any powers and/or authority of the Board (or of the quorum or approval requirements applicable to the Board);

**(R)**    approve any senior level management compensation, including any employee profit sharing plans (or any amendments thereto) including, but not limited to, any stock option plan, or enter into any collective bargaining agreement, or establish, adopt, enter into, amend or terminate any material employee plan, excluding existing current variable bonus plans; or

**(S)**    approve or make any change or amendment to the Initial Business Plan.

Notwithstanding the foregoing, the affirmative vote of the Investor or the Investor Director will not be required under this **Section 3.3** if the applicable action has been proposed in a duly noticed Board meeting or in a unanimous written consent provided to the Investor Director, and the Investor or the Investor Director has failed to respond to such proposal within thirty (30) days after receipt thereof.

### 3.4    Conflicts of Interest and Transaction with Related Parties.

**(A)**    The Company shall have in place a conflict of interest policy that will require a director to immediately disclose to the Board any interest or conflict that he or she may have on a matter on which the approval or ratification of the Board is being sought. In no event shall the vote of any director who was nominated by, or who is a Related Party of, a Related Party that is the Company's counterparty in a proposed agreement, arrangement or transaction to

be approved be counted toward the majority approval required. Such director shall abstain (and if he or she does not abstain, shall be deemed to have abstained) from voting on the approval or ratification of the proposed agreement, arrangement or transaction.

**(B)** The Shareholders and the Company acknowledge and agree that all transactions between the Company or its subsidiaries and any Shareholders or Related Party of the Shareholders will be (i) on market terms and conditions and on an arm's length basis, (ii) disclosed to the Board at least fifteen (15) business days in advance of the consummation of any such transaction and (iii) subject to approval pursuant to **Section 3.3** hereof, including approval by the Investor.

## 3.5 **Information Rights**.

**(A)** **Delivery of Financial Statements; Assignment of Information Rights**. The Company shall deliver to each Major Shareholder:

**(i)** as soon as practicable, but in any event within 120 days after the end of each Financial Year of the Company, (a) a balance sheet as of the end of such Financial Year, and (b) a statement of income for such Financial Year and a statement of cash flows for such Financial Year, and a comparison between (x) the actual amounts as of and for such Financial Year and (y) the comparable amounts for the prior Financial Year and as included in the Annual Budget for such Financial Year, with an explanation of any material differences between such amounts and a schedule as to the sources and applications of funds for such Financial Year, and (c) a statement of stockholders' equity as of the end of such Financial Year, all such financial statements audited and certified by Auditors selected by the Company;

**(ii)** as soon as practicable, but in any event within 45 days after the end of each of the first three quarters of each Financial Year of the Company, (a) an unaudited balance sheet as of the end of such fiscal quarter and an unaudited statement of stockholders' equity as of the end of such fiscal quarter and (b) an unaudited statement of income for such fiscal quarter and an unaudited statement of cash flows for such fiscal quarter, all prepared in accordance with GAAP (except that such financial statements (x) may be subject to normal year-end audit adjustments and (y) may not contain all notes thereto that may be required in accordance with GAAP); and

**(iii)** as soon as practicable, but in any event within 30 days after the end of each month (other than the last month of the Company's Financial Year), (a) an unaudited balance sheet as of the end of such month and an unaudited statement of stockholders' equity as of the end of such month and (b) an unaudited statement of income for such month and an unaudited statement of cash flows for such month, all prepared in accordance with GAAP (except that such financial statements (x) may be subject to normal year-end audit adjustments and (y) may not contain all notes thereto that may be required in accordance with GAAP).

**(iv)** Within fifteen (15) days after the end of each month of each Financial Year, monthly progress reports including operational updates.

**(v)**    No later than ten (10) days after each Shareholders' Meeting and/or Board Meeting, the minutes thereof reflecting decisions adopted at such meeting.

**(vi)**    Within fifteen (15) days after receipt thereof by the Company, any management letter or similar letter from the Auditors.

**(B)**    In addition, the Company shall, and the Shareholders shall cause the Company to, promptly notify the Investor upon becoming aware of any: (a) litigation or investigations or proceedings which have or may reasonably be expected to have a Material Adverse Effect on the Company or its subsidiaries; or (b) criminal investigations or proceedings against the Company or its Subsidiaries, and any such notification shall specify the nature of the action or proceeding and any steps that the Company proposes to take in response to the same.

**(C)**    No later than thirty (30) days after any change in Auditors, the Company shall instruct such new Auditors (whose fees and expenses shall be for the account of the Company) to communicate directly with Investor at any time regarding the Company's financial statements, accounts and operations, and provide to Investor a copy of that authorization; and (ii) take such actions, issue such additional instructions and deliver such additional documents as necessary to procure the Auditors' compliance with such instruction.

**(D)**    The Company shall, and the Controlling Shareholder shall cause the Company to, promptly provide to all the Major Shareholders such information as any of the Major Shareholders from time to time requests with regard to the Company and any of its Subsidiaries that is reasonably related to such Major Shareholder's interest as a stockholder of the Company. The Company shall provide to the Investor Director all information as and when provided to any other Director in his or her capacity as a Director.

**(E)**    The Investor Director may provide to the Investor any information that the Investor Director receives in his or her capacity as a director, including, without limitation, any information related to company operations, and may provide periodic reports to Investor, as applicable, related to the discharge of his or her duties as a director; ***provided***, ***however***, that such information may not be provided to the extent the Company is advised by its legal counsel that access to such information could be deemed a waiver or otherwise adversely affect the attorney-client privilege between the Company and its legal counsel.

**3.7**    **Corrupt Practices**.  No Shareholder or the Company will directly or indirectly made any contribution, gift, bribe, rebate, payoff, influence payment, kickback or other payment to or for the benefit of any government official, candidate for public office, political party, political campaign or other Person, private or public, regardless of form, whether in money, property, or services (a) for the purpose of (i) influencing any act or decision of such government official, candidate, party, campaign or other Person, (ii) inducing such government official, candidate, party, campaign or other Person to do or omit to do any act in violation of a lawful duty, (iii) obtaining or retaining business for or with any Person, (iv) expediting or securing the performance of official acts of a routine nature or (v) otherwise securing any improper advantage, in each case, with respect to the Company or (b) in violation of the Foreign Corrupt

Practices Act of 1977, 15 U.S.C. §§ 78dd-1, et seq. or other law, in each case, with respect to the Company.

**3.8    Insurance**.  The Company shall, and shall ensure that each of its subsidiaries shall, at all times (a) properly insure and keep insured, with a financially sound and reputable insurer or insurers, all of its insurable assets against insurable losses; (b) promptly notify the relevant insurer of any claim by the Company and or any subsidiary of the Company under any policy written by that insurer and diligently pursue that claim; (c) comply with all warranties and conditions under each insurance policy; (d) not do or omit to do, or permit to be done or not done, anything which might prejudice the Company's right to claim or recover under any insurance policy; and (e) at Investor's request, submit relevant documentation evidencing insurances in place; and, (f) maintain any other insurance that may be required by applicable law.

**3.9    Key Personnel**.  The Company shall inform Investor of any termination of employment of any Key Personnel in writing, within three (3) days of any change.

**3.10    Key Man Provision**.  Except in the event of death, disability or force majeure, in the event that the Founder ceases to devote a majority of his business time and his efforts, skill, business judgment to the advancement of the business and interest of the Company (either directly or through CB Germany or CBD) without the Investor Director written consent, the Founder will resign from the Board and CB Germany will vote its Shares "(i) to remove the Founder as a director and (ii) as directed by the Investor until the hiring of a replacement which is (a) reasonably acceptable to the Investor Director or (b) approved by the affirmative vote or written consent of 75% of the directors on the Board.

**3.11    Annual Business Plan; Annual Budget**.  If an Annual Budget or an Annual Business Plan is not adopted in accordance with **Section 3.3** prior to the start of the applicable Financial Year, then, until so adopted, the Annual Budget and Annual Business Plan for such Financial Year will be the same as the prior Financial Year's Annual Budget and Annual Business Plan; *provided*, that in the case of the Annual Budget, non-recurring or extraordinary items shall be excluded, and the budget for each line item shall be increased by 5.0%.

**4.    COVENANTS OF THE SHAREHOLDERS**

**4.1    Drag-Along Rights**. Subject to the provisions of **Section 3.3** and **Article 5** hereof, if a Majority of Shareholders (the "**Approving Shareholders**") approve the material terms of a sale of all of their Shares in exchange for cash to a Person that is not: (x) an underwriter nor any other entity in connection with an offering of securities, (y) a Shareholder or an Affiliate or Family Member or a Related Party of such Shareholder, or (z) a Related Party of the Company or its subsidiaries, for consideration to be received by the Shareholders on account of their disposition of Shares consisting solely of cash (a "**Conforming Sale**"), the Approving Shareholders shall give notice thereof to the Company and each Shareholder who is not an Approving Shareholder ("**Drag-Along Shareholders**"), which shall state the name of the proposed Transferee, the price or other consideration to be paid for the Shares, the terms of payment therefor and all other pertinent terms and conditions and the names of each Approving Shareholder (the "**Conforming Sale Notice**"), and each Drag-Along Shareholder shall be

obligated to, and shall upon the written request of the Approving Shareholders, (a) sell, transfer and deliver to the Transferee specified in the Conforming Sale Notice a number Shares of such Drag-Along Shareholder in the proportion that the total number of Shares involved in the Conforming Sale bears to the total number of Shares of all Shareholders then outstanding, at the same price per Share and upon the same terms and conditions as applicable to the Approving Shareholders; (b) execute and deliver such instruments of conveyance and transfer and take such other action (including, but not limited to, voting the Shares of such Drag-Along Shareholder in favor of the Conforming Sale and executing any purchase agreements, merger agreements, indemnity agreements, escrow agreements or related documents) as the Approving Shareholders or the Transferee may reasonably require in order to carry out the terms and provisions of this Section; *provided, however,* that the Drag-Along Shareholders shall not be required to make any representations or warranties or incur any liabilities of any kind other that with respect to title to their Shares; and (c) not take any action (including, but not limited to, assertion of dissenter rights under any applicable laws that may apply to the Company or such transaction) inconsistent with such other Drag-Along Shareholder's covenants and agreements under this Section (the "**Drag-Along Rights**"). Notwithstanding the foregoing, the Investor will not be obligated to participate in a Conforming Sale unless the Investor would receive in such Conforming Sale an amount equal to or greater than the highest of (i) four times (4x) the amount paid by the Investor to CB Germany for the Investor's Shares under the Stock Purchase Agreement (the "**Investor Purchase Price**"), (ii) an amount that would provide to the Investor an annual internal rate of return of twenty percent (20%) on the Investor Purchase Price (which calculation shall include all dividends or any cash out payments to the Investor from the Company), or (iii) the then current fair market value of the Investor's Shares based on the Company Value at such time. Each Shareholder shall, and hereby does, irrevocably appoint the President of the Company as such Shareholder's true and lawful attorney-in-fact and proxy, coupled with an interest, to act for such Shareholder and in the name, place and stead of such Shareholder and for the use and benefit of such Shareholder, solely to execute and deliver such instruments of conveyance and transfer and take such other action (including, but not limited to, voting the Shares of such Shareholder in favor of the Conforming Sale and executing any purchase agreements, merger agreements, indemnity agreements, escrow agreements or related documents consistent herewith) on behalf of each Drag-Along Shareholder as the Approving Shareholders or the Transferee may reasonably require in order to carry out the terms, covenants and provisions of this **Section 4.1**, if such Drag-Along Shareholder shall fail to perform and observe the terms, covenants and provisions of this Section on the part of such Drag-Along Shareholder to be performed and observed hereunder within fifteen (15) days after written demand therefor shall have been given to such Drag-Along Shareholder by the Approving Shareholders or the President, or any of them.

      **4.2**    <u>**Tag-Along Rights**</u>. Without prejudice to the Shareholders' rights as per **Section 4.3** hereof, in the event that a Shareholder ("**Tag-Along Selling Shareholder**") or any of its Affiliates shall determine to sell Shares representing at least 5% of all Shares of the Company on a fully diluted basis, which Shares are held of record or owned beneficially, or both, by the Tag-Along Selling Shareholder or such Affiliate, or any right, title or interest therein, either directly or indirectly, to any other Person not then a Shareholder, or an Affiliate thereof, pursuant to a bona-fide offer of such Person, at a price and upon such terms and conditions as the Tag-Along Selling Shareholder or such Affiliate deem advisable in its sole and absolute discretion,

the Tag-Along Selling Shareholder shall give notice thereof to the other Shareholders ("**Tag-Along Shareholders**"), which shall state the name of the proposed Transferee, the price to be paid for such Shares, or right, title or interest therein, the terms of payment therefor and all other pertinent terms and conditions, including the equivalent fair market value of any consideration other than cash or obligations to pay cash in the future determined in good faith in the reasonable discretion of the Tag-Along Selling Shareholder ("**Tag-Along Selling Shareholder Sale Notice**"). The Tag-Along Selling Shareholder Sale Notice shall constitute an offer by the Tag-Along Selling Shareholder for the Tag-Along Shareholders to participate in the sale of such Shares by the Tag-Along Selling Shareholder, or if a sale of any indirect right, title or interest in such Shares by such Affiliate, an offer by the Tag-Along Selling Shareholder to purchase a number of Shares held by the Tag-Along Shareholders equal to the proportionate interest therein represented thereby, in the same proportion as the number of Shares held by each Tag-Along Shareholder bears to the total number of Shares held by the Tag-Along Selling Shareholder, such Tag-Along Shareholder and all other shareholders of the Company with similar rights to participate in such sale of Shares pursuant to any agreement with the Tag-Along Selling Shareholder, at the same price and upon the same terms and conditions as contained in the Tag-Along Selling Shareholder Sale Notice at which such Shares, or any right, title or interest therein, either directly or indirectly, are proposed to be sold by the Tag-Along Selling Shareholder or such Affiliate; *provided, however,* (i) that each Tag-Along Shareholder shall be entitled to exercise such right to participate in the sale of such Shares by the Tag-Along Selling Shareholder, or if a sale of any indirect right, title or interest in such Shares by such Affiliate, to accept the Tag-Along Selling Shareholder's offer to purchase a number of Shares held by such Tag-Along Shareholder equal to the proportionate interest therein represented thereby, either in whole or in part, with respect to the pro rata share of such Tag-Along Shareholder therein, and (ii) that the right of each Tag-Along Shareholder to participate in such sale of Shares by the Tag-Along Selling Shareholder, or if a sale of any indirect right, title or interest in such Shares by such Affiliate, to accept the Tag-Along Selling Shareholder's offer to purchase a number of Shares held by such Tag-Along Shareholder equal to the proportionate interest therein represented thereby, shall be exercisable by such Tag-Along Shareholder only in respect to the consideration consisting of cash or obligations to pay cash in the future and cash in an amount equal to the equivalent fair market value of any consideration other than cash or obligations to pay cash in the future determined in good faith in the reasonable discretion of the Tag-Along Selling Shareholder as specified in the Tag-Along Selling Shareholder Sale Notice, which offer may be accepted by such Tag-Along Shareholder either in whole or in part by written notice to such effect given to the Tag-Along Selling Shareholder at any time within thirty (30) days after the date the Tag-Along Selling Shareholder Sale Notice is given to such Tag-Along Shareholder. In the event that a Tag-Along Shareholder fails to exercise timely such right to participate in such sale of Shares by the Tag-Along Selling Shareholder, or if a sale of any indirect right, title or interest in such Shares by such Affiliate, to accept such offer to purchase a number of Shares held by such Tag-Along Shareholder equal to the proportionate interest therein represented thereby, either in whole or in part, within such thirty-(30)-day period, the right of such Tag-Along Shareholder to participate in that particular sale of Shares by the Tag-Along Selling Shareholder, or if a sale of any indirect right, title or interest in such Shares by such Affiliate, to accept such offer to purchase a number of Shares held by such Tag-Along Shareholder equal to the proportionate interest therein represented thereby, or the unexercised portion thereof, shall terminate, and the Tag-Along Selling Shareholder or such Affiliate shall have the right thereafter

to sell any or all of the remaining Shares, or right, title or interest therein, covered by the Tag-Along Selling Shareholder Sale Notice to the Transferee specified in the Tag-Along Selling Shareholder Sale Notice, free of any rights of such Tag-Along Shareholder pursuant to this Section; ***provided, however,*** (x) that such sale shall be consummated within sixty (60) days after the date the rights of all Tag-Along Shareholders to participate in such sale of Shares by the Tag-Along Selling Shareholder, or if a sale of any indirect right, title or interest in such Shares by an Affiliate of the Tag-Along Selling Shareholder, to accept such offer to purchase a number of Shares held by all Tag-Along Shareholders equal to the proportionate interest therein represented thereby, or the unexercised portion thereof, has terminated pursuant to the provisions of this Section, (y) such sale shall not be at a higher price per Share, or right, title or interest therein, nor upon terms more favorable to the seller than that stated in the Tag-Along Selling Shareholder Sale Notice, and (z) upon the consummation of such sale as aforesaid, the Transferee to whom such Shares are Transferred shall be deemed a Permitted Transferee hereunder and shall comply with the provisions of **Section 1.3(B)** hereof with respect to the terms, covenants, conditions and restrictions contained in this Agreement applicable to the Tag-Along Selling Shareholder from whom such Shares were acquired. In the event that the Tag-Along Selling Shareholder or such Affiliate fails to consummate such sale of such Shares, or right, title or interest therein, covered by the Tag-Along Selling Shareholder Sale Notice to such Transferee as aforesaid within such sixty-(60)-day period, the Tag-Along Selling Shareholder or such Affiliate may not sell such Shares, or right, title or interest therein, without again complying with the provisions of this Section.

If the proposed Transfer by the Selling Shareholder would result in CB Germany or the Founder owning (directly or indirectly) less than fifty point one percent (50.1%) of the Shares of the Company issued and outstanding from time to time on a fully-diluted basis after such date, the Investor shall be entitled to participate in the sale of such Shares by the Tag-Along Selling Shareholder with respect to up to all of the Shares of the Company owned by the Investor.

