# EXHIBIT 5

## SECOND AMENDED AND RESTATED SHAREHOLDERS AGREEMENT

THIS SECOND AMENDED AND RESTATED SHAREHOLDERS AGREEMENT (this "**Agreement**") is made as of March 8, 2016, (the "**Effective Date**") by and among CONCORD BLUE ENERGY, INC., a Delaware corporation ("**Company**"), CONCORD BLUE ENGINEERING GMBH, a German company ("**CB Germany**"), WESTERN ENERGY SOLUTIONS, LLC, a California limited liability company ("**WES**") (CB Germany and WES being hereinafter sometimes referred to separately as an "**Original Shareholder**" and collectively as the "**Original Shareholders**"), STEFAN BURMESTER ("**Burmester**"), Municipal Employees' Retirement System of Michigan, a public nonprofit corporation established and maintained under the laws of the State of Michigan  (the "**Investor**") and such other Person or Persons as may be added as a party or parties to this Agreement pursuant to the provisions of **Section 1.3(A)** hereof.

### W I T N E S S E T H :

WHEREAS, the authorized shares of capital stock of the Company consists of 1,000,000 shares of Common Stock ("**Common Stock**"), par value US $0.01 per share, of which 200,000 shares of Common Stock are issued and outstanding as of the date of this Agreement;

WHEREAS, the Original Shareholders previously entered into that certain Shareholders Agreement dated as of April 19, 2012 (the "**Original Agreement**");

WHEREAS, the Original Shareholders amended and restated the Original Agreement on December 18, 2014 in its entirety to provide for, among other things, the manner of acquisition of Common Stock from the Company, the manner of adding one or more Persons as parties to this Agreement, including additional, supplemental and/or modified terms and conditions thereof, if any, applicable to each such Person, and for the manner of the disposition of Shares by any Shareholder subject to this Agreement (such amended and restated Original Agreement being referred to as the "**A&R Agreement**");

WHEREAS, currently CB Germany (the "**Controlling Shareholder**") is the holder of record and beneficial owner of 159,466 shares of Common Stock, WES is the holder of record and beneficial owner of 10,000 shares of Common Stock, Burmester is the holder of record and beneficial owner of 3,563 shares of Common Stock and the Investor is the holder of record and beneficial owner of 30,534 shares of Common Stock; and

WHEREAS, the parties desire to have Investor become a Party to this Agreement and amend and restate the A&R Agreement in its entirety as set forth herein;

NOW, THEREFORE, in consideration of the mutual promises, agreements, covenants, representations and warranties hereinafter set forth, the parties, intending to be bound legally, hereby agree to amend and restate the A&R Agreement in its entirety as follows:

1.    **SCOPE OF AGREEMENT**

    **1.1**    **Certain Definitions**. For purposes of this Agreement, the following terms shall have the meanings ascribed in this Section:

        **(A)**    "**Additional Shareholder**" shall mean each Person who becomes a Shareholder and party to this Agreement pursuant to the provisions of **Section 1.3(A)** hereof, for so long as such Person holds of record or owns beneficially, or both, any Shares, or any right, title or interest therein, either directly or indirectly.

        **(B)**    "**Affiliate**" shall mean, with respect to any Person (the "**first Person**"), (i) any second Person directly or indirectly controlling, controlled by or under common control with the first Person or owning or controlling ten percent (10%) or more of the outstanding voting securities, capital or profits interests, or beneficial interests in the first Person; (ii) any officer, director, manager, general partner, trustee or Family Member of the first Person; or (iii) if the first Person is an officer, director, manager, general partner or trustee, any corporation, limited liability company, partnership or trust for which such first Person acts in that capacity. For purposes of this Section, (x) the term "**control**" (including the terms "**controlled by**" and "**under common control with**") means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract or otherwise; (y) a manager of a limited liability company includes a member of a limited liability company that is managed by its members rather than by managers; and (z) a general partner includes any general partner in a limited liability partnership.

        **(C)**    "**Annual Budget**" means each of the initial budget of the Company and its subsidiaries adopted by the Board for each Financial Year, which shall be approved by the Board no later than November 30th of each previous Financial Year, each of which will cover, among other things, the following: capital expenditures, estimated revenues, operating expenses, estimated EBITDA, administrative expenses, investments, personnel/employment, marketing/advertising and financing/indebtedness.

        **(D)**    "**Annual Business Plan**" means each Financial Year's plan proposed and approved by the Board, which contains all financial, accounting, legal, and commercial operations to be developed by the Company in the following Financial Year, including a detailed annual budget for each activity/action;

        **(E)**    "**Auditors**" means the independent, external auditors of the Company which shall be a firm of the Big Five  accounting firms to be selected by the Board, currently the following: PwC, Deloitte, E&Y, KPMG, BDO;

        **(F)**    "**Beneficial Owner**" shall mean any Person who owns, either directly or indirectly, any equity interest in any Shareholder or any of its Affiliates that is an entity as of the date of this Agreement or, with respect to any Additional Shareholder or any of its Affiliates that is an entity, as of the date such Additional Shareholder became a Shareholder under this Agreement.

(G)    "**Board**" shall mean the board of directors of the Company.

(H)    "**CBD**" shall mean Concord Blue Development, LLC, a Delaware limited liability company.

(I)    "**CBD Operating Agreement**" shall mean that certain Amended and Restated Limited Liability Company Agreement, dated on or about the date hereof, by and among the Company, CBD and the Investor, as amended, amended and restated, supplemented or otherwise modified from time to time.

(J)    "**Charter**" shall mean the Company's certificate of incorporation, as amended, amended and restated, supplemented or otherwise modified from time to time.

(K)    "**Company Value**" shall mean, as of any given date, the gross price at which the Company's business and assets would be purchased and sold as a going concern between a willing buyer and willing seller, with both sides having knowledge of all relevant facts and neither being under any compulsion to sell or buy, as determined by an appraiser with at least five (5) years' experience in the valuation of a business similar to that conducted by the Company and associated with (a) Duff & Phelps or (b) if Duff & Phelps is unable or unwilling to so serve, a nationally-recognized valuation firm, not an Affiliate or Family Member of any Shareholder, officer or director of the Company, selected by the Board (the "**Appraiser**"). The fees of the Appraiser shall be paid by the Company.

(L)    "**Controlling Shareholder**" has the meaning set forth in the introductory section of this Agreement.

(M)    "**Drexel Engagement Letter**" shall mean that certain Engagement Letter dated July 28, 2014, by and between the Company and Drexel Hamilton LLC.

(N)    "**EBITDA**" means, for any period, earnings before interest and taxes of the Company and its consolidated subsidiaries for such period, plus amortization and depreciation charges, plus any other non-cash charges appearing above the operating income line in the Company's annual audited financial statements, as calculated in accordance with GAAP.

(O)    "**Family Member**" shall mean any spouse of any Person, any parent, sibling or lineal descendant of such Person or spouse, or any spouse of any such parent, sibling or lineal descendant, whether by blood or adoption, or any trust for the exclusive benefit of any one or more of such individuals.

(P)    "**Financial Year**" means the accounting year of the Company commencing each year on January 1st and ending on the following December 31st;

(Q)    "**Founder**" means Christopher Thannhaeuser.

(R)    "**GAAP**" means U.S. generally accepted accounting principles, consistently applied.

(S)    "**Initial Business Plan**" means the initial Annual Business Plan of the Company for the remainder of Financial Year 2016 approved by the Board, which shall be developed within 180 days following the Effective Date.

(T)    "**Key Personnel**" shall mean, collectively, the general manager, finance manager and operations manager of the Company.

(U)    "**Liquidation Event**" means any liquidation, winding up or bankruptcy, reorganization, composition with creditors or other analogous insolvency proceeding  (whether preventive or ordinary) of the Company or any subsidiary of the Company, whether voluntary or involuntary, or any petition presented or resolution passed for any such event or for the appointment of an insolvency practitioner.

(V)    "**Major Shareholder**" means any Shareholder that, individually or together with such Shareholder's Affiliates, holds at least 5% of the Company's Shares on a fully diluted basis.

(W)    "**Majority of Shareholders**" shall mean the Shareholder(s) holding a majority of all outstanding Shares.

(X)    "**Material Adverse Effect**" means a material adverse effect on:

(i)    the Company's or any of its subsidiaries' assets or properties;

(ii)    the Company's or any of its subsidiaries' financial condition; or

(iii)    the carrying on of the Company's or any of its subsidiaries' business or operations,

in each case, taken as a whole.

(Y)    "**New Securities**" means any new Shares or other equity securities of the Company.

(Z)    "**Permitted Transferee**" shall mean any Person to whom any Shares held by any Shareholder, or any right, title or interest therein, are Transferred, either directly or indirectly, in accordance with this Agreement, and who complies with the provisions of **Section 1.3(B)** hereof.

(AA)    "**Person**" shall mean any individual, any company, limited liability company, partnership or other business entity or enterprise or any trust, whether or not any such entity, enterprise or trust, is organized or operated for profit or nonprofit purposes.

(BB)    "**Principal**" means a Person who is an individual and the grantor of Qualified Trust which is a Shareholder or any of its Affiliate, including, without limitation, the Transferor Shareholder with respect to a Qualified Trust to which the Transferor's Shares or any portion thereof is Transferred in accordance with **Section 5.2(E)** of this Agreement.

(CC)   "**Qualified Trust**" means a trust duly created in which (a) a Principal is the grantor that is wholly revocable by such Principal, (b) such Principal, either alone or together with such Principal's spouse serve as sole trustees, and (c) the named beneficiaries include only such Principal, such Principal's spouse and/or their Family Members.

(DD)   "**Share Value**" shall mean, as of any given date, the portion of the net Company Value allocable to each share of Common Stock and all other class of equity securities of the Company convertible into Common Stock and all options, warrants and other rights to acquire any shares of Common Stock or any other class of equity securities of the Company convertible into Common Stock, outstanding on such date on a fully-diluted basis, after taking into account the portion of the Company Value allocable to any class of equity securities of the Company with preference rights and the exercise or conversion price of any options, warrants and other rights to acquire any shares of Common Stock or any other class of equity securities of the Company convertible into Common Stock, as determined by the Appraiser.

(EE)   "**Shares**" shall mean (i) all authorized and unissued shares of Common Stock or any other class of equity securities of the Company convertible into Common Stock that the Company may issue pursuant to its articles of incorporation or any amendment thereto and all treasury shares of Common Stock or any other class of equity securities of the Company convertible into Common Stock now or hereafter held by the Company, and (ii) all issued and outstanding shares of Common Stock or any other class of equity securities of the Company convertible into Common Stock, or any option, warrant or other right to acquire any shares of Common Stock or any other class of equity securities of the Company convertible into Common Stock, now or hereafter held of record or owned beneficially, or both, by any Shareholder, Shareholder, or any right, title or interest therein, either directly or indirectly, for so long as such Shareholder owns any such shares, option, warrant or other right, or any right, title or interest therein, either directly or indirectly.

(FF)   "**Shareholders**" shall mean (i) CB Germany, for so long as CB Germany holds of record or owns beneficially, or both, any Shares, or any right, title or interest therein, either directly or indirectly, and each Permitted Transferee, if any, to whom any such Shares, or any right, title or interest therein, either directly or indirectly, are Transferred who becomes a party to this Agreement pursuant to the provisions of **Section 1.3(B)** hereof in respect of any or all such Shares or right, title or interest therein, for so long as such Permitted Transferee holds any such Shares or right, title or interest therein, (ii) WES for so long as WES holds of record or owns beneficially, or both, any Shares, or any right, title or interest therein, either directly or indirectly, and each Permitted Transferee, if any, to whom any such Shares, or any right, title or interest therein, either directly or indirectly, are Transferred who becomes a party to this Agreement pursuant to the provisions of **Section 1.3(B)** hereof in respect of any or all such Shares or right, title or interest therein, for so long as such Permitted Transferee holds any such Shares or right, title or interest therein, (iii) Burmester, for so long as Burmester holds of record or owns beneficially, or both, any Shares, or any right, title or interest therein, either directly or indirectly, and each Permitted Transferee, if any, to whom any such Shares, or any right, title or interest therein, either directly or indirectly, are Transferred who becomes a party to this Agreement pursuant to the provisions of **Section 1.3(B)** hereof in respect of any or all such Shares or right, title or interest therein, for so long as such Permitted Transferee holds any such

Page 5 of 35

Shares or right, title or interest therein, (iv) the Investor, for so long as the Investor holds of record or owns beneficially, or both, any Shares, or any right, title or interest therein, either directly or indirectly, and each Permitted Transferee, if any, to whom any such Shares, or any right, title or interest therein, either directly or indirectly, are Transferred who becomes a party to this Agreement pursuant to the provisions of **Section 1.3(B)** hereof in respect of any or all such Shares or right, title or interest therein, for so long as such Permitted Transferee holds any such Shares or right, title or interest therein and (v) each Person who becomes a Shareholder and party to this Agreement pursuant to the provisions of **Section 1.3(A)** hereof, for so long as such Person holds of record or owns beneficially, or both, any Shares, or any right, title or interest therein, either directly or indirectly, and each Permitted Transferee, if any, to whom any such Shares, or any right, title or interest therein, either directly or indirectly, are Transferred who becomes a party to this Agreement pursuant to the provisions of **Section 1.3(B)** hereof in respect of any or all such Shares or right, title or interest therein, for so long as such Permitted Transferee holds any such Shares or right, title or interest therein.

(GG) "**Stock Purchase Agreement**" shall mean that Stock Purchase Agreement, dated as of March 8, 2016, by and among CB Germany, the Company and the Investor.

(HH) "**Subscription Agreement**" shall mean that Membership Interest Subscription Agreement, dated as of March 8, 2016, by and between CBD and the Investor.

