# **EXHIBIT 6**

# PARTNERING AGREEMENT

This Partnering Agreement ("Agreement") is entered into this 8th day of March, 2016, by and between, Concord Blue Energy, Inc., a corporation organized and existing under the laws of the State of Delaware with offices at 12424 Wilshire Boulevard, Suite 660, Los Angeles, California 90025 ("CBE"), Concord Blue Development, LLC, a limited liability company organized and existing under the laws of the State of Delaware with offices at 12424 Wilshire Boulevard, Suite 660, Los Angeles, California 90025 ("CBD") and verdant $f$ AG, a limited liability company organized and existing under the laws of Switzerland with offices at Gladbachstrasse 105, 8044 Zurich, Switzerland ("V$f$"), hereinafter collectively referred to as the "Parties", and individually as the "Party".

## 1    PREMISES

WHEREAS, various external parties will be seeking to develop Waste Conversion (hereinafter "WC") projects (the "Projects" or "WC Projects");

WHEREAS, the Parties wish to work together to identify, secure and develop the Projects;

WHEREAS, CBE is experienced in the design, development, and prototyping of WC technology and possesses related proprietary Technical Data and Technical Know-How that is valuable and unique to CBE;

WHEREAS, CBD is focused on the construction, lease and ownership, and the operation, management, maintenance, financing and refinancing of Projects;

WHEREAS, V$f$ is experienced in the sourcing, diligence, structuring and management of assets and capital, and possesses related proprietary relationships with capital sources that are valuable and exclusive to V$f$;

WHEREAS, the Parties have unique and complementary backgrounds and capabilities that, together, will enhance the likelihood of successfully developing WC Projects; and

WHEREAS, the Parties recognize the efficiency of partnering and wish to partner for the purpose of competitively developing any resulting WC Projects.

NOW, THEREFORE, in consideration of the foregoing, and in express reliance upon the following mutual promises and covenants, the Parties agree as follows:

## 2 DEFINITIONS

**"External Capital"** means capital not provided by any CBD equity holder or CBE shareholder or by any local developer or any other development partner that is involved in the applicable Project.

**"Closing"** means the funding of CBD's $25 million equity raise with the Municipal Employee's Retirement System ("MERS") ("CB Equity Raise").

**"CB CAPITAL"** has the meaning described in Section 5 below.

**"DoD ROFR"** means the Right Of First Refusal for CBD to raise External Capital required to develop Department of Defense projects in cooperation with Lockheed Martin Corporation, a Maryland corporation, acting through its Missile and Fire Control business unit, or, at its election, one of its wholly-owned affiliates, as established in the Teaming Agreement between CBE and Lockheed Martin.

## 3 GOALS

3.1 COMMON GOALS

    (i) Maximize global roll out of CBE' Reformer technology to further the positive environmental impact

    (ii) Ensure a strong financial return for parties

    (iii) Ensure CB Reformer technology to remain in the long term the leading, commercially viable technology

    (iv) Secure the first projects of CBD and ensure its economic viability and financing

    (v) Build a long term sustainable business

3.2 CONCORD BLUE, ALL ENTITIES,

    (i) Secure realistic and appropriate revenues from Intellectual Property (IP) and secure the long term value proposition of the IP by continuous development

    (ii) Secure realistic and appropriate revenues from Reformer sales

    (iii) Maximize the long term profitability of CBD by maximizing the global footprint of CBD

    (iv) Maximize the beneficial environmental impact globally

    (v) Be a key player towards establishing and profiting from a hydrogen economy

    (vi) Electrify Africa

3.3 VERDANT$f$,

    (i) Hedge downside and/or reputational risk for V$f$ and its clients

    (ii) Minimize financial downside risk for clients

(iii) Maximize long term financial returns for clients while ensuring strong medium term cash yield distribution, within environmental, reputational and risk constraints

(iv) Maximize environmental benefits

(v) Create a healthy revenue stream for V$f$ via management of External Capital required for WC projects based on CBE's Reformer technology

The Parties acknowledge that the foregoing goals constitute objectives only and no Party shall be liable under, or in breach of, this Agreement for the failure of any such objective to be achieved.

