# **EXHIBIT 12**

*EXECUTION VERSION*

# SECOND AMENDMENT TO
# AMENDED AND RESTATED
# LIMITED LIABILITY COMPANY AGREEMENT

### (Concord Blue Development, LLC)

**THIS SECOND AMENDMENT TO AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT** (this "*Amendment*"), dated as of November 24th, 2020, is entered into by and among Concord Blue Development, LLC, a Delaware limited liability company (the "*Company*"), Concord Blue Energy, Inc., a Delaware corporation ("*CBE*"), Municipal Employees' Retirement System of Michigan, a public nonprofit corporation established and maintained under the laws of the State of Michigan ("*MERS*"), and Berger Group Holdings, Inc. ("*LBG*"). Capitalized terms not defined herein shall have the meaning set forth in the LLC Agreement and Subscription Agreement (as defined below).

### RECITALS

**WHEREAS**, the Company was organized and formed by filing a Certificate of Formation with the Secretary of State of the State of Delaware on July 24, 2014 (the "*Certificate of Formation*");

**WHEREAS**, the Company and CBE entered into that certain Operating Agreement of Concord Blue Development, LLC, dated as of July 24, 2014 (the "*Original LLC Agreement*");

**WHEREAS**, the Company, CBE and MERS entered into that certain Membership Interest Subscription Agreement, dated as of March 6, 2016 (the "*Subscription Agreement*"), as subsequently supplemented by that certain Addendum No. 1 to the Membership Interest Subscription Agreement dated as of August 24, 2017;

**WHEREAS**, the Company, CBE and MERS entered into that certain Amended and Restated Limited Liability Company Agreement, dated as of March 21, 2016 (the "*LLC Agreement*"), which amended and restated the Original LLC Agreement;

**WHEREAS**, LBG became a Member of the Company on July 18, 2016 by the conversion of the LBG Note;

**WHEREAS**, the Company, CBE and MERS executed by written consent pursuant to pursuant to Section 7.02 of the LLC Agreement that certain First Amendment to the Amended and Restated Limited Liability Company Agreement, dated as of February 8, 2017, altering certain manager voting rights; and

**WHEREAS**, the parties hereto now wish to further amend the LLC Agreement and to amend the Subscription Agreement on the terms set forth herein;

**NOW, THEREFORE**, in consideration of the foregoing and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

EXECUTION VERSION

# ARTICLE 1   AMENDMENT

**Section 1.01    Amendments.**  In accordance with Section 12.13 of the LLC Agreement, the LLC Agreement is hereby amended as follows:

(a)    Anti-Dilution.  Section 3.06 of the LLC Agreement is amended by deleting such section in its entirety and substituting the following:

"Section 3.06 Anti-Dilution.  If at any time after the Effective Date and prior to March 21, 2021, the Company, subject to the other terms and provisions of this Agreement (including Section 3.07, Section 6.04 and Section 6.05) raises capital, including through the issuance of any Units or interest in Units (including without limitation warrants, options, convertible notes or quasi-equity), used by the Company to fund or invest, directly or indirectly, whether in the form of equity, debt or any combination thereof, in any Core Project (as defined in that certain Membership Interest Subscription Agreement dated March 8, 2016), each of the Members other than CBE (determined as of immediately prior to such issuance) shall be compensated for the dilution either with increased ownership in the Company or with increased ownership in projects developed by CBD."

(b)    Redemption Triggered.  Section 3.09(b) of the LLC Agreement is amended by striking in the first sentence the phrase "on the second anniversary of the Effective Date, and substituting the phrase "by March 21, 2020".  As of November 24th, 2020 the Company is unable to pay Investor the redemption amount, hence it is agreed that Investor shall be issued in lieu of interests in the Company, equity interests in CBE at the agreed upon valuation.

(c)    MERS Managers.  Section 6.02(a)(i)(B) of the LLC Agreement is amended by deleting such subsection in its entirety and substituting the following:  "two Managers (the 'MERS managers') shall be designated by MERS."

