# **EXHIBIT 14**

DATED                                    13    NOVEMBER 2020

MUNICIPAL EMPLOYEE'S RETIREMENT SYSTEM OF
MICHIGAN
(as Lender)

- and -

INFINITE FUELS GMBH
(as Borrower)

BRIDGE LOAN FACILITY AGREEMENT



Matter ref: 768610/000001
Ref: MUNLIB01/3537702

Hogan Lovells International LLP
Karl-Scharnagl-Ring 5, 80539 Munich

## CONTENTS

| CLAUSE | | PAGE |
|---|---|---|
| 1. | DEFINITIONS AND INTERPRETATION | 1 |
| 2. | THE FACILITY | 8 |
| 3. | CONDITIONS OF UTILISATION | 8 |
| 4. | UTILISATION | 10 |
| 5. | REPAYMENT | 11 |
| 6. | PREPAYMENT AND CANCELLATION | 11 |
| 7. | INTEREST | 13 |
| 8. | TAX GROSS UP AND INDEMNITIES | 13 |
| 9. | INCREASED COSTS | 16 |
| 10. | OTHER INDEMNITIES | 18 |
| 11. | COSTS AND EXPENSES | 18 |
| 12. | REPRESENTATIONS | 20 |
| 13. | INFORMATION UNDERTAKINGS | 22 |
| 14. | GENERAL UNDERTAKINGS | 23 |
| 15. | UNDERTAKINGS IN CONNECTION WITH THE EU-GRANT AGREEMENT | 26 |
| 16. | MEASURES REQUIRING APPROVAL | 26 |
| 17. | ACCOUNT STRUCTURE | 27 |
| 18. | TRANSACTION SECURITY | 29 |
| 19. | EVENTS OF DEFAULT | 29 |
| 20. | CHANGES TO THE LENDER | 32 |
| 21. | ASSIGNMENTS AND TRANSFER BY THE BORROWER | 32 |
| 22. | PAYMENTS | 33 |
| 23. | SET-OFF | 33 |
| 24. | NOTICES | 33 |
| 25. | PARTIAL INVALIDITY | 34 |
| 26. | REMEDIES AND WAIVERS | 34 |
| 27. | AMENDMENTS AND WAIVERS | 34 |
| 28. | COUNTERPARTS | 35 |
| 29. | GOVERNING LAW | 36 |
| 30. | JURISDICTION | 36 |

SCHEDULES

| 1. | SCHEDULE 1 – CONDITIONS PRECEDENT | 37 |
|---|---|---|
| 2. | SCHEDULE 2 – UTILISATION REQUEST | 40 |
| 3. | SCHEDULE 3 – EXISTING SECURITY | 41 |

| 4. | SCHEDULE 4 – EXISTING FINANCIAL INDEBTEDNESS | 42 |
|---|---|---|
| 5. | SCHEDULE 5 – TRANSACTION SECURITY | 44 |
| 6. | SCHEDULE 6 – KNOW-YOUR-CUSTOMER-CHECK/ANTI-MONEY-LAUNDERING | 45 |

This bridge loan facility agreement (hereinafter the "**Facility Agreement**") is entered into on ___13___ November 2020 (hereinafter the "**Signing Date**")

**BETWEEN:**

(1)    **MERS REAL ASSETS ACCOUNT, a discretionary investment account of Municipal Employee's Retirement System of Michigan (**"**MERS**"**)**, a public non-profit organization duly organized and validly existing under the laws of the State of Michigan, whose registered office is at 1134 Municipal Way, Lansing, MI 48917, USA, managed by Verdantf A.G., a corporation organized under the laws of Switzerland with fiscal identification number CHE-144.966.055 and registered office at Kobiboden 63, 8840 Einsiedeln, Switzerland (the "**Lender**"); and

(2)    **Infinite Fuels GmbH**, a limited liability company organized under the laws of the Federal Republic of Germany, with registered office at Borgstedtfelde 15, 24794 Borgstedt, Germany and registered with the commercial register (*Handelsregister*) of the local court (*Amtsgericht*) Kiel under no. HRB 19784 KI (the "**Borrower**").

**IT IS AGREED:**

1.    **DEFINITIONS AND INTERPRETATION**

1.1    **Definitions**

In this Facility Agreement:

"**Account Bank**" means any financial institution in Germany, including but not limited to GLS Gemeinschaftsbank eG and VR-Bank Schleswig-Mittelholstein eG.

"**Affiliate**" means, in relation to any person, a Subsidiary of that person or a Holding Company of that person or any other Subsidiary of such a Holding Company.

"**Agency**" means the Executive Agency for Small and Medium-sized Enterprises of the European Union.

"**Authorisation**" means an authorisation, consent, approval, resolution, licence, exemption, filing, notarisation or registration.

"**Business Day**" means a day (other than a Saturday or Sunday):

(a)    in relation to any date of payment or receipt of Euro, which is a TARGET Day and on which banks are open for business in Germany; and

(b)    for any other purpose, on which banks are open for business in Germany.

"**Change of Control**" means any change in relation to (i) the Control over the Borrower or (ii) the Economic Dependence of the Borrower.

"**Concord Blue**" means Concord Blue Engineering GmbH, a limited liability company organized under the laws of the Federal Republic of Germany, with registered office at Königsallee 6-8, 40212 Düsseldorf, Germany, and registered with the commercial register (*Handelsregister*) of the local court (*Amtsgericht*) Düsseldorf under no. HRB 34943.

"**Control**" in relation to a company exists if

(a)    a person or group of persons acting together directly or indirectly holds at least 50 % of the shares and/or holds or exerts at least 50 % of the voting rights of a company; and/or

(b)    a person or group of persons acting together have the legal or factual capability to appoint the majority of the members of the management/the managing board and/or of the representatives of the shareholders on the supervisory board (whereby for the calculation of the respective majority any member of a management or supervisory body that has or may have a veto or a multiple voting right shall be counted twice); and/or

(c)    the company is a downstream affiliate company ("nachgelagert verbundenes Unternehmen") within in the meaning of sections 15 ff. of the German Stock Corporation Act ("Aktiengesetz") of a person or group of persons acting together.

(d)    "Acting together" means when individuals and/or legal entities coordinate their conduct with regard to the Borrower and/or a shareholder on the basis of an agreement or on any other basis.

"**Default**" means an Event of Default or any event or circumstance specified in Clause 19 (*Events of Default*) which would (with the expiry of a grace period, the giving of notice, the making of any determination specified in that Clause or any combination of any of the foregoing) be an Event of Default.

"**Economic Dependence**" of a company exists, if, within the meaning of article 4, paragraph 1, no. 39 of the Regulation (EU) no. 575/2013, it and (at least) one other individual and/or legal entity with whom there is no relationship of Control are to be regarded as constituting a single risk because they are so interconnected that, if one of them were to experience financial problems, in particular funding or repayment difficulties, the other or all of the others would also be likely to encounter funding or repayment difficulties.

"**EPCM Contract**" means the contract for services in the areas engineering, procurement management, construction management and commissioning management, entered into by the Borrower and Concord Blue, originally dated 20 December 2019 and as amended, varied, novated, supplemented, superseded or extended from time to time, at last by an amendment agreement dated 17 September 2020 under which Concord Blue provides services for EUR 3,500,000.00.

"**EU's Part of the Total Eligible Costs**" means a maximum of amount of EUR 6,000,691.00 of the Total Eligible Costs.

"**EU-Grant**" means the grant awarded to the Borrower from the Agency of the EU Life Program under the EU-Grant Agreement.

"**EU-Grant Agreement**" means the agreement between the Borrower and the European Union represented by the Agency with the agreement number LIFE17 ENV/DE/000267, originally dated 11 June 2018 and as amended, varied, novated, supplemented, superseded or extended from time to time, at last by a second amendment agreement (the"**2nd Amendment Agreement**") dated 22 August 2019.

"**EU-Grant Tranches**" means EU-Grant Tranche 1, EU-Grant Tranche 2 and EU-Grant Tranche 3 and "**EU-Grant Tranche**" means any of them.

"**EU-Grant Tranche 1**" means the second pre-financing payment by the Agency under the EU-Grant Agreement of EUR 900,103.65, due within 60 calendar days from when the Agency receives the request for the second pre-financing payment.

"**EU-Grant Tranche 2**" means the third pre-financing payment by the Agency under the EU-Grant Agreement of EUR 2,400,276.40, due within 60 calendar days from when the Agency receives the request for the third pre-financing payment.

**"EU-Grant Tranche 3"** means the payment of the balance by the Agency under the EU-Grant Agreement covering the remaining part of the EU's Part of the Total Eligible Costs, max. EUR 1,800,207.30, due within 90 calendar days from when the Agency receives the request for payment of the balance, no later than 90 calendar days following the Expected End Date of the Project. In case the eligible costs of the Project are lower than estimated the Total Eligible Costs and the summed up amounts of the EU-Grant Tranche 1 and EU-Grant Tranche 2 already exceed the maximum amount of the EU-Grant the EU-Grant Tranche 3 takes the form of a recovery.

**"EUR"** or **"euro"** means the single currency of the Participating Member States.

**"Event of Default"** means any event or circumstance specified as such in Clause 19 (*Events of Default*) (save for Clause 19.12 (*Acceleration*)).

**"Expected End Date of the Project"** means 31 December 2022 as of the 2nd Amendment Agreement.

**"Facility"** means Facility A and Facility B.

**"Facility A"** means the bridge loan facility made available under this Facility Agreement as described in paragraph 2.1(a) of Clause 2.1 (*The Facilities*).

**"Facility A Loan"** means a loan made or to be made under Facility A or the principal amount outstanding for the time being of that loan.

**"Facility B"** means the bridge loan facility made available under this Facility Agreement as described in paragraph 2.1(b) of Clause 2.1 (*The Facilities*).

**"Facility B Loan"** means a loan made or to be made under Facility B or the principal amount outstanding for the time being of that loan.

**"Final Repayment Date"** means the earlier date of either 10 July 2023 or the Business Day after the EU-Grant Tranche 3 is received.

**"Finance Documents"** means the Facility Agreement, the Transaction Security Agreements and any other document designated as such by the Lender and the Borrower.

**"Financial Indebtedness"** means any indebtedness for or in respect of:

(a)     moneys borrowed;

(b)     any amount raised by acceptance under any acceptance credit facility;

(c)     any amount raised pursuant to any note purchase facility or the issue of bonds, notes, debentures, loan stock or any similar instrument;

(d)     the amount of any liability in respect of any lease or hire purchase contract which would, in accordance with GAAP, be treated as a balance sheet liability (other than a lease or hire purchase contract which would, in accordance with GAAP in force prior to 1 January 2019 have been treated as an operating lease);

(e)     receivables sold or discounted (other than any receivables to the extent they are sold on a non-recourse basis);

(f)     any amount raised under any other transaction (including any forward sale or purchase agreement) having the commercial effect of a borrowing;

(g)     any derivative transaction entered into in connection with protection against or benefit from fluctuation in any rate or price (and, when calculating the value of any derivative transaction, only the marked to market value shall be taken into account);

(h)     shares which are expressed to be redeemable;

(i)     any counter indemnity obligation in respect of a guarantee, indemnity, bond, standby or documentary letter of credit or any other instrument issued by a bank or financial institution; and

(j)     the amount of any liability in respect of any guarantee or indemnity or other contingent liability for any of the items referred to in Clauses (a) to (i).

"**GAAP**" means general accepted accounting principles to the extent applicable to the relevant financial statements in Germany.

"**Holding Company**" means, in relation to a person, any other person in respect of which it is a Subsidiary.

"**Loan**" means Facility A Loan and Facility B Loan.

