# **<u>EXHIBIT 21</u>**

CONFIDENTIAL

# STOCK PURCHASE AGREEMENT

This Stock Purchase Agreement (this "Agreement"), dated as of December 28, 2021, is entered into by and among CB Patent Investments LLC, a Nevada limited liability company ("Purchaser"), Western Energy Solutions, LLC, a California limited liability company ("Seller"). Each of Purchaser and Seller are referred to herein as a "Party", and collectively as the "Parties".

## RECITALS

WHEREAS, reference is made to Concord Blue Energy, Inc., a Delaware corporation (the "Company"), which has issued common stock, par value $0.01 per share (the "Shares");

WHEREAS, Seller is the holder of 8,500 Shares (the "Purchased Interests");

WHEREAS, Seller desires to sell to Purchaser, and Purchaser wishes to purchase from Seller, all Shares held by Seller, subject to the terms and conditions set forth herein; and

NOW, THEREFORE, in consideration of the mutual covenants and agreements hereinafter set forth and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

## ARTICLE I
## DEFINED TERMS

1.01   Defined Terms. As used in this Agreement, the following terms have the meanings set forth below:

"Affiliate" means, with respect to any Person, any other Person controlling, controlled by, or under common control with such Person. For purposes of this definition and the Agreement, the term "control" (and correlative terms) means the power, whether by contract, equity ownership, or otherwise, to direct the policies or management of a Person. The term "Affiliate" shall be deemed to include current and future "Affiliates".

"Agreement" has the meaning set forth in the Preamble.

"Business Day" means any day other than (a) a Saturday, Sunday, or a federal holiday or (b) a day on which commercial banks in New York, New York or Zurich, Switzerland are authorized or required to be closed.

"Claims" has the meaning set forth in Section 6.01(a).

"Closing" has the meaning set forth in Section 2.03.

"Closing Date" has the meaning set forth in Section 2.03.

"Company" has the meaning set forth in the Recitals.

"Contract" means any written, oral, or other agreement, contract, license, sublicense, subcontract, settlement agreement, lease, power of attorney, understanding, arrangement, instrument, note, purchase order, warranty, insurance policy, benefit plan, or legally binding commitment or undertaking of any nature.

1

"Damages" includes any loss, damage, injury, Liability, claim, demand, settlement, judgment, award, fine, penalty, tax, fee (including reasonable attorneys' fees), charge, cost (including costs of investigation), or Expense of any nature.

"Entity" means any corporation (including any non-profit corporation), general partnership, limited partnership, limited liability partnership, joint venture, estate, trust, company (including any limited liability company, or joint stock company), firm or other enterprise, association, organization, or entity.

"Exchange Act" means the Securities and Exchange Act of 1934, as amended, or any successor Law, and the rules and regulations promulgated thereunder.

"Equity Interests" means shares of capital stock, membership interests in a limited liability company, partnership interests, beneficial interests in a trust, or other equity ownership interests in a Person, and any warrants, options, or other rights entitling the holder thereof to purchase or acquire any such Equity Interest or any stock appreciation, phantom stock, profit participation, or similar rights with respect to the capital stock of, or other equity or voting interest in any Person.

"Expense" means any fee, cost, expense, payment, expenditure, or Liability.

"GAAP" means generally accepted accounting principles in the United States in effect as of the applicable date of determination or in effect for the applicable period under consideration, as appropriate.

"Governmental Entity" means any: (a) multinational or supranational body exercising legislative, judicial, or regulatory powers; (b) nation, state, commonwealth, province, territory, county, municipality, district, or other jurisdiction of any nature; (c) federal, state, provincial, local, municipal, foreign, or other government; (d) instrumentality, subdivision, department, ministry, board, court, administrative agency, regulatory authority, or commission, or other governmental entity, authority, or instrumentality or political subdivision thereof; or (e) any professional association or quasi-governmental or private body exercising any executive, legislative, judicial, regulatory, taxing, importing, or other governmental functions.

"Information" has the meaning set forth in Section 3.07(d).

"Investment Advisers Act" means the Investment Advisers Act of 1940, as amended, or any successor law, and the rules and regulations promulgated thereunder.

"Investment Company Act" means the Investment Company Act of 1940, as amended, or any successor Law, and the rules and regulations promulgated thereunder.