## 4.3     Right of First Refusal.

(A)     **Right of First Refusal.** Subject to the provisions of **Article** 5 hereof, and except as otherwise expressly provided in **Sections 4.1**, **4.2** and **5.2** hereof, in the event that any Shareholder ("**Selling Shareholder**") or any of its Affiliates shall determine to Transfer any Shares held of record or owned beneficially, or both, by the Selling Shareholder or such Affiliate, or any right, title or interest therein, either directly or indirectly, to any unrelated Person pursuant to a bona-fide offer of such Person, at a price and upon such terms and conditions as the Selling Shareholder or such Affiliate deems advisable in its sole and absolute discretion, the Selling Shareholder shall give notice thereof to the other Shareholders (the "**Offeree Shareholder**s"), which shall state the name of the proposed Transferee, the price to be paid for such Shares, or right, title or interest therein, the terms of payment therefor and all other pertinent terms and conditions, including the equivalent fair market value of any consideration other than cash or obligations to pay cash in the future determined in good faith in the reasonable discretion of the Selling Shareholder ("**Sale Notice**"). The Sale Notice shall constitute an offer by the Selling Shareholder to sell the Shares, or if a sale of any indirect right, title or interest in such Shares by such Affiliate, a number of Shares held by the Selling Shareholder equal to the proportionate interest therein represented thereby, covered by the Sale Notice (the "**Offered**

**Shares**"), to the Offeree Shareholders in the proportion of their respective Pro Rata Allocation (as hereinafter defined) of the Offered Shares, at the same price and upon the same terms and conditions as contained in the Sale Notice at which such Shares, or any right, title or interest therein, either directly or indirectly, are proposed to be sold by the Selling Shareholder or such Affiliate; *provided, however,* (i) that each Offeree Shareholder shall be entitled to exercise its right of first refusal to purchase with respect to any or all of its Pro Rata Allocation of the Offered Shares, and (ii) that such right of first refusal to purchase Offeree Shareholder's Pro Rata Allocation of the Offered Shares shall be exercisable by such Offeree Shareholder only in respect to the consideration consisting of cash or obligations to pay cash in the future and cash in an amount equal to the equivalent fair market value of any consideration other than cash or obligations to pay cash in the future determined in good faith in the reasonable discretion of the Selling Shareholder as specified in the Sale Notice, which offer may be accepted by such Offeree Shareholder by written notice to such effect given to the Selling Shareholder, the Company and the other Offeree Shareholders within the times and in the manner provided in **Section 4.3(C)** hereof. In the event that the Offeree Shareholders fail to exercise timely their first rights of refusal to purchase all of the Offered Shares, the Selling Shareholder or such Affiliate shall have the right thereafter to sell to the Transferee any or all of the remaining Offered Shares, or the proportionate right, title or interest therein represented thereby, covered by the Sale Notice for which the rights of first refusal of the Offeree Shareholders therein have terminated pursuant to the provisions of **Section 4.3(C)** hereof, free of any rights of the Offeree Shareholders therein pursuant to this Section; *provided, however,* (x) that such sale shall be consummated within sixty (60) days after the date that rights of first refusal to purchase such remaining Offered Shares have terminated pursuant to the provisions of **Section 4.3(C)** hereof, (y) such sale shall not be at a lower price per Share, or right, title or interest therein, nor upon terms more favorable to the seller than that stated in the Sale Notice, and (z) upon consummation of such sale, such Transferee to whom such remaining Offered Shares, or right, title or interest therein, are Transferred shall be deemed a Permitted Transferee hereunder and shall comply with the provisions of **Section 1.3** hereof. In the event that Selling Shareholder or such Affiliate fails to consummate such sale of such Shares, or right, title or interest therein, covered by the Sale Notice to such Transferee as aforesaid within such sixty-(60)-day period, Selling Shareholder or such Affiliate may not sell such Shares, or right, title or interest therein, without again complying with the provisions of this Section.

        **(B)**    **Pro Rata Allocation.** The allocation of any Offered Shares among the Offeree Shareholders required pursuant to the provisions of this Section shall be made to the Offeree Shareholders in the same proportion as the number of Shares held by each Offeree Shareholder bears to the total number of Shares held by all Offeree Shareholders. In the event that any one or more but not all of the Offeree Shareholders exercise timely their respective rights to purchase their respective portion of the Offered Shares, there shall be one or more successive allocations among the Offeree Shareholders who exercised timely such rights with respect to their entire Pro Rata Allocation, in the same proportions as the number of Shares held by each Offeree Shareholder bears to the total number of Shares held by all such Offeree Shareholders, or until such time as all such Offeree Shareholders who exercised timely such rights with respect to their entire Pro Rata Allocation fail to exercise timely such rights with respect to the next successive allocation, whichever occurs first. For purposes of this Agreement, the term "**Pro Rata Allocation**" shall mean, with respect to each Offeree Shareholder, (a) any or

all of the proportion of such Offered Shares first allocated to such Offeree Shareholder and, in the event such Offeree Shareholder exercises timely the right to purchase all such Offered Shares, all (but not less than all) of the proportion of such Offered Shares allocated to such Offeree Shareholder in any successive allocation that such Offeree Shareholder exercises timely the right to purchase hereunder, or (b) such proportion of the Offered Shares allocated to such Offeree Shareholder as may be mutually agreed by all Offeree Shareholders who timely exercise their rights to purchase hereunder.

(C)    **Manner of Exercise.** The Offeree Shareholders with the first right to purchase any Offered Shares pursuant to the provisions of this Agreement shall exercise such right by notice given to the Selling Shareholder, the Company and each other Offeree Shareholder within thirty (30) days after the date the Sale Notice was given, and the Offeree Shareholders with each successive right thereafter to purchase any Offered Shares pursuant to the provisions of this Agreement shall exercise such right by notice given to the Selling Shareholder, the Company and each other Offeree Shareholder within fifteen (15) days after the date of expiration of the notice period applicable to the Offeree Shareholders with the immediately preceding right to purchase such Offered Shares. In the event that any Offeree Shareholder fails to exercise timely the right to purchase any Offered Shares in any allocation as provided in this Agreement, the rights of such Offeree Party to purchase such Offered Shares hereunder shall terminate and be of no further force of effect with respect to that particular allocation of such Offered Shares**; *provided, however,*** that such termination shall not affect any exercise by such Offeree Shareholder of the right to purchase such Offered Shares in any prior allocation. In the event that any Offeree Shareholder exercises timely such right to purchase any such Offered Shares as provided in this Agreement and thereafter fails to consummate such purchase of such Offered Shares such Offeree Shareholder had so elected to purchase, the rights of such Offeree Shareholder to purchase such Offered Shares hereunder shall terminate and be of no further force of effect with respect to that particular sale of such Offered Shares, and the other Offeree Shareholders (if any) having the next successive right to purchase such Offered Shares pursuant to the provisions of this Agreement shall have the right to purchase such Offered Shares in the manner provided herein, which right shall be exercised by notice given to the Selling Shareholder, the Company and each such other Offeree Shareholder within fifteen (15) days after the date notice of such failure to consummate such purchase was given by the Selling Shareholder to the Company and such other Offeree Shareholders.

(D)    **Closing and Payment.** The consummation of the sale and purchase of any Offered Shares required pursuant to the provisions of **Section 4.3(A)** hereof ("**Closing**"), shall be held contemporaneously by all relevant parties at the principal office of the Company, at 10:00 a.m., local time, on the tenth (10th) business day after the date upon which notice of election to purchase such Offered Shares was given by the Offeree Shareholder last to elect in accordance with the provisions of **Section 4.3(C)** hereof, or on such other date as all relevant parties may mutually agree upon in writing. In the event that any Offeree Shareholder fails to consummate the purchase of such Offered Shares at the Closing in accordance with the provisions of this Agreement, the Selling Shareholder shall give prompt notice thereof to the Company and each other Offeree Shareholder having the next successive right to purchase such Offered Shares pursuant to the provisions of this Agreement, and the Closing shall be adjourned with respect to all other Offeree Shareholders at such Closing until 10:00 a.m., local time, on a date determined

in accordance with the provisions of this Section. At the Closing, (a) the Selling Shareholder shall execute, acknowledge and/or deliver or cause to be delivered to each Offeree Shareholder who timely exercised its right to purchase its Pro Rata Portion of the Offered Shares (i) a certificate attesting that such Selling Shareholder is the sole legal and beneficial owner of such Offered Shares free and clear of all liens, encumbrances, security interests, claims and adverse interests of any kind whatsoever, and that the Selling Shareholder has full right and power to sell and transfer such Offered Shares to such Offeree Shareholder, (ii) a stock power or other instrument transferring all right, title and interest in and to such Offered Shares to such Offeree Shareholder, together with evidence of payment of all requisite transfer taxes (if any), (iii) such other documents by the Selling Shareholder as may be required pursuant to **Section 5.1**, and (iv) if the Offered Shares being purchased by all such Offeree Shareholders constitutes all of the Shares then owned by the Selling Shareholder, a resignation with respect to all offices and positions with the Company held by the Selling Shareholder, its Affiliates or their respective representatives, without prejudice to any rights that the Selling Shareholder, its Affiliates or their respective representatives may have pursuant to any written employment agreement with the Company, and (b) each such Offeree Shareholder shall execute, acknowledge and/or deliver to the Selling Shareholder (i) a sum equal to the cash portion of the purchase price for such Offered Shares in accordance with the provisions of this Agreement, payable by wire transfer or unendorsed cashier's check to the order of the Selling Shareholder, and if applicable, such documents concerning the portion of the purchase price for such Offered Shares representing indebtedness to pay cash in the future as the Selling Shareholder may reasonably request in accordance with the provisions of this Agreement, and (ii) such other documents by such Offeree Shareholder as may be required pursuant to **Section 5.1** hereof.

  **4.4** **Confidentiality**.  The Investor agrees that the Investor will keep confidential and will not disclose, divulge or use for any purpose (other than to monitor the Investor's investment in the Company) any confidential information obtained from the Company pursuant to this Agreement or in connection with the Investor's ownership of the Shares or participation in the management of the Company, unless such confidential information (x) is known or becomes known to the public in general (other than as a result of a breach or violation by the Investor or any of its Affiliates or representatives of this **Section 4.4** or any other non-use or confidentiality obligation), (y) is or has been independently developed or conceived (as demonstrated by written evidence) by the Investor without use of, derivation from, reference to or reliance upon any of the Company's confidential information and without violating any of the confidentiality obligations hereunder or any other non-use or confidentiality obligation, or (z) is or has been made known or disclosed to the Investor by a third party without a breach of any legal, fiduciary, contractual or other obligation of confidentiality such third party may have to the Company; *provided, however*, that the Investor may disclose the Company's confidential information (a) to the Investor's attorneys, accountants, consultants and other professionals to the extent necessary to obtain their services in connection with monitoring the Investor's investment in the Company, *provided that* the Investor informs each such individual that such information is confidential and that by receiving such information such individual is agreeing to maintain the confidentiality of such information, or (b) as may be required by applicable law, *provided that* the Investor delivers to the Company advance written notice of such disclosure and exercises reasonable best efforts to minimize the extent of any such required disclosure and obtain assurance that confidential treatment will be accorded to the disclosed information.

    **4.5**    <u>Investor Exchange Right</u>.

    **(A)**    The Company shall not, prior to the closing date of the first sale of Common Stock to the general public pursuant to a registration statement filed with and declared effective by the SEC under the Federal Securities Act (as defined in <u>Section 5.1</u>), declare or pay any dividends to the Shareholders unless it has first provided the Investor with notice of the Company's intent to declare or pay such dividends and provide the Investor with the right, exercisable within 15 days of the Investor's receipt of such notice, to exchange, on a one-for-one basis, its Shares of Common Stock, for Shares of a new class of preferred stock ("**Investor Preferred Stock**") providing for cumulative dividends at an annual rate (beginning on the Effective Date) of 8.0% ("**Accruing Dividends**"), which Accruing Dividends shall be payable only when, as and if declared by the Board, except that such Accruing Dividends shall be payable upon a liquidation event, and shall be paid prior to the payment of any dividends on Common Stock.  Such Investor Preferred Stock shall in all other respects have the same rights and privileges as Common Stock, and shall vote together with the Common Stock as a single class, in each case, except as otherwise required by applicable law.

    **(B)**    In the event the Investor exercises its exchange right in accordance with <u>Section 4.5(A)</u>, the Company will cause its certificate of incorporation to be amended in order to provide for the authorization and issuance of the Investor Preferred Stock and the specification of the rights, preferences and privileges thereof.

    **4.6**    <u>Right to Equity Swap</u>.

    **(A)**    At any time Investor shall have the right to exchange with the Company all, or part, of its Shares in the Company for a number of Units of CBD representing an equivalent value determined as set forth in <u>Section 4.6(B)</u> below.

    **(B)**    Investor shall exercise its right hereunder by giving notice to the Company and the Company, after receiving such notice, shall promptly, but in no event later than 15 days after receiving such notice, appoint an Appraiser to determine the Company Value and the enterprise value of CBD as of such time (determined in the same manner set forth in the definition of "Company Value" hereunder). Once each such enterprise value has been determined by the selected Appraiser, the Company shall redeem all the Shares of Investor in exchange for the number of Units of CBD representing an equivalent value.

    **(C)**    Notwithstanding the foregoing, in no event will Investor receive pursuant to this <u>Section 4.6</u> voting Units of CBD in excess of 50% of the aggregate voting Units of CBD.

    **4.7**    **Special Indemnity**. CB Germany hereby agrees that it shall indemnify and hold harmless Investor from and against any Losses suffered by Investor as a result of claims for indemnification against CBE or CBD made by Investor pursuant to, and subject to the limitations set forth in, the Stock Purchase Agreement and/or the Subscription Agreement.

**5.**    <u>**TRANSFER RESTRICTIONS**</u>

5.1    **General Transfer Restrictions**. No Shareholder or any of its Affiliates shall Transfer any Shares held of record or owned beneficially, or both, by such Shareholder or its Affiliate, or any right, title or interest therein, either directly or indirectly, (i) in the absence of an effective registration or qualification statement pertaining thereto under the Securities Act of 1933, as amended, and all rules and regulations promulgated thereunder (collectively, "**Federal Securities Act**"), or the laws of any state, including the laws of the State of California, and all rules and regulations promulgated thereunder (collectively, "**State Securities Acts**"), or an exemption from such registration or qualification is established, and (ii) except as otherwise expressly permitted by this Agreement. Any attempted or purported Transfer of Shares held of record or owned beneficially, or both, by such Shareholder or its Affiliate, or any right, title or interest therein, either directly or indirectly, other than in accordance with and as permitted by this Agreement, whether by operation of law or otherwise, shall be null, void and without effect as against the Company and the other Shareholders.

5.2    **Permitted Transfers**. No Shareholder or any of its Affiliates shall Transfer any Shares held of record or owned beneficially, or both, by such Shareholder or Affiliate, or any right, title or interest therein, either directly or indirectly, except as follows:

(A)    **Bona-Fide Sale to Unrelated Person.** A Shareholder or any of its Affiliates may sell any or all of the Shares held of record or owned beneficially, or both, by such Shareholder or Affiliate, or any right, title or interest therein, either directly or indirectly, to any unrelated Person pursuant to a bona-fide offer of such unrelated Person, at a price and upon such terms and conditions as such Shareholder or Affiliate deems advisable in its sole and absolute discretion, subject to all of the terms, covenants, conditions and restrictions contained in this Agreement, including, without limitation, those set forth in **Sections 1.3, 4.1, 4.2, 4.3, 5.1** and **5.4** hereof.

(B)    **Issuance of Minority Equity Interests.**  A Shareholder or any of its Affiliates that is an entity may issue equity securities of such Shareholder or Affiliate representing less than fifty (50%) of the voting power of such Shareholder or Affiliate and which does not result in a change of control of either such Shareholder or such Affiliate (or, with respect to the Controlling Shareholder, a Change of Control Event), either directly or indirectly through one or more intermediaries, in one or more transactions occurring at any time, subject to all of the terms, covenants, conditions and restrictions contained in this Agreement, including, without limitation, **Section 5.1** and **5.4** hereof, other than those set forth in **Sections 1.3, 4.1, 4.2** and **4.3** hereof solely with respect to such Transfer.

(C)    **Reorganization, Consolidation or Merger.** A Shareholder or any of its Affiliates that is an entity may Transfer any or all of the Shares held of record or owned beneficially, or both, by such Shareholder or Affiliate, or any right, title or interest therein, either directly or indirectly, to, between or among such Shareholder and/or any one or more its Affiliates, with or without consideration, as part of any reorganization, consolidation or merger with, between or among such Shareholder and/or its Affiliates, as long as it doesn't constitute a Change of Control Event for the Controlling Shareholder subject to all of the terms, covenants, conditions and restrictions contained in this Agreement, including, without limitation, **Sections**

**1.3**, **5.1** and **5.4** hereof, other than those set forth in **Section 4.1, 4.2** and **4.3** hereof solely with respect to such Transfer.

      **(D)**    **Beneficial Owners.** A Shareholder or any of its Affiliates that is an entity may Transfer any or all of the Shares held of record or owned beneficially, or both, by such Shareholder or Affiliate, or any right, title or interest therein, either directly or indirectly, to, between or among any one or more of Beneficial Owners of such Shareholder or Affiliate, with or without consideration, as long as it doesn't constitute a Change of Control Event for the Controlling Shareholder subject to all of the terms, covenants, conditions and restrictions contained in this Agreement, including, without limitation, **Sections 1.3**, **5.1** and **5.4** hereof, other than those set forth in **Section 4.1, 4.2** and **4.3** hereof solely with respect to such Transfer.

      **(E)**    **Family Planning-Related Transfers, Etc.** A Shareholder or any of its Affiliates who is an individual may Transfer any or all of the Shares held of record or owned beneficially, or both, by such Shareholder or Affiliate, or any right, title or interest therein, either directly or indirectly, to a Qualified Trust, with or without consideration, subject to all of the terms, covenants, conditions and restrictions contained in this Agreement, including, without limitation, **Sections 1.3**, **5.1** and **5.4** hereof, other than those set forth in **Section 4.1, 4.2** and **4.3** hereof solely with respect to such Transfer; *provided*, *however*, that such Shareholder in such Shareholder's individual capacity shall not be released from, and shall remain responsible for, all of the terms, covenants, conditions and obligations on the part of the Qualified Trust to be performed and observed under this Agreement in respect to the Shares or portion thereof so Transferred, jointly and severally with such Transferee Qualified Trust.

    **5.3**    **Community Property; Death or Divorce, Etc.**

      **(A)**    **Community Property.** The parties acknowledge that Shares held by any Shareholder, or any indirect right, title or interest therein of any of its Affiliates, in whole or in part, may constitute community property of such Shareholder or Affiliate and the spouse of such Shareholder or Affiliate. Accordingly, such community property interest in such Shares may be subject to a right of testamentary disposition by such spouse upon the death of such spouse and a right of division of marital property upon dissolution of their marriage. Subject to the provisions of **Section 5.1** hereof, the parties agree that Shares or any right, title or interest therein acquired by any Transferee pursuant to any inter vivos, testate or intestate Transfer by the spouse of a Shareholder or its Affiliate, or pursuant to a division of marital property upon the dissolution of marriage of a Shareholder or its Affiliate and the spouse of such Shareholder or Affiliate, shall be subject to all of the provisions of this Agreement, including, without limitation, the provisions of **Article 5** hereof.