(II) "**Teaming Agreement**" shall mean that certain Teaming Agreement, dated as of July 25, 2013, by and between the Company and Lockheed Martin Corporation, as amended by that certain First Amendment to Teaming Agreement, dated as of December 18, 2015, and as further amended, amended and restated, supplemented or otherwise modified from time to time.

(JJ) "**Transfer**" shall mean any sale, transfer, pledge, hypothecation or other disposition of any Shares now or hereafter held of record or owned beneficially, or both, by any Shareholder, including, without limitation, the grant of any option, warrant or other rights to acquire any such Shares, or any right, title or interest therein, either directly or indirectly, whether voluntarily, involuntarily or by operation of law.

(KK) "**Transferee**" shall mean any Person to whom any Shares now or hereafter held of record or owned beneficially, or both, by any Shareholder, or any right, title or interest therein, either directly or indirectly, are Transferred.

(LL) "**Voting Shares**" means and includes any securities of the Company the holders of which are entitled to vote for members of the Board, including all shares of Common Stock, by whatever name called, now owned or subsequently acquired by a Shareholder, however acquired, whether through stock splits, stock dividends, reclassifications, recapitalizations, similar events or otherwise

**1.2** **Applicability of Agreement**. The provisions of this Agreement shall apply to (i) all Shares that the Company may issue pursuant to its articles of incorporation or any amendment thereto, (ii) all Shares now or hereafter held by the Company, and (iii) all Shares now or

hereafter held of record or owned beneficially, or both, by any Shareholder, and all rights, title and interests therein, either directly or indirectly.

    **1.3**    <u>**Additional Parties**</u>.

    **(A)**    <u>**Additional Shareholders**</u>. Subject to the provisions of **Section 3.1** hereof, (i) except as may be agreed otherwise by all Shareholders of the Company as a condition of the issuance, sale or transfer of any Shares by the Company to any Person not then a Shareholder, the Company shall necessarily require such Person to become a Shareholder and party to this Agreement upon the terms, covenants, conditions and restrictions contained in this Agreement, with such modifications, additional and/or supplemental terms and conditions applicable to such Person as the board of directors of the Company deems advisable in the best interest of the Shareholders in its sole and absolute discretion, and (ii) upon the issuance, sale or transfer of such Shares by the Company to such Person, such Person shall thereafter be deemed a "Shareholder" and party to this Agreement for so long as such Person holds any Shares, or any right, title or interest therein, either directly or indirectly, and shall be bound by and duly perform and observe each and every term, covenant, condition and restriction to be performed and observed by such Shareholder under this Agreement, with such modifications, additional and/or supplemental terms and conditions applicable to such Shareholder as the Board deems advisable in the best interest of the Shareholders in its sole and absolute discretion in connection with the issuance or transfer of Shares by the Company to such Person. Upon the request of the Company or any Shareholder, the Company and each such Person who becomes a Shareholder and party to this Agreement pursuant to the provisions of this Section shall deliver an original counterpart of an Additional Shareholder Joinder to this Agreement substantially in the form of **Exhibit** "A" attached hereto and made a part hereof, with respect to the terms, covenants, conditions and restrictions contained herein, with such modifications, additional and/or supplemental terms and conditions applicable to such Person as the Board deems advisable in the best interest of the Shareholders in its sole and absolute discretion in connection with the issuance, sale or transfer of Shares by the Company to such Person, duly executed by the Company and such Person and, if such Person is married, a consent to such terms, covenants, conditions and restrictions duly executed by the spouse of such Person in form and substance reasonably satisfactory to the Company, which original counterpart and, if applicable, consent of such spouse shall be filed with the Secretary of the Company.

    **(B)**    <u>**Permitted Transferees**</u>. Subject to the provisions of **Article 5** hereof, (i) any Transferee to whom any Shares now or hereafter held of record or owned beneficially, or both, by any Shareholder, or any right, title or interest therein, either directly or indirectly, are Transferred shall be subject to all of the terms and conditions of this Agreement with respect to such Shares, or right, title, or interest therein, and (ii) any Permitted Transferee to whom any Shares now or hereafter held of record or owned beneficially, or both, held by any Shareholder, or any right, title or interest therein, either directly or indirectly, are Transferred shall thereafter be deemed a "Shareholder" and party to this Agreement, whether or not such Permitted Transferee executes a joinder to this Agreement, for so long as such Permitted Transferee holds any Shares, or any right, title or interest therein, either directly or indirectly, and shall be bound by and duly perform and observe each and every terms, covenant, condition and restriction to be performed and observed hereunder on the part of the Shareholder from whom such Shares, or

right, title or interest therein, either directly or indirectly, were acquired by such Permitted Transferee. Upon the request of the Company or any Shareholder, the Company and each Permitted Transferee shall deliver an original counterpart of a Permitted Transferee Joinder to this Agreement substantially in the form of **Exhibit "B"** attached hereto and made a part hereof with respect to the terms, covenants, conditions and restrictions contained in this Agreement applicable to the Shareholder from whom such Shares, or right, title or interest therein, either directly or indirectly, were acquired by such Permitted Transferee in accordance with the terms hereof, duly executed by such Permitted Transferee and, if such Person is married, a consent to such terms, covenants, conditions and restrictions duly executed by the spouse of such Permitted Transferee in form and substance reasonably satisfactory to the Company, which original counterpart and, if applicable, consent of such spouse shall be filed with the Secretary of the Company.

       **1.4**    **Inconsistencies**. In the event of any inconsistency between the articles of incorporation or by-laws of the Company and this Agreement, as between the Shareholders, the provisions of this Agreement shall govern and control to the maximum extent permitted under applicable law.

## 2.    BOARD COMPOSITION.

       **2.1**    **Board Composition**. Each Shareholder agrees to vote, or cause to be voted, all Voting Shares owned by such Shareholder, or over which such Shareholder has voting control, from time to time and at all times, in whatever manner as shall be necessary to ensure that, at each annual or special meeting of the Company's stockholders at which an election of directors is held or pursuant to any written consent of the Company's stockholders, the following individuals shall be elected to the Board:

       **(A)**    three individuals jointly designated by CB Germany and WES and/or their respective Permitted Transferees, which individuals shall initially be Christopher Thannhaeuser, Wesley Bilson and Gregory Bilson; and

       **(B)**    one individual designated by the Investor (the "**Investor Director**"), which individual shall initially be Berry Polmann, for so long as the Investor and its Affiliates continue to own beneficially at least 2.5% of the Company's Shares on a fully diluted basis.

To the extent that any of clauses **(A)** and **(B)** above shall not be applicable, any member of the Board who would otherwise have been designated in accordance with the terms thereof shall instead be elected by all of the Company's stockholders entitled to vote thereon in accordance with, and pursuant to, the Charter.

       **2.2**    **Failure to Designate a Board Member**. In the absence of any designation from the Persons or groups with the right to designate a director as specified in **Section 2.1**, the director previously designated by them and then serving shall be reelected if still eligible to serve as provided herein.

       **2.3**    **Removal of Board Members**. Each Shareholder agrees to vote, or cause to be voted, all Voting Shares owned by such Shareholder, or over which such Shareholder has voting

control, from time to time and at all times, in whatever manner as shall be necessary to ensure that:

**(A)** no director elected pursuant to **Section 2.1** or **Section 2.2** may be removed from office unless (i) such removal is directed or approved by the affirmative vote of the Person(s) entitled under **Section 2.1** to designate that director or (ii) the Person(s) originally entitled to designate or approve such director pursuant to **Section 2.1** is no longer so entitled to designate or approve such director;

**(B)** any vacancies created by the resignation, removal or death of a director elected pursuant to **Section 2.1** or **Section 2.2** shall be filled pursuant to the provisions of this **Article** 2; and

**(C)** upon the written request of any party entitled to designate a director as provided in **Section 2.1(A)** or **Section 2.1(B)** to remove such director, such director shall be removed.

All Shareholders agree to execute any written consents required to perform their obligations as set forth in this Agreement, and the Company agrees, at the written request of any party entitled to designate directors, to call a special meeting of the Company's stockholders for the purpose of electing directors.

### 2.4    Procedures of the Board.

**(A)    Board Meetings**.

**(i)** The Board will meet no less frequently than once every quarter subject to an annual schedule and confirmation of the date of the next Board meeting at the previous Board meeting.

**(ii)** During the fourth quarter, for each Financial Year the Board shall approve the Annual Budget and the Annual Business Plan for the succeeding Financial Year.

**(iii)** Notwithstanding the above, the Chairman of the Board or any director may call a meeting of the Board not contemplated in this paragraph by written notice to all other directors, which notice will set forth the date, time and place of such meeting. Board Meetings may be held telephonically and the Board may adopt resolutions by unanimous written consent.

**(B)    Notice of Board Meetings; Agenda**.

**(i)** Written notice of each Board meeting shall be given by the Chairman of the Board to all directors. Written notice of a meeting under this **Section 2.4** shall be sent to the address notified from time to time by the directors, whether a physical address or via email, as may be requested by them at least fifteen (15) days in advance of such Board meeting; ***provided*** that where, exceptionally, the Board is required to make a decision in

circumstances in which the foregoing notice requirements cannot be observed, such notice requirements may be waived with the unanimous approval of all directors.

(ii)    An agenda setting out in detail the items of business proposed to be transacted at a Board meeting together with necessary information and supporting documents shall be circulated to each of the directors. The agenda, information and documents shall be circulated five (5) days prior to the date of the relevant meeting; ***provided*** that where, exceptionally, the Board is required to make a decision in circumstances in which the foregoing notice requirements cannot be observed, such requirement to circulate agenda information and documents may be waived with the unanimous approval of all Directors.

(C)    **Directors' Expenses**.  Except if a director is an officer of the Company (in which case Company policies will apply) each director shall be reimbursed for his or her reasonable expenses incurred in connection with his or her attendance to any meeting where his or her presence is required, including but not limited to in-person Shareholders' meetings and in-person Board meetings.  Such policy shall include reimbursement of the reasonable expenses incurred by such director in attending an in-person Board meeting or an in-person Shareholders' meeting or any other meeting which such director is requested to attend in his or her capacity as a director of the Company (including the reasonable costs of travel and attendance), including up to four yearly visits in conjunction with Board or Shareholder's meetings by such director to the Company's offices and operations.  Notwithstanding the foregoing, the expenses reimbursable pursuant to this **Section 2.4(C)** shall not be reimbursed to the extent they exceed the estimated amount for director expenses included in the Annual Budget approved by the Board as provided herein.

(D)    **Directors' Insurance**.  The Company shall obtain directors and officers liability insurance in an amount not less than $2 million in coverage for, at a minimum, the Investor Director, with a reputable national or international insurer.

## 3.    COVENANTS WITH RESPECT TO THE COMPANY.

3.1    **Pre-Emptive Rights**. In the event that the Board shall determine to issue, sell or transfer any Shares or any options, warrants or other rights to acquire any Shares (other than Shares and/or options, warrants or other rights to acquire Shares issuable by the Company pursuant to the Drexel Engagement Letter or any replacement thereof), at a price and upon such terms and conditions as the Board deems advisable in its sole and absolute discretion, the Company shall give notice thereof to the Shareholders, which shall state the price to be paid for such Shares or options, warrants or other rights, the terms of payment therefor and all other pertinent terms and conditions, including the equivalent fair market value of any consideration other than cash or obligations to pay cash in the future determined in good faith in the reasonable discretion of the Board ("**Company Sale Notice**"). The Company Sale Notice shall constitute an offer by the Company for the issuance, sale or transfer of those Shares or options, warrants or other rights to each Shareholder, in the same proportions as the number of Shares held by such Shareholder bears to the total number of Shares held by all Shareholders and other shareholders of the Company with pre-emptive rights in respect to such issuance or sale of such Shares or options, warrants or other rights pursuant to the articles of incorporation of the Company or any

agreement with the Company, at a price and upon terms and conditions not less favorable than the price, terms and conditions at which such Shares or options, warrants or other rights are proposed to be offered for issuance or sale by the Company; ***provided, however,*** (i) that each Shareholder shall be entitled to exercise such pre-emptive right either in whole or in part with respect to the pro rata share of such Shareholder therein, and (ii) that such pre-emptive right shall be exercisable by each Shareholder only in respect to the consideration consisting of cash or obligations to pay cash in the future and cash in an amount equal to the equivalent fair market value of any consideration other than cash or obligations to pay cash in the future determined in good faith in the reasonable discretion of the Board as specified in the Company Sale Notice, which offer may be accepted by such Shareholder either in whole or in part by written notice to such effect given to the Company at any time within thirty (30) days after the date the Company Sale Notice is given to such Shareholder by the Company.  At the end of such thirty (30) day period, the Company shall notify each Shareholder that elected to purchase or acquire all of the Shares or options, warrants or other rights available to it (each, a "**Fully Participating Shareholder**") of any other Shareholder's failure to do likewise.  During the ten (10) day period commencing after the Company has given such notice, each Fully Participating Shareholder may elect to exercise its pre-emptive right with respect to the number of remaining Shares or options, warrants or other rights equal to the proportion of Shares held by such Fully Participating Shareholder bears to the total number of Shares held by all Fully Participating Shareholders.  In the event that such Fully Participating Shareholders fail to exercise timely their pre-emptive right either in whole or in part to purchase such remaining Shares or options, warrants or other rights within such thirty-(30)-day period, the pre-emptive right of such Fully Participating Shareholders, or the unexercised portion thereof, shall terminate with respect to that particular issue or sale of such Shares or options, warrants or other rights, and the Company shall have the right thereafter to issue, sell or transfer any or all of the remaining Shares or options, warrants or other rights covered by the Company Sale Notice to any one or more Persons; ***provided, however,*** (x) that such issuance, sale or transfer shall be consummated within sixty (60) days after the date the pre-emptive rights of the Shareholders to purchase such Shares or options, warrants or other rights, or the unexercised portion thereof, has terminated pursuant to the provisions of this Section, and (y) such issuance, sale or transfer  shall not be at a lower price per Share or option, warrant or other right nor upon terms more favorable to the purchaser than that stated in the Company Sale Notice. In the event that the Company fails to consummate such issuance, sale or transfer of the remaining Shares or options, warrants or other rights covered by the Company Sale as aforesaid within such sixty-(60)-day period, the Company may not issue, sell or transfer such Shares or options, warrants or other rights without again complying with the provisions of this Section.