## 4    PURPOSE OF THIS AGREEMENT

Parties intend to enter into a long term partnership to support the global rollout of CBE's Reformer technology via the development and building of WC Projects.

Parties agree that CBD's objective is to monetize fully developed and operational WC Projects by transferring such Projects into one or more special purpose vehicles, yieldcos, or yieldco-like vehicles, organized, structured and managed by V$f$, on terms acceptable to CBD, in order to free up CBD's project development equity, lock in project development premiums, generate a return for CBD investors and accelerate the global roll out of CBD.

Pursuant and subject to the terms and conditions set forth herein, parties agree to form a strategic alliance pursuant to which the parties will operate under principles of mutual trust, open communication and in cooperation with each other.

## 5    CB CAPITAL

CBD will establish an investment subsidiary CB CAPITAL (working title) for raising and managing External Capital (in the form of equity, debt and hybrid instruments), for all WC Projects which CBD is developing, where External Capital is required or intended to be used.

CB CAPITAL's role is to support and accelerate the global roll-out of CBD by raising External Capital and manage that External Capital via special purpose vehicles, yieldcos, or similar vehicles in order to free up CBD's project development equity, lock in project development premiums, generate a return for CBD investors and accelerate the global roll-out of CBD.

CB CAPITAL will be wholly owned by CBD, however V$f$ will manage CB CAPITAL pursuant to a management agreement[1]. At the CBD's board request, V$f$ can open the CB CAPITAL platform for non V$f$ related capital or joint venture with other parties in a revenue sharing agreement in order to accelerate CBE technology or make expansion possible.

CB CAPITAL shall have a right of first refusal to provide all or part of the External Capital and CBD shall provide CB CAPITAL with written notice of the opportunity and

---

[1] Management agreement to include appropriate indemnification provisions for breaches/violations of law.

3

the material terms and conditions for providing such External Capital. CB CAPITAL shall have a period of ninety (90) days from the receipt of such notice to elect whether to provide External Capital, in its sole discretion; provided that such period shall automatically be decreased (i) to fifteen (15) days on the date that is nine (9) months following the date of availability of a viable group of projects that form a pipeline for a specific SPV e.g. Island Nations, US Non-Defense, etc. ("SPV Pipeline Formation"), unless $Vf$ in its sole discretion elects prior to the expiration of such nine (9) month period to extend such fifteen (15) day period to sixty (60) days, (ii) if $Vf$ makes the election described in clause (i), to fifteen (15) days on the date that is twelve (12) months following the SPV Pipeline Formation, unless $Vf$ in its sole discretion elects prior to the expiration of such twelve (12) month period to extend such sixty (60) day period to thirty (30) days, and (iii) to fifteen (15) days on the date that is fifteen (15) months following the SPV Pipeline Formation;. If CB CAPITAL does not respond in writing during such period or elects not to provide the required External Capital, CBD may offer the opportunity to provide such External Capital to a third party; provided, however, that CBD shall not offer to a third party the opportunity to provide such External Capital on terms substantially more favorable than those set forth in the initial notice provided to CB CAPITAL, unless such more favorable terms have been offered to CB CAPITAL and CB CAPITAL has not elected to provide the External Capital under such more favorable terms within thirty (30) days of receiving the more favorable terms.

CBD shall make every reasonable effort to enforce the DoD ROFR. CB CAPITAL will represent CBD in exercising any DoD ROFR and shall be responsible for all costs and obligations related to organizing and managing the CB CAPITAL vehicles, except as otherwise approved by CBD; provided that in no event will CB CAPITAL create or subject CBD to any obligation without CBD's prior written consent. CB CAPITAL will grant MERS of Michigan (MERS), a $Vf$ client, a USD 150m right of first refusal on providing External Capital for WC projects with LM and the DoD.

$Vf$ is structured to share revenues derived from the management of CB CAPITAL, with MERS upon the finalization of the $Vf$ – MERS framework agreement.