(d)    Amendment to Subscription Agreement.  That certain Membership Interest Subscription Agreement of Concord Blue Development, LLC, shall be amended to provide that Section 5.02(a) of such Subscription Agreement is deleted in its entirety and replaced with the following:

"Section 5.02 Interest in Projects.  (a)  The Investor shall receive equity interests valued at US$15,000,000 in the aggregate in one or more of the following projects, as determined by the Investor in its sole discretion: (i) that certain project under development  by the Company or its Affiliates in Herten, Germany, and (ii) that certain project under development  by the Company or its Affiliates in Eagar, Arizona; or (iii) any other project, as agreed upon by the Company and Investor from time to time, each acting reasonably (the projects described in clauses (i), (ii) and (iii) being referred to as the "***Core Projects***"). The Parties shall determine the date (the "***Value Date***") on which each of the Core Projects (x) shall be valued by mutual agreement of the Parties, (y) the portion of equity interests to be received by Investor in each Core Project (provided that the aggregate value of such interests shall not exceed US$15,000,000) and (z) shall determine each Core Project's projected cash flow.  The value of each Core Project for purposes of this Section 5.02(a) shall be based on the net present value as of the Value Date of the projected cash flows from the applicable Core Project over the applicable Core Project's useful life.  In addition,

at the time of issuance of such equity interests, Investor will receive a warrant that is exercisable for nominal consideration for an additional interest in the applicable Core Project in the event that in the second year of such Core Project's operation, cash flow to Investor from such Core Project is more than 12% below the projected amount for such Core Project, the percentage amount of such additional interest to be determined by reference to the percentage of the shortfall in the cash flows to Investor from such Core Project.  As an illustrative example, if the shortfall in cash flows to Investor from such Core Project is 20% below the projected amount for such Core Project, the percentage amount of such additional interest shall provide Investor with an additional 8% of cash flows from such Core Project, based on the actual cash flow of such Core Project measured as of the end of such second year.  In addition, Investor will receive a put right such that in the event the applicable Core Project is not developed, Investor will have the option to put its equity interest (including the additional interest) in such Core Project to the Company in exchange for a comparably valued interest and warrant in a different project then under development by the Company (an "**Other Project**").  Notwithstanding the foregoing, should the Company fail to, or be unable to, allocate US$15,000,000 in equity interests to Investor in Core Projects, as provided herein, by November 24, 2020, Investor shall be issued in lieu of equity interests in the Core Projects, regardless of and notwithstanding any requirement of Section 3.04(b) of the LLC Agreement, equity interests in the Company at the initial valuation as of the Effective Date; *provided that*, should the Company fail to develop any project, as provided herein, by March 8, 2021, Investor shall be issued in lieu of interests in the Company, regardless of and notwithstanding any requirement of Section 3.04(b) of the LLC Agreement, equity interests in CBE at the initial valuation as of the Effective Date, in an aggregate value of US$15,000,000.  The Company will create a new special purpose vehicle for each Core Project.  The foregoing will be subject to documentation reasonably agreeable to the Company and Investor.  Company and CBE shall use their good faith best efforts to obtain financing necessary for the Core Projects and develop the Core Projects in a timely fashion in accordance with applicable laws.

(b)    At a time to be mutually agreed, the Parties will engage an independent appraiser to perform an independent valuation of each of the Core Projects in which the Investor has received equity interests pursuant to Section 5.02(a).  Such appraiser shall perform a valuation, as of the Value Date, based on the net present value of the projected cash flows from the applicable Core Project calculated at the time of such appraisal over the applicable Core Project's useful life.  In the event the values of the Core Projects as determined by such independent appraiser are different from the values of the Core Projects calculated as of the Value Date, the percentage equity interest pursuant to Section 5.02(a) shall be adjusted such that it is based on the value of the applicable Core Project as determined by the independent appraiser.  In addition, the Investor shall have the right, exercisable for a period of thirty (30) days following the Investor's receipt of the valuation report from the independent appraiser, to put its equity interest (including the additional interest) in such Core Project to the Company in exchange for a comparably valued interest in any other Core Project."