"**Loan Bank Account**" means the Pledged and Blocked Account into which the Loan is paid.

"**Loan Repayment Dates**" means the respective days on which the repayment instalments shall be made as described in paragraph (a) of Clause 5.2 (*Loan repayment dates*) and "**Loan Repayment Date**" means any of them.

"**Material Adverse Effect**" means any effect resulting from any event or circumstance which in each case is or could, with reasonable likelihood immediately or with the passage of time, be materially adverse to:

(a)     the ability of the Borrower to perform its material obligations under the Finance Documents;

(b)     the financial conditions or assets of the Borrower;

(c)     the validity or enforceability of the Finance Documents; or

(d)     any rights or remedy of the Lender in respect of a Finance Document.

"**Month**" means a calendar month.

"**Participating Member State**" means any member state of the European Union that adopts or has adopted the euro as its lawful currency in accordance with legislation of the European Union relating to Economic and Monetary Union.

"**Party**" means a party to this Facility Agreement and all together the "**Parties**".

"**Pledged and Blocked Account**" means the account in the name of the Borrower with the Account Bank with the account no. (IBAN) DE75 4306 0967 1083 2556 01 to which (i) the Loan shall be paid and (ii) the EU Grant shall be paid and in respect of which the Borrower, unlike a pledged account which is not blocked, may only dispose with the prior written approval of the Lender.

"**Project**" means the construction and operation of a plant, in which communal organic waste is, converted into sustainable hydrogen as far as the construction and operation of the plant was used as a basis for the EU-Grant Agreement.

"**Repayment Tranche**" means any of the repayments of the Loan together with the respective interest payments and all together the "**Repayment Tranches**".

"**Repeating Representations**" means each of the representations set out in Clauses 12.1 (*Status*) to 12.18 (*No adverse consequences*) inclusive other than the representations in clause 12.12 (*No insolvency proceedings*), 12.14 (*Non-conflict with laws*), 12.15 (*Litigation*), and 12.16 (*Taxes*).

"**Security**" means a mortgage, land charge, charge, pledge, lien, assignment or transfer for security purposes, retention of title arrangement or other security interest securing any obligation of any person or any other agreement or arrangement having a similar effect.

"**Structure Chart**" means the group structure chart showing the ownership of the Borrower which must be provided by the Borrower as a Condition Precedent pursuant to Clause 2(e) of Schedule 1 – *Conditions Precedent.*

"**Subsidiary**" means an entity of which a person has direct or indirect control or owns directly or indirectly more than 50 % of the voting capital or similar right of ownership and control for this purpose means the power to direct the management and the policies of the entity whether through the ownership of voting capital, by contract or otherwise.

"**TARGET2**" means the Trans-European Automated Real-time Gross Settlement Express Transfer payment system which utilises a single shared platform and which was launched on 19 November 2007.

"**TARGET Day**" means any day on which TARGET2 is open for the settlement of payments in euro.

"**Taronis**" means Taronis Technologies Inc., 300 W Clarendon Ave #230, Phoenix, AZ 85013, USA.

"**Tax**" means any tax, levy, impost, duty or other charge or withholding of a similar nature (including any penalty or interest payable in connection with any failure to pay or any delay in paying any of the same).

"**Total Eligible Costs**" means the total eligible Project costs in an amount of EUR 10,381,166.00 estimated by the Agency under the EU-Grant Agreement.

"**Utilisation**" means any utilisation of the Facility.

"**Utilisation Date**" means each date of a Utilisation, being the date on which a Loan is to be made.

"**Utilisation Request**" means a notice substantially in the form set out in Schedule 2 – *Utilisation Request.*

"**Utilisation Tranche**" means each of the individual drawdown payments.

1.2    **Construction**

(a)    Unless a contrary indication appears, any reference in this Facility Agreement to:

(i)     the "**Lender**", the "**Borrower**" or any other person shall be construed so as to include its successors in title and permitted transferees;

(ii)    "**assets**" includes present and future properties, revenues and rights of every description;

(iii)   "**including**" or "**includes**" means including or includes without limitation;

(iv)    a "**Finance Document**" or any other agreement or instrument is a reference to that Finance Document or other agreement or instrument as amended, supplemented, extended or restated;

(v)     "**indebtedness**" includes any obligation (whether incurred as principal or as surety) for the payment or repayment of money, whether present or future, actual or contingent;

(vi)    "**director**" includes any statutory legal representative(s) of a person pursuant to the laws of its jurisdiction of incorporation;

(vii)   "**reasonable endeavours**" includes payment by the relevant person of all its own and any third party's reasonable costs, fees and expenses;

(viii)  a "**person**" includes any individual, firm, company, corporation, legal entity, government, state or agency of a state or any association, trust, joint venture, consortium or partnership (whether or not having separate legal personality);

(ix)    "**promptly**" means without undue delay (*ohne schuldhaftes Zögern*);

(x)     a "**regulation**" includes any regulation, rule, official directive, request or guideline (whether or not having the force of law but, if not having the force of law, which is generally complied with by those to whom it is addressed) of any governmental, intergovernmental or supranational body, agency, department or regulatory, self-regulatory or other authority or organisation;

(xi)    a provision of law is a reference to that provision as amended or re-enacted;

(xii)   a time of day is a reference to Frankfurt am Main time;

(xiii)  references in the singular shall include references in the plural and vice versa, words denoting any gender shall include any other gender and words denoting natural persons shall include any other persons;

(xiv)   references to a statute, treaty or legislative provision shall be construed, at any particular time, as including a reference to any modification, extension or re-enactment at any time then in force and to all subordinate legislation made from time to time under it; and

(xv)    "**control**" means the power to direct the management and policies of an entity, whether through the ownership of voting capital, by contract or otherwise.

(b)     Section, Clause and Schedule headings are for ease of reference only.

(c)     Unless a contrary indication appears, a term used in any other Finance Document or in any notice given under or in connection with any Finance Document has the same meaning in that Finance Document or notice as in this Facility Agreement.

(d)     A Default (other than an Event of Default) is "**continuing**" if it has not been remedied to the satisfaction of the Lender or waived in writing and an Event of Default is "**continuing**" if it has not been waived in writing.

(e)     Nothing in this Facility Agreement shall be construed so as to exclude the liability of any person for its own wilful misconduct (*Vorsatz*).

## 1.3    Non-business days

If an amount under this Facility Agreement would otherwise be due and payable on a day which is not a Business Day, it will instead be due and payable on the next Business Day in that Month (if there is one) or the preceding Business Day (if there is not).

## 1.4    Language

This Facility Agreement is made in the English language. For the avoidance of doubt, the English language version of this Facility Agreement shall prevail over any translation of this Facility Agreement. However, where a German translation of a word or phrase appears in the text of this Facility Agreement, the German translation of such word or phrase shall prevail throughout for the construction.

SECTION 2 – THE FACILITY

2.    **THE FACILITY**

2.1    **Commitment**

Subject to the terms of this Facility Agreement, the Lender makes available to the Borrower

(a)    a bridge loan facility in an amount of up to EUR 2,375,000.00 (Facility A); and

(b)    a bridge loan facility in an amount of up to EUR 1,125,000.00 (Facility B).

2.2    **Purpose**

The Facility shall be used by the Borrower to pay pre-defined fees as owed under the EPCM Contract to Concord Blue to the extent they qualify as part of the Total Eligible Costs.

2.3    **Monitoring**

The Lender is not bound to monitor or verify the application of any amount borrowed pursuant to this Facility Agreement.

3.    **CONDITIONS OF UTILISATION**

3.1    **Conditions precedent**

The Lender will only be obliged to disburse the Facility if all Conditions Precedent set out in Schedule 1 – *Conditions Precedent* (the "**Conditions Precedent**") are met. All relevant evidence and all respective documents have to be satisfactory to the Lender in terms of form and content. Unless otherwise agreed or permitted under the Facility Agreement, any documents are to be submitted to the Lender as originals. The Lender shall notify the Borrower promptly upon being so satisfied.

3.2    **Further conditions precedent**

Subject to Clause 3.1 (*Conditions Precedent*), the Lender will only be obliged to comply with Clause 2 (*The Facility*) if on the date of the respective Utilisation Request and on the proposed Utilisation Date the Lender is satisfied that:

(a)    no Default is continuing or would result from the proposed Utilisation; and

(b)    the Repeating Representations to be made by the Borrower are true by reference to the facts and circumstances existing at the date the relevant representation or warranty is deemed to be repeated; and

(c)    in the case of a Utilisation which shall be used in accordance with Clause 2.2 (*Purpose*), the Borrower has provided evidence, satisfactory to the Lender, of the funding requirements of the Project for which the Loan shall be used for.

3.3    **Drawdowns**

(a)    The disbursement of Facility A will be made in no more than one (1) Utilisation.

(b)    The disbursement of Facility B will be made in no more than one (1) Utilisation.

(c)    Facility A is to be drawn down in whole from the Signing Date until and including 26 February 2021 provided that the respective Conditions Precedent have been satisfied in full ("**Availability Period for Facility A**"). Facility B is to be drawn down

in whole from 11 November 2021 until and including 28 February 2022 provided that the respective Conditions Precedent have been satisfied in full ("**Availability Period for Facility B**" and together with Availability Period for Facility A the "**Availability Periods**").

**SECTION 3 - UTILISATION**

4.    **UTILISATION**

4.1    **Delivery of a utilisation request**

(a)    In order to receive the amounts under each Facility the Borrower shall deliver to the Lender a duly completed Utilisation Request by no later than 10.00 am five (5) Business Days prior to the relevant Utilisation Date.

(b)    Each Utilisation Request is irrevocable and will not be regarded as having been duly completed unless the proposed Utilisation Date is a Business Day within the respective Availability Period.

4.2    **Loan bank account**

The proceeds of each Utilisation Tranche shall be deposited into the Loan Bank Account.

4.3    **Cancellation of commitment**

(a)    Facility A to the extent, at that time, is unutilised shall be immediately cancelled at the end of the Availability Period for Facility A.

(b)    Facility B to the extent, at that time, is unutilised shall be immediately cancelled at the end of the Availability Period for Facility B.

- 54 -

SECTION 4 – REPAYMENT, PREPAYMENT AND CANCELLATION

5.    **REPAYMENT**

5.1    **Repayment tranches**

The Borrower shall repay the Loan together with the respective interest in three (3) Repayment Tranches:

(a)    The first Repayment Tranche shall be the aggregate of (i) EUR 517,488.22 and (ii) all accrued interest thereon (the "**Repayment Tranche 1**").

(b)    The second Repayment Tranche shall be the aggregate of (i) EUR 1,783,683.62 and (ii) all accrued interest thereon (the "**Repayment Tranche 2**").

(c)    The third Repayment Tranche shall be the aggregate of (i) EUR 1,198,828.16 and (ii) all accrued interest thereon (the "**Repayment Tranche 3**").

5.2    **Loan repayment dates**

(a)    The payment of the Repayment Tranches shall take place on the following Loan Repayment Dates:

(i)    Repayment Tranche 1 shall be paid on the earlier date of either 10 March 2021 or the Business Day after the EU-Grant Tranche 1 is received;

(ii)    Repayment Tranche 2 shall be paid on the earlier date of either 10 March 2022 or the Business Day after the EU-Grant Tranche 2 is received;

(iii)    Repayment Tranche 3 shall be paid on the earlier date of either 10 July 2023 or the Business Day after the EU-Grant Tranche 3 is received.

(b)    In case the Borrower, with the prior written approval of the Lender, submits an amendment request regarding the EU-Grant Agreement to the Agency, the Loan Repayment Dates may each and only one time each be postponed by a maximum of eight (8) Months. Just for the avoidance of doubt each amendment, novation, supplementation, substitution or extension of the EU-Grant Agreement is subject to the prior written approval of the Lender.