"Law" means any federal, state, local, municipal, foreign, supranational or other law, statute, constitution, treaty, principle of common law, directive, resolution, ordinance, code, edict, Order, rule, guideline, guidance, regulation, sanction, or requirement issued, enacted, adopted, promulgated, entered, implemented, or otherwise put into effect by or under the authority of any Governmental Entity.

"Legal Proceeding" means any action, suit, litigation, arbitration, claim, assessment, proceeding (including any civil, criminal, administrative, investigative, or appellate proceeding), hearing, inquiry, audit, examination, or investigation commenced, brought, conducted or heard by or before, or otherwise involving, any court or other Governmental Entity or any arbitrator or arbitration panel.

"Liability" means any debt, obligation, duty, or liability of any nature (including any unknown,

undisclosed, unmatured, unaccrued, unasserted, contingent, indirect, conditional, implied, vicarious, derivative, joint, several, or secondary liability), regardless of whether such debt, obligation, duty, or liability would be required to be disclosed on a balance sheet prepared in accordance with GAAP and regardless of whether such debt, obligation, duty, or liability is immediately due and payable.

"Lien" means any lien, pledge, hypothecation, charge, mortgage, deed of trust, easement, encroachment, security interest, encumbrance, license, possessory interest, conditional sale, or other title retention arrangement, intangible property right, claim, infringement, option, right of first refusal, preemptive right, community property interest, or restriction of any nature (including any restriction on the voting of any security or restriction on the transfer, use, or ownership of any security or other asset).

"Order" means any order, writ, injunction, judgment, edict, decree, ruling, or award of any arbitrator or any court or other Governmental Entity.

"Party" and "Parties" each has the meaning set forth in the Preamble.

"Permit" means (a) any permit, license, approval, certificate, franchise, permission, clearance, Consent, registration, variance, sanction, exemption, Order, qualification, or authorization issued, granted, given, or otherwise made available by or under the authority of any Governmental Entity or pursuant to any applicable Law or (b) any right under any Contract with any Governmental Entity.

"Person" means any individual, Entity or Governmental Entity.

"Purchase Price" has the meaning set forth in Section 2.02(a).

"Purchased Interests" has the meaning set forth in the Recitals.

"Purchaser" has the meaning set forth in the Preamble.

"Releasees" has the meaning set forth in Section 6.01(a).

"Releasors" has the meaning set forth in Section 6.01(a).

"Securities Act" means the Securities Act of 1933, as amended, or any successor Law, and the rules and regulations promulgated thereunder.

"Securities Laws" means the Securities Act, the Exchange Act, the Investment Advisers Act, the Investment Company Act, state "blue sky" securities and investment advisory Laws, all similar foreign securities Laws, and the rules and regulations promulgated thereunder and the rules and regulations of the Toronto Stock Exchange and the New York Stock Exchange.

"Seller" has the meaning set forth in the Preamble.

"Shares" has the meaning set forth in the Recitals.

"Transactions" has the meaning set forth in Section 2.01.

## ARTICLE II
## PURCHASE AND SALE

2.01   Purchase and Sale. Subject to the terms and conditions set forth herein, at the Closing (as defined herein), Seller shall sell to Purchaser, and Purchaser shall purchase from Seller, all of Seller's

3

right, title and interest in and to all Shares held by such Seller, free and clear of any Liens, for the consideration specified in Section 2.02 (the "Transactions").

      2.02    Purchase Price.

      (a)    The aggregate purchase price for all Purchased Interests shall be Two Hundred Thousand dollars ($200,000) (the "Purchase Price"), payable to Sellers.

      (b)    Purchaser shall pay the Purchase Price, or cause the Purchase Price to be paid, to Seller at the Closing in cash, by wire transfer of immediately available funds to the account set forth on Schedule B.

      2.03    Closing. The closing of the Transactions (the "Closing") shall take place simultaneously with the execution of this Agreement on the date of this Agreement (the "Closing Date"). The consummation of the Transactions shall be deemed to occur at 12:01 a.m. Pacific Time on the Closing Date.

      2.04    Transfer Taxes. Seller shall pay for any sales, use or transfer taxes, documentary charges, recording fees or similar taxes, charges, fees or expenses, if any, that become due and payable as a result of the Transactions.