      **(B)**    **Death or Divorce, Etc.** Subject to the provisions of **Section 5.1** hereof, nothing contained in this Agreement shall be deemed to prohibit or otherwise restrict any Transfer of held of record or owned beneficially, or both, by any Shareholder or its Affiliates, or any right, title or interest therein, either directly or indirectly, pursuant to any testate or intestate Transfer by such Shareholder or Affiliate or, if such Shareholder or Affiliate is a trust, upon the death of any trustor of such trust, or any involuntary Transfer upon the divorce of such Shareholder or Affiliate or, if such Shareholder or Affiliate is a trust, upon the divorce of any

trustor of such trust, to, between and among such Shareholder or Affiliate and any one or more Family Members of such Shareholder or Affiliate; ***provided, however,*** that all such Shares, or right, title or interest therein, shall remain subject to the provisions of this Agreement, and the Transferee to whom such Shares, or right, title or interest therein, are Transferred shall be deemed a Permitted Transferee hereunder and shall comply with the provisions of **Section 1.3, 5.1** and **5.4** hereof.

> **5.4**    **Change of Control**.

The occurrence of one or both of the following scenarios will be deemed as a change of control event ("**Change of Control Event**"):

> **(A)**    **Change of Control at the Company:** If the Controlling Shareholder sells all or part of its Shares in the Company such that its ownership interest in the Company would fall below fifty point one percent (50.1%), provided that, reductions of the Controlling Shareholder's interest in the Company below 50.1% which are due to capital increases of the Company by third parties' contributions shall not be considered as a Change of Control Event; or,

> **(B)**    **Change of Control at the Controlling Shareholder:** If a Person other than Founder (a "**New Majority Shareholder**") obtains "control" (used in this **Section 5.4** as defined in the definition of "Affiliate" hereunder) of CB Germany.

If at any time: (i) the Controlling Shareholder wishes or intends to enter into one or more transactions, the effect of which would be to cause a Change of Control Event; or, (ii) CB Germany's shareholding structure has been altered in such way that a New Majority Shareholder obtains control of CB Germany; then the Controlling Shareholder will give written notice to Investor, of such transfer or situation, as it may correspond (a "**Change of Control Notice**"). In case of any attempt of Change of Control Event of CB Germany referred to above, CB Germany shall give notice to the New Majority Shareholder that under such event the New Majority Shareholder will be obligated to purchase all or part of Investor's Shares in the Company as specified in the Put Option mentioned in paragraph (y) below. In case Investor exercises the Put Option one or more times and the New Majority Shareholder fails to comply to purchase the Investor's Shares in the Company by the end of the last date for closing as established in paragraph (y) below, then on the day following such date, Investor shall give notice of the New Majority Shareholder's default and CB Germany will become obligated to comply with the Put Option in the same terms and conditions provided in paragraph (y) herein and purchase the Put Shares within the following 30 days.

In the case of the Change of Control Event mentioned in paragraph **(A)** above, Investor shall have the right to exercise its right of first refusal as described in **Section 4.3** and its tag-along right as described in **Section 4.2**. If Investor decides not to exercise these rights and gives notice to the Controlling Shareholder and the New Majority Shareholder of such decision within 15 days following receipt of the Change of Control Notice, from that moment on for a period of one hundred twenty (120) days Investor shall be free to sell and transfer (in one or more transactions) all or a portion of its Shares to any third parties, without being subject to any of the limitations

contained in this Agreement (other than **Section 1.3(B)** and clause (i) of **Section 5.1**), including but not limited to Sections **4.2** and **4.3**; ***provided*** that the proposed transferee of such Shares is not deemed by the Board, in its reasonable judgment, to be a direct competitor of the Company or a director, officer, employee or holder of more than 10% of a direct competitor of the Company.

In the case of a Change of Control Event described in paragraph (B), Investor shall have the right to sell and transfer (in one or more transactions) all or a portion of its Shares to the New Majority Shareholder, without being subject to any of the limitations contained in this Agreement (other than **Section 1.3(B)** and clause (i) of **Section 5.1**), including but not limited to Sections **4.2** and **4.3**, and within one hundred twenty (120) days from the reception by Investor of the Change of Control Notice, Investor may:

(y)  Sell to the New Majority Shareholder, on one or more occasions during such 120-day period (the "**Put Period**"), and the New Majority Shareholder shall be obligated to purchase from Investor upon exercise of such option, all or a part of Investor's Shares as specified in a notice given by Investor to Controlling Shareholder and to the New Majority Shareholder (the "**Put Option**").

The Put Option may be exercised by Investor as many times as it may correspond during the Put Period, by giving written notice to the New Majority Shareholder and Controlling Shareholder (the "**Put Notice**") at any time (and, for the avoidance of doubt, on one or more occasions) during the Put Period.

In each case, the Put Notice shall specify: (a) the number (and if applicable, the type) of Shares which Investor is willing to sell to the New Majority Shareholder (the "**Put Shares**"); (b) the price per Share for those Put Shares (the "**Put Price**"), which shall be a sum in USD equal to the highest of: (i) two times (2x) the Investor Purchase Price, or (ii) an amount that would provide to the Investor an annual internal rate of return of twenty percent (20%) over the Investor Purchase Price, since the date such amount was disbursed by the Investor (which calculation shall include all dividends or any cash out payments to the Investor from the Company), divided between all Investor's Shares, and multiplied by the number of Put Shares; and (c) the bank account into which the Put Price shall be paid.

Closing of the purchase of the Put Shares will take place at the Company's headquarters office thirty (30) days following the date the Put Notice is given to the Controlling Shareholder and the New Majority Shareholder, unless the New Majority Shareholder and the Investor agree in writing to a different date, time or place. After such 30-day period, and only if the purchase of the Put Shares has not been executed by causes not attributable to Investor, the New Majority Shareholder shall pay Investor daily liquidated damages calculated in accordance with the following formula, which shall be paid together with the Put Price:

| Net profit of the Company for the prior Financial Year | X | Participation of Investor as of such date | = daily liquidated damages |
|---|---|---|---|
| 360 | | | |

At the closing of such purchase, Investor will deliver to the New Majority Shareholder any documentation necessary to transfer the Put Shares to the New Majority Shareholder, free and clear of any lien or rights of others of any nature created by Investor, other than liens or rights created pursuant to this Agreement.

For the avoidance of doubt, Investor shall be entitled to any dividends, distributions or return of capital relating to the Put Shares which are the subject of the relevant Put Notice which were declared or otherwise had a record date on or before the date on which the Put Shares have been duly transferred to the New Majority Shareholder (and New Majority Shareholder has fully paid up the Put Price and, if corresponds, any daily liquidated damages accrued in Investor's favor). To the extent that any such dividends, distributions or return of capital are paid to the New Majority Shareholder, whether before or after the date where the Put Shares have been duly transferred to the New Majority Shareholder, the New Majority Shareholder shall be deemed to hold such amounts in trust and for the benefit of Investor and shall promptly pay to Investor an amount equal to the amount of such dividends, distributions or return of capital so received by it.

The parties agree that in case of a dilution of Investor and the Controlling Shareholder, by virtue of any future capital increase, by the incorporation of new investors or shareholders that will reduce the ownership interest of the Controlling Shareholder below 50.1% in the Company, then the Change of Control Event mentioned in paragraph (A) and (B) above, will cease to be enforceable against the Controlling Shareholder.

**5.5** **Legends**. The certificates evidencing the Shares held by each Shareholder shall contain the following legends:

**THE SHARES OR OPTION, WARRANT OR OTHER RIGHTS TO ACQUIRE SHARES OF THE COMPANY REPRESENTED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED OR QUALIFIED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR ANY REGULATIONS PROMULGATED THEREUNDER, OR UNDER ANY APPLICABLE STATE SECURITIES ACTS OR ANY REGULATIONS PROMULGATED THEREUNDER, AND MAY NOT BE OFFERED FOR SALE, SOLD, PLEDGED, HYPOTHECATED, TRANSFERRED OR OTHERWISE DISPOSED OF UNLESS REGISTERED OR QUALIFIED UNDER THE SECURITIES ACT AND ALL APPLICABLE STATE SECURITIES LAWS OR AN EXEMPTION FROM SUCH REGISTRATION OR QUALIFICATION IS ESTABLISHED TO THE SATISFACTION OF THE COMPANY**

**THE SHARES OR OPTION, WARRANT OR OTHER RIGHTS TO ACQUIRE SHARES OF THE COMPANY REPRESENTED BY THIS CERTIFICATE ARE SUBJECT TO THE TERMS OF A SHAREHOLDERS AGREEMENT AMONG THE COMPANY AND CERTAIN SHAREHOLDERS OF THE COMPANY, INCLUDING THE HOLDER HEREOF, A COPY OF WHICH IS AVAILABLE FOR INSPECTION BY APPROPRIATE INTERESTED PARTIES AT THE PRINCIPAL OFFICE OF THE ISSUER, AND SUCH SHARES MAY NOT BE OFFERED FOR SALE, SOLD, PLEDGED, HYPOTHECATED, TRANSFERRED OR OTHERWISE DISPOSED OF EXCEPT IN COMPLIANCE WITH SAID SHAREHOLDERS AGREEMENT AND APPLICABLE LAWS.**

## 6.    <u>TERM, DEFAULT AND TERMINATION</u>

**6.1**    <u>Term</u>. The term of this Agreement shall commence on the date first above written and shall continuing indefinitely in full force and effect until (i) terminated in accordance with this Agreement, or (ii) all Shares held by the Shareholders become held by the Company and/or one remaining Shareholder, whichever occurs first.

**6.2**    <u>Default</u>. In the event that a party shall breach or default with respect to any of such party's material obligations set forth in this Agreement, and such breach or default is not cured within applicable grace periods, except as otherwise expressly provided in this Agreement, the nondefaulting party shall be entitled to such remedies as it is entitled to at law or in equity, including, without limitation, an action for damages and/or suit for specific performance, injunctive relief and other equitable remedies and the remedies of the Investor pursuant to the Stock Purchase Agreement executed between Concord Blue Engineering, GmbH, as Seller and the Investor as Purchaser, or under any related agreements including, but not limited to, the Membership Interest Subscription Agreement and the Amended and Restated Limited Liability Company Agreement dated on or about the date hereof. For the avoidance of doubt, a breach of this Agreement shall be deemed to be a breach under such other agreements.

**6.3**    <u>**Opportunity to Cure**</u>. Notwithstanding anything contained herein to the contrary, no breach or default as to any provision or obligation set forth in this Agreement shall be claimed or charged by any party against any other party unless (i) notice thereof has been given to the defaulting party, and (ii) such defaulting party shall have failed to cure such breach or default in all material respects within fifteen (15) days after the date such notice is given to the defaulting party (a "**Default**").

**6.4**    <u>**Time of the Essence**</u>. Except as provided in **Section 6.3** hereof, time is of the essence of this Agreement and each respective of the respective rights and obligations of the parties hereunder. Whenever the last day for the exercise of any right or the performance of any obligation hereunder shall fall on a Saturday, Sunday or legal holiday, the party shall have until 5:00 p.m., Pacific Time, on the next succeeding business day to exercise such right or perform such obligation.

6.5    **Termination**. This Agreement may be terminated at any time as follows:

(A)    By mutual agreement of the Shareholders; or

(B)    By the Company on the date the Company consummates an issuance of any class of its equity securities as a public offering pursuant to a registration or qualification statement filed with, and declared effective by, the Securities and Exchange Commission under the Federal Securities Act, or by any applicable state governmental authority of competent jurisdiction under any applicable States Securities Acts ("**Public Offering**"), upon written notice by the Company to each Shareholder.

6.6    **Cumulative Remedies**. In the event of any breach or default hereunder, no delay or omission in the exercise of any right or remedy by any nondefaulting party shall impair such right or remedy or be construed as a waiver of such breach or default. The waiver by any party of any term, covenant or condition herein contained shall not be deemed to be a waiver of any other term, covenant or condition herein contained. Except as otherwise expressly provided in this Agreement  or under applicable laws, all rights, powers, options or remedies afforded to any party hereunder shall be cumulative and not alternative, and the exercise of one or more rights, powers, options or remedies shall not bar any other rights, powers, options or remedies.

6.7    **Saving of Rights**.

(A)    The rights and remedies of Investor in relation to any misrepresentation or breach of warranty on the part of any of the Shareholder shall not be prejudiced by any investigation by or on behalf of Investor into the affairs of any of the Shareholders, by the execution or the performance of this Agreement or by any other act or thing by or on behalf of Investor which might prejudice such rights or remedies.

(B)    No course of dealing and no failure or delay by Investor or any other Party to this Agreement in exercising any power, remedy, discretion, authority or other right under this Agreement or any other agreement shall impair, or be construed to be a waiver of or an acquiescence in, that or any other power, remedy, discretion, authority or right under this Agreement, or in any manner preclude its additional or future exercise.

7.    **GOVERNING LAW AND DISPUTE RESOLUTION**

7.1    **Governing Law**. This Agreement, the respective rights, obligations and remedies of the parties hereunder and all controversies, disputes and claims under, arising from or related to this Agreement, the interpretation, breach, termination or validity hereof, or the transactions contemplated hereby, shall be governed by and construed in accordance with the internal laws of the State of Delaware, United States of America, without reference to its principles of conflict of laws.

7.2    **Consent to Jurisdiction and Venue**. Subject to **Sections 7.3** and **7.4** hereof, any action, suit, arbitration or other proceeding under, arising from or related to this Agreement, the interpretation, breach, termination or validity hereof, or the transactions contemplated hereby, shall be conducted only in County of Kent, State of Delaware, United States of America, in

accordance with this Section, and each party hereby irrevocably consents and submits to the personal jurisdiction of, and venue in, the Court of Chancery for the County of Kent, State of Delaware, United States of America, and the United States District Court for the District of Delaware, United States of America, in any such any action, suit, arbitration or other proceeding.

Investor declares that, notwithstanding to the contrary in this Agreement, Investor has sovereign status under the Eleventh Amendment to the United States Constitution and therefore reserves all immunities, defenses, rights or actions arising out from its sovereign status except to the extent waived by statute. No waiver of such reserved immunities, defenses, rights or actions shall be implied or otherwise deemed to exist by any reason of Investor´s entry into this Agreement, by any express or implied provision thereof or by any actions or omissions to act by Investor or any of its representatives or agents, whether taken pursuant to this Agreement or prior to the Investor's execution thereof. This provision shall be governed by, and construed in accordance with, the laws of the State of Michigan, United States of America.

      **7.3**      <u>**Arbitration**</u>. Subject to the provisions of **Section 7.4** hereof, in the event of any controversy, dispute or claim under, arising from or related to this Agreement, the interpretation, breach, termination or validity hereof, or any of the transactions contemplated hereunder, the sole and exclusive remedy of the parties shall be to submit such controversy, dispute or claim to binding arbitration as provided herein. All arbitration proceedings pursuant to this Section shall be conducted only in the County of Kent, State of Delaware, United States of America, in accordance with the then-current rules and procedures of the American Arbitration Association by one (1) arbitrator appointed by the American Arbitration Association. Arbitration of the dispute shall commence no later than thirty (30) days after the appointment of such arbitrator, and shall be conducted before such arbitrator at a hearing of no more than three (3) days commenced no later than ninety (90) days after the selection or appointment of such arbitrator. The arbitrator shall be bound by the express terms of this Agreement and shall endeavor to reach his or her decision as quickly as possible, which decision shall be final and binding on the parties. Judgment on the award rendered by the arbitrator may be entered in any court of competent jurisdiction; any other application or dispute shall be submitted to the Court of Chancery for the County of Kent, State of Delaware, United States of America, or the United States District Court for the District of Delaware, United States of America, for determination.

      **7.4**      <u>**Equitable Remedies**</u>. Nothing contained in this Article shall be deemed or construed to limit or preclude the right of any party to seek and obtain in any court of competent jurisdiction any injunctive relief, specific performance or other equitable remedies to enforce and protect its rights under this Agreement and to prevent or curtail any breach or threatened breach of this Agreement by the other party. In connection therewith, each party acknowledges and agrees (i) that issuance or transfer of Shares to Shareholder as contemplated hereunder is of a special, unique and irreplaceable character, (ii) that monetary damages would not provide an adequate remedy in the event of the breach or threatened breach of any of terms, covenants and conditions on the part of such party to be performed or observed under this Agreement, and (ii) in the event of any breach or threatened breach of such terms, covenants and conditions by such party, that the other party shall be entitled to injunctive relief, specific performance and other equitable remedies in any court of competent jurisdiction to enforce and protect its rights under this Agreement and to prevent or curtail any breach or threatened breach of this Agreement by

the defaulting party without the necessity of proving actual damages and without the necessity of posting any bond or other security in connection therewith to the maximum extent permitted under applicable law, in addition to any other remedies to which it may be entitled. Seeking or obtaining any such injunctive relief, specific performance or other equitable remedies shall not be deemed a waiver of the right of arbitration hereunder by any party.

7.5    **Waiver of Jury Trial**. each party hereby irrevocably waives the right to trial by jury in any action, suit or other proceeding under, arising from or related to this Agreement, the interpretation, breach, termination or validity hereof or the transactions contemplated hereby, to the maximum extent permitted under applicable laws.

7.6    **Recovery of Costs**. In any legal action, equitable suit, arbitration or other proceeding under, arising from or related to this Agreement, the interpretation, breach, termination or validity hereof, or any of the transactions contemplated hereunder, the prevailing party shall be entitled to recover reasonable attorneys' fees and costs incurred by such party in connection therewith, in addition to any other relief to which such party may be entitled.

8.    **MISCELLANEOUS PROVISIONS**

8.1    **Parties in Interest**. Nothing in this Agreement, whether express or implied, is intended to confer any rights or remedies under or by reason of this Agreement on any persons or entities other than the parties to it and their respective heirs, devisees, representatives, successors and permitted assigns, nor is anything in this Agreement intended to relieve or discharge the obligation or liability of any third persons to any party to this Agreement, nor shall any provision give any third persons any right of subrogation or action over against any party to this Agreement.