      **3.2**    **Inspection Rights**. Each Shareholder shall have the right, at any time and from time to time during reasonable business hours upon reasonable prior notice given to the Company, (i) to examine and inspect the books, records and accounts of the Company, all of which shall be made available to such Shareholder and/or its authorized representatives at the principal office of the Company and (ii) to discuss the business, operations and financial situation of the Company with the main officers of the Company and its Auditors, provided that the Shareholder will notify the Company prior to contacting the Auditors and give the Company the opportunity of participating in such discussions. In the event that any Shareholder desires an extraordinary audit of the books, records and accounts of the Company, whether by the

accountants of the Company or otherwise, such Shareholder may have such audit made at its sole cost and expense.

**3.3**    **Matters Requiring Investor Director Approval**.  So long as the Investor is entitled to elect the Investor Director, the Company hereby covenants and agrees with each Shareholder that it shall not, without approval of the  Shareholders (to the extent approval of the stockholders of the Company is required under Delaware law) or the Board, as the case may be, which approval must include the affirmative vote of the Investor, in case of a Shareholder resolution, or the Investor Director, in case of a Board Resolution, except to the extent included in (i) any Annual Budget or Annual Business Plan that has been approved in accordance with this **Section 3.3**, or (ii) the Initial Business Plan:

**(A)**    amend or repeal the Company's Charter or bylaws or the charter or bylaws (or equivalent organizational documents) of any subsidiary of the Company: (i) in any manner that affects the Shares owned by the Investor or the rights of the Investor under this Agreement, except as otherwise consented by the Investor pursuant to this **Section 3.3**, or (ii) in contravention of the terms of this Agreement;

**(B)**    except as required by the terms of the CBD Operating Agreement, the Subscription Agreement, the Teaming Agreement or the Drexel Engagement Letter, sell any shares or other equity interests or debt securities in any of the subsidiaries of the Company, or engage in any merger, consolidation, reorganization or sale of substantially all of the Company's (and/or its subsidiaries') assets, or similar transaction, in each case, other than a Conforming Sale made in accordance with **Section 4.1**;

**(C)**    except as required by the terms of the CBD Operating Agreement, the Subscription Agreement, the Teaming Agreement or the Drexel Engagement Letter, increase or reduce the capital stock of the Company or its subsidiaries, including, without limitation, any repurchases, redemptions, conversions, issue by the Company or its subsidiaries, of debt or debt securities convertible into equity, issue by the Company or its subsidiaries, through private or public offering of New Securities (including convertible bonds);

**(D)**    authorize or undertake any Liquidation Event;

**(E)**    make any acquisition of any Person or all or substantially all of the assets of a Person;

**(F)**    establish or amend a dividend policy;

**(G)**    incur indebtedness in excess of $50,000 or grant a lien on the Company's assets for that amount; in both cases, whether in a single or several transactions;

**(H)**    make capital expenditures which exceed those approved Annual Budget and Annual Business Plan by more than fifteen percent (15%) of the approved amount;

**(I)**    enter into any new line of business;

**(J)** enter into, or be a party to, any transaction with any Shareholder, an Affiliate or Family member of any Shareholder, or a director, officer or employee of the Company or any "associate" (as defined in Rule 12b-2 promulgated under the Securities Exchange Act of 1934, as amended) of any such individual (any such Person, a "**Related Party**"), except for any transactions contemplated by this Agreement;

**(K)** appoint or remove Auditors different from the big five accounting firms.

**(L)** approve or modify the Annual Budget and/or the Annual Business Plan;

**(M)** grant any loan, advance or other extension of credit in excess of $25,000 to any third party (other than extensions of trade credit in the ordinary course of business and temporary advances to non-shareholder employees);

**(N)** reduce, recapitalize, redeem or repurchase any indebtedness owing to any Shareholder or Affiliate;

**(O)** enter into, make any material change to or terminate any partnership, strategic alliance, joint venture or other similar arrangement or relationship with any Person;

**(P)** change the accounting policies or practices of the Company, except when required by applicable law;

**(Q)** modify any powers and/or authority of the Board (or of the quorum or approval requirements applicable to the Board);

**(R)** approve any senior level management compensation, including any employee profit sharing plans (or any amendments thereto) including, but not limited to, any stock option plan, or enter into any collective bargaining agreement, or establish, adopt, enter into, amend or terminate any material employee plan, excluding existing current variable bonus plans; or

**(S)** approve or make any change or amendment to the Initial Business Plan.

Notwithstanding the foregoing, the affirmative vote of the Investor or the Investor Director will not be required under this **Section 3.3** if the applicable action has been proposed in a duly noticed Board meeting or in a unanimous written consent provided to the Investor Director, and the Investor or the Investor Director has failed to respond to such proposal within thirty (30) days after receipt thereof.

### 3.4 <u>Conflicts of Interest and Transaction with Related Parties</u>.

**(A)** The Company shall have in place a conflict of interest policy that will require a director to immediately disclose to the Board any interest or conflict that he or she may have on a matter on which the approval or ratification of the Board is being sought. In no event shall the vote of any director who was nominated by, or who is a Related Party of, a Related Party that is the Company's counterparty in a proposed agreement, arrangement or transaction to

be approved be counted toward the majority approval required.  Such director shall abstain (and if he or she does not abstain, shall be deemed to have abstained) from voting on the approval or ratification of the proposed agreement, arrangement or transaction.

(B)    The Shareholders and the Company acknowledge and agree that all transactions between the Company or its subsidiaries and any Shareholders or Related Party of the Shareholders will be (i) on market terms and conditions and on an arm's length basis, (ii) disclosed to the Board at least fifteen (15) business days in advance of the consummation of any such transaction and (iii) subject to approval pursuant to **Section 3.3** hereof, including approval by the Investor.

3.5    **Information Rights**.

(A)    **Delivery of Financial Statements; Assignment of Information Rights**. The Company shall deliver to each Major Shareholder:

(i)    as soon as practicable, but in any event within 120 days after the end of each Financial Year of the Company, (a) a balance sheet as of the end of such Financial Year, and (b) a statement of income for such Financial Year and a statement of cash flows for such Financial Year, and a comparison between (x) the actual amounts as of and for such Financial Year and (y) the comparable amounts for the prior Financial Year and as included in the Annual Budget for such Financial Year, with an explanation of any material differences between such amounts and a schedule as to the sources and applications of funds for such Financial Year, and (c) a statement of stockholders' equity as of the end of such Financial Year, all such financial statements audited and certified by Auditors selected by the Company;

(ii)    as soon as practicable, but in any event within 45 days after the end of each of the first three quarters of each Financial Year of the Company, (a) an unaudited balance sheet as of the end of such fiscal quarter and an unaudited statement of stockholders' equity as of the end of such fiscal quarter and (b) an unaudited statement of income for such fiscal quarter and an unaudited statement of cash flows for such fiscal quarter, all prepared in accordance with GAAP (except that such financial statements (x) may be subject to normal year-end audit adjustments and (y) may not contain all notes thereto that may be required in accordance with GAAP); and

(iii)    as soon as practicable, but in any event within 30 days after the end of each month (other than the last month of the Company's Financial Year), (a) an unaudited balance sheet as of the end of such month and an unaudited statement of stockholders' equity as of the end of such month and (b) an unaudited statement of income for such month and an unaudited statement of cash flows for such month, all prepared in accordance with GAAP (except that such financial statements (x) may be subject to normal year-end audit adjustments and (y) may not contain all notes thereto that may be required in accordance with GAAP).

(iv)    Within fifteen (15) days after the end of each month of each Financial Year, monthly progress reports including operational updates.

(v)     No later than ten (10) days after each Shareholders' Meeting and/or Board Meeting, the minutes thereof reflecting decisions adopted at such meeting.

(vi)     Within fifteen (15) days after receipt thereof by the Company, any management letter or similar letter from the Auditors.

(B)     In addition, the Company shall, and the Shareholders shall cause the Company to, promptly notify the Investor upon becoming aware of any: (a) litigation or investigations or proceedings which have or may reasonably be expected to have a Material Adverse Effect on the Company or its subsidiaries; or (b) criminal investigations or proceedings against the Company or its Subsidiaries, and any such notification shall specify the nature of the action or proceeding and any steps that the Company proposes to take in response to the same.

(C)     No later than thirty (30) days after any change in Auditors, the Company shall instruct such new Auditors (whose fees and expenses shall be for the account of the Company) to communicate directly with Investor at any time regarding the Company's financial statements, accounts and operations, and provide to Investor a copy of that authorization; and (ii) take such actions, issue such additional instructions and deliver such additional documents as necessary to procure the Auditors' compliance with such instruction.

(D)     The Company shall, and the Controlling Shareholder shall cause the Company to, promptly provide to all the Major Shareholders such information as any of the Major Shareholders from time to time requests with regard to the Company and any of its Subsidiaries that is reasonably related to such Major Shareholder's interest as a stockholder of the Company. The Company shall provide to the Investor Director all information as and when provided to any other Director in his or her capacity as a Director.

(E)     The Investor Director may provide to the Investor any information that the Investor Director receives in his or her capacity as a director, including, without limitation, any information related to company operations, and may provide periodic reports to Investor, as applicable, related to the discharge of his or her duties as a director; *provided*, *however*, that such information may not be provided to the extent the Company is advised by its legal counsel that access to such information could be deemed a waiver or otherwise adversely affect the attorney-client privilege between the Company and its legal counsel.

3.7    **Corrupt Practices**.  No Shareholder or the Company will directly or indirectly made any contribution, gift, bribe, rebate, payoff, influence payment, kickback or other payment to or for the benefit of any government official, candidate for public office, political party, political campaign or other Person, private or public, regardless of form, whether in money, property, or services (a) for the purpose of (i) influencing any act or decision of such government official, candidate, party, campaign or other Person, (ii) inducing such government official, candidate, party, campaign or other Person to do or omit to do any act in violation of a lawful duty, (iii) obtaining or retaining business for or with any Person, (iv) expediting or securing the performance of official acts of a routine nature or (v) otherwise securing any improper advantage, in each case, with respect to the Company or (b) in violation of the Foreign Corrupt

Practices Act of 1977, 15 U.S.C. §§ 78dd-1, et seq. or other law, in each case, with respect to the Company.

**3.8    Insurance**.  The Company shall, and shall ensure that each of its subsidiaries shall, at all times (a) properly insure and keep insured, with a financially sound and reputable insurer or insurers, all of its insurable assets against insurable losses; (b) promptly notify the relevant insurer of any claim by the Company and or any subsidiary of the Company under any policy written by that insurer and diligently pursue that claim; (c) comply with all warranties and conditions under each insurance policy; (d) not do or omit to do, or permit to be done or not done, anything which might prejudice the Company's right to claim or recover under any insurance policy; and (e) at Investor's request, submit relevant documentation evidencing insurances in place; and, (f) maintain any other insurance that may be required by applicable law.

**3.9    Key Personnel**.  The Company shall inform Investor of any termination of employment of any Key Personnel in writing, within three (3) days of any change.

**3.10    Key Man Provision**.  Except in the event of death, disability or force majeure, in the event that the Founder ceases to devote a majority of his business time and his efforts, skill, business judgment to the advancement of the business and interest of the Company (either directly or through CB Germany or CBD) without the Investor Director written consent, the Founder will resign from the Board and CB Germany will vote its Shares "(i) to remove the Founder as a director and (ii) as directed by the Investor until the hiring of a replacement which is (a) reasonably acceptable to the Investor Director or (b) approved by the affirmative vote or written consent of 75% of the directors on the Board.

**3.11    Annual Business Plan; Annual Budget**.  If an Annual Budget or an Annual Business Plan is not adopted in accordance with **Section 3.3** prior to the start of the applicable Financial Year, then, until so adopted, the Annual Budget and Annual Business Plan for such Financial Year will be the same as the prior Financial Year's Annual Budget and Annual Business Plan; *provided*, that in the case of the Annual Budget, non-recurring or extraordinary items shall be excluded, and the budget for each line item shall be increased by 5.0%.