$Vf$ aims to raise long term capital via private investment fund or yieldcos-like structure to enable flexibility and expedient and secure capital allocation processes and will be compensated via market standard management fees and incentive structures for which $Vf$ will provide the required fiduciary and regulatory services, structuring framework, risk management and reporting. For the avoidance of doubt there will be no double layer of management fees, clients will only pay management fees to management of their respective investment vehicle, CBD will not pay CB CAPITAL nor $Vf$ additionally.

$Vf$ represents and warrants that neither the execution and delivery of this Agreement by it, the consummation of the transactions herein contemplated, nor the fulfillment of, or compliance with, the terms and provisions hereof by it, conflict with any applicable law, regulation or rule of any governmental instrumentality governing its business. Further, no consent, approval or other authorization of or by, or filing or registration with, any court, administrative or regulatory agency or other governmental authority is required to be obtained by it in connection with the transactions contemplated by this Agreement, except

for those consents, approvals or other authorizations that will be timely obtained by $Vf$ to the extent required by applicable law.

## 6 RESTRICTIONS

$Vf$ will provide the services outlined in this document targeted at the waste conversion space solely to CB CAPITAL.

CBE shall ensure that no CB existing or sponsored equity is deploying activities directly or indirectly competitive to CBD, undercutting or eroding CBD's market position without prior approval of a Supermajority Board Vote (as defined in CBD's Amended and Restated Limited Liability Company Agreement).

CBE shall use every reasonable efforts to ensure via its Teaming Agreement with Lockheed Martin that the DoD ROFR is secured and enforced, and that the intellectual property stemming from ongoing development between LM and CBE is sufficiently secured and available to CBD to the extent provided under the terms of the Teaming Agreement.

CBE shall make any improvement to the CB Reformer technology available to CBD before or concurrently with its making available to non CBD clients in order to protect the long term market position and viability of CBD and CBD's Projects.

CBE shall ensure that WC projects where CBE, CBD or any other affiliate of CBE has a direct or indirect equity or equity like position will flow through CBD unless formally declined by CBD.

## 7 COSTS

Both MERS and $Vf$ will be reimbursed, subject to the cost cap below, for all costs and fees incurred in relation to the Closing within 3 months after the date of the Closing, upon presentation of corresponding invoices.

Cost Cap:
  (i)   $100k legal and structuring
  (ii)  $75k financial modelling and external consultants
  (iii) $50k per $Vf$ involved partner (3), including all expenses

## 8 CONFIDENTIALITY

Confidentiality between parties is governed by the Non Disclosure Agreement (DOC NR) between CB and $Vf$. This agreement will be amended and restated to reflect:

MERS requires full confidentiality on their investments and their name can only be released to investors and business partners based upon prior written consent

MERS requires full confidentiality regarding the financial performance of their investments, subject to any law, rule, regulation or the lawful requirement of a governmental authority or otherwise in connection with any other legal, regulatory, judicial, arbitral or administrative

5

process; and provided that such confidentiality shall not apply to any other direct or indirect investor in CBD.

The need for $Vf$, CBE and CBD to raise capital and win project bids and predetermined information might need to be released, the amended and reinstated NDA will reflect a mutually agreed frame work

## 9 ASSIGNMENT

No Party may assign, transfer or convey its rights or delegate its duties under this Agreement without the written approval of the other Parties.

## 10 LIMITATION OF LIABILITY

No Party shall be liable to another, whether based on contract, tort (including negligence), strict liability or any other legal theory for any special, consequential, indirect, exemplary or punitive damages, including, but not limited to, loss of revenue, loss of profit, loss of business opportunity, pollution or environmental damages, occupational diseases, toxic torts, or loss from not achieving a financial close on the first investment round of CBD.

## 11 NO OBLIGATION TO INVEST

No provision of this Agreement shall be construed as creating an obligation or a firm undertaking by any Party to invest equity capital into any partnership, corporation or other business association; and no such commitment shall arise except with the approval of the Board of Directors or other governing body of such Parties and receipt of required regulatory approvals.