EXECUTION VERSION

## ARTICLE 2   RATIFICATION

**Section 2.01    Ratification and Affirmation.**  Except as expressly amended or modified hereby, the LLC Agreement shall remain unmodified and in full force and effect and the Members and the Company hereby ratify and confirm the LLC Agreement, as modified and amended herein, in all respects.  Specifically, and without limitation to the foregoing, parties acknowledged and affirm the following:

(a)   Voting Percentage.  The parties acknowledge and affirm that the Voting Percentage Interest of MERS as reflected in Exhibit A to the LLC Agreement as of December 31, 2017, is not contingent upon further releases of any amounts from the Escrow Account and shall not be diminished notwithstanding any prior releases, or any decision by MERS to release or not release any additional amounts, from the Escrow Account, and may not be diminished under any circumstances except with the express written consent of MERS in connection with the issuance by the Company of additional Units to new members.  For avoidance of doubt, such acknowledgement and affirmation shall apply, without limitation, to actions requiring a Supermajority Board Vote pursuant to Section 6.04 of the LLC Agreement (including without limitation any strategic partnership referenced in subsection (c)) or a Supermajority Member Vote pursuant to Section 6.05 of the LLC Agreement (including without limitation issuance of Interests referenced in subsection (c) or formation of subsidiaries or business combinations referenced in subsection (q)).  To the extent that this provision shall conflict with the terms of the LLC Agreement this provision shall control.

(b)   Removal of Managers.  The parties acknowledge and affirm that no MERS Manager designated by MERS pursuant to Section 6.02(a)(i)(B) of the LLC Agreement may be removed pursuant to Section 6.02(c) of the LLC Agreement without the express written consent of MERS.  To the extent that this provision shall conflict with the terms of the LLC Agreement this provision shall control.

(c)   Partnering Agreement.  The parties acknowledge and reaffirm that certain Partnering Agreement with verdant*f* AG, dated March 8, 2016 focusing on developing and funding projects including assembling and managing a dedicated fund will move from Concord Blue Development into Concord Blue Energy to be ratified in a future amendment and will be extended by 5 years.

(d)   Preferred Return.  For avoidance of doubt, nothing herein shall affect MERS' rights to distributions pursuant to Section 5.01 of the LLC Agreement based on Capital Contributions actually made by distributions or releases from the Escrow Account, and the parties acknowledge and affirm that such distribution rights are not contingent upon further distributions or releases of any amounts from the Escrow Account and shall not be diminished notwithstanding any previous distributions or release from the Escrow Account to the Company or any Affiliate, or any decision by MERS to release or not release any additional amounts from the Escrow Account.  To the extent that this provision shall conflict with the terms of the LLC Agreement this provision shall control.

(e)   Anti-Dilution.  The parties acknowledge and affirm that the anti-dilution provisions of Section 3.05 (relating to LMC Discretionary Payments under the December 18, 2015 Teaming Agreement) and Section 3.06 (relating to Core Projects investments) of the LLC

**EXECUTION VERSION**

Agreement exist to protect MERS' interests and that MERS is entitled to such protections in light of its financial support of Affiliates of the Company notwithstanding any distributions or releases from the Escrow Account to the Company or its Affiliates, or any decision by MERS to release or not release any additional amounts from the Escrow Account, and may not be diminished under any circumstances except with the express written consent of MERS.

### ARTICLE 3  MISCELLANEOUS

**Section 3.01    Governing Law.** Except as expressly provided in Section 3.02(b) of this Amendment, this Amendment, and all claims, disputes, actions or other litigation that may be based upon, arise out of or relate to this Amendment or the negotiation, execution or performance of this Amendment, whether in contract, tort, equity or otherwise, will be construed in accordance with and be governed by the Laws of the State of Delaware without regard to principles of conflicts of Laws that would permit or require the application of Laws of another jurisdiction.

**Section 3.02  Dispute Resolution.**

(a)    Any controversy, dispute or claim arising from or related to this Amendment shall be resolved as set forth in Sections 6.11 and 12.07 of the LLC Agreement.