5.3    **Reborrowing**

The Borrower may not re-borrow any part of the Facility which is repaid during the respective Availability Period.

6.    **PREPAYMENT AND CANCELLATION**

If it becomes unlawful in any applicable jurisdiction for the Lender to perform any of its obligations as contemplated by this Facility Agreement or to fund or maintain its position in the Loan:

(a)    the Lender shall promptly notify the Borrower upon becoming aware of that event by submitting official documents that show the changes that (i) led to this event and (ii) show the concrete effects of the event on the Financial Documents;

(b)    upon the Lender notifying the Borrower, the Facility will be immediately cancelled to the extent affected by such illegality; and

(c)    the Borrower shall repay the Loan, to the extent required under the notice pursuant to sub-sections (a) and (b), within ten (10) Business Days after the Lender has notified the Borrower or, if earlier, the date specified by the Lender in the notice delivered to the Borrower (being no earlier than the last day of any applicable grace period permitted by law).

### SECTION 5 – PAYMENT AND CALCULATION OF INTEREST AND FEES

7. **INTEREST**

7.1 **Fixed period**

The period for which a fixed interest rate is agreed for the Loan (i.e. the fixed interest rate period) is hereinafter referred to as a "**Fixed Period**". The Fixed Period for any amount drawn under the Loan begins at the respective Utilisation Date and ends on the Final Repayment Date.

7.2 **Interest rate**

The Borrower shall pay to the Lender for the Fixed Period a fixed interest rate of 12.00 % p.a. ("**Interest Rate**").

7.3 **Interest payment dates**

Interest will be due and payable on each Loan Repayment Date as well as on the Final Repayment Date (each of these dates shall be referred to as an "**Interest Payment Date**").

7.4 **Calculation of interest**

(a)    Interest will accrue on any amount drawn under the Loan for the period between the commencement of the day on which the respective amount is drawn until the end of the next Interest Payment Date ("**Interest Calculation Period**"). With regard to subsequent Interest Calculation Periods, interest will accrue on a Loan at the beginning of the first day after the preceding Interest Payment Date and end at the end of the following Interest Payment Date with the effect that at the end of an Interest Calculation Period such expired Interest Calculation Period is automatically followed by a further Interest Calculation Period. The last Interest Calculation Period ends at the end of the Final Repayment Date.

(b)    Interest will be calculated as follows: the effective number of calendar days of a Fixed Period is divided by 365 (actual/365) and to be multiplied by the respective interest rate.

7.5 **Default interest**

If the Borrower fails to pay any amount (other than interest) payable by it under the Finance Document on the respective due dates, interest shall accrue on the respective overdue amount from the due date up to the date of actual payment (both before and after judgment) at a rate which is 200 basis points p.a. higher than the Interest Rate which would have been payable if the overdue amount had, during the period of non-payment, constituted a Loan in the currency of the overdue amount for successive Fixed Periods.

8. **TAX GROSS UP AND INDEMNITIES**

8.1 **Definitions**

(a)    In this Agreement:

"**Protected Party**" means the Lender which is or will be subject to any liability or required to make any payment for or on account of Tax in relation to a sum received or receivable (or any sum deemed for the purposes of Tax to be received or receivable) under a Finance Document.

"**Qualifying Lender**" means the Lender which is beneficially entitled to interest payable to the Lender and is:

(i)     lending through a facility office in the jurisdiction of incorporation of the Borrower; or

(ii)    a Treaty Leader.

"**Tax Credit**" means a credit against, relief or remission for, or repayment of, any Tax.

"**Tax Deduction**" means a deduction or withholding for or on account of Tax from a payment under a Finance Document.

"**Tax Payment**" means either the increase in a payment made by the Borrower to the Lender under Clause 8.2 (*Tax gross up*) or a payment under Clause 8.3 (*Tax indemnity*).

"**Treaty Lender**" means the Lender which:

(i)     is treated as a resident of a Treaty State for the purposes of the Treaty; and

(ii)    does not carry on a business in the jurisdiction of incorporation of the Borrower through a permanent establishment with which that Lender's participation in a Loan is effectively connected.

"**Treaty State**" means a jurisdiction having a double taxation agreement (a "**Treaty**") with the jurisdiction of incorporation of the Borrower which makes provision for full exemption from tax imposed by the jurisdiction of incorporation of the Borrower on interest.

(b)     Unless a contrary indication appears, in this Clause 8 a reference to "**determines**" or "**determined**" means a determination made in the absolute discretion of the person making the determination.

## 8.2     Tax gross-up

(a)     The Borrower shall make all payments to be made by it without any Tax Deduction, unless a Tax Deduction is required by law.

(b)     The Borrower shall promptly upon becoming aware that it must make a Tax Deduction (or that there is any change in the rate or the basis of a Tax Deduction) notify the Lender accordingly. Similarly, the Lender shall notify the Borrower on becoming so aware.

(c)     If a Tax Deduction is required by law to be made by the Borrower, the amount of the payment due from the Borrower shall be increased to an amount which (after making any Tax Deduction) leaves an amount equal to the payment which would have been due if no Tax Deduction had been required.

(d)     If the Borrower is required to make a Tax Deduction, it shall make that Tax Deduction and any payment required in connection with that Tax Deduction within the time allowed and in the minimum amount required by law.

(e)     Within 30 days of making either a Tax Deduction or any payment required in connection with that Tax Deduction, the Borrower shall deliver to the Lender evidence reasonably satisfactory to the Lender that the Tax Deduction has been

made or (as applicable) any appropriate payment paid to the relevant taxing authority.

(f)     A Treaty Lender and the Borrower shall cooperate in completing any procedural formalities necessary for the Borrower to obtain authorisation to make that payment without a Tax Deduction.

## 8.3     Tax indemnity

(a)     The Borrower shall (within three (3) Business Days of demand by the Lender) pay to a Protected Party an amount equal to the loss, liability or cost which that Protected Party determines will be or has been (directly or indirectly) suffered for or on account of Tax by that Protected Party in respect of a Finance Document or the Project.

(b)     Clause 8.3(a) shall not apply:

    (i)     with respect to any Tax assessed on the Lender:

        (1)     under the law of the jurisdiction in which that Lender is incorporated or, if different, the jurisdiction (or jurisdictions) in which that Lender is treated as resident for tax purposes; or

        (2)     under the law of the jurisdiction in which that the Lender's facility office is located in respect of amounts received or receivable in that jurisdiction,

    if that tax is imposed on or calculated by reference to the net income received or receivable (but not any sum deemed to be received or receivable) by the Lender; or

    (ii)     to the extent a loss, liability or cost is compensated for by an increased payment under Clause 8.2 (*Tax gross-up*).

(c)     A Protected Party making, or intending to make, a claim under Clause 8.3(a) shall promptly notify the Lender of the event which will give, or has given, rise to the claim, following which the Lender shall notify the Borrower.

(d)     A Protected Party shall, on receiving a payment from the Borrower under this Clause 8.3, notify the Lender.

## 8.4     Tax Credit

If the Borrower makes a Tax Payment and the Lender determines that:

(a)     a Tax Credit is attributable to an increased payment of which that Tax Payment forms part, to that Tax Payment or to a Tax Deduction in consequence of which that Tax Payment was required; and

(b)     that Lender has obtained and utilised that Tax Credit,

the Lender shall pay an amount to the Borrower which Lender determines will leave it (after that payment) in the same after-Tax position as it would have been in had the Tax Payment not been required to be made by the Borrower.

8.5     **Stamp taxes**

The Borrower shall pay and, within three (3) Business Days of demand, indemnify the Lender against any cost, loss or liability that Lender incurs in relation to all stamp duty, registration and other similar Taxes payable in respect of any Finance Document.

8.6     **VAT**

(a)     All amounts expressed to be payable under a Finance Document by the Borrower to the Lender which (in whole or in part) constitute the consideration for any supply for VAT purposes are deemed to be exclusive of any VAT which is chargeable on that supply, and accordingly, if VAT is or becomes chargeable on any supply made by the Lender to the Borrower under a Finance Document and the Lender is required to account to the relevant tax authority for the VAT, the Borrower must pay to the Lender (in addition to and at the same time as paying any other consideration for such supply) an amount equal to the amount of the VAT (and the Lender must promptly provide an appropriate VAT invoice to the Borrower).

(b)     In relation to any supply made by the Lender to the Borrower under a Finance Document, if reasonably requested by such Lender, the Borrower must promptly provide Lender with details of Borrower's VAT registration and such other information as is reasonably requested in connection with Lender's VAT reporting requirements in relation to such supply.

9.      INCREASED COSTS

9.1     **Increased costs**

(a)     Subject to Clause 9.3 (*Exceptions*) the Borrower shall, within five (5) Business Days of a demand by the Lender, pay for the account of the Lender the amount of any Increased Costs incurred by the Lender or any of its Affiliates as a result of:

(i)     the introduction of or any change in (or in the interpretation, administration or application of) any law or regulation;

(ii)    compliance with any law or regulation made after the Signing Date;

(iii)   the implementation, administration or application of, or compliance with, Basel III or any other law or regulation which implements Basel III (whether such implementation, application or compliance is by a government regulator, the Lender or any of its Affiliates) unless costs in connection therewith have already been allocated to the financing provided by this Facility Agreement prior to the Signing Date (directly or indirectly); or

(iv)    CRD IV.

(b)     In this Facility Agreement:

"**Basel III**" means:

(i)     the agreements on capital requirements, a leverage ratio and liquidity standards contained in "*Basel III: A global regulatory framework for more resilient banks and banking systems*", "*Basel III: International framework for liquidity risk measurement, standards and monitoring*" and "*Guidance for national authorities operating the countercyclical capital buffer*" published by the Basel Committee on Banking Supervision in December 2010, each as amended, supplemented or restated;

(ii)    the rules for global systemically important banks contained in "*Global systemically important banks: assessment methodology and the additional loss absorbency requirement - Rules text*" published by the Basel Committee on Banking Supervision in November 2011, as amended, supplemented or restated; and

(iii)   any further guidance or standards published by the Basel Committee on Banking Supervision relating to "*Basel III*";

"**CRD IV**" means:

(iv)    Regulation (EU) No 575/2013 of the European Parliament and of the Council of 26 June 2013 on prudential requirements for credit institutions and investment firms; and

(v)     Directive 2013/36/EU of the European Parliament and of the Council of 26 June 2013 on access to the activity of credit institutions and the prudential supervision of credit institutions and investment firms; and

"**Increased Costs**" means:

(vi)    a reduction in the rate of return from the Facility or on the Lender's (or its Affiliate's) overall capital;

(vii)   an additional or increased cost; or

(viii)  a reduction of any amount due and payable under any Finance Document,

which is incurred or suffered by the Lender or any of its Affiliates to the extent that it is attributable to the Lender having entered into granting the Facility or funding or performing its obligations under any Finance Document.

## 9.2    Increased cost claims

(a)    The Lender intending to make a claim pursuant to Clause 9.1 (*Increased costs*), shall notify the Borrower of the event giving rise to the claim.

(b)    The Lender shall as soon as practicable after a demand by the Borrower, provide a certificate (i) confirming the amount of its Increased Costs, (ii) including a high level description of how the amount of its Increased Costs under such claim were calculated and (iii) with respect to claims for the payment of Increased Costs in connection with Basel III and CRD IV or any law or regulation that implements or applies Basel III and/or CRD IV the certificate shall provide for a confirmation that claims by the Lender for Increased Costs are not intended to be made against the Borrower only.