      2.05    Withholding Taxes. Purchaser shall be entitled to deduct and withhold from the Purchase Price all taxes that Purchaser may reasonably determine to be required to deduct and withhold under any provision of tax Law. All such withheld amounts shall be treated as delivered to Seller hereunder.

## ARTICLE III
## REPRESENTATIONS AND WARRANTIES OF THE SELLERS

      Seller hereby represents and warrants to and for the benefit of Purchaser, that the following statements contained in this ARTICLE III are true and correct as of the date hereof.

      3.01    Authority; Enforceability. Seller has all requisite power, authority, and capacity to enter into this Agreement, to carry out its obligations hereunder and to consummate the Transactions. This Agreement has been duly executed and delivered by Seller, and this Agreement constitutes legal, valid and binding obligations of Seller, enforceable against Seller in accordance with its terms.

      3.02    No Conflicts; Consents. The execution, delivery and performance by Seller of this Agreement, and the consummation of the Transactions, do not and will not: (a) violate or conflict with any Law applicable to Seller; (b) conflict with, or result in (with or without notice or lapse of time or both) any violation of, or default under, or give rise to a right of termination, acceleration or modification of any obligation or loss of any benefit under any Contract to which Seller is a party; (c) result in any violation, conflict with or constitute a default under the Company's organizational documents; or (d) result in the creation or imposition of any Lien on the Purchased Interests, or any portion thereof. No consent, approval, waiver or authorization is required to be obtained by Seller from any Person in connection with the execution, delivery and performance by Seller of its obligations under this Agreement or the consummation of the Transactions.

      3.03    Legal Proceedings. There is no Legal Proceeding of any nature pending or, to Seller's knowledge, threatened against or by Seller or any Affiliate thereof (a) relating to or affecting the Purchased Interests; or (b) that challenges or seeks to prevent, enjoin or otherwise delay the Transactions. No event has occurred or circumstances exist that may give rise to, or serve as a basis for, any such Legal

Proceeding.

    3.04    <u>Ownership of Purchased Interests</u>.

    (a)    Seller owns of record and beneficially and has good, valid, and marketable title to the Equity Interests of the Company that are set forth set forth opposite its name on <u>Schedule A</u>, free and clear of all Contracts, options, warrants, calls, puts, convertible or exchangeable securities, subscriptions, rights (including any preemptive rights), other plans or commitments, or claims of any character, contingent or otherwise and other Liens, except for any restrictions on transfer of such Equity Interests of the Company under applicable Securities Laws.

    (b)    Seller is the sole legal, beneficial, record and equitable owner of the Purchased Interests set forth opposite its name on <u>Schedule A</u>, free and clear of all Liens.

    (c)    There are no voting trusts, proxies or other agreements or understandings in effect with respect to the voting or transfer of any of the Purchased Interests set forth opposite Seller's name on <u>Schedule A</u>.

    (d)    No Person has, or has asserted, any right, title, claim, equity or interest in the Purchased Interests set forth opposite Seller's name on <u>Schedule A</u>, or the proceeds thereof.

    (e)    Seller has not signed a power of attorney or other authorization respecting the Purchased Interests set forth opposite Seller's name on <u>Schedule A</u> that is now outstanding and in force.

    (f)    Other than Seller or as otherwise contemplated by this Agreement, no Person is entitled to receive any payment or consideration from Purchaser or the Company as a result of or in connection with the Transactions.

    3.05    <u>The Company</u>.

    (a)    The Company (i) is duly organized, and validly existing, and in good standing (or equivalent status), under the laws of the State of Delaware; (ii) has the requisite corporate power and authority to own, lease and operate its properties and to carry on its business as now being conducted and as currently planned by the Company to be conducted; and (iii) is duly qualified, licensed, and admitted to do business, and is in good standing (or equivalent status), in each jurisdiction in which such qualification, license, or admission is necessary.

    (b)    The Company has Made Available to Purchaser accurate and complete copies of the Company's organizational documents. All actions taken and all transactions entered into by the Company have been duly approved by all necessary action of the managers, members, or officers of the Company, as applicable.  There have been no material violations of any provision of any of the Company's organizational documents and the Company has not taken any actions that are inconsistent in any material respect with any resolution adopted by the managers, members, or officers of the Company, as applicable.