8.2    **Assignment**. Each party acknowledges and agrees that the identity and investor qualifications of each Shareholder are of a special, unique and irreplaceable nature, and that no party may assign any of the rights or delegate any of the obligations of such party under this Agreement, either in whole or in part, at any time other than to a Permitted Transferee to whom any Shares may be Transferred, without the prior written consent of the other parties in each instance, which consent may be withheld for any or no reason or conditioned upon such additional terms and conditions as the non-assigning parties shall determine in their respective sole and absolute discretion. Any assignment of this Agreement, or any assignment of any of the rights or any delegation of any of the obligations of a party under this Agreement, either in whole or in part, in violation of this Section shall be null, void and without force or effect against the Company and the other Shareholders.

8.3    **Notices**. All notices, directions and other communications required or permitted to be given hereunder ("**Notice**") shall be in writing and sent by certified or registered mail, return receipt requested, postage prepaid, or transmitted by facsimile, electronic mail or other form of electronic written communication that the recipient has the facilities to receive, promptly confirmed by a manually signed original thereof sent by certified or registered mail, return receipt requested, postage prepaid, or delivered personally against a signed receipt therefor, in each case to the intended recipient as follows: (i) **IF TO THE COMPANY**, to Concord Blue

Energy, Inc., 12424 Wilshire Boulevard, Suite 660, Los Angeles, California 90025, United States of America, Attention: President (E-Mail: cb@concordblueenergy.com), with a copy contemporaneously sent Concord Blue Energy, Inc., c/o Paracorp Incorporated, 2140 S. Dupont Highway, Camden, Delaware 19934, with a copy contemporaneously sent to Concord Blue Engineering GmbH, Konigsallee 6, 40212 Duesseldorf, Germany, Attention Christopher Thannhaeuser, Chairman (Facsimile Number: 492113230505; E-Mail: ct@concordblue.de), (ii) **IF TO CB GERMANY,** to Concord Blue Engineering GmbH, Konigsallee 6, 40212 Duesseldorf, Germany, Attention: Christopher Thannhaeuser, Chairman (Facsimile Number: 492113230505); E-Mail: ct@concordblue.de), (iii) **IF TO WES**, to Western Energy Solutions, LLC, 881 Alma Real Drive, Suite 301, Los Angeles, California 90272, United States of America, Attention: Wesley Bilson, Manager (E-Mail: wbilson@western4solutions.com), (iv) **IF TO Burmester**, to Stefan Burmester, An der Kalvey 21, 40489 Duesseldorf, Germany (Facsimile Number: 49711940415; E-mail:  sb@concordblue.de), (v) **IF TO the Investor**, to Verdant $f$ AG (on behalf of the Municipal Employees' Retirement System of Michigan), Attention: Ms. Gaia Arnaboldi / Mr. Berry Polmann, Gladbachstrasse 105, 8044 Zurich, Switzerland (Facsimile Number: 795553375 / 795555373), with a copy to [berry@verdantf.com and gaia@verdantf.com], and (vi) **IF TO AN ADDITIONAL SHAREHOLDER**, to such Additional Shareholder at the address for such Additional Shareholder specified in the Additional Shareholder Joinder to this Agreement pursuant to which such Additional Shareholder became a Shareholder under this Agreement, or at such other address as a party may designate from time to time by Notice given to the other parties in accordance with the provisions of this Agreement. Each Notice sent by certified or registered mail shall be deemed given on the date shown on the return receipt as the date of delivery or the date upon which the appropriate postal authority certifies that it was unable to effectuate delivery, whichever is applicable. Each Notice transmitted by facsimile, electronic mail or other form of electronic written communication or delivered personally shall be deemed given on the date of transmission or delivery, as the case may be.

      **8.4**    <u>**Entire Agreement**</u>. This Agreement contains the complete and entire understanding of the parties and shall supersede and replace any and all other arrangements, communications, representations or agreements, whether oral or written, with respect to the subject matter hereof.

      **8.5**    <u>**Binding Effect**</u>. This Agreement and the respective rights and obligations of the parties hereunder shall be binding upon and inure to the benefit of the parties hereto and their respective heirs, devisees, representatives, successors and permitted assigns.

      **8.6**    <u>**Amendment**</u>. In addition to automatic termination hereof as provided in **Section 6.5**, this Agreement may be amended, modified, terminated or supplemented and the observance of any provision hereof may be waived (either generally or in a particular instance, and either retroactively or prospectively) by a writing signed by (x) the Company, (y) Shareholders holding at least a majority of the shares of capital stock of the Company then held by all of the Shareholders (the "**Requisite Shareholders**"), and (z) the Investor.  Any amendment, modification, termination, supplement or waiver effected in accordance with this **Section 8.6** shall be binding on all parties hereto and all of their respective successors, permitted assigns, heirs, executors and administrators whether or not such party, successor, permitted assignee, heir, executor or administrator entered into or approved such amendment, modification,

termination, supplement or waiver.  Each Shareholder other than the Investor acknowledges that, by the operation of this **Section 8.6**, the Requisite Shareholders and the Investor will have the right and power to diminish or eliminate all rights of such Shareholder hereunder. Notwithstanding the foregoing and except as otherwise provided in **Section 6.5** with respect to automatic termination of this Agreement in its entirety. Notwithstanding the foregoing and except as otherwise provided in **Section 6.5** with respect to automatic termination of this Agreement in its entirety:

> **(A)**    any provision hereof may be waived by a party, on such party's own behalf, without the consent of any other party; and

> **(B)**    this Agreement may not be amended, modified, terminated or supplemented and the observance of any provision hereof may not be waived with respect to any Shareholder without the written consent of such Shareholder unless such amendment, modification, termination, supplementation or waiver applies to all Shareholders, as the case may be, in the same fashion.

The Company shall give prompt written notice of any amendment, modification, termination, supplementation or waiver hereunder to any party hereto that did not consent in writing thereto. For purposes of this **Section 8.6**, the requirement of a written instrument may be satisfied in the form of an action by written consent of the stockholders circulated by the Company and executed by the stockholder parties specified, whether or not such action by written consent makes explicit reference to the terms of this Agreement.  No waivers of, or exceptions to, any term, condition or provision hereof, in any one or more instances, shall be deemed to be, or construed as, a further or continuing waiver of, or exception to, any such term, condition or provision.

   **8.7**    **Waiver or Consent**. No waiver of any rights or obligations under this Agreement or of any objection to any act or omission connected therewith shall be claimed or implied by any party, or be deemed or construed to constitute a consent to the continuation of any such act or omission or a consent to any other or future act or omission, unless in writing signed by the party against whom enforcement of such waiver or consent is sought.

   **8.8**    **Severability**. In the event any provision, clause or application of this Agreement is invalidated or unenforceable for any reason whatsoever, this Agreement shall remain binding and in full force and effect to the maximum extent permitted under applicable law, except for such invalidated or unenforceable provision, clause or application. If any injustice or frustration of purpose shall result therefrom, however, the parties shall negotiate in good faith to provide adjustments to ameliorate the effects of such injustice or frustration of purpose.

   **8.9**    **Drafting Presumption**. It is acknowledged that the parties and their respective agents have participated in an arms'-length negotiation in the preparation of this Agreement. As a consequence, the parties agree that no presumption shall be applied in any interpretation of this Agreement that the terms hereof shall be construed more strictly against the party who prepared the same, whether through such party's agents or otherwise.

**8.10    Headings**. The article and section headings contained in this Agreement are solely for the purpose of convenience and shall neither be deemed a part of this Agreement nor be used in any interpretation hereof.

**8.11    Gender**. Each term stated in the singular shall include the plural, and pronouns stated in the masculine gender shall include the feminine and neuter genders, and *vice versa*, wherever appropriate by the context.

**8.12    Counterparts**. This Agreement may be executed in one or more original or facsimile counterparts executed by a party and delivered personally or by facsimile or other form of electronic written communication that the other parties have the facilities to receive, which shall be effective when so executed and delivered by all parties, each of which shall be deemed an original and all of which shall constitute one and the same instrument. If any party so executes and delivers this Agreement in facsimile counterpart by facsimile or other electronic transmission to the other parties, such party shall promptly deliver to the other parties an original counterpart manually signed by such party, but the failure of such party to do so shall not affect the due execution and delivery of this Agreement by such party in accordance with the provisions of this Section.

**8.13    Capacity, Authority and Authorization**. Each party which is an entity represents (i) that it is a corporation, partnership, limited liability company or other entity, duly incorporated or organized and existing under the laws of the jurisdiction of its incorporation or organization, (ii) that it has all requisite power and authority to enter into this Agreement and to perform its obligations hereunder, and (iii) that all actions required to be taken by its directors, trustees, managers or partners and, if applicable, its shareholders, members or other owners to authorize the execution and delivery of this Agreement and the performance of its obligations hereunder have been duly and validly taken and are in full force and effect. Each individual signing this Agreement on behalf of a party which is an entity represents and warrants that he or she has been duly authorized by all requisite action to execute and deliver this Agreement on behalf of such party.

*[Signature pages follow]*

**IN WITNESS WHEREOF,** each party has duly executed and delivered this Shareholders Agreement as of the date first above written.

**CONCORD BLUE ENERGY, INC.,**
a Delaware corporation


By: _____
        Wesley Bilson, Its President


**CONCORD BLUE ENGINEERING GMBH.,**
a German company


By: _____
        Christopher Thannhaeuser, Its Chairman


**WESTERN ENERGY SOLUTIONS, LLC**,
a California limited liability company


By: _____
        Gregory Bilson, Manager

**STEFAN BURMESTER**


By: _____

**MUNICIPAL EMPLOYEES´ RETIREMENT SYSTEM OF MICHIGAN,**
a public nonprofit corporation established and maintained under the laws of the State of Michigan

By verdant *f* AG pursuant to power of attorney dated March ___, 2016

By:

_____

Name:
Title:

## EXHIBIT "A"

### ADDITIONAL SHAREHOLDER JOINDER TO

### SECOND AMENDED AND RESTATED SHAREHOLDERS AGREEMENT

THIS ADDITIONAL SHAREHOLDER JOINDER TO SECOND AMENDED AND RESTATED SHAREHOLDERS AGREEMENT (this "**Joinder**") is made as of _____, _____, by and between **CONCORD BLUE ENERGY, INC.**, a Delaware corporation ("**Company**"), and _____, a[n] _____ ("**Additional Shareholder**"), as an Additional Shareholder and party to that certain Second Amended and Restated Shareholders Agreement dated March 8, 2016, by and among **CONCORD BLUE ENERGY, INC.**, a Delaware corporation ("**Company**"), **CONCORD BLUE ENGINEERING GMBH**, a German company ("**CB Germany**"), **WESTERN ENERGY SOLUTIONS, LLC**, a California limited liability company ("**WES**") (CB Germany and WES being hereinafter sometimes referred to separately as an "**Original Shareholder**" and collectively as the "**Original Shareholders**"), **STEFAN BURMESTER** ("**Burmester**"), Municipal Employees' Retirement System of Michigan, a public nonprofit corporation established and maintained under the laws of the State of Michigan  (the "**Investor**") and such other Person or Persons, if any, as have been added as a party or parties thereto pursuant to the provisions of **Section 1.3(A)** thereof prior to the date hereof (if and as amended to date and as amended by this Joinder) (collectively, the "**Shareholders Agreement**"), with reference to the following facts:

WHEREAS, Additional Shareholder desires to acquire from the Company, and the Company is willing to issue, sell or transfer to Additional Shareholder, certain Shares of the Company, subject to, among other things, the terms and conditions of the Shareholders Agreement and this Joinder;

NOW THEREFORE, in consideration of the foregoing, the mutual promises, covenants and agreements contained in the Shareholders Agreement and other good and valuable consideration, receipt and sufficiency of which are hereby mutually acknowledged, the parties, intending to be bound legally, hereby agree as follows:

1. **Interpretation.** Capitalized terms not otherwise defined herein shall have the meanings ascribed to such terms in the Shareholders Agreement. In the event of any inconsistency between the provisions of the Shareholders Agreement and this Joinder thereto, the provisions of this Joinder shall govern and control in all respects.

2. **Additional Shareholder Added as Party to Shareholders Agreement.** As a condition of the issuance, sale or transfer Shares to Additional Shareholder by the Company, Additional Shareholder shall be, and hereby is, added as a Shareholder and a party to the Shareholders Agreement upon the terms and subject to the conditions contained in the Shareholders Agreement, with the modifications, additional and/or supplemental terms and conditions applicable to Additional Shareholder set forth in Section 3 hereof, if any, pursuant to **Section 1.3(A)** of the Shareholders Agreement.

**3.**    **Modifications, Additional and/or Supplemental Terms**. The following modifications, additional and/or supplemental terms to the Shareholders Agreement shall be applicable to Additional Shareholder:

[Specify modified, additional and/or supplemental terms or state none]

**4.**    **Acceptance and Assumption by Additional Shareholder.** Additional Shareholder shall, and hereby does, accept the addition of Additional Shareholder as a Shareholder and party to the Shareholders Agreement, upon the terms and subject to the conditions contained in the Shareholders Agreement, with the modifications, additional and/or supplemental terms and conditions applicable to Additional Shareholder set forth in Section 3 hereof, if any, pursuant to Section 2 hereof, and agrees to be bound by, and to duly and timely perform and observe, all of the terms, covenants and conditions on the part of Additional Shareholder to be performed or observed under the Shareholders Agreement and this Joinder, including, without limitation, modifications, additional and/or supplemental terms to the Shareholders Agreement set forth in Section 3 hereof, if any.

**5.**    **Notices to Additional Shareholder**. All Notices to Additional Shareholder shall be in writing and sent by certified or registered mail, return receipt requested, postage prepaid, or transmitted by facsimile, electronic mail or other form of electronic written communication that Additional Shareholder has the facilities to receive, promptly confirmed by a manually signed original thereof sent by certified or registered mail, return receipt requested, postage prepaid, or delivered personally against a signed receipt therefor, in each case to [specify name, address, facsimile number and email address of Additional Shareholder], or at such other address as Additional Shareholder may designate from time to time by Notice given to the Company and other Shareholder in accordance with the provisions of **Section 8.3** of the Shareholders Agreement.

**6.**    **Ratification of Shareholders Agreement**. Except as expressly modified by this Joinder, the Shareholders Agreement shall remain in full force and effect in accordance with its terms, and is hereby ratified and confirmed in all respects.

**7.**    **Counterparts**. This Joinder may be executed in one or more original or facsimile counterparts manually signed by a party and delivered personally or by facsimile or other electronic transmission to the other party, each of which shall be deemed an original and all of which shall constitute one and the same instrument and shall be effective when so executed and delivered by all parties.  If any party so executes and delivers this Joinder in facsimile counterpart by facsimile or other electronic transmission to the other party, such party shall promptly deliver to the other party an original counterpart manually signed by such party, but the failure of such party to do so shall not affect the due execution and delivery of this Joinder by such party in accordance with the provisions hereof.

**8.**    **Capacity, Authority and Authorization**. Each party which is an entity represents (i) that it is a corporation, partnership, limited liability company or other entity, duly incorporated or organized and existing under the laws of the jurisdiction of its incorporation or organization, (ii) that it has all requisite power and authority to enter into this Agreement and to perform its obligations hereunder, and (iii) that all actions required to be taken by its directors, trustees, managers or partners and, if applicable, its shareholders, members or other owners to authorize

the execution and delivery of this Agreement and the performance of its obligations hereunder have been duly and validly taken and are in full force and effect. Each individual signing this Agreement on behalf of a party which is an entity represents and warrants that he or she has been duly authorized by all requisite action to execute and deliver this Agreement on behalf of such party.

**IN WITNESS WHEREOF,** each party has caused this Additional Shareholder Joinder to Shareholders Agreement to be executed and delivered by him or her or its behalf by its duly authorized representative as of the date first above written.

**CONCORD BLUE ENERGY, INC.,**                **[ADDITIONAL SHAREHOLDER]**

a Delaware corporation

By: _____        By: _____

      [Name; Title]

EXHIBIT "B"

PERMITTED TRANSFEREE JOINDER TO

SECOND AMENDED AND RESTATED SHAREHOLDERS AGREEMENT

THIS PERMITTED TRANSFEREE JOINDER TO SECOND AMENDED AND RESTATED SHAREHOLDERS AGREEMENT (this "**Joinder**") is made as of _____, _____, by and between CONCORD BLUE ENERGY, INC., a Delaware corporation ("**Company**"), and _____, a[n] _____ ("**Permitted Transferee**"), as a Shareholder and party to that certain Second Amended and Restated Shareholders Agreement dated March 8, 2016, by and among CONCORD BLUE ENERGY, INC., a Delaware corporation ("**Company**"), CONCORD BLUE ENGINEERING GMBH, a German company ("**CB Germany**"), WESTERN ENERGY SOLUTIONS, LLC, a California limited liability company ("**WES**") (CB Germany and WES being hereinafter sometimes referred to separately as an "**Original Shareholder**" and collectively as the "**Original Shareholders**"), STEFAN BURMESTER ("**Burmester**"), Municipal Employees' Retirement System of Michigan, a public nonprofit corporation established and maintained under the laws of the State of Michigan  (the "**Investor**") and such other Person or Persons, if any, as have been added as a party or parties thereto pursuant to the provisions of **Section 1.3(A)** thereof prior to the date hereof (if and as amended to date and as amended by this Joinder) (collectively, the "**Shareholders Agreement'**), with reference to the following facts:

WHEREAS, Permitted Transferee acquired Shares of the Company (the "**Transferred Shares**") from [specify Transferor Shareholder] ("**Transferor Shareholder**") in accordance with the terms and conditions of the Shareholders Agreement, subject to the terms and conditions of the Shareholders Agreement;

NOW THEREFORE, in consideration of the foregoing, the mutual promises, covenants and agreements contained in the Shareholders Agreement and other good and valuable consideration, receipt and sufficiency of which are hereby mutually acknowledged, the parties, intending to be bound legally, hereby agree as follows:

1.    **Interpretation.** Capitalized terms not otherwise defined herein shall have the meanings ascribed to such terms in the Shareholders Agreement. In the event of any inconsistency between the provisions of the Shareholders Agreement and this Joinder thereto, the provisions of this Joinder shall govern and control in all respects.

2.    **Permitted Transferee Added as Party to Shareholders Agreement.** Permitted Transferee shall be, and hereby is, added as a Shareholder and a party to the Shareholders Agreement upon the terms and subject to the conditions contained in the Shareholders Agreement applicable to Transferee Shareholder in respect to the Transferred Shares pursuant to **Section 1.3(B)** of the Shareholders Agreement.