**4.    COVENANTS OF THE SHAREHOLDERS**

**4.1    Drag-Along Rights**. Subject to the provisions of **Section 3.3** and **Article 5** hereof, if a Majority of Shareholders (the "**Approving Shareholders**") approve the material terms of a sale of all of their Shares in exchange for cash to a Person that is not: (x) an underwriter nor any other entity in connection with an offering of securities, (y) a Shareholder or an Affiliate or Family Member or a Related Party of such Shareholder, or (z) a Related Party of the Company or its subsidiaries, for consideration to be received by the Shareholders on account of their disposition of Shares consisting solely of cash (a "**Conforming Sale**"), the Approving Shareholders shall give notice thereof to the Company and each Shareholder who is not an Approving Shareholder ("**Drag-Along Shareholders**"), which shall state the name of the proposed Transferee, the price or other consideration to be paid for the Shares, the terms of payment therefor and all other pertinent terms and conditions and the names of each Approving Shareholder (the "**Conforming Sale Notice**"), and each Drag-Along Shareholder shall be

ACTIVE 211562594v.15

obligated to, and shall upon the written request of the Approving Shareholders, (a) sell, transfer and deliver to the Transferee specified in the Conforming Sale Notice a number Shares of such Drag-Along Shareholder in the proportion that the total number of Shares involved in the Conforming Sale bears to the total number of Shares of all Shareholders then outstanding, at the same price per Share and upon the same terms and conditions as applicable to the Approving Shareholders; (b) execute and deliver such instruments of conveyance and transfer and take such other action (including, but not limited to, voting the Shares of such Drag-Along Shareholder in favor of the Conforming Sale and executing any purchase agreements, merger agreements, indemnity agreements, escrow agreements or related documents) as the Approving Shareholders or the Transferee may reasonably require in order to carry out the terms and provisions of this Section; *provided, however,* that the Drag-Along Shareholders shall not be required to make any representations or warranties or incur any liabilities of any kind other that with respect to title to their Shares; and (c) not take any action (including, but not limited to, assertion of dissenter rights under any applicable laws that may apply to the Company or such transaction) inconsistent with such other Drag-Along Shareholder's covenants and agreements under this Section (the "**Drag-Along Rights**"). Notwithstanding the foregoing, the Investor will not be obligated to participate in a Conforming Sale unless the Investor would receive in such Conforming Sale an amount equal to or greater than the highest of (i) four times (4x) the amount paid by the Investor to CB Germany for the Investor's Shares under the Stock Purchase Agreement (the "**Investor Purchase Price**"), (ii) an amount that would provide to the Investor an annual internal rate of return of twenty percent (20%) on the Investor Purchase Price (which calculation shall include all dividends or any cash out payments to the Investor from the Company), or (iii) the then current fair market value of the Investor's Shares based on the Company Value at such time. Each Shareholder shall, and hereby does, irrevocably appoint the President of the Company as such Shareholder's true and lawful attorney-in-fact and proxy, coupled with an interest, to act for such Shareholder and in the name, place and stead of such Shareholder and for the use and benefit of such Shareholder, solely to execute and deliver such instruments of conveyance and transfer and take such other action (including, but not limited to, voting the Shares of such Shareholder in favor of the Conforming Sale and executing any purchase agreements, merger agreements, indemnity agreements, escrow agreements or related documents consistent herewith) on behalf of each Drag-Along Shareholder as the Approving Shareholders or the Transferee may reasonably require in order to carry out the terms, covenants and provisions of this **Section 4.1**, if such Drag-Along Shareholder shall fail to perform and observe the terms, covenants and provisions of this Section on the part of such Drag-Along Shareholder to be performed and observed hereunder within fifteen (15) days after written demand therefor shall have been given to such Drag-Along Shareholder by the Approving Shareholders or the President, or any of them.

       4.2    **Tag-Along Rights**. Without prejudice to the Shareholders' rights as per **Section 4.3** hereof, in the event that a Shareholder ("**Tag-Along Selling Shareholder**") or any of its Affiliates shall determine to sell Shares representing at least 5% of all Shares of the Company on a fully diluted basis, which Shares are held of record or owned beneficially, or both, by the Tag-Along Selling Shareholder or such Affiliate, or any right, title or interest therein, either directly or indirectly, to any other Person not then a Shareholder, or an Affiliate thereof, pursuant to a bona-fide offer of such Person, at a price and upon such terms and conditions as the Tag-Along Selling Shareholder or such Affiliate deem advisable in its sole and absolute discretion,

the Tag-Along Selling Shareholder shall give notice thereof to the other Shareholders ("**Tag-Along Shareholders**"), which shall state the name of the proposed Transferee, the price to be paid for such Shares, or right, title or interest therein, the terms of payment therefor and all other pertinent terms and conditions, including the equivalent fair market value of any consideration other than cash or obligations to pay cash in the future determined in good faith in the reasonable discretion of the Tag-Along Selling Shareholder ("**Tag-Along Selling Shareholder Sale Notice**"). The Tag-Along Selling Shareholder Sale Notice shall constitute an offer by the Tag-Along Selling Shareholder for the Tag-Along Shareholders to participate in the sale of such Shares by the Tag-Along Selling Shareholder, or if a sale of any indirect right, title or interest in such Shares by such Affiliate, an offer by the Tag-Along Selling Shareholder to purchase a number of Shares held by the Tag-Along Shareholders equal to the proportionate interest therein represented thereby, in the same proportion as the number of Shares held by each Tag-Along Shareholder bears to the total number of Shares held by the Tag-Along Selling Shareholder, such Tag-Along Shareholder and all other shareholders of the Company with similar rights to participate in such sale of Shares pursuant to any agreement with the Tag-Along Selling Shareholder, at the same price and upon the same terms and conditions as contained in the Tag-Along Selling Shareholder Sale Notice at which such Shares, or any right, title or interest therein, either directly or indirectly, are proposed to be sold by the Tag-Along Selling Shareholder or such Affiliate; *provided, however,* (i) that each Tag-Along Shareholder shall be entitled to exercise such right to participate in the sale of such Shares by the Tag-Along Selling Shareholder, or if a sale of any indirect right, title or interest in such Shares by such Affiliate, to accept the Tag-Along Selling Shareholder's offer to purchase a number of Shares held by such Tag-Along Shareholder equal to the proportionate interest therein represented thereby, either in whole or in part, with respect to the pro rata share of such Tag-Along Shareholder therein, and (ii) that the right of each Tag-Along Shareholder to participate in such sale of Shares by the Tag-Along Selling Shareholder, or if a sale of any indirect right, title or interest in such Shares by such Affiliate, to accept the Tag-Along Selling Shareholder's offer to purchase a number of Shares held by such Tag-Along Shareholder equal to the proportionate interest therein represented thereby, shall be exercisable by such Tag-Along Shareholder only in respect to the consideration consisting of cash or obligations to pay cash in the future and cash in an amount equal to the equivalent fair market value of any consideration other than cash or obligations to pay cash in the future determined in good faith in the reasonable discretion of the Tag-Along Selling Shareholder as specified in the Tag-Along Selling Shareholder Sale Notice, which offer may be accepted by such Tag-Along Shareholder either in whole or in part by written notice to such effect given to the Tag-Along Selling Shareholder at any time within thirty (30) days after the date the Tag-Along Selling Shareholder Sale Notice is given to such Tag-Along Shareholder. In the event that a Tag-Along Shareholder fails to exercise timely such right to participate in such sale of Shares by the Tag-Along Selling Shareholder, or if a sale of any indirect right, title or interest in such Shares by such Affiliate, to accept such offer to purchase a number of Shares held by such Tag-Along Shareholder equal to the proportionate interest therein represented thereby, either in whole or in part, within such thirty-(30)-day period, the right of such Tag-Along Shareholder to participate in that particular sale of Shares by the Tag-Along Selling Shareholder, or if a sale of any indirect right, title or interest in such Shares by such Affiliate, to accept such offer to purchase a number of Shares held by such Tag-Along Shareholder equal to the proportionate interest therein represented thereby, or the unexercised portion thereof, shall terminate, and the Tag-Along Selling Shareholder or such Affiliate shall have the right thereafter

to sell any or all of the remaining Shares, or right, title or interest therein, covered by the Tag-Along Selling Shareholder Sale Notice to the Transferee specified in the Tag-Along Selling Shareholder Sale Notice, free of any rights of such Tag-Along Shareholder pursuant to this Section; *provided, however,* (x) that such sale shall be consummated within sixty (60) days after the date the rights of all Tag-Along Shareholders to participate in such sale of Shares by the Tag-Along Selling Shareholder, or if a sale of any indirect right, title or interest in such Shares by an Affiliate of the Tag-Along Selling Shareholder, to accept such offer to purchase a number of Shares held by all Tag-Along Shareholders equal to the proportionate interest therein represented thereby, or the unexercised portion thereof, has terminated pursuant to the provisions of this Section, (y) such sale shall not be at a higher price per Share, or right, title or interest therein, nor upon terms more favorable to the seller than that stated in the Tag-Along Selling Shareholder Sale Notice, and (z) upon the consummation of such sale as aforesaid, the Transferee to whom such Shares are Transferred shall be deemed a Permitted Transferee hereunder and shall comply with the provisions of **Section 1.3(B)** hereof with respect to the terms, covenants, conditions and restrictions contained in this Agreement applicable to the Tag-Along Selling Shareholder from whom such Shares were acquired. In the event that the Tag-Along Selling Shareholder or such Affiliate fails to consummate such sale of such Shares, or right, title or interest therein, covered by the Tag-Along Selling Shareholder Sale Notice to such Transferee as aforesaid within such sixty-(60)-day period, the Tag-Along Selling Shareholder or such Affiliate may not sell such Shares, or right, title or interest therein, without again complying with the provisions of this Section.

If the proposed Transfer by the Selling Shareholder would result in CB Germany or the Founder owning (directly or indirectly) less than fifty point one percent (50.1%) of the Shares of the Company issued and outstanding from time to time on a fully-diluted basis after such date, the Investor shall be entitled to participate in the sale of such Shares by the Tag-Along Selling Shareholder with respect to up to all of the Shares of the Company owned by the Investor.

### 4.3 <u>Right of First Refusal</u>.

(A) <u>Right of First Refusal.</u> Subject to the provisions of **Article 5** hereof, and except as otherwise expressly provided in **Sections 4.1**, **4.2** and **5.2** hereof, in the event that any Shareholder ("**Selling Shareholder**") or any of its Affiliates shall determine to Transfer any Shares held of record or owned beneficially, or both, by the Selling Shareholder or such Affiliate, or any right, title or interest therein, either directly or indirectly, to any unrelated Person pursuant to a bona-fide offer of such Person, at a price and upon such terms and conditions as the Selling Shareholder or such Affiliate deems advisable in its sole and absolute discretion, the Selling Shareholder shall give notice thereof to the other Shareholders (the "**Offeree Shareholder**s"), which shall state the name of the proposed Transferee, the price to be paid for such Shares, or right, title or interest therein, the terms of payment therefor and all other pertinent terms and conditions, including the equivalent fair market value of any consideration other than cash or obligations to pay cash in the future determined in good faith in the reasonable discretion of the Selling Shareholder ("**Sale Notice**"). The Sale Notice shall constitute an offer by the Selling Shareholder to sell the Shares, or if a sale of any indirect right, title or interest in such Shares by such Affiliate, a number of Shares held by the Selling Shareholder equal to the proportionate interest therein represented thereby, covered by the Sale Notice (the "**Offered**

**Shares**"), to the Offeree Shareholders in the proportion of their respective Pro Rata Allocation (as hereinafter defined) of the Offered Shares, at the same price and upon the same terms and conditions as contained in the Sale Notice at which such Shares, or any right, title or interest therein, either directly or indirectly, are proposed to be sold by the Selling Shareholder or such Affiliate; ***provided, however,*** (i) that each Offeree Shareholder shall be entitled to exercise its right of first refusal to purchase with respect to any or all of its Pro Rata Allocation of the Offered Shares, and (ii) that such right of first refusal to purchase Offeree Shareholder's Pro Rata Allocation of the Offered Shares shall be exercisable by such Offeree Shareholder only in respect to the consideration consisting of cash or obligations to pay cash in the future and cash in an amount equal to the equivalent fair market value of any consideration other than cash or obligations to pay cash in the future determined in good faith in the reasonable discretion of the Selling Shareholder as specified in the Sale Notice, which offer may be accepted by such Offeree Shareholder by written notice to such effect given to the Selling Shareholder, the Company and the other Offeree Shareholders within the times and in the manner provided in **Section 4.3(C)** hereof. In the event that the Offeree Shareholders fail to exercise timely their first rights of refusal to purchase all of the Offered Shares, the Selling Shareholder or such Affiliate shall have the right thereafter to sell to the Transferee any or all of the remaining Offered Shares, or the proportionate right, title or interest therein represented thereby, covered by the Sale Notice for which the rights of first refusal of the Offeree Shareholders therein have terminated pursuant to the provisions of **Section 4.3(C)** hereof, free of any rights of the Offeree Shareholders therein pursuant to this Section; ***provided, however,*** (x) that such sale shall be consummated within sixty (60) days after the date that rights of first refusal to purchase such remaining Offered Shares have terminated pursuant to the provisions of **Section 4.3(C)** hereof, (y) such sale shall not be at a lower price per Share, or right, title or interest therein, nor upon terms more favorable to the seller than that stated in the Sale Notice, and (z) upon consummation of such sale, such Transferee to whom such remaining Offered Shares, or right, title or interest therein, are Transferred shall be deemed a Permitted Transferee hereunder and shall comply with the provisions of **Section 1.3** hereof. In the event that Selling Shareholder or such Affiliate fails to consummate such sale of such Shares, or right, title or interest therein, covered by the Sale Notice to such Transferee as aforesaid within such sixty-(60)-day period, Selling Shareholder or such Affiliate may not sell such Shares, or right, title or interest therein, without again complying with the provisions of this Section.

(B)    **Pro Rata Allocation.** The allocation of any Offered Shares among the Offeree Shareholders required pursuant to the provisions of this Section shall be made to the Offeree Shareholders in the same proportion as the number of Shares held by each Offeree Shareholder bears to the total number of Shares held by all Offeree Shareholders. In the event that any one or more but not all of the Offeree Shareholders exercise timely their respective rights to purchase their respective portion of the Offered Shares, there shall be one or more successive allocations among the Offeree Shareholders who exercised timely such rights with respect to their entire Pro Rata Allocation, in the same proportions as the number of Shares held by each Offeree Shareholder bears to the total number of Shares held by all such Offeree Shareholders, or until such time as all such Offeree Shareholders who exercised timely such rights with respect to their entire Pro Rata Allocation fail to exercise timely such rights with respect to the next successive allocation, whichever occurs first. For purposes of this Agreement, the term "**Pro Rata Allocation**" shall mean, with respect to each Offeree Shareholder, (a) any or

all of the proportion of such Offered Shares first allocated to such Offeree Shareholder and, in the event such Offeree Shareholder exercises timely the right to purchase all such Offered Shares, all (but not less than all) of the proportion of such Offered Shares allocated to such Offeree Shareholder in any successive allocation that such Offeree Shareholder exercises timely the right to purchase hereunder, or (b) such proportion of the Offered Shares allocated to such Offeree Shareholder as may be mutually agreed by all Offeree Shareholders who timely exercise their rights to purchase hereunder.