## 12 TERMINATION

This Agreement shall terminate and have no further effect, except with respect to the obligations with respect to $Vf$'s fiduciary duty regarding its clients invested capital, it's fund or yieldcos like structure in effect prior to termination, which shall survive in accordance with their terms, upon the occurrence of any of the following events:

(i) written agreement signed by both Parties;

(ii) if any Party files for bankruptcy or is debarred or suspended by a competent governmental authority, if such debarment or suspension precludes the participation by such Party in pursuing any WC Projects (and not if such debarment or suspension simply precludes the pursuit of one or more individual third party contracts under any WC Projects);

(iii) the fifth (5th) anniversary of the date of this Agreement, unless $Vf$ in its sole discretion, decides to exercise an option to extend twice the term of this Agreement for an additional five (5) years to reflect the typical 15 to 20 year duration of energy infrastructure investment vehicles.

6

## 13   NOTICES

All notices under this Agreement shall be in writing by email, as follows:

| To V$f$: | To CB: |
|---|---|
| Gladbachstrasse 105<br>Zurich, Zurich 8044 Switzerland | 12424 Wilshire Blvd, Suite 660<br>Los Angeles, California 90025 USA |
| gaia@verdantf.com | gb@concordblueenergy.com and<br>ct@concordblueenergy.com |

Either Party may change the address to which such notice or communication is directed by not less than seven (7) days prior written notice to the other Party. Notices or other communications will be effective upon receipt during regular business hours, being Monday through Friday, 8:00 a.m. to 5:00 p.m. recipient's local time, or one (1) hour after the next regular business day begins if received on a non-business day in the jurisdiction of the recipient.

## 14   Governing Law

This Agreement shall be governed by and construed in accordance with the laws of the State of California and the Parties irrevocably submit to the exclusive jurisdiction of the Los Angeles courts.

## 15   Dispute Resolution

The Parties shall use commercially reasonable efforts to first settle any claim, controversy, or dispute (each a "Dispute") arising out of or related to the existence, validity, construction, performance and termination of this Agreement (or any terms thereof) between themselves. Except as set forth below, if any Dispute cannot be resolved between the Parties or through non-binding mediation within thirty (30) days of notice of such Dispute, the Dispute shall be finally settled through binding arbitration. The arbitration shall be held in Los Angeles, California, or such other venue as the Parties may agree, in accordance with the Rules of Conciliation and Arbitration of the American Arbitration Association (the "Rules") by three arbitrators appointed in accordance the Rules. Subject to Clause 11, LIMITATION OF LIABILITY, the arbitrators shall have authority to provide any relief available in law or equity. Judgment on the arbitral award may be entered in any court or tribunal having jurisdiction thereof. No arbitration arising out of or related to this Agreement shall include, by joinder or other manner, any person not a party to this Agreement. Each Party shall be responsible for its own attorney's fees and costs.

Notwithstanding the foregoing, The Parties agree and acknowledge that it may be necessary under certain circumstances to seek specific performance or injunctive relief to enforce this Agreement. In any such event, the aggrieved Party will be entitled to avail itself of the appropriate court in Los Angeles, California to obtain such relief.

**IN WITNESS THEREOF,** the undersigned being duly authorized on behalf of CB and V$f$ sign the present Partnering Agreement.

CONCORD BLUE ENERGY, INC.                    FOR VERDANT$f$

BY: _C. TLL5_____                          BY:_____

NAME: Christopher Thannhaeuser              NAME:_____

TITLE: CEO                                   TITLE:_____


CONCORD BLUE DEVELOPMENT, LLC

BY: _[signature]_____

NAME: Gregory Bilson

TITLE: Manager

[Signature Page to Partnering Agreement]

**IN WITNESS THEREOF,** the undersigned being duly authorized on behalf of CB and V$f$ sign the present Partnering Agreement.

CONCORD BLUE ENERGY, INC.

BY:_____

NAME:_____

TITLE:_____

FOR VERDANT$f$

BY:_____ *[signature]*

NAME: Berry Polmann,    Gaia Arnaboldi

TITLE: Managing Partner, Managing Partner

CONCORD BLUE DEVELOPMENT, LLC

BY:_____

NAME:_____

TITLE:_____

[Signature Page to Partnering Agreement]