(b)    Each Member acknowledges that notwithstanding anything to the contrary in this Amendment, MERS reserves all immunities, defenses, rights or actions arising out MERS' sovereign status or under the Eleventh Amendment to the United States Constitution, except to the extent waived by statute. No waiver of such reserved immunities, defenses, rights, or actions shall be implied or otherwise deemed to exist by reason of its entry into this Amendment, by any express or implied provision thereof or by any actions or omissions to act by MERS or any of its representatives or agents, whether taken pursuant to this Amendment or prior to MERS' execution hereof.  This Section 3.02(d) shall be governed by, and construed in accordance with, the laws of the State of Michigan, United States of America.

**Section 3.02    Counterparts.**  This Amendment may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same Amendment. The exchange of copies hereof, including signature pages hereto, by facsimile, e-mail or other means of electronic transmission shall constitute effective execution and delivery hereof as to the parties and may be used in lieu of the original Amendment for all purposes. Signatures transmitted by facsimile, e-mail or other means of electronic transmission shall be deemed to be original signatures for all purposes.

EXECUTION VERSION

## ARTICLE 4   CBE SHARES

*Figure 4.1 Prior Valuation & Liabilities Converted into CBE Shares*

| 2016 MERS CBE Shares Purchase | | Liabilities Converted into CBE Shares | | | |
|---|---|---|---|---|---|
| Valuation | $70,000,000 | Party | Amount | New Shares | Description |
| Total shares | 203,563 | MERS | $15,000,000 | 43,621 | Equity interest |
| Price/share | $343.87 | MERS | $12,330,517 | 35,858 | CBD puts |
| | | MERS | $7,210,899 | 20,970 | Shares bonus |
| | | CT Power | $7,285,342 | 21,186 | Outstanding debt |
| | | CB Engineering | $3,892,635 | 11,320 | Outstanding debt |

**Section 4.01   $15 Million Equity Interest.** Per section 1.01 (d) above MERS has elected to convert their right to receive $15 million of equity interest in Concord Blue Development (CBD) core projects into Concord Blue Energy (CBE) shares. The $15 million of equity interest is to be converted into shares per the initial valuation of CBE as of the effective date.

As illustrated in Figure 4.1 the initial valuation as of the date MERS purchased 15% of CBE's shares at $10,500,000 is $70,000,000. There are total of 203,563 CBE shares resulting in price per share of $343.87 ($70,000,000 divided by 203,563 shares). Therefore, MERS $15 million of equity interest will be converted into 43,621 new shares ($15,000,000 divided by $343.87/share).

These shares were to be transferred to MERS by March 21, 2021 per prior agreement. However, it has now been agreed these shares are owed to MERS as of the signed date of this document. In the event $15 million of equity interest in CBD projects is realized by March 21, 2021 then ownership of these new shares shall transfer from MERS to CBE as the original terms would then be fulfilled.

*EXECUTION VERSION*

**Section 4.02   Shares Redemption.** As referred to in section 1.01(b) above MERS has elected to exercise their right under section 3.09(b) of the CBD LLC Agreement to redeem their shares. Payment for this redemption shall be received in new CBE shares. As illustrated in Figure 4.1 the redemption amount owed is $12,330,517 resulting in new shares of 35,858 ($12,330,517 divided by $343.87/share). Once these new shares have been issued then MERS CBD shares are cancelled.

**Section 4.03   Bonus Shares.** MERS will receive a special share bonus transferring 20,970 CBE shares owned by CB Engineering to MERS valued at $7,210,954 (20,970 shares times $343.87).

**Section 4.04   Liabilities Owed to CT Power GmbH ("CT Power") & Concord Blue Engineering GmbH ("CB Engineering").** CBE & CBD have accumulated outstanding debts to CT Power & CB Engineering, which shall be converted into new CBE shares for CB Engineering. $7,285,341 of debt to CT Power will be converted into 21,186 shares ($7,285,341/$343.87). $3,892,635 of debt to Concord Blue Engineering will likewise be converted into 11,320 shares.

MERS shall have the right to audit company documents to verify liabilities owed to CT Power and CB Engineering for the next three years from the effective date of this document adjusting CB Engineering shares accordingly.

**Section 4.05   Management Team.** Key members of Concord Blue's management team shall also receive new CBE shares. The individuals and ownership percentage will be as follows: Frank Gilliam 5.00%, Sebastian Flahs 1.25% and Scott Noll 1.00%.