## 9.3    Exceptions

(a)    Clause 9.1 (*Increased costs*) does not apply to the extent any Increased Cost is:

(i)     attributable to a Tax Deduction required by law to be made by the Borrower; and

(ii)    compensated for by Clause 8.2 (*Tax Gross-up)* or Clause 8.3 (*Tax indemnity)*;

(iii)   attributable to the wilful breach or a breach due to gross negligence by the Lender or its Affiliates of any law or regulation; or

(iv)   attributable to the implementation or application of or compliance with the "International Convergence of Capital Measurement and Capital Standards, a Revised Framework" published by the Basel Committee on Banking Supervision in June 2004 in the form existing on the Signing Date (but excluding any amendment arising out of Basel III and CRD IV) ("**Basel II**") or any other law or regulation which implements Basel II (whether such implementation, application or compliance is by a government, regulator, the Lender or any of its Affiliates).

(b)   In this Clause 9.3, a reference to a "**Tax Deduction**" has the same meaning given to the term in Clause 8.1 (*Definitions).*

## 9.4   Maximum of Increased costs

The Increased Costs to be paid by the Borrower are capped at a maximum of EUR 10,000.00 (ten thousand).

## 10.   OTHER INDEMNITIES

The Borrower shall, within five (5) Business Days of demand, indemnify the Lender against any loss, liability or documented cost incurred by it as a result of the occurrence of any Event of Default caused solely by the Borrower.

## 11.   COSTS AND EXPENSES

## 11.1   Transaction expenses

The Borrower shall pay the Lender, together with Repayment Tranche 3, and additionally to principal and interest paid on such date, the amount of all documented costs and expenses (including, where applicable, the fees and expenses of each adviser) reasonably incurred by any of them in connection with the negotiation, preparation, printing and execution and perfection of:

(a)   this Facility Agreement, the other Finance Documents and any other documents referred to in this Facility Agreement or the Finance Documents; and

(b)   any other Finance Documents executed after the Signing Date.

The transaction expenses to be paid by the Borrower are capped at a maximum of EUR 90,000.00 (ninetythousand).

## 11.2   Amendment costs

If the Borrower requests an amendment, waiver or approval, the Borrower shall, within five (5) Business Days of demand:

(a)   reimburse the Lender for the amount of all documented costs and expenses (including any adviser's fees) reasonably incurred by the Lender in responding to, evaluating, negotiating or complying with that request or requirement; and

(b)   pay to the Lender an amendment/approval/waiver fee in an amount agreed with the Borrower.

The amendment costs to be paid by the Borrower are capped at a maximum of EUR 10,000.00 (ten thousand).

### 11.3    Enforcement and preservation costs

The Borrower shall, within three (3) Business Days of demand, pay to the Lender the amount of all documented costs and expenses up to the statutory fees (including where applicable the fees and expenses of each adviser) incurred by the Lender in connection with the enforcement of, or the preservation of any rights under, any Finance Document and any proceedings instituted by or against the Lender as a consequence of taking or holding the Transaction Security or enforcing these rights.

**SECTION 6 - REPRESENTATIONS, UNDERTAKINGS AND EVENTS OF DEFAULT**

12. **REPRESENTATIONS**

The Borrower makes the representations and warranties set out in Clauses 12.1 (*Status*) to 12.13 (*Immunity*) to the Lender on the Signing Date. The Borrower is deemed to make the Repeating Representations on each date of each Utilisation Request and on each Utilisation Date (except that those contained in Clause 13.2 (*Financial statements*) shall cease to be made in relation to the original financial statements once subsequent financial statements have been delivered under this Facility Agreement). Each representation or warranty deemed to be made after the Signing Date shall be deemed to be made by reference to the facts and circumstances existing at the date the representation or warranty is deemed to be made.

12.1 **Status**

(a)     It is a limited liability company, duly incorporated and validly existing under the laws of the Federal Republic of Germany.

(b)     It has the power to own its assets and carry on its business as it is being conducted.

12.2 **Binding obligations**

The obligations expressed to be assumed by it in each Finance Document are legal, valid, binding and enforceable obligations.

12.3 **Non-conflict with other obligations**

The entry into and performance by it of, and the transactions contemplated by, and the granting of any Security pursuant to, the Finance Documents do not and will not conflict with:

(a)     any relevant law or regulation applicable to it;

(b)     its constitutional documents; or

(c)     any agreement or instrument binding upon it or any of its assets or constitute a default or termination event (however described) under any such agreement or instrument.

12.4 **Power and authority**

It has the power to enter into, perform and deliver and has taken all necessary action to authorise its entry into, performance and delivery of, the Finance Documents and the transactions contemplated by those Finance Documents.

12.5 **Validity and admissibility in evidence**

All Authorisations required:

(a)     to enable it to lawfully enter into, exercise its rights and comply with its obligations in the Finance Documents; and

(b)     to make the Finance Documents admissible in evidence in its jurisdiction of incorporation,

have been obtained or effected and are in full force and effect.

12.6    **Governing law and enforcement**

(a)    The choice of German law as the governing law of the Finance Documents will be recognised and enforced in its jurisdiction of incorporation.

(b)    Any judgment obtained in Germany in relation to the Finance Documents will be recognised and enforced in its jurisdiction of incorporation.

12.7    **No filing or stamp taxes**

Under the law of its jurisdiction of incorporation it is not necessary that the Finance Documents be filed, recorded or enrolled with any court or other authority in that jurisdiction or that any stamp, registration or similar Tax be paid on or in relation to the Finance Documents or the transactions contemplated by the Finance Documents.

12.8    **No default**

(a)    No Default is continuing or is reasonably likely to result from the making of any Utilisation or the entry into, the performance of, or any transaction contemplated by, any Finance Document to which it is party.

(b)    No other event or circumstance is outstanding which constitutes a default under any other agreement or instrument which is binding on it or to which its assets are subject which might have a Material Adverse Effect.

12.9    **No encumbrances**

It has not created or permitted to subsist any encumbrance on any part of its revenue and fixed assets, other than an encumbrance arising by operation of law or in the ordinary course of business.

12.10    **Financial statements**

(a)    The most recent financial statements were prepared in accordance with GAAP consistently applied and, together with the notes thereto, present an accurate and fair view of its financial condition during and as at the end of the relevant financial year.

(b)    Since the date of the most recent financial statements delivered pursuant to Clause 13.2 (*Financial statements*) there has been no material adverse change in the business, assets or financial condition of the Borrower.

12.11    **Pari passu ranking**

Its payment obligations under the Finance Documents rank at least *pari passu* with the claims of all its other unsecured and unsubordinated creditors, except for obligations mandatorily preferred by law applying to companies generally.

12.12    **No insolvency proceedings**

It has not taken any corporate action, nor have any other steps been taken or legal proceedings been started, or, to its best knowledge and belief, after due enquiry, threatened for its winding-up, dissolution, administration or re-organisation or for the appointment of a receiver or administrator.

12.13   **Immunity**

It will not be entitled to claim immunity from suit, execution, attachment or other legal process in any proceedings taken in its jurisdiction of incorporation in relation to any Finance Document.

12.14   **Non-conflict with laws**

It has complied with and observed in all material respects all applicable laws and regulations.

12.15   **Litigation**

No litigation, arbitration or administrative proceedings of or before any court, arbitral body or agency which, if adversely determined, might reasonably be expected to have a Material Adverse Effect has or have (to the best of its knowledge and belief) been started or threatened against it.

12.16   **Taxes**

(a)   The Borrower has filed, or procured the filing of, all Tax returns and supporting information that are required to have been filed by it in any of its relevant jurisdictions, and has paid or discharged all Taxes due and payable from it or against its assets.

(b)   The Borrower is not required to make any Tax Deduction (as defined in Clause 8.1 (*Definitions*)) from any payment it may make under any Finance Document to the Lender.

12.17   **Centre of main interest and establishments**

For the purposes of The Council of the European Union Regulation No 2015/848 on Insolvency Proceedings (recast) (the "**Regulation**"), the "centre of main interest" (as that term is used in Article 3(1) of the Regulation) of the Borrower is situated in Germany and the Borrower has no "establishment" (as that term is used in Article 2(10) of the Regulation) in any other jurisdiction.

12.18   **No adverse consequences**

It is not necessary under the laws of its jurisdiction of incorporation:

(a)   in order to enable the Lender to enforce its rights under any Finance Document; or

(b)   by reason of the execution of any Finance Document or the performance by it of its obligations under any Finance Document,

that the Lender should be licensed, qualified or otherwise entitled to carry on business in Germany.

13.   **INFORMATION UNDERTAKINGS**

The undertakings in this Clause 13 remain in force from the Signing Date for so long as any amount is outstanding under the Finance Documents.

13.1   **Notification of default**

The Borrower shall notify the Lender of any Default (and the steps, if any, being taken to remedy it) promptly upon becoming aware of its occurrence.

13.2    **Financial statements**

The Borrower shall supply to the Lender:

(a)    as soon as the same become available, but in any event within 180 days after the end of each of its financial years its audited financial statements for that financial year beginning with the end of the year 2020; and

(b)    as soon as the same become available, but in any event within 45 days after the end of each of its financial years the Borrower's unaudited financial statements for that financial year beginning with the end of the year 2020.

13.3    **Requirements as to financial statements**

(a)    Each set of financial statements delivered by the Borrower pursuant to Clause 13.2 (*Financial statements*) shall be certified by a director of the relevant company as fairly presenting its financial condition as at the date as at which those financial statements were drawn up.

(b)    The Borrower shall procure that each set of financial statements delivered pursuant to Clause 13.2 (*Financial statements*) is prepared using GAAP.

13.4    **Information: miscellaneous**

The Borrower shall supply to the Lender:

(a)    all documents dispatched by the Borrower to its shareholders (or any class of them) or its creditors generally at the same time as they are dispatched;

(b)    promptly upon becoming aware of them, the details of any litigation, arbitration or administrative proceedings which are current, threatened or pending against the Borrower; and

(c)    promptly, upon reasonable request, such further information regarding the financial condition, business and operations of the Borrower.

13.5    **"Know your customer" checks**

The Borrower shall promptly on the request of the Lender supply any documentation or other evidence which is reasonably requested by the Lender to enable the Lender to carry out and be satisfied with the results of any applicable "know your customer" checks or other similar checks required under any applicable law or regulation.

14.    **GENERAL UNDERTAKINGS**

The undertakings in this Clause 14 remain in force from the Signing Date for so long as any amount is outstanding under the Finance Documents.

14.1    **Authorisations**

The Borrower shall obtain, comply with and do all that is necessary to maintain in full force and effect any Authorisation required under any law (including environmental law) or regulation of its jurisdiction of incorporation to:

(a)    enable it to own its property and assets and carry on its business;

(b)    enable it to perform its obligations under the Finance Documents; and

    (c)    ensure the legality, validity, enforceability or admissibility in evidence in each relevant jurisdiction of any Finance Document.

## 14.2 Compliance with laws

The Borrower shall comply in all material respects with all relevant applicable laws to which it may be subject.

## 14.3 Pari passu

The Borrower shall ensure that its payment obligations under the Finance Documents rank at least pari passu with all its other present and future unsecured and unsubordinated payment obligations, except for obligations mandatorily preferred by law applying to companies generally.

## 14.4 Merger

The Borrower must not enter into any amalgamation, demerger, merger or corporate reconstruction without the prior approval of the Lender. The Lender shall approve these specific events unless they can demonstrate how the proposed amalgamation, demerger, merger or corporate reconstruction will increase risks the Lender may fail to receive the complete and irrevocable repayment of all outstanding Loan amounts together with all interest, costs and other payments owed to the Lender under the Facility Agreement.