    (c)    There are no outstanding powers of attorney executed by or on behalf of the Company in favor of another Person.

    (d)    There is not currently, and since January 1, 2017 there has not been, any Legal Proceeding pending or threatened in writing, or, to the knowledge of Seller, threatened orally (i)

5

against the Company or any current or former employee, manager, or officer of the Company and which relates to the Company or (ii) that involves any of the assets owned or used in any material manner by the Company.

(e) The Company, and solely in connection with the business of the Company, each manager and each officer of the Company (i) is, and at all times has been, in material compliance with all applicable Laws, (ii) is not subject to any cease-and-desist or other written Order issued by, or party to any Contract, consent agreement or memorandum of understanding with, or party to any commitment letter or similar written undertaking to, or subject to any written Order or directive by, or a recipient of any supervisory letter from or has adopted any resolutions at the request of, any Governmental Entity and, to the knowledge of Seller, none of them is threatened with the imposition or receipt of any of the foregoing, and (iii) to the knowledge of Seller (A) is not subject to any notice of investigation by any Governmental Entity, nor (B) has any such investigation been initiated or threatened.

(f) The Company holds, to the extent required by applicable Laws, all Permits from, and has made all declarations and filings with, all Governmental Entities that are required to be held or made for the operation of its business as currently conducted.

3.06 Brokers. No broker, finder or investment banker is entitled to any brokerage, finder's or other fee or commission in connection with the Transactions based upon arrangements made by or on behalf of Seller.

3.07 Non-Reliance.

(a) Seller (i) has such knowledge and experience in financial and business matters as to be capable of evaluating the merits, risks and suitability of the Transactions, (ii) has received and carefully reviewed such information that he and his advisers deem necessary to make the decision to enter into this Agreement and to consummate the Transactions, and (iii) is consummating the Transactions with a full understanding of all of the terms, conditions and risks and willingly assumes those terms, conditions and risks.

(b) Seller has evaluated the merits and risks of the Transactions based exclusively on their own independent review and consultations with such investment, legal, tax, accounting and other advisers as it deemed necessary, and Seller is able to bear the economic risks associated with the sale. Seller has made its own decision concerning the Transactions without reliance on any representation or warranty of, or advice from, Purchaser or the Company.

(c) Neither Purchaser, nor the Company, nor any of their respective Affiliates, officers, directors, principals, equityholders, employees or agents has been requested to or has provided Seller with any information or advice with respect to the Purchased Interests, nor is such information or advice necessary or desired.

(d) Seller acknowledges and understands that (i) the Company may possess material nonpublic information regarding the Company that may not be known to Seller that may substantially impact the value of the Purchased Interests, including (A) information received by principals and employees of the Company in their capacities as directors, officers, significant equityholders or Affiliates of the Company and (B) information received on a privileged basis from the attorneys and financial advisers representing the Company and the board of managers of the Company (collectively, the "Information"), and (ii) neither the Company, nor any other Person, is disclosing such Information, if any, to Seller. Notwithstanding the foregoing, Seller has

deemed it appropriate to enter into this Agreement and to consummate the Transactions.

(e)  Seller acknowledges that Purchaser is relying upon, without limitation, the representations and warranties contained in this ARTICLE III in engaging in the Transactions and would not engage in the Transactions in the absence of such representations and warranties.

3.08  No Other Representations or Warranties. Except for the representations and warranties contained in this ARTICLE III, none of Seller, nor any agent of any Seller, has made or makes any other express or implied representation or warranty, either written or oral, on behalf of Seller.

## ARTICLE IV
## REPRESENTATIONS AND WARRANTIES OF PURCHASER

Purchaser hereby represents and warrants to and for the benefit of Seller, that the following statements contained in this ARTICLE IV are true and correct as of the date hereof.

4.01  Organization and Authority of Purchaser; Enforceability. Purchaser has all requisite power, authority, and capacity to enter into this Agreement, to carry out its obligations hereunder and to consummate the Transactions. This Agreement has been duly executed and delivered by Purchaser, and (assuming due authorization, execution and delivery by Seller) this Agreement constitutes legal, valid and binding obligations of Purchaser enforceable against Purchaser in accordance with its terms.