3.    **Acceptance and Assumption by Permitted Transferee.** Permitted Transferee shall, and hereby does, accept the addition of Permitted Transferee as a Shareholder and party to the

Shareholders Agreement, upon the terms and subject to the conditions contained in the Shareholders Agreement, and agrees to be bound by, and to duly and timely perform and observe, all of the terms, covenants and conditions on the part of Transferor Shareholder to be performed or observed under the Shareholders Agreement in respect to the Transferred Shares.

4.      **Notices to Additional Shareholder**. All Notices to Permitted Transferee shall be in writing and sent by certified or registered mail, return receipt requested, postage prepaid, or transmitted by facsimile, electronic mail or other form of electronic written communication that Permitted Transferee has the facilities to receive, promptly confirmed by a manually signed original thereof sent by certified or registered mail, return receipt requested, postage prepaid, or delivered personally against a signed receipt therefor, in each case to [specify name, address, facsimile number and email address of Permitted Transferee], or at such other address as Permitted Transferee may designate from time to time by Notice given to the Company and other Shareholder in accordance with the provisions of **Section 8.3** of the Shareholders Agreement.

5.      **Ratification of Shareholders Agreement**. Except as expressly modified by this Joinder, the Shareholders Agreement shall remain in full force and effect in accordance with its terms, and is hereby ratified and confirmed in all respects.

6.       **Counterparts**. This Joinder may be executed in one or more original or facsimile counterparts manually signed by a party and delivered personally or by facsimile or other electronic transmission to the other party, each of which shall be deemed an original and all of which shall constitute one and the same instrument and shall be effective when so executed and delivered by all parties.  If any party so executes and delivers this Joinder in facsimile counterpart by facsimile or other electronic transmission to the other party, such party shall promptly deliver to the other party an original counterpart manually signed by such party, but the failure of such party to do so shall not affect the due execution and delivery of this Joinder by such party in accordance with the provisions hereof.

7.      **Capacity, Authority and Authorization**. Each party which is an entity represents (i) that it is a corporation, partnership, limited liability company or other entity, duly incorporated or organized and existing under the laws of the jurisdiction of its incorporation or organization, (ii) that it has all requisite power and authority to enter into this Agreement and to perform its obligations hereunder, and (iii) that all actions required to be taken by its directors, trustees, managers or partners and, if applicable, its shareholders, members or other owners to authorize the execution and delivery of this Agreement and the performance of its obligations hereunder have been duly and validly taken and are in full force and effect. Each individual signing this Agreement on behalf of a party which is an entity represents and warrants that he or she has been duly authorized by all requisite action to execute and deliver this Agreement on behalf of such party.

**8.**

     **IN WITNESS WHEREOF,** each party has caused this Permitted Transferee Joinder to Shareholders Agreement to be executed and delivered by him or her or its behalf by its duly authorized representative as of the date first above written.

**CONCORD BLUE ENERGY, INC.,**       **[PERMITTED TRANSFEREE]**

a Delaware corporation

By: _____    By: _____

     [Name; Title]

**EXHIBIT B**

**Form of Amendment Agreement**

[Attached]

THIS AGREEMENT AND OMNIBUS AMENDMENT (this "*Agreement*") is dated as of March 8, 2016, is given effect as of the date of each license Agreement (as defined below) by and among Concord Blue Patent GmbH ("*CB Patents Germany*"), Concord Blue Engineering GmbH ("*CB Germany*"), Concord Blue Patents, LLC ("*CB Patents*") Concord Blue Energy, Inc. ("*CBE*") and Concord Blue Development, LLC ("*CBD*").

PRELIMINARY STATEMENTS

A.    The parties hereto are party to one or more of the following intellectual property license agreements (each a "*License Agreement*", and collectively, the "*License Agreements*"):

1.    Exclusive Intellectual Property License Agreement, dated as of May 17, 2012, by and between Concord Blue Patent GmbH and Concord Blue Engineering GmbH (the "*CB Engineering License Agreement*");

2.    Exclusive Intellectual Property License Agreement, dated as of March 13, 2015, by and between Concord Blue Engineering GmbH and Concord Blue Patents, LLC (the "*CB Patents License Agreement*");

3.    Exclusive Intellectual Property License Agreement, dated as of March 13, 2015, by and between Concord Blue Patents, LLC and Concord Blue Energy, Inc. (the "*CBE License Agreement*"); and

4.    Amended and Restated Project Development Agreement, dated as of February 19, 2016, by and between Concord Blue Energy, Inc. and Concord Blue Development, LLC (the "*CBD License Agreement*").

B.    The parties hereto wish to make to make certain acknowledgements and agreements and amend the License Agreements in certain respects.

C.    This Agreement is being entered into as a condition precedent to the closing of the Stock Purchase Agreement between Municipal Employees' Retirement System of Michigan, a public nonprofit corporation established and maintained under the laws of the State of Michigan ("*MERS*") and CB Germany (the "*SPA*") and the Membership Interest Subscription Agreement between CBD and MERS (the "*Subscription Agreement*") dated as of the date hereof.

THEREFORE, in consideration of the foregoing and other good and valid consideration, the receipt and sufficiency of which are hereby expressly acknowledged, the parties hereby agree to the following:

1.    <u>Definitions</u>.    Except as otherwise defined in this Agreement, terms used in this Agreement shall have the definitions set forth in the applicable License Agreements.

2.    <u>Amendments</u>.  Each of the parties acknowledges and agrees as follows:

(a)    The definition of "Patent Rights" in each License Agreement other than the CBD License Agreement, and the definition of "CB Patent Rights" in the CBD License Agreement, is hereby amended and restated in its entirety as follows:

"Patent Rights" (or "CB Patent Rights", as applicable) means:

(i) the patents and patent applications listed below:

- European patent PCT/EP 2010/007798 concerning a method regarding the pyrolysis and reformation of water-containing organic material components, filed December 20, 2010;

- Indian patent 1312/MUM/2009 filed May 28, 2009 and international application number PCT/IN2009/000644, filed November 13, 2009;

- (WO2001021730) METHOD FOR GASIFYING ORGANIC MATERIALS AND MIXTURES OF MATERIALS having a United States National Stage Application filed March 25, 2002 with Application Serial Number: 10/089,012 and issued as U.S. Patent No. 7,077,878;

- (WO2008046578) METHOD FOR PRODUCING A PRODUCT GAS RICH IN HYDROGEN having a United States National Stage Application filed May 13, 2009 with Application Serial Number: 12/311,919;

(ii) any and all patents that have issued or in the future will issue from the foregoing patents and patent applications, including utility models and design patents and certificates of invention, and all divisions, continuations, continuations-in-part, reissues, renewals, extensions or additions, and foreign equivalents thereof, and (iii) all future patent rights owned by Concord Blue Patent GmbH, in each instance in respect of clauses (i) and (ii) above, that claim inventions or discoveries necessary to make, use, sell, import or export products and services for the thermolysis, pyrolysis and gasification of biomass."

(b)    The definition of "Confidential Information" in each of the License Agreements other than the CBD License Agreement is hereby amended and restated in its entirety as follows:

""Confidential Information" means Concord Blue Patent GmbH's technical data, formulae, standards, technical information, specifications, processes, methods, information, knowledge, trade practices and secrets, that are necessary or useful to exploit fully the inventions or discoveries claimed under the Patent Rights, the CBR or the thermolysis, pyrolysis and gasification of biomass.  "CBR" means the Concord Blue Reformer, which practices the inventions or discoveries claimed under the Patent Rights and contains Concord Blue Engineering GmbH's proprietary equipment used to convert biomass and various forms of waste materials into energy and other products."

3.    <u>Agreements.</u>

(a)    The parties acknowledge and agree that notwithstanding anything to the contrary in the License Agreements (but without limiting the rights of CBE as licensee under the CBE License Agreement or CBD as licensee under the CBD License Agreement):

(i)    except for CB Patents Germany, which shall enforce the Patent Rights in accordance with the CB Engineering License Agreement, none of the parties shall be obligated to enforce or defend the Patent Rights or assert, pursue, or defend claims of infringement against third parties;

(ii)    each of CBE and CBD shall have the right, but not the obligation, to assert claims of patent infringement against third parties (and each of CB Patents Germany, CB Germany and CB Patents agrees to support such claims, including, without limitation, by providing standing where necessary), at the asserting party's expense and recovery shall be for the exclusive benefit of the asserting party;

(iii)    the license granted in each of the License Agreements shall be perpetual and irrevocable for so long as the applicable licensee has not materially breached the terms of the applicable License Agreement, which breach remains uncured for longer than 60 days following written notice thereof from the applicable licensor to the applicable licensee, and each licensor under each License Agreement acknowledges and agrees that money damages shall be a sufficient remedy for any breach by the applicable licensee of the terms of the applicable License Agreement;

(iv)    a manufacturing license or operating license, by whatever name called under any License Agreement, shall not be deemed to be invalid, and no licensor shall have any grounds to disapprove or object to such manufacturing license or operating license, so long as the terms of such manufacturing license or operating license are not materially inconsistent with the terms of the form of Single Engineering, Manufacturing & Operating License Agreement attached hereto as <u>Exhibit A</u>, and no licensor under the License Agreements will be required to be a party to any manufacturing license or operating license, other than CB Germany (provided that CB Germany may provide for designees to receive payments thereunder);

(v)    with respect to use of qualified manufacturers or engineering procurement companies for manufacture or construction, no approval of any party other than CB Germany shall be required with respect to the forms of non-disclosure and non-competition agreements to be executed by such qualified manufacturers or engineering procurement companies.  The approval of CB Germany shall be required in such instances, but such approval shall not be unreasonably withheld, conditioned or delayed by CB Germany;

(vi)    no written approval of any party other than CB Germany shall be required prior to the making by any licensee under a License Agreement of substantial structural changes to a Licensed Facility.  The determination of what constitutes a "substantial structural change" to a Licensed Facility owned or operated (directly or indirectly) by CBD or CBE shall be by a Supermajority Board Vote of CBD, as defined in the Amended and Restated Limited Liability Company Agreement of CBD ("<u>LLC Agreement</u>").  The written approval of CB Germany shall

be required in such instances, but such approval shall not be unreasonably withheld, conditioned or delayed by CB Germany;

(vii)    no party shall be restricted or limited in the filing of patents, so long as such party does not use IP Rights (or in the case of CBD, CB IP Rights) as defined in the applicable License Agreement in the development or commercialization of such patents; and

(viii)    as among the parties, all improvements and further developments to the IP Rights or CB IP Rights, as applicable, shall be owned by CB Patents Germany, and each party hereby assigns all right, title and interest of such party in and to such improvements and further developments to CB Patents Germany, subject to the licenses granted with respect to such IP Rights or CB IP Rights, as applicable, under the License Agreements.

(b)    Each of CB Patents Germany, CB Germany and CB Patents hereby agrees with CBE that notwithstanding any breach by any party other than CBE of the terms of any of the License Agreements, so long as CBE has not materially breached the terms of the CBE License Agreement, which breach remains uncured for longer than 60 days following written notice thereof from CB Patents Germany to CBE, the license under the IP Rights granted to CBE under the CBE License Agreement shall be irrevocable and shall remain unmodified and in full force and effect, and each such party acknowledges that money damages shall be a sufficient remedy for any breach by CBE of the terms of the CBE License Agreement.  To the extent such license is modified, encumbered or diminished in any manner as a result of the breach by any party other than CBE of the terms of any of the License Agreements, CB Patents Germany hereby grants to CBE, for the term of such modification, encumbrance or diminishment, a non-exclusive license under the IP Rights of the same scope as the license granted under the CBE License Agreement.

(c)    Each of CB Patents Germany, CB Germany, CB Patents and CBE hereby agrees with CBD that notwithstanding any breach by any party other than CBD of the terms of any of the License Agreements, so long as CBD has not materially breached the terms of the CBD License Agreement, which breach remains uncured for longer than 60 days following written notice thereof from CB Patents Germany to CBD, the license under the CB IP Rights granted to CBD under the CBD License Agreement shall be irrevocable and shall remain unmodified and in full force and effect, and each such party acknowledges that money damages shall be a sufficient remedy for any breach by CBD of the terms of the CBD License Agreement.  To the extent such license is modified, encumbered or diminished in any manner as a result of the breach by any party other than CBE of the terms of any of the License Agreements, CB Patents Germany hereby grants to CBD, for the term of such modification, encumbrance or diminishment, a non-exclusive license under the CB IP Rights of the same scope as the license granted under the CBD License Agreement.

(d)    The materiality of any breach by CBE or CBD referred to in Sections 3(b) or 3(c) above shall be mutually agreed by the parties and if the parties are unable to agree, by an independent JAMS arbitrator selected by the parties.

4.    <u>Miscellaneous.</u>

(a)    Except as herein provided, the License Agreements shall remain unchanged and in full force and effect.

(b)    This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement.  The exchange of copies hereof, including signature pages hereto, by facsimile, e-mail or other means of electronic transmission shall constitute effective execution and delivery hereof as to the parties and may be used in lieu of the original Agreement for all purposes.  Signatures transmitted by facsimile, e-mail or other means of electronic transmission shall be deemed to be original signatures for all purposes.

(c)    Each of the parties hereto acknowledges and consents to each of the amendments to the License Agreements contemplated hereby.

(d)    This Agreement shall be governed by the laws (other than choice of law principles) of the State of California.

(e)    Any breach of this Agreement by CB Patents Germany, CB Germany, or CB Patents shall constitute a breach of the SPA and Subscription Agreement, and the remedies contained in such agreements shall be available to MERS, including but not limited to access to the collateral and Escrow Account referred to therein.

[<i>Remainder of Page is Intentionally Blank</i>]

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed as of the day and year first above written.

**CONCORD BLUE DEVELOPMENT, LLC**

By: _____
Name:
Title:


**CONCORD BLUE ENERGY, INC.**

By: _____
Name:
Title:


**CONCORD BLUE PATENTS, LLC**

By: _____
Name:
Title:


**CONCORD ENGINEERING GMBH**

By: _____
Name:
Title:


**CONCORD BLUE PATENT GMBH**

By: _____
Name:
Title:

**EXHIBIT A**

**FORM OF SINGLE ENGINEERING, MANUFACTURING &
OPERATING LICENSE AGREEMENT**

**SCHEDULE 3.01(l)**

**SHAREHOLDERS (POST-CLOSING)**

| Shareholder | Shares |
|---|---|
| Seller | 159,466 |
| Western Energy Solutions, LLC | 10,000 |
| Burmester | 3,563 |
| Purchaser | 30,534 |
| **Total** | **203,563** |

**SCHEDULE 3.01(m)**

**ENCUMBRANCES (SUBSIDIARIES)**

1. The Company is the legal and beneficial owner of 60% of the issued and outstanding equity interests of CB Eagar.  Western Energy Solutions, LLC owns the remaining issued and outstanding equity interests of CB Eagar.  The Company plans to contribute its equity interests in CB Eagar to CBD.

2. CBD is the legal and beneficial owner of 70% of the issued and outstanding equity interests of CBVI.  Leeward Renewables, LLC owns the remaining issued and outstanding equity interest of CBVI.

3. CBD plans to issue equity securities to the Investor and Louis Berger Group or its affiliate and in connection therewith to enter into an Amended and Restated Limited Liability Company Agreement (the "CBD Operating Agreement").  The CBD Operating Agreement will contain Encumbrances and restrictions on transfer of its equity securities.

4. The equity securities to be issued to Louis Berger Group or its affiliate in CBD described above will be issued by conversion of indebtedness pursuant to a Convertible Promissory Note, dated as of July 1, 2015, by the Company in favor of Berger Group Holdings, Inc., in the principal amount of $475,000.

5. Encumbrances under Amended and Restated Operating Agreement of Concord Blue Eagar, LLC (f/k/a Concord Blue Development USA, LLC), dated as of May 7, 2012, by and between Concord Blue Energy, Inc. and Western Energy Solution, LLC.

6. Encumbrances under Operating Agreement of Concord Blue Virgin Islands, LLC, dated as of March 5, 2015, by and between Concord Blue Development, LLC and Leeward Renewables, LLC.

## SCHEDULE 3.01(o)(i)

## CONTRACTS

1. Amended and Restated Project Development Agreement, dated as of Feb 19, 2016, by and between Concord Blue Energy, Inc. and Concord Blue Development, LLC.

2. Exclusive Intellectual Property License Agreement, dated as of March 13, 2015, by and between Concord Blue Patents, LLC and Concord Blue Energy, Inc.

3. Exclusive Intellectual Property License Agreement, dated as of May 17, 2012, by and between Concord Blue Patent, GmbH and Concord Blue Engineering, GmbH.

4. Exclusive Intellectual Property License Agreement, dated as of March 13, 2012, by and between Concord Blue Patents, LLC and Concord Blue Engineering, GmbH.

5. Asset Construction and Usage Agreement, dated as of Oct 9, 2014, by and between Lockheed Martin Corporation Mission Systems and Training and Concord Blue Energy, Inc.

6. License of Intellectual Property and Technology Rights Agreement, dated as of Oct 9, 2014, by and between Concord Blue Engineering GmbH and Lockheed Martin Corporation.

7. Proprietary Information Agreement, dated as of Oct 3, 2011, by and among Lockheed Martin Corporation, CBES Global, LLC, and Concord Blue Engineering GmbH.

8. 1st Amendment to Proprietary Information Agreement, dated as of Mar 26, 2012, by and among Lockheed Martin Corporation, Concord Blue Energy Services, LLC, and Concord Blue Engineering GmbH.

9. 2nd Amendment to Proprietary Information Agreement, dated as of Jul 25, 2013, by and among Lockheed Martin Corporation, Concord Blue Energy Services, LLC, and Concord Blue Engineering GmbH.

10. 3rd Amendment to Proprietary Information Agreement, dated as of Apr 3, 2014, by and among Lockheed Martin Corporation, Concord Blue USA, Inc., and Concord Blue Engineering GmbH.

11. Teaming Agreement, dated as of Jul 25, 2013, by and between Concord Blue USA, Inc., and Lockheed Martin Corporation.

12. 1st Amendment to Teaming Agreement, dated as of Dec 18, 2015, by and among Concord Blue Energy, Inc., Concord Blue Development, LLC, and Lockheed Martin Corporation.

13. Concord Blue/Louis Berger Biomass/Waste to Energy/Synthetic Fuels Cooperation Indicative Terms and Conditions Sheet, dated as of Dec 23, 2015, by and between Louis Berger Services and Concord Blue Energy, Inc. (not yet countersigned, but has been approved for signature by Louis Berger).

14. Proprietary Information Agreement, dated as of Jan 27, 2014, by and between Louis Berger Group, Inc. and Concord Blue Energy, Inc.

15. Master License Agreement, dated as of Oct 29, 2014, by and between Concord Blue Engineering GmbH and W2E international Corp.