(C)    **Manner of Exercise.** The Offeree Shareholders with the first right to purchase any Offered Shares pursuant to the provisions of this Agreement shall exercise such right by notice given to the Selling Shareholder, the Company and each other Offeree Shareholder within thirty (30) days after the date the Sale Notice was given, and the Offeree Shareholders with each successive right thereafter to purchase any Offered Shares pursuant to the provisions of this Agreement shall exercise such right by notice given to the Selling Shareholder, the Company and each other Offeree Shareholder within fifteen (15) days after the date of expiration of the notice period applicable to the Offeree Shareholders with the immediately preceding right to purchase such Offered Shares. In the event that any Offeree Shareholder fails to exercise timely the right to purchase any Offered Shares in any allocation as provided in this Agreement, the rights of such Offeree Party to purchase such Offered Shares hereunder shall terminate and be of no further force of effect with respect to that particular allocation of such Offered Shares**; *provided, however,*** that such termination shall not affect any exercise by such Offeree Shareholder of the right to purchase such Offered Shares in any prior allocation. In the event that any Offeree Shareholder exercises timely such right to purchase any such Offered Shares as provided in this Agreement and thereafter fails to consummate such purchase of such Offered Shares such Offeree Shareholder had so elected to purchase, the rights of such Offeree Shareholder to purchase such Offered Shares hereunder shall terminate and be of no further force of effect with respect to that particular sale of such Offered Shares, and the other Offeree Shareholders (if any) having the next successive right to purchase such Offered Shares pursuant to the provisions of this Agreement shall have the right to purchase such Offered Shares in the manner provided herein, which right shall be exercised by notice given to the Selling Shareholder, the Company and each such other Offeree Shareholder within fifteen (15) days after the date notice of such failure to consummate such purchase was given by the Selling Shareholder to the Company and such other Offeree Shareholders.

(D)    **Closing and Payment.** The consummation of the sale and purchase of any Offered Shares required pursuant to the provisions of **Section 4.3(A)** hereof ("**Closing**"), shall be held contemporaneously by all relevant parties at the principal office of the Company, at 10:00 a.m., local time, on the tenth (10th) business day after the date upon which notice of election to purchase such Offered Shares was given by the Offeree Shareholder last to elect in accordance with the provisions of **Section 4.3(C)** hereof, or on such other date as all relevant parties may mutually agree upon in writing. In the event that any Offeree Shareholder fails to consummate the purchase of such Offered Shares at the Closing in accordance with the provisions of this Agreement, the Selling Shareholder shall give prompt notice thereof to the Company and each other Offeree Shareholder having the next successive right to purchase such Offered Shares pursuant to the provisions of this Agreement, and the Closing shall be adjourned with respect to all other Offeree Shareholders at such Closing until 10:00 a.m., local time, on a date determined

in accordance with the provisions of this Section. At the Closing, (a) the Selling Shareholder shall execute, acknowledge and/or deliver or cause to be delivered to each Offeree Shareholder who timely exercised its right to purchase its Pro Rata Portion of the Offered Shares (i) a certificate attesting that such Selling Shareholder is the sole legal and beneficial owner of such Offered Shares free and clear of all liens, encumbrances, security interests, claims and adverse interests of any kind whatsoever, and that the Selling Shareholder has full right and power to sell and transfer such Offered Shares to such Offeree Shareholder, (ii) a stock power or other instrument transferring all right, title and interest in and to such Offered Shares to such Offeree Shareholder, together with evidence of payment of all requisite transfer taxes (if any), (iii) such other documents by the Selling Shareholder as may be required pursuant to **Section 5.1**, and (iv) if the Offered Shares being purchased by all such Offeree Shareholders constitutes all of the Shares then owned by the Selling Shareholder, a resignation with respect to all offices and positions with the Company held by the Selling Shareholder, its Affiliates or their respective representatives, without prejudice to any rights that the Selling Shareholder, its Affiliates or their respective representatives may have pursuant to any written employment agreement with the Company, and (b) each such Offeree Shareholder shall execute, acknowledge and/or deliver to the Selling Shareholder (i) a sum equal to the cash portion of the purchase price for such Offered Shares in accordance with the provisions of this Agreement, payable by wire transfer or unendorsed cashier's check to the order of the Selling Shareholder, and if applicable, such documents concerning the portion of the purchase price for such Offered Shares representing indebtedness to pay cash in the future as the Selling Shareholder may reasonably request in accordance with the provisions of this Agreement, and (ii) such other documents by such Offeree Shareholder as may be required pursuant to **Section 5.1** hereof.

   4.4 **Confidentiality**.  The Investor agrees that the Investor will keep confidential and will not disclose, divulge or use for any purpose (other than to monitor the Investor's investment in the Company) any confidential information obtained from the Company pursuant to this Agreement or in connection with the Investor's ownership of the Shares or participation in the management of the Company, unless such confidential information (x) is known or becomes known to the public in general (other than as a result of a breach or violation by the Investor or any of its Affiliates or representatives of this **Section 4.4** or any other non-use or confidentiality obligation), (y) is or has been independently developed or conceived (as demonstrated by written evidence) by the Investor without use of, derivation from, reference to or reliance upon any of the Company's confidential information and without violating any of the confidentiality obligations hereunder or any other non-use or confidentiality obligation, or (z) is or has been made known or disclosed to the Investor by a third party without a breach of any legal, fiduciary, contractual or other obligation of confidentiality such third party may have to the Company; ***provided, however***, that the Investor may disclose the Company's confidential information (a) to the Investor's attorneys, accountants, consultants and other professionals to the extent necessary to obtain their services in connection with monitoring the Investor's investment in the Company, ***provided that*** the Investor informs each such individual that such information is confidential and that by receiving such information such individual is agreeing to maintain the confidentiality of such information, or (b) as may be required by applicable law, ***provided that*** the Investor delivers to the Company advance written notice of such disclosure and exercises reasonable best efforts to minimize the extent of any such required disclosure and obtain assurance that confidential treatment will be accorded to the disclosed information.

    4.5    **Investor Exchange Right**.

    **(A)**    The Company shall not, prior to the closing date of the first sale of Common Stock to the general public pursuant to a registration statement filed with and declared effective by the SEC under the Federal Securities Act (as defined in <u>Section 5.1</u>), declare or pay any dividends to the Shareholders unless it has first provided the Investor with notice of the Company's intent to declare or pay such dividends and provide the Investor with the right, exercisable within 15 days of the Investor's receipt of such notice, to exchange, on a one-for-one basis, its Shares of Common Stock, for Shares of a new class of preferred stock ("**Investor Preferred Stock**") providing for cumulative dividends at an annual rate (beginning on the Effective Date) of 8.0% ("**Accruing Dividends**"), which Accruing Dividends shall be payable only when, as and if declared by the Board, except that such Accruing Dividends shall be payable upon a liquidation event, and shall be paid prior to the payment of any dividends on Common Stock. Such Investor Preferred Stock shall in all other respects have the same rights and privileges as Common Stock, and shall vote together with the Common Stock as a single class, in each case, except as otherwise required by applicable law.

    **(B)**    In the event the Investor exercises its exchange right in accordance with <u>Section 4.5(A)</u>, the Company will cause its certificate of incorporation to be amended in order to provide for the authorization and issuance of the Investor Preferred Stock and the specification of the rights, preferences and privileges thereof.

    4.6    **Right to Equity Swap**.

    **(A)**    At any time Investor shall have the right to exchange with the Company all, or part, of its Shares in the Company for a number of Units of CBD representing an equivalent value determined as set forth in <u>Section 4.6(B)</u> below.

    **(B)**    Investor shall exercise its right hereunder by giving notice to the Company and the Company, after receiving such notice, shall promptly, but in no event later than 15 days after receiving such notice, appoint an Appraiser to determine the Company Value and the enterprise value of CBD as of such time (determined in the same manner set forth in the definition of "Company Value" hereunder). Once each such enterprise value has been determined by the selected Appraiser, the Company shall redeem all the Shares of Investor in exchange for the number of Units of CBD representing an equivalent value.

    **(C)**    Notwithstanding the foregoing, in no event will Investor receive pursuant to this <u>Section 4.6</u> voting Units of CBD in excess of 50% of the aggregate voting Units of CBD.

    4.7    **Special Indemnity**. CB Germany hereby agrees that it shall indemnify and hold harmless Investor from and against any Losses suffered by Investor as a result of claims for indemnification against CBE or CBD made by Investor pursuant to, and subject to the limitations set forth in, the Stock Purchase Agreement and/or the Subscription Agreement.

**5.**    <u>**TRANSFER RESTRICTIONS**</u>

5.1    <u>**General Transfer Restrictions**</u>. No Shareholder or any of its Affiliates shall Transfer any Shares held of record or owned beneficially, or both, by such Shareholder or its Affiliate, or any right, title or interest therein, either directly or indirectly, (i) in the absence of an effective registration or qualification statement pertaining thereto under the Securities Act of 1933, as amended, and all rules and regulations promulgated thereunder (collectively, "**Federal Securities Act**"), or the laws of any state, including the laws of the State of California, and all rules and regulations promulgated thereunder (collectively, "**State Securities Acts**"), or an exemption from such registration or qualification is established, and (ii) except as otherwise expressly permitted by this Agreement. Any attempted or purported Transfer of Shares held of record or owned beneficially, or both, by such Shareholder or its Affiliate, or any right, title or interest therein, either directly or indirectly, other than in accordance with and as permitted by this Agreement, whether by operation of law or otherwise, shall be null, void and without effect as against the Company and the other Shareholders.

5.2    <u>**Permitted Transfers**</u>. No Shareholder or any of its Affiliates shall Transfer any Shares held of record or owned beneficially, or both, by such Shareholder or Affiliate, or any right, title or interest therein, either directly or indirectly, except as follows:

(A)    <u>**Bona-Fide Sale to Unrelated Person.**</u> A Shareholder or any of its Affiliates may sell any or all of the Shares held of record or owned beneficially, or both, by such Shareholder or Affiliate, or any right, title or interest therein, either directly or indirectly, to any unrelated Person pursuant to a bona-fide offer of such unrelated Person, at a price and upon such terms and conditions as such Shareholder or Affiliate deems advisable in its sole and absolute discretion, subject to all of the terms, covenants, conditions and restrictions contained in this Agreement, including, without limitation, those set forth in **Sections 1.3, 4.1, 4.2, 4.3, 5.1** and **5.4** hereof.

(B)    <u>**Issuance of Minority Equity Interests.**</u>  A Shareholder or any of its Affiliates that is an entity may issue equity securities of such Shareholder or Affiliate representing less than fifty (50%) of the voting power of such Shareholder or Affiliate and which does not result in a change of control of either such Shareholder or such Affiliate (or, with respect to the Controlling Shareholder, a Change of Control Event), either directly or indirectly through one or more intermediaries, in one or more transactions occurring at any time, subject to all of the terms, covenants, conditions and restrictions contained in this Agreement, including, without limitation, **Section 5.1** and **5.4** hereof, other than those set forth in **Sections 1.3, 4.1, 4.2** and **4.3** hereof solely with respect to such Transfer.

(C)    <u>**Reorganization, Consolidation or Merger.**</u> A Shareholder or any of its Affiliates that is an entity may Transfer any or all of the Shares held of record or owned beneficially, or both, by such Shareholder or Affiliate, or any right, title or interest therein, either directly or indirectly, to, between or among such Shareholder and/or any one or more its Affiliates, with or without consideration, as part of any reorganization, consolidation or merger with, between or among such Shareholder and/or its Affiliates, as long as it doesn't constitute a Change of Control Event for the Controlling Shareholder subject to all of the terms, covenants, conditions and restrictions contained in this Agreement, including, without limitation, **Sections**

**1.3**, **5.1** and **5.4** hereof, other than those set forth in **Section 4.1, 4.2** and **4.3** hereof solely with respect to such Transfer.

   **(D)**  **Beneficial Owners.** A Shareholder or any of its Affiliates that is an entity may Transfer any or all of the Shares held of record or owned beneficially, or both, by such Shareholder or Affiliate, or any right, title or interest therein, either directly or indirectly, to, between or among any one or more of Beneficial Owners of such Shareholder or Affiliate, with or without consideration, as long as it doesn't constitute a Change of Control Event for the Controlling Shareholder subject to all of the terms, covenants, conditions and restrictions contained in this Agreement, including, without limitation, **Sections 1.3**, **5.1** and **5.4** hereof, other than those set forth in **Section 4.1, 4.2** and **4.3** hereof solely with respect to such Transfer.

   **(E)**  **Family Planning-Related Transfers, Etc.** A Shareholder or any of its Affiliates who is an individual may Transfer any or all of the Shares held of record or owned beneficially, or both, by such Shareholder or Affiliate, or any right, title or interest therein, either directly or indirectly, to a Qualified Trust, with or without consideration, subject to all of the terms, covenants, conditions and restrictions contained in this Agreement, including, without limitation, **Sections 1.3**, **5.1** and **5.4** hereof, other than those set forth in **Section 4.1, 4.2** and **4.3** hereof solely with respect to such Transfer; *provided*, *however*, that such Shareholder in such Shareholder's individual capacity shall not be released from, and shall remain responsible for, all of the terms, covenants, conditions and obligations on the part of the Qualified Trust to be performed and observed under this Agreement in respect to the Shares or portion thereof so Transferred, jointly and severally with such Transferee Qualified Trust.