*Figure 4.2 Concord Blue Energy Capitalization Table*

| CBE | Current Capitalization | | | New Capitalization | |
|---|---|---|---|---|---|
| Shareholders | Shares | % | New Shares | Shares | % |
| Concord Blue Eng. | 160,966 | 79.07% | 11,536 | 172,502 | 50.70% |
| MERS | 30,534 | 15.00% | 100,448 | 130,982 | 38.50% |
| WES | 8,500 | 4.18% | - | 8,500 | 2.50% |
| S.Burmester | 3,563 | 1.75% | - | 3,563 | 1.05% |
| F.Gilliam | - | - | 17,011 | 17,011 | 5.00% |
| S.Flahs | - | - | 4,253 | 4,253 | 1.25% |
| S.Noll | - | - | 3,402 | 3,402 | 1.00% |
| | 203,563 | 100% | 136,650 | 340,213 | 100.00% |

**Section 4.06   Concord Blue Energy Capitalization Post-Transactions.** As of the date this document is signed new CBE shares to be issued under article 4 of this amendment shall be owed to each shareholder. The shares shall then be issued as expeditiously as possible thereafter. New shares owed to the management team as described above can be delayed per their request for tax reasons. The effect of these transactions on Concord Blue Energy's capitalization structure is illustrated above in Figure 4.2.

*EXECUTION VERSION*

# ARTICLE 5   INTEGRATION OF CB ENGINEERING INTO CBE

**Section 5.01   Concord Blue Engineering GmbH ("CB Engineering").** CB Engineering is a engineering consulting company incorporated in Dusseldorf, Germany 100% owned by CT Power, which in turn is 100% owned by Charlie Thannhaeuser. There are two board directors, Charlie Thannhaeuser (Chairman) and Sebastian Flahs (CEO).

This company contains the core engineering capabilities of the Concord Blue Reforming ("CBR") process technology required to design, build and operate CBR facilities. CB Engineering has developed proprietary tools and methods, simulation models and design processes compulsory to completing the engineering packages underpinning each facility.

CB Engineering also develops all of the CBR intellectual property including the patents owned by CB Patents and used by CBE in the manufacturing of CBRs. This patent portfolio includes three new patents, two filed this year and one to be filled within the next few months, to improve performance including increasing efficiencies, reducing operating expenses and decreasing capex.

CB Engineering currently employs 12 full time engineers with deep expertise in process engineering with special focus on thermal conversion processes including 1) pyrolysis, gasification and combustion, 2) mechanical and design engineering covering thermodynamics, 3D modeling, plant layout & piping and 3) project management for power generation plants from initial concept to plant construction through commissioning.

Personnel backgrounds include syngas cleaning systems to dry and wet flue gas cleaning systems (including absorption and adsorption processes and gas filtration) to water and wastewater treatment systems, desulfurization processes, air filtration, and similar processes.

**Section 5.02   CB Engineering and CBE.** Analysis and internal discussions have determined pooling together the resources, capabilities and business models of the two firms into one consolidated company will better position the combined business for success. Advantages are expected to include greater transparency throughout the organization, stronger investor interest to secure additional capital in upcoming fundraising initiatives and significant reduction of internal conflicts of interest.

**Section 5.03   Wholly owned Subsidiary**. CB Engineering will become a wholly owned subsidiary bringing into CBE extensive toolset of capabilities described in section 5.01 above. Post-integration, CBE's headcount will grow from 4 to 20 employees and services will be expanded beyond reselling CBRs to include full suite of proprietary, engineering-related services increasing CBE's ability to fully monetize each project opportunity from cradle to grave. These expanding revenues streams together with robust, in-house engineering capabilities will better position CBE to achieve higher valuations and greater investor returns.