## 14.5 Change of business

The Borrower shall procure that no substantial change is made to the general nature of the business of the Borrower from that carried on at the Signing Date.

## 14.6 Negative pledge

In this Clause 14.6, "**Quasi-Security**" means an arrangement or transaction described in paragraph (b) below.

    (a)    The Borrower shall not create or permit to subsist any Security over any of its assets and shall ensure that its shareholders do not pledge their shares in the Borrower to a third party (this does not apply to the share pledge agreement regarding the shares in the Borrower for the benefit of Taronis as specified in Schedule 3 – *Existing Security*).

    (b)    The Borrower shall not:

        (i)    sell, transfer or otherwise dispose of any of its assets on terms whereby they are or may be leased to or re-acquired by the Borrower;

        (ii)    sell, transfer or otherwise dispose of any of its receivables on recourse terms;

        (iii)    enter into any arrangement under which money or the benefit of a bank or other account may be applied, set-off or made subject to a combination of accounts; or

        (iv)    enter into any other preferential arrangement having a similar effect,

    in circumstances where the arrangement or transaction is entered into primarily as a method of raising Financial Indebtedness or of financing the acquisition of an asset.

(c)     Paragraphs (a) and (b) above do not apply to any Security or (as the case may be) Quasi-Security, listed below:

(i)     any Security or Quasi-Security listed in Schedule 3 – *Existing Security* (the "**Existing Security**") except to the extent the principal amount secured by that Security or Quasi-Security exceeds the amount stated in that Schedule;

(ii)    any lien arising by operation of law;

(iii)   any Security or Quasi-Security over or affecting any asset acquired by the Borrower after the Signing Date if:

(A)    the Security or Quasi-Security was created in contemplation of the acquisition of that asset by the Borrower; and

(B)    the principal amount secured has not been increased in contemplation of or since the acquisition of that asset by the Borrower;

(iv)   any Security or Quasi-Security entered into pursuant to any Finance Document; or

(v)    any Security or Quasi-Security arising under any retention of title, hire purchase or conditional sale arrangement or arrangements having similar effect in respect of goods supplied to the Borrower in the ordinary course of trading and on the supplier's standard or usual terms and not arising as a result of any default or omission by the Borrower.

## 14.7   Additional financing

(a)     If the Borrower is requested financial guarantees in order to secure the payment of EU-Grant Tranche 1 and EU-Grant Tranche 2 and in order to do so requires additional financing to serve as collateral, in addition to that collateral secured by the financing provided by Taronis, the Lender shall have the option, subject to paragraph (b) below, to provide such financing to the Borrower, such financing shall be subject to a borrowing fee of not less than EUR 50,000.00 and interest rate of at least 13.5% p.a. as well as to further terms and conditions to be agreed under separate documentation.

(b)     The Borrower shall be obliged to request this financing (and the Lender shall have the option to provide it or not) if the Borrower is required to provide additional collateral for the disbursement of a pre-financing payment and if not providing such additional collateral could affect the Borrower's ability to pay principal or interest to the Lender on any Loan Repayment Date.

## 14.8   Taxes

(a)     Borrower must pay all Taxes due and payable by it prior to the accrual of any fine or penalty for late payment, unless (and only to the extent that):

(i)     payment of those Taxes can be lawfully withheld and is being contested in good faith;

(ii)    adequate reserves are being maintained for those Taxes and the costs required to contest them; and

(iii)    failure to pay those Taxes is not reasonably likely to have a material adverse effect.

(b)    Borrower must ensure that its residence for Tax purposes is in its jurisdiction of incorporation.

15.    **UNDERTAKINGS IN CONNECTION WITH THE EU-GRANT AGREEMENT**

(a)    The Borrower undertakes to fulfill the respective Conditions Precedent under the EU-Grant Agreement in respect of the respective EU-Grant Tranche and request the disbursement of the EU-Grant Tranches on the Pledged and Blocked Account in due time and in the manner prescribed in the EU-Grant Agreement.

(b)    The Borrower undertakes to ensure that neither reasons for (i) termination of the EU-Grant Agreement nor (ii) suspension of payments of any EU-Grant Tranche or suspension of time limits for payments of any EU-Grant Tranche or (iii) reduction of the EU's Part of the Total Eligible Costs occurs.

(c)    The Borrower undertakes to use the EU-Grant Tranches first for the repayment of the Facility and the respective interest and only then uses a potentially remaining amount for other purposes.

(d)    The Borrower may not assign any rights and claims under and in connection with the EU-Grant Agreement to any third-party.

(e)    The Borrower shall ensure that its shareholders will not pledge their shares in the Borrower to third parties until the complete and irrevocable repayment of all outstanding Loan amounts together with all interest, costs and other payments owed to the Lender under the Facility Agreement (*negative pledge*) with the exception of Clause 16.2.

(f)    Clause 15(e) does not apply to the share pledge agreement regarding the shares in the Borrower for the benefit of Taronis as specified in Schedule 3 – *Existing Security*.

16.    **MEASURES REQUIRING APPROVAL**

16.1    **Change of control**

(a)    The occurrence of a Change of Control requires the prior written approval of the Lender. The Lender is only allowed to refuse the approval for good reason (in the event it will increase risks the Lender may fail to receive the complete and irrevocable repayment of all outstanding Loan amounts together with all interest, costs and other payments owed to the Lender under the Facility Agreement), such approval shall not be unreasonably withheld or delayed by the Lender.

(b)    Any changes in the shareholdings of the Borrower which do not result in a Change of Control do not require the approval of the Lender, provided that the Borrower has previously submitted to the Lender (to the satisfaction of the Lender) all information related to the envisaged change in shareholdings and the Lender has confirmed that the relevant event does not constitute a Change of Control.

16.2    **Financial indebtedness**

The Borrower may not have or assume any financial indebtedness or grant any security interests in any asset (including the pledge of shares in the Borrower by shareholders of Borrower) other than indebtedness incurred under the Finance Documents unless (i) the

respective claims against the Borrower resulting from such financial indebtedness are both (a) fully subordinated to all present and future claims of the Lender according to Sec. 39 Para. 2 German Insolvency Act ("*Insolvenzordnung*" – InsO) under a subordination agreement based on a standard from provided by the Lender and (b) are assigned as security in favour of the Lender under a security assignment based on a standard form provided by the Lender or (ii) expressly approved by the Lender.

### 16.3 EU-Grant Agreement

(a)    The termination of the EU-Grant Agreement by the Borrower requires the prior written approval of the Lender.

(b)    Any amendment of the EU-Grant Agreement requires the prior written approval of the Lender, in particular with regard to a postponement of the disbursement dates of the EU-Grant Tranches. The Lender is only allowed to refuse the approval for good reason (in the event it will increase risks the Lender may fail to receive the complete and irrevocable repayment of all outstanding Loan amounts together with all interest, costs and other payments owed to the Lender under the Facility Agreement), such approval shall not be unreasonably withheld or delayed by the Lender.

(c)    Any suspension of the implementation of the Project as prescribed in the EU-Grant Agreement requires the prior written approval of the Lender. The Lender is only allowed to refuse the approval for good reason (in the event it will increase risks the Lender may fail to receive the complete and irrevocable repayment of all outstanding Loan amounts together with all interest, costs and other payments owed to the Lender under the Facility Agreement), such approval shall not be unreasonably withheld or delayed by the Lender.

### 16.4 EPCM Contract

(a)    The termination of the EPCM Contract by the Borrower requires the prior written approval of the Lender.

(b)    Any amendment of the EPCM Contract requires the prior written approval of the Lender. The Lender is only allowed to refuse the approval for good reason (in the event it will increase risks the Lender may fail to receive the complete and irrevocable repayment of all outstanding Loan amounts together with all interest, costs and other payments owed to the Lender under the Facility Agreement), such approval shall not be unreasonably withheld or delayed by the Lender.

## 17.    ACCOUNT STRUCTURE

### 17.1 Permitted accounts

Until the full and final payment of all claims of the Lender against the Borrower under or in connection with the Finance Documents the Borrower shall comply with the following covenants regarding account maintenance:

(a)    The Borrower shall maintain the following accounts:

(i)    an operational account in the name of the Borrower for the business operation of the Borrower held with VR-Bank Schleswig-Mittelholstein eG and the account no. (IBAN) DE33 2169 0020 0005 3245 56 (the "**Operational Account I**"),

(ii)     an operational account in the name of the Borrower for the business operation of the Borrower held with GLS Gemeinschaftsbank eG and the account no. (IBAN) DE05 4306 0967 1083 2556 00 (the "**Operational Account II**" and together with the Operational Account II the "**Operational Accounts**"),

(iii)    the Pledged and Blocked Account for, inter alia, the receipt of the payments of the EU-Grant Tranches and the Loan proceeds held with GLS Gemeinschaftsbank eG and the account no. (IBAN) DE75 4306 0967 1083 2556 01.

(b)     The Operational Accounts have to be pledged to the Lender by the Borrower by way of a first-ranking pledge in a separate account pledge agreement. The Borrower has to submit a confirmation of the respective Account Banks to the Lender, according to which the respective institution, with regard to the pledged accounts – for the duration of the pledge to the Lender – (i) waives any offset/retention rights ("*Aufrechnungs-/Zurückbehaltungsrechte*") and (ii) a right of lien (e.g. according to its general terms of business) of the respective Account Bank is excluded and/or subordinated to the Lender's right of lien. However, a right of lien of the respective Account Bank may proceed to the extent it guarantees expenses and fees exclusively connected with the account holding as well as amounts not finally credited to the account (e.g. return debit notes ("*Rücklastschriften*")). Until further notice disposals can be made without the Lender's approval. The Lender may revoke the Borrower's disposal rights if a Default or an Event of Default has occurred and is continuing. The Borrower hereby authorises the Lender to dispose over the credit balances on the respective Operational Account in accordance with this Clause 17.1 if the Lender has revoked the Borrower's disposal rights.

(c)     The Pledged and Blocked Account has to be pledged to and blocked in favour of the Lender by way of a first-ranking pledge in a separate account pledge agreement. The Borrower has to submit a confirmation of the respective Account Banks to the Lender, according to which the respective institution, with regard to the pledged accounts – for the duration of the pledge to the Lender – (i) waives any offset/retention rights ("*Aufrechnungs-/Zurückbehaltungsrechte*") and (ii) a right of lien (e.g. according to its general terms of business) of the respective Account Bank is excluded and/or subordinated to the Lender's right of lien. However, a right of lien of the respective Account Bank may proceed to the extent it guarantees expenses and fees exclusively connected with the account holding as well as amounts not finally credited to the account (e.g. return debit notes ("*Rücklastschriften*")). The Borrower may dispose over the credit balances on the Pledged and Blocked Account only with the Lender's prior written approval.

(d)     The Borrower may only maintain or open accounts other than the accounts according to Clause 17.1(a) with the Lender's prior written approval.

(e)     The Borrower shall ensure that none of its accounts has a debit balance.

## 17.2    Deposits into the loan bank account

The Borrower shall procure that the proceeds of all Loans shall be paid into the Loan Bank Account.

17.3   **Withdrawals from the loan bank account**

The Borrower may withdraw any of the amounts resulting from the proceeds of all Loans standing to the credit of the Loan Bank Account only for making payments which are due and payable and are covered by the purpose of the Facility as set out in Clause 2.2 (*Purpose*) and only with the prior written approval of the Lender.

18.   **TRANSACTION SECURITY**

(a)   The Borrower shall provide to the Lender, under separate security documents, the security specified in Schedule 5 – *Transaction Security* (the "**Transaction Security**"), in form and substance satisfactory to the Lender (the "**Transaction Security Agreements**").