4.02  No Conflicts; Consents. The execution, delivery and performance by Purchaser of this Agreement, and the consummation of the Transactions, do not and will not violate or conflict with any Law applicable to Purchaser. No consent, approval, waiver or authorization is required to be obtained by Purchaser from any Person in connection with the execution, delivery and performance by Purchaser of its obligations under this Agreement or the consummation of the Transactions.

4.03  Brokers. No broker, finder or investment banker is entitled to any brokerage, finder's or other fee or commission in connection with the Transactions based upon arrangements made by or on behalf of Purchaser.

## ARTICLE V
## CLOSING DELIVERABLES

5.01  Closing Deliverables of Seller. At the Closing, Seller shall deliver to Purchaser:

(a)  an IRS Form W-8 or W-9, duly executed by Seller; and

(b)  a stock power, in form and substance reasonably acceptable to Purchaser, duly executed by Seller, in respect of the Purchased Interests and in favor of Purchaser.

## ARTICLE VI
## CERTAIN COVENANTS

6.01  Release.

(a)  Seller, on behalf of itself and its Affiliates, subsidiaries, successors and assigns, and each of their respective, including former, directors, officers, managers, employees, attorneys, agents, representatives, successors and assigns (collectively, the "Releasors"), does

7

hereby forever release, remise, discharge, waive, and acquit Purchaser, the Company, Municipal Employees' Retirement System of Michigan, and CT Power GmbH, and each of their respective direct and indirect equity holders, subsidiaries, Affiliates and each of their respective, including former, directors, officers, managers, employees, attorneys, agents, representatives, successors and assigns (collectively, the "<u>Releasees</u>") from any and all actions, causes of action, suits, losses, liabilities, rights, debts, liabilities, dues, sums of money, accounts, reckonings, obligations, costs, expenses, fees liens, bonds, bills, specialties, covenants, contracts, controversies, agreements, promises, variances, trespasses, damages, judgments, extents, executions, claims, and demands, of every kind and nature whatsoever, known or unknown, foreseen or unforeseen, matured or unmatured, suspected or unsuspected, in law, admiralty, or equity (including any and all claims alleging violations of Securities Laws, common-law fraud or deceit, breach of fiduciary duty, negligence or otherwise), whether directly, derivatively, representatively or in any other capacity (collectively, "<u>Claims</u>"), which any of such Releasors ever had, now have, or hereafter can, shall, or may have against any of such Releasees from the beginning of time through the date hereof and going forward for all time, including for, upon, or by reason of any matter, cause, or thing, arising out of, related to or in connection with any Claim against Purchaser or the Company, other than any Claims arising out of this Agreement, including any rights (including any co-transfer, tag-along, drag-along, right of first offer, right of first refusal, pre-emptive, consent, or voting right, or right to receive notice) to which Seller may be entitled. Seller further agrees that none of the Releasees shall have any Liability whatsoever to the Releasors due to or in connection with the Releasees' use or non-disclosure of Information or otherwise as a result of the Transactions, and Seller hereby irrevocably releases, discharges and dismisses any and all Claims, which are based upon or arise from the failure the Company to disclose Information. Seller also agrees that it will not institute or maintain, or assist any Person to institute or maintain, any cause of action, suit, complaint or other proceeding against any Releasee as a result of the existence or substance of Information and the fact that Information has not been disclosed to Seller. Seller intends to effect, to the maximum extent permitted by applicable Law, a complete and knowing waiver of its rights thereto as set forth herein.

(b)     Each Releasor understands that it may later discover Claims or facts that may be different from, or in addition to, those that it or any other Releasor now knows or believes to exist regarding the subject matter of the release contained in this <u>Section 6.01</u>, and which, if known at the time of signing this Agreement, may have materially affected this Agreement and such Releasor's decision to enter into it and grant the release contained in this <u>Section 6.01</u>. Nevertheless, the Releasors intend to fully, finally and forever settle and release all Claims that now exist, may exist, or previously existed, as set out in the release contained in this <u>Section 6.01</u>, whether known or unknown, foreseen or unforeseen, or suspected or unsuspected, and the release given herein is and will remain in effect as a complete release, notwithstanding the discovery or existence of such additional or different facts. The Releasors hereby waive any right or Claim that might arise as a result of such different or additional Claims or facts.