16. Service Agreement, dated as of November 17, 2015, by and between Concord Blue Energy, Inc. and Groupo Almeida.

17. Proprietary Information Agreement, dated as of July 22, 2015, by and between Groupo Almeida and Concord Blue Energy, Inc.

18. Amended & Restated Shareholders Agreement, dated as of Dec 18, 2014, by and among Concord Blue Energy, Inc., Concord Blue Engineering GmbH, and Western Energy Solutions, LLC.

19. Additional Shareholder Joinder to Amended & Restate Shareholder Agreement, dated as of Dec 29, 2014, by and between Concord Blue Energy, Inc., and Stefan Burmester.

20. Burmester Stock Subscription Agreement, dated as of Dec 29, 2014, by and between Concord Blue Energy, Inc., and Stefan Burmester.

21. Engagement Agreement Providing for Investment Banking Services, dated as of July 28, 2014, by and between Concord Blue Energy, Inc., and Drexel Hamilton LLC (45 day notice of cancellation has been provided on Feb 9, 2016 for termination of engagement).

22. Amendment to Engagement Agreement Providing for Investment Banking Services, dated as of Aug 12, 2014, by and between Concord Blue Energy, Inc., and Drexel Hamilton LLC (45 day notice of cancellation has been provided on Feb 9, 2016 for termination of engagement).

23. Proprietary Information Agreement, dated as of May 5, 2014, by and between Concord Blue USA, Inc., and Drexel Hamilton LLC.

24. Proprietary Information Agreement, dated as of Jan 30, 2013, by and between Concord Blue Engineering GmbH and LanzaTech, Inc.

25. Proprietary Information Agreement, dated as of No 19, 2014, by and between Concord Blue Energy, Inc., and W2E International Corp.

26. Office Lease, dated as of May 16, 2012, by and between Douglas Emmett and Concord Blue Energy, Inc.

27. 1st Amendment to Office Lease, dated as of Jun 19, 2015, by and between Douglas Emmett and Concord Blue Energy, Inc.

28. Amended and Restated Operating Agreement of Concord Blue Eagar, LLC (f/k/a Concord

Blue Development USA, LLC), dated as of May 7, 2012, by and between Concord Blue Energy, Inc. and Western Energy Solution, LLC.

29. First Amendment to Amended and Restated Operating Agreement of Good Earth Power AZ, LLC, dated as of Jan 1, 2015, by and among ZR FEC LTD (principal owner and manager), Concord Blue Eagar, LLC, Western Energy Solutions, LLC, Concord Blue Energy, Inc., Christine Diane Cooley, Marlin A. Johnson, and Patricia S. Johnson. (*A minority interest in Good Earth Power AZ, LLC is held by the Company*)

30. Operating Agreement of Concord Blue Virgin Islands, LLC, dated as of March 5, 2015, by and between Concord Blue Development, LLC and Leeward Renewables, LLC.

## SCHEDULE 3.01(p)

## ORDINARY COURSE OF BUSINESS

1. Convertible Promissory Note, dated as of July 1, 2015, by and between CBD and Berger Group Holdings, Inc., in the principal amount of $475,000.00.

2. Asset Construction and Usage Agreement, dated as of Oct 9, 2014, by and between Lockheed Martin Corporation Mission Systems and Training and Concord Blue Energy, Inc.

3. Loan payable due to Christopher Thannhaeuser (individual), CT Power GmbH and Concord Blue Engineering GmbH in the approximate aggregate amount of $1,077,325.

4. Loan payable to Western Energy Solutions, LLC in the approximate amount of $425,000.

5. Back salary payable to Greg Bilson in the approximate amount of $136,000.

6. Back salary payable to Wesley Bilson in the approximate amount of $465,000.

7. Back salary payable to Christopher Thannhaeuser in the approximate amount of $240,000.

8. Federal income taxes payable in the approximate amount of $152,426.

9. Amended and Restated Project Development Agreement, dated as of Feb 19, 2016, by and between Concord Blue Energy, Inc. and Concord Blue Development, LLC.

10. Exclusive Intellectual Property License Agreement, dated as of March 13, 2015, by and between Concord Blue Patents, LLC and Concord Blue Energy, Inc.

11. Asset Construction and Usage Agreement, dated as of Oct 9, 2014, by and between Lockheed Martin Corporation Mission Systems and Training and Concord Blue Energy, Inc.

12. License of Intellectual Property and Technology Rights Agreement, dated as of Oct 9, 2014, by and between Concord Blue Engineering GmbH and Lockheed Martin Corporation.

13. Proprietary Information Agreement, dated as of Oct 3, 2011, by and among Lockheed Martin Corporation, CBES Global, LLC, and Concord Blue Engineering GmbH.

14. 1st Amendment to Proprietary Information Agreement, dated as of Mar 26, 2012, by and among Lockheed Martin Corporation, Concord Blue Energy Services, LLC, and Concord Blue Engineering GmbH.

15. 2nd Amendment to Proprietary Information Agreement, dated as of Jul 25, 2013, by and among Lockheed Martin Corporation, Concord Blue Energy Services, LLC, and Concord Blue Engineering GmbH.

16. 3rd Amendment to Proprietary Information Agreement, dated as of Apr 3, 2014, by and

among Lockheed Martin Corporation, Concord Blue USA, Inc., and Concord Blue Engineering GmbH.

17. Teaming Agreement, dated as of Jul 25, 2013, by and between Concord Blue USA, Inc., and Lockheed Martin Corporation.

18. 1st Amendment to Teaming Agreement, dated as of Dec 18, 2015, by and among Concord Blue Energy, Inc., Concord Blue Development, LLC, and Lockheed Martin Corporation.

19. Concord Blue/Louis Berger Biomass/Waste to Energy/Synthetic Fuels Cooperation Indicative Terms and Conditions Sheet, dated as of Dec 23, 2015, by and between Louis Berger Services and Concord Blue Energy, Inc. (not yet countersigned, but has been approved for signature by Louis Berger).

20. Proprietary Information Agreement, dated as of Jan 27, 2014, by and between Louis Berger Group, Inc. and Concord Blue Energy, Inc.

21. Master License Agreement, dated as of Oct 29, 2014, by and between Concord Blue Engineering GmbH and W2E international Corp.

22. Service Agreement, dated as of November 17, 2015, by and between Concord Blue Energy, Inc. and Groupo Almeida.

23. Proprietary Information Agreement, dated as of July 22, 2015, by and between Groupo Almeida and Concord Blue Energy, Inc.

24. Amended & Restated Shareholders Agreement, dated as of Dec 18, 2014, by and among Concord Blue Energy, Inc., Concord Blue Engineering GmbH, and Western Energy Solutions, LLC.

25. Additional Shareholder Joinder to Amended & Restate Shareholder Agreement, dated as of Dec 29, 2014, by and between Concord Blue Energy, Inc., and Stefan Burmester.

26. Burmester Stock Subscription Agreement, dated as of Dec 29, 2014, by and between Concord Blue Energy, Inc., and Stefan Burmester.

27. Engagement Agreement Providing for Investment Banking Services, dated as of July 28, 2014, by and between Concord Blue Energy, Inc., and Drexel Hamilton LLC (45 day notice of cancellation has been provided on Feb 9, 2016 for termination of engagement).

28. Amendment to Engagement Agreement Providing for Investment Banking Services, dated as of Aug 12, 2014, by and between Concord Blue Energy, Inc., and Drexel Hamilton LLC (45 day notice of cancellation has been provided on Feb 9, 2016 for termination of engagement).

29. Proprietary Information Agreement, dated as of May 5, 2014, by and between Concord Blue USA, Inc., and Drexel Hamilton LLC.

30. Proprietary Information Agreement, dated as of Jan 30, 2013, by and between Concord Blue Engineering GmbH and LanzaTech, Inc.

31. Proprietary Information Agreement, dated as of No 19, 2014, by and between Concord Blue Energy, Inc., and W2E International Corp.

32. Office Lease, dated as of May 16, 2012, by and between Douglas Emmett and Concord Blue Energy, Inc.

33. 1st Amendment to Office Lease, dated as of Jun 19, 2015, by and between Douglas Emmett and Concord Blue Energy, Inc.

34. Amended and Restated Operating Agreement of Concord Blue Eagar, LLC (f/k/a Concord Blue Development USA, LLC), dated as of May 7, 2012, by and between Concord Blue Energy, Inc. and Western Energy Solution, LLC.

35. First Amendment to Amended and Restated Operating Agreement of Good Earth Power AZ, LLC, dated as of Jan 1, 2015, by and among ZR FEC LTD (principal owner and manager), Concord Blue Eagar, LLC, Western Energy Solutions, LLC, Concord Blue Energy, Inc., Christine Diane Cooley, Marlin A. Johnson, and Patricia S. Johnson. (*A minority interest in Good Earth Power AZ, LLC is held by the Company*)

36. Operating Agreement of Concord Blue Virgin Islands, LLC, dated as of March 5, 2015, by and between Concord Blue Development, LLC and Leeward Renewables, LLC.

**SCHEDULE 3.01(q)**

**FINANCIAL STATEMENTS**

[Attached]

**FENTON & ROSS**

AN ACCOUNTANCY CORPORATION

**CONCORD BLUE ENERGY, INC.**

**COMPILED FINANCIAL STATEMENTS**
**YEAR ENDED DECEMBER 31, 2014**

10866 Wilshire Blvd., Suite 1250 • Los Angeles, CA 90024 • Tel: (310) 477-6440 • Fax: (310) 477-6474 • E-mail: dfenton@fentonross.com

# CONCORD BLUE ENERGY, INC.

## YEAR ENDED DECEMBER 31, 2014

## CONTENTS

|  | Page |
|---|---|
| **Accountants' compilation report** | 1 |
| **Financial statements** |  |
| Balance sheet | 2 |
| Statement of income | 3 |
| Statement of stockholders' equity | 4 |

# FENTON & ROSS
## AN ACCOUNTANCY CORPORATION

---

**ACCOUNTANTS' COMPILATION REPORT**

Board of Directors
Concord Blue Energy, Inc.

We have compiled the accompanying balance sheet of Concord Blue Energy, Inc. (the "Company") for the year ended December 31, 2014, and the related statements of income and stockholders' equity for the year then ended.  We have not audited or reviewed the accompanying financial statements and, accordingly, do not express an opinion or provide any assurance about whether the financial statements are in accordance with the accounting principles generally accepted in the United States of America.

Management is responsible for the preparation and fair presentation of the financial statements in accordance with accounting principles generally accepted in the United States of America, and for designing, implementing, and maintaining internal control relevant to the preparation and fair presentation of the financial statements.

Our responsibility is to conduct the compilation in accordance with Statements on Standards for Accounting and Review Services issued by the American Institute of Certified Public Accountants.  The objective of a compilation is to assist management in presenting financial information in the form of financial statements without undertaking to obtain or provide any assurance that there are no material modifications that should be made to the financial statements.

Accounting principles generally accepted in the United States of America require that the ownership by one reporting entity, directly or indirectly, of more than 50 percent of the outstanding units of another entity to consolidate that entity in its financial statements. Management has informed us that the Company's financial statements do not include the accounts of Concord Blue Eager, LLC which the Company owns a 60 percent controlling interest. The effect of this departure on the financial statements has not been determined.

Management has elected to omit substantially all of the disclosures and the statement of cash flows required by accounting principles generally accepted in the United States of America.  If the omitted disclosures were included in the financial statements, they might influence the user's conclusions about the company's financial position, results of operations, and cash flows. Accordingly, these financial statements are not designed for those who are not informed about such matters.

*Fenton & Ross*

Los Angeles, California
February 24, 2015

1

# CONCORD BLUE ENERGY, INC.

## BALANCE SHEET
## DECEMBER 31, 2014

### ASSETS

**Current assets:**

| | | |
|---|---|---:|
| Cash | $ | 1,218,695 |
| Deferred tax asset | | 82,100 |
| Due from related party | | 47,046 |
| Total current assets | | 1,347,841 |
| **Property, plant & equipment,** net of accumulated depreciation | | 16,434 |
| **Investments** | | 440,000 |
| **Due from related party** | | 1,750,000 |
| **Intangible asset** | | 8,360,000 |
| **Other assets** | | 18,027 |
| **Total assets** | $ | 11,932,302 |

### LIABILITIES AND STOCKHOLDER'S EQUITY

**Current liabilities:**

| | | |
|---|---|---:|
| Accounts payable and accrued expenses | $ | 400,111 |
| Income tax payable | | 188,334 |
| Notes payable shareholders | | 1,151,593 |
| Total current liabilities | | 1,740,038 |

**Stockholder's equity:**

| | |
|---|---:|
| Common stock, $.01 par value:  1,000,000 shares authorized; 203,563 shares issued and outstanding | 2,036 |
| Additional paid-in capital | 10,213,964 |
| Retained earnings | (23,736) |
| | 10,192,264 |
| **Total liabilities and stockholders' equity** $ | 11,932,302 |

See accountants' compilation report.

# CONCORD BLUE ENERGY, INC.

## STATEMENT OF INCOME
## YEARE ENDED DECEMBER 31, 2014

|  | Amount |
|---|---|
| **Revenue,** net | $ 2,000,000 |
| **Operating expenses** | 1,130,979 |
| **Income from operations** | 869,021 |
| **Income tax expense** | 260,334 |
| **Net income** | $ 608,687 |

See accountants' compilation report.

Schedule 3.01(q) - 5

3

# CONCORD BLUE ENERGY, INC.

## STATEMENT OF STOCKHOLDERS' EQUITY
## YEAR ENDED DECEMBER 31, 2014

| | Common stock | | Additional paid-in capital | Retained earnings | Total |
|---|---|---|---|---|---|
| | Shares issued | Amount | | | |
| Balance, December 31, 2013 | 200,000 | $ 2,000 | $ 8,998,000 | $ (632,423) | $ 8,367,577 |
| Sale of common stock | 3,563 | 36 | 1,215,964 | | 1,216,000 |
| Net income | | | - | 608,687 | 608,687 |
| Balance, December 31, 2014 | 203,563 | $ 2,036 | $ 10,213,964 | $ (23,736) | $ 10,192,264 |

See accountants' compilation report.

# FENTON & ROSS
## AN ACCOUNTANCY CORPORATION

**CONCORD BLUE ENERGY, INC.**

**COMPILED FINANCIAL STATEMENTS
YEAR ENDED DECEMBER 31, 2015**

10866 Wilshire Blvd., Suite 1250 • Los Angeles, CA 90024 • Tel: (310) 477-6440 • Fax: (310) 477-6474 • E-mail: dfenton@fentonross.com

Schedule 3.01(q) - 7

# CONCORD BLUE ENERGY, INC.

## YEAR ENDED DECEMBER 31, 2015

<br>

### CONTENTS

|  | Page |
|---|---|
| **Accountants' compilation report** | 1 |
| **Financial statements** | |
| Balance sheet | 2 |
| Statement of operations | 3 |
| Statement of stockholders' equity | 4 |

# FENTON & ROSS
## AN ACCOUNTANCY CORPORATION

### ACCOUNTANTS' COMPILATION REPORT

Board of Directors
Concord Blue Energy, Inc.

Management is responsible for the accompanying financial statements of Concord Blue Energy, Inc. (the "Company"), which comprise the balance sheet as of December 31, 2015, and the related statement of operations and retained earnings for the year then ended in accordance with accounting principles generally accepted in the United States of America. We have performed a compilation engagement in accordance with Statements on Standards for Accounting and Review Services promulgated by the Accounting and Review Services Committee of the AICPA. We did not audit or review the financial statements nor were we required to perform any procedures to verify the accuracy or completeness of the information provided by management. Accordingly, we do not express an opinion, a conclusion, nor provide any form of assurance on these financial statements.

Accounting principles generally accepted in the United States of America require that the ownership by one reporting entity, directly or indirectly, of more than 50 percent of the outstanding units of another entity to consolidate that entity in its financial statements. Management has informed us that the Company's financial statements do not include the accounts of Concord Blue Eager, LLC which the Company owns a 60 percent controlling interest. Management has not determined the effect of this departure on the financial statements.

Management has elected to omit substantially all of the disclosures and the statement of cash flows required by accounting principles generally accepted in the United States of America. If the omitted disclosures and the statement of cash flows were included in the financial statements, they might influence the user's conclusions about the Company's financial position, results of operations, and cash flows. Accordingly, the financial statements are not designed for those who are not informed about such matters.

*Fenton & Ross*

Los Angeles, California
January 28, 2016

1

# CONCORD BLUE ENERGY, INC.

**BALANCE SHEET**
**DECEMBER 31, 2015**

---

### ASSETS

**Current assets:**

| | | |
|---|---|---:|
| Cash | $ | 8,361 |
| Deferred tax asset | | 424,700 |
| Due from related party | | 181,506 |
| Total current assets | | 614,567 |

| | | |
|---|---|---:|
| **Property, plant & equipment,** net of accumulated depreciation | | 13,493 |
| **Investments** | | 1,440,000 |
| **Due from related party** | | 1,750,000 |
| **Intangible asset** | | 8,360,000 |
| **Other assets** | | 18,027 |
| **Total assets** | $ | 12,196,087 |

### LIABILITIES AND STOCKHOLDERS' EQUITY

**Current liabilities:**

| | | |
|---|---|---:|
| Accounts payable and accrued expenses | $ | 958,268 |
| Income tax payable | | 152,426 |
| Convertible debt | | 475,000 |
| Notes payable shareholders | | 1,125,663 |
| Total current liabilities | | 2,711,357 |

**Stockholders' equity:**

| | |
|---|---:|
| Common stock, $.01 par value:  1,000,000 shares authorized; | |
| 203,563 shares issued and outstanding | 2,036 |
| Additional paid-in capital | 10,213,964 |
| Retained earnings | (731,270) |
| | 9,484,730 |

| | | |
|---|---|---:|
| **Total liabilities and stockholders' equity** | $ | 12,196,087 |

See accountants' compilation report.

2

# CONCORD BLUE ENERGY, INC.

## STATEMENT OF OPERATIONS
## YEAR ENDED DECEMBER 31, 2015

|  | Amount |
|---|---|
| **Revenue,** net | $ 368,999 |
| **Operating expenses** | 1,399,583 |
| **Loss from operations** | (1,030,584) |
| **Other expense** | |
| Interest, net | (55,368) |
| **Loss before income tax benefit** | (1,085,952) |
| **Income tax benefit** | 378,418 |
| **Net loss** | $ (707,534) |

See accountants' compilation report.