  **5.3**  **Community Property; Death or Divorce, Etc.**

   **(A)**  **Community Property.** The parties acknowledge that Shares held by any Shareholder, or any indirect right, title or interest therein of any of its Affiliates, in whole or in part, may constitute community property of such Shareholder or Affiliate and the spouse of such Shareholder or Affiliate. Accordingly, such community property interest in such Shares may be subject to a right of testamentary disposition by such spouse upon the death of such spouse and a right of division of marital property upon dissolution of their marriage. Subject to the provisions of **Section 5.1** hereof, the parties agree that Shares or any right, title or interest therein acquired by any Transferee pursuant to any inter vivos, testate or intestate Transfer by the spouse of a Shareholder or its Affiliate, or pursuant to a division of marital property upon the dissolution of marriage of a Shareholder or its Affiliate and the spouse of such Shareholder or Affiliate, shall be subject to all of the provisions of this Agreement, including, without limitation, the provisions of **Article 5** hereof.

   **(B)**  **Death or Divorce, Etc.** Subject to the provisions of **Section 5.1** hereof, nothing contained in this Agreement shall be deemed to prohibit or otherwise restrict any Transfer of held of record or owned beneficially, or both, by any Shareholder or its Affiliates, or any right, title or interest therein, either directly or indirectly, pursuant to any testate or intestate Transfer by such Shareholder or Affiliate or, if such Shareholder or Affiliate is a trust, upon the death of any trustor of such trust, or any involuntary Transfer upon the divorce of such Shareholder or Affiliate or, if such Shareholder or Affiliate is a trust, upon the divorce of any

Page 25 of 35

trustor of such trust, to, between and among such Shareholder or Affiliate and any one or more Family Members of such Shareholder or Affiliate; ***provided, however,*** that all such Shares, or right, title or interest therein, shall remain subject to the provisions of this Agreement, and the Transferee to whom such Shares, or right, title or interest therein, are Transferred shall be deemed a Permitted Transferee hereunder and shall comply with the provisions of **Section 1.3, 5.1** and **5.4** hereof.

### 5.4    Change of Control.

The occurrence of one or both of the following scenarios will be deemed as a change of control event ("**Change of Control Event**"):

(A)    **Change of Control at the Company:** If the Controlling Shareholder sells all or part of its Shares in the Company such that its ownership interest in the Company would fall below fifty point one percent (50.1%), provided that, reductions of the Controlling Shareholder's interest in the Company below 50.1% which are due to capital increases of the Company by third parties' contributions shall not be considered as a Change of Control Event; or,

(B)    **Change of Control at the Controlling Shareholder:** If a Person other than Founder (a "**New Majority Shareholder**") obtains "control" (used in this **Section 5.4** as defined in the definition of "Affiliate" hereunder) of CB Germany.

If at any time: (i) the Controlling Shareholder wishes or intends to enter into one or more transactions, the effect of which would be to cause a Change of Control Event; or, (ii) CB Germany's shareholding structure has been altered in such way that a New Majority Shareholder obtains control of CB Germany; then the Controlling Shareholder will give written notice to Investor, of such transfer or situation, as it may correspond (a "**Change of Control Notice**"). In case of any attempt of Change of Control Event of CB Germany referred to above, CB Germany shall give notice to the New Majority Shareholder that under such event the New Majority Shareholder will be obligated to purchase all or part of Investor's Shares in the Company as specified in the Put Option mentioned in paragraph (y) below. In case Investor exercises the Put Option one or more times and the New Majority Shareholder fails to comply to purchase the Investor's Shares in the Company by the end of the last date for closing as established in paragraph (y) below, then on the day following such date, Investor shall give notice of the New Majority Shareholder's default and CB Germany will become obligated to comply with the Put Option in the same terms and conditions provided in paragraph (y) herein and purchase the Put Shares within the following 30 days.

In the case of the Change of Control Event mentioned in paragraph **(A)** above, Investor shall have the right to exercise its right of first refusal as described in **Section 4.3** and its tag-along right as described in **Section 4.2**. If Investor decides not to exercise these rights and gives notice to the Controlling Shareholder and the New Majority Shareholder of such decision within 15 days following receipt of the Change of Control Notice, from that moment on for a period of one hundred twenty (120) days Investor shall be free to sell and transfer (in one or more transactions) all or a portion of its Shares to any third parties, without being subject to any of the limitations

ACTIVE 211562594v.15

contained in this Agreement (other than **Section 1.3(B)** and clause (i) of **Section 5.1**), including but not limited to Sections **4.2** and **4.3**; *provided* that the proposed transferee of such Shares is not deemed by the Board, in its reasonable judgment, to be a direct competitor of the Company or a director, officer, employee or holder of more than 10% of a direct competitor of the Company.

In the case of a Change of Control Event described in paragraph (B), Investor shall have the right to sell and transfer (in one or more transactions) all or a portion of its Shares to the New Majority Shareholder, without being subject to any of the limitations contained in this Agreement (other than **Section 1.3(B)** and clause (i) of **Section 5.1**), including but not limited to Sections **4.2** and **4.3**, and within one hundred twenty (120) days from the reception by Investor of the Change of Control Notice, Investor may:

(y) Sell to the New Majority Shareholder, on one or more occasions during such 120-day period (the "**Put Period**"), and the New Majority Shareholder shall be obligated to purchase from Investor upon exercise of such option, all or a part of Investor's Shares as specified in a notice given by Investor to Controlling Shareholder and to the New Majority Shareholder (the "**Put Option**").

The Put Option may be exercised by Investor as many times as it may correspond during the Put Period, by giving written notice to the New Majority Shareholder and Controlling Shareholder (the "**Put Notice**") at any time (and, for the avoidance of doubt, on one or more occasions) during the Put Period.

In each case, the Put Notice shall specify: (a) the number (and if applicable, the type) of Shares which Investor is willing to sell to the New Majority Shareholder (the "**Put Shares**"); (b) the price per Share for those Put Shares (the "**Put Price**"), which shall be a sum in USD equal to the highest of: (i) two times (2x) the Investor Purchase Price, or (ii) an amount that would provide to the Investor an annual internal rate of return of twenty percent (20%) over the Investor Purchase Price, since the date such amount was disbursed by the Investor (which calculation shall include all dividends or any cash out payments to the Investor from the Company), divided between all Investor's Shares, and multiplied by the number of Put Shares; and (c) the bank account into which the Put Price shall be paid.

Closing of the purchase of the Put Shares will take place at the Company's headquarters office thirty (30) days following the date the Put Notice is given to the Controlling Shareholder and the New Majority Shareholder, unless the New Majority Shareholder and the Investor agree in writing to a different date, time or place. After such 30-day period, and only if the purchase of the Put Shares has not been executed by causes not attributable to Investor, the New Majority Shareholder shall pay Investor daily liquidated damages calculated in accordance with the following formula, which shall be paid together with the Put Price:

ACTIVE 211562594v.15

$$\frac{\text{Net profit of the Company for the prior Financial Year}}{360} \quad X \quad \text{Participation of Investor as of such date} \quad = \text{daily liquidated damages}$$

At the closing of such purchase, Investor will deliver to the New Majority Shareholder any documentation necessary to transfer the Put Shares to the New Majority Shareholder, free and clear of any lien or rights of others of any nature created by Investor, other than liens or rights created pursuant to this Agreement.

For the avoidance of doubt, Investor shall be entitled to any dividends, distributions or return of capital relating to the Put Shares which are the subject of the relevant Put Notice which were declared or otherwise had a record date on or before the date on which the Put Shares have been duly transferred to the New Majority Shareholder (and New Majority Shareholder has fully paid up the Put Price and, if corresponds, any daily liquidated damages accrued in Investor's favor). To the extent that any such dividends, distributions or return of capital are paid to the New Majority Shareholder, whether before or after the date where the Put Shares have been duly transferred to the New Majority Shareholder, the New Majority Shareholder shall be deemed to hold such amounts in trust and for the benefit of Investor and shall promptly pay to Investor an amount equal to the amount of such dividends, distributions or return of capital so received by it.

The parties agree that in case of a dilution of Investor and the Controlling Shareholder, by virtue of any future capital increase, by the incorporation of new investors or shareholders that will reduce the ownership interest of the Controlling Shareholder below 50.1% in the Company, then the Change of Control Event mentioned in paragraph (A) and (B) above, will cease to be enforceable against the Controlling Shareholder.

**5.5**  **Legends**. The certificates evidencing the Shares held by each Shareholder shall contain the following legends:

**THE SHARES OR OPTION, WARRANT OR OTHER RIGHTS TO ACQUIRE SHARES OF THE COMPANY REPRESENTED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED OR QUALIFIED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR ANY REGULATIONS PROMULGATED THEREUNDER, OR UNDER ANY APPLICABLE STATE SECURITIES ACTS OR ANY REGULATIONS PROMULGATED THEREUNDER, AND MAY NOT BE OFFERED FOR SALE, SOLD, PLEDGED, HYPOTHECATED, TRANSFERRED OR OTHERWISE DISPOSED OF UNLESS REGISTERED OR QUALIFIED UNDER THE SECURITIES ACT AND ALL APPLICABLE STATE SECURITIES LAWS OR AN EXEMPTION FROM SUCH REGISTRATION OR QUALIFICATION IS ESTABLISHED TO THE SATISFACTION OF THE COMPANY**

**THE SHARES OR OPTION, WARRANT OR OTHER RIGHTS TO ACQUIRE SHARES OF THE COMPANY REPRESENTED BY THIS CERTIFICATE ARE SUBJECT TO THE TERMS OF A SHAREHOLDERS AGREEMENT AMONG THE COMPANY AND CERTAIN SHAREHOLDERS OF THE COMPANY, INCLUDING THE HOLDER HEREOF, A COPY OF WHICH IS AVAILABLE FOR INSPECTION BY APPROPRIATE INTERESTED PARTIES AT THE PRINCIPAL OFFICE OF THE ISSUER, AND SUCH SHARES MAY NOT BE OFFERED FOR SALE, SOLD, PLEDGED, HYPOTHECATED, TRANSFERRED OR OTHERWISE DISPOSED OF EXCEPT IN COMPLIANCE WITH SAID SHAREHOLDERS AGREEMENT AND APPLICABLE LAWS.**

## 6.    TERM, DEFAULT AND TERMINATION

**6.1    Term**. The term of this Agreement shall commence on the date first above written and shall continuing indefinitely in full force and effect until (i) terminated in accordance with this Agreement, or (ii) all Shares held by the Shareholders become held by the Company and/or one remaining Shareholder, whichever occurs first.

**6.2    Default**. In the event that a party shall breach or default with respect to any of such party's material obligations set forth in this Agreement, and such breach or default is not cured within applicable grace periods, except as otherwise expressly provided in this Agreement, the nondefaulting party shall be entitled to such remedies as it is entitled to at law or in equity, including, without limitation, an action for damages and/or suit for specific performance, injunctive relief and other equitable remedies and the remedies of the Investor pursuant to the Stock Purchase Agreement executed between Concord Blue Engineering, GmbH, as Seller and the Investor as Purchaser, or under any related agreements including, but not limited to, the Membership Interest Subscription Agreement and the Amended and Restated Limited Liability Company Agreement dated on or about the date hereof. For the avoidance of doubt, a breach of this Agreement shall be deemed to be a breach under such other agreements.

**6.3    Opportunity to Cure**. Notwithstanding anything contained herein to the contrary, no breach or default as to any provision or obligation set forth in this Agreement shall be claimed or charged by any party against any other party unless (i) notice thereof has been given to the defaulting party, and (ii) such defaulting party shall have failed to cure such breach or default in all material respects within fifteen (15) days after the date such notice is given to the defaulting party (a "**Default**").

**6.4    Time of the Essence**. Except as provided in **Section 6.3** hereof, time is of the essence of this Agreement and each respective of the respective rights and obligations of the parties hereunder. Whenever the last day for the exercise of any right or the performance of any obligation hereunder shall fall on a Saturday, Sunday or legal holiday, the party shall have until 5:00 p.m., Pacific Time, on the next succeeding business day to exercise such right or perform such obligation.

ACTIVE 211562594v.15

**6.5**     **Termination**. This Agreement may be terminated at any time as follows:

**(A)**     By mutual agreement of the Shareholders; or

**(B)**     By the Company on the date the Company consummates an issuance of any class of its equity securities as a public offering pursuant to a registration or qualification statement filed with, and declared effective by, the Securities and Exchange Commission under the Federal Securities Act, or by any applicable state governmental authority of competent jurisdiction under any applicable States Securities Acts ("**Public Offering**"), upon written notice by the Company to each Shareholder.

**6.6**     **Cumulative Remedies**. In the event of any breach or default hereunder, no delay or omission in the exercise of any right or remedy by any nondefaulting party shall impair such right or remedy or be construed as a waiver of such breach or default. The waiver by any party of any term, covenant or condition herein contained shall not be deemed to be a waiver of any other term, covenant or condition herein contained. Except as otherwise expressly provided in this Agreement  or under applicable laws, all rights, powers, options or remedies afforded to any party hereunder shall be cumulative and not alternative, and the exercise of one or more rights, powers, options or remedies shall not bar any other rights, powers, options or remedies.

**6.7**     **Saving of Rights**.

**(A)**     The rights and remedies of Investor in relation to any misrepresentation or breach of warranty on the part of any of the Shareholder shall not be prejudiced by any investigation by or on behalf of Investor into the affairs of any of the Shareholders, by the execution or the performance of this Agreement or by any other act or thing by or on behalf of Investor which might prejudice such rights or remedies.