EXECUTION VERSION

*Figure 5.1 Concord Blue Energy Capitalization Table Post Integration*

| CBE | New Capitalization | | | Post-Integration Capitalization | |
|---|---|---|---|---|---|
| Shareholders | Shares | % | Shares Swap | Shares | % |
| Concord Blue Eng. | 172,502 | 50.70% | (172,502) | - | 0.00% |
| CT Power | | | 172,502 | 172,502 | 50.70% |
| MERS | 130,982 | 38.50% | - | 130,982 | 38.50% |
| WES | 8,500 | 2.50% | - | 8,500 | 2.50% |
| S.Burmester | 3,563 | 1.05% | - | 3,563 | 1.05% |
| F.Gilliam | 17,011 | 5.00% | - | 17,011 | 5.00% |
| S.Flahs | 4,253 | 1.25% | - | 4,253 | 1.25% |
| S.Noll | 3,402 | 1.00% | - | 3,402 | 1.00% |
| | 340,213 | 100% | - | 340,213 | 100.00% |

**Section 5.04   Post-CB Integration Capitalization**. The CBE capitalization structure post-integration is illustrated above in Figure 5.1. CB Engineering will be brought in with roughly 735,000 Euro in outstanding payments to third party suppliers, royalty payments to the original inventor. Any and all related party and intercompany debt between CT Power, CB Engineering and CB Energy is considered to be fully converted in the debt-to-equity swap as outlined in tables 4.2 and 5.1. In any event MERS' share in CBE is to be treated as non – dilutable until at least 5 million USD of external capital third party has been invested in CBE.

**Section 5.05   Procedure to Pay Prior Loans Incurred to Fund CB Engineering.** The process to pay past loans incurred to operate CB Engineering will be as follows:

1. Only loans incurred before the date of this amendment will be the responsibility of CBE to repay
2. To be recognized as potential debt owed by CBE, Charlie Thannhaeuser must provide a loan agreement for each loan, which must include the following:
    a. Name & address of the lender
    b. Loan terms including principal, interest, loan date, amount repaid, due date
    c. Signature of the lender verifying the loan terms are accurate subject to perjury
3. Bank statements must be submitted to verify loan proceeds of each loan was received from each lender into Charlie Thannhaeuser's and / or CT Power bank account
4. Additional documentation including bank records must be submitted to verify loan proceeds for each loan were used to pay CB Engineering's operating expenses
5. All loans that complete steps 1 through 4 will be CBE liabilities, managed and tracked on a repayment schedule spreadsheet prioritized based on urgency to repay
6. Total loans used to fund CB Engineering expenses to be recorded on the repayment schedule as CBE debt is hereby capped at EUR 2,840,000

*EXECUTION VERSION*

7. Cash of $500K will be made available to Charlie Thannhaeuser to repay portion of these loans once funds from the IF EPCM down payment are received
8. These initial repayments from the $500K are to assist efforts to renegotiate each loan pushing out due dates to coincide with expected cash inflows consistent with best practices for managing any other company payable
9. The loan repayment schedule will then be updated to reflect these debt restructuring negotiations and amounts paid
10. Interest rate for each loan paid out of CBE funds is hereby capped at 8%
11. Every effort is to be made to negotiate with each lender to write off as much debt as possible and/or to accept a special class of equity in exchange for all or some of the outstanding balance
12. All additional loan repayments after the initial cash payment described in #6 above will be subject to board approval
13. Once per quarter the board shall review the updated loan repayment schedule together with other company debts scheduled for payment on the company's cash flow management spreadsheet
14. Board shall approve each scheduled loan repayment accordingly subject to availability of funds

[signature page follows]

*EXECUTION VERSION*

IN WITNESS WHEREOF, the parties hereto have caused this Second Amendment to Amended and Restated Limited Liability Company Agreement to be duly executed and delivered as of the date first set forth above.

**COMPANY:**

CONCORD BLUE DEVELOPMENT, LLC

By: _____

Name: Charlie Thannhaeuser

Title:

**MEMBERS:**

CONCORD BLUE ENERGY, INC.

By: _____

Name: Charlie Thannhaeuser

Title:

CONCORD BLUE ENGINEERING, GmbH

By: _____

Name: Charlie Thannhaeuser

Title:

MUNICIPAL EMPLOYEES' RETIREMENT SYSTEM OF MICHIGAN (MERS)

By: verdant*f* AG, pursuant to power of attorney dated March 8, 2016

By: _____

Name: Berry Polmann, Gaia Arnaboldi

Title:   Co-Founding Partners