(b)   In case of an enforcement of the Transaction Security the Lender may determine in its sole discretion which of several security interests shall be enforced.

19.   **EVENTS OF DEFAULT**

Each of the events or circumstances set out in this Clause 19 (*Events of Default*) is an Event of Default (save for Clause 19.12 (*Acceleration*)).

19.1   **Non-payment**

The Borrower does not pay on the due date any amount payable pursuant to a Finance Document at the place and in the currency in which it is expressed to be payable.

19.2   **Other obligations**

(a)   The Borrower does not comply with any provision of the Finance Documents (other than those referred to in Clause 19.1 (*Non-payment*)).

(b)   No Event of Default under Clause 19.2(a) will occur if the failure to comply is capable of remedy and is remedied within ten (10) Business Days of the earlier of (A) the Lender giving notice to the Borrower and (B) the Borrower becoming aware of the failure to comply.

19.3   **Misrepresentation**

Any representation or statement made or deemed to be made by the Borrower in the Finance Documents or any other document delivered by the Borrower under or in connection with any Finance Document is or proves to have been incorrect or misleading in any material respect when made or deemed to be made.

19.4   **Cross default**

(a)   Any Financial Indebtedness of the Borrower or any payment obligation under the EPCM Contract is not paid when due nor within any originally applicable grace period.

(b)   Any Financial Indebtedness of the Borrower or any payment obligation under the EPCM Contract is declared to be or otherwise becomes due and payable prior to its specified.

(c)   Any commitment for any Financial Indebtedness of the Borrower is cancelled or suspended by a creditor of the Borrower.

(d)     Any commitment in connection with granting an EU-Grant Tranche under the EU-Grant Agreement to the Borrower is cancelled by the Agency.

(e)     Any creditor of the Borrower becomes entitled to declare any Financial Indebtedness of the Borrower due and payable prior to its specified maturity.

## 19.5    Insolvency

(a)     The Borrower is unable or admits inability to pay its debts as they fall due (*zahlungsunfähig*) or is deemed to or declared to be unable to pay its debts under applicable law or such inability to pay its debts is threatening (*drohende Zahlungsunfähigkeit*), suspends or threatens to suspend making payments on any of its debts, becomes over-indebted (*überschuldet*) or, by reason of actual or anticipated financial difficulties, commences negotiations with one or more of its creditors (other than the Lender) with a view to rescheduling any of its indebtedness.

(b)     A moratorium is declared in respect of the indebtedness of the Borrower.

## 19.6    Insolvency proceedings

Any corporate action, legal proceedings or other procedure or step or any judicial order is made in relation to:

(a)     the suspension of payments, a moratorium of any indebtedness, winding-up, dissolution, administration or reorganisation (by way of voluntary arrangement, reorganisation plan, scheme of arrangement or otherwise) of the Borrower;

(b)     a general composition, compromise, assignment or arrangement with or for the benefit of any creditor of the Borrower;

(c)     the appointment of a liquidator (other than, subject to the terms of this Facility Agreement, in respect of a solvent dissolution, liquidation or reorganisation of the Borrower), receiver, administrative receiver, administrator, compulsory manager or other similar officer in respect of the Borrower or all or a substantial part of its assets;

(d)     enforcement of any Security over all or a substantial part of the assets of the Borrower; or

(e)     any analogous event occurs in any jurisdiction.

## 19.7    Creditors' process

Any expropriation, attachment, sequestration, distress or execution or any analogous process in any jurisdiction affects any asset or assets of the Borrower is not discharged within twenty (20) Business Days.

## 19.8    Unlawfulness

It is or becomes unlawful for the Borrower to perform any of its obligations under the Finance Documents.

## 19.9    Effectiveness of finance documents

(a)     It is or becomes unlawful for any person (other than the Lender) to perform any of its obligations under any of the Finance Documents (or any transaction contemplated therein).

- 54 -

(b)     Any Finance Document is not effective in any respect or is alleged by any party to it to be ineffective in any respect for any reason.

(c)     Any Finance Document is or becomes unenforceable in any respect.

(d)     Any Security created or expressed to be created by the Finance Documents ceases to be in full force or effect or does not create in favour of the Lender as Security for the obligations expressed to be secured by it, legal, valid, binding and enforceable Security over the assets expressed to be charged by it and having the ranking and priority which it is expressed to have (other than in respect of obligations mandatorily preferred by law applying to companies generally).

(e)     Any party (other than the Lender) to a Finance Document rescinds or repudiates that Finance Document or threaten in writing to rescind or repudiate that Finance Document.

## 19.10   Material adverse change

(a)     Any event or circumstance occurs which has or may reasonably likely have a Material Adverse Effect.

(b)     No Event of Default under Clause 19.10(a) will occur if such event is capable of remedy and is remedied within ten (10) Business Days of the earlier of (A) the Lender giving notice to the Borrower and (B) the Borrower becoming aware thereof.

## 19.11   Change of control

A Change of Control occurs, unless the Lender has given its prior written approval to such Change of Control. The Lender is only allowed to refuse the approval for good reason (in the event it will increase risks the Lender may fail to receive the complete and irrevocable repayment of all outstanding Loan amounts together with all interest, costs and other payments owed to the Lender under the Facility Agreement), such approval shall not be unreasonably withheld or delayed by the Lender.

## 19.12   Acceleration

On and at any time after the occurrence of an Event of Default which is continuing the Lender may by notice to the Borrower:

(a)     cancel the Facility whereupon it shall immediately be cancelled; and/or

(b)     declare that all or part of any amounts outstanding under the Finance Documents, together with accrued interest, are:

(i)     immediately due and payable; and/or

(ii)    payable on demand by the Lender.

Any notice given under this Clause will take effect in accordance with its terms.

## SECTION 7 - CHANGES TO PARTIES

20.  **CHANGES TO THE LENDER**

20.1  **Assignments and transfers by the lender**

Subject to this Clause 20, the Lender (the "**Existing Lender**") may:

(a)   assign any of its rights (*Abtretung*); or

(b)   assign and transfer by assumption of contract (*Vertragsübernahme*) any of its rights and obligations,

to a bank or financial institution or to a trust, fund or other entity which is regularly engaged in or established for the purpose of making, purchasing or investing in loans, securities or other financial assets (the "**New Lender**").

20.2  **Conditions of transfer**

(a)   The approval of the Borrower is required for a transfer by assumption of contract (*Vertragsübernahme*) by an Existing Lender in accordance with Clause 20.1 (*Assignments and transfers by the Lender*) save that such approval shall not be required if the assignment or transfer is:

(i)    to an Affiliate of the Lender;

(ii)   made at a time when an Event of Default is continuing; or

(iii)  to a proposed New Lender that has a rating for its long-term unsecured and non-credit-enhanced debt obligations of (i) BBB+ or higher by S&P or Fitch or (ii) Baa1 or higher by Moody's.

(b)   Where the approval of the Borrower is required under Clause 20.2(a), such approval shall not be unreasonably withheld or delayed by the Borrower, and the Borrower shall be deemed to have given its approval unless the approval has been expressly refused by the Borrower before the expiry of ten (10) Business Days from (but excluding) the day on which the request for approval has been received.

20.3  **Conditions of assignment**

The approval of the Borrower shall not be required for an assignment (*Abtretung*) by the Lender of any of its rights under the Facility Agreement.

21.  **ASSIGNMENTS AND TRANSFER BY THE BORROWER**

The Borrower may not assign any of its rights or transfer any of its rights or obligations under the Finance Documents.

**SECTION 8 - PAYMENTS**

22.  **PAYMENTS**

22.1  **No set-off by the borrower**

All payments to be made by the Borrower under the Finance Documents shall be calculated and be made without (and free and clear of any deduction for) set-off or counterclaim.

22.2  **Currency of account**

(a)  Subject to Subclauses 22.2(b) and 22.2(c), euro is the currency of account and payment for any sum due from the Borrower under any Finance Document.

(b)  Each payment in respect of costs, expenses or Taxes shall be made in the currency in which the costs, expenses or Taxes are incurred.

(c)  Any amount expressed to be payable in a currency other than euro shall be paid in that other currency.

23.  **SET-OFF**

The Lender may set off any matured obligation due to it from the Borrower under the Finance Documents against any matured obligation owed by the Lender to the Borrower, regardless of the place of payment, booking branch or currency of either obligation. If the obligations are in different currencies, the Lender may convert either obligation at a market rate of exchange in its usual course of business for the purpose of the set-off.

24.  **NOTICES**

24.1  **Communications in writing**

Any communication to be made under or in connection with the Finance Documents shall be made in writing and, unless otherwise stated, may be made by e-mail, fax or letter.

24.2  **Addresses**

The e-mail address, address and fax number (and the department or officer, if any, for whose attention the communication is to be made) of each Party for any communication or document to be made or delivered under or in connection with the Finance Documents is:

(a)  in the case of the Borrower and the Lender that identified with its name in this Facility Agreement. As of the Signing Date the addresses and e-mail addresses of the Borrower and the Lender are:

(i)  Borrower

Address:    Borgstedtfelde 15, 24794 Borgstedt, Germany

E-Mail:     a.noky@infinitefuels.de

Attention:  Andreas Noky

(ii)  Lender

Address:    Kobiboden 63, 8840 Einsiedel, Switzerland

E-Mail:     gaia@verdantf.com, berry@verdantf.com

Attention:    Gaia Arnaboldi and Berry Polmann; and

(b)    in the case of any successor Lender, that notified in writing to the Borrower on or prior to the date on which it becomes a Party,

or any substitute e-mail address, address or fax number as a Party may notify to the other Parties by not less than five (5) Business Days' notice.

24.3    **Delivery**

Any communication or document made or delivered by one person to another under or in connection with the Finance Documents will only be effective:

(a)    if by way of e-mail when actually received in legible form;

(b)    if by way of fax, when actually received in legible form; and

(c)    if by way of letter, when it has been left at the relevant address or five (5) Business Days after being deposited in the post postage prepaid in an envelope addressed to it at that address,

and, if a particular department or officer is specified as part of its address details provided under Clause 24.2 (*Addresses*), if addressed to that department or officer.

25.    PARTIAL INVALIDITY

Should part of the Finance Documents become invalid (*unwirksam*), voidable (*anfechtbar*) or unenforceable (*undurchführbar*), this shall not affect the validity or effectiveness of the Finance Documents. The parties to the Finance Documents are aware of the decision of the Federal Court of Justice pursuant to which this clause solely constitutes a reversal of the burden of proof. In this context, the parties explicitly state that it is their actual will that this clause not only reverses the burden of proof but that the legal consequences of section 139 German Civil Code (*Bürgerliches Gesetzbuch* – BGB) (invalidity of the entire agreement) are waived. The invalid, voidable or unenforceable part of the Finance Documents shall instead be replaced by an agreement between the Parties that comes as close as possible in a legally permissible way to what the contractual Parties would have agreed upon if they had been aware of the invalidity, voidability or unenforceability. The Parties shall proceed in the same way if there is a gap in the Finance Documents.

26.    REMEDIES AND WAIVERS

No failure to exercise, nor any delay in exercising, on the part of the Lender, any right or remedy under the Finance Documents shall operate as a waiver, nor shall any single or partial exercise of any right or remedy prevent any further or other exercise or the exercise of any other right or remedy. The rights and remedies provided in this Facility Agreement are cumulative and not exclusive of any rights or remedies provided by law.

27.    AMENDMENTS AND WAIVERS

Any term of the Finance Documents may be amended or waived only with the written approval of the Borrower and the Lender. This also applies to this Clause 27.