(c)     Each Releasor (i) knows of no Claims against any one or more of the Releasees that are not covered by the release contained in this <u>Section 6.01</u>, and (ii) has neither assigned nor transferred any of the Claims released herein to any Person, and no Person has subrogated to or has any interest or rights in any Claims.

(d)     Each Releasor agrees that the release contained in this <u>Section 6.01</u> shall be and remain effective in all respects, notwithstanding such different or additional facts, or the discovery thereof, and further hereby expressly waives any and all rights provided in California Civil Code Section 1542, or any similar provision, which provides as follows:

8

A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS SETTLEMENT WITH THE DEBTOR.

6.02    Indemnification. Seller hereby agrees to indemnify Purchaser, its Affiliates and each of its respective officers, directors, employees, equityholders, other securityholders, members, agents, and representatives from and against any Damages suffered or incurred by any of the foregoing resulting from, related to or arising out of (a) any breach of any representation, warranty, covenant or agreement made by Seller in this Agreement, and (b) any claim asserted or held by any third party (i) alleging that they have any right, title or interest in or to the Purchased Interests or (ii) alleging or involving any prior sale of, ownership of, interest in or right to acquire any interests, shares, or other Equity Interests of the Company or Seller, or that is in any way inconsistent with, or that involves an allegation of facts inconsistent with, any information set forth in Schedule A.

# ARTICLE VII
Miscellaneous

7.01    Expenses. Except as otherwise provided in Section 2.04 and Section 6.02, each Party shall bear its own costs and expenses incurred in connection with this Agreement and the Transactions.

7.02    Further Assurances. Following the Closing, each of the Parties shall, and shall cause their respective Affiliates to, execute and deliver such additional documents, instruments, conveyances and assurances and take such further actions as may be reasonably required to carry out the provisions hereof and give effect to the Transactions.

7.03    Notices. All notices and other communications required or permitted to be given or made pursuant to this Agreement shall be made in writing signed by the sender and shall be deemed duly given (a) on the date delivered, if personally delivered, (b) the day that receipt is confirmed (with receipt confirmed by telephone or email) after being sent by email in portable document format (PDF), (c) on the Business Day after being sent by email in portable document format (PDF) if receipt is not confirmed prior to subsection (b) on the date sent, or (d) on the Business Day after being sent by Federal Express or another recognized overnight mail service that utilizes a written form of receipt for next day or next Business Day delivery, in each case addressed to the applicable Party at the address set forth below; provided, that a Party may change its address for receiving notice by the proper giving of notice hereunder:

If to Purchaser:

CB Patent Investments LLC
c/o Verdantf AG
Kobiboden 63
8840 Einsiedeln
Switzerland
Attention: Gaia Arnaboldi
Email: gaia@verdantf.com
Telephone: +41 79 555 3375

9

        with a copy (which shall not constitute notice) to:

            Hogan Lovells International LLP
            Karl-Scharnagl-Ring 5
            80539 Munich
            Germany
            Attention: Christian Herweg
            Email: christian.herweg@hoganlovells.com
            Telephone: +49 89 290 12 242

        If to Seller:

            Western Energy Solutions, LLC
            475 Washington Blvd
            Marina Del Rey, CA 90292
            Attention: Gregory Bilson
            Email: gbilson@western4solutions.com
            Telephone: 310-699-0060

      7.04    <u>Headings</u>. The headings in this Agreement are for reference only and shall not affect the interpretation of this Agreement.

      7.05    <u>Severability</u>. If any term or provision of this Agreement is invalid, illegal or unenforceable in any jurisdiction, such invalidity, illegality or unenforceability shall not affect any other term or provision of this Agreement or invalidate or render unenforceable such term or provision in any other jurisdiction. Upon such determination that any term or other provision is invalid, illegal or unenforceable, the Parties shall negotiate in good faith to modify the Agreement so as to effect the original intent of the Parties as closely as possible in a mutually acceptable manner in order that the Transactions be consummated as originally contemplated to the greatest extent possible.

      7.06    <u>Entire Agreement</u>. This Agreement constitutes the sole and entire agreement of the Parties with respect to the subject matter contained herein, and supersede all prior and contemporaneous understandings and agreements, both written and oral, with respect to such subject matter.