Schedule 3.01(q) - 11

3

**CONCORD BLUE ENERGY, INC.**

**STATEMENT OF STOCKHOLDERS' EQUITY**
**YEAR ENDED DECEMBER 31, 2015**

| | Common stock | | Additional paid-in capital | Retained earnings | Total |
|---|---|---|---|---|---|
| | Shares issued | Amount | | | |
| **Balance, December 31, 2014** | 203,563 | $ 2,036 | $ 10,213,964 | $ (23,736) | $ 10,192,264 |
| **Net loss** | | | - | (707,534) | (707,534) |
| **Balance, December 31, 2015** | 203,563 | $ 2,036 | $ 10,213,964 | $ (731,270) | $ 9,484,730 |

See accountants' compilation report.                                                    4

**SCHEDULE 3.01(t)**

**INSURANCE**

[Attached]

Concord Blue Energy, Inc.,
Concord Blue Eagar, LLC, Concord Blue Development, LLC

| Coverage | Carrier | Premium | Effective Date | Policy Number | Limits | Deductibles/Add'l Terms |
|---|---|---|---|---|---|---|
| **Commercial General Liability** | Crum & Forster Specialty | $35,974.47 | 1-17-2016/1-17-2017 | EPK111240 | **Commercial General Liability - Occurrence - LIMITS INCLUDE DEFENSE COSTS UNDER CONTRACTORS POLLUTION COVERAGE PART**<br>$ 2,000,000  General Aggregate<br>$ 2,000,000  Products/Completed Operations, aggregate<br>$ 1,000,000  Personal and Advertising Injury<br>$ 1,000,000  Each Occurrence<br>$ 100,000  Fire Damage<br>$10,000  Medical Payments<br>**Contractors Pollution Liability Occurrence Form with Mold Exception - Claims Made, Retro Date 1/17/2015**<br><br>$1,000,000  Contractors Pollution Liability<br>Not Covered Onsite Cleanup Pollution<br>**Employee Benefit Liability - Claims Made**<br>$ 1,000,000  Employee Benefits Liability - Each Claim<br>$ 1,000,000  Employee Benefits Liability - Aggregate<br>**Hired Auto and Non Owned Auto Liability** | 1)Excludes Intercompany Sales/Suits & Foreign Sales<br>2)Non Auditable<br>3)Primary and Noncontributor A/I W WOS<br><br><br>$5,000  Deductible BI/PD & Pollution<br>$5,000  Deductible |
| **Automobile Liability** | | | | | $1,000,000  Liability, Combined Single Limit, Non Owned/Hired Only | |
| **Workers Compensation** | State Compensation Insurance Fund<br>WC Fees & Assessments | $3,317<br>+ taxes & fees<br>$918 deposit<br>quarterly adj | 10-26-2015/10-26-2016 | 9076983-15 | **Statutory Workers' Compensation**<br><br>$ 1,000,000  Accident Limit<br>$ 1,000,000  Disease - Per Person<br>$ 1,000,000  Disease - Policy Aggregate | California<br><br>Excludes: Wesley Bilson<br>Excludes: Greg Bilson<br>Included Blanket WOS |
| **Foreign Liability** | Insurance Co of the State of PA | $11,862 | 12-6-2015/ 1-17-2017 | WS11006546 | **Foreign Commercial General Liability**<br><br>$ 5,000,000  Each Occurrence<br>$ 5,000,000  Aggregate<br>$ 25,000  Medical Expense<br>$ 5,000,000  Aggregate<br>**Foreign Voluntary Workers Compensation & Employers Liability**<br>$ 1,000,000  Supplemental Repatriation Expense<br>$ 1,000,000  Employers Liability<br>**Foreign Travel Accident and Sickness**<br><br>100,000  Accidental Death & Dismemberment<br>100,000  Emergency Medical Evacuation<br>250,000  Kidnap Ransom | |
| **Professional Liability - Claims Made** | Ironshore Specialty Ins | $10,000 | 5-2-2015/5-2-2016 | 2012101 | $1,000,000  Each Occurrence<br>$1,000,000  Aggregate<br>Retro Date: 5/2/2014 | $25,000  Deductible<br>See Definition of Consulting Services Endorsement #5 |
| **Excess Liability** | Crum & Forster Specialty | $26,110.37 | 1-17-2016/1-17-2017 | EFX104907 | $5,000,000  Each Occurrence<br>$5,000,000  Aggregate | $10,000  Retention<br><br>Excess of CGL, Contractor's Pollution,  Non Owned/Hired Auto Liability & Employers Liability only |

## SCHEDULE 3.01(w)

## INTELLECTUAL PROPERTY RIGHTS

1. Agreement and Omnibus Amendment, dated as of March 8, 2016, by and between Concord Blue Patent GmbH, Concord Blue Engineering GmbH, Concord Blue Patents, LLC, Concord Blue Energy, Inc., and Concord Blue Development, LLC.

2. Indemnification Agreement, dated as of March 8, 2016, by and between the Municipal Employees' Retirement System of Michigan, Concord Blue Energy, Inc., Concord Blue Development, LLC, Concord Blue Patents GmbH, and Concord Blue Engineering GmbH.

3. PCT/EP 2010/007798 concerning a method regarding the pyrolysis and reformation of water-containing organic material components was filed on December 20, 2010.

4. An invention related to a process for generating energy from organic materials and or biomass on the basis on which a Indian patent 1312/ MUM/2009 filed 28th May 2009 and an international application number PCT / IN2009/000644, filed 13th November 2009.

5. (WO2002038706) METHOD FOR GASIFICATION OF LIQUID TO PASTY ORGANIC SUBSTANCES AND SUBSTANCE having a United States National Stage Application filed March 25, 2002 with Application Serial Number:  10/416,137.

6. (WO2001021730) METHOD FOR GASIFYING ORGANIC MATERIALS AND MIXTURES OF MATERIALS having a United States National Stage Application filed March 25, 2002 with Application Serial Number: 10/089,012 and issued as U.S. Patent No. 7,077,878.

7. (WO2008046578) METHOD FOR PRODUCING A PRODUCT GAS RICH IN HYDROGEN having a United States National Stage Application filed May 13, 2009 with Application Serial Number: 12/311,919.

8. International Trademark has been filed for Concord Blue.

9. International Trademark has been filed for Concord Blue Reformer.



10. International Trademark has been filed for the Concord Blue logo.

**SCHEDULE 3.01(y)**

**LEASED REAL PROPERTY**

Real property leased under the following leases:

1.      Office Lease, dated as of May 16, 2012, by and between Douglas Emmett and Concord Blue Energy, Inc.

2.      1st Amendment to Office Lease, dated as of Jun 19, 2015, by and between Douglas Emmett and Concord Blue Energy, Inc.

3.      Lease Agreement, dated as of March 3, 2015, by and between the Town of Eagar and CB Eagar.

## SCHEDULE 3.01(cc)

## AFFILIATE TRANSACTIONS

1.  Promissory Note, dated as of December 20, 2012, by the Company in favor of Seller, in the principal amount of $44,714.00.

2.  Promissory Note, dated as of May 8, 2012, by the Company in favor of Western Energy Solutions, LLC, in the principal amount of $440,000.

3.  Equipment Purchase Agreement, dated as of September 4, 2013, by and between the Company and Seller.

4.  Acknowledgement and Agreement, dated as of July 15, 2013, by and between the Company and Seller.

5.  Exclusive Intellectual Property License Agreement, dated as of March 13, 2015, by and between the Company and Concord Blue Patents LLC.

6.  Amended and Restated Project Development Agreement, dated as of Feb 19, 2016, by and between Concord Blue Energy, Inc. and Concord Blue Development, LLC.

7.  Exclusive Intellectual Property License Agreement, dated as of March 13, 2015, by and between Concord Blue Patents, LLC and Concord Blue Energy, Inc.

8.  Proprietary Information Agreement, dated as of Oct 3, 2011, by and among Lockheed Martin Corporation, CBES Global, LLC, and Concord Blue Engineering GmbH.

9.  1st Amendment to Proprietary Information Agreement, dated as of Mar 26, 2012, by and among Lockheed Martin Corporation, Concord Blue Energy Services, LLC, and Concord Blue Engineering GmbH.

10. 2nd Amendment to Proprietary Information Agreement, dated as of Jul 25, 2013, by and among Lockheed Martin Corporation, Concord Blue Energy Services, LLC, and Concord Blue Engineering GmbH.

11. 3rd Amendment to Proprietary Information Agreement, dated as of Apr 3, 2014, by and among Lockheed Martin Corporation, Concord Blue USA, Inc., and Concord Blue Engineering GmbH.

12. 1st Amendment to Teaming Agreement, dated as of Dec 18, 2015, by and among Concord Blue Energy, Inc., Concord Blue Development, LLC, and Lockheed Martin Corporation.

13. Amended and Restated Operating Agreement of Concord Blue Eagar, LLC (f/k/a Concord Blue Development USA, LLC), dated as of May 7, 2012, by and between Concord Blue Energy, Inc. and Western Energy Solution, LLC.

14. First Amendment to Amended and Restated Operating Agreement of Good Earth Power AZ, LLC, dated as of Jan 1, 2015, by and among ZR FEC LTD (principal owner and manager), Concord Blue Eagar, LLC, Western Energy Solutions, LLC, Concord Blue

Energy, Inc., Christine Diane Cooley, Marlin A. Johnson, and Patricia S. Johnson. (*A minority interest in Good Earth Power AZ, LLC is held by the Company*)

15. Salaries, bonuses and benefits paid to Founder, Greg Bilson and Wesley Bilson.

16. Loan payable due to Christopher Thannhaeuser (individual), CT Power GmbH and Concord Blue Engineering GmbH in the approximate aggregate amount of $1,077,325.

**SCHEDULE 3.02(b)(i)**

**CERTIFICATE OF INCORPORATION**

[Attached]

# Delaware

PAGE 1

## The First State

I, JEFFREY W. BULLOCK, SECRETARY OF STATE OF THE STATE OF
DELAWARE, DO HEREBY CERTIFY THE ATTACHED IS A TRUE AND CORRECT
COPY OF THE CERTIFICATE OF INCORPORATION OF "CONCORD BLUE
ENERGY, INC.", FILED IN THIS OFFICE ON THE ELEVENTH DAY OF
APRIL, A.D. 2012, AT 6:21 O'CLOCK P.M.

A FILED COPY OF THIS CERTIFICATE HAS BEEN FORWARDED TO THE
KENT COUNTY RECORDER OF DEEDS.

5138503   8100

120419769

You may verify this certificate online
at corp.delaware.gov/authver.shtml

Jeffrey W. Bullock, Secretary of State

AUTHENTICATION: 9496999

DATE: 04-11-12

State of Delaware
Secretary of State
Division of Corporations
Delivered 06:21 PM 04/11/2012
FILED 06:21 PM 04/11/2012
SRV 120419769 - 5138503 FILE

# STATE *of* DELAWARE
# CERTIFICATE *of* INCORPORATION
# *A* STOCK CORPORATION

- **First:** The name of this Corporation is CONCORD BLUE ENERGY, INC.

- **Second:** Its registered office in the State of Delaware is to be located at
  2140 S. Dupont Highway      Street, in the City of Camden
  County of Kent            Zip Code 19934     . The registered agent in
  charge thereof is PARACORP INCORPORATED

  **Third:** The purpose of the corporation is to engage in any lawful act or activity for
  which corporations may be organized under the General Corporation Law of
  Delaware.

- **Fourth:** The amount of the total stock of this corporation is authorized to issue is
  1,000,000            shares (number of authorized shares) with a par value of
  0.0100000000         per share.

- **Fifth:** The name and mailing address of the incorporator are as follows:
  Name Sharon R. Flavin
  Mailing Address 10866 Wilshire Blvd., Suite 1500
            Los Angeles, CA      Zip Code 90024

- **I, The Undersigned,** for the purpose of forming a corporation under the laws of the
  State of Delaware, do make, file and record this Certificate, and do certify that the
  facts herein stated are true, and I have accordingly hereunto set my hand this
  11th     day of APRIL        , A.D. 20 12    .

  BY: _____
            (Incorporator)

  NAME: SHARON R. FLAVIN
            (type or print)

**SCHEDULE 3.02(b)(ii)**

**BYLAWS**

[Attached]

# BY-LAWS
## OF
## CONCORD BLUE ENERGY, INC.
### a Delaware Corporation

### ARTICLE I    OFFICES

1.1    <u>Registered Office</u>: The registered office shall be established and maintained at 2140 S. Dupont Highway, Camden, Delaware 19934, and PARACORP INCORPORATED shall be the registered agent of the Corporation in charge thereof.

1.2    <u>Other Offices</u>: The Corporation may have other offices, either within or outside the State of Delaware, at such place or places as the Board of Directors may from time to time appoint or the business of the Corporation may require, provided, however, that the Corporation's books and records shall be maintained at such place within the continental United States as the Board of Directors shall from time to time designate.

### ARTICLE II    STOCKHOLDERS

2.1    <u>Place of Stockholders' Meetings</u>: All meetings of the stockholders of the Corporation shall be held at such place or places, within or outside the State of Delaware as may be fixed by the Board of Directors from time to time or as shall be specified in the respective notices thereof. The Board of Directors may, in its sole discretion, determine that the meeting shall not be held at any designated place, but may instead be held solely by means of remote communication. Stockholders and proxyholders not physically present at a meeting of stockholders may, by means of remote communication participate in a meeting of stockholders and be deemed present in person and vote at a meeting of stockholders whether such meeting is to be held at a designated place or solely by means of remote communication, provided that (I) the Corporation shall implement reasonable measures to verify that each person deemed present and permitted to vote at the meeting by means of remote communication is a stockholder or proxyholder, (ii) the Corporation shall implement reasonable measures to provide such stockholders and proxyholders a reasonable opportunity to participate in the meeting and to vote on matters submitted to stockholders, including an opportunity to read or hear the proceedings of the meeting substantially concurrently with such proceedings, and (iii) if any stockholder or proxyholder votes or takes other action at the meeting by means of remote communication, a record of such vote or other action shall be maintained by the Corporation.

2.2    <u>Date and Hour of Annual Meetings of Stockholders</u>:    An annual meeting of stockholders shall be held for the election of directors and any other proper purpose on a date and a time designated by or in the manner provided herein. If there be a failure to hold the annual meeting or to take action by written consent to elect Directors in lieu of an annual meeting for a period of 30 days after the date designated for the annual meeting, or if no date has been designated, for a period of 13 months after the latest to occur of the organization of the Corporation, its last annual meeting or the last action by written consent to elect Directors in lieu of an annual meeting, the Court of Chancery may summarily order a meeting to be held upon the application of any stockholder or Director.

2.3    Purpose of Annual Meetings:  At each annual meeting, the stockholders shall elect the members of the Board of Directors for the succeeding year.  At any such annual meeting any further proper business may be transacted.

2.4    Special Meetings of Stockholders:  Special meetings of the stockholders or of any class or series thereof entitled to vote may be called by the Board of Directors, President or by the Chairman of the Board of Directors, or at the request in writing by stockholders of record owning at least fifty (50%) percent of the issued and outstanding voting shares of common stock of the Corporation.

2.5    Notice of Meetings of Stockholders:  Except as otherwise expressly required or permitted by law, not less than ten days nor more than sixty days before the date of every stockholders' meeting the Secretary shall give to each stockholder of record entitled to vote at such meeting, written notice, served personally by mail or by telegram, stating the following:  the place, date and hour of the meeting, the means of remote communications, if any, by which stockholders and proxyholders may be deemed to be present in person and vote at such meeting; and, in the case of a special meeting, the purpose or purposes for which the meeting is called.  Such notice, if mailed shall be deemed to be given when deposited in the United States mail, postage prepaid, directed to the stockholder at his address for notices to such stockholder as it appears on the records of the Corporation.  Any notice to stockholders shall be effective if given by a form of electronic transmission consented to by the stockholder to whom notice is to be given.

2.6    Quorum of Stockholders:  (a)  Unless otherwise provided by the Certificate of Incorporation or by law, at any meeting of the stockholders, the presence in person or by proxy of stockholders entitled to cast a majority of the votes thereat shall constitute a quorum.   The withdrawal of any stockholder after the commencement of a meeting shall have no effect on the existence of a quorum, after a quorum has been established at such meeting.

(b)    At any meeting of the stockholders at which a quorum shall be present, a majority of voting stockholders, present in person or by proxy, may adjourn the meeting from time to time without notice other than announcement at the meeting so long as the time, place, if any, and the means of remote communications, if any, by which stockholders and proxyholders may be deemed to be present in person and vote at such adjourned meeting are announced at the meeting at which the adjournment is taken.  In the absence of a quorum, the Officer presiding thereat shall have power to adjourn the meeting from time to time until a quorum shall be present.  Notice of any adjourned meeting, other than announcement at the meeting, shall not be required to be given except as provided in paragraph (d) below and except where expressly required by law.

(c)    At any adjourned session at which a quorum shall be present, any business may be transacted which might have been transacted at the meeting originally called but only those stockholders entitled to vote at the meeting as originally noticed shall be entitled to vote at any adjournment or adjournments thereof, unless a new record date is fixed by the Board of Directors.

(d)    However, if an adjournment is for more than thirty days, or if after the adjournment a new record date is fixed for the adjourned meeting, a notice of the adjourned meeting shall be given to each stockholder of record entitled to vote at the meeting.

2.7    <u>Chairman and Secretary of Meeting</u>: The President, shall preside at meetings of the stockholders. The Secretary shall act as secretary of the meeting or if he is not present, then the presiding Officer may appoint a person to act as secretary of the meeting.

2.8    <u>Voting by Stockholders</u>: Except as may be otherwise provided by the Certificate of Incorporation or these by-laws, at every meeting of the stockholders each stockholder shall be entitled to one vote for each share of voting stock standing in his name on the books of the Corporation on the record date for the meeting. Except as otherwise provided by these by-laws, all elections and questions shall be decided by the vote of a majority in interest of the stockholders present in person or represented by proxy and entitled to vote at the meeting.

2.9    <u>Proxies</u>: Any stockholder entitled to vote at any meeting of stockholders may vote either in person or by proxy. A proxy may be in writing, subscribed by the stockholder or his duly authorized attorney-in-fact, but need not be dated, sealed, witnessed or acknowledged, but no such proxy shall be voted or acted upon after three (3) years from its date, unless the proxy calls for a longer period. A stockholder may authorize another person to act for such stockholder as proxy by transmitting or authorizing the transmission of a telegram, cablegram or other means of electronic transmission to the proxyholder, provided that any such communication must either set forth or be submitted with information from which it can be determined that such communication was authorized by the stockholder.