**(B)**     No course of dealing and no failure or delay by Investor or any other Party to this Agreement in exercising any power, remedy, discretion, authority or other right under this Agreement or any other agreement shall impair, or be construed to be a waiver of or an acquiescence in, that or any other power, remedy, discretion, authority or right under this Agreement, or in any manner preclude its additional or future exercise.

## 7.     GOVERNING LAW AND DISPUTE RESOLUTION

**7.1**     **Governing Law**. This Agreement, the respective rights, obligations and remedies of the parties hereunder and all controversies, disputes and claims under, arising from or related to this Agreement, the interpretation, breach, termination or validity hereof, or the transactions contemplated hereby, shall be governed by and construed in accordance with the internal laws of the State of Delaware, United States of America, without reference to its principles of conflict of laws.

**7.2**     **Consent to Jurisdiction and Venue**. Subject to **Sections 7.3** and **7.4** hereof, any action, suit, arbitration or other proceeding under, arising from or related to this Agreement, the interpretation, breach, termination or validity hereof, or the transactions contemplated hereby, shall be conducted only in County of Kent, State of Delaware, United States of America, in

accordance with this Section, and each party hereby irrevocably consents and submits to the personal jurisdiction of, and venue in, the Court of Chancery for the County of Kent, State of Delaware, United States of America, and the United States District Court for the District of Delaware, United States of America, in any such any action, suit, arbitration or other proceeding.

Investor declares that, notwithstanding to the contrary in this Agreement, Investor has sovereign status under the Eleventh Amendment to the United States Constitution and therefore reserves all immunities, defenses, rights or actions arising out from its sovereign status  except to the extent waived by statute. No waiver of such reserved immunities, defenses, rights or actions shall be implied or otherwise deemed to exist by any reason of Investor´s entry into this Agreement, by any express or implied provision thereof or by any actions or omissions to act by Investor or any of its representatives or agents, whether taken pursuant to this Agreement or prior to the Investor's execution thereof. This provision shall be governed by, and construed in accordance with, the laws of the State of Michigan, United States of America.

       **7.3**      <u>**Arbitration**</u>. Subject to the provisions of **Section 7.4** hereof, in the event of any controversy, dispute or claim under, arising from or related to this Agreement, the interpretation, breach, termination or validity hereof, or any of the transactions contemplated hereunder, the sole and exclusive remedy of the parties shall be to submit such controversy, dispute or claim to binding arbitration as provided herein. All arbitration proceedings pursuant to this Section shall be conducted only in the County of Kent, State of Delaware, United States of America, in accordance with the then-current rules and procedures of the American Arbitration Association by one (1) arbitrator appointed by the American Arbitration Association. Arbitration of the dispute shall commence no later than thirty (30) days after the appointment of such arbitrator, and shall be conducted before such arbitrator at a hearing of no more than three (3) days commenced no later than ninety (90) days after the selection or appointment of such arbitrator. The arbitrator shall be bound by the express terms of this Agreement and shall endeavor to reach his or her decision as quickly as possible, which decision shall be final and binding on the parties. Judgment on the award rendered by the arbitrator may be entered in any court of competent jurisdiction; any other application or dispute shall be submitted to the Court of Chancery for the County of Kent, State of Delaware, United States of America, or the United States District Court for the District of Delaware, United States of America, for determination.

       **7.4**      <u>**Equitable Remedies**</u>. Nothing contained in this Article shall be deemed or construed to limit or preclude the right of any party to seek and obtain in any court of competent jurisdiction any injunctive relief, specific performance or other equitable remedies to enforce and protect its rights under this Agreement and to prevent or curtail any breach or threatened breach of this Agreement by the other party. In connection therewith, each party acknowledges and agrees (i) that issuance or transfer of Shares to Shareholder as contemplated hereunder is of a special, unique and irreplaceable character, (ii) that monetary damages would not provide an adequate remedy in the event of the breach or threatened breach of any of terms, covenants and conditions on the part of such party to be performed or observed under this Agreement, and (ii) in the event of any breach or threatened breach of such terms, covenants and conditions by such party, that the other party shall be entitled to injunctive relief, specific performance and other equitable remedies in any court of competent jurisdiction to enforce and protect its rights under this Agreement and to prevent or curtail any breach or threatened breach of this Agreement by

ACTIVE 211562594v.15

the defaulting party without the necessity of proving actual damages and without the necessity of posting any bond or other security in connection therewith to the maximum extent permitted under applicable law, in addition to any other remedies to which it may be entitled. Seeking or obtaining any such injunctive relief, specific performance or other equitable remedies shall not be deemed a waiver of the right of arbitration hereunder by any party.

       7.5      **Waiver of Jury Trial**. each party hereby irrevocably waives the right to trial by jury in any action, suit or other proceeding under, arising from or related to this Agreement, the interpretation, breach, termination or validity hereof or the transactions contemplated hereby, to the maximum extent permitted under applicable laws.

       7.6      **Recovery of Costs**. In any legal action, equitable suit, arbitration or other proceeding under, arising from or related to this Agreement, the interpretation, breach, termination or validity hereof, or any of the transactions contemplated hereunder, the prevailing party shall be entitled to recover reasonable attorneys' fees and costs incurred by such party in connection therewith, in addition to any other relief to which such party may be entitled.

8.      MISCELLANEOUS PROVISIONS

       8.1      **Parties in Interest**. Nothing in this Agreement, whether express or implied, is intended to confer any rights or remedies under or by reason of this Agreement on any persons or entities other than the parties to it and their respective heirs, devisees, representatives, successors and permitted assigns, nor is anything in this Agreement intended to relieve or discharge the obligation or liability of any third persons to any party to this Agreement, nor shall any provision give any third persons any right of subrogation or action over against any party to this Agreement.

       8.2      **Assignment**. Each party acknowledges and agrees that the identity and investor qualifications of each Shareholder are of a special, unique and irreplaceable nature, and that no party may assign any of the rights or delegate any of the obligations of such party under this Agreement, either in whole or in part, at any time other than to a Permitted Transferee to whom any Shares may be Transferred, without the prior written consent of the other parties in each instance, which consent may be withheld for any or no reason or conditioned upon such additional terms and conditions as the non-assigning parties shall determine in their respective sole and absolute discretion. Any assignment of this Agreement, or any assignment of any of the rights or any delegation of any of the obligations of a party under this Agreement, either in whole or in part, in violation of this Section shall be null, void and without force or effect against the Company and the other Shareholders.

       8.3      **Notices**. All notices, directions and other communications required or permitted to be given hereunder ("**Notice**") shall be in writing and sent by certified or registered mail, return receipt requested, postage prepaid, or transmitted by facsimile, electronic mail or other form of electronic written communication that the recipient has the facilities to receive, promptly confirmed by a manually signed original thereof sent by certified or registered mail, return receipt requested, postage prepaid, or delivered personally against a signed receipt therefor, in each case to the intended recipient as follows: (i) **IF TO THE COMPANY**, to Concord Blue

Energy, Inc., 12424 Wilshire Boulevard, Suite 660, Los Angeles, California 90025, United States of America, Attention: President (E-Mail: cb@concordblueenergy.com), with a copy contemporaneously sent Concord Blue Energy, Inc., c/o Paracorp Incorporated, 2140 S. Dupont Highway, Camden, Delaware 19934, with a copy contemporaneously sent to Concord Blue Engineering GmbH, Konigsallee 6, 40212 Duesseldorf, Germany, Attention Christopher Thannhaeuser, Chairman (Facsimile Number: 492113230505; E-Mail: ct@concordblue.de), (ii) **IF TO CB GERMANY,** to Concord Blue Engineering GmbH, Konigsallee 6, 40212 Duesseldorf, Germany, Attention: Christopher Thannhaeuser, Chairman (Facsimile Number: 492113230505); E-Mail: ct@concordblue.de), (iii) **IF TO WES**, to Western Energy Solutions, LLC, 881 Alma Real Drive, Suite 301, Los Angeles, California 90272, United States of America, Attention: Wesley Bilson, Manager (E-Mail: wbilson@western4solutions.com), (iv) **IF TO Burmester**, to Stefan Burmester, An der Kalvey 21, 40489 Duesseldorf, Germany (Facsimile Number: 49711940415; E-mail:  sb@concordblue.de), (v) **IF TO the Investor**, to Verdant*ƒ* AG (on behalf of the Municipal Employees' Retirement System of Michigan), Attention: Ms. Gaia Arnaboldi / Mr. Berry Polmann, Gladbachstrasse 105, 8044 Zurich, Switzerland (Facsimile Number: 795553375 / 795555373), with a copy to [berry@verdantf.com and gaia@verdantf.com], and (vi) **IF TO AN ADDITIONAL SHAREHOLDER**, to such Additional Shareholder at the address for such Additional Shareholder specified in the Additional Shareholder Joinder to this Agreement pursuant to which such Additional Shareholder became a Shareholder under this Agreement, or at such other address as a party may designate from time to time by Notice given to the other parties in accordance with the provisions of this Agreement. Each Notice sent by certified or registered mail shall be deemed given on the date shown on the return receipt as the date of delivery or the date upon which the appropriate postal authority certifies that it was unable to effectuate delivery, whichever is applicable. Each Notice transmitted by facsimile, electronic mail or other form of electronic written communication or delivered personally shall be deemed given on the date of transmission or delivery, as the case may be.

       **8.4**    **Entire Agreement**. This Agreement contains the complete and entire understanding of the parties and shall supersede and replace any and all other arrangements, communications, representations or agreements, whether oral or written, with respect to the subject matter hereof.

       **8.5**    **Binding Effect**. This Agreement and the respective rights and obligations of the parties hereunder shall be binding upon and inure to the benefit of the parties hereto and their respective heirs, devisees, representatives, successors and permitted assigns.

       **8.6**    **Amendment**. In addition to automatic termination hereof as provided in **Section 6.5**, this Agreement may be amended, modified, terminated or supplemented and the observance of any provision hereof may be waived (either generally or in a particular instance, and either retroactively or prospectively) by a writing signed by (x) the Company, (y) Shareholders holding at least a majority of the shares of capital stock of the Company then held by all of the Shareholders (the "**Requisite Shareholders**"), and (z) the Investor.  Any amendment, modification, termination, supplement or waiver effected in accordance with this **Section 8.6** shall be binding on all parties hereto and all of their respective successors, permitted assigns, heirs, executors and administrators whether or not such party, successor, permitted assignee, heir, executor or administrator entered into or approved such amendment, modification,

termination, supplement or waiver.  Each Shareholder other than the Investor acknowledges that, by the operation of this **Section 8.6**, the Requisite Shareholders and the Investor will have the right and power to diminish or eliminate all rights of such Shareholder hereunder. Notwithstanding the foregoing and except as otherwise provided in **Section 6.5** with respect to automatic termination of this Agreement in its entirety.  Notwithstanding the foregoing and except as otherwise provided in **Section 6.5** with respect to automatic termination of this Agreement in its entirety:

> **(A)**    any provision hereof may be waived by a party, on such party's own behalf, without the consent of any other party; and

> **(B)**    this Agreement may not be amended, modified, terminated or supplemented and the observance of any provision hereof may not be waived with respect to any Shareholder without the written consent of such Shareholder unless such amendment, modification, termination, supplementation or waiver applies to all Shareholders, as the case may be, in the same fashion.

The Company shall give prompt written notice of any amendment, modification, termination, supplementation or waiver hereunder to any party hereto that did not consent in writing thereto. For purposes of this **Section 8.6**, the requirement of a written instrument may be satisfied in the form of an action by written consent of the stockholders circulated by the Company and executed by the stockholder parties specified, whether or not such action by written consent makes explicit reference to the terms of this Agreement.  No waivers of, or exceptions to, any term, condition or provision hereof, in any one or more instances, shall be deemed to be, or construed as, a further or continuing waiver of, or exception to, any such term, condition or provision.

> **8.7**    <u>**Waiver or Consent**</u>. No waiver of any rights or obligations under this Agreement or of any objection to any act or omission connected therewith shall be claimed or implied by any party, or be deemed or construed to constitute a consent to the continuation of any such act or omission or a consent to any other or future act or omission, unless in writing signed by the party against whom enforcement of such waiver or consent is sought.

> **8.8**    <u>**Severability**</u>. In the event any provision, clause or application of this Agreement is invalidated or unenforceable for any reason whatsoever, this Agreement shall remain binding and in full force and effect to the maximum extent permitted under applicable law, except for such invalidated or unenforceable provision, clause or application. If any injustice or frustration of purpose shall result therefrom, however, the parties shall negotiate in good faith to provide adjustments to ameliorate the effects of such injustice or frustration of purpose.

> **8.9**    <u>**Drafting Presumption**</u>. It is acknowledged that the parties and their respective agents have participated in an arms'-length negotiation in the preparation of this Agreement. As a consequence, the parties agree that no presumption shall be applied in any interpretation of this Agreement that the terms hereof shall be construed more strictly against the party who prepared the same, whether through such party's agents or otherwise.

**8.10**    **Headings**. The article and section headings contained in this Agreement are solely for the purpose of convenience and shall neither be deemed a part of this Agreement nor be used in any interpretation hereof.

**8.11**    **Gender**. Each term stated in the singular shall include the plural, and pronouns stated in the masculine gender shall include the feminine and neuter genders, and *vice versa*, wherever appropriate by the context.

**8.12**    **Counterparts**. This Agreement may be executed in one or more original or facsimile counterparts executed by a party and delivered personally or by facsimile or other form of electronic written communication that the other parties have the facilities to receive, which shall be effective when so executed and delivered by all parties, each of which shall be deemed an original and all of which shall constitute one and the same instrument. If any party so executes and delivers this Agreement in facsimile counterpart by facsimile or other electronic transmission to the other parties, such party shall promptly deliver to the other parties an original counterpart manually signed by such party, but the failure of such party to do so shall not affect the due execution and delivery of this Agreement by such party in accordance with the provisions of this Section.