28.   **COUNTERPARTS**

Each Finance Document may be executed in any number of counterparts, and this has the same effect as if the signatures on the counterparts were on a single copy of the Finance Document.

## SECTION 9 - GOVERNING LAW AND JURISDICTION

29.    **GOVERNING LAW**

This Facility Agreement and any non-contractual obligations arising out of or in connection with it are governed by German law.

30.    **JURISDICTION**

(a)    The courts of Frankfurt am Main, Germany have exclusive jurisdiction to settle any dispute arising out of or in connection with this Facility Agreement (including a dispute regarding the existence, validity or termination of this Facility Agreement) (a "**Dispute**").

(b)    The Borrower and the Lender agree that the courts of Frankfurt am Main, Germany are the most appropriate and convenient courts to settle Disputes and accordingly neither the Borrower nor the Lender will argue to the contrary.

- 54 -

## Schedule 1 – Conditions Precedent

1.   **FACILITY AGREEMENT AND SECURITY DOCUMENTS**

   (a)   Submission of (i) an execution version of the Facility Agreement duly signed by the Borrower and of (ii) the execution versions of the Transaction Security Agreements as specified in Schedule 5 – *Transaction Security* duly signed by the Borrower.

   (b)   All necessary, or agreed, entries, notifications, approvals or disclosures/notices have been effected or obtained (in particular, the notification of the Account Bank regarding the Transaction Security).

2.   **BORROWER AND SHAREHOLDERS**

   (a)   Submission of an up-to-date certified copy of the commercial register entry of the Borrower, as well as of its shareholders (if available).

   (b)   Submission of a copy of the articles of association of the Borrower and its shareholders including respective lists of shareholders.

   (c)   Submission of a shareholder resolution for the Borrower:

      (i)   approving the terms of, and the transactions contemplated by, the Finance Documents to which it is a party and resolving that it execute, deliver and perform the Finance Documents to which it is a party;

      (ii)   authorising a specified person or persons to execute the Finance Documents to which it is a party on its behalf; and

      (iii)   authorising a specified person or persons, on its behalf, to sign and/or despatch all documents and notices (including if relevant any Utilisation Request) to be signed and/or despatched by it under or in connection with the Finance Documents to which it is a party.

   (d)   Submission of the signed opening balance sheet of the Borrower and its shareholders or, alternatively, of the signed copies of the last three audited annual financial statements (if available).

   (e)   Submission of the Structure Chart signed by the Borrower which shows the participations in the Borrower and all group companies and all its direct and indirect shareholders up to and including the ultimate owner(s) (with percentage ratios showing the respective amounts of ownership interest) confirmed by certified register extracts or lists of shareholders (or comparable sources).

   (f)   Fulfilment of all regulatory requirements regarding identification of new shareholders and of anti-money-laundering law including specimen signatures and identity verification (including copies of identity cards) of the persons signing a Finance Document.

   (g)   Submission of the business plan or Project prospectus of the Borrower until the Final Repayment Date.

   (h)   Submittal of calendar for funding by the Borrower's shareholders of the balance of the total project costs not covered by the EU-Grant. These funds shall be deposited at the respective dates into an account subject to a pledge in favour of the Lender.

(i)     A copy of any power of attorney or constitutional document being relied upon by any person signing a Finance Document as attorney for or on behalf of the Borrower (if applicable).

3.   **EPCM CONTRACT**

(a)     Submission of a copy of the EPCM Contract signed by the Borrower (including any annexes and amendments (if any)).

(b)     Evidence that the down payment under the EPCM Contract is due and payable.

4.   **EU-GRANT AGREEMENT**

(a)     Submission of a copy of the EU-Grant Agreement signed by the Borrower and the Agency (including any annexes and amendments (if any)).

(b)     Submission of evidence of the change of account structure for payments.

5.   **OTHER CONDITIONS PRECEDENT**

(a)     Submission of a copy of (i) any other loan agreements for the benefit of the Borrower (in particular, but not limited to. the loan agreement entered into with Taronis dated 10 January 2020) or any other form of Financial Indebtedness as specified in Schedule 4 – *Existing Financial Indebtedness* and (ii) any security documents to any Existing Security as specified in Schedule 3 – *Existing Security* in relation to any assets of the Borrower or its shareholders (in particular, but not limited to, the share pledge agreement regarding the shares in the Borrower for the benefit of Taronis).

(b)     All covenants and undertakings pursuant to the provisions of the Facility Agreement have been met and complied with.

(c)     No Default or Event of Default pursuant to the provisions of the Facility Agreement has been occurred or has not been remedied.

(d)     Provide copies of material contracts (the "**Material Contracts**").

(e)     No default under Material Contracts.

(f)     The Borrower shall cooperate with the Lender in order to obtain a standard high-level credit review by a German credit review company.

6.   **FURTHER CONDITIONS PRECEDENT FOR THE DRAWDOWN OF FACILITY B**

(a)     Delivery of a Utilisation Request.

(b)     Evidence of the payment of EU-Grant Tranche 1.

(c)     Payment of Repayment Tranche 1 under the Facility Agreement.

(d)     Submission of a copy of the amendment no. 4 to the EU-Grant Agreement signed by the Borrower and the Agency.

(e)     The Borrower shall provide the Lender with the following information(which shall be approved by a third party monitor):

(i)     Financial statements of Borrower (balance sheet, P&L, etc.).

- 39 -

(ii)     Updated Project costs.

(iii)    Timeline and cashflow structure for the Project costs

(iv)     Calendar for expected payments from the EU-Grant and the corresponding dates for requesting such payments as allowed under the EU-Grant Agreement.

(v)      Chart of obligations of the Borrower under the EU-Grant Agreement and estimated date for compliance if not complied with yet.

(vi)     List of conditions for each payment under the EU-Grant Agreement.

(vii)    List of all financial obligations of the Borrower and dates for payment under the terms of each.

(viii)   List of any obligations under any other agreements related to level of indebtedness of Borrower, or capitalization.

## Schedule 2 – Utilisation Request

From:   [***]

To:      Municipal Employee's Retirement System of Michigan ("MERS") as Lender

Dated: [***]

Dear Sirs

### BRIDGE LOAN FACILITY AGREEMENT DATED [***] (THE "AGREEMENT")

1.      We refer to the Agreement. This is a Utilisation Request. Terms defined in the Agreement have the same meaning in this Utilisation Request unless given a different meaning in this Utilisation Request.

2.      We wish to borrow a Loan under the Facility on the following terms:

Proposed Utilisation Date:            [***] (or, if that is not a Business Day, the next Business Day)

Amount:                                        EUR [***]

[Purpose of Loan and amount to be applied   [***]
to each purpose]

3.      We confirm that:

(a)      each condition specified in Clause 5(b), 5(c) and 5(e) of Schedule 1 – *Conditions Precedent* of the Agreement is satisfied on the date of this Utilisation Request; and

(b)      the proceeds of this Loan are to be applied for a purpose or purposes which is/are in accordance with Clause 2.2(*Purpose*) of the Agreement.

4.      The proceeds of this Loan should be credited to the Loan Bank Account.

5.      This Utilisation Request is irrevocable.


Yours faithfully


…………………………………
For and on behalf of
[***]

**Schedule 3 – Existing Security**

| Security | Total principal amount of indebtedness secured |
|---|---|
| Share pledge agreement, entered into between Talon Ventures & Consulting GmbH as pledgor, Taronis (formerly MagneGas Corporation, a Delaware corporation) as pledgee and the Borrower as company signed 27 September 2018 and notarized on 27 September 2018 regarding the shares in the Borrower | EUR 1.169.233,65 |
| Account pledge agreement, entered into between the Borrower as pledgor and Taronis (formerly MagneGas Corporation, a Delaware corporation) as pledgee regarding the account in the name of the Borrower with the Volksbank-Raiffeisenbank im Kreis Rendsburg eG with the account no. 6015324556 | EUR 700,103.65 |

- 42 -

## Schedule 4 – Existing Financial Indebtedness

The Existing Financial Indebtedness of today (09 November 2020) is listed in the following Table.

| Existing Loans | | | | | | |
|---|---|---|---|---|---|---|
| Lender | Borrower | Dated | Loan Amount | Interest Rate | Principal Due Date | Comment |
| Investitionsbank Schleswig Holstein | Infinite Fuels | | 200.000,00 € | 6,42% | 17.03.23 | deposited as cash deposit with VR-Bank Schleswig-Mittelholstein eG |
| Talon Ventures & Consulting GmbH | Infinite Fuels | 06.03.19 | 1.536,11 € | 5,0% | 31.12.20 | |
| Talon Ventures & Consulting GmbH | Infinite Fuels | 14.03.19 | 30.000,00 € | 5,0% | 31.12.20 | |
| Talon Ventures & Consulting GmbH | Infinite Fuels | 14.03.19 | 2.142,00 € | 5,0% | 31.12.20 | |
| Talon Ventures & Consulting GmbH | Infinite Fuels | 29.03.19 | 800,00 € | 5,0% | 31.12.20 | |
| Andreas Noky | Infinite Fuels | 03.04.19 | 3.201,89 € | 5,0% | 31.12.20 | |
| Talon Ventures & Consulting GmbH | Infinite Fuels | 08.05.19 | 9.951,37 € | 5,0% | 31.12.20 | |
| Talon Ventures & Consulting GmbH | Infinite Fuels | 23.05.19 | 51,49 € | 5,0% | 31.12.20 | |
| Talon Ventures & Consulting GmbH | Infinite Fuels | 27.05.19 | 19,90 € | 5,0% | 31.12.20 | |
| Andreas Noky | Infinite Fuels | 31.05.19 | 650,12 € | 5,0% | 31.12.20 | |
| Talon Ventures & Consulting GmbH | Infinite Fuels | 06.06.19 | 20.941,10 € | 5,0% | 31.12.20 | |
| Andreas Noky | Infinite Fuels | 30.06.19 | 1.011,65 € | 5,0% | 31.12.20 | |
| Talon Ventures & Consulting GmbH | Infinite Fuels | 06.06.19 | 13.901,37 € | 5,0% | 31.12.20 | |
| Talon Ventures & Consulting GmbH | Infinite Fuels | 27.06.19 | 8.875,58 € | 5,0% | 31.12.20 | |
| Talon Ventures & Consulting GmbH | Infinite Fuels | 12.07.19 | 3.253,94 € | 5,0% | 31.12.20 | |
| Talon Ventures & Consulting GmbH | Infinite Fuels | 24.07.19 | 5.355,00 € | 5,0% | 31.12.20 | |
| Andreas Noky | Infinite Fuels | 31.07.19 | 962,56 € | 5,0% | 31.12.20 | |
| Talon Ventures & Consulting GmbH | Infinite Fuels | 26.08.19 | 5.355,00 € | 5,0% | 31.12.20 | |
| Talon Ventures & Consulting GmbH | Infinite Fuels | 24.10.19 | 22.522,50 € | 15,0% | 31.12.20 | |
| Talon Ventures & Consulting GmbH | Infinite Fuels | 26.10.19 | 59,50 € | 12,0% | 31.12.20 | |
| Talon Ventures & Consulting GmbH | Infinite Fuels | 07.11.19 | 181,83 € | 15,0% | 31.12.20 | |
| Andreas Noky | Infinite Fuels | 14.11.19 | 1.250,19 € | 5,0% | 31.12.20 | |
| Talon Ventures & Consulting GmbH | Infinite Fuels | 22.11.19 | 18.000,00 € | 15,0% | 31.12.20 | |