      7.07    <u>Successors and Assigns</u>. This Agreement shall be binding upon and shall inure to the benefit of the Parties and their respective successors and permitted assigns. Neither Party may assign its rights or obligations hereunder without the prior written consent of the other Party, which consent shall not be unreasonably withheld or delayed. No assignment shall relieve the assigning party of any of its obligations hereunder.

      7.08    <u>No Third-Party Beneficiaries</u>. This Agreement is for the sole benefit of the Parties and their respective successors and permitted assigns and nothing herein, express or implied, is intended to or shall confer upon any other Person any legal or equitable right, benefit or remedy of any nature whatsoever under or by reason of this Agreement. Notwithstanding the foregoing, the Parties acknowledge and agree that the Company is an intended third-party beneficiary of this Agreement, is entitled to the rights and benefits conferred upon it by this Agreement, may rely on the representations, warranties and covenants made in this Agreement, and may enforce the provisions of this Agreement as if it were a Party.

      7.09    <u>Amendment and Modification</u>. This Agreement may be amended only by an instrument in writing executed by the Parties, and supplemented only by documents delivered or to be delivered in

\\NY - 768610/000001 - 10397980 v4

accordance with the terms thereof.

7.10     Waiver. No waiver by any Party of any of the provisions hereof shall be effective unless explicitly set forth in writing and signed by the party so waiving. No waiver by any Party shall operate or be construed as a waiver in respect of any failure, breach or default not expressly identified by such written waiver, whether of a similar or different character, and whether occurring before or after that waiver. No failure to exercise, or delay in exercising, any right, remedy, power or privilege arising from this Agreement shall operate or be construed as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege.

7.11     Governing Law. This Agreement, and any action, arbitration, suit or other Legal Proceeding arising out of or relating to this Agreement (including the enforcement of any provision of this Agreement), any of the Transactions or the legal relationship of the Parties (whether at law or in equity, whether in contract or in tort, or otherwise), shall be governed by and construed and interpreted in accordance with the Laws of the State of New York irrespective of the choice of laws principles of the State of New York, as to all matters, including matters of validity, construction, effect, enforceability, performance and remedies and in respect of the statute of limitations or any other limitations period applicable to any claim, controversy or dispute.

7.12     Forum and Venue. Any action, suit or other Legal Proceeding arising out of or relating to this Agreement (including the enforcement of any provision of this Agreement), any of the Transactions or the legal relationship of the Parties (whether at law or in equity, whether in contract or in tort or otherwise), including an action, suit or other Legal Proceeding based upon fraud, intentional misrepresentation or willful misconduct, shall be brought or otherwise commenced exclusively in the state or federal courts located in in the borough of Manhattan in the State of New York or the United States Southern District of New York. Each Party: (a) expressly and irrevocably consents and submits to the jurisdiction of each state and federal court located in the borough of Manhattan in the State of New York or the United States Southern District of New York (and each appellate court located in the same) in connection with any such action, suit, or Legal Proceeding; (b) agrees that each state and federal court located in the borough of Manhattan in the State of New York or the United States Southern District of New York shall be deemed to be a convenient forum; and (c) agrees not to assert (by way of motion, as a defense, or otherwise), in any such action, suit, or Legal Proceeding commenced in any state or federal court located in the borough of Manhattan in the State of New York or the United States Southern District of New York, any claim that such Party is not subject personally to the jurisdiction of such court, that such action, suit, or Legal Proceeding has been brought in an inconvenient forum, that the venue of such action, suit, or Legal Proceeding is improper or that this Agreement or the subject matter of this Agreement may not be enforced in or by such court.

7.13     Waiver of Jury Trial. Each Party acknowledges and agrees that any controversy which may arise under this Agreement is likely to involve complicated and difficult issues and, therefore, each such party irrevocably and unconditionally waives any right it may have to a trial by jury in respect of any Legal Proceeding arising out of or relating to this Agreement or the Transactions.

7.14     Specific Performance. The Parties agree that irreparable damage would occur if any provision of this Agreement were not performed in accordance with the terms hereof and that the Parties shall be entitled to specific performance of the terms hereof, in addition to any other remedy to which they are entitled at law or in equity. Each Party (a) agrees that it shall not oppose the granting of such specific performance or relief and (b) hereby irrevocably waives any requirements for the security or posting of any bond in connection with such relief.