2.10    <u>Inspectors</u>: The election of Directors and any other vote by ballot at any meeting of the stockholders shall be supervised by one or more inspectors. Such inspectors may be appointed by the presiding Officer before or at the meeting; or if one or both inspectors so appointed shall refuse to serve or shall not be present, such appointment shall be made by the Officer presiding at the meeting.

2.11    <u>List of Stockholders</u>: (a) At least ten days before every meeting of stockholders, the officer who has charge of the stock ledger shall prepare and make a complete list of the stockholders entitled to vote at the meeting, arranged in alphabetical order, and showing the address of each stockholder and the number of shares registered in the name of each stockholder.

(b)    For a period of at least ten days prior to the meeting, such list shall be open to examination by any stockholder for any purpose germane to the meeting, either at the principal place of business of the Corporation during ordinary business hours or on a reasonably accessible electronic network, and the information required to gain access to such list shall be provided with the notice of the meeting. If the meeting is to be held at a designated place, then the list shall be produced and kept at the time and place where the meeting is to be held and may be inspected by any stockholder who is present. If the meeting is to be held solely by means of remote communication, then the list shall be open to inspection of any stockholder during the meeting on a reasonably accessible electronic network and the information required to access such list shall be provided with the notice of the meeting.

(c)    The stock ledger shall be the only evidence as to who are the stockholders entitled to examine the stock ledger, the list required by this Section 2.11 or the books of the Corporation, or to vote in person or by proxy at any meeting of stockholders.

2.12    Procedure at Stockholders' Meetings: Except as otherwise provided by these by-laws or any resolutions adopted by the stockholders or Board of Directors, the order of business and all other matters of procedure at every meeting of stockholders shall be determined by the presiding Officer.

2.13    Action By Consent Without Meeting: Unless otherwise provided by the Certificate of Incorporation, any action required to be taken at any annual or special meeting of stockholders, or any action which may be taken at any annual or special meeting, may be taken without a meeting, without prior notice and without a vote, if a consent in writing, setting forth the action so taken, shall be signed by the holders of outstanding stock having not less than the minimum number of votes that would be necessary to authorize or take such action at a meeting at which all shares entitled to vote thereon were present and voted.  Prompt notice of the taking of the corporate action without a meeting by less than unanimous written consent shall be given to those stockholders who have not consented in writing.  An electronic transmission consenting to an action to be taken and transmitted by a stockholder, member or proxyholder or by a person authorized to act for a stockholder, member or proxyholder, shall be deemed to be written, signed and dated for the purposes of this section provided that such electronic transmission sets forth information from which the Corporation can determine that the electronic transmission was transmitted by the stockholder or proxyholder and the date on which the stockholder or proxyholder transmitted such electronic transmission.  The date on which such electronic transmission is transmitted shall be deemed the date on which such consent was signed.  No consent given by electronic transmission shall be deemed delivered until reproduced in paper and delivered to the Corporation at its registered office in the state, its principal place of business or an Officer having custody of the record book of stockholder meetings in the manner provided by the Board of Directors.

ARTICLE III  DIRECTORS

3.1    Powers of Directors:  The property, business and affairs of the Corporation shall be managed by its Board of Directors which may exercise all the powers of the Corporation except such as are by the law of the State of Delaware or the Certificate of Incorporation or these by-laws required to be exercised or done by the stockholders.

3.2    Number, Method of Election, Terms of Office of Directors:  The number of Directors which shall constitute the Board of Directors shall be Three (3), unless and until otherwise determined by a vote of a majority of the entire Board of Directors or by majority vote of the stockholders given at a special meeting of the stockholders called for that purpose.  Each Director shall hold office until the next annual meeting of stockholders and until his successor is elected and qualified, provided, however, that a Director may resign at any time.  Directors need not be stockholders.  All elections of Directors shall be by written ballot, unless otherwise provided in the Certificate of Incorporation; if authorized by the Board of Directors, such requirement of a written ballot shall be satisfied by a ballot submitted by electronic transmission, provided that any such electronic transmission must either set forth or be submitted with information from which it can be determined that the electronic transmission was authorized by the stockholder or proxyholder.

3.3    Vacancies on Board of Directors; Removal:  (a)  Any Director may resign his office at any time by delivering his resignation in writing or by electronic transmission to the Corporation by delivery to the Chairman of the Board or to the President.  The resignation will take effect at the time specified therein or, if no time is specified, it will be effective at the time of its receipt by the

Corporation. The acceptance of a resignation shall not be necessary to make it effective, unless expressly so provided in the resignation.

(b)    Any vacancy in the authorized number of Directors may be filled by majority vote of the stockholders and any Director so chosen shall hold office until the next annual election of Directors by the stockholders and until his successor is duly elected and qualified or until his earlier resignation or removal.

(c)    Any Director may be removed with or without cause at any time by the majority vote of the stockholders given at a special meeting of the stockholders called for that purpose.

3.4    Meetings of the Board of Directors: (a) The Board of Directors may hold its meetings, both regular and special, either within or outside the State of Delaware.

(b)    Regular meetings of the Board of Directors may be held at such time and place as shall from time to time be determined by resolution of the Board of Directors. No notice of such regular meetings shall be required. If the date designated for any regular meeting shall be a legal holiday, then the meeting shall be held on the next day which is not a legal holiday.

(c)    The first meeting of each newly elected Board of Directors shall be held immediately following the annual meeting of the stockholders for the election of Officers and the transaction of such other business as may come before it. If such meeting is held at the place of the stockholders' meeting, no notice thereof shall be required.

(d)    Special meetings of the Board of Directors shall be held whenever called by direction of the Chairman of the Board or the President or at the written request of any one Director.

(e)    The Secretary shall give notice to each Director of any special meeting of the Board of Directors by mailing the same at least three days before the meeting or by telegraphing, telexing, or delivering the same not later than the date before the meeting.

Unless required by law, such notice need not include a statement of the business to be transacted at, or the purpose of, any such meeting. Any and all business may be transacted at any meeting of the Board of Directors. No notice of any adjourned meeting need be given.

No notice to or waiver by any Director shall be required with respect to any meeting at which the Director is present.

3.5    Quorum and Action: Unless provided otherwise by law or by the Certificate of Incorporation or these by-laws, a majority of the Directors shall constitute a quorum for the transaction of business; but if there shall be less than a quorum at any meeting of the Board, a majority of those present may adjourn the meeting from time to time. The vote of a majority of the Directors present at any meeting at which a quorum is present shall be necessary to constitute an act of the Board of Directors.

3.6    Presiding Officer and Secretary of the Meeting: The President, or, in his absence a member of the Board of Directors selected by the members present, shall preside at meetings of the

Board. The Secretary shall act as secretary of the meeting, but in his absence the presiding Officer may appoint a secretary of the meeting.

3.7    Action by Consent Without Meeting:  Any action required or permitted to be taken at any meeting of the Board of Directors or of any committee thereof may be taken without a meeting if all members of the Board or committee, as the case may be, consent thereto in writing or by electronic transmission, and the writing or writings or electronic transmission or electronic transmissions are filed with the minutes or proceedings of the Board or committee.  Such filing shall be in paper form if the minutes are maintained in paper form and shall be in electronic form if the minutes are maintained in electronic form.

3.8    Action by Telephonic Conference:  Members of the Board of Directors, or any committee designated by such board, may participate in a meeting of such board or committee by means of conference telephone or other communications equipment by means of which all persons participating in the meeting can hear each other, and participation in such a meeting shall constitute presence in person at such meeting.

3.9    Committees:    The Board of Directors shall, by resolution or resolutions passed by a majority of Directors, designate one or more committees, each of such committees to consist of one or more Directors of the Corporation, for such purposes as the Board shall determine.  The Board may designate one or more Directors as alternate members of any committee, who may replace any absent or disqualified member at any meeting of such committee.

3.10    Compensation of Directors:  Directors shall receive such reasonable compensation for their service on the Board of Directors or any committees thereof, whether in the form of salary or a fixed fee for attendance at meetings, or both, with expenses, if any, as the Board of Directors may from time to time determine.  Nothing herein contained shall be construed to preclude any Director from serving in any other capacity and receiving compensation therefor.

ARTICLE IV  OFFICERS

4.1    Officers, Title, Elections, Terms:  (a)  The elected Officers of the Corporation shall be a President, a Treasurer and a Secretary, and such other Officers as the Board of Directors shall deem advisable.  The Officers shall be elected by the Board of Directors at its annual meeting following the annual meeting of the stockholders, to serve at the pleasure of the Board or otherwise as shall be specified by the Board at the time of such election and until their successors are elected and qualified.

(b)    The Board of Directors may elect or appoint at any time, and from time to time, additional Officers or agents with such duties as it may deem necessary or desirable.  Such additional Officers shall serve at the pleasure of the Board or otherwise as shall be specified by the Board at the time of such election or appointment.  Two or more offices may be held by the same person.

(c)    Any vacancy in any office may be filled for the unexpired portion of the term by the Board of Directors.

(d)      Any Officer may resign his office at any time. Such resignation shall be made in writing and shall take effect at the time specified therein or, if no time be specified, at the time of its receipt by the Corporation. The acceptance of a resignation shall not be necessary to make it effective, unless expressly so provided in the resignation.

(e)      The salaries of all Officers of the Corporation shall be fixed by the Board of Directors.

4.2      Removal of Elected Officers: Any elected Officer may be removed at any time, either with or without cause, by resolution adopted at any regular or special meeting of the Board of Directors by a majority of the Directors then in office.

4.3      Duties: (a) President: The President shall be the principal executive Officer of the Corporation and, subject to the control of the Board of Directors, shall supervise and control all the business and affairs of the Corporation. He shall, when present, preside at all meetings of the stockholders and of the Board of Directors. He shall see that all orders and resolutions of the Board of Directors are carried into effect (unless any such order or resolution shall provide otherwise), and in general shall perform all duties incident to the office of president and such other duties as may be prescribed by the Board of Directors from time to time.

(b)      Treasurer: The Treasurer shall:  (1) have charge and custody of and be responsible for all funds and securities of the Corporation; (2) receive and give receipts for moneys due and payable to the Corporation from any source whatsoever; (3) deposit all such moneys in the name of the Corporation in such banks, trust companies, or other depositaries as shall be selected by resolution of the Board of Directors; and (4) in general perform all duties incident to the office of treasurer and such other duties as from time to time may be assigned to him by the President or by the Board of Directors. He shall, if required by the Board of Directors, give a bond for the faithful discharge of his duties in such sum and with such surety or sureties as the Board of Directors shall determine.

(c)      Secretary: The Secretary shall: (1) keep the minutes of the meetings of the stockholders, the Board of Directors, and all committees, if any, of which a secretary shall not have been appointed, in one or more books provided for that purpose; (2) see that all notices are duly given in accordance with the provisions of these by-laws and as required by law; (3) be custodian of the corporate records and of the seal of the Corporation and see that the seal of the Corporation is affixed to all documents, the execution of which on behalf of the Corporation under its seal, is duly authorized; (4) keep a register of the post office address of each stockholder which shall be furnished to the Secretary by such stockholder; (5) have general charge of stock transfer books of the Corporation; and (6) in general perform all duties incident to the office of secretary and such other duties as from time to time may be assigned to him by the President or by the Board of Directors.

## ARTICLE V   CAPITAL STOCK

5.1      Stock Certificates:  (a) Every holder of stock in the Corporation shall be entitled to have a certificate signed by, or in the name of, the Corporation by the President or a Vice President and by the Treasurer or the Secretary, certifying the number of shares owned by him.

(b)    The signatures of the Officers of the Corporation may be facsimiles, and, if permitted by law, any other signature may be a facsimile.

(c)    If any Officer who has signed or whose facsimile signature has been placed upon a certificate shall have ceased to be such Officer before such certificate is issued, it may be issued by the Corporation with the same effect as if he were such Officer at the date of issue.

(d)    Certificates of stock shall be issued in such form not inconsistent with the Certificate of Incorporation as shall be approved by the Board of Directors, and shall be numbered and registered in the order in which they were issued.

(e)    All certificates surrendered to the Corporation shall be canceled with the date of cancellation, and shall be retained by the Secretary, together with the powers of attorney to transfer and the assignments of the shares represented by such certificates, for such period of time as shall be prescribed from time to time by resolution of the Board of Directors.

5.2    Record Ownership:  A record of the name and address of the holder of such certificate, the number of shares represented thereby and the date of issue thereof shall be made on the Corporation's books.  The Corporation shall be entitled to treat the holder of any share of stock as the holder in fact thereof, and accordingly shall not be bound to recognize any equitable or other claim to or interest in any share on the part of any other person, whether or not it shall have express or other notice thereof, except as required by law.

5.3    Transfer of Record Ownership:  Transfers of stock shall be made on the books of the Corporation only by direction of the person named in the certificate or his attorney, lawfully constituted in writing, and only upon the surrender of the certificate therefor and a written assignment of the shares evidenced thereby.  Whenever any transfer of stock shall be made for collateral security, and not absolutely, it shall be so expressed in the entry of the transfer when the certificates are presented to the Corporation for transfer, and both the transferor and the transferee shall request the Corporation to do so.

5.4    Lost, Stolen or Destroyed Certificates:  Certificates representing shares of the stock of the Corporation shall be issued in place of any certificate alleged to have been lost, stolen or destroyed in such manner and on such terms and conditions as the Board of Directors from time to time may authorize, including the requirement to give the Corporation a bond sufficient to indemnify it against any claim that may be made against it on account of the alleged loss, theft or destruction, or issuance of such new certificate.

5.5    Transfer Agent; Registrar; Rules Respecting Certificates:  The Corporation may maintain one or more transfer offices or agencies where stock of the Corporation shall be transferable.  The Corporation may also maintain one or more registry offices where such stock shall be registered.  The Board of Directors may make such rules and regulations as it may deem expedient concerning the issue, transfer and registration of stock certificates.

5.6    Fixing Record Date for Determination of Stockholders of Record:  The Board of Directors may fix, in advance, a date as the record date for the purpose of determining stockholders entitled to notice of, or to vote at, any meeting of the stockholders or any adjournment thereof, or the stockholders entitled to receive payment of any dividend or other distribution or the allotment of any

rights, or entitled to exercise any rights in respect of any change, conversion or exchange of stock, or to express consent to corporate action in writing without a meeting, or in order to make a determination of the stockholders for the purpose of any other lawful action. Such record date in any case shall be not more than sixty days nor less than ten days before the date of a meeting of the stockholders, nor more than sixty days prior to any other action requiring such determination of the stockholders. A determination of stockholders of record entitled to notice or to vote at a meeting of stockholders shall apply to any adjournment of the meeting; provided, however, that the Board of Directors may fix a new record date for the adjourned meeting.

5.7    Dividends: Subject to the provisions of the Certificate of Incorporation, the Board of Directors may, out of funds legally available therefor at any regular or special meeting, declare dividends upon the capital stock of the Corporation out of the Corporation's surplus as computed in accordance with applicable law, or if no such surplus exists, then out of its net profits for the fiscal year in which such dividend is declared and/ or the preceding fiscal year. Before declaring any dividend there may be set apart out of any funds of the Corporation available for dividends, such sum or sums as the Board of Directors from time to time in its discretion deems proper for working capital or as a reserve fund to meet contingencies or for equalizing dividends or for such other purposes as the Board of Directors shall deem conducive to the interests of the Corporation.

## ARTICLE VI  SECURITIES HELD BY THE CORPORATION

6.1    Voting: Unless the Board of Directors shall otherwise order, the President, the Secretary or the Treasurer shall have full power and authority, on behalf of the Corporation, to attend, act and vote at any meeting of the stockholders of any corporation in which the Corporation may hold stock, and at such meeting to exercise any or all rights and powers incident to the ownership of such stock, and to execute on behalf of the Corporation a proxy or proxies empowering another or others to act as aforesaid. The Board of Directors from time to time may confer like powers upon any other person or persons.

6.2    General Authorization to Transfer Securities Held by the Corporation: (a) Any of the following Officers, to wit: the President and the Treasurer shall be, and they hereby are, authorized and empowered to transfer, convert, endorse, sell, assign, set over and deliver any and all shares of stock, bonds, debentures, notes, subscription warrants, stock purchase warrants, evidence of indebtedness, or other securities now or hereafter standing in the name of or owned by the Corporation, and to make, execute and deliver, under the seal of the Corporation, any and all written instruments of assignment and transfer necessary or proper to effectuate the authority hereby conferred.

(b)    Whenever there shall be annexed to any instrument of assignment and transfer executed pursuant to and in accordance with the foregoing paragraph (a), a certificate of the Secretary of the Corporation in office at the date of such certificate setting forth the provisions of this Section 6.2 and stating that they are in full force and effect and setting forth the names of persons who are then Officers of the Corporation, then all persons to whom such instrument and annexed certificate shall thereafter come, shall be entitled, without further inquiry or investigation and regardless of the date of such certificate, to assume and to act in reliance upon the assumption that the shares of stock or other securities named in such instrument were theretofore duly and properly transferred, endorsed, sold, assigned, set over and delivered by the Corporation, and that with respect

to such securities the authority of these provisions of the by-laws and of such Officers is still in full force and effect.

## ARTICLE VII   MISCELLANEOUS

7.1     Signatories:  All checks, drafts or other orders for the payment of money, notes or other evidences of indebtedness issued in the name of the Corporation shall be signed by such Officer or Officers or such other person or persons as the Board of Directors may from time to time designate.

7.2     Seal:  The seal of the Corporation shall be in such form and shall have such content as the Board of Directors shall from time to time determine.

7.3     Notice and Waiver of Notice:  Whenever any notice of the time, place or purpose of any meeting of the stockholders, Directors or a committee is required to be given under the law of the State of Delaware, the Certificate of Incorporation or these by-laws, a waiver thereof in writing, signed by the person or persons entitled to such notice, or a waiver by electronic transmission by the person entitled to notice whether before or after the holding thereof, or actual attendance at the meeting in person or, in the case of any stockholder, by his attorney-in-fact, shall be deemed equivalent to the giving of such notice to such persons.

7.4     Indemnity:  The Corporation shall indemnify its Directors, Officers and employees to the fullest extent allowed by law, provided, however, that it shall be within the discretion of the Board of Directors whether to advance any funds in advance of disposition of any action, suit or proceeding, and provided further that nothing in this section 7.4 shall be deemed to obviate the necessity of the Board of Directors to make any determination that indemnification of the Director, Officer or employee is proper under the circumstances because he has met the applicable standard of conduct set forth in subsections (a) and (b) of Section 145 of the Delaware General Corporation Law.

7.5     Fiscal Year:  Except as from time to time otherwise determined by the Board of Directors, the fiscal year of the Corporation shall end on December 31.