**8.13**    **Capacity, Authority and Authorization**. Each party which is an entity represents (i) that it is a corporation, partnership, limited liability company or other entity, duly incorporated or organized and existing under the laws of the jurisdiction of its incorporation or organization, (ii) that it has all requisite power and authority to enter into this Agreement and to perform its obligations hereunder, and (iii) that all actions required to be taken by its directors, trustees, managers or partners and, if applicable, its shareholders, members or other owners to authorize the execution and delivery of this Agreement and the performance of its obligations hereunder have been duly and validly taken and are in full force and effect. Each individual signing this Agreement on behalf of a party which is an entity represents and warrants that he or she has been duly authorized by all requisite action to execute and deliver this Agreement on behalf of such party.

*[Signature pages follow]*

**IN WITNESS WHEREOF,** each party has duly executed and delivered this Shareholders Agreement as of the date first above written.

**CONCORD BLUE ENERGY, INC.**,
a Delaware corporation

By: _____
Wesley Bilson, Its President

**CONCORD BLUE ENGINEERING GMBH.**,
a German company

By: _____
Christopher Thannhaeuser, Its Director

**WESTERN ENERGY SOLUTIONS, LLC**,
a California limited liability company

By: _____
Gregory Bilson, Manager

**STEFAN BURMESTER**

By: _____

[Signature Page to Second Amended and Restated Shareholders Agreement]

**MUNICIPAL EMPLOYEES´ RETIREMENT SYSTEM OF MICHIGAN,**
a public nonprofit corporation established and maintained under the laws of the State of Michigan

By verdant ƒ AG pursuant to power of attorney dated March  8 , 2016

By:

Name: Gaia Arnaboldi, Berry Polmann
Title: Managing Partner, Managing Partner

[Signature Page to Second Amended and Restated Shareholders Agreement]

EXHIBIT "A"

## ADDITIONAL SHAREHOLDER JOINDER TO

## SECOND AMENDED AND RESTATED SHAREHOLDERS AGREEMENT

THIS ADDITIONAL SHAREHOLDER JOINDER TO SECOND AMENDED AND RESTATED SHAREHOLDERS AGREEMENT (this "**Joinder**") is made as of _____, _____, by and between CONCORD BLUE ENERGY, INC., a Delaware corporation ("**Company**"), and _____,    a[n]    _____ ("**Additional Shareholder**"), as an Additional Shareholder and party to that certain Second Amended and Restated Shareholders Agreement dated March 8, 2016, by and among CONCORD BLUE ENERGY, INC., a Delaware corporation ("**Company**"), CONCORD BLUE ENGINEERING GMBH, a German company ("**CB Germany**"), WESTERN ENERGY SOLUTIONS, LLC, a California limited liability company ("**WES**") (CB Germany and WES being hereinafter sometimes referred to separately as an "**Original Shareholder**" and collectively as the "**Original Shareholders**"), STEFAN BURMESTER ("**Burmester**"), Municipal Employees' Retirement System of Michigan, a public nonprofit corporation established and maintained under the laws of the State of Michigan  (the "**Investor**") and such other Person or Persons, if any, as have been added as a party or parties thereto pursuant to the provisions of **Section 1.3(A)** thereof prior to the date hereof (if and as amended to date and as amended by this Joinder) (collectively, the "**Shareholders Agreement**"), with reference to the following facts:

WHEREAS, Additional Shareholder desires to acquire from the Company, and the Company is willing to issue, sell or transfer to Additional Shareholder, certain Shares of the Company, subject to, among other things, the terms and conditions of the Shareholders Agreement and this Joinder;

NOW THEREFORE, in consideration of the foregoing, the mutual promises, covenants and agreements contained in the Shareholders Agreement and other good and valuable consideration, receipt and sufficiency of which are hereby mutually acknowledged, the parties, intending to be bound legally, hereby agree as follows:

1.      **Interpretation.** Capitalized terms not otherwise defined herein shall have the meanings ascribed to such terms in the Shareholders Agreement. In the event of any inconsistency between the provisions of the Shareholders Agreement and this Joinder thereto, the provisions of this Joinder shall govern and control in all respects.

2.      **Additional Shareholder Added as Party to Shareholders Agreement.** As a condition of the issuance, sale or transfer Shares to Additional Shareholder by the Company, Additional Shareholder shall be, and hereby is, added as a Shareholder and a party to the Shareholders Agreement upon the terms and subject to the conditions contained in the Shareholders Agreement, with the modifications, additional and/or supplemental terms and conditions applicable to Additional Shareholder set forth in Section 3 hereof, if any, pursuant to **Section 1.3(A)** of the Shareholders Agreement.

3.    **Modifications, Additional and/or Supplemental Terms**. The following modifications, additional and/or supplemental terms to the Shareholders Agreement shall be applicable to Additional Shareholder:

[Specify modified, additional and/or supplemental terms or state none]

4.    **Acceptance and Assumption by Additional Shareholder.** Additional Shareholder shall, and hereby does, accept the addition of Additional Shareholder as a Shareholder and party to the Shareholders Agreement, upon the terms and subject to the conditions contained in the Shareholders Agreement, with the modifications, additional and/or supplemental terms and conditions applicable to Additional Shareholder set forth in Section 3 hereof, if any, pursuant to Section 2 hereof, and agrees to be bound by, and to duly and timely perform and observe, all of the terms, covenants and conditions on the part of Additional Shareholder to be performed or observed under the Shareholders Agreement and this Joinder, including, without limitation, modifications, additional and/or supplemental terms to the Shareholders Agreement set forth in Section 3 hereof, if any.

5.    **Notices to Additional Shareholder**. All Notices to Additional Shareholder shall be in writing and sent by certified or registered mail, return receipt requested, postage prepaid, or transmitted by facsimile, electronic mail or other form of electronic written communication that Additional Shareholder has the facilities to receive, promptly confirmed by a manually signed original thereof sent by certified or registered mail, return receipt requested, postage prepaid, or delivered personally against a signed receipt therefor, in each case to [specify name, address, facsimile number and email address of Additional Shareholder], or at such other address as Additional Shareholder may designate from time to time by Notice given to the Company and other Shareholder in accordance with the provisions of **Section 8.3** of the Shareholders Agreement.

6.    **Ratification of Shareholders Agreement**. Except as expressly modified by this Joinder, the Shareholders Agreement shall remain in full force and effect in accordance with its terms, and is hereby ratified and confirmed in all respects.

7.    **Counterparts**. This Joinder may be executed in one or more original or facsimile counterparts manually signed by a party and delivered personally or by facsimile or other electronic transmission to the other party, each of which shall be deemed an original and all of which shall constitute one and the same instrument and shall be effective when so executed and delivered by all parties.  If any party so executes and delivers this Joinder in facsimile counterpart by facsimile or other electronic transmission to the other party, such party shall promptly deliver to the other party an original counterpart manually signed by such party, but the failure of such party to do so shall not affect the due execution and delivery of this Joinder by such party in accordance with the provisions hereof.

8.    **Capacity, Authority and Authorization**. Each party which is an entity represents (i) that it is a corporation, partnership, limited liability company or other entity, duly incorporated or organized and existing under the laws of the jurisdiction of its incorporation or organization, (ii) that it has all requisite power and authority to enter into this Agreement and to perform its obligations hereunder, and (iii) that all actions required to be taken by its directors, trustees, managers or partners and, if applicable, its shareholders, members or other owners to authorize

the execution and delivery of this Agreement and the performance of its obligations hereunder have been duly and validly taken and are in full force and effect. Each individual signing this Agreement on behalf of a party which is an entity represents and warrants that he or she has been duly authorized by all requisite action to execute and deliver this Agreement on behalf of such party.

**IN WITNESS WHEREOF,** each party has caused this Additional Shareholder Joinder to Shareholders Agreement to be executed and delivered by him or her or its behalf by its duly authorized representative as of the date first above written.

**CONCORD BLUE ENERGY, INC.,**                    **[ADDITIONAL SHAREHOLDER]**

a Delaware corporation




By: _____          By: _____

       [Name; Title]




Additional Shareholder Joinder to Shareholders Agreement 3 of 3

EXHIBIT "B"

PERMITTED TRANSFEREE JOINDER TO

SECOND AMENDED AND RESTATED SHAREHOLDERS AGREEMENT

THIS PERMITTED TRANSFEREE JOINDER TO SECOND AMENDED AND RESTATED SHAREHOLDERS AGREEMENT (this "**Joinder**") is made as of _____, _____, by and between CONCORD BLUE ENERGY, INC., a Delaware corporation ("**Company**"), and _____, a[n] _____ ("**Permitted Transferee**"), as a Shareholder and party to that certain Second Amended and Restated Shareholders Agreement dated March 8, 2016, by and among CONCORD BLUE ENERGY, INC., a Delaware corporation ("**Company**"), CONCORD BLUE ENGINEERING GMBH, a German company ("**CB Germany**"), WESTERN ENERGY SOLUTIONS, LLC, a California limited liability company ("**WES**") (CB Germany and WES being hereinafter sometimes referred to separately as an "**Original Shareholder**" and collectively as the "**Original Shareholders**"), STEFAN BURMESTER ("**Burmester**"), Municipal Employees' Retirement System of Michigan, a public nonprofit corporation established and maintained under the laws of the State of Michigan  (the "**Investor**") and such other Person or Persons, if any, as have been added as a party or parties thereto pursuant to the provisions of **Section 1.3(A)** thereof prior to the date hereof (if and as amended to date and as amended by this Joinder) (collectively, the "**Shareholders Agreement'**), with reference to the following facts:

WHEREAS, Permitted Transferee acquired Shares of the Company (the "**Transferred Shares**") from [specify Transferor Shareholder] ("**Transferor Shareholder**") in accordance with the terms and conditions of the Shareholders Agreement, subject to the terms and conditions of the Shareholders Agreement;

NOW THEREFORE, in consideration of the foregoing, the mutual promises, covenants and agreements contained in the Shareholders Agreement and other good and valuable consideration, receipt and sufficiency of which are hereby mutually acknowledged, the parties, intending to be bound legally, hereby agree as follows:

1.    **Interpretation.** Capitalized terms not otherwise defined herein shall have the meanings ascribed to such terms in the Shareholders Agreement. In the event of any inconsistency between the provisions of the Shareholders Agreement and this Joinder thereto, the provisions of this Joinder shall govern and control in all respects.

2.    **Permitted Transferee Added as Party to Shareholders Agreement.** Permitted Transferee shall be, and hereby is, added as a Shareholder and a party to the Shareholders Agreement upon the terms and subject to the conditions contained in the Shareholders Agreement applicable to Transferee Shareholder in respect to the Transferred Shares pursuant to **Section 1.3(B)** of the Shareholders Agreement.

3.    **Acceptance and Assumption by Permitted Transferee.** Permitted Transferee shall, and hereby does, accept the addition of Permitted Transferee as a Shareholder and party to the

Shareholders Agreement, upon the terms and subject to the conditions contained in the Shareholders Agreement, and agrees to be bound by, and to duly and timely perform and observe, all of the terms, covenants and conditions on the part of Transferor Shareholder to be performed or observed under the Shareholders Agreement in respect to the Transferred Shares.

4.    **Notices to Additional Shareholder**. All Notices to Permitted Transferee shall be in writing and sent by certified or registered mail, return receipt requested, postage prepaid, or transmitted by facsimile, electronic mail or other form of electronic written communication that Permitted Transferee has the facilities to receive, promptly confirmed by a manually signed original thereof sent by certified or registered mail, return receipt requested, postage prepaid, or delivered personally against a signed receipt therefor, in each case to [specify name, address, facsimile number and email address of Permitted Transferee], or at such other address as Permitted Transferee may designate from time to time by Notice given to the Company and other Shareholder in accordance with the provisions of **Section 8.3** of the Shareholders Agreement.

5.    **Ratification of Shareholders Agreement**. Except as expressly modified by this Joinder, the Shareholders Agreement shall remain in full force and effect in accordance with its terms, and is hereby ratified and confirmed in all respects.

6.    **Counterparts**. This Joinder may be executed in one or more original or facsimile counterparts manually signed by a party and delivered personally or by facsimile or other electronic transmission to the other party, each of which shall be deemed an original and all of which shall constitute one and the same instrument and shall be effective when so executed and delivered by all parties.  If any party so executes and delivers this Joinder in facsimile counterpart by facsimile or other electronic transmission to the other party, such party shall promptly deliver to the other party an original counterpart manually signed by such party, but the failure of such party to do so shall not affect the due execution and delivery of this Joinder by such party in accordance with the provisions hereof.

7.    **Capacity, Authority and Authorization**. Each party which is an entity represents (i) that it is a corporation, partnership, limited liability company or other entity, duly incorporated or organized and existing under the laws of the jurisdiction of its incorporation or organization, (ii) that it has all requisite power and authority to enter into this Agreement and to perform its obligations hereunder, and (iii) that all actions required to be taken by its directors, trustees, managers or partners and, if applicable, its shareholders, members or other owners to authorize the execution and delivery of this Agreement and the performance of its obligations hereunder have been duly and validly taken and are in full force and effect. Each individual signing this Agreement on behalf of a party which is an entity represents and warrants that he or she has been duly authorized by all requisite action to execute and deliver this Agreement on behalf of such party.

**8.**

 **IN WITNESS WHEREOF,** each party has caused this Permitted Transferee Joinder to Shareholders Agreement to be executed and delivered by him or her or its behalf by its duly authorized representative as of the date first above written.

**CONCORD BLUE ENERGY, INC.,**                    **[PERMITTED TRANSFEREE]**

a Delaware corporation

By: _____         By:  _____

     [Name; Title]