| | | | | | | |
|---|---|---|---|---|---|---|
| Talon Ventures & Consulting GmbH | Infinite Fuels | 20.12.19 | 33.247,03 € | 12,5% | 31.12.20 | |
| Andreas Noky | Infinite Fuels | 23.12.19 | 15.695,79 € | 15,0% | 31.12.20 | |
| Andreas Noky | Infinite Fuels | 12.02.20 | 1.086,66 € | 15,0% | 31.12.20 | |
| Andreas Noky | Infinite Fuels | 10.03.20 | 12.846,82 € | 15,0% | 31.12.20 | |
| Talon Ventures & Consulting GmbH | Infinite Fuels | 06.04.20 | 12.579,34 € | 12,5% | 31.12.20 | |
| Talon Ventures & Consulting GmbH | Infinite Fuels | 06.04.20 | 4.550,00 € | 12,5% | 31.12.20 | |
| Talon Ventures & Consulting GmbH | Infinite Fuels | 20.04.20 | 4.500,00 € | 12,5% | 31.12.20 | |
| Talon Ventures & Consulting GmbH | Infinite Fuels | 15.05.20 | 194.317,84 € | 12,5% | 31.12.20 | |
| Bernd Laufenberg | Infinite Fuels | 04.06.20 | 300.000,00 € | 5,0% | 31.12.20 | |
| Talon Ventures & Consulting GmbH | Infinite Fuels | 29.06.20 | 30.000,00 € | 5,0% | 31.12.20 | Personal Loan Business Partner of Andreas Noky and Matthias Mueller |
| Andreas Noky | Infinite Fuels | 22.07.20 | 2.112,73 € | 15,0% | 31.12.20 | |
| Talon Ventures & Consulting GmbH | Infinite Fuels | 14.08.20 | 83.993,64 € | 5,0% | 31.12.20 | |
| Andreas Noky | Infinite Fuels | 20.08.20 | 5.537,85 € | 15,0% | 31.12.20 | |
| Talon Ventures & Consulting GmbH | Infinite Fuels | 30.08.20 | 51.035,83 € | 12,5% | 31.12.20 | |
| Talon Ventures & Consulting GmbH | Infinite Fuels | 10.09.20 | 527,00 € | 12,5% | 31.12.20 | |
| Andreas Noky | Infinite Fuels | 16.09.20 | 1.995,71 € | 15,0% | 31.12.20 | |

The loans were raised to cover the operating costs of Infinite Fuels GmbH.

| Lender | Borrower | Dated | Loan Amount | Interest Rate | Principal Due Date | Comment |
|---|---|---|---|---|---|---|
| Investitionsbank Schleswig Holstein | Infinite Fuels | 26.09.2018 | 200.000,00 € | 6,42% | 17.03.23 | deposited as cash deposit with VR-Bank Schleswig-Mittelholstein eG |
| Taronis Technologies Inc | Infinite Fuels | 26.09.2018 | 700,103.65 € | 0,0% | After the EU returns the Guarantee | deposited as cash deposit with VR-Bank Schleswig-Mittelholstein eG |

The loans from IB-SH and Taronis were raised and deposited with the VR-Bank Schleswig Mittelholstein as collateral for the guarantee for the LIFE project.

- 54 -

**Schedule 5 – Transaction Security**

1.  The credit balances standing to the credit of the Operational Accounts shall be pledged to the Lender as Transaction Security by way of a first-ranking pledge in a separate account pledge agreement. The pledge must be notified to, and be confirmed by, the respective Account Bank.

2.  The credit balances standing to the credit of the Pledged and Blocked Account shall be pledged to and blocked in favour of the Lender as Transaction Security by way of a first-ranking pledge in a separate account pledge agreement. The pledge must be notified to, and be confirmed by, the Account Bank.

## Schedule 6 – Know-your-customer-check/Anti-money-laundering

1. **DECLARATION ON SOURCE OF FUNDS**

   The Borrower hereby declares that the equity and cash flow do not come from sources of money laundering, terrorist financing or other criminal acts within the meaning of section 25h German Banking Act (KWG) in particular (non-exhaustive catalogue):

   - Counterfeiting of money and official stamps (sec. 146 - 152b German Criminal Act – "StGB"),

   - Violation of privacy (sec. 201 - 204 German Criminal Act – "StGB"),

   - Theft and unlawful appropriation (sec. 242 - 248c German Criminal Act – "StGB"),

   - Robbery and blackmail (sec. 249 - 256 German Criminal Act – "StGB"),

   - Fraud and embezzlement (sec. 263 – 266a German Criminal Act – "StGB"),

   - Economic offenses against general interests (sec. 266b, 264a German Criminal Act – "StGB"),

   - Forgery (sec. 267 - 282 German Criminal Act – "StGB"),

   - Offenses against the competition law (sec. 298 - 302 German Criminal Act – "StGB"),

   - Offences in the State of Insolvency (sec. 283 - 283d German Criminal Act – "StGB"),

   - Corruption, taking and given bribes (sec. 331 - 336 German Criminal Act – "StGB"),

   - Tax offenses (sec. 369-376 German Tax Act – "AO").

2. **DETAILS REGARDING THE ECONOMIC BENEFICIARY/-IES**

   (a) An "economic beneficiary" is the individual who ultimately owns or controls the Borrower, or on the initiative of whom the loan is raised. If the Borrower is a legal entity, control/ownership will be assumed to exist if an individual, directly or indirectly, holds more than 25 % of the capital shares or controls more than 25 % of the voting rights.

   (b) Such control thresholds do not apply for incorporated foundations under civil law and for legal structures under which assets are managed or distributed by way of a trust (*treuhänderisch*) and for similar legal structures (sec. 3, subsec. 3 German Money Laundering Act ("*Geldwäschegesetz*" – GWG)). In such legal structures, "economic beneficiaries" are:

   (i) any natural person which acts as trustee (*Treugeber*), custodian of a trust (Trustee) or protector, to the extent applicable;

   (ii) any natural person which is member of the board of a foundation;

   (iii) any natural person which was determined as beneficiary;

   (iv) the group of natural persons, for whoms benefit the assets shall be managed or distributed to the extent such natural person which shall become beneficiary of the managed assets has not been determined; and

(v)     any natural person which otherwise directly or indirectly exerts dominant influence on the management of the assets or the distribution of proceeds.

(c)     In the event of multi-level shareholding structures, any person which holds the majority of the shares at the intermediary company and, therefore, controls such company, is regarded as the "economic beneficiary". A material shareholding is assumed if the shareholding in an intermediary company is at least 25 %. For foundations and similar legal structures sec. 3, subsec. 3 German Money Laundering Act ("*Geldwäschegesetz*" – GWG) does also apply in the event of multi-level shareholdings.

(d)     If even after performance of a comprehensive assessment no natural person has been ascertained as "economic beneficiary", according to sec. 3, subsec. 2 German Money Laundering Act ("*Geldwäschegesetz*" – GWG) the legal representative, the managing partner or the partner of the relevant contracting party is regarded as "economic beneficiary".

3.     ACTING ON THE INITIATIVE OF ANOTHER

The Borrower hereby declares as follows:

☒     I act in my own economic interests, and not on the initiative of a third party; in particular, I do not act in the capacity as a trustee.

☐     I act on the initiative of the following individual or legal entity. If acts are performed on the initiative of a legal entity, additional details regarding such legal entity's ownership/control structure must be included separately in accordance with the information under this Clause 3.

Name and address/seat of the individual/legal entity on the initiative of whom/which the loan is raised:

_____

The applicable option must be ticked. Any changes to the information under this Clause 3 must be notified to the Lender without undue delay and in writing.

4.     ADDITIONAL DETAILS REGARDING THE OWNERSHIP OR CONTROL IF THE BORROWER IS A LEGAL ENTITY

The Borrower

☐     is listed on an organised market within the meaning of sec. 2, subsec. 5 German Securities Trading Act ("*Wertpapierhandelsgesetz*" – WpHG), or on a market in a third country which has the same transparency requirements as the requirements under Community law in relation to the voting rights, or equivalent international standards.

Stock market / Market segment          Stock exchange / Abbreviation

_____          _____

_____          _____

☐     is a bank or another business enterprise within the meaning of annex 1 No. 1 lit. a of the German Money Laundering Act ("*Geldwäschegesetz*" – GWG).

- 47 -

☐    is a public administration authority within the meaning of annex 1 No. 1 lit. b of the German Money Laundering Act ("*Geldwäschegesetz*" – GWG).

☐    has no identifiable economic beneficiary, as the participation thresholds - also in the event of multi-level shareholdings - are not exceeded (i.e., no more than 25 % of the capital shares or voting rights) and no other actual control is recognisable.

☐    is a foundation or a similar legal structure under which assets are managed or distributed by way of a trust ("*treuhänderisch*") or a similar legal form or a similar legal structure is part of a multi-level shareholding.

| First and last name | Function (e.g. trustor, beneficiary) | Shareholding or preference quota / shares / voting rights - directly/indirectly | Additional identification characteristics (date and place of birth, nationality, address) |
|---|---|---|---|
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |

☒    is not covered by any of the aforementioned regulations. The economic beneficiary is/The economic beneficiaries are pursuant to sec. 3 German Money Laundering Act ("~~Wertpapierhandelsgesetz~~ – ~~WpHG~~) the following individual[s].
"Geldwäschegesetz" GWG

| First and last name | Shareholding or preference quota / shares / voting rights - directly/indirectly | Additional identification characteristics (date of birth, address) |
|---|---|---|
| Thomas Müller | 98,3 % | 02.02.1960, Kollenrodtstraße 54, 30163 Hannover |
|  |  |  |
|  |  |  |
|  |  |  |

Additional details regarding the Borrower's ownership and control structure:

☐    see separate annex

Any changes to the information under this Clause 4 must be notified to the Lender without undue delay and in writing.

Hogan Lovells

5.  **INFORMATION ABOUT THE GERMAN IDENTIFICATION NUMBER ACCORDING TO SECTION 139B GERMAN TAX CODE ("*ABGABENORDNUNG*" – AO) AND GERMAN ECONOMIC IDENTIFICATION NUMBER ACCORDING TO SECTION 139C GERMAN TAX CODE ("*ABGABENORDNUNG*" – AO)**

The Borrower is obligated to provide the Lender with the following data for each account holder, every other person entitled to dispose over the accounts and every "economic beneficiary" according to sec. 3 German Money Laundering Act ("*Geldwäschegesetz*" – GWG):

(i)     for a natural person the German identification number according to sec. 139b German Tax Code ("*Abgabenordnung*" – AO); and

(ii)    the German economic identification number according to sec. 139c German Tax Code ("*Abgabenordnung*" – AO) or, if no German economic identification number has been assigned yet and the respective person is not a natural person, the German tax number applicable to the taxation on the income.

Any change to the data information in accordance with this Clause 5 must be notified to the Lender without undue delay and in writing.

---

Frankfurt a.M. _____, 13.11.20 _____
(place)                              (date)

_____
(signature)

by:    Andreas Noky, CEO _____
       (name of representative in block letters with function)

- 49 -

*(Signature Page)*

**LENDER**

**MUNICIPAL EMPLOYEE'S RETIREMENT SYSTEM OF MICHIGAN ("MERS")**

*Zurich*, *12-11-2000*
(place)    (date)

_____, _____
(place)    (date)

_____
(signature)

_____
(signature)

by: _____
(name of representative in block letters with function)

by: _____
(name of representative in block letters with function)

**(Signature Page)**

**BORROWER**

**INFINITE FUELS GMBH**

Frankfurt a.M. , 13.11.2020          _____ , _____
*(place)*      *(date)*                    *(place)*              *(date)*

_____          _____
*(signature)*                              *(signature)*

by:  Andreas Noky, CEO                by:  _____
*(name of representative in block letters with*    *(name of representative in block letters with*
*function)*                                *function)*