      7.15    <u>Counterparts</u>. This Agreement may be executed in two or more counterparts, each and all of which shall be deemed an original and all of which together shall constitute but one and the same instrument. A signature delivered by email of a PDF document shall be deemed an original signature hereto and such delivery shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

      7.16    <u>Construction</u>.

          (a)    <u>Gender; Plurals</u>. For purposes of this Agreement, whenever the context requires: the singular number shall include the plural, and vice versa; the masculine gender shall include the feminine and neuter genders; the feminine gender shall include the masculine and neuter genders; and the neuter gender shall include the masculine and feminine genders.

          (b)    <u>Ambiguities</u>. The Parties agree that any rule of construction to the effect that ambiguities are to be resolved against the drafting Party shall not be applied in the construction or interpretation of this Agreement.

          (c)    <u>Including</u>. As used in this Agreement, the words "include" and "including", and variations thereof, shall not be deemed to be terms of limitation, but rather shall be deemed to be followed by the words "without limitation".

          (d)    <u>Or</u>. As used in this Agreement, the word "or" shall mean "and/or".

          (e)    <u>References</u>. Except as otherwise indicated, all references to "Sections", "Schedules", and "Exhibits" in this Agreement or in any Schedule or Exhibit to this Agreement are intended to refer to Sections of this Agreement and Schedules and Exhibits to this Agreement, respectively. Any Contract, instrument, or statute defined or referred to in this Agreement means such Contract, instrument, or statute, in each case as from time to time amended, modified, or supplemented, including (in the case of Contracts or instruments) by waiver or consent and (in the case of statutes) by succession or comparable successor statutes. Any Contract or instrument defined or referred to in this Agreement shall include all exhibits, schedules, and other documents or Contracts attached thereto. Any statute defined or referred to in this Agreement shall include all rules and regulations promulgated thereunder.

          (f)    <u>Hereof</u>. The terms "hereof", "herein", "hereunder", "hereby", "herewith", and words of similar import shall, unless otherwise stated, be construed to refer to this Agreement as a whole and not to any particular provision of this Agreement.

          (g)    <u>Dollars; Exchange Rate</u>. Any references in this Agreement to "Dollars" or "$" shall be to U.S. dollars, unless otherwise specified.

          (h)    <u>Certain Measurements</u>. Unless otherwise specified in this Agreement, in computing any period of time described in this Agreement, the date that is the reference date in calculating such period, or the day of the act or event after which the designated period of time begins to run, will be excluded, and the last day of the period so computed will be included.

[<i>Remainder of page intentionally left blank</i>.]

IN WITNESS WHEREOF, the undersigned have executed and delivered this Stock Purchase Agreement as of the date first set forth above.

**PURCHASER**:

**CB PATENT INVESTMENTS LLC**

By: _____   _____
 Name: Gaia Arnaboldi                                     Berry Polmann
 Title:  Vice President                                         Vice President

[*Stock Purchase Agreement*]

IN WITNESS WHEREOF, the undersigned have executed and delivered this Stock Purchase Agreement as of the date first set forth above.

**SELLER:**

**WESTERN ENERGY SOLUTIONS, LLC**

By: _____
Name: Gregory Bilson
Title: Managing Member

*[Stock Purchase Agreement]*

\\NY - 768610/000001 - 10397980 v4

Schedule A

Capitalization of the Company

| Name of Shareholder of Concord Blue Energy, Inc. | Issued and Outstanding Common Stock, Par Value $0.01 of Concord Blue Energy, Inc. |
|---|---|
| Western Energy Solutions, LLC | 8,500 |
| Concord Blue Engineering, GmbH | 160,966 |
| Municipal Employees' Retirement System of Michigan | 346,072 |
| Stefan Burmester | 3,563 |
| | |
| TOTAL | 519,101 |

A-1

<u>Schedule B</u>

Wire Information

| <u>Seller</u> | <u>Wire Information</u> |
|---|---|
| Western Energy Solutions, LLC, a California limited liability company | Bank: Wells Fargo Bank<br>Account Name: Western Energy Solutions, LLC<br>Routing #: 121000248<br>Account #: 5205633489 |

B- 1

\\NY - 768610/000001 - 10